No. 24-12617

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

AARON ZAHN

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Case No. 3:22-CR-00023-BJD-MCF

**PRINCIPAL BRIEF OF APPELLANT**

PAUL C. HUCK, JR.
SAMUEL J. SALARIO, JR.
JESSICA SLATTEN
ROBERT E. MINCHIN III
**LAWSON HUCK GONZALEZ, PLLC**
1700 South MacDill Ave., Ste. 240
Tampa, FL 33629
850-825-4334

*Counsel for Aaron Zahn*

Case No. 24-12617
*USA v. Zahn*

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for Appellant Aaron Zahn certifies that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Albritton, A. Brian

2. Allen, Andy

3. Bray, Angela

4. Breslow, Brandon Kyle

5. Campion, John

6. Chang, Emily

7. City of Jacksonville, Florida

8. City of Jacksonville, Council Auditor's Office

9. City of Jacksonville, Office of General Counsel

10. Cline, John D.

11. Corsmeier, Arnold B.

12. Creed & Gowdy

13. Davis, Brian J., Hon.

14. Dykes, Melissa

15. Duva, Tysen

Case No. 24-12617
*USA v. Zahn*

16. Green, April

17. Felman, James E.

18. Flanagan, Kelly

19. Foley & Lardner LLP

20. Gowdy, Bryan

21. Granat, Sean Bryan

22. Howard, Alan

23. Huck, Paul C., Jr.

24. Jacksonville Electric Authority

25. Jefferson, Raquel Ramirez

26. Johnson, Camille-Lee

27. Kynes, Markman & Felman, P.A.

28. Law Office of John D. Cline

29. Lawson Huck Gonzalez, PLLC

30. Licandro, Catherine M.

31. McBride, Mitchell

32. Minchin III, Robert E.

33. Murphy, Niels P.

34. Nelson, Mullins, Riley & Scarborough, LLP

35. Newbill, Fredrick, Rev.

Case No. 24-12617
*USA v. Zahn*

36. Nixon Peabody LLP

37. Pardo, David

38. Pestana, Diego M.

39. Pillsbury Wintrhop Shaw Pittman, LLP

40. Phelps Dunbar LLP

41. Richardson, Monte E., Hon.

42. Salario, Jr., Samuel J.

43. Shannon, Ann

44. Slatten, Jessica

45. Suarez, Eduardo A.

46. The Suarez Law Firm, P.A.

47. United States Attorney's Office, Middle District of Florida

48. Vinyard, Herschel T.

49. Wannemacher, Ryan

50. Wedekind, III, Lee Dilly

51. Yanes, Katherine Earle

52. Zahn, Aaron

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

This politically-charged prosecution is another in a never-ending series in which the Government has warped federal statutes restricted to schemes to wrongfully obtain "property in the victim's hands" to federalize conduct traditionally left to state authorities and local politics. *See Cleveland v. United States*, 531 U.S. 12, 26 (2000). The Government prosecuted Mr. Zahn, the former CEO of a local utility, for scheming to defraud a city of "property" that *never existed* and, even if it had, to which the city *had no legal right* through a benefit plan that also *never existed* and, even if it had, *could not* have defrauded the city of property. It was an invalid "intangible rights" prosecution by another name.

The Supreme Court has repeatedly rejected the Government's over-reaching interpretations of the property fraud statutes as irreconcilable with text, federalism, and fair notice. *E.g.*, *Ciminelli v. United States*, 598 U.S. 306, 314-15 (2023); *Kelly v. United States*, 590 U.S. 391, 398-99 (2020). The Government's distortion of those statutes here presents, among other things, questions about whether a defendant can conspire to violate 18 U.S.C. § 666 or commit wire fraud by allegedly inducing a local utility to consider alternatives—possible future decisions that, if made, might create the "property" that never existed and to which the "victim"—which never lost a dime—had no legal right. Mr. Zahn respectfully requests oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...................................................................... CIP - 1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF CITATIONS ...................................................................................... vii

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES ............................................................................ 2

STATEMENT OF THE CASE ................................................................................ 6

    I.    **Background to the indictment and trial.** ................................................ 6

        **A. The relationship between JEA and the City.** .................................... 7

        **B. JEA's Board decides to evaluate strategic alternatives and
            authorize an employee benefits plan, subject to further
            review.** ............................................................................................... 8

            **1. Decision 1: Evaluate strategic alternatives, including
               a possible sale of JEA.** ............................................................. 9

            **2. Decision 2: Authorize implementation of an
               employee benefit plan, subject to further review.** ............. 12

        **C. The General Counsel objects to the PUP, so Mr. Zahn
            suspends implementation and advises the Board the PUP
            should not apply in Scenario 3.** ...................................................... 15

        **D. Political blowback forces Mr. Zahn to make protected *Garrity*
            statements.** ....................................................................................... 17

E. The Government investigates, knowingly disregards DOJ procedures, and uses Mr. Zahn's *Garrity* statements. ..................20

II. Course of proceedings and disposition below.....................................23

A. The indictment. ............................................................................23

B. The *Kastigar* proceedings. ........................................................26

C. The trial. ......................................................................................27

1. The Government's theory. ..................................................27

2. Motions for judgment of acquittal. ...................................28

3. The charge conference.......................................................29

4. The verdict, post-trial motion, and sentencing.................30

III. Statement of the facts. ........................................................................32

A. Additional facts relevant to the property fraud issues. ................32

1. The potential existence of money from a sale of JEA.......32

2. The potential implementation of the PUP. ........................34

B. Facts related to the jurisdictional elements of the offenses..........36

IV. Standards of review. ...........................................................................38

SUMMARY OF THE ARGUMENT....................................................................40

ARGUMENT ......................................................................................................43

I. Property fraud issues: The District Court erred by denying a judgment of acquittal, declining to dismiss the indictment, and declining to instruct the jury on the "property" elements of Counts I and II. ..........................................................................43

iii

A. The Government's indictment and evidence were insufficient to prove a traditional property interest in the City's hands. ........43

    1. Section 666 and the wire fraud statute require an existing property interest traditionally protected at law. .........................................................................44

    2. The Government presented a disguised intangible-rights theory and failed to prove a traditional property interest in the City's hands. .................47

    3. The indictment failed to allege a traditional property interest in the City's hands. .................53

B. The Government failed to prove the alleged scheme would proximately result in the City parting with money. .....................53

C. The Government failed to prove the alleged scheme, executed as intended, would divest the City of money. .................56

D. The District Court erred by failing to instruct the jury on the definition of property and the requirement of causation. ............58

II. Wire fraud jurisdictional issues: The District Court erred in denying a judgment of acquittal on Count II because the evidence was insufficient to prove Mr. Zahn caused a wire transmission for the purpose of executing a scheme to defraud. ........................60

III. Section 666 jurisdictional issues: The District Court erred by denying a judgment of acquittal on Count I because the evidence was insufficient to prove the City received federal benefits, the federal money JEA received qualified as "benefits," and that Mr. Zahn was an agent of the City, and by constructively amending the indictment. ..........................................................................64

A. The Government failed to prove the City received federal funds. ............................................................................65

B. The Government failed to prove the federal funds received by JEA were federal "benefits" under Section 666. .....................67

iv

      C. The Government failed to prove Mr. Zahn was the City's "agent." .............................................................. 69

      D.  The District Court constructively amended the indictment to allow the jury to find Mr. Zahn was the City's agent. ............. 70

IV.  *Kastigar* issues: Because the Government's investigation was unavoidably tainted by the disclosure of Mr. Zahn's *Garrity* statement, the District Court erred by denying Mr. Zahn's motion to dismiss the indictment. ........................................... 71

      A. The District Court's *Kastigar* findings rest on three legal errors, any one of which requires a reversal. ................................ 73

            1. The District Court legally erred by assuming that the Government met its burden even if some of the evidence before the grand jury was tainted. ...................... 73

            2. The District Court legally erred by failing to require the Government to prove how it built its case against Mr. Zahn. ............................................................. 74

            3. The District Court impermissibly shifted the burden of proof from the Government to Mr. Zahn. ................... 76

      B. The District Court's harmless-error determination was erroneous. ....................................................................... 78

            1. The District Court improperly conflated its harmless-error and its sufficiency-of-the-evidence analyses. ............................................................... 78

            2. The Government's record made it impossible to conduct a legally proper harmless-error analysis. ............ 79

            3. This Court's precedents assuming harmless error applies to *Kastigar* errors are mistaken and, if necessary, should be revisited *en banc*. ............................ 80

v

**C. Because of the *Kastigar* error, this Court should reverse with instructions to dismiss the indictment.**............................................81

CONCLUSION ....................................................85

CERTIFICATE OF COMPLIANCE ......................................86

CERTIFICATE OF SERVICE............................................87

# TABLE OF CITATIONS

**Cases**                                                          **Page(s)**

*Arizona v. Fulminante*,
    499 U.S. 279 (1991)...........................................................................81

*Brown v. Electrolux Home Prods., Inc.*,
    817 F.3d 1225 (11th Cir. 2016)....................................................80

*Chapman v. California*,
    386 U.S. 18 (1967)......................................................................78, 79

\* *Ciminelli v. United States*,
    598 U.S. 306 (2023)...................................................i,43, 44, 46, 48, 52, 53

\* *Cleveland v. United States*,
    531 U.S. 12 (2000)................................. i, 25, 29-31, 40, 44, 45, 47,49,59, 64

\* *Fischer v. United States*,
    529 U.S. 667 (2000).....................................................................68, 69

\* *Garrity v. New Jersey*,
    385 U.S. 493 (1967).......................................................................7, 71

*Kann v. United States*,
    323 U.S. 88 (1944)...........................................................................60

\* *Kastigar v. United States*,
    406 U.S. 441 (1974)................................................................ 4, 71-84

\* *Kelly v. United States*,
    590 U.S. 391 (2020).................................................... i, 43-45, 51, 53, 55, 56

*Kousisis v. United States*,
    No. 23-909 ......................................................................................57

\* *Loughrin v. United States*,
    573 U.S. 351 (2014)............................................29, 30, 54, 55, 59

*Mason v. Allen*,
  605 F.3d 1114 (11th Cir. 2010).....................................................78

* *McNally v. United States*,
  483 U.S. 350 (1987)..............................................44, 45, 51, 52

*Molinos Valle Del Cibao, C. por A v. Lama*,
  633 F.3d 1330 (11th Cir. 2011).................................................67

* *Parr v. United States*,
  363 U.S. 370 (1960)..................................................62, 63, 64

*Pasquantino v. United States*,
  544 U.S. at 349 (2005)...........................................................49

*Pereira v. United States*,
  347 U.S. 1 (1954)....................................................................61

*Satterwhite v. Texas*,
  486 U.S. 249 (1988)..........................................................78, 79

*Schmuck v. United States*,
  489 U.S. 705 (1989)..........................................................60, 63

*Skilling v. United States*,
  561 U.S. 358 (2010).................................................................45

* *United States v. Abu-Shawish*,
  507 F.3d 550 (7th Cir. 2007)...................................................69

*United States v. Adkinson*,
  158 F.3d 1147 (11th Cir. 1998)..............................................61

* *United States v. Adler*,
  186 F.3d 574 (4th Cir. 1999)..................................................49

*United States v. Allen*,
  864 F.3d 63 (2d Cir. 2017).......................................................72

* *United States v. Berroa*,
856 F.3d 141 (1st Cir. 2017) ........................................................54, 55, 56, 59

*United States v. Britton*,
108 U.S. 199 (1883) ........................................................................................51

*United States v. Cancelliere*,
69 F.3d 1116 (11th Cir. 1995).......................................................................71

*United States v. Cozzi*,
613 F.3d 725 (7th Cir. 2010)..........................................................................39

*United States v. Culver*,
598 F.3d 740 (11th Cir. 2010)...................................................................39, 58

*United States v. DeQuattro*,
118 F.4th 424 (1st Cir. 2024) .......................................................................67

* *United States v. Dooley*,
578 F.3d 582 (7th Cir. 2009).....................................................................61, 62

* *United States v. Doran*,
854 F.3d 1312 (11th Cir. 2017)........................................................ 38, 65-70

*United States v. Edgar*,
304 F.3d 1320 (11th Cir. 2002)......................................................................68

*United States v. Evans*,
473 F.3d 1115 (11th Cir. 2006)..................................................60, 61, 63, 64

*United States v. Griffin*,
324 F.3d 320 (5th Cir. 2003)....................................................................49, 52

*United States v. Grigsby*,
111 F.3d 806 (11th Cir. 1997).......................................................................39

* *United States v. Hampton*,
775 F.2d 1479 (11th Cir. 1985)...................................................72, 74, 75, 84

\* *United States v. Henry,*
  29 F.3d 112 (3d Cir. 1994)...................................................................51

*United States v. Hill,*
  643 F.3d 807 (11th Cir. 2011)...................................................79, 80

*United States v. Hubbell,*
  530 U.S. 27 (2000) ..................................................................................78

\* *United States v. Keller,*
  916 F.2d 628 (11th Cir. 1990)...................................................70, 71

*United States v. Kwiat,*
  817 F.2d 440 (7th Cir. 1987) ............................................................63

*United States v. Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.,*
  940 F.2d 397 (9th Cir. 1991)...........................................................52

*United States v. Martin,*
  803 F.3d 581 (11th Cir. 2015)...................................................54, 55

\* *United States v. McLean,*
  802 F.3d 1228 (11th Cir. 2015)...............................38, 66, 67, 68

*United States v. Morris,*
  20 F.3d 1111 (11th Cir. 1994)...................................................59, 60

*United States v. Narog,*
  372 F.3d 1243(11th Cir. 2004).......................................................71

\* *United States v. North,*
  910 F.2d 843 (D.C. Cir. 1990) .......................................................83

*United States v. Nyhuis,*
  8 F.3d 731 (11th Cir. 1993)............................................................39

*United States v. Ochs,*
  842 F.2d 515 (1st Cir. 1988) ..........................................................51

*United States v. Pendergraft,*
  297 F.3d 1198 (11th Cir. 2002) ...................................................... 53

*United States v. Pelletier,*
  898 F.2d 297 (2d Cir. 1990) ............................................. 75, 76, 79

*United States v. Pinson,*
  860 F.3d 152 (4th Cir. 2017) ......................................................... 69

*United States v. Poindexter,*
  951 F.2d 369 (D.C. Cir. 1991) ...................................................... 72

*United States v. Ponds,*
  454 F.3d 313 (D.C. Cir. 2006) ...................................................... 79

*United States v. Ratcliff,*
  488 F.3d 639 (5th Cir. 2007) .................................................... 48, 49

* *United States v. Schmidgall,*
  25 F.3d 1523 (11th Cir. 1994) ............................. 72-74, 78, 80, 81

*United States v. Slough,*
  641 F.3d 544 (D.C. Cir. 2011) ...................................................... 39

* *United States v. Takhalov,*
  827 F.3d 1307 (11th Cir. 2016) ....................................... 47, 57, 58

*United States v. Yates,*
  16 F.4th 256 (9th Cir. 2021) ......................................................... 48

## Statutes

18 U.S.C. § 371 ................................................................................ 1, 23

18 U.S.C. § 666 ........................................................ i, 43-59, 64-70

18 U.S.C. § 666(a)(1) ........................................................ 55, 64, 65, 66

18 U.S.C. § 666(a)(1)(A) ........................................................ 23, 44, 56

18 U.S.C. § 666(b) ................................................................64, 68

18 U.S.C. § 666(c) ...................................................................57

18 U.S.C. § 666(d) ...................................................................70

18 U.S.C. § 666(d)(1) .....................................................25, 38, 69

18 U.S.C. § 1343 ............................................................1, 23, 60

18 U.S.C. § 3231 .......................................................................1

28 U.S.C. § 1291 .......................................................................1

Ch. 78-536, Laws of Florida (1978) ...........................................7

Ch. 80-515, Laws of Florida (1980) ...........................................7

Ch. 92-340, Laws of Florida (1992) ...........................................7

**Other Authorities**

Bryan A. Garner, *The Law of Judicial Precedent* (2016) ........................................80

## JURISDICTIONAL STATEMENT

This was a prosecution of "offenses against the laws of the United States" over which the District Court had jurisdiction under 18 U.S.C. § 3231. Mr. Zahn was prosecuted under 18 U.S.C. §§ 371, 666, and 1343. (ECF-1).[1]

This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from the District Court's "final decision." The judgment was filed on August 1, 2024, and the notice of appeal was timely filed on August 13, 2024. (ECF-542, 552). An amended judgment was filed on August 16, 2024, and an amended notice of appeal was timely filed on August 23, 2024. (ECF-551, 552).

---

[1]    Record references begin with the prefix "ECF-" followed by the docket entry and page numbers. Where an exhibit is cited, the docket entry and exhibit number are cited (*e.g.*, "ECF-100-3" refers to Exhibit 3 to entry 100). There are two exhibits that do not have District Court docket entries but that are included in the record—Government Exhibit 20Q at trial and Defense Exhibit 230 at the *Kastigar* hearing, and they are cited as GX20Q and DX230, respectively.

## STATEMENT OF THE ISSUES

I. ***Property fraud issues:*** Whether the District Court erred by denying a judgment of acquittal on each of the two counts of the indictment and in instructing the jury on those counts.

    A. *Property in the victim's hands.* Whether the Government presented insufficient evidence that the object of the alleged scheme was a traditional property interest in the City's hands.

    B. *Causation.* Whether the Government presented insufficient evidence the alleged scheme would have proximately caused the City to part with property.

    C. *Intent.* Whether the Government presented insufficient evidence Mr. Zahn intended to harm a property interest.

    D. *Instructional issues.* Whether the District Court erred by refusing to instruct the jury:

        1. on the meaning of "property;" and

        2. that, under the wire fraud statute, the Government had to prove the alleged scheme would have resulted in Mr. Zahn unlawfully obtaining property.

II. ***Wire fraud jurisdictional issues.*** Whether the District Court erred by denying a judgment of acquittal on Count II because the Government

presented insufficient evidence Mr. Zahn caused a wire transmission for the purpose of executing an alleged scheme to defraud.

**III.** ***Section 666 jurisdictional issues.*** Whether the District Court erred by denying a judgment of acquittal because (1) the Government presented insufficient evidence that the City received federal benefits or Mr. Zahn was the City's agent and (2) in instructing the jury it could convict if it found Mr. Zahn was the City's agent.

    A.    *Receipt of benefits.* Whether the Government presented insufficient evidence that the City received federal benefits.

    B.    *Requirement of benefits*. Whether the Government presented insufficient evidence that certain federal funds were "benefits" under Section 666.

    C.    *Defendant as agent.* Whether the Government presented insufficient evidence Mr. Zahn was an agent of the City.

    D.    *Constructive amendment.* Whether the District Court constructively amended the indictment by instructing the jury it could convict if it found Mr. Zahn was an agent of the City, when the indictment alleged only that he was an agent of JEA.

**IV.**    ***Kastigar issues.*** Whether the District Court erred by denying a motion to dismiss the indictment under *Kastigar v. United States*, 406 U.S. 441 (1974).

    A.    Whether the District Court's holding that the Government satisfied its burden under *Kastigar* was legally erroneous because:

        1.    it assumed some of the evidence presented to the grand jury was tainted, yet found the Government met its burden anyway.

        2.    it failed to require the Government to prove how it built its case against Mr. Zahn.

        3.    it shifted the burden of proof from the Government to Mr. Zahn.

    B.    Whether the District Court's harmless-error determination was legally erroneous because:

        1.    it improperly conflated harmless error with evidentiary sufficiency.

        2.    the Government's record made it impossible to review for harmless error.

        3.    this Court's precedents assuming, without deciding, the harmless-error rule applies are mistaken.

4

C.    Assuming this Court finds a *Kastigar* error, whether on remand it should instruct the District Court to dismiss the indictment.

## STATEMENT OF THE CASE

**I.    Background to the indictment and trial.**

Jacksonville Electric Authority (JEA) is a local utility in the City of Jacksonville. (ECF-504 at 141-43). This case involves decisions by its Board of Directors to consider potential strategic alternatives—including, but not limited to, a sale of its assets—and a potential employee benefit plan.

The Board's consideration never matured to execution—and no one took a dime from the City—but it ignited a political firestorm that roiled City politics. As Board members and City officials sought cover, Mr. Zahn and Ryan Wannemacher, JEA's former CEO and CFO, were investigated, compelled to give statements, and crucified by a local press inundating the public with inflammatory ledes about "the greatest fraud in Jacksonville history." (ECF-117-1 at 18; *see id.* at 11-24 (summarizing media coverage)). A federal prosecutor who says you "find some of your best cases in the newspaper" wanted in, and after grand jury proceedings tainted by Mr. Zahn's compelled statements—immunized under *Garrity v. New Jersey*, 385 U.S. 493 (1967)—secured an indictment for conspiracy under Section 666 and wire fraud. (ECF-1; ECF-558 at 113-14).

In a joint trial lasting four weeks, two different juries heard the same evidence and reached irreconcilable results. Mr. Wannemacher was not guilty. (ECF-489). Mr. Zahn was convicted. (ECF-488). He is currently incarcerated.

### A.    The relationship between JEA and the City.

As the Government saw it, Mr. Zahn schemed to defraud the City of "property"—"money" "destined for" the City if JEA was sold. (ECF-1 at 8, 12-13; ECF-502 at 2). The relationship between the City and JEA is thus important.

JEA is a local utility providing electric, water, and sewer services in the City and elsewhere. (ECF-504 at 141-42). The City is the government of the City of Jacksonville. (ECF-504 at 144). The trial evidence was uncontroverted that the City and JEA are distinct legal entities: JEA is not a department of City government. (*See* ECF-470-33 at 9-10). Rather, it is a "legally separate organization[]" from the City. (ECF-470-99 at 80).

JEA was established by the Florida Legislature as a distinct "body politic and corporate of the State of Florida" and "independent agency" of the City.[2] (ECF-470-33 at 9-10; ECF-476-80 at 1 ECF-476-88 at 1; ECF-476-113 at 1). It is a "separate governmental unit[]."(ECF-470-33 at 9). Under Article 21 of the City's Charter—which regulates the relationship—the City does not manage JEA: JEA has its own seven-member Board and "full and independent authority" to hire and fire its own employees. (ECF-476-13 at 4-5; ECF-470-33 at 17). The City has influence because Board members are appointed by the mayor and confirmed by

---

[2]    *See* Ch. 78-536, Laws of Florida (1978); Ch. 80-515, Laws of Florida (1980); Ch. 92-340, Laws of Florida (1992).

the City Council. (*Id.*). The City also provides certain services to JEA—including those of its Office of General Counsel (OGC). (*E.g.*, ECF-517 at 10).

The economic relationship is that JEA is required to pay the City an annual "contribution" in lieu of taxes, based on a millage on sales of electric and water services. (ECF-504 at 147; ECF-476-4 at 23-24; ECF-476-120 at 58-59). The contribution is negotiated by JEA and the City every five years. (ECF-476-4 at 23-24; ECF-476-120 at 58-59). JEA also pays the City an annual franchise fee. (ECF-473-4 at 24; ECF-476-120 at 58-59). The annual payments were over \$160 million in 2019. (ECF-476-120 at 59).

Although JEA makes these annual payments to the City, the City does not own JEA's assets; JEA owns its own assets. (ECF-470-33 at 10-11; ECF-476-3 at 2; ECF-476-98 at 17). Likewise, the City does not own any equity in JEA; JEA does not have "equity or stock." (ECF-516 at 35, 114; *see* ECF-502 at 3; ECF-526 at 62). JEA is free to sell its assets, subject to the qualification that a sale of more than ten percent must be approved by the City Council and the City's voters. (ECF-476-19 at 2-3; ECF-480-33 at 15-16; ECF-516 at 139, 231). There was no evidence that the City has any legal right to proceeds—either in general or any specific amount—from an asset sale.

**B.    JEA's Board decides to evaluate strategic alternatives and authorize an employee benefits plan, subject to further review.**

On July 23, 2019, the JEA Board made the two decisions at issue here.

### 1.    Decision 1: Evaluate strategic alternatives, including a possible sale of JEA.

Well before Mr. Zahn became CEO, it was understood that JEA faced serious challenges—declining sales, competition, environmental mandates, rising capital costs, and a disastrous contract to buy power from a nuclear plant called Vogtle. (*See* ECF-470-90 at 8-14; ECF-476-6 at 8-16; ECF-504 at 161-63; ECF-505 at 68-69; ECF-512 at 101-02; ECF-513 at 122-126). Though JEA's fundamentals were solid, there were "dark clouds" threatening the business if it didn't adapt. (ECF-505 at 68-69; *see* ECF-470-90 at 14). But JEA's ability to adapt was limited: As a public utility, it labored under legal and political constraints private utilities don't have. (ECF-470-75; ECF-512 at 117-20; ECF-523 at 72).

Unsurprisingly, the idea of privatizing JEA through a sale or other deal was debated long before Mr. Zahn became CEO. (*E.g.,* ECF-476-2; ECF-517 at 148-50). Most recently, in November 2017, the outgoing Board Chair gave a "mic drop" speech recommending the Board consider it. (*See* ECF-504 at 174-75).

The issue became politically toxic. A meeting between JEA and the City Council in February 2018 was dubbed the "Valentine's Day Massacre." (ECF-514 at 131, 250-51). There was "fighting between the president of the City Council and the Mayor's office" and "things got ugly pretty fast." (*Id.* at 250-51). Thereafter, even though privatization was "a reasonable question to ask," the political risks made even mentioning it "a difficult conversation." (*Id.* at 140).

Enter Mr. Zahn. A businessman, he was appointed interim CEO—after a former CEO abruptly resigned—and later hired permanently. (ECF-504 at 195; ECF-505 at 7-8; ECF-517 at 72). He was expected to bring "innovative" ideas and "shake up JEA." (ECF-517 at 84; *see* ECF-513 at 156). This was often uncomfortable from a political perspective. (*See* ECF-523 at 70-72).

In late 2018, JEA's Board directed leadership to produce a ten-year strategic plan. (*See* ECF-470-23 at 26; ECF-476-16 at 1, 32; ECF-512 at 167-68). JEA hired McKinsey and Co., a respected consultancy, to conduct a scenario-planning exercise. (ECF-476-16; ECF-512 at 168, 193-94). Scenario planning is a technique to avoid stability bias—the assumption "the future is going to look like the present"—by accounting for future "disruption in the marketplace." (ECF-512 at 193-94; *see also id.* at 182). Three scenarios were presented: Scenario 1, a "status quo scenario" in which JEA continued as usual; Scenario 2, a "traditional utility response" in which JEA addressed market disruptions with the tools available to a public utility; and Scenario 3, a "non-traditional utility response" in which the Board would evaluate strategic alternatives to Scenarios 1 and 2. (*Id.* at 181, 185-86, 196-97; *see also* ECF-476-37 at 5-6, 182; ECF-476-87).

McKinsey prepared Scenario 1 and "partnered" with JEA leadership on Scenario 2. (*See* ECF-512 at 181-82, 186, 196-97). Consistent with JEA's well-known challenges, Scenarios 1 and 2 identified significant future challenges for

JEA. (*See* ECF-476-27 at 116-122; ECF-476-37 at 60-71). Still, this was a scenario-planning exercise—not a financial forecast—and McKinsey and JEA leadership emphasized that Scenarios 1 and 2 were "not a projection of future financial performance" and were "not intended" to present a "most likely scenario for JEA." (ECF-476-27 at 112, 130; ECF-476-37 at 58; *see also* ECF-476-37 at 5-6; ECF-512 at 195-96). A McKinsey partner testified the work was "honest" and that nothing about it was "deceptive or inappropriate." (ECF-512 at 166, 193, 196).

After hearing about Scenario 1 and 2, the Board asked JEA leadership to prepare a plan implementing Scenario 2 and a presentation about Scenario 3. (*See* ECF-476-37 at 6). At a July 23, 2019 meeting, JEA's leadership presented a Scenario 2 plan that contemplated pulling the levers JEA had: increasing rates, decreasing service, and reducing headcount by about 600 employees. (*See id.* at 65-105). Leadership also presented Scenario 3, suggesting the Board consider alternatives to going it alone—converting to a cooperative, a public company, or a private company, or selling to a private company. (*Id.* at 188). A sale of JEA—if it were to occur—would be a sale of JEA's assets. (*E.g.*, ECF-476-98).

Scenario 3 included minimum requirements setting "specific goals for key stakeholders" in JEA because "a dramatic shift in business needs to deliver dramatic results." (ECF-476-77 at 21, 46; GE-20Q at 02:16:39). They included $3 billion to be given to the City—150 percent of the present value of contributions

11

JEA might have made to the City for the 20 years if it remained a stand-alone business. (*See* ECF-476-77 at 46). Another was $400 million for JEA customers. (*Id*.). There were also commitments to protect salaries and benefits, deliver consumer rate stability, and provide renewable power. (*Id.* at 46-48).

The Board adopted Resolution 2019-07 "to *investigate* and pursue Scenario 3" through a competitive solicitation called an Invitation to Negotiate (ITN). (ECF-476-37 at 196) (emphasis added); *see also* ECF-470-17 at 3)). As Board members stated in real time, this was "not a decision to sell JEA" but instead "a decision to *explore alternatives for growth*." (GE20Q at 02:04:04) (emphasis added); *see id.* at 02:04:37 (Scenario 3 about "exploring options"), 02:07:10 ("certainly a lot more to dig into")). "Any final outcome," the resolution stated, was "subject to additional Board action and other approvals." (ECF-476-37 at 196).

### 2. Decision 2: Authorize implementation of an employee benefit plan, subject to further review.

Recruiting and retaining employees was also a challenge for JEA: It had "to compete against investor-owned utilities" that used public utilities as "a feeding ground" for talent. (ECF-511 at 119; ECF-523 at 24; *see also* ECF-512 at 98). JEA hired Willis Towers Watson (WTW), a benefits consultant, to assist. (ECF-511 at 114). In January 2019, the Board decided to bring "total compensation" to 50% of market—including salary, short-term incentives, and long-term incentives. (*See* ECF-470-10 at 7; ECF-476-71 at 13-14; ECF-476-72 at 188; ECF-523 at 23).

After several iterations with WTW, OGC, and JEA's outside lawyers, and in consultation with the Compensation Committee and the Board, the long-term piece became the Performance Unit Plan (PUP). (*See* ECF-470-16; ECF-476-37 at 6-7; ECF-514 at 163). To avoid legal ambiguities around public-sector incentive plans, the PUP was designed as a benefits plan providing employees the opportunity to buy "performance units," the value of which would increase or decrease with JEA's performance—giving employees "skin in the game" to drive financial performance and incentivizing employee retention. (ECF-476-85 at 12; *see also* ECF-476-25 at 10). The number of units available to an employee—their "allocation"—would be entrusted to the Chair of the Board's Compensation Committee. (*See* ECF-476-80 at 1; ECF-476-81). She could delegate it to the CEO, but he could not determine his own allocation. (ECF-523 at 39, 124).

The units' value would be determined by comparing JEA's financial position—net of contributions to the City and payments to customers—over a three-year "performance period." (ECF-476-41 at 4-6). If JEA's net position increased, ten percent of the value would go to the PUP, regardless of whether JEA remained as a stand-alone business or executed a Scenario 3 transaction. (*See* ECF-476-37 at 278-79; ECF-476-41). If a Scenario 3 transaction happened *and* produced more than $3 billion of proceeds to be given to the City and $400 million to customers—a "Recapitalization Event"—the performance period would end and

the comparison would be between the start date of the period and the date of the transaction. (ECF-476-41 at 5, 6). So, a sale of JEA—if considered and approved—would have to produce more than $3.4 billion of proceeds before the PUP would pay a cent to participating employees.

After discussing the concept at a June 25, 2019 meeting, the Board considered authorizing management to implement a PUP on July 23, 2019. (GE20Q at 02:41:40). Mr. Wannemacher presented the Board with an illustration—provided in advance with a draft resolution the Board would later approve—showing the PUP's value would be "10% of the value created" by the increase in JEA's net position in a performance period. (ECF-476-37 at 279, 344-52; GE-20Q at 02:44:02-02:47:30). In response to questions from the Board, Mr. Wannemacher explained that in a Recapitalization Event, (1) the performance period would end (so, value would be determined as at that date) and (2) all units would vest (so, employees would receive the benefit of all units they had). (GE20Q at 02:53:22, 02:55:58). Mr. Wannemacher also clarified that although the Board would authorize the issuance of 100,000 units, only 30,000 would be issued in the first year—when the Board was expected to decide about Scenario 3. (GE20Q at 02:53:29; ECF-476-37 at 190 (timeline for Scenario 3 evaluation)).

Although their tunes would change later, Board members understood how the PUP could operate in a Recapitalization Event: One even commented that this

feature gave the PUP "the salutary effects of a retention plan in these times of uncertainty." (GE20Q at 02:56:00). Accordingly, the Board adopted Resolution 2019-10, granting management "authority" to "implement" the PUP, in consultation with OGC, and to prepare and execute a definitive Performance Unit Plan and contracts governing employees' participation. (ECF-476-41). As the Board was advised, the PUP was subject to additional legal review by OGC and outside counsel before it could be implemented. (*See* ECF-476-87 at n.2; *see also* ECF-523 at 87). In addition, the PUP had to be reviewed by accountants and disclosed on JEA's financial statements—thus in the public domain. (ECF-516 at 34-35, 128, 163).

Considering JEA's history, the PUP was likely to invite political controversy. (*See* ECF-511 at 54, 144; ECF-523 at 56, 69). After the Board meeting, Mr. Zahn was prepared to proceed so long as the PUP could be implemented "lawfully" and "any ethical concerns were addressed." (ECF-523 at 81-82, 101).

**C.**    **The General Counsel objects to the PUP, so Mr. Zahn suspends implementation and advises the Board the PUP should not apply in Scenario 3.**

Reenter politics: The PUP did not survive review. JEA's lawyers at Pillsbury Winthrop and Foley & Lardner understood how the PUP worked and cleared it from a legal and ethical perspective (ECF-470-41 (showing Foley understood

payments); ECF-470-80 (discussions among lawyers regarding payments); ECF-476-80 (Pillsbury memo on legal issues) ECF-476-85 (Foley opining PUP is consistent with ethics laws); ECF-523 at 43 (Foley advised JEA that PUP "was entirely legal and ethical")). But the City's General Counsel—aware of the PUP for months, having previously advised the Board it had authority to adopt Resolution 2019-10—got second thoughts. (*See* ECF-476-87; ECF-517 at 192-95).

On November 5, 2019, the General Counsel met with JEA's Chief Administrative Officer and Chief Legal Officer, the two law firms, Mr. Zahn, and others to share his concerns. (*See* ECF-517 at 192-95). Although couched legally, the concerns were political: The General Counsel could not approve a plan that paid employees in a JEA sale. (ECF-517 at 220; *see also* ECF-517 at 45 (General Counsel "was talking about sort of the policy implications and the fact that the plan was novel"); ECF-517 at 190-92)). The lawyers had a spirited discussion but couldn't agree. (ECF-523 at 118). So, Mr. Zahn decided to terminate the PUP. (*See* ECF-517 at 196 (telling General Counsel "[I]f you're going to kill it, kill it.")). He consulted with the Board Chair and Compensation Committee Chair and indefinitely postponed its implementation. (ECF-476-46 at 2).

In a November 12, 2019 letter, Mr. Zahn advised the General Counsel and the Board of his decision and recommended the PUP not be implemented until the

Board finished considering Scenario 3. (ECF-476-46 at 2-3). That terminated any possibility the PUP would pay in any potential sale of JEA. (*See id.*).

### D. Political blowback forces Mr. Zahn to make protected *Garrity* statements.

Politics again intervened. Unknown to JEA, the City Auditor plotted with a City Councilman to publish an incendiary memo about how the PUP theoretically might work in a Scenario 3 transaction. (*See* ECF-476-55; ECF-511 at 250; ECF-512 at 44-45). He made sure no one at JEA learned about the broadside beforehand. (ECF-470-88; ECF-511 at 237). On November 18, 2019—knowing the PUP was a dead-letter—he published a memo explosively claiming the PUP could pay up to $636 million in a sale. (ECF-476-55 at 3).

The memo was drafted to stoke controversy. The Auditor assumed 100,000 units would be issued before a sale—had the PUP been implemented and JEA been sold—even though the number was 30,000. (ECF-476-55 at 2; *supra* at 14). That inflated his calculations by 70 percent. The Auditor also omitted any mention of his private deal with the City Councilman, claiming he published the memo only because the PUP had not been "formally rescinded" by the Board. (*Id.* at 1). The Board Chair clapped back that the Auditor knew the PUP wouldn't apply in a sale and the Board hadn't "formally rescinded" the PUP because, as the Auditor also knew, the Board frequently meets only once in November and December. (ECF-

470-50). In December, the Board met and rescinded the ITN and the PUP. (ECF-470-91; ECF-514 at 181).

But the memo had its effect: A political firestorm followed. In December 2019, Councilmen Diamond and Salem held a public hearing. Councilman Diamond (a former prosecutor) criticized JEA leadership but opined, "I don't see lawbreaking, I just see terrible … decisions." (ECF-112-8 at 3-4). The General Counsel assured the Board that "[i]n preliminarily approving the PUP [on July 23], the JEA Board did not act outside of their legal authority." (ECF-112-7 at 1).

Even so, at JEA's December 17, 2019 Board meeting, the Chair moved for Mr. Zahn's termination for "cause." (ECF-114-25 at 9-10). That failed because no one would second it, and an Assistant City Attorney said he knew of no evidence justifying a for-cause removal. (*Id.* at 11-13).

Investigation swiftly followed—on two fronts. First, from mid-December 2019 through January 2020, JEA—aided by the same OGC that told the Board it could adopt Resolution 2019-10—compelled several employees to testify under *Garrity*'s immunity from prosecutorial use or derivative use of their statements. (*E.g.*, ECF-112-12). On January 21 and 22, Mr. Zahn testified for approximately twelve hours, fielding questions from seven attorneys and producing a two-volume *Garrity* statement totaling 478 pages. (ECF-116-1 (Volume I) & 116-2 (Volume II)); (*see also* ECF-192-1 (topical summary)).

18

Armed with the *Garrity* statement, on January 28, 2020, the Assistant City Attorney—who previously couldn't justify a for-cause termination—used a televised Board meeting to recommend terminating Mr. Zahn for cause. (*See* ECF-310 at 100-01). He read aloud a termination letter containing twenty-four new findings. (ECF-112-13). A comparison to Mr. Zahn's *Garrity* statement proves the letter—blasted to anyone watching—was based on the *Garrity* statement. It used the statement to create the narrative undergirding the indictment here—████

████████████████████████████████

(*Compare, e.g.*, ECF-116-2 at 43-44 (*Garrity* statement), *with* ECF-112-13 (termination letter); *see also* ECF-299-1 (chart comparing *Garrity* statement to indictment)). JEA's attorneys later used the *Garrity* statement to sue him for fraud and breach of fiduciary duty. (ECF-112-30).

Parallel to the JEA investigation, the City Council established a special investigatory committee (SIC). (ECF-112-22). During its investigation, SIC members read Mr. Zahn's *Garrity* statement and termination letter, discussed their contents publicly and with witnesses, and authorized posting them on the internet. (ECF-112-24; ECF-112-25 at 3, 5). Ultimately, the SIC produced a report citing Mr. Zahn's statements and a chronology. (*See* ECF-112 at 23 & n.49 (linking chronology (ECF-289-129) and report (DX230)).

### E.    The Government investigates, knowingly disregards DOJ procedures, and uses Mr. Zahn's *Garrity* statements.

A federal investigation began in mid-January 2020. On January 15, OGC provided the Government with documents including several employees' *Garrity* statements. (ECF-126-1 at 1). Despite being warned about the *Garrity* material, *id.* at 1, the lead prosecutor unilaterally decided not to follow the Department of Justice's established *Kastigar* procedures—such as using a taint team to shield the prosecution team from immunized *Garrity* material. (ECF-270 at 118). Instead, he decided it would suffice if the prosecution team didn't obtain or read Mr. Zahn's *Garrity* statement; segregated his statement—which the Government had already received—from the FBI's document review tool; and avoided press coverage that seemed like it would address Mr. Zahn's statement. (*Id.* at 99, 105-10). The same prosecutor later told the District Court "I couldn't even find anybody in my office that's had a *Kastigar* hearing." (ECF-530 at 26).

But the press coverage to which the prosecutor referred dominated the news, resulting in Mr. Zahn's *Garrity* statement and its fruits being publicized so widely "you really could not avoid it." (ECF-273 at 176). For example, beginning the same day JEA announced Mr. Zahn's termination through early-February 2020, Mr. Zahn's *Garrity* statement featured in headlines like these:

- "JEA shake-up: Board members resign after firing CEO Aaron Zahn with cause" (ECF-299 at 39).

20

- "Fired JEA CEO's testimony revealed: Aaron Zahn questioned over bonus plan" (ECF-112-15).

- "Fired JEA CEO Aaron Zahn ███████████████████████████
  ██████████████" (ECF-112-17).

In addition, Mr. Zahn's *Garrity* statement was widely shared with City officials and third-parties—potentially over 14,000 times. (ECF-112-26). On the day Mr. Zahn was fired, JEA sent the termination letter to all 2,000 of its employees. (*See* ECF-299 at 39). Mr. Zahn's leaked statement also spread like wildfire on social media. (*See, e.g.*, ECF-114-48). While Mr. Zahn's grand jury sat, the media coverage continued. For example, in April 2021, Jacksonville's largest newspaper, *The Florida Times-Union*, published an article titled, "Auditor who blew the lid off JEA bonus plan talks to federal grand jury." (ECF-112-21). It emphasized that Mr. Zahn ████████████████████████████████

███████████████████████████████████████

█████████████████ (*Id.* at 2).

The lead prosecutor's instruction to avoid media reports did not reach materials like Mr. Zahn's termination letter or the SIC's report, both relying on his *Garrity* statement. Indeed, the lead prosecutor admitted "mining" the SIC report. (ECF-112-27 at 3). When the Government interviewed 80 witnesses (dozens of whom testified before the grand jury and at trial), it declined to ask whether they

read Mr. Zahn's *Garrity* statement, the termination letter, or media reports about them. (ECF-315 at 37 n.26 (identifying interviews where inquiries weren't made)).

Moreover, the Government routinely accepted reports, briefings, and evidence from individuals involved with the JEA and SIC investigations who were steeped in Mr. Zahn's *Garrity* statement. (*See, e.g.*, ECF-112-27). One SIC lawyer who read Mr. Zahn's *Garrity* statements, ██████████████████████ ████, (*see* ECF-116-1 at 31) "discovered" a memo ██████████████████. (*See* ECF-299 at 129-30 (summarizing the memo's discovery)). The memo—which the Government would later accuse Mr. Zahn of hiding—was written by non-Florida lawyers who opined Florida law prohibited an incentive plan backed by bonds— the PUP was not to be backed by bonds—but simultaneously advised JEA to seek advice from lawyers who know Florida law. (ECF-275 at 95-98). Unsurprisingly, third-party investigators forwarded bond counsel's memo to the Government in March 2020. (ECF-269 at 93-94; 271 at 28-29).

While the grand jury sat, the lead prosecutor asked a third-party exposed to Mr. Zahn's *Garrity* statements if he "had any additional documents regarding the [PUP] that would bolster" his case. (ECF-271 at 161). That led the Government to its most crucial evidence: two spreadsheets of potential PUP calculations prepared by Mr. Wannemacher before the July 2019 Board meeting. (*Id.* at 162-66). The spreadsheets were features of the indictment and the trial, used to show that

Messrs. Zahn and Wannemacher knew what the PUP would pay in a sale. (*E.g.*, ECF-1 at 16, 19, 24; ECF-526 at 27, 33, 61, 79, 93). Still, over a year-and-a-half into its investigation, the Government hadn't discovered them. But after talking to the tainted third-party, it found them ███████████████████████████ ███████████████. (ECF-116-2 at 2-3 (███████████████████████ ███████████████████████); *see also* ECF-299 at 123-29; ECF-315 at 69-72) (summarizing how the Government found the spreadsheets)).

## II. Course of proceedings and disposition below.

### A. The indictment.

On March 2, 2022, Messrs. Zahn and Wannemacher were charged in a two-count indictment. (ECF-1). Count I alleged a conspiracy under 18 U.S.C. § 371 and Count II alleged wire fraud under 18 U.S.C. § 1343. (*Id.* at 1, 25-27).

***Count I***. The conspiracy count alleged two objects. The first was federal-program fraud under 18 U.S.C. § 666(a)(1)(A), making it a crime for (1) "an agent of a local government or any agency thereof," (2) receiving "more than $10,000 in federal assistance in any one year period," (3) "to embezzle, steal, obtain by fraud, knowingly convert, or intentionally misapply," (4) "property owned by or under the care, custody, or control of such agency." (ECF-473 at 15). The second was wire fraud under 18 U.S.C. § 1343, which criminalizes (1) causing the use of the

23

wires, (2) for the purpose of, (3) carrying out a scheme to defraud, (4) with intent to defraud, (5) a person of "money or property." (*See id*. at 18-20).

Although the "speaking indictment" was sprawling, the gist was that Messrs. Zahn and Wannemacher schemed to defraud the City of money it might have received if JEA had been sold and the PUP been implemented. (*See* ECF-1 at 8-25). It alleged they planned to (1) misleadingly use scenario planning to persuade the Board to "effectuate a sale of JEA" (*id.* at 8, 11) and (2) mislead the Board that the PUP would produce "modest" payouts, when it (in the Government's opinion) would make "exorbitant" payouts if implemented. (*Id.* at 8, 13, 14, 17).

This was the same theory JEA advanced in Mr. Zahn's termination letter and its subsequent lawsuit against Mr. Zahn, both based on Mr. Zahn's *Garrity* statement. (*See* ECF-299-2 (comparison chart of termination letter and indictment); ECF-112-31 (comparison chart of civil complaint and indictment)). The indictment endlessly discussed the spreadsheets the Government discovered after talking to the third-party tainted by Mr. Zahn's *Garrity* statement. (*Id.* at 9, 14, 15, 16, 19, 22, 24). It also repeatedly emphasized the memo from JEA's bond counsel that a bond plan was not in accord with Florida law. (*Id.* at 4-5, 9, 18).

The indictment identified the object of the fraud not as a specific amount of real money but rather as a hypothetical "tens of millions of dollars" that could have been paid under the PUP, had it been implemented, that "would have otherwise

gone to the [City]," had JEA been sold. (*Id.* at 8, 12-13). The property harm was, therefore, the hypothetical "detriment" to "the [City] General Fund" from hypothetical "payouts … funded by net proceeds to the [City]" from a PUP that was never implemented in a sale that was never even agreed to. (*Id.* at 7, 14).

To satisfy the jurisdictional hooks of Section 666—that the victimized organization receive federal "benefits" and the defendant be an agent of that organization—the indictment alleged: (1) the City and JEA each received federal funds and (2) "ZAHN was an agent of JEA, within the meaning of 18 U.S.C. § 666(d)(1)." (ECF-1 at 7-8). It did not allege Mr. Zahn was an agent of the City, the purported victim of the scheme.

*Count II*. The wire fraud count alleged a "a scheme to defraud … for the purpose of obtaining money." (ECF-1 at 26). Substantively, it relied on the allegations of Count I. (*Id.*). Jurisdictionally, it hinged on a single wire transmission: a "live stream" of the July 23, 2019 Board meeting. (*Id.* at 27).

Whether a scheme to deprive the City of hypothetical sale proceeds through a never-implemented PUP was directed to "property" under Section 666 and the wire fraud statute was a major issue from the get-go. Mr. Zahn moved to dismiss, arguing the indictment failed to allege the "object of scheme" was "property in the hands of the victim"—a present, enforceable property interest—as required by *Cleveland*. (ECF-93 at 12). The District Court denied the motion. (ECF-373).

### B.    The *Kastigar* proceedings.

Mr. Zahn moved to dismiss the indictment under *Kastigar,* arguing the Government unlawfully used his *Garrity* statement and its fruits before the grand jury. The District Court referred the motion to a Magistrate Judge, who held an eight-day hearing. (*See* ECF-268-ECF-275).

The Government failed to call several key witnesses who testified before the grand jury. (*See* ECF-310 at 59 n.14). The witnesses the Government did call acknowledged exposure to Mr. Zahn's *Garrity* statement, termination letter, or media coverage of these materials—sometimes all three. (*See* ECF-299-3 (chart of tainted *Kastigar* witnesses)). One of them—Kelly Flanagan, a member of the JEA Board—was concerned briefings she received about Mr. Zahn's *Garrity* statement and exposure to media coverage influenced her testimony. (ECF-272 at 162-70).

Nonetheless, the Magistrate Judge recommended Mr. Zahn's motion be denied. (ECF-310 at 1-2, 102). He found the Government showed an "independent basis" for the indictment, "even assuming that some of the evidence to the Grand Jury was tainted." (*Id.* at 102). Alternatively, he found that, to the extent the Government used tainted evidence, it "was harmless beyond a reasonable doubt as the evidence was otherwise sufficient to sustain the indictment." (*Id.*). Mr. Zahn filed objections, but the District Court overruled them and adopted Magistrate Judge's report. (ECF-315, ECF-361 at 5-6).

26

That did not end the *Kastigar* problems. Over Mr. Zahn's objections, (*e.g.*, ECF-334), the Government failed to fully vet its witnesses and evidence for trial at the *Kastigar* hearing. Although that should have precluded it from relying on unvetted evidence at trial, the District Court gave the Government four more bites at the apple through additional proceedings. (ECF-361 at 6; ECF- 407; *see also* ECF-384, 391, 522, 531). These emphasized what the District Court presumed true—the grand jury heard tainted evidence. (*Compare* ECF-407 at 9-10, 16 (limiting tainted trial testimony of Anton Derkach), *with* ECF-315 at 65 (quoting Derkach's tainted grand jury testimony)). The District Court held fast to its ruling denying relief. (*See* ECF-497, ECF-540).

### C.    The trial.

The District Court held one trial before two juries—one each for Messrs. Zahn and Wannemacher. (*See* ECF-504-528).

### 1.    The Government's theory.

The Government's theory was that Messrs. Zahn and Wannemacher schemed to "steal money from the City." (ECF-526 at 42-43). It explained that the PUP would have been "funded by a sale of JEA after money goes to the City." (ECF-504 at 50). Thus, "the crux of the conspiracy" was "that when JEA was sold and the City … got all that money," the City would have lost money through the PUP. (ECF-504 at 30; *see also* ECF-502 at 2, 3, 7, 12). It was "an effort to fleece

the City." (ECF-504 at 44). Yet, apart from describing JEA as a City "asset"—which was incorrect, as JEA owned its own assets (*supra* at 8)—the Government presented no evidence the City was legally entitled to *any* proceeds from a JEA sale, let alone *all* proceeds over $3.4 billion.

The Government nonetheless theorized that Messrs. Zahn and Wannemacher would deprive the City of money by deceiving the JEA Board. (*See* ECF-504 at 30-31). In its telling, the "main event" was the July 23, 2019 Board meeting where the Board decided to "investigate and pursue" Scenario 3 and authorize implementation of a PUP, subject to further review. (ECF-526 at 42; *see also* ECF-504 at 33; *supra* at 14-15).

Mr. Zahn disputed every element of the Government's case. (ECF-504 at 52-54). In opening statements, his counsel identified several "must prove" items for the Government, one of which was "the existence of this property they were going to steal," and committed that the Government would "not be able to rule out the very reasonable possibility that there was no property"—money from a sale that never happened to be stolen by a PUP that was never implemented. (*Id.* at 52-53).

## 2.    Motions for judgment of acquittal.

Mr. Zahn moved for judgment of acquittal at the close of the Government's case and of the evidence. (ECF-523 at 147; ECF-524 at 193-94). He argued the Government's evidence was insufficient to prove (1) property in the City's hands,

(2) the jurisdictional elements of Section 666 and wire fraud, (3) intent to deprive a victim of property, and (4) the scheme, if successful, would have deprived anyone of property. (ECF-523 at 147-65; ECF-525 at 194-96). The District Court denied the motions. (ECF-524 at 197). It refused to engage with *Cleveland*'s requirement of "property in the hands of the victim," commenting simply that "the record in this case seems to be overflowing with dollar signs." (*Id.*).

### 3.    The charge conference.

At the charge conference, the District Court cut the legs out from Mr. Zahn's commitment that the Government couldn't prove a scheme to take "property." Mr. Zahn requested, correctly under *Cleveland*, jury instructions that the object had to be "money or property in the hands of" a victim and that it "does not suffice that the object may become property." (ECF-398 at 37-38). He also requested, correctly under *Loughrin v. United States*, 573 U.S. 351 (2014), an instruction that to convict of wire fraud, the jury had to find the scheme "would have resulted, in the ordinary course, as the direct means to obtain money or property." (*Id.* at 38-39). Over Mr. Zahn's objections that "the property interests … have been really central to our case," the District Court refused both instructions. (ECF-524 at 216-17, 222, 240, 241). As read, the instructions did not inform the jury either (1) that the object of a scheme under Section 666 or the wire fraud statute must be "property in the

victim's hands" or (2) of *Loughrin*'s requirement that the scheme needed to be one that would result in the taking of money or property. (*See* ECF-473 at 15-20).

Additionally, the District Court belatedly allowed the Government to match its indictment to its trial theory. Because its theory was Mr. Zahn schemed to deprive the *City* of money, it asked for an instruction that the jury could convict it found Mr. Zahn was an agent of *either* the City *or* JEA, when its indictment alleged he was only an "agent of JEA." (ECF-1 at 2; ECF-345 at 15). Over objection that the instruction worked a constructive amendment of the indictment, the District Court gave it anyway. (ECF-524 at 253; ECF-473 at 15).

### 4.    The verdict, post-trial motion, and sentencing.

The two juries heard the same evidence, except that the Wannemacher jury heard brief excerpts of Mr. Zahn's *Garrity* statement that Mr. Zahn himself could not offer. (*See* ECF-525). The Wannemacher jury acquitted on both counts. (ECF-489). The Zahn jury returned guilty verdicts on both counts, finding a Section 666 violation—but not a wire fraud violation—on the conspiracy count. (ECF-488).

Mr. Zahn again moved for a judgment of acquittal. (ECF-497). He argued the Government failed to prove the object of the fraud was "property in the victim's hands" because under *Cleveland* and other precedents, "[o]nly present and existing property in the hands of a victim can sustain a conviction." (*Id.* at 6).

Separately, Mr. Zahn argued that the Government failed to prove the jurisdictional elements of Section 666 and wire fraud. On Section 666, the Government's theory was a scheme to take money *from the City*, but its evidence was (1) that Mr. Zahn was an agent of *JEA*, *not the City*, and (2) *JEA*, *and not the City*, received federal funds (which it failed to prove were "benefits" under Section 666, anyway). (ECF-497 at 12-14). With respect to wire fraud, Mr. Zahn argued that the Government failed to prove he "caused" a wire transmission "for the purpose" of executing a scheme because the livestream of the Board meeting had nothing to do with Mr. Zahn: Board meetings were automatically livestreamed under a policy predating Mr. Zahn's tenure. (*Id.* at 16-18). He also argued that the Government failed to prove the scheme could have resulted in a property loss, failed to prove an intent to defraud, and that the jury instruction on "agent" under Section 666 constructively amended the indictment. (*Id*. at 6-7, 10-20).

The District Court denied relief. (ECF-502 at 2; ECF-540). Without discussing *Cleveland*, it held that the object of the scheme was "funds that would have otherwise gone to the [City]." (ECF-540 at 7-8). It rejected Mr. Zahn's arguments on Section 666's jurisdictional elements—and constructive amendment—because it believed JEA was "owned by the City" and, thus, that JEA and the City were the same organization. (*See id.* at 5). It held that the livestream

of the Board meeting was sufficient to prove wire fraud's jurisdictional elements because any wire "occurring only incidental" to a scheme is enough. (*Id.* at 11).

The District Court sentenced Mr. Zahn to 48 months in prison. (ECF-552).

## III.    Statement of the facts.

### A.    Additional facts relevant to the property fraud issues.

#### 1.    The potential existence of money from a sale of JEA.

There never was a sale, a sale contract, or any sale proceeds: The ITN was terminated before JEA even received final bids. But from the beginning, whether a sale could have happened—let alone produce the $3.4 billion of net proceeds necessary for the PUP to operate—was speculative and remote. The evidence was that "[a] sale of all or a portion of JEA's assets will represent one of the largest, most complex transactions ever attempted in the municipal utility market." (ECF-476-4 at 28; *see also* ECF-476-3 at 5). As JEA's investment banker testified, in view of these complexities, making a sale happen would be like "landing a 747 on an aircraft carrier in a hurricane." (ECF-516 at 171-72).

The Government did produce evidence JEA received responses to the ITN meeting the minimum requirements, focusing on a bid by NextEra. (*See* ECF-516 at 217-254 (testimony of NextEra official) ECF-526 at 34-35, 40, 53 (closing argument about NextEra); ECF-476-93 (summary of replies to ITN)). But NextEra's bid—like all bids—was subject to due diligence, and there was no proof

anyone's terms would have survived it. (*See* ECF-476-96 at 3, 5, 7-8 (describing diligence items in NextEra bid); ECF-476-93 (summarizing diligence requirements of bidders)). And diligence was hardly the end of it, because any sale of JEA—let alone one producing more than $3.4 billion net—had to run many other gauntlets.

*First,* JEA's disastrous Plant Vogtle contract had to be solved. (ECF-516 at 151-52). Among other things, the debt service was in the billions, and the project was mired in litigation. (ECF-476-120 at 62, 67; ECF-516 at 151). NextEra's solution was to stick legacy JEA customers with the burden by making it a charge on their future bills after a sale. (ECF-516 at 250-52). There was no evidence JEA (or anyone else) would agree to that. Nor would it have escaped another Vogtle thicket: The Vogtle contract gave JEA's counterparty rights under "change in control provisions" that would need to be resolved. (ECF-476-4 at 26; *see also* ECF-516 at 148). Without a solution to Vogtle, even NextEra believed there could be no deal with JEA. (*Id.* at 253-54; *see also* ECF-476-93 at 20 (NextEra bid "highly dependent on interpretation of … consent rights" under Vogtle contract); ECF-516 at 154 (no bidder proposed to assume liability for Vogtle)).

*Second*, Vogtle was not JEA's only big contract. It had other contracts that, like Vogtle, had "change of control" provisions presenting "complexities around ownership, transfer rights, and division of property rights should a privatization

occur." (ECF-476-4 at 26; *see also* ECF-476-3 at 3-4). The Government never explained whether or how these "complexities" could be resolved.

*Third*, any sale would require approvals from multiple state and federal regulators. (*See* ECF-476-3 at 4-5; ECF-476-96 at 12-13; ECF-476-98 at 16, 38, 47, 88 (draft asset purchase agreement; requiring regulatory approvals); ECF-516 at 148)). Take one significant regulatory roadblock: NextEra's plan to stick legacy JEA ratepayers with Vogtle required Florida Public Service Commission approval. (ECF-516 at 252-54). There was no evidence such approvals would be obtained.

*Fourth*, a sale required approval by JEA's Board. (*E.g.*, ECF-517 at 299). No Board Member testified they would have voted for a sale.

*Fifth*, a sale required approval by the City Council. (*Id.*). There was no evidence the Council would have voted to approve.

*Sixth*, a sale required the affirmative vote of Jacksonville citizens. (*Id.*). There was no evidence such a vote could be obtained.

## 2.    The potential implementation of the PUP.

On the Government's evidence, any possibility the PUP would take money from the City was likewise speculative and remote, for several reasons.

*First*, in any sale of JEA, the "amount owed to the employee … w[ould] be paid by the Purchaser," not the City. (ECF-476-88 at 3; *see also* ECF-476-79 at 16 (draft plan; providing that the "obligations of JEA under this Plan and any

Agreement shall become the rights and obligations of" any buyer); ECF-476-98 at 8-9, 81 (draft asset purchase agreement; providing for purchaser's assumption of liabilities and not excluding JEA benefit plans). As designed, then, the PUP could not take any "money" from the City's hands.

*Second*, the PUP had to clear legal and ethical review before it could be implemented. JEA's Chief Administrative Officer, Herschel Vinyard, took the lead. (*See generally* ECF-523 at 82-130). A lawyer with a history of government service, he "did not think [the PUP] would work politically" and was worried about public blowback. (*Id.* at 56, 67-69).

Mr. Vineyard established a series of "circuit breakers" to ensure that if the PUP "was not appropriate, was not lawful, then … it would hopefully just stop in its tracks." (ECF-523 at 60). Those included reviews by (1) OGC, (2) two outside law firms representing JEA, (3) the Florida Attorney General, and (4) the Florida Commission on Ethics. (*See id.* at 84-95). Messrs. Zahn and Wannemacher knew about and supported these protocols. (*See id.* at 83-84).

The lawyers reviewed the PUP and prepared requests to the Attorney General and Commission on Ethics. (*See, e.g.*, ECF-470-39; ECF-476-88; ECF-518 at 119, 154-55). JEA's two outside counsel reviewed the PUP and cleared it as legal and ethical. (*Supra* at 15-16). The PUP failed during legal review because the

City's General Counsel thought employees should not receive payouts in a sale. (*Supra* at 16). The circuit breakers functioned as intended. (ECF-526 at 118).

*Second*, before any sale, the PUP would have been audited and disclosed on JEA's financial statements. (ECF-516 at 113, 168-69, 175-77). Had the PUP advanced, its terms and operation would have been public.

*Third*, by design, PUP units had to be allocated to employees by the Board's Compensation Committee Chair or Mr. Zahn as her designee—except that Mr. Zahn could not allocate units to himself. (*Supra* at 14). There was no evidence of what the allocations, especially to Mr. Zahn, would have been.

*Fourth***,** before the PUP could be implemented, a finalized PUP document and corresponding PUP agreements for employees had to be drafted, pass legal review, and be approved. (*E.g.*, ECF-476-79; ECF-476-87). As that progressed from the July Board meeting into fall 2019, it became clear that documenting, implementing, and allocating units in the PUP would take longer than the ITN because "[t]here was simply too much work to be done still at that time. (ECF-523 at 45-46; *see id.* at 39). It was highly unlikely—if not impossible—that the PUP could be implemented before a sale, had one occurred. (*See* ECF-526 at 120).

### B.    Facts related to the jurisdictional elements of the offenses.

***Wire fraud.*** The sole jurisdictional hook on Count II for wire fraud was a livestream of the July 23, 2019 JEA Board meeting. (ECF-1 at 27). Neither Mr.

Zahn nor Mr. Wannemacher caused the livestream: The uncontroverted evidence was that (1) the JEA Board met regularly every month; and (2) JEA Board meetings were livestreamed "automatically as a matter of regular practice" under a policy predating Mr. Zahn. (ECF-505 at 35; *see also* ECF-513 at 39 (similar); ECF-526 at 48 (prosecutor conceding "Yes, it was a predetermined meeting. It was going to be live streamed…."); ECF-470 at 2-9 (reflecting admitted evidence of regular Board meetings each month)). Nor did the livestream further the alleged deception: The uncontroverted evidence was that on July 23, 2019, Mr. Zahn, Mr. Wannemacher, and the Board members were present in-person. (*See* GE20Q).

**Section 666.** The Government failed to produce evidence that the City received federal "benefits" under Section 666. Instead, it relied on federal money received by JEA. (ECF-526 at 47). The Government introduced two exhibits it described as "[s]preadsheet[s] showing Federal Funds to JEA." (ECF-476 at 13). They were schedules to JEA's 2018 and 2019 financial statements, showing "total expenditures of federal awards received by JEA for the year … that have been funded" under the Presidentially Declared Disasters Program. (ECF-476-115 at 1; ECF-476-116 at 1). They reflect federal funds were "[p]assed through" to JEA by the Governor's office as "Disaster Grants." (ECF-476-115 at 5; ECF-476-116 at 5).

The exhibits do not describe the program, explain how it operated with respect to the Governor, or explain the relationship between the Governor and

37

JEA. They state that they present "*total expenditures* of federal awards *received by JEA* for the year[s]" ended September 30, 2019 and September 30, 2020. (ECF-476-115 at 6; ECF-476-116 at 6) (emphasis added). The witness testimony described the funds simply as "federal grant money." (ECF-515 at 235).

Likewise, the Government did not produce evidence that Mr. Zahn was the City's agent. It pointed to Mr. Zahn's employment agreement with JEA. (ECF-502 at 11). But on its face, that was not an agreement between Mr. Zahn and the City. (*See* ECF-476-113 at 1). Instead, it provided that "*JEA* is desirous of continuing to employ Employee" and that "*JEA* and Employee agree" to the employment. (*Id.*) (emphasis added). It contained no rights or obligations between Mr. Zahn and the City. (*See id.*). Nor did it name Mr. Zahn as "a person authorized to act on behalf" of the City, as "a servant or employee" of the City, or as "a partner, director, officer, manager, [or] representative" of the City. 18 U.S.C. § 666(d)(1).

## IV.    Standards of review.

*Issue I.A-I.C*: The Court reviews a denial of a motion for judgment of acquittal *de novo*. *United States v. Doran*, 854 F.3d 1312, 1313 (11th Cir. 2017). It conducts an "independent review," taking the evidence in the light most favorable to the Government, to determine "whether a reasonable jury could have found [Mr. Zahn] guilty beyond a reasonable doubt." *United States v. McLean*, 802 F.3d 1228, 1233 (11th Cir. 2015) (quotation omitted).

*Issue I.D*: The Court reviews a denial of a jury instruction for abuse of discretion. *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997). A district court abuses its discretion "where (1) the requested instruction was substantively correct, (2) the District Court's charge to the jury did not cover the gist of the instruction, and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *United States v. Culver*, 598 F.3d 740, 751 (11th Cir. 2010) (quotation omitted).

*Issue II*: The standard of review is the same as for Issue I.A-C.

*Issue III*: The standard of review is the same as for Issues I.A-C and II.

*Issue IV*: The Court reviews a *Kastigar* finding on whether the Government proved an indictment is not in any way, directly or indirectly, tainted for clear error. *United States v. Nyhuis*, 8 F.3d 731, 741 (11th Cir. 1993). Such a finding is clearly erroneous if "induced by an erroneous view of the law." *United States v. Slough*, 641 F.3d 544, 549 (D.C. Cir. 2011) (quotation omitted). Legal conclusions are reviewed *de novo. United States v. Cozzi*, 613 F.3d 725, 728 (7th Cir. 2010).

## SUMMARY OF THE ARGUMENT

The property fraud statutes don't empower federal prosecutors to intervene in local political rows. So, the Government can't score convictions by tarring local officials as bad actors in front of juries: The statutes don't "enact as federal law the Ninth Commandment to Moses on Sinai." *United States v. Takhalov*, 827 F.3d 1307, 1310 (11th Cir. 2016). Instead, the Government must run the table on a set of legal requirements designed to restrict federal prosecutions to matters of federal interest. Here, the prosecutor scratched every time he picked up the cue stick.

The Government's cardinal overreach was wielding federal statutes requiring "property in the victim's hands" to reach the speculative and remote possibility the City might receive money if JEA was sold. *Cleveland*, 531 U.S. at 26 (quotation omitted). Under those statutes, "*it does not suffice* … that the object of the fraud *may become property in the recipient's hands*." *Id.* at 15 (emphasis added). Yet, that was the most the Government proved. By wrongly holding that hypothetical, future money counts as real, existing property, the District Court gave the Government a free pass on this essential element of its proof.

The Government's hypothetical-money theory left it with a second problem: It couldn't prove either that the scheme would proximately result in the City being wrongfully deprived of property or that it was intended to achieve that deprivation. Because the alleged scheme, as purportedly designed by the alleged conspirators,

required a sale and the PUP to clear multiple hurdles—legal, ethics, regulatory, and accountant approval, for example—disclosing everything, one of two outcomes was baked in: A sale and the PUP either (1) would be approved with everything in the open or (2) wouldn't be approved at all (as it happened). By allowing the Government to imagine hypothetical, future money into the City's hands, the District Court also allowed it to imagine that the scheme evaded all these hurdles, while failing to present evidence that it in fact would.

The Government's second overreach was leading the District Court to overlook its burden to prove the jurisdictional elements of wire fraud and Section 666. For wire fraud, there was no way Mr. Zahn "cause[d]" the livestream of the July 23 Board meeting "for the purpose of executing" a scheme because the livestream and the scheme were wholly unrelated: The livestream happened automatically without regard to the scheme and did nothing to help it along. And the Section 666 theory was that Mr. Zahn was an agent of the City, which received federal funds. Yet, the Government only had evidence Mr. Zahn was JEA's agent (not the City's) and that JEA (not the City) received federal funds. Although those facts required the Government to prove JEA and the City were alter egos, the uncontroverted evidence was they are separate and distinct entities.

The Government's third overreach was selling the District Court on inaccurate jury instructions tipping the scales in its favor. The District Court

refused instructions about "property" and proximate cause, even though they were correct and critical to Mr. Zahn's defenses. Worse still, by instructing the jury that it could find Mr. Zahn was an agent of the City, it constructively amended a Section 666 count charging only that he "was an agent of JEA." (ECF-1 at 2).

The Government's final overreach was ignoring DOJ policy and soaking the grand jury in Mr. Zahn's *Garrity* statement and its fruits. Instead of checking that overreach and holding the Government to its *Kastigar* burden to prove the indictment *was not* directly or indirectly tainted, the District Court shifted the burden to Mr. Zahn and required him to show that it *was* tainted. Compounding that mistake, it wrongly conducted a one-sided review for "harmless error"—a tainted indictment violating the Fifth Amendment cannot be harmless—without reviewing all the evidence before the grand jury and deciding whether the grand jury's exposure to *Garrity* material was harmless beyond a reasonable doubt.

## ARGUMENT

I.  **Property fraud issues: The District Court erred by denying a judgment of acquittal, declining to dismiss the indictment, and declining to instruct the jury on the "property" elements of Counts I and II.**

The District Court wrongly allowed a federal prosecutor to over-extend federal fraud statutes to justify taking sides in a local political controversy. Section 666 and the wire fraud statute are limited to schemes to defraud a victim of "property."[3] Here, the Government failed to plead or prove that: (1) the object of the scheme was a traditional property interest in the City's hands, (2) the scheme would proximately cause the City to part with property, and (3) the scheme was intended to defraud the City of property. The District Court multiplied the error by failing to instruct the jury on the "property" and causation elements.

### A.  The Government's indictment and evidence were insufficient to prove a traditional property interest in the City's hands.

The Government persuaded the District Court that Mr. Zahn "participated in a conspiracy to steal money destined for [the City]" from a "potential sale of JEA." (ECF-502 at 2, 6; ECF-540 at 9-10). To prove that "potential" proceeds from a sale of JEA's assets qualified as "property," however, it had to produce evidence there was a "traditional property interest" in those "potential" proceeds, *Ciminelli*, 598

---

[3]    Although the wire fraud statute refers to "money or property," courts construe it identically with the "property" requirement of Section 666. *See Kelly v. United States*, 590 U.S. 391, 398 (2020).

43

U.S. at 316, "in the [City's] hands," *Cleveland*, 531 U.S. at 15. Because the

Government failed to do that, Mr. Zahn's convictions must be reversed.

> **1.    Section 666 and the wire fraud statute require an existing property interest traditionally protected at law.**

Section 666 and the wire fraud statute are "limited in scope to the protection

of property rights." *Kelly*, 590 U.S. at 398-99 (quoting *McNally v. United States*,

483 U.S. 350, 360 (1987)). Thus, they require the Government to prove the

"object" of a scheme is a "traditionally recognized property interest"—namely, an

interest "long … recognized as property." *Ciminelli*, 598 U.S. at 314. And that

interest must presently be "property in the victim's hands," *Cleveland*, 531 U.S. at

26, not one that "may become property" in the future.[4] *Id.* at 15.

Since *McNally*, the Court has consistently prohibited the Government from

characterizing intangible rights or future expectations as "property." *See Ciminelli*,

598 U.S. at 314; *Cleveland*, 531 U.S. at 24. The statutory text demands it:

"Property" naturally means interests historically protected as "property rights." *See*

*id.* That is reinforced by federalism and lenity principles that restrain the

Government from "enforc[ing] (its view of) integrity in broad swaths of state and

---

[4]    The text of Section 666(a)(1)(A) is explicit, requiring in the present tense that the property "*is* owned by, or *is* under the care, custody, or control" of the victim. (Emphasis added).

local policymaking," *Kelly*, 590 U.S. at 404, and wielding the statutes in ways that leave their "outer boundaries ambiguous," *McNally*, 483 U.S. at 360.

In *McNally*, the Government charged state officials with mail fraud and conspiracy alleging their failure to disclose a conflict of interest denied a state government the "intangible right" to the officials' honest services. 483 U.S. at 352-54. The Government argued the right to disclosure "to persons in state government whose actions or deliberations could have been affected" was "property." *Id.* at 353. The Supreme Court rejected that theory because the statute is "limited … to the protection of property rights," which don't include an "intangible right of the citizenry to good government." *Id.* at 356, 360. That would make the statute's "outer boundaries ambiguous" and wrongly "involve[] the Federal Government in setting standards of disclosure and good government." *Id.* at 360.

Although *McNally* "stopped … the intangible rights doctrine in its tracks," *Skilling v. United States*, 561 U.S. 358, 401 (2010), it hasn't stopped the Government from evading the legal requirement of "property." In *Cleveland*, while prosecuting a scheme to obtain state-issued video-poker licenses, the Government floated a new theory that a future expectation of money created "property." 531 U.S. at 16-17. Although licenses are not traditional property rights—they are exercises of regulatory authority—the Government said they were "property" because they (1) entitled the state to fees and a share of the licensees' revenue in

the future, and (2) were akin to a franchisor's interest in a franchise—the licensee operated the video-poker machines for the state's future benefit. *Id.* at 21-22, 24.

The Court reversed because the Government hadn't proved a property interest "in the victim's hands." *Id.* at 26. Reasoning that the future revenue came to the state "only *after* [licenses] have been issued," it held that "[i]t does not suffice" that the object of a scheme "may become property in the recipient's hands" later. *Id.* at 15, 26. The franchise analogy couldn't fix the problem because the state didn't own the video-poker business, so there was no "asset" backing the claim the licenses were "property." *Id*. at 24. The Government's theory "stray[ed] from traditional concepts of property" and invited a "sweeping expansion of federal criminal jurisdiction." *Id.*

Most recently, in *Ciminelli*, the Government persuaded the Second Circuit that the right to information about property was itself "property." 598 U.S. at 313-14. There, it used the "right-to-control" theory to win a conviction for conspiracy and wire fraud against an official who schemed to steer a government contract to a developer (in exchange for payments). *Id.* at 312-13. It posited that the "right to control" the contract was "property" because "a defining feature of most property is the right to control the asset," which is denied when the owner is deprived of information about it. *Id.* at 313 (quotation omitted).

46

The Court rejected the theory because the "right to control" is "not an interest … long … recognized as property" and so "cannot be squared with the text of the federal fraud statutes." *Id.* at 314. "The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest." *Id.* at 316. So, a claimed right to information bearing on the potential disposition of property is not "grounded in traditional property notions" and would improperly "place under federal superintendence a vast array of conduct traditionally policed by the states." *Id.* at 315, 316 (quotation omitted).

> **2.    The Government presented a disguised intangible-rights theory and failed to prove a traditional property interest in the City's hands.**

The District Court erred by allowing the Government to disguise a legally invalid intangible-rights theory as a valid theory about "money" the City might have received if JEA was sold. The District Court was wrong to hold "the record in this case seems to be overflowing with dollar signs" (ECF-524 at 197), because the Government never proved the City had any dollars or a legal right to them. At best, there was an intangible right to information about exploring Scenario 3. The theory was about a "right to control" and invalid as a matter of law.

There never was "money" in the City's hands—only the possibility of money if JEA was sold. Yet, *Cleveland* holds that the possibility an interest "may become property" is insufficient. 531 U.S. at 15. Instead, it is essential to identify

what interest *was* in the City's hands and determine whether *that interest* is property. On the Government's proof, the only thing in the City's hands was an ephemeral interest in the JEA Board's decision to evaluate Scenario 3, which might, through a chain of future decisions, have resulted in a sale of JEA's assets and thus money. But Scenario 3 was merely a decision to "explore alternatives" to JEA going it alone, "subject to further Board action and other approvals." (*Supra* at 12). It was a "discretionary economic decision" about the investigating a possible future course of action, not property. *Ciminelli*, 598 U.S. at 316.

The Government presented a legally invalid "right to control" theory. It was that the JEA Board would not have voted to explore Scenario 3 if it knew that the scenario planning results did not reflect JEA's most likely future or the PUP might apply to ten percent of proceeds above $3.4 billion. Putting aside that the Board knew both—it was told so—the theory is no different from the theory in *Ciminelli* that the local government would have evaluated contracts differently if it knew the procurement was rigged. *See id.* at 310. The interest the Government's case posited is simply "not a traditional property interest." *Id.* at 316.

The Government's effort to conceal its invalid theory as a valid theory about "money" fails. The Government cannot dodge the requirement of a traditional property right by dressing an intangible right in its clothes. *See United States v. Yates*, 16 F.4th 256, 267 (9th Cir. 2021) (rejecting effort to "recharacterize …

honest services" theories "as schemes to deprive the employer of a property interest"); *United States v. Ratcliff*, 488 F.3d 639, 645-46 (5th Cir. 2007) (rejecting characterization of intangible rights as "money" where scheme "did not implicate [the local government's] property rights"); *United States v. Griffin*, 324 F.3d 320, 355 (5th Cir. 2003) (rejecting argument that tax credits were property where the state's interest was "purely abstract or theoretical").

Moreover, the Government side-stepped its burden to prove a traditional property right "in the victim's hands." *Cleveland*, 531 U.S. at 26. Granted, "money in hand" is a property right. *Pasquantino v. United States*, 544 U.S. at 349, 356 (2005). But the Government couldn't prove the City had "money in hand." Without that, the only way for it to prevail was to prove that the City had a present legal right to money. *See Cleveland*, 531 U.S. at 22 (reversing wire fraud conviction absent proof of "money to which the State was entitled by law"); *United States v. Adler*, 186 F.3d 574, 577 (4th Cir. 1999) (affirming dismissal where Government failed to allege a creditor had a "property right" in the specific money that was the subject of the indictment). But the Government never advanced that theory because it couldn't prove it. It would have required the City to have a

49

present right—perhaps under a contract for sale—entitling it to the "money" the Government theorized the scheme would steal.[5]

At most, there was a mere possibility the City might receive money in the future. That possibility hinged on future decisionmakers making a host of future decisions: (1) a plan to resolve the enormous Plant Vogtle problem; (2) a plan to resolve "change in control" rights; (3) decisions by a buyer, after diligence, to buy JEA for more than $3.4 billion net; (4) a decision by the JEA Board to approve a sale; (5) decisions by regulators to clear a sale; (6) a decision by the City Council to approve a sale; and (7) a decision by the City's electorate to approve a sale. (*Supra* at 32-34). This made the possibility vanishingly small—like "landing a 747 on an aircraft carrier during a hurricane." (ECF-516 at 171-72)—and proves that if the City had any interest, it was an intangible interest in information about whether Scenario 3 was sound policy, not a property right in "money."

Nonetheless, the Government wrongly persuaded the District Court that because conspiracy and wire fraud are inchoate offenses, the mere possibility of money was enough. But that's not how the property fraud statutes work. The Government cannot summon property out of thin air—and into the victim's hands—by chanting, as it did in the District Court, "the gravamen of the crime is

---

[5]    Indeed, Government could not even prove the City had a legal right to any proceeds in a sale of JEA. (*Supra* at 8).

not success." (ECF-502 at 6). *See Kelly*, 590 U.S. at 398 n.1 ("If there was property fraud here, there was also conspiracy to commit it. But if not, not."); *McNally*, 531 U.S. at 361 ("The Government concedes that if petitioners' substantive mail fraud convictions are reversed, their conspiracy convictions should also be reversed."); *United States v. Britton*, 108 U.S. 199, 206-07 (1883) ("If, therefore, … defendants had misapplied the funds … by themselves declaring a dividend, when there were no net profits to pay it, it would not have charged a criminal act."). Otherwise, the Government could just "let in through the back door the very prosecution theory that the Supreme Court has tossed out through the front"—intangible rights that are not property rights. *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988).

Indeed, when the Government has tried to conjure property this way, courts have checked the overreach. *See id.* (explaining courts cannot "recharacterize every breach of fiduciary duty as a financial harm"). In *United States v. Henry*, the Government charged conspiracy to commit wire fraud in a scheme to steer a government's bank deposits to one bank and away from competitors. 29 F.3d 112, 113 (3d Cir. 1994). The district court dismissed the indictment because the competing banks' opportunity to receive the deposits wasn't "property." *Id.*

The Third Circuit affirmed because the Government failed to allege an interest "traditionally recognized" as a property right. *Id*. at 115. Sure, money on deposit with a bank is "the property of that bank." *Id.* at 114. But that couldn't

51

prove "property" because "the money had not yet been deposited," and "something that would become … property if and when it were received" is not itself property. *Id.* at 114-15. The Government had an "intangible rights problem": The competing banks might have an "interest in a fair bidding opportunity," but that is not a "traditionally recognized, enforceable property right." *Id.* at 115.

Likewise, the City might have had an interest in money from a potential sale, but an interest in something that may become property "if and when it were received" is not itself property. *See also Griffin*, 324 F.3d at 354 (holding that tax credits were not property because they had a "zero intrinsic value" while in the victim's hands); *United States v. Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991) (holding that market share—an expectation of future business—is not "property"). The same intangible-rights problem exists here: The City might have had an intangible right to information about whether Scenario 3 was sound policy, but that is not a property right.

Furthermore, the Government's theory neuters *Ciminelli*. If the magic words "the gravamen of the crime is not success" eliminate the requirement of property "in the victim's hands," it would have been simple for *Ciminelli* to say the local government's right to information about a future contract is the contract itself, making it "property." But that would not change the fact that the real interest was

only an intangible right related to discretionary economic decisions. *See Ciminelli*, 598 U.S. at 311 (reversing wire fraud and conspiracy convictions).

This case presents the same federalism and fair-notice problems as *McNally* and its progeny. People consider ideas that might result in property all the time. Under the Government's theory, any deception in those deliberations is a federal crime because property might exist if a series of future decisions make the idea a reality. That violates the Supreme Court's admonitions that this "almost limitless variety of deceptive actions [is] traditionally left to state contract and tort law," *Ciminelli*, 589 U.S. at 315, and federal prosecutors cannot "criminaliz[e] all acts of dishonesty by state and local officials." *Kelly*, 590 U.S. at 398.

### 3. The indictment failed to allege a traditional property interest in the City's hands.

The indictment charged the same case the Government presented at trial: a scheme to deprive the City of hypothetical money. (*Supra* at 24-25). The District Court erred by denying Mr. Zahn's motion to dismiss the indictment as well. *See, e.g.*, *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002).

### B. The Government failed to prove the alleged scheme would proximately result in the City parting with money.

Because the District Court erroneously imagined property in the City's hands, it also erroneously imagined that *none* of the things that *had to happen* to deprive the City of money—*e.g.*, legal clearance, City Council and voter

approval—*would have happened*. The District Court's speculation that those contingences would inevitably occur relieved the Government of its burden to prove they would proximately follow and cause the City to part with money.

The District Court was mistaken. *See Loughrin*, 573 U.S. at 362-64. In *Loughrin*, the Supreme Court interpreted the bank fraud statute, which prohibits schemes to "obtain property" of a bank "by means of" false pretenses. *Id.* at 353. It explained the statute requires a causal connection between the defendant's conduct and a deprivation of property such that a deprivation will follow "in the ordinary course" from the conduct. *Id.* at 364. Under that standard, "not every but-for cause will do" because "the defendant's false statement [must be] the mechanism naturally inducing a bank … to part with money." *Id.* at 363. Merely "indirect" or "incidental" connections are insufficient. *Id.*

Like the "property" requirement, the causation requirement protects the "relation between federal and state criminal jurisdiction." *Id.* at 362 (quotation omitted). By demanding that prohibited conduct and property deprivation be linked, it prevents a federal "plenary ban on fraud." *Id.*

The wire fraud statute incorporates *Loughrin's* causation requirement and requires that a scheme "naturally induc[e]" a victim to part with property in a manner akin to "proximate causation." *United States v. Berroa*, 856 F.3d 141, 149-50 & n.4 (1st Cir. 2017) (mail fraud); *see also United States v. Martin*, 803 F.3d

581, 590 (11th Cir. 2015) (applying *Loughrin* to wire fraud statute). So does the text of Section 666, which punishes one who "embezzles, steals, [or] obtains by fraud … property," 18 U.S.C. § 666(a)(1), and is thus limited to schemes "to divest the victim" of property. *Kelly*, 590 U.S. at 399. The federalism concerns operate the same way, too, because the statutes' prohibitions of "schemes for obtaining property" preclude "a sweeping expansion of federal criminal jurisdiction." *Id.* at 404 (quotation omitted); *see also Berroa*, 856 F.3d at 150.

Here, the Government failed to prove the scheme would naturally and proximately result in the City losing money. The decisions the scheme supposedly induced—to explore Scenario 3 and approve implementation of a PUP, subject to review—could not directly result in the City losing money: They could neither cause a sale, result in an implemented PUP, or result in the allocation of units to employees. These were subject to future decisions by future decisionmakers independent of the scheme.

Take one uncontroverted fact: A sale had to obtain regulatory approval. Yet, it was also uncontroverted that NextEra—the Government's preferred bidder— would *not* buy JEA unless JEA's ratepayers covered the cost of Plant Vogtle and the PSC had to approve its plan. (*Supra* at 34). The Government offered no evidence PSC approval could be obtained. Without that, the PUP could not have resulted in the City losing money. Any connection between the Board's decisions

and the loss of City property is entirely indirect. *See Berroa*, 856 F.3d at 150 (holding medical providers' false statements to obtain medical licenses did not cause patients to part with "money" for their services).

And this says nothing about other events—legal review, accountant review, Attorney General review, Commission on Ethics review, City Council and voter approval, and the like—that all had to break the right way before it would be possible for the City to lose property. Nor does it say anything about the fact that any payments from the PUP would be made by the buyer in any asset sale, not the City, so the scheme could not have taken any money from the City. (*Supra* at 34-35). Yet, by allowing the Government to imagine money in the City's hands, the District Court allowed it to dodge its burden of proof on causation.

### C. The Government failed to prove the alleged scheme, executed as intended, would divest the City of money.

The Government also failed to prove the scheme, if executed, would have defrauded the City of property.[6] *See Kelly*, 590 U.S. at 399 (both statutes criminalize schemes "to divest the victim" of property); *McNally*, 483 U.S. at 358 ("[T]he words 'to defraud' commonly refer to wronging one in his property

---

[6]     On the Section 666 count, the jury found embezzlement or theft, 18 U.S.C. § 666(a)(1)(A), which it was instructed requires "wrongfully or intentionally taking money or property." (ECF-473 at 17). The Government's theory of embezzlement or theft was the wrongful taking of money by fraud—*i.e.*, misleading the JEA Board about Scenario 3 and a PUP. (ECF-502 at 8).

rights") (quotation omitted). Because conspiracy and wire fraud are inchoate crimes, a realized injury wasn't required. But the Government did have to prove the scheme, completed as intended, would have defrauded the City of property.

In this Circuit, a victim cannot be defrauded of property if he is "merely induced … to enter into a transaction that he otherwise would have avoided." *Takhalov*, 827 F.3d at 1310 (cleaned up).[7] "[T]o defraud, one must use deception to cause some injury …." *Id.* at 1312. When someone is deceived to do a deal but still gets its benefit, he is not *defrauded* of property. *Id.* at 1313. To defraud someone of property, one must mislead "about the nature of the bargain"—the "price" or the "characteristics" of the exchange. *Id.* at 1313-14.

The Government's burden is compounded under Section 666 because it "does not apply to bona fide salary, wages, fees, or other compensation paid … in the usual course of business." 18 U.S.C. § 666(c). If the scheme would have resulted in disclosure and approval of the PUP—a long-term employee benefits plan—Mr. Zahn would have been entitled to any payments and there could be no conspiracy to steal or embezzle property as a matter of law.

On the Government's evidence, given the disclosure requirements built into the process, there was not even proof of intent to deceive, let alone to defraud.

---

[7]     The fraudulent-inducement theory of property fraud is before the Supreme Court. *See Kousisis v. United States*, No. 23-909 (argued December 9, 2024).

Further still, if the scheme was completed as intended, the City would receive the benefit of its bargain. The ITN was structured so all terms of any Scenario 3 transaction would be disclosed before approval. Likewise with the PUP, the operation of which would be disclosed—if more disclosure was needed—through legal review, auditor review, and the resulting public disclosure. (*Supra* at 32-34). If a sale occurred, the City would have received the benefit of its bargain: a sale on agreed terms. If PUP payments were made, the City would have received the benefit of its bargain—a benefit plan to incentivize employee retention—and payments would have been bona fide compensation. *See Takhalov*, 827 F.3d at 1312-13. By allowing the Government to camouflage a mere possibility of money as property, the District Court let the Government prove a property fraud case with disputed evidence of deception alone.

### D.    The District Court erred by failing to instruct the jury on the definition of property and the requirement of causation.

A district court abuses its discretion by refusing to give a jury instruction if "(1) the requested instruction was substantively correct, (2) the court's charge to the jury did not cover the gist of the instruction, and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *Culver*, 598 F.3d at 751 (quotation omitted). Here, the District Court abused its discretion in denying two of Mr. Zahn's proposed jury instructions.

First, Mr. Zahn's requested an instruction explaining that the word "property"— in both Section 666 and the wire fraud statute—required the Government to establish that the object of the alleged scheme was property in the victim's hands. A primary theory of defense on both counts was that the Government could not prove a scheme to unlawfully take "property" (*supra* at 28), which is money or property in the hands of the victim. *Cleveland*, 531 U.S. at 15. By rejecting Mr. Zahn's legally correct definition of "property," and thus not telling the jury that the "property" object of the scheme had to be property "in the victim's hands," the District Court gutted Mr. Zahn's defense by preventing him from keeping his commitment to the jury in opening statements. (*Supra* at 28). This Court should reverse and remand for a new trial. *See United States v. Morris*, 20 F.3d 1111, 1118 (11th Cir. 1994) (reversing where theory of defense was "compromised without an adequate instruction").

Second, regarding the wire fraud count, the District Court abused its discretion by denying Mr. Zahn's request for an instruction under *Loughrin*. To convict a defendant of wire fraud, the jury must find that the scheme would have resulted, in the ordinary course, as the direct means to obtain money or property. *Berroa*, 856 F.3d at 149. The absence of a *Loughrin* instruction wrongly allowed the jury to convict based on pretend money (that could only exist if certain events that could not possibly occur came to pass), contrary to Mr. Zahn's central—and

correct—defense it could not. This Court should reverse Mr. Zahn's wire fraud

conviction and remand for a new trial. *See Morris*, 20 F.3d at 1118.

## II.  Wire fraud jurisdictional issues: The District Court erred in denying a judgment of acquittal on Count II because the evidence was insufficient to prove Mr. Zahn caused a wire transmission for the purpose of executing a scheme to defraud.

The District Court wrongly allowed the Government to decide a local

political controversy by ignoring the federal jurisdictional elements of wire fraud:

(1) that Mr. Zahn "caused" a wire transmission (2) "for the purpose of executing"

the alleged scheme. 18 U.S.C. § 1343. Those elements ensure the statute—under

the Commerce Clause—reaches only "limited instances in which the use of the

[wires] is a part of the execution of the fraud." *Schmuck v. United States*, 489 U.S.

705, 710 (1989) (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)).[8]

The Government charged only one wire transmission: the livestream of the

July 23, 2019 JEA Board meeting. (ECF-1 at 20). Yet, the livestream had nothing

to do with Mr. Zahn or the alleged scheme. Rather, the evidence was that (1) the

Board had monthly meetings, (2) the meetings were automatically livestreamed,

and (3) the Board's deliberations were in person. (*Supra* at 36-37). Even without

---

[8]      *Schmuck* involved mail fraud, 18 U.S.C. § 1341, but because the operative text of the two statutes is identical, they are interpreted identically. *See United States v. Evans*, 473 F.3d 1115, 1118 n.3 (11th Cir. 2006).

the scheme, the meeting would have been livestreamed; and even without the livestream, the scheme would have happened the same way.

But to prove Mr. Zahn "caused" a wire transmission, the Government had to prove he did *some act* "with knowledge that the use of the [wires] will follow in the ordinary course of business" or was the reasonably foreseeable result. *Pereira v. United States*, 347 U.S. 1, 8-9 (1954). And to prove he did so "for the purpose of executing" a scheme, it had to prove the wire was "incident to an essential part of the scheme." *Id.*. The Government proves these elements with evidence the defendant did something foreseeably resulting in a wire transmission facilitating the alleged scheme—advancing it, concealing it, or moving proceeds. *E.g.*, *United States v. Evans*, 473 F.3d 1115, 1120-21 (11th Cir. 2006) (efforts to conceal resulting in a fax); *United States v. Adkinson*, 158 F.3d 1147, 1163 (11th Cir. 1998) (using mailings "as one step toward[] the receipt of the fruits of the fraud"). Indeed, the jury here was instructed that the Government had to prove "Mr. Zahn … caused to be transmitted by wire … some communication … *to help carry out*" the scheme. (ECF-473 at 18) (emphasis added).

That proof is missing where, as here, the wire transmission is independent of the scheme and the scheme would unfold the same way regardless. *See United States v. Dooley*, 578 F.3d 582 (7th Cir. 2009). In *Dooley*, for example, the Government charged a police officer with wire fraud after he schemed to steal the

proceeds of bank robberies and, later, to conceal it. *Id.* at 584-86. To prove a wire transmission, the Government relied on an email from the officer's supervisor instructing him to deliver the proceeds to an FBI agent as evidence in an investigation; he delivered counterfeit bills instead. *Id.* at 588. The Government argued the officer "cause[d]" the wire transmission because he knew the FBI would come for the evidence and it was foreseeable the supervisor's email instructing him to deliver it would "follow in the ordinary course of business" from the FBI's efforts. *Id.* (quoting *Periera*, 374 U.S. at 8-9).

On that evidence, the Government failed to prove causation because to "follow in the ordinary course of business," a wire transmission must "occur not only *after* the defendant's act, *but as a result of* that act." *Id.* at 588. The evidence failed to show that because "[e]ven if [the officer] never had committed any theft," the FBI would have come for the evidence and the supervisor still would have sent "exactly the same email message." *Id.* at 589. There was no proof the wire transmission either "would not have occurred, or would have occurred in a substantially different form," without the scheme. *Id.*

*Parr v. United States*, in turn, shows how the Government also failed to prove a wire transmission "for the purpose of executing" a scheme. 363 U.S. 370, 391 (1960). There, the defendants cheated a local government of tax revenue. *Id.* at 374. They mailed statements to taxpayers, mailed payments to the government's

bank, and wrote checks to fictitious people. *Id. at* 374-76. The Supreme Court reversed their mail fraud convictions because the mailings were not "incident to an essential part of the scheme." *Id.* at 391 (quotation omitted). They were ordinary communications required by law and would have been sent regardless. *Id.*; *see also Schmuck*, 489 U.S. at 713 (explaining that mailings "would have been made regardless"). They were not "part(s) of the execution of the fraud." *Parr*, 363 U.S. at 391 (quotation omitted).

Likewise, the evidence Mr. Zahn caused a wire transmission "for the purpose of" deceiving the JEA Board was insufficient. The Board meeting would have been held and livestreamed regardless, and the scheme would have unfolded the same way regardless. *See also United States v. Kwiat*, 817 F.2d 440, 443 (7th Cir. 1987) (reversing where "[t]he mailings … did not make the fraud possible or facilitate it"). No reasonable jury could find the wire transmission "help[ed] carry out" the alleged scheme to defraud. (ECF-473 at 18).

The District Court ruled otherwise because it misread this Court's decision in *Evans* to hold that any "wire transmission only occurring incidental to the scheme" suffices. (ECF-540 at 11). Unlike this case, *Evans* involved a wire transmission that did foreseeably result from the defendant's act and facilitate his scheme. The defendant concealed his fraud by falsely negotiating with the

victim—lulling him to inaction—and a wire transmission from the victim was a natural extension of the communications. *Evans*, 473 F.3d at 1122.

The District Court effectively struck the causation and "for the purpose of" requirements from the statute. Under its reasoning, almost any deception near an active communication device is wire fraud. The text forecloses that interpretation. "Causes" connotes an action *resulting* in a wire transmission, not just talking while one happens. "For the purpose of executing such scheme" connotes *assisting* a scheme, not being unrelated to it. If the Government's unusual theory here makes things ambiguous, federalism and lenity resolve the ambiguity in Mr. Zahn's favor. *See Cleveland*, 531 U.S. at 25 (explaining that lenity is "especially appropriate in construing" the mail fraud statute); *Parr*, 363 U.S. at 385 (the mail fraud statute does not permit "essentially state law crimes" to "become federal ones").

## III. Section 666 jurisdictional issues: The District Court erred by denying a judgment of acquittal on Count I because the evidence was insufficient to prove the City received federal benefits, the federal money JEA received qualified as "benefits," and that Mr. Zahn was an agent of the City, and by constructively amending the indictment.

Section 666(a)(1) punishes an "agent" of a "local … government" or "agency" who "embezzles" or "steals" property from that local government or agency. 18 U.S.C. § 666(a)(1). Because Section 666 is a Spending Clause statute, the victim organization must "receive[] … *benefits* in excess of $10,000 under a Federal program." *Id.* § 666(b) (emphasis added). To ensure the defendant's

conduct risks federal funds, the defendant must also be an "agent" of that organization. *Id.* § 666(a)(1), (b). The Government failed to prove these elements.

### A.    The Government failed to prove the City received federal funds.

The Government's theory that Mr. Zahn conspired to steal money from the City required it to prove the City received federal "benefits." Its only evidence, however, was that JEA—not the City—received federal money. The District Court glossed over that failure by *assuming* the City and JEA are one and the same. (*See* ECF-540 at 5-6). But, as a matter of law, it was not permitted to "conflat[e]" the two entities as "alter egos so as to … treat [them] as one and the same." *Doran*, 854 F.3d at 1315. Instead, it had to find the Government presented sufficient evidence the relationship was so close it could "pierce [JEA's] corporate veil." *Id.*

There, the Government whiffed. The trial evidence was JEA was its own "body politic and corporate" and "legally separate from the City." It owned its own assets and was responsible for its own liabilities It could hire and fire its own employees. It could acquire and dispose of its own assets, subject only to the qualification that City Council and elector approval was required if more than ten percent of the assets were sold to another utility. JEA was not the City's alter ego: If it wanted, the Florida Legislature "could easily have made [JEA] a department[] of the City rather than [an] independent agenc[y]." (ECF-470-33 at 9-10).

Under this Court's precedents, no reasonable jury could find JEA's receipt of federal funds was the City's receipt of funds. In *Doran*, Florida State University established a non-profit to support its business school. 854 F.3d at 1314. The non-profit was managed by a board composed of four FSU officials, two FSU professors, and a seventh member appointed by FSU's president. *Id.* Although FSU received more than $10,000 in federal benefits, the non-profit did not. *Id.* After an officer of the non-profit embezzled money from the non-profit, he was convicted under Section 666(a)(1) on the theory that FSU's receipt of federal funds was properly attributed to the non-profit victimized by the embezzlement. *Id.*

This Court reversed because the Government failed to prove the non-profit received federal funds. *Id.* at 1315. It rejected the Government's argument that FSU's receipt of federal funds could be attributed to the non-profit because the two entities were "closely affiliated." *Id.* at 1314. Despite the affiliation, the two entities were separate in legal form and operational substance, and the receipt of federal funds by FSU was not the receipt of federal funds by the non-profit. *Id.* at 1315. Absent evidence the two entities were "alter egos so as to allow the Court to pierce the [non-profit's] corporate veil and to treat FSU and the [non-profit] as one and the same," the Government's evidence was insufficient. *Id.*

The Court relied on its decision in *McLean*, where the Government argued an agency affiliated with a city government received federal funds that were paid

66

to the city. *Id.* (discussing *McLean*, 802 F.3d at 1231, 1241). Although the city "was financially accountable for the [agency] and the agency is part of the [city's] operations," the agency—not the city—was the "relevant local organization." *Id.* (quoting *McLean*, 802 F.3d at 1241). Likewise here, JEA and the City are separate organizations, and the Government failed entirely to prove the two were alter egos to pierce the legal veil separating them. *See also United States v. DeQuattro*, 118 F.4th 424, 434 (1st Cir. 2024) (holding evidence of "significant" operational and organizational "ties" between related government entities was insufficient).

The District Court wrongly held otherwise because it thought JEA "was owned by the City." (ECF-540 at 5). The Government didn't prove that (*supra* at 37-38), but it would not make a legal difference if it had. The entire purpose of alter-ego/veil-piercing doctrine is that absent proof an owner "dominated and controlled" an enterprise and used it for an "improper purpose," the law *refuses to treat* the owner and the enterprise as the same. *Molinos Valle Del Cibao, C. por A v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011). *Doran* relied on *Molinos* for this very point. *See* 854 F.3d at 15 (citing *Molinos*); *see also DeQuattro*, 118 F.4th at 434. The Government proved nothing of the kind here.

### B. The Government failed to prove the federal funds received by JEA were federal "benefits" under Section 666.

Even if the Government proved JEA and the City were alter egos, it failed to prove the federal funds JEA received were "benefits" under Section 666.

The Government must prove the victimized organization received more than $10,000 of "*benefits*" "under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b) (emphasis added). But not all federal grants qualify as "benefits." *See Fischer v. United States*, 529 U.S. 667, 681 (2000); *Doran*, 854 F.3d at 1316. To keep Section 666 consistent with the Spending Clause, whether they do "turns on the relevant federal 'program's structure, operation, and purpose,' as well as the conditions under which an entity receives federal payments." *United States v. Edgar*, 304 F.3d 1320, 1324 (11th Cir. 2002) (quoting *Fischer*, 529 U.S. at 681).

Thus, the Government must prove the federal program had a "sufficiently comprehensive structure, operation, and purpose to merit characterization of the funds as benefits" and that there is a "nexus" between that purpose and the use of the funds by the recipient. *McLean*, 802 F.3d at 1231, 1240 (quotation omitted); *see also Fischer*, 529 U.S. at 679-80. The idea is to ensure the term "benefits" is limited to the federal interest: "to protect the integrity of … money distributed through federal programs." *McLean*, 802 F.3d at 1237 (quotation omitted).

Here, the Government did not prove anything about either the structure, operation, or purpose of the FEMA grants or the relationship between JEA's use of those grants and the structure, operation, and purpose of the program. The only evidence it highlighted was two schedules to JEA's financial statements, showing

"total expenditures of federal awards received by JEA for the year … that have been funded" under the Presidentially Declared Disasters Program. They reflect that federal funds were "[p]assed through" to JEA by the Governor's office as "Disaster Grants." (ECF-475-115 at 4; ECF-476-116 at 4). They said nothing about the structure of the program, how it operated with respect to the Governor or JEA, or why grants made to the Governor were "passed through" to JEA. Nor did they exclude the possibility that the grants were for cost reimbursement and had "no goals beyond performance of an immediate transaction." *See United States v. Pinson*, 860 F.3d 152, 166 (4th Cir. 2017) (quoting *Fischer*, 529 U.S. at 680). The Government thus failed to prove federal "benefits" under Section 666.

## C.    The Government failed to prove Mr. Zahn was the City's "agent."

The Government's failure to prove JEA and the City were alter egos also dooms its proof that Mr. Zahn was the City's agent. Under Section 666, an "agent" is a "person authorized to act on behalf of another person or a government and … includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). There was no evidence that Mr. Zahn held City office or was "authorized to act on [its] behalf." The Government's only evidence was Mr. Zahn's employment agreement *with JEA*, which, by definition, was insufficient to prove he was an agent *of the City*. *See Doran*, 852 F.3d at 1315-16; *United States v. Abu-Shawish*, 507 F.3d 550, 555-56 (7th Cir. 2007).

**D.    The District Court constructively amended the indictment to allow the jury to find Mr. Zahn was the City's agent.**

The theory that Mr. Zahn was the City's agent wasn't alleged in the indictment. Yet, the District Court constructively amended the indictment by instructing the jury it could find him guilty on that basis.

Under the Fifth Amendment, "a defendant can only be convicted only for a crime charged in the indictment." *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). It is per se reversible error for the jury instructions to constructively amend the indictment, which occurs when "the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction." *Id.* at 634, 636.

The instruction the jury could convict if Mr. Zahn was an agent of the City altered the indictment's charging terms and broadened the possible bases for conviction. An "essential element" of Section 666 is that the defendant is an agent of the victimized organization. *See Doran*, 852 F.3d at 1315-16. The indictment charged that element unambiguously, alleging that "ZAHN was an agent *of JEA* within the meaning of 18 U.S.C. § 666(d)." (ECF-1 ¶1) (emphasis added). Allowing the jury to convict if it found he was *the City's* agent—matching the indictment to the Government's theory—constructively amended the indictment.

*Keller* proves it. There, the Government charged a conspiracy between the defendant and a person identified by name in the indictment, yet the district court

70

instructed the jury it could find the defendant guilty if he conspired with anyone. *Keller*, 916 F.2d at 632. This Court reversed because the instruction amended the indictment, which "specifically allege[d] that only two individuals conspired, and contain[ed] no language indicating that there were" other conspirators. *Id.* at 634.

Likewise here, the instruction that the jury could convict if Mr. Zahn was the City's agent constructively amended an indictment charging he was only JEA's agent. *See also United States v. Narog*, 372 F.3d 1243, 1248 (11th Cir. 2004) (holding "an indictment[] containing both the broad language of the statutory crime and additional language seemingly narrowing the charged crime" is constructively amended "when that narrowing language is removed"); *United States v. Cancelliere*, 69 F.3d 1116, 1121 (11th Cir. 1995) (holding indictment charging that the defendant acted "knowingly and willfully" was amended when "the government moved … to delete the requirement that they prove willfulness").

### IV.    *Kastigar* issues: Because the Government's investigation was unavoidably tainted by the disclosure of Mr. Zahn's *Garrity* statement, the District Court erred by denying Mr. Zahn's motion to dismiss the indictment.

Because Mr. Zahn, a public employee, was compelled to testify about facts related to the indictment, his testimony is subject to use and derivative use immunity. *See Garrity*, 385 U.S. at 500. The Fifth Amendment prohibits the Government "from using [his] compelled testimony *in any respect*," including "evidence derived directly and indirectly therefrom." *Kastigar*, 406 U.S. at 453

71

(emphasis added). To ensure the Government complies, *Kastigar* requires it to satisfy the "*heavy burden* of proving that *all of the evidence* it proposes to use was derived from legitimate independent sources." 406 U.S. at 461-62 (emphasis added). "This burden ... imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460.

"To establish a 'wholly independent' source, the government must demonstrate that each step of the investigative chain through which the evidence was obtained is untainted." *United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994). "This includes an affirmative showing that none of the evidence presented to the grand jury was derived directly or indirectly from the immunized testimony." *Id.* Mere denials, even in good faith, do not cut the mustard. *Id.*; *see also United States v. Allen*, 864 F.3d 63, 94 (2d Cir. 2017).

Where, as here, exposure to *Garrity* statements is widespread and predates most of the Government's investigation, and the Government fails to follow reliable procedures for walling off immunized testimony and its fruits, the "burden of affirmatively proving independent sources" is "virtually insurmountable." *United States v. Hampton*, 775 F.2d 1479, 1490 (11th Cir. 1985); *see also United States v. Poindexter*, 951 F.2d 369, 376 (D.C. Cir. 1991) (holding "it may well be

extremely difficult for the prosecutor to sustain its burden of proof" in such circumstances) (quotation omitted)).

Measured against these standards, *Kastigar* requires reversal for two reasons. First, the District Court's findings on wholly independent source rest on three mistakes of law. Second, the District Court misapplied the harmless-error standard—assuming this Court's precedent applying that standard is correct. When viewed through the correct legal lens, the Government did not and cannot meet its *Kastigar* burden. The Court should reverse and remand for dismissal.

> ### A. The District Court's *Kastigar* findings rest on three legal errors, any one of which requires a reversal.

The District Court held "that the Government has shown an independent basis for the factual allegations in the Indictment *even assuming that some of the evidence to the Grand Jury was tainted*." (ECF-310 at 102) (emphasis added). This was a legal error for three reasons, each alone meriting reversal.

> ### 1. The District Court legally erred by assuming that the Government met its burden even if some of the evidence before the grand jury was tainted.

Mr. Zahn's indictment is either tainted by his *Garrity* testimony or it's not. The entire point of a *Kastigar* proceeding is to answer that question. *See Schmidgall*, 25 F.3d at 1528 ("[T]he prosecution has the burden of showing that its evidence *is not tainted* ….") (emphasis added). Instead of holding the Government to its burden to establish a wholly independent source for all its evidence, the

District Court "assum[ed] that some of the evidence presented to the grand jury was tainted," yet held that "the Government has shown an independent basis for the factual allegations in the Indictment." (ECF-310 at 102; *see also id.* at 69 n.17 (assuming 14 witnesses who testified to the grand jury "may have been exposed to or influenced by Defendants' *Garrity* statements").

When it comes to Fifth Amendment immunity, the Government can't be a little bit pregnant. Neither the Fifth Amendment nor *Kastigar* sanctions a standard under which an indictment is simultaneously tainted and clean. *See Kastigar*, 406 U.S. at 461-62 ("[T]he government [has] the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.").

Rather, taint under *Kastigar* is an all-or-nothing proposition: The Government's burden "includes an affirmative showing that *none of the evidence presented to the grand jury* was derived directly or indirectly from the immunized testimony." *Schmidgall*, 25 F.3d at 1528 (emphasis added). The District Court's assumption that "some of the evidence to the Grand Jury was tainted" (ECF-310 at 102) cannot be reconciled with this legal principle.

### 2. The District Court legally erred by failing to require the Government to prove how it built its case against Mr. Zahn.

*Kastigar* requires the Government to prove how it *actually* built its case against the immunized defendant, not how it *could have* built its case. *See Hampton*, 775 F.2d at 1490 ("Each step of the investigative chain by which the

evidence presented *was obtained* must be documented and accounted for.")
(emphasis added). Instead of holding the Government to *that* standard, the District
Court sanctioned a sourcing-back process that allowed the Government to launder
evidence tainted by Mr. Zahn's *Garrity* statement and its fruits. The most
compelling example is the Government's discovery of the spreadsheets, drafted by
Mr. Wannemacher, who was acquitted at trial, yet which the Government used
against Mr. Zahn to devasting effect. (*Supra* at 22-23).

Indisputably, the Government sourced the spreadsheets by contacting a
third-party exposed to Mr. Zahn's *Garrity* statement asking him for help finding
more evidence. (*See id.*) Yet, the District Court failed to require the Government to
prove how it found them to corroborate the Government's bare denial that it was
not through Mr. Zahn's *Garrity* statement or its fruits. *See Kastigar*, 406 U.S. at
460 (barring the use of compelled testimony as an investigatory lead). Instead, it
held the spreadsheets were not tainted evidence by positing a hypothetical means
by which the Government *might have* sourced it: It *might have* located these
documents within terabytes of other documents, even though it failed to do so for
the preceding year and a half. (*Compare* ECF-310 at 81-91 (spreadsheet findings),
*with* ECF-315 at 69-73 (explaining legal errors with findings, including
impermissible reliance on "inevitable discovery" of the spreadsheets). As a matter
of law, however, the Government cannot meet its burden "simply by showing the

availability of 'wholly independent' evidence from which *it might* have procured the indictment or conviction." *United States v. Pelletier*, 898 F.2d 297, 303 (2d Cir. 1990) (emphasis added).

Instead of faithfully applying *Kastigar*, the District Court turned what should have been a vetting proceeding—to decide whether the indictment was clean or tainted—into a proceeding about how the Government might have built a clean case against Mr. Zahn. That's not how *Kastigar* works. The Government cannot crib its case from reports and complaints by third-parties (OGC and SIC), who indisputably relied on Mr. Zahn's *Garrity* statement and its fruits, to support their conclusions but then claim it would have gotten to the same place on its own. Nor can the Government elicit incriminating grand jury testimony from witnesses—like Anton Derkach—that the District Court excluded at trial *precisely because it was tainted*, yet simultaneously contend it satisfied its burden to prove a wholly independent source because people experienced what they experienced.

The District Court erred because it failed to require the Government to prove that *it actually built* its case against Mr. Zahn cleanly and instead allowed it to skate by showing how *it might have built* that case cleanly.

### 3.    The District Court impermissibly shifted the burden of proof from the Government to Mr. Zahn.

The District Court failed to hold the Government to its heavy burden to establish a source for its investigation and *all* its evidence that is "wholly

independent" from Mr. Zahn's *Garrity* statement. Instead, it shifted that burden to Mr. Zahn. For example, the District Court required Mr. Zahn to "identif[y] any particular statement in [his] Termination Letter that could have been gleaned solely from his *Garrity* statement and that would have been useful to the prosecution." (ECF-310 at 101). The District Court further relieved the Government of its burden to show that its interviews of individuals indisputably exposed to Mr. Zahn's *Garrity* statement did not provide investigatory leads. (*See id.* at 69-70 & n.17).

Similarly, the District Court relied on 39 impermissible inferences in the Government's favor that shifted the burden from the Government to Mr. Zahn. (*See* ECF-315-1 at 1-5). As one example, it improperly inferred the Government's investigation—which almost entirely happened after Mr. Zahn's *Garrity* statement—would have been done the same way and discovered the same evidence simply because the City Auditor wrote the memo kickstarting the political backlash that led JEA to compel Mr. Zahn's *Garrity* statement. (*See id.* at 3). Similarly, the District Court inferred that just because a witness had personally participated in events before Mr. Zahn's *Garrity* statement, the witness's later testimony could not have been tainted. (*See id.* at 2, 4). It did so even though these witnesses were indisputably exposed to Mr. Zahn's *Garrity* statement and its fruits and even though some of them (*e.g.*, Board Member Kelly Flanagan) admitted they were concerned the exposure infected their grand jury testimony. (*See id.* at 4).

The District Court legally erred by shifting the Government's burden under

*Kastigar* to Mr. Zahn, when he did "not have the burden of proving that his

testimony was improperly used." *United States v. Hubbell*, 530 U.S. 27, 40 (2000).

### B. The District Court's harmless-error determination was erroneous.

#### 1. The District Court improperly conflated its harmless-error and its sufficiency-of-the-evidence analyses.

"Whether an error is harmless is a mixed question of law and fact that [this

Court] review[s] *de novo*." *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010).

The standard for determining whether a constitutional error is harmless is governed

by *Chapman v. California*, 386 U.S. 18, 23-24 (1967). To apply *Chapman* in the

*Kastigar* context, the court must consider all the evidence before the grand jury

and determine whether the Government proved beyond a reasonable doubt that

there is no reasonable possibility the error (*i.e.*, the tainted evidence) contributed to

the outcome (*i.e.*, the indictment). *See Schmidgall*, 25 F.3d at 1529.

The District Court impermissibly conflated harmless error with evidentiary

sufficiency, holding that "[t]o the extent the Government used any evidence that

was tainted," it "was harmless beyond a reasonable doubt *as the evidence was*

*otherwise sufficient to sustain the Indictment*." (ECF-310 at 102) (emphasis

added). It thus improperly relieved the Government of its legal burden under

*Chapman*. *See Satterwhite v. Texas*, 486 U.S. 249, 258-59 (1988) (holding the test

78

"is not whether the legally admitted evidence was sufficient" but "whether the [Government] has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict'") (quoting *Chapman*, 386 U.S. at 24).

> **2.     The Government's record made it impossible to conduct a legally proper harmless-error analysis.**

Here, conducting a harmless-error analysis was legally impossible. The Government never proved the source of *all* its evidence—for example, it did not call as witnesses at the *Kastigar* hearing over a dozen people who testified before the grand jury—and the District Court never identified what was tainted, let alone the extent to which the Government used it. So, it is not possible to analyze this record to determine whether, in the context of all the evidence the Government presented to the grand jury, it met its burden to prove its use of *Garrity*-tainted evidence was harmless beyond a reasonable doubt. *See United States v. Ponds*, 454 F.3d 313, 328 (D.C. Cir. 2006) ("Determining the precise manner in which [the defendant's *Kastigar*] rights were violated is essential" to analyzing harmless error.); *see also Pelletier*, 898 F.2d at 303 (recognizing an indictment may be sustained only if the use of tainted evidence "was so minimal or of such inconsequential nature in light of the other evidence" that it was harmless). Put differently, the Government cannot refuse to give the District Court the full picture of how it developed the evidence and still benefit from a harmlessness determination that necessarily depends on how material the tainted evidence was to

the outcome. But that is exactly what the District Court allowed here. *See United States v. Hill,* 643 F.3d 807, 878-79 (11th Cir. 2011) ("No reliable harmless determination can be made until a full evidentiary hearing is conducted into the derivative use issue as to all of the evidence used against [the defendant].").

> ### 3.    This Court's precedents assuming harmless error applies to *Kastigar* errors are mistaken and, if necessary, should be revisited *en banc*.

The Supreme Court has never held that the harmless-error rule applies when an indictment is tainted by a *Kastigar* violation. And while this Court has assumed that it does, *see, e.g.*, *Schmidgall*, 25 F.3d at 1529, it does not appear to have done so over a defendant's argument the rule should not apply in that circumstance. Because "assumptions are not holdings," however, the Court is not duty-bound to indulge the same assumption here. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016); *cf.* Bryan A. Garner, *The Law of Judicial Precedent* § 23, at 229 (2016) (noting "the rule that a court won't normally accept as binding precedent a point that was passed by in silence").

This Court—as a panel or *en banc*—should disavow review for harmless error in this context. A tainted *indictment* is not a *trial* error—*i.e.*, an error that occurs during the part of the case dedicated to guilt or innocence—which is where harmless-error review applies to constitutional errors. If an indictment is tainted, the Fifth Amendment precludes the prosecution *in toto*. Moreover, harmless-error

review is utterly inconsistent with the Government's *Kastigar* burden to prove its indictment is not tainted "in any respect," whether "directly or indirectly." *Kastigar*, 406 U.S. at 453. The error is structural and not subject to harmless-error review. *See Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991) (explaining that the "common thread connecting" the harmless-error analysis to constitutional errors is that each case involved "error which occurred *during the presentation of the case to the jury*, and which may therefore be quantitatively assessed in the context of other evidence presented") (emphasis added).

> **C.    Because of the *Kastigar* error, this Court should reverse with instructions to dismiss the indictment.**

When viewed through the correct legal lens, the Government failed to—and cannot—meet its *Kastigar* burden. Accordingly, reversal of Mr. Zahn's convictions and remand for dismissal is the only remedy that protects his Fifth Amendment privilege. *See Schmidgall*, 25 F.3d at 1531 n.10 (collecting cases where *Kastigar* violations resulted in "outright reversals with directions to dismiss the indictment or reverse the conviction without allowing further proceedings").

Several points illustrate why Mr. Zahn's *Garrity* statement and its fruits so infect the Government's evidence that giving it another chance to obtain an untainted indictment would be like trying to unmix Kool-Aid:

- Just days after the federal investigation began, Mr. Zahn gave a *Garrity* statement resulting in JEA terminating his employment.

- The local press headlined information sourced directly from Mr. Zahn's *Garrity* statement and termination letter—including immunized statements from Mr. Zahn. Both Mr. Zahn's *Garrity* statement and his termination letter were posted on public websites and widely disseminated and read.

- Despite the widespread consumption of Mr. Zahn's *Garrity* statement and its fruits, the Government eschewed the DOJ's *Kastigar* procedures because the lead prosecutor "disagreed" with them.

- The Government took no measures to ensure the witnesses it interviewed—dozens of whom testified before the grand jury—were not exposed to or influenced by Mr. Zahn's *Garrity* statement or its fruits.

- The Government sourced critical evidence from third-parties it knew were exposed to Mr. Zahn's *Garrity* statement or its fruits. These included the spreadsheets and the bond-counsel memorandum that featured heavily in the indictment and trial.

- The lead prosecutor "mined" an investigative report prepared by third-party investigators exposed to Mr. Zahn's *Garrity* statement and its fruits. The report presented a theory for prosecuting Mr. Zahn like that used in his indictment and relied on information derived from Mr. Zahn's *Garrity* statement.

- Mr. Zahn's grand jury returned an indictment tracking key findings in his termination letter; the termination letter's findings in turn are based on Mr. Zahn's *Garrity* statement.

- Numerous grand jury witnesses who testified during the *Kastigar* hearing admitted they were exposed to Mr. Zahn's *Garrity* statement, its fruits, or both. (*See* ECF-299-3 (identifying tainted witnesses)). Some could not be certain that their grand jury testimony was independent from Mr. Zahn's *Garrity* statement. For example, JEA Board member Kelly Flanagan testified she was concerned that her testimony was influenced by media coverage and information she received from others exposed to Mr. Zahn's *Garrity* statement.

- The Government failed to call several of its grand jury witnesses at the *Kastigar* hearing. The District Court did not dismiss the indictment even though the record clearly shows that tainted testimony was presented to the grand jury. Later, the District Court ruled that *Kastigar* required limiting the trial testimony of at least one witness (Anton Derkach) on the key issue of how media reports of Mr. Zahn's *Garrity* statement changed his view of the facts. Mr. Zahn's grand jury heard the same testimony that the District Court found it necessary to keep from the trial jury.

- Even the lead prosecutor admitted that he got the case from the news.

(*Supra* at 17-23, 26-27).

Because the Government failed to adopt reliable procedures to shield its investigation from Mr. Zahn's *Garrity* statement and its fruits, it could not separate its untainted evidence from his immunized testimony. *See United States v. North*, 910 F.2d 843, 862 (D.C. Cir. 1990) (recognizing the difficulty of proving an independent source "where the immunized testimony is so broadly disseminated that interested parties study it and even casual observers have some notion of its content"). Perhaps the most telling example is what the record *does not show*—i.e., the wholly independent evidence supporting Mr. Zahn's indictment and convictions on the alleged intent elements and overt acts of the alleged conspiracy. That is because Mr. Zahn's indictment flows from his compelled testimony and its fruits. (*See* ECF-299-1 (comparison of *Garrity* statement and indictment); ECF-299-2 (comparison of termination letter and indictment)).

Because the Government did not prove a source for *all* its evidence that is wholly independent of Mr. Zahn's *Garrity* statement and its fruits, the District

Court erred by denying *Kastigar* relief. And because the Government's case is so tainted that it can never meet its *Kastigar* burden, the Court should reverse and remand for dismissal. *See Hampton*, 775 F.2d at 1490-91 (dismissal required where federal investigation relied on tainted state investigation). At a minimum, the Court should direct further proceedings to ensure that Mr. Zahn's indictment and convictions are not obtained in violation of his Fifth Amendment privilege.

## CONCLUSION

Mr. Zahn's convictions should be reversed and the case should be remanded for entry of a judgment of acquittal, dismissal, or new trial, depending on the reasons for reversal.

Dated:  February 11, 2025                    Respectfully submitted,

                                     By:    /s/ Samuel J. Salario, Jr.
                                            PAUL C. HUCK, JR.
                                            SAMUEL J. SALARIO, JR.
                                            JESSICA SLATTEN
                                            ROBERT E. MINCHIN III
                                            LAWSON HUCK GONZALEZ, PLLC
                                            1700 South MacDill Avenue
                                            Suite 240
                                            Tampa, FL 33629
                                            (850) 825-4334
                                            paul@lawsonhuckgonzalez.com
                                            samuel@lawsonhuckgonzalez.com
                                            jessica@lawsonhuckgonzalez.com
                                            bob@lawsonhuckgonzalez.com
                                            michelle@lawsonhuckgonzalez.com

                                            *Counsel for Aaron Zahn*

## <u>CERTIFICATE OF COMPLIANCE</u>

On January 21, 2025, Appellant filed an Unopposed Motion to Exceed Word Limit for Appellant's Principal Brief (Doc. 21), which is pending as of this filing. Assuming the unopposed motion is granted, this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 19,520 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Rule 32-4 of the Eleventh Circuit Rules. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: February 11, 2025          By:    */s/ Samuel J. Salario, Jr.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2025 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I further certify that hard copies of the redacted and unredacted versions of this brief have been forwarded to the Court and that the unredacted version has been served by email on counsel for the Government.

By:    */s/ Samuel J. Salario, Jr.*