No. 24-12617-AA

In the
# United States Court of Appeals
# for the Eleventh Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AARON ZAHN,

*Defendant-Appellant*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:22-CR-23-BJD-MCR-1

---

## SUPPLEMENTAL APPENDIX
## Volume I of XVII

---

GREGORY W. KEHOE
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

EMILY C. L. CHANG
Assistant United States Attorney
Appellate Division
USA No. 166
400 W. Washington St., Ste. 3100
Orlando, FL 32801
(407) 648-7500
emily.chang@usdoj.gov

August 21, 2025

# Index of Appendix

## Volume I

District Court Docket Sheet.................................................................Docket

Transcript of Kastigar Hearing, Vol I (05/15/2023)........................... Doc. 268

Transcript of Kastigar Hearing, Vol II (05/16/2023) ......................... Doc. 269

## Volume II

Transcript of Kastigar Hearing, Vol III (05/17/2023) ........................ Doc. 270

Transcript of Kastigar Hearing, Vol IV (05/18/2023) ........................ Doc. 271

## Volume III

Transcript of Kastigar Hearing, Vol V (05/19/2023)........................... Doc. 272

Transcript of Kastigar Hearing, Vol VI (05/23/2023) ........................ Doc. 273

## Volume IV

Transcript of Kastigar Hearing, Vol VII (05/24/2023) ....................... Doc. 274

Transcript of Kastigar Hearing, Vol VIII (05/25/2023)....................... Doc. 275

Order Adopting Report and Recommendations................................. Doc. 361

## Volume V

Defendant Exhibit 134 ..................................................................Doc. 470-33

Defendant Exhibit 482 Part 1 (pp. 1-144) ......................................Doc. 470-99

## Volume VI

Defendant Exhibit 482 Part 1 (pp. 145-152)...................................Doc. 470-99

Government Exhibit 4.................................................................. Doc. 476-4

Government Exhibit 5 ................................................................ Doc. 476-5

Government Exhibit 6C .............................................................. Doc. 476-7

Government Exhibit 13 ...............................................................Doc. 476-13

Government Exhibit 17 ...............................................................Doc. 476-17

Government Exhibit 20A1 ...........................................................Doc. 476-20

Government Exhibit 20A4 ...........................................................Doc. 476-23

Government Exhibit 20B1.............................................................Doc. 476-25

Government Exhibit 20B2.............................................................Doc. 476-26

**Volume VII**

Government Exhibit 20F2..............................................................Doc. 476-28

Government Exhibit 20K ..............................................................Doc. 476-33

Government Exhibit 20L1..............................................................Doc. 476-34

Government Exhibit 20M ..............................................................Doc. 476-36

Government Exhibit 20P3..............................................................Doc. 476-39

Government Exhibit 20P5..............................................................Doc. 476-41

Government Exhibit 20AA1...........................................................Doc. 476-46

Government Exhibit 20AA2...........................................................Doc. 476-47

Government Exhibit 21C ..............................................................Doc. 476-57

Government Exhibit 21H ..............................................................Doc. 476-62

Government Exhibit 21J ................................................................Doc. 476-63

Government Exhibit 23B................................................................Doc. 476-68

## Volume VIII

Government Exhibit 24 .................................................................Doc. 476-71

Government Exhibit 29B................................................................Doc. 476-76

Government Exhibit 30 .................................................................Doc. 476-77

Government Exhibit 31D ...............................................................Doc. 476-81

Government Exhibit 32C ...............................................................Doc. 476-84

Government Exhibit 33B................................................................Doc. 476-87

Government Exhibit 33C ...............................................................Doc. 476-88

Government Exhibit 36A ...............................................................Doc. 476-96

## Volume IX

Government Exhibit 37 .................................................................Doc. 476-99

Government Exhibit 40B...............................................................Doc. 476-107

Government Exhibit 40C ...............................................................Doc. 476-108

Government Exhibit 41A ...............................................................Doc. 476-110

Government Exhibit 43A ...............................................................Doc. 476-113

Government Exhibit 44A ...............................................................Doc. 476-115

Government Exhibit 20X ...............................................................Doc. 476-130

**Volume X**

Transcript of Jury Trial, Day 1 (02/21/2024) .................................... Doc. 504

Transcript of Jury Trial, Day 2 (02/22/2024) .................................... Doc. 505

**Volume XI**

Transcript of Jury Trial, Day 3 (02/23/2024) .................................... Doc. 506

Transcript of Jury Trial, Vol IV (02/26/2024) ................................... Doc. 511

**Volume XII**

Transcript of Jury Trial, Vol V (02/27/2024) .................................... Doc. 512

Transcript of Jury Trial, Vol VI (02/28/2024) (pp. 1-172) .................. Doc. 513

**Volume XIII**

Transcript of Jury Trial, Vol VI (02/28/2024) (pp. 173-274).............. Doc. 513

Transcript of Jury Trial, Vol VII (02/29/2024) ................................. Doc. 514

**Volume XIV**

Transcript of Jury Trial, Vol VIII (03/01/2024)................................ Doc. 515

Transcript of Jury Trial, Vol IV (03/02/2024) (pp. 1-206) .................. Doc. 516

**Volume XV**

Transcript of Jury Trial, Vol IV (03/02/2024) (pp. 207-270).............. Doc. 516

Transcript of Jury Trial, Vol X (03/05/2024) .................................... Doc. 517

Transcript of Jury Trial, Vol XI (03/06/2024) (pp. 1-110).................. Doc. 518

## Volume XVI

Transcript of Jury Trial, Vol XI (03/06/2024) (pp. 111-293) .............. Doc. 518

Transcript of Jury Trial, Vol XII (03/07/2024)................................. Doc. 520

Transcript of Jury Trial, Vol XVI (03/14/2024)................................ Doc. 527

Certificate of Service

## Volume XVII, Sealed

Report and Recommendations.......................................................... Doc. 310

Zahn's Objections ............................................................................ Doc. 315

Zahn's Inferences.......................................................................... Doc. 315-1

# DOCKET

## *3:22cr23, USA v. Zahn et al*

US District Court Criminal Docket

United States District Court, Florida Middle

(Jacksonville)

**This case was retrieved on 08/20/2025**

## Header

---

**Date Filed:** 03/02/2022
**Other Docket:** None

**Class Code:** Closed
**Closed:** 08/01/2024

## Participants

---

### Defendant

---

**Name**
Aaron Zahn
Appeals court case number: 24-12617-A USCA 307 S 15th
Street Jacksonville Beach, FL 32250 BOND
*TERMINATED: 08/01/2024*

**Attorneys**
A. Brian Albritton
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Phelps Dunbar, LLP
100 S Ashley Dr Ste 2000
Tampa, FL 33602-5315
USA
brian.albritton@phelps.com
813-472-7557Fax: 813/472-7570Designation: Retained

Brandon Kyle Breslow
Kynes, Markman & Felman, PA
100 S Ashley Dr - Ste 1300 PO Box 3396
Tampa, FL 33601-3396
USA
bbreslow@kmf-law.com
813-229-1118Designation: Retained

Bryan Scott Gowdy
ATTORNEY TO BE NOTICED
Creed & Gowdy, P.A.
865 May St
Jacksonville, FL 32210
USA
bgowdy@appellate-firm.com
904/350-0075Fax: 904/350-0086

Diego M. Pestana
ATTORNEY TO BE NOTICED
Suarez Law Firm
1011 West Cleveland Street
Tampa, FL 33606
USA
dpestana@suarezlawfirm.com
813-459-1495Designation: Retained

Eduardo A. Suarez
ATTORNEY TO BE NOTICED
The Suarez Law Firm, P.A.
1011 W Cleveland St
Tampa, FL 33606-1913
USA
esuarez@suarezlawfirm.com
813-229-0040Fax: 813-229-0041Designation: Retained

Mitchell McBride
ATTORNEY TO BE NOTICED
Holland & Knight LLP
100 N Tampa Street Suite 4100
Tampa, FL 33602
USA
mitchell.mcbride@hklaw.com
813-227-8500Designation: Retained

Paul Courtney Huck , Jr
ATTORNEY TO BE NOTICED
Lawson Huck Gonzalez, PLLC
334 Minorca Avenue
Coral Gables, FL 33134
USA
paul@lawsonhuckgonzalez.com
850-825-4334

Raquel Ramirez Jefferson
ATTORNEY TO BE NOTICED
Phelps Dunbar LLP
100 South Ashley DR Suite 2000
Tampa, FL 33602
USA
raquel.jefferson@phelps.com
813-472-7550Designation: Retained

Samuel J. Salario , Jr.
ATTORNEY TO BE NOTICED
Lawson Huck Gonzalez, PLLC
1700 South MacDill Avenue Suite 240
Tampa, FL 33629
USA
samuel@lawsonhuckgonzalez.com
850-825-4334

| Charges | Disposition |
| --- | --- |
| **Complaints:** none | |
| **Pending:** CONSPIRACY TO DEFRAUD THE UNITED STATES(1) | Imprisonment: 48 months to run concurrently with Count II; Supervised Release: 1 year to run concurrently with Count II; Special Assessment: $100.00 |
| FRAUD BY WIRE, RADIO, OR TELEVISION(2) | Imprisonment: 48 months to run concurrently with Count I; Supervised Release: 1 year to run concurrently with Count I; Special Assessment: $100.00 |
| **Offense Level (Opening):** Felony | |
| **Terminated:** none | |

**Case Assigned To:** Senior Judge Brian J. Davis

**Case Referred To:** Magistrate Judge Monte C. Richardson

## Defendant

| Name | Attorneys |
|---|---|
| Ryan Wannemacher<br>31 Nicklaus Ct. Santa Rosa Beach, FL 32459 BOND<br>*TERMINATED: 03/28/2024* | James E. Felman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Kynes, Markman & Felman, PA<br>100 S Ashley Dr - Ste 1300 PO Box 3396<br>Tampa, FL 33601-3396<br>USA<br>JFelman@kmf-law.com<br>813/229-1118Fax: 813/221-6750 |

Niels P. Murphy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
01/31/2024
Murphy & Anderson, PA
1501 San Marco Blvd
Jacksonville, FL 32207-2926
USA
nmurphy@murphyandersonlaw.com
904/598-9282Fax: 904/598-9283

Brandon Kyle Breslow
ATTORNEY TO BE NOTICED
Kynes, Markman & Felman, PA
100 S Ashley Dr - Ste 1300 PO Box 3396
Tampa, FL 33601-3396
USA
bbreslow@kmf-law.com
813-229-1118Designation: Retained

Catherine M. Licandro
ATTORNEY TO BE NOTICED
01/31/2024
Murphy & Anderson, P.A.
1501 San Marco Blvd.
Jacksonville, FL 32207
USA
clicandro@murphyandersonlaw.com
904-598-9282Fax: 904-598-9283

John D. Cline
ATTORNEY TO BE NOTICED
Law Office of John D. Cline
600 Stewart Street Suite 400
Seattle, WA 98101
USA
cline@johndclinelaw.com
360-320-6435Designation: Retained

Katherine Earle Yanes
ATTORNEY TO BE NOTICED
Kynes, Markman & Felman, PA
100 S Ashley Dr - Ste 1300 PO Box 3396
Tampa, FL 33601-3396
USA

KYanes@kmf-law.com
813/229-1118Fax: 813-221-6750

## Charges

**Complaints:** none

**Pending:** none

**Terminated:** CONSPIRACY TO DEFRAUD THE UNITED
STATES(1)

FRAUD BY WIRE, RADIO, OR TELEVISION(2)
**Offense Level (Terminated):** Felony

**Case Assigned To:** Senior Judge Brian J. Davis

**Case Referred To:** Magistrate Judge Monte C. Richardson

## Disposition

Not Guilty (Judgment of Acquittal)

Not Guilty (Judgment of Acquittal)

## Defendant

**Name**
City of Jacksonville, Neighborhood Code Enforcement
Division

**Attorneys**
Sean Bryan Granat
ATTORNEY TO BE NOTICED
City of Jacksonville Office of General Counsel
St James Bldg - Suite 480 117 W Duval St
Jacksonville, FL 32202
USA
SGranat@coj.net
904/255-5061Fax: 904/255-5021Designation: Retained

Sean Bryan Granat
ATTORNEY TO BE NOTICED
City of Jacksonville Office of General Counsel
St James Bldg - Suite 480 117 W Duval St
Jacksonville, FL 32202
USA
SGranat@coj.net
904/255-5061Fax: 904/255-5021Designation: Retained

## Charges

**Complaints:** City of Jacksonville, Neighborhood Code
Enforcement Division

**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

## Defendant

**Name**
Nelson, Mullins, Riley and Scarborough, LLP

**Attorneys**
Lee Dilly Wedekind , III
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Wedekind LLP
Suite 4100 6867 Southpoint Drive North
Jacksonville, FL 32256
USA

lwedekind@wedekindllp.com
904-434-1724Designation: Retained

Lee Dilly Wedekind , III
ATTORNEY TO BE NOTICED
Wedekind LLP
Suite 4100 6867 Southpoint Drive North
Jacksonville, FL 32256
USA
lwedekind@wedekindllp.com
904-434-1724Designation: Retained

## Charges

**Complaints:** Nelson, Mullins, Riley and Scarborough, LLP

**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

## Defendant

| Name | Attorneys |
|---|---|
| JEA | Lee Dilly Wedekind , III<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Wedekind LLP<br>Suite 4100 6867 Southpoint Drive North<br>Jacksonville, FL 32256<br>USA<br>lwedekind@wedekindllp.com<br>904-434-1724Designation: Retained<br><br>Lee Dilly Wedekind , III<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Wedekind LLP<br>Suite 4100 6867 Southpoint Drive North<br>Jacksonville, FL 32256<br>USA<br>lwedekind@wedekindllp.com<br>904-434-1724Designation: Retained<br><br>Sean Bryan Granat<br>ATTORNEY TO BE NOTICED<br>City of Jacksonville Office of General Counsel<br>St James Bldg - Suite 480 117 W Duval St<br>Jacksonville, FL 32202<br>USA<br>SGranat@coj.net<br>904/255-5061Fax: 904/255-5021Designation: Retained |

## Charges

**Complaints:** JEA

**Pending:** none

**Terminated:** none

## Disposition

represented by

**Case Assigned To:** Senior Judge Brian J. Davis

## Defendant

| Name | Attorneys |
|---|---|
| Pillsbury Winthrop Shaw Pittman, LLP | Maria T. Galeno |

**Name**

Pillsbury Winthrop Shaw Pittman, LLP

**Attorneys**

Maria T. Galeno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED;
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019
USA
maria.galeno@pillsburylaw.com
212-858-1833Fax: 212-298-8407Designation: Retained

Jennifer G. Altman
ATTORNEY TO BE NOTICED
Pillsbury Winthrop Shaw Pittman
600 Brickell Avenue, Suite 3100
Miami, Fl 33131
USA
jennifer.altman@pillsburylaw.com
786-913-4900Fax: 786-913-4901Designation: Retained

John R. Van Son
PRO HAC VICE;ATTORNEY TO BE NOTICED;
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street 27th Floor
New York, NY 10019
USA
john.vanson@pillsburylaw.com
212-858-1043Designation: Retained

Marcia L. Pope
PRO HAC VICE;ATTORNEY TO BE NOTICED;
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center 22nd Floor
San Francisco, CA 94111
USA
marcia.pope@pillsburylaw.com
415-983-6487Fax: 415-983-1200Designation: Retained

## Charges

**Complaints:** Pillsbury Winthrop Shaw Pittman, LLP

**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

## Defendant

**Name**

Cox Media Group Jacksonville
owner of WJAX-TV

**Attorneys**

Minch Minchin
ATTORNEY TO BE NOTICED
Shullman Fugate PLLC

50 Laura Street
Jacksonville, FL 32202
USA
mminchin@shullmanfugate.com
904-914-3070Designation: Retained

Rachel E. Fugate
ATTORNEY TO BE NOTICED
Shullman Fugate PLLC
100 S Ashley Dr Ste 600
Tampa, FL 33602
USA
rfugate@shullmanfugate.com
813/935-5098Designation: Retained

## Charges

**Complaints:** Cox Media Group Jacksonville owner of WJAX-TV

**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

## Defendant

**Name**
Graham Media Group, Florida, Inc.

**Attorneys**
Edward L. Birk
ATTORNEY TO BE NOTICED
Marks Gray, PA
Suite 800 1200 Riverplace Blvd
Jacksonville, FL 32207
USA
ebirk@marksgray.com
904/398-0900Fax: 904/399-8440Designation: Retained

## Charges

**Complaints:** Graham Media Group, Florida, Inc.

**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

## Defendant

**Name**
First Coast News

**Attorneys**
Jennifer A. Mansfield
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holland & Knight, LLP
Suite 3900 50 N Laura St
Jacksonville, FL 32202
USA
jennifer.mansfield@hklaw.com
904/353-2000Fax: 904/358-1872Designation: Retained

## Charges

**Complaints:** First Coast News
**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

## Defendant

**Name**
Florida Times-Union

**Attorneys**
Jennifer A. Mansfield
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holland & Knight, LLP
Suite 3900 50 N Laura St
Jacksonville, FL 32202
USA
jennifer.mansfield@hklaw.com
904/353-2000Fax: 904/358-1872Designation: Retained

## Charges

**Complaints:** Florida Times-Union
**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

## Defendant

**Name**
Camille Lee-Johnson

**Attorneys**
Vincent Albert Citro
ATTORNEY TO BE NOTICED
Losey PLLC
1420 Edgewater Drive
Orlando, FL 32804
USA
vcitro@losey.law
407-205-8456Designation: Retained

## Charges

**Complaints:** Camille Lee-Johnson
**Pending:** none

**Terminated:** none

**Case Assigned To:** Senior Judge Brian J. Davis

## Disposition

represented by

# U.S. Attorneys

Andrew Tysen Duva

ATTORNEY TO BE NOTICED

US Attorney's Office - FLM

Suite 700 300 N Hogan St

Jacksonville, FL 32202

USA

Tysen.Duva@usdoj.gov

904/301-6348Fax: 904/301-6310Designation: Retained

Angela Bray

ATTORNEY TO BE NOTICED

DOJ-USAO

Jacksonville Division 300 N. Hogan Street Suite 700

Jacksonville, FL 32202

USA

adbray@fbi.gov

904-248-7000Designation: Retained

Angela Bray

ATTORNEY TO BE NOTICED

DOJ-USAO

Jacksonville Division 300 N. Hogan Street Suite 700

Jacksonville, FL 32202

USA

adbray@fbi.gov

904-248-7000Designation: Retained

Ann Shannon

ATTORNEY TO BE NOTICED

United States Attorney's Office

Jacksonville Division 700 N. Hogan Street

Jacksonville, FL 32202

USA

acshannon@fbi.gov

904-248-7000Designation: Retained

Arnold B. Corsmeier

ATTORNEY TO BE NOTICED

US Attorney's Office - FLM

Suite 700 300 N Hogan St

Jacksonville, FL 32202

USA

chip.corsmeier@usdoj.gov

904/301-6300Fax: 904/301-6310Designation: Retained

David Pardo

ATTORNEY TO BE NOTICED

DOJ-USAO Tampa Office

400 North Tampa Street Suite 3200

Tampa, FL 33602

USA

david.pardo@usdoj.gov

813-274-6000Designation: Retained

# Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 03/02/2022 | INDICTMENT returned in open court as to Aaron Zahn (1) count(s) 1, 2, Ryan Wannemacher (2) count(s) 1, 2. (BGR) (Additional attachment(s) added on 3/7/2022: # 1 Restricted Unredacted Indictment) (BGR). (Entered: 03/07/2022) | |
| 2 | 03/02/2022 | MOTION to Seal Indictment and Related Documentsby USA as to Aaron Zahn, Ryan Wannemacher. (BGR) (Entered: 03/07/2022) | |
| 3 | 03/02/2022 | ORDER granting 2 Motion to Seal Indictment and Related Documents as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Joel B. Toomey on 3/2/2022. (BGR) (Entered: 03/07/2022) | |
| 4 | 03/02/2022 | MOTION for Arrest Warrant by USA as to Aaron Zahn. (BGR) (Entered: 03/07/2022) | |
| 5 | 03/02/2022 | ORDER granting 4 Motion for Arrest Warrant as to Aaron Zahn (1). Signed by Magistrate Judge Joel B. Toomey on 3/2/2022. (BGR)  (Entered: 03/07/2022) | |
| 8 | 03/02/2022 | MOTION for Arrest Warrant by USA as to Ryan Wannemacher. (BGR) (Entered: 03/07/2022) | |
| 9 | 03/02/2022 | ORDER granting 8 Motion for Arrest Warrant as to Ryan Wannemacher (2). Signed by Magistrate Judge Joel B. Toomey on 3/2/2022. (BGR)  (Entered: 03/07/2022) | |
| 12 | 03/03/2022 | ORDER OF RECUSAL in case as to Aaron Zahn, Ryan Wannemacher. Signed by Judge Marcia Morales Howard on 3/3/2022. (BGR)  (Entered: 03/07/2022) | |
| 13 | 03/03/2022 | ORDER OF RECUSAL in case as to Aaron Zahn, Ryan Wannemacher. Signed by US Magistrate Judge Laura Lothman Lambert on 3/2/2022. (BGR)  (Entered: 03/07/2022) | |
| 14 | 03/07/2022 | IN CAMERA MOTION to Unseal Indictment and Related Filings by USA as to Aaron Zahn, Ryan Wannemacher. (BGR) (Entered: 03/07/2022) | |
| 15 | 03/07/2022 | ORDER granting 14 In Camera Motion to Unseal Indictment and Related Filings as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Judge Brian J. Davis on 3/7/2022. (BGR)  (Entered: 03/07/2022) | |
| 16 | 03/07/2022 | ORDER as to Aaron Zahn, Ryan Wannemacher: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the | |

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/1/2020. (BGR) (Entered: 03/07/2022) | |
| 17 | 03/07/2022 | NOTICE OF ATTORNEY APPEARANCE: James E. Felman appearing for Ryan Wannemacher (Felman, James) (Entered: 03/07/2022) | |
| 18 | 03/07/2022 | NOTICE OF ATTORNEY APPEARANCE: Katherine Earle Yanes appearing for Ryan Wannemacher (Yanes, Katherine) (Entered: 03/07/2022) | |
| 19 | 03/07/2022 | NOTICE OF ATTORNEY APPEARANCE: Brandon Kyle Breslow appearing for Ryan Wannemacher (Breslow, Brandon) (Entered: 03/07/2022) | |
| 20 | 03/07/2022 | NOTICE OF ATTORNEY APPEARANCE: A. Brian Albritton appearing for Aaron Zahn (Albritton, A.) (Entered: 03/07/2022) | |
| 21 | 03/07/2022 | NOTICE OF ATTORNEY APPEARANCE: Eduardo A. Suarez appearing for Aaron Zahn (Suarez, Eduardo) (Entered: 03/07/2022) | |
| 22 | 03/07/2022 | ORDER OF RECUSAL directing the Clerk of Court to reassign this case to another United States Magistrate Judge. Signed by Magistrate Judge Patricia D. Barksdale on 3/7/2022. (ASL) (Entered: 03/07/2022) | |
| 23 | 03/07/2022 | CASE as to Aaron Zahn, Ryan Wannemacher Reassigned to Magistrate Judge Monte C. Richardson. New case number: 3:22-cr-23-BJD-MCR. Magistrate Judge Patricia D. Barksdale no longer assigned to the case. (LRB) (Entered: 03/07/2022) | |
| 24 | 03/07/2022 | NOTICE OF HEARING as to Aaron Zahn, Ryan Wannemacher: Initial Appearance, Arraignment and Bond set for 3/8/2022 at 02:30 PM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS) (Entered: 03/07/2022) | |
| 25 | 03/07/2022 | ORDER permitting members of media to enter Courthouse with laptops and tablets for the initial appearance, arraignment and bond hearing set before U.S. Magistrate Judge, Monte C. Richardson on 3/8/2022 at 2:30 pm. See Order for details and instructions on prohibited live transmission and audio/video recording as to Aaron Zahn and Ryan Wannemacher Signed by Magistrate Judge Monte C. Richardson on 3/7/2022. (SHS) (SHS). (Entered: 03/07/2022) | |
| 26 | 03/08/2022 | NOTICE OF ATTORNEY APPEARANCE: Niels P. Murphy appearing for Ryan Wannemacher (Murphy, Niels) (Entered: 03/08/2022) | |
| 27 | 03/08/2022 | Receipt for Surrender of Passport as to Ryan Wannemacher Passport Number 7940 issued by USA (BGR) (Entered: 03/08/2022) | |
| | 03/08/2022 | Arrest of Aaron Zahn, Ryan Wannemacher on 3/8/2022 (SHS) (Entered: 03/08/2022) | |
| 28 | 03/08/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Initial Appearance, Bond and ARRAIGNMENT as to Aaron Zahn (1) Count 1, 2 and Ryan Wannemacher (2) Count 1, 2 held on 3/8/2022 Defendant(s) pled not guilty. (Digital) (SHS) (Entered: 03/08/2022) | |
| 29 | 03/08/2022 | ORAL MOTION for Bond by USA as to Aaron Zahn, Ryan Wannemacher. (SHS) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 03/08/2022) | |
| 30 | 03/08/2022 | ORDER Setting Conditions of Release as to Aaron Zahn (1) $100,000.00 - Unsecured. Signed by Magistrate Judge Monte C. | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Richardson on 3/8/2022. (SHS)  (Entered: 03/08/2022) | |
| 31 | 03/08/2022 | Unsecured BOND entered as to Aaron Zahn in amount of $ 100,000.00. (SHS) (Entered: 03/08/2022) | |
| 32 | 03/08/2022 | ORDER Setting Conditions of Release as to Ryan Wannemacher (2) $100,000.00. Signed by Magistrate Judge Monte C. Richardson on 3/8/2022. (SHS)  (SHS). (Entered: 03/08/2022) | |
| 33 | 03/08/2022 | Unsecured BOND entered as to Ryan Wannemacher in amount of $ 100,000.00. (SHS) (SHS). (Entered: 03/08/2022) | |
| 34 | 03/08/2022 | NOTICE of acceptance of general discovery (FILED IN OPEN COURT) by Aaron Zahn (SHS)  (Entered: 03/08/2022) | |
| 35 | 03/08/2022 | NOTICE of acceptance of general discovery (FILED IN OPEN COURT) by Ryan Wannemacher (SHS)  (Entered: 03/08/2022) | |
| 36 | 03/08/2022 | SCHEDULING ORDER  as to Aaron Zahn, Ryan Wannemacher Status Conference set for 4/18/2022 at 03:30 PM in Jacksonville Courtroom 12 C before Judge Brian J. Davis Jury Trial set for trial term commencing 5/2/2022 at 09:00 AM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. Discovery motions due by 3/22/2022 Dispositive motions due by 4/5/2022 Signed by Magistrate Judge Monte C. Richardson on 3/8/2022. (SHS) (Entered: 03/08/2022) | |
| 39 | 03/09/2022 | Arrest Warrant Returned Executed on 3/8/2022 as to Aaron Zahn. (BGR) (Entered: 03/09/2022) | |
| 40 | 03/09/2022 | Arrest Warrant Returned Executed on 3/8/2022 as to Ryan Wannemacher. (BGR) (Entered: 03/09/2022) | |
| 42 | 03/10/2022 | NOTICE OF ATTORNEY APPEARANCE: Catherine M. Licandro appearing for Ryan Wannemacher  (Licandro, Catherine) (Entered: 03/10/2022) | |
| 43 | 03/11/2022 | UNOPPOSED MOTION to Continue Pretrial Motions Deadlines and Trial Date by Ryan Wannemacher. (Felman, James) (Modified on 3/14/2022 to edit docket text) (JDR). (Entered: 03/11/2022) | |
| 44 | 03/14/2022 | JOINT MOTION to Briefly Continue the April 18th Status Conference to Another Date that week or next by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Modified on 3/15/2022 to edit docket text) (JDR). (Entered: 03/14/2022) | |
| 45 | 03/22/2022 | ORDER granting 43 Defendant Wannemacher's Unopposed Motion to Continue Pretrial Motions Deadlines and Trial Date and the 44 Unopposed Joint Motion to Briefly Continue the April 18 Status Conference to Another Date that Week or Next as to Aaron Zahn (1) and Ryan Wannemacher (2). Status Conference set for 4/19/2022 at 10:00 AM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. See Order for details. Signed by Judge Brian J. Davis on 03/21/2022. (CKS)  (Entered: 03/22/2022) | |
| 46 | 03/25/2022 | Receipt for Surrender of Passport as to Aaron Zahn Passport Number 4446 issued by USA (BGR) (Entered: 03/25/2022) | |
| 47 | 04/13/2022 | ORDER permitting members of the media to enter the Courthouse with a laptop computer or tablet (but not cell phones) as to Aaron Zahn, Ryan Wannemacher. See Order for details. Signed by Judge Brian J. Davis on 4/13/2022. (CKS)  (Entered: 04/13/2022) | |
| 48 | 04/13/2022 | ENDORSED ORDER: In the Order (Doc. 45) entered on March 21, 2022, the Court set aside one (1) hour for the status conference. Due to a scheduling conflict, the Court must limit the hearing to 30 minutes as to Aaron Zahn, Ryan Wannemacher. Signed by Judge Brian J. Davis on 4/13/2022. (CKS)  (Entered: 04/13/2022) | |
| 49 | 04/19/2022 | Minute Entry for In Person proceedings held before Judge Brian J. Davis: STATUS Conference as to Aaron Zahn and Ryan Wannemacher held on 4/19/2022. Court Reporter: Shelli | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Kozachenko (CKS) (Entered: 04/20/2022) | |
| 50 | 04/19/2022 | ORAL MOTION to Continue Trial as to Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 04/22/2022) | |
| 51 | 04/22/2022 | ORDER granting 50 Oral Motions to Continue Trial as to Aaron Zahn (1) and Ryan Wannemacher (2). Status Conference set for 6/21/2022 at 03:30 PM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. Jury Trial set for trial term commencing on 5/1/2023 at 09:00 AM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. Discovery motions are due on or before August 15, 2022. Dispositive motions, motions to suppress, and other non-discovery motions are due on or before September 15, 2022. Signed by Judge Brian J. Davis on 4/22/2022. (CKS) (Entered: 04/22/2022) | |
| 52 | 05/02/2022 | Unopposed MOTION for Miscellaneous Relief, specifically Permission to Relocate  by Aaron Zahn. (Suarez, Eduardo) (Entered: 05/02/2022) | |
| 53 | 05/03/2022 | ORDER granting 52 Defendant Aaron Zahn's Unopposed Motion to Relocate as to Aaron Zahn (1). Signed by Magistrate Judge Monte C. Richardson on 5/3/2022. (SHS)  (Entered: 05/03/2022) | |
| 54 | 05/20/2022 | NOTICE OF ATTORNEY APPEARANCE: Raquel Ramirez Jefferson appearing for Aaron Zahn  (Ramirez Jefferson, Raquel) (Entered: 05/20/2022) | |
| 55 | 05/25/2022 | TRANSCRIPT of Criminal Status Conference as to Aaron Zahn, Ryan Wannemacher held on 4/19/22 before Judge Brian J. Davis. Court Reporter/Transcriber Shelli Kozachenko, Telephone number 904.301.6842. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/15/2022 Redacted Transcript Deadline set for 6/27/2022 Release of Transcript Restriction set for 8/23/2022. (SMK) (Entered: 05/25/2022) | |
| 56 | 05/25/2022 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Aaron Zahn, Ryan Wannemacher. Court Reporter: Shelli Kozachenko (SMK) (Entered: 05/25/2022) | |
| 57 | 06/16/2022 | Unopposed MOTION to Continue Status Conference set on June 21, 2022 at 3:30 pm  by USA as to Aaron Zahn, Ryan Wannemacher. (Duva, Andrew) (Entered: 06/16/2022) | |
| 58 | 06/17/2022 | ORDER granting 57 Government's Unopposed Motion to Continue Status Conference as to Aaron Zahn (1) and Ryan Wannemacher (2). The Status Conference is continued to 7/5/2022 at 04:30 PM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. Signed by Judge Brian J. Davis on 6/17/2022. (CKS)  (Entered: 06/17/2022) | |
| 59 | 06/21/2022 | Unopposed MOTION for Miscellaneous Relief, specifically Leave to Serve Pretrial Subpoenas  by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit A (Proposed Subpoena to Nixon Peabody), # 2 Exhibit B (Proposed Subpoena to Pillsbury))(Breslow, Brandon) (Entered: 06/21/2022) | |
| 60 | 06/29/2022 | ORDER granting 59 Motion for Leave to Serve Pretrial Subpoenas as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 6/29/2022. (SHS) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | (Entered: 06/29/2022) | |
| 61 | 06/29/2022 | Joint MOTION for Miscellaneous Relief, specifically Defendants' Motion to Establish Procedures for Filing and Service of Garrity Materials by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit 1)(Felman, James) (Entered: 06/29/2022) | |
| 62 | 07/05/2022 | Minute Entry for In Person proceedings held before Judge Brian J. Davis: STATUS Conference as to Aaron Zahn, Ryan Wannemacher held on 7/5/2022. Court Reporter: Shelli Kozachenko (CKS) (Entered: 07/06/2022) | |
| 63 | 07/13/2022 | RESPONSE 61 Joint MOTION for Miscellaneous Relief, specifically Defendants' Motion to Establish Procedures for Filing and Service of Garrity Materials by USA as to Ryan Wannemacher (Duva, Andrew) (Entered: 07/13/2022) | |
| 64 | 07/15/2022 | Joint MOTION for Leave to File a Reply to the Governments' Response to Motion to Establish Procedures for Filing and Service of Garrity Materials by Aaron Zahn, Ryan Wannemacher. (Felman, James) (Modified on 7/18/2022, to edit text) (BGR). (Entered: 07/15/2022) | |
| 65 | 07/18/2022 | ENDORSED ORDER: 64 Defendants' Motion for Leave to File a Reply is TAKEN UNDER ADVISEMENT. The Government shall file its response on or before July 25, 2022, or the Court will consider the Motion unopposed. Signed by Judge Brian J. Davis on 7/18/2022. (AMP) (Entered: 07/18/2022) | |
| 66 | 07/20/2022 | Unopposed Second MOTION for Leave to Serve Pretrial Subpoenas by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit A (Proposed Subpoena to Jacksonville Office of General Counsel), # 2 Exhibit B (Proposed Subpoena to Jacksonville Council Auditor's Office), # 3 Exhibit C (Proposed Subpoena to Foley &amp; Lardner))(Breslow, Brandon) (Modified on 7/21/2022, to edit text) (BGR). (Entered: 07/20/2022) | |
| 67 | 07/20/2022 | RESPONSE in Opposition by USA as to Aaron Zahn, Ryan Wannemacher re 64 Joint MOTION for Leave to File a Reply to the Governments' Response to Motion to Establish Procedures for Filing and Service of Garrity Materials (Duva, Andrew) (Modified on 7/21/2022 to edit docket text) (JDR). (Entered: 07/20/2022) | |
| 68 | 07/26/2022 | ORDER granting 66 Unopposed Motion for Leave to Serve Pretrial Subpoenas as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 7/26/2022. (SHS) (Entered: 07/26/2022) | |
| 69 | 07/27/2022 | ORDER GRANTING IN PART 61 Defendants' Motion to Establish Procedures for Filing and Service of Garrity Materials; DENYING 64 Defendants' Motion for Leave to File a Reply. See order for details. Signed by Judge Brian J. Davis on 7/27/2022. (AMP) (Entered: 07/27/2022) | |
| 70 | 08/05/2022 | Unopposed Third MOTION for Leave to Serve Pretrial Subpoenas by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit A (Proposed Subpoena to Smith Hulsey), # 2 Exhibit B (Proposed Subpoena to Nelson Mullins))(Felman, James) (Modified on 8/8/2022, to edit text) (BGR). (Entered: 08/05/2022) | |
| 71 | 08/11/2022 | Unopposed MOTION to Extend Time to Discovery-Motions Deadline by Aaron Zahn, Ryan Wannemacher. (Breslow, Brandon) (Entered: 08/11/2022) | |
| 72 | 08/11/2022 | Amended MOTION to Extend Time to Discovery-Motions Deadline by Aaron Zahn, Ryan Wannemacher. (Breslow, Brandon) (Entered: 08/11/2022) | |
| 73 | 08/11/2022 | ORDER granting 70 Unopposed Third Motion for Leave to Serve Pretrial Subpoenas as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 8/11/2022. (SHS) (Entered: 08/11/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 74 | 08/15/2022 | ORDER granting 72 Defendants' Amended Unopposed Motion to Extend Discovery Motions Deadline as to Aaron Zahn (1) and Ryan Wannemacher (2). Discovery motions are due on or before October 14, 2022. Dispositive motions, motions to suppress, and other non-discovery motions are due November 14, 2022. Signed by Judge Brian J. Davis on 8/11/2022. (CKS)  (Entered: 08/15/2022) | |
| | 08/15/2022 | Set/Reset Deadlines as to Aaron Zahn, Ryan Wannemacher: Discovery due by 10/14/2022 (BGR) (Entered: 08/15/2022) | |
| 75 | 09/19/2022 | Unopposed Fourth MOTION for Leave to Serve Pretrial Subpoena by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit A (Proposed Subpoena to Jacksonville Electric Authority))(Breslow, Brandon) (Modified on 9/20/2022, to edit text) (BGR). (Entered: 09/19/2022) | |
| 76 | 09/23/2022 | ORDER granting 75 Unopposed Fourth Motion for Leave to Serve Pretrial Subpoenas as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 9/22/2022. (SHS)  (Entered: 09/23/2022) | |
| 77 | 10/03/2022 | TRANSCRIPT of Criminal Status Conference as to Aaron Zahn, Ryan Wannemacher held on 7/5/22 before Judge Brian J. Davis. Court Reporter/Transcriber Shelli Kozachenko, Telephone number 904.301.6842. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/24/2022 Redacted Transcript Deadline set for 11/3/2022 Release of Transcript Restriction set for 1/3/2023. (SMK) (Entered: 10/03/2022) | |
| 78 | 10/03/2022 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Aaron Zahn, Ryan Wannemacher. Court Reporter: Shelli Kozachenko (SMK) (Entered: 10/03/2022) | |
| 79 | 10/12/2022 | Unopposed MOTION for Miscellaneous Relief, specifically Nonparties City of Jacksonville's and JEA's Unopposed Motion for Protective Order  by City of Jacksonville as to Aaron Zahn, Ryan Wannemacher. (Granat, Sean) (Entered: 10/12/2022) | |
| 80 | 10/14/2022 | Unopposed MOTION for Miscellaneous Relief, specifically Partial Extension or Modification to the Discovery-Motions Deadline re Set/Reset Deadlines, 74 Order on Motion to Extend Time,  by Aaron Zahn, Ryan Wannemacher. (Felman, James) (Entered: 10/14/2022) | |
| 81 | 10/17/2022 | ORDER granting 80 Defendats' Unopposed Motion for a Partial Extension or Modification to the Discovery-Motions Deadline as to Aaron Zahn (1) and Ryan Wannemacher (2). Discovery motions are due on or before October 28, 2022. See Order for further details. Signed by Judge Brian J. Davis on 10/17/2022. (EL) (Entered: 10/17/2022) | |
| 82 | 10/18/2022 | ENDORSED ORDER taking under advisement 79 Nonparties City of Jacksonville's and JEA's Unopposed Motion for Protective Order. The parties shall file a proposed protective order and email it in Word format to chambers_FLMD_Richardson@flmd.uscourts.gov on or before October 21, 2022. Signed by Magistrate Judge Monte C. | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Richardson on 10/18/2022. (ADM) (Entered: 10/18/2022) | |
| 83 | 10/19/2022 | NOTICE of Filing proposed Protective Order by City of Jacksonville as to Aaron Zahn, Ryan Wannemacher re 82 Order on Motion for Miscellaneous Relief, 79 Unopposed MOTION for Miscellaneous Relief, specifically Nonparties City of Jacksonville's and JEA's Unopposed Motion for Protective Order . (Attachments: # 1 Text of Proposed Order Attachment A - City's Proposed Order)(Granat, Sean) (Modified on 10/20/2022 to edit docket text) (JDR). (Entered: 10/19/2022) | |
| 84 | 10/20/2022 | ORDER granting 79 Motion for protective order as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 10/20/2022. (ADM) (Entered: 10/20/2022) | |
| 85 | 10/20/2022 | PROTECTIVE ORDER as to Aaron Zahn, Ryan Wannemacher. Signed by Magistrate Judge Monte C. Richardson on 10/20/2022. (ADM) (Entered: 10/20/2022) | |
| 86 | 10/20/2022 | NOTICE OF HEARING as to Aaron Zahn, Ryan Wannemacher: Status Conference set for 11/14/2022 at 03:30 PM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. (CKS) (Entered: 10/20/2022) | |
| 87 | 10/21/2022 | Unopposed MOTION to Continue Status Conference set on November 14, 2022 at 3:30 pm by USA as to Aaron Zahn, Ryan Wannemacher. (Duva, Andrew) (Entered: 10/21/2022) | |
| 88 | 10/31/2022 | ORDER granting 87 United States' Unopposed Motion to Continue or Reschedule Status Conference as to Aaron Zahn (1) and Ryan Wannemacher (2). The status conference is now scheduled for November 10, 2022, at 10:00 a.m. before the undersigned in Courtroom 12C. Signed by Judge Brian J. Davis on 10/28/2022. (CKS) (Entered: 10/31/2022) | |
| 89 | 11/01/2022 | Unopposed MOTION for Miscellaneous Relief, specifically to exceed motion page limit by one page by Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Entered: 11/01/2022) | |
| 90 | 11/04/2022 | UNOPPOSED MOTION for Leave to File Certain Exhibits to the Motion to Sever Under Seal by Ryan Wannemacher. (Felman, James) (Modified on 11/7/2022 to edit docket text) (JDR). (Entered: 11/04/2022) | |
| 91 | 11/04/2022 | UNOPPOSED MOTION for Extension of Page Limit for Motion to Sever by Ryan Wannemacher. (Felman, James) (Modified on 11/7/2022 to edit docket text) (JDR). (Entered: 11/04/2022) | |
| 92 | 11/04/2022 | ENDORSED ORDER: Defendants' Unopposed Motion for Leave to Exceed Motion Page Limit 89 is GRANTED. Defendants' Motion to Dismiss shall not exceed 26 pages. Signed by Judge Brian J. Davis on 11/3/2022. (AMP) (Entered: 11/04/2022) | |
| 93 | 11/07/2022 | MOTION to Dismiss the Indictment for Failure to State an Offense by Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Entered: 11/07/2022) | |
| 94 | 11/07/2022 | ENDORSED ORDER: 91 Defendant Ryan Wannemacher's Unopposed Motion for Extension of Page Limit for Motion to Sever is GRANTED. Defendant Wannemacher's Motion to Sever may contain up to, but no more than, twenty-nine (29) pages. Signed by Judge Brian J. Davis on 11/7/2022. (AMP) (Entered: 11/07/2022) | |
| 95 | 11/07/2022 | Unopposed MOTION Briefly Continue Status the November 10th Status Conference to another Date Next Week by Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Modified on 11/8/2022 to edit docket text)(JDR). (Entered: 11/07/2022) | |
| 96 | 11/08/2022 | Unopposed MOTION for Miscellaneous Relief, specifically Exceed Page Limit for Motion for Hearing Pursuant to Kastigar v. United States by Ryan Wannemacher. (Felman, James) (Entered: | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 11/08/2022) | |
| 97 | 11/08/2022 | Unopposed MOTION for Leave to File Under Seal as to Certain Exhibits to His Motion for a Kastigar Hearing by Aaron Zahn. (Albritton, A.) (Modified on 11/9/2022 to edit docket text) (JDR). (Entered: 11/08/2022) | |
| 98 | 11/08/2022 | Unopposed MOTION for Leave to exceed motion page limit in two evidentiary motions by Aaron Zahn. (Albritton, A.) (Modified on 11/9/2022 to edit docket text) (JDR). (Entered: 11/08/2022) | |
| 99 | 11/09/2022 | MOTION to Quash in Part Defendant Ryan Wannemacher's Subpoena Duces Tecum or, in the Alternative, Motion for a Protective Order by Nelson, Mullins, Riley and Scarborough, LLP as to Aaron Zahn, Ryan Wannemacher. (Wedekind, Lee) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 11/09/2022) | |
| 100 | 11/09/2022 | ORDER granting 95 Defendants' Unopposed Motion to Briefly Continue the November 10th Status Conference to Another Date Next Week as to Aaron Zahn (1), Ryan Wannemacher (2). The status conference is now scheduled for November 14, 2022, at 3:30 p.m. before the undersigned in Courtroom 12C. Signed by Judge Brian J. Davis on 11/9/2022. (CKS) (Entered: 11/09/2022) | |
| 101 | 11/09/2022 | MOTION for Miscellaneous Relief, specifically for a Pretrial James Hearing by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit Chronology, # 2 Exhibit Vinyard, # 3 Exhibit Gabriel Memo, # 4 Exhibit Gabriel Email to Green)(Albritton, A.) (Entered: 11/09/2022) | |
| 102 | 11/11/2022 | MOTION to Sever Defendant by Ryan Wannemacher. (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit J)(Felman, James) (Entered: 11/11/2022) | |
| 104 | 11/14/2022 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 93 MOTION to Dismiss the Indictment for Failure to State an Offense (Duva, Andrew) (Entered: 11/14/2022) | |
| 105 | 11/14/2022 | Unopposed MOTION for Leave to File Document Under Seal as to Certain Exhibits to the Motion for a Hearing Pursuant to Kastigar v. United States by Ryan Wannemacher. (Felman, James) (Entered: 11/14/2022) | |
| 106 | 11/14/2022 | ENDORSED ORDER directing USA, Aaron Zahn, Ryan Wannemacher to respond to 99 MOTION to Quash in Part Defendant Ryan Wannemacher's Subpoena Duces Tecum or, in the Alternative, Motion for a Protective Order as to Aaron Zahn, Ryan Wannemacher. Responses due by 11/23/2022 Signed by Magistrate Judge Monte C. Richardson on 11/14/2022. (SHS) (Entered: 11/14/2022) | |
| 107 | 11/14/2022 | ENDORSED ORDER taking under advisement 97 Motion for Leave to File as to Aaron Zahn (1); taking under advisement 90 Sealed Motion for leave to file under seal as to Ryan Wannemacher (2); taking under advisement 105 Motion for Leave to File as to Ryan Wannemacher (2). The parties shall file a proposed order and email it in Word format to chambers_FLMD_Richardson@flmd.uscourts.gov on or before November 16, 2022. Signed by Magistrate Judge Monte C. Richardson on 11/14/2022. (SHS) Modified on 11/14/2022 (SHS). (Entered: 11/14/2022) | |
| 108 | 11/14/2022 | ENDORSED ORDER: 98 Defendant Aaron Zahn's Unopposed Motion for Leave to Exceed Motion Page Limit in Two Evidentiary Motions is GRANTED. Defendant Zahn's motion for hearing may contain up to, but no more than, thirty-one (31) pages and his motion for transfer may contain up to, but no more than, twenty- | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | eight (28) pages. Signed by Judge Brian J. Davis on 11/14/2022. (AMP)  (Entered: 11/14/2022) | |
| 109 | 11/14/2022 | ENDORSED ORDER: 96 Defendant Ryan Wannemacher's Unopposed Motion for Extension of Page Limit for Motion for a Hearing Pursuant to Kastigar v. United States is GRANTED. Defendant Wannemacher's Motion may contain up to, but no more than, thirty-two (32) pages. Signed by Judge Brian J. Davis on 11/14/2022. (AMP)  (Entered: 11/14/2022) | |
| 113 | 11/14/2022 | Emergency MOTION to Strike 110 MOTION for Hearing Pursuant to Kastigar v. United States  by Ryan Wannemacher. (Felman, James) (Entered: 11/14/2022) | |
| 114 | 11/14/2022 | MOTION for Hearing Pursuant to Kastigar v. United States by Ryan Wannemacher. (Attachments: # 1 Exhibit List, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 6(Appendix Index), # 6 Appendix A1, # 7 Appendix A2, # 8 Appendix A3, # 9 Appendix A4, # 10 Appendix A5, # 11 Appendix A6, # 12 Appendix A7, # 13 Appendix A8, # 14 Appendix A9, # 15 Appendix A10, # 16 Appendix A11, # 17 Appendix A12, # 18 Appendix A13, # 19 Appendix A14, # 20 Appendix A15, # 21 Appendix A16, # 22 Appendix A17, # 23 Appendix A18, # 24 Appendix A19, # 25 Appendix A20, # 26 Appendix A21, # 27 Appendix A22, # 28 Appendix A23, # 29 Appendix A24, # 30 Appendix A25, # 31 Appendix A26, # 32 Appendix A27, # 33 Appendix A28, # 34 Appendix A29, # 35 Appendix A30, # 36 Appendix A31, # 37 Appendix A32, # 38 Appendix A33, # 39 Appendix A34, # 40 Appendix A35, # 41 Appendix A36, # 42 Appendix A37, # 43 Appendix A38, # 44 Appendix A39, # 45 Appendix A40, # 46 Appendix A41, # 47 Appendix A42, # 48 Appendix A43, # 49 Appendix A44, # 50 Appendix A45, # 51 Appendix A46, # 52 Appendix A47, # 53 Appendix A48, # 54 Appendix A49, # 55 Appendix A50)(Felman, James) (Entered: 11/14/2022) | |
| 115 | 11/14/2022 | MOTION for Hearing on Defendant Zahn's Motion for Kastigar Hearing by Aaron Zahn. (Attachments: # 1 Exhibit Exh 01, # 2 Exhibit Exh 02, # 3 Exhibit Exh 04, # 4 Exhibit Exh 05, # 5 Exhibit Exh 06, # 6 Exhibit Exh 07, # 7 Exhibit Exh 08, # 8 Exhibit Exh 09, # 9 Exhibit Exh 10, # 10 Exhibit Exh 11, # 11 Exhibit Exh 12, # 12 Exhibit Exh 13, # 13 Exhibit Exh 14, # 14 Exhibit Exh 15, # 15 Exhibit Exh 16, # 16 Exhibit Exh 17, # 17 Exhibit Exh 18, # 18 Exhibit Exh 19, # 19 Exhibit Exh 20, # 20 Exhibit Exh 21, # 21 Exhibit Exh 22, # 22 Exhibit Exh 23, # 23 Exhibit Exh 24, # 24 Exhibit Exh 25, # 25 Exhibit Exh 26, # 26 Exhibit Exh 27, # 27 Exhibit Exh 28, # 28 Exhibit Exh 29, # 29 Exhibit Exh 30, # 30 Exhibit Exh 31, # 31 Exhibit Exh 32, # 32 Exhibit Exh 33, # 33 Exhibit Exh 34, # 34 Exhibit Exh 35 Part 1, # 35 Exhibit Exh 35 Part 2, # 36 Exhibit Exh 36)(Albritton, A.) (Entered: 11/14/2022) | |
| 118 | 11/14/2022 | MOTION to Change Venue / Transfer Case Intradistrict Transfer by Aaron Zahn. (Attachments: # 1 Exhibit Exh 1, # 2 Exhibit Exh 2, # 3 Exhibit Exh 3, # 4 Exhibit Exh 4)(Albritton, A.) (Entered: 11/14/2022) | |
| 119 | 11/14/2022 | GOVERNMENT'S ORE TENUS MOTION for Extension of Time as to Aaron Zahn, Ryan Wannemacher. (CKS) Modified on 11/15/2022 (CKS). (Entered: 11/14/2022) | |
| 120 | 11/14/2022 | Minute Entry for In Person proceedings held before Judge Brian J. Davis: STATUS Conference as to Aaron Zahn, Ryan Wannemacher held on 11/14/2022; granting 119 Government's (Uopposed) Oral Motion for Extension of Time. Government's Response to Motions due on or before December 3, 2022. Status Conference set for January 10, 2023, at 4:00 p.m. before Judge Brian J. Davis. Court Reporter: Shelli Kozachenko (CKS) Modified on 11/15/2022 to edit entry (CKS). (Entered: 11/15/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 121 | 11/15/2022 | ENDORSED ORDER: 113 Defendant Wannemacher's Unopposed Emergency Motion to Strike or Remove from the Public Record Unredacted Motion for a Hearing Pursuant to Kastigar v. United States is GRANTED to the extent that Docket Entry 110 will remain under seal. Signed by Judge Brian J. Davis on 11/15/2022. (AMP) (Entered: 11/15/2022) | |
| 122 | 11/16/2022 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 101 MOTION for Miscellaneous Relief, specifically for a Pretrial James Hearing  (Duva, Andrew) (Entered: 11/16/2022) | |
| 123 | 11/17/2022 | ORDER granting 97 Motion for Leave to File as to Aaron Zahn (1); granting 90 Sealed Motion for leave to file under seal as to Ryan Wannemacher (2); granting 105 Motion for Leave to File as to Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 11/16/2022. (SHS) (Entered: 11/17/2022) | |
| 127 | 11/22/2022 | MOTION for Leave to File a Reply to 104 United State's Opposition to Defendants Motion to Dismiss the Indictment for Failure to State an Offense by Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Modified on 11/23/2022 to edit docket text) (JDR). (Entered: 11/22/2022) | |
| 128 | 11/23/2022 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 127 MOTION for Leave to File Document Reply to US Opposition to Defendants Motion to Dismiss the Indictment for Failure to State an Offense  (Duva, Andrew) (Entered: 11/23/2022) | |
| 129 | 11/23/2022 | RESPONSE in Opposition by Aaron Zahn, Ryan Wannemacher re 99 MOTION to Quash in Part Defendant Ryan Wannemacher's Subpoena Duces Tecum or, in the Alternative, Motion for a Protective Order  (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Felman, James) (Entered: 11/23/2022) | |
| 130 | 11/23/2022 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 106 Order directing response to motion, 99 MOTION to Quash in Part Defendant Ryan Wannemacher's Subpoena Duces Tecum or, in the Alternative, Motion for a Protective Order  (Duva, Andrew) (Entered: 11/23/2022) | |
| 131 | 11/28/2022 | ENDORSED ORDER: 127 Defendants' Motion for Leave to File a Reply to Docket Entry 104 is DENIED. Signed by Judge Brian J. Davis on 11/28/2022. (AMP)  (Entered: 11/28/2022) | |
| 132 | 11/30/2022 | RESPONSE to Motion re 114 MOTION for Hearing Pursuant to Kastigar v. United States, 115 MOTION for Hearing on Defendant Zahn's Motion for Kastigar Hearing by USA as to Aaron Zahn, Ryan Wannemacher  (Duva, Andrew) (Entered: 11/30/2022) | |
| 133 | 11/30/2022 | MEMORANDUM in opposition by USA as to Aaron Zahn re 118 MOTION to Change Venue / Transfer Case Intradistrict Transfer (Duva, Andrew) (Entered: 11/30/2022) | |
| 134 | 11/30/2022 | ORDER taking under advisement 99 Motion to Quash as to Aaron Zahn (1). See Order for details. Signed by Magistrate Judge Monte C. Richardson on 11/30/2022. (ADM)  (Entered: 11/30/2022) | |
| 135 | 12/01/2022 | RESPONSE to Motion re 102 MOTION to Sever Defendant  by USA as to Ryan Wannemacher  (Duva, Andrew) (Entered: 12/01/2022) | |
| 136 | 12/05/2022 | MOTION for Leave to File Reply; re 135 Response to Motion to Sever by Ryan Wannemacher. (Felman, James) (Modified on 12/6/2022, to edit text) (BGR). (Entered: 12/05/2022) | |
| 137 | 12/05/2022 | RESPONSE in Opposition by USA as to Ryan Wannemacher re 136 MOTION for Leave to File Reply to Response to Motion to Sever (Duva, Andrew) (Modified on 12/6/2022, to edit text) (BGR). (Entered: 12/05/2022) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 138 | 12/07/2022 | ORDER DENYING 136 Defendant Wannemacher's Motion for Leave to File Reply to Government's Response to Defendant's Motion to Sever. Signed by Judge Brian J. Davis on 12/6/2022. (AMP) (Entered: 12/07/2022) | |
| 139 | 12/08/2022 | MOTION for Leave to File a Reply to US Opposition to Zahn Motion for Intradistrict Transfer or in the alternative Motion for Oral Argument by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Modified on 12/9/2022, to edit text) (BGR). (Entered: 12/08/2022) | |
| 140 | 12/09/2022 | RESPONSE in Opposition by USA as to Aaron Zahn re 139 MOTION for Leave to File Document to File a Reply to US Opposition to Zahn Motion for Intradistrict Transfer or in the alternative Motion for Oral Argument  (Duva, Andrew) (Modified on 12/12/2022, to edit text) (BGR). (Entered: 12/09/2022) | |
| 141 | 12/09/2022 | ENDORSED ORDER: Over the Government's objection, Defendant Zahn's Motion for Leave to File a Reply 139 is GRANTED. On or before December 16, 2022, Defendant may file a reply not to exceed five (5) pages. Signed by Judge Brian J. Davis on 12/9/2022. (AMP) (Entered: 12/09/2022) | |
| 142 | 12/12/2022 | ENDORSED ORDER: The Government's Motion for Leave to file a sur-reply 140 is GRANTED. No later than five (5) days after Defendant Zahn files his reply, the Government may file a sur-reply not to exceed five (5) pages. Signed by Judge Brian J. Davis on 12/12/2022. (AMP) (Entered: 12/12/2022) | |
| 143 | 12/16/2022 | REPLY TO Response to Motion by Aaron Zahn re 118 MOTION to Change Venue / Transfer Case Intradistrict Transfer (Attachments: # 1 Exhibit Dr. Edelman Supplemental Declaration)(Albritton, A.) (Modified on 12/19/2022, to edit text) (BGR). (Entered: 12/16/2022) | |
| 144 | 12/19/2022 | ORDER granting 99 Motion to Quash as to Aaron Zahn (1). Signed by Magistrate Judge Monte C. Richardson on 12/19/2022. (ADM) (Entered: 12/19/2022) | |
| 145 | 12/19/2022 | ORDER taking under advisement 112 Sealed Motion as to Aaron Zahn (1); taking under advisement 115 Motion for Hearing as to Aaron Zahn (1); taking under advisement 110 Sealed Motion as to Ryan Wannemacher (2); taking under advisement 114 Motion for Hearing as to Ryan Wannemacher (2). See Order for details. Signed by Magistrate Judge Monte C. Richardson on 12/19/2022. (ADM) (Entered: 12/19/2022) | |
| 146 | 12/20/2022 | SUR-REPLY re 143 Reply to Response to motion by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Modified on 12/21/2022, to edit text) (BGR). (Entered: 12/20/2022) | |
| 147 | 12/21/2022 | MOTION to Continue trial  by Aaron Zahn, Ryan Wannemacher. (Felman, James) (Entered: 12/21/2022) | |
| 148 | 12/23/2022 | JOINT RESPONSE 145 Sealed Order on Motion for Hearing, by Aaron Zahn, Ryan Wannemacher (Parties' Joint Response) (Felman, James) (Modified on 12/27/2022, to edit text) (BGR). (Entered: 12/23/2022) | |
| 149 | 12/30/2022 | RESPONSE to Motion re 147 MOTION to Continue trial  by USA as to Aaron Zahn, Ryan Wannemacher  (Duva, Andrew) (Entered: 12/30/2022) | |
| 150 | 01/10/2023 | GOVERNMENT'S ORAL MOTION to File Documents Under Seal as to Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 01/13/2023) | |
| 151 | 01/10/2023 | Minute Entry for In Person proceedings held before Judge Brian J. Davis: STATUS Conference as to Aaron Zahn, Ryan Wannemacher held on 1/10/2023; granting 150 Government's Oral Motion to File Documents Under Seal as to Ryan Wannemacher (2). Court Reporter: Shelli Kozachenko (CKS) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | (Entered: 01/13/2023) | |
| 152 | 01/25/2023 | ORDER granting 147 Defendant's Motion to Continue Trial as to Aaron Zahn (1), Ryan Wannemacher (2). Status Conference set for 5/22/2023 at 04:00 PM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. Jury Trial set for trial term commencing on 10/2/2023 at 09:00 AM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. Signed by Judge Brian J. Davis on 1/24/2023. (CKS)  (Entered: 01/25/2023) | |
| 153 | 01/25/2023 | ORDER DENYING 101 Defendants' Motion for a Pretrial James Hearing. Signed by Judge Brian J. Davis on 1/25/2023. (AMP) (Entered: 01/25/2023) | |
| 154 | 01/25/2023 | Unopposed MOTION to Amend 85 Order  by City of Jacksonville and JEA as to Aaron Zahn, Ryan Wannemacher. (Granat, Sean) (Modified on 1/26/2023, to edit text) (BGR). (Entered: 01/25/2023) | |
| 155 | 01/26/2023 | ENDORSED ORDER taking under advisement 154 JEA's Unopposed Motion to Amend Protective Order 85 as to Ryan Wannemacher (2). On or before January 31, 2023, JEA shall file a proposed amended order and email it in Word format to chambers_FLMD_Richardson@flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 1/26/2023. (ADM) (Entered: 01/26/2023) | |
| 156 | 01/27/2023 | NOTICE of Filing Proposed Amended Protective Order by City of Jacksonville as to Aaron Zahn, Ryan Wannemacher re 155 Order on Motion to Amend / Correct / Modify / Supplement, 85 Order. (Attachments: # 1 City's Proposed Order)(Granat, Sean) (Modified on 1/30/2023, to edit text) (BGR). (Entered: 01/27/2023) | |
| 157 | 01/30/2023 | ORDER granting 154 Motion to Amend Protective Order as to Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 1/30/2023. (ADM)  (Entered: 01/30/2023) | |
| 158 | 01/30/2023 | AMENDED PROTECTIVE ORDER as to Aaron Zahn, Ryan Wannemacher. Signed by Magistrate Judge Monte C. Richardson on 1/30/2023. (ADM)  (Entered: 01/30/2023) | |
| 159 | 01/31/2023 | NOTICE of In Camera Filing of Entire Grand Jury Record Pursuant to this Court's Order on January 25, 2023 by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew)  (Entered: 01/31/2023) | |
| 160 | 02/01/2023 | TRANSCRIPT of Criminal Status Conference as to Aaron Zahn, Ryan Wannemacher held on 1/10/23 before Judge Brian J. Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 2/22/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/2/2023. (SMK) (Entered: 02/01/2023) | |
| 161 | 02/07/2023 | NOTICE OF HEARING as to Aaron Zahn, Ryan Wannemacher: Status Conference set for 2/15/2023 at 10:30 AM in Jacksonville Courtroom 5C before Magistrate Judge Monte C. Richardson to discuss the Kastigar hearing procedure and set a date. If the parties wish to appear by Zoom, they should contact the Courtroom Deputy. (ADM)  (Entered: 02/07/2023) | |
| 162 | 02/08/2023 | MOTION for Order to Show Cause  by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Felman, James) (Entered: 02/08/2023) | |
| 164 | 02/15/2023 | ORDER regarding dates for the Kastigar hearing as to Aaron Zahn, Ryan Wannemacher. Signed by Magistrate Judge Monte C. Richardson on 2/15/2023. (ADM)  Modified on 2/15/2023 PDF attached and NEF regenerated to counsel (AET). (Entered: 02/15/2023) | |
| 165 | 02/15/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: STATUS Conference as to Aaron Zahn, Ryan Wannemacher held on 2/15/2023. (Digital) (SHS) (Entered: 02/15/2023) | |
| 166 | 02/22/2023 | TRANSCRIPT of Digitally Recorded Status Conference as to Aaron Zahn, Ryan Wannemacher held on 2/15/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 3/15/2023. Redacted Transcript Deadline set for 3/27/2023. Release of Transcript Restriction set for 5/23/2023. (SMK) (Entered: 02/22/2023) | |
| 167 | 02/22/2023 | RESPONSE to 162 MOTION for Order to Show Cause by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher (Attachments: # 1 Exhibits A - U)(BD) (Entered: 02/23/2023) | |
| 168 | 02/23/2023 | NOTICE to counsels Marcia L. Pope, Maria T. Galeno and John R. Van Son of Local Rule 2.01(c), Special Admission to Practice - File a Motion to Appear Pro Hac Vice. Co-counsel with filing rights may electronically file the motion on behalf of the non-resident lawyer or the motion may be filed on paper; Pay the Special Admission Fee; as to Aaron Zahn, Ryan Wannemacher (Signed by Deputy Clerk). (BD)  (Entered: 02/23/2023) | |
| 169 | 02/23/2023 | REQUEST for Hearing by Aaron Zahn, Ryan Wannemacher re 162 MOTION for Order to Show Cause . (Felman, James) (Modified on 2/24/2023, to edit text) (BGR). (Entered: 02/23/2023) | |
| 170 | 02/23/2023 | MOTION for Maria T. Galeno to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-20544039 for $150  by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit Maria Galeno Certification)(Altman, Jennifer) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/23/2023) | |
| 171 | 02/23/2023 | MOTION for Marcia L. Pope to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-20544088 for $150  by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit Marcia L. Pope's Certification)(Altman, Jennifer) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/23/2023) | |
| 172 | 02/23/2023 | MOTION for John R. Van Son to appear pro hac vice, Special Admission fee paid, Receipt No. FLMDC-20544109 for $150  by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit John R. Van Son's Certification)(Altman, Jennifer) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/23/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 173 | 02/23/2023 | MOTION to Quash Defendants' Subpoena Duces Tecum by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher. (Altman, Jennifer) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/23/2023) | |
| 174 | 02/24/2023 | ENDORSED ORDER taking under advisement 170, 171, and 172 Motions to Appear Pro Hac Vice. On or before March 1, 2023, Non-Party Respondent, Pillsbury Winthrop Shaw Pittman LLP, shall supplement its certificate under Local Rule 3.01(g) to clarify whether any party to this action opposes the Motions to Appear Pro Hac Vice. Signed by Magistrate Judge Monte C. Richardson on 2/24/2023. (ADM)  (Entered: 02/24/2023) | |
| 175 | 02/28/2023 | SUPPLEMENT re 170 MOTION for Maria T. Galeno to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-20544039 for $150   by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher (Altman, Jennifer) (Entered: 02/28/2023) | |
| 176 | 02/28/2023 | SUPPLEMENT re 171 MOTION for Marcia L. Pope to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-20544088 for $150   by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher (Altman, Jennifer) (Entered: 02/28/2023) | |
| 177 | 02/28/2023 | SUPPLEMENT re 172 MOTION for John R. Van Son to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-20544109 for $150   by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher (Altman, Jennifer) (Entered: 02/28/2023) | |
| 178 | 03/02/2023 | ENDORSED ORDER granting 170, 171, and 172 Motions to Appear Pro Hac Vice. If Maria T. Galeno, Esq., Marcia L. Pope, Esq., and John R. Van Son, Esq. have not already done so, they shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 3/2/2023. (ADM) (Entered: 03/02/2023) | |
| 179 | 03/02/2023 | NOTICE OF ATTORNEY APPEARANCE Arnold B. Corsmeier appearing for USA.  (Corsmeier, Arnold)  (Entered: 03/02/2023) | |
| 180 | 03/08/2023 | RESPONSE to Motion re 173 MOTION to Quash Defendants' Subpoena Duces Tecum by Aaron Zahn, Ryan Wannemacher. (Felman, James) (Entered: 03/08/2023) | |
| 181 | 03/08/2023 | REQUEST for Hearing by Aaron Zahn, Ryan Wannemacher re 180 Response to Motion, 173 MOTION to Quash Defendants' Subpoena Duces Tecum. (Felman, James)  (Modified on 3/10/2023, to edit text) (BGR). (Entered: 03/08/2023) | |
| 182 | 03/14/2023 | MOTION for Leave to File Document : A Reply to Defendants' Opposition to its Motion to Quash Defendants' Subpoena Duces Tecum by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher. (Altman, Jennifer) (Entered: 03/14/2023) | |
| 183 | 03/28/2023 | PRE-KASTIGAR Hearing Brief Regarding Requested Hearing Procedures by Aaron Zahn, Ryan Wannemacher (Attachments: # 1 Exhibit A (redacted))(Felman, James) (Modified on 3/28/2023, to edit text) (BGR). (Entered: 03/28/2023) | |
| 185 | 03/28/2023 | PRE-KASTIGAR Hearing Brief Regarding Diamond-Salem Hearing Issues by Ryan Wannemacher (Attachments: # 1 Exhibit List, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M)(Felman, James) (Modified on 3/28/2023, to edit text) (BGR). (Entered: 03/28/2023) | |
| 186 | 03/29/2023 | ENDORSED ORDER granting, over Defendants' objection, 182 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Non-Party Pillsbury Winthrop Shaw Pittman LLP's Motion for Leave to File a Reply to Defendants' Opposition to Its Motion to Quash Defendants' Subpoena Duces Tecum. Pillsbury's reply, limited to five (5) pages, is due on or before April 5, 2023. Signed by Magistrate Judge Monte C. Richardson on 3/29/2023. (ADM) (Entered: 03/29/2023) | |
| 187 | 04/04/2023 | NOTICE of Filing Summary of Responses at Diamond-Salem Hearing by Ryan Wannemacher (Felman, James) (Entered: 04/04/2023) | |
| 189 | 04/04/2023 | NOTICE of Filing Summary of Garrity Statement by Ryan Wannemacher (Felman, James) (Entered: 04/04/2023) | |
| 191 | 04/04/2023 | NOTICE of Filing - Under Seal and Ex Parte - Summaries of His Garrity Statement for Court's Use for Kastigar Motion by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 04/04/2023) | |
| 193 | 04/05/2023 | MEMORANDUM in Support re 173 MOTION to Quash Defendants' Subpoena Duces Tecum by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher (Altman, Jennifer) (Modified on 4/5/2023, to edit text) (BGR). (Entered: 04/05/2023) | |
| 194 | 04/11/2023 | MOTION to Intervene Regarding Access to Judicial Proceedings by Cox Media Group Jacksonville as to Aaron Zahn, Ryan Wannemacher. (BD) (Entered: 04/11/2023) | |
| 195 | 04/11/2023 | ORDER taking under advisement 169 Request for Hearing and 181 Motion for Hearing as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 4/11/2023. (ADM) (Entered: 04/11/2023) | |
| 196 | 04/11/2023 | Unopposed MOTION to Begin Kastigar Hearing on May 15, 2023 by USA as to Aaron Zahn, Ryan Wannemacher. (Duva, Andrew) (Modified on 4/12/2023, to edit text) (BGR). (Entered: 04/11/2023) | |
| 197 | 04/12/2023 | ENDORSED ORDER: Any party opposing 194 WJAX-TV's Motion to Intervene Regarding Access to Judicial Proceedings shall file a response to the Motion on or before April 19, 2023. Signed by Magistrate Judge Monte C. Richardson on 4/12/2023. (ADM) (Entered: 04/12/2023) | |
| 198 | 04/12/2023 | ORDER granting 196 Motion to Continue as to Aaron Zahn (1), Ryan Wannemacher (2). The Kastigar hearing is scheduled to take place on May 15-16 and May 18-19, 2023 (and, if additional time is necessary, May 23-26, 2023), starting at 9:30 a.m. Signed by Magistrate Judge Monte C. Richardson on 4/12/2023. (ADM) (Entered: 04/12/2023) | |
| 199 | 04/12/2023 | NOTICE of Joinder by Graham Media Group, Florida, Inc. as to Aaron Zahn, Ryan Wannemacher (JDR) (Entered: 04/12/2023) | |
| 200 | 04/13/2023 | NOTICE OF ATTORNEY APPEARANCE David Pardo appearing for USA. (Pardo, David) (Entered: 04/13/2023) | |
| 201 | 04/13/2023 | NOTICE in Response to Court's Order by Aaron Zahn, Ryan Wannemacher re 195 Order on Motion for Hearing. (Felman, James) (Entered: 04/13/2023) | |
| 202 | 04/14/2023 | MOTION to Intervene and to Oppose Closure of Court Proceedings from the Public re 183 Trial Brief by Florida Times-Union, First Coast News as to Aaron Zahn, Ryan Wannemacher. (Mansfield, Jennifer) (Modified on 4/17/2023, to edit text) (BGR). (Entered: 04/14/2023) | |
| 203 | 04/19/2023 | RESPONSE 202 MOTION for Miscellaneous Relief, specifically MOTION TO INTERVENE AND TO OPPOSE CLOSURE OF COURT PROCEEDINGS FROM THE PUBLIC re 183 Trial Brief , 199 Notice (Other), 194 MOTION to Intervene Regarding Access to Judicial Proceedings by Aaron Zahn as to Aaron Zahn, Ryan | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Wannemacher  (Ramirez Jefferson, Raquel) (Entered: 04/19/2023) | |
| 204 | 04/19/2023 | RESPONSE 202 MOTION for Miscellaneous Relief, specifically MOTION TO INTERVENE AND TO OPPOSE CLOSURE OF COURT PROCEEDINGS FROM THE PUBLIC re 183 Trial Brief , 194 MOTION to Intervene Regarding Access to Judicial Proceedings, 199 Notice (Other) by Ryan Wannemacher (Felman, James) (Entered: 04/19/2023) | |
| 205 | 04/20/2023 | MOTION for Hearing or, Alternatively, to File Sur-Reply by Florida Times-Union, First Coast News as to Aaron Zahn, Ryan Wannemacher. (Mansfield, Jennifer) (Entered: 04/20/2023) | |
| 206 | 04/20/2023 | RESPONSE 205 MOTION for Hearing or, Alternatively, to File Sur-Reply by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Ramirez Jefferson, Raquel) (Entered: 04/20/2023) | |
| 207 | 04/24/2023 | ENDORSED ORDER granting in part 205 First Coast News and The Florida Times-Union's Request to File a Sur-Reply. The Sur-reply, limited to five (5) pages, is due on or before April 27, 2023. Signed by Magistrate Judge Monte C. Richardson on 4/24/2023. (ADM)  (Entered: 04/24/2023) | |
| 208 | 04/24/2023 | ORDER denying 162 Motion for Order to Show Cause as to Aaron Zahn (1), Ryan Wannemacher (2); granting in part 173 Motion to Quash as to Aaron Zahn (1), Ryan Wannemacher (2); denying 181 Motion for Hearing as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 4/24/2023. (ADM)  (Entered: 04/24/2023) | |
| 209 | 04/27/2023 | MOTION for John D. Cline to appear pro hac vice  by Ryan Wannemacher. (Felman, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 04/27/2023) | |
| 210 | 04/27/2023 | REPLY TO RESPONSE to Motion by Florida Times-Union, First Coast News as to Aaron Zahn, Ryan Wannemacher re 114 MOTION for Hearing Pursuant to Kastigar v. United States, 115 MOTION for Hearing on Defendant Zahn's Motion for Kastigar Hearing -Sur-reply in opposition to closure (Mansfield, Jennifer) (Entered: 04/27/2023) | |
| 211 | 04/28/2023 | MOTION for Miscellaneous Relief, specifically to Intervene to Oppose Defendants' Request to Close Kastigar re 183 Trial Brief by JEA as to Aaron Zahn, Ryan Wannemacher. (Wedekind, Lee) WITHDRAWN per Order 217 Modified on 5/3/2023 (MDC). (Entered: 04/28/2023) | |
| 212 | 04/28/2023 | MOTION to Withdraw Document 211 MOTION for Miscellaneous Relief, specifically to Intervene to Oppose Defendants' Request to Close Kastigar re 183 Trial Brief  by JEA as to Aaron Zahn, Ryan Wannemacher. (Wedekind, Lee) (Entered: 04/28/2023) | |
| 213 | 04/28/2023 | Unopposed MOTION for Leave to File Document Supplemental Exhibits of Recent Pretrial Publicity in Support of Motion for Intradistrict Transfer by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Ramirez Jefferson, Raquel) (Entered: 04/28/2023) | |
| 214 | 04/28/2023 | NOTICE of compliance by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher with 208 Order on Motion for Order to Show Cause Order on Motion to Quash Order on Motion for Hearing, (Altman, Jennifer)  (Entered: 04/28/2023) | |
| 215 | 04/28/2023 | MOTION to Unseal Document Garrity-related pleadings for review by USA filter team by USA as to Aaron Zahn, Ryan Wannemacher. (Pardo, David) (Entered: 04/28/2023) | |
| 216 | 05/01/2023 | RESPONSE 215 MOTION to Unseal Document Garrity-related pleadings for review by USA filter team by Aaron Zahn, Ryan Wannemacher  (Felman, James) (Entered: 05/01/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 217 | 05/02/2023 | ENDORSED ORDER granting 212 JEA's Motion to Withdraw Its Motion to Intervene to Oppose Defendants' Request to Close Kastigar Hearing. JEA's Motion to Intervene to Oppose Defendants' Request to Close Kastigar Hearing 211 is withdrawn. Signed by Magistrate Judge Monte C. Richardson on 5/1/2023. (ADM) (Entered: 05/02/2023) | |
| 218 | 05/02/2023 | ORDER denying 194, 199, 202 Media Motions to Intervene. See Order for details. Signed by Magistrate Judge Monte C. Richardson on 5/1/2023. (ADM) (Entered: 05/02/2023) | |
| 219 | 05/02/2023 | JEA'S AMENDED MOTION to Intervene to Oppose Defendants' Request to Close Kastigar Hearing re 183 Defendants' Pre-Kastigar Hearing Brief Regarding Requested Hearing and Procedures by JEA as to Aaron Zahn, Ryan Wannemacher. (Wedekind, Lee) Modified on 5/3/2023 to edit docket text (MDC). (Entered: 05/02/2023) | |
| 220 | 05/02/2023 | NOTICE to counsel John D. Cline Local Rule 2.01(c), Special Admission to Practice - Pay the Special Admission Fee; as to Ryan Wannemacher (Signed by Deputy Clerk). (JDR) (Entered: 05/02/2023) | |
| 221 | 05/02/2023 | ENDORSED ORDER: Defendant Zahn's Motion for Leave to File Supplemental Exhibits 213 is GRANTED. Signed by Judge Brian J. Davis on 5/2/2023. (EL) (Entered: 05/02/2023) | |
| 222 | 05/02/2023 | ENDORSED ORDER directing John D. Cline to pay the pro hac vice fee on or before May 5, 2023, or his Motion to Appear Pro Hac Vice 209 will be denied without prejudice. Signed by Magistrate Judge Monte C. Richardson on 5/2/2023. (ADM) (Entered: 05/02/2023) | |
| 223 | 05/02/2023 | ENDORSED ORDER: Defendant Zahn's response, if any, to 219 JEA's Amended Motion to Intervene to Oppose Defendants' Request to Close the Kastigar Hearing is due on or before May 5, 2023. Signed by Magistrate Judge Monte C. Richardson on 5/2/2023. (ADM) (Entered: 05/02/2023) | |
| 224 | 05/02/2023 | ENDORSED ORDER denying without prejudice 215 United States' Motion to Partially Unseal Pleadings Containing Garrity-Related Materials, so that the Government has a chance to confer with Defendants on the issues raised in 216 Defendants' Response, and, if necessary, refile the motion (preferably as a joint motion) on or before May 8, 2023. Signed by Magistrate Judge Monte C. Richardson on 5/2/2023. (ADM) (Entered: 05/02/2023) | |
| | 05/03/2023 | PRO HAC VICE FEES paid by attorney John D. Cline appearing on behalf of Ryan Wannemacher (Filing fee $150 receipt number 36508.) Related document: 209 MOTION for John D. Cline to appear pro hac vice. (BD) (Entered: 05/03/2023) | |
| 225 | 05/03/2023 | NOTICE of Filing Supplemental Exhibits In Support Of Defendant Zahn's Motion for Intradistrict Transfer by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 221 Order on Motion for Leave to File Amicus Brief / Document, 213 Unopposed MOTION for Leave to File Document Supplemental Exhibits of Recent Pretrial Publicity in Support of Motion for Intradistrict Transfer. (Attachments: # 1 Exhibit Articles, # 2 Exhibit Edelman's 2nd Supplemental Declaration)(Ramirez Jefferson, Raquel) (Entered: 05/03/2023) | |
| 226 | 05/04/2023 | ENDORSED ORDER granting 209 Motion of John D. Cline to Appear Pro Hac Vice. If Mr. Cline has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 5/3/2023. (ADM) (Entered: 05/04/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 227 | 05/05/2023 | WITNESS LIST by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 05/05/2023) | |
| 228 | 05/05/2023 | EXHIBIT LIST by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 05/05/2023) | |
| 229 | 05/05/2023 | NOTICE OF ATTORNEY APPEARANCE: Mitchell McBride appearing for Aaron Zahn, Ryan Wannemacher co-counsel o/b/o Aaron Zahn (McBride, Mitchell) (Entered: 05/05/2023) | |
| 230 | 05/05/2023 | RESPONSE in Opposition by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 219 Amended MOTION for Miscellaneous Relief, specifically to Intervene to Oppose Defendants' Request to Close Kastigar Hearing re 183 Trial Brief to JEA's Amended Motion to Intervene to Oppose Defendants' Request to Close Kastigar Hearing (Ramirez Jefferson, Raquel) (Entered: 05/05/2023) | |
| 231 | 05/05/2023 | EXHIBIT LIST by Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 05/05/2023) | |
| 232 | 05/06/2023 | EXHIBIT LIST by Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 05/06/2023) | |
| 233 | 05/08/2023 | ORDER denying 219 JEA's Amended Motion to Intervene to Oppose Defendants' Request to Close Kastigar Hearing as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 5/8/2023. (ADM) (Entered: 05/08/2023) | |
| 234 | 05/08/2023 | OBJECTION to Magistrate Judge's Order on Defendants' Motion for Order to Show Cause and Pillsbury Winthrop Shaw Pittman LLP's Motion to Quash Subpoena Duces Tecum by Aaron Zahn, Ryan Wannemacher as to Aaron Zahn, Ryan Wannemacher re 208 Order denying 162 Motion for Order to Shaw Cause (Felman, James) (Modified on 5/11/2023 to edit docket text and event type) (JDR). (Entered: 05/08/2023) | |
| 235 | 05/08/2023 | Second MOTION to Unseal Document [partial] by USA as to Aaron Zahn, Ryan Wannemacher. (Pardo, David) (Entered: 05/08/2023) | |
| 236 | 05/09/2023 | RESPONSE 235 Second MOTION to Unseal Document [partial] by Aaron Zahn, Ryan Wannemacher (Felman, James) (Entered: 05/09/2023) | |
| 237 | 05/09/2023 | ORDER granting 235 Motion to Unseal Document [partial] as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 5/9/2023. (ADM) (Entered: 05/09/2023) | |
| 238 | 05/10/2023 | ORDER permitting members of media to enter the Courthouse with laptops and tablets for the Kastigar hearing before the undersigned starting on May 15, 2023 at 9:30 a.m. in Courtroom 5C. Signed by Magistrate Judge Monte C. Richardson on 5/10/2023. (ADM) (Entered: 05/10/2023) | |
| 239 | 05/10/2023 | WITNESS LIST by Ryan Wannemacher (Felman, James) (Entered: 05/10/2023) | |
| 240 | 05/10/2023 | Unopposed MOTION to Allow Electronic Equipment, specifically 3 laptops, 1 portable laptop display, 1 cell phone by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Entered: 05/10/2023) | |
| 241 | 05/10/2023 | OBJECTION to Magistrate Judge's Order Denying Intervention and Partially Closing Courtroom During Kastigar Hearing and Request for Expedited Review re 218 ORDER denying 194, 199, 202 Media Motions to Intervene. by Florida Times-Union, First Coast News as to Aaron Zahn, Ryan Wannemacher. (Mansfield, Jennifer) (Modified on 5/11/2023 to edit docket text) (JDR). (Entered: 05/10/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 242 | 05/10/2023 | NOTICE Regarding Objections to the Government's Exhibit List by Aaron Zahn, Ryan Wannemacher re 218 Order on Motion for Leave to File Amicus Brief / Document, Order on Motion for Miscellaneous Relief, 228 Exhibit List. (Albritton, A.)  (Entered: 05/10/2023) | |
| 243 | 05/10/2023 | WITNESS LIST by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 05/10/2023) | |
| 244 | 05/11/2023 | ORDER granting 240 Motion to Allow Electronic Equipment. Signed by Magistrate Judge Monte C. Richardson on 5/11/2023. (ADM)  (Entered: 05/11/2023) | |
| 245 | 05/12/2023 | ORDER OVERRULING 241 First Coast News and the Florida Times-Union's Objections to the Magistrate Judge's Order Denying Intervention and Partially Closing [the] Courtroom During Kastigar Hearings and Request for Expedited Review. Signed by Judge Brian J. Davis on 5/12/2023. (AMP)  (Entered: 05/12/2023) | |
| 246 | 05/12/2023 | Second Amended Joint Kastigar Hearing EXHIBIT LIST by Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Modified on 5/15/2023 to edit docket text) (JDR). (Entered: 05/12/2023) | |
| 247 | 05/15/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kasigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/15/2023. Court Reporter: Shelli Kozachenko (Digital) (SHS) (Entered: 05/16/2023) | |
| 248 | 05/16/2023 | NOTICE OF HEARING as to Aaron Zahn, Ryan Wannemacher: Kastigar Hearing set for 5/17/2023 at 01:00 PM in Jacksonville Courtroom 5 C before Magistrate Judge Monte C. Richardson. (SHS)  (Entered: 05/16/2023) | |
| 249 | 05/16/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/16/2023. Court Reporter: Shelli Kozachenko (Digital) (SHS) (Entered: 05/16/2023) | |
| 250 | 05/17/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/17/2023. Court Reporter: Shelli Kozachenko (Digital) (SHS) (Entered: 05/17/2023) | |
| 251 | 05/18/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/18/2023. Court Reporter: Shelli Kozachenko (Digital) (SHS) (Entered: 05/18/2023) | |
| 253 | 05/19/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/19/2023. Court Reporter: Shelli Kozachenko (Digital) (SHS) (Entered: 05/19/2023) | |
| 254 | 05/19/2023 | RESPONSE 234 MOTION for Miscellaneous Relief, specifically by Pillsbury Winthrop Shaw Pittman, LLP as to Aaron Zahn, Ryan Wannemacher Non-Party Pillsbury Winthrop Shaw Pittman LLP's Response to Defendants' Objections to Magistrate Judge's Order on Defendants' Motion for Order to Show Cause and Pillsbury Winthrop Shaw Pittman LLP's Motion to Quash Subpoena Duces Tecum (Altman, Jennifer) (Entered: 05/19/2023) | |
| 255 | 05/22/2023 | NOTICE of Filing Exhibit by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 165 Status Conference. (Albritton, A.)  (Entered: 05/22/2023) | |
| 256 | 05/22/2023 | Third Amended Joint Kastigar Hearing EXHIBIT LIST by Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Modified on 5/23/2023 to edit docket text) (JDR). (Entered: 05/22/2023) | |
| 257 | 05/22/2023 | Minute Entry for In Person proceedings held before Judge Brian J. Davis: STATUS Conference as to Aaron Zahn, Ryan Wannemacher held on 5/22/2023. Court Reporter: Shelli | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Kozachenko (CKS) (Entered: 05/23/2023) | |
| 258 | 05/23/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/23/2023. Court Reporter: Shelli Kozachenko (Digital) (SHS) (Entered: 05/23/2023) | |
| 259 | 05/23/2023 | ORAL MOTION to Unseal portions of Mr. Wannamacher's Garrity Statement by USA as to Ryan Wannemacher. (SHS) (Entered: 05/23/2023) | |
| 260 | 05/23/2023 | ORAL ORDER denying 259 Oral Motion to Unseal portions of of Mr. Wannamacher's Garrity Statement as to Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 5/23/2023. (SHS)  (Entered: 05/23/2023) | |
| 261 | 05/24/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/24/2023. (Digital) (SHS) (Entered: 05/24/2023) | |
| 262 | 05/25/2023 | Minute Entry for In Person proceedings held before Magistrate Judge Monte C. Richardson: Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 5/25/2023. Court Reporter: Shelli Kozachenko (Digital) (SHS) (Entered: 05/25/2023) | |
| 263 | 05/26/2023 | Fourth Amended Joint Kastigar Hearing EXHIBIT LIST by Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Modified on 5/30/2023 to edit docket text) (JDR). (Additional attachment(s) added on 7/11/2023: # 4 Exhibit 129, # 5 Exhibit 135, # 6 Exhibit #136, (7) Exhibit 137, # 8 Exhibit 215, # 9 Exhibit 216, # 10 Exhibit 143, # 11 Exhibit 185, # 12 Exhibit 193, # 13 Exhibit 194, # 14 Exhibit 225, # 15 Exhibit 30, # 16 Exhibit 74, # 17 Exhibit 76, # 18 Exhibit 142), # 19 Exhibit 13, # 20 Exhibit 84, # 21 Exhibit 107, # 22 Exhibit 113, # 23 Exhibit 115, # 24 Exhibit 122, # 25 Exhibit 130, # 26 Exhibit 131A, # 27 Exhibit 139, # 28 Exhibit 143-1, # 29 Exhibit 170, # 30 Exhibit 197, # 31 Exhibit 229, # 33 Exhibit 9, # 35 Exhibit 155, # 36 Exhibit 162), # 37 Exhibit 65, # 38 Exhibit 66, # 39 Exhibit 70, # 40 Exhibit 229). Modified on 7/11/2023 (SHS). (Entered: 05/26/2023) | |
| 264 | 05/26/2023 | ORDER terminating 112 and 115 Motion for Hearing as to Aaron Zahn (1); terminating 110 and 114 Motion for Hearing as to Ryan Wannemacher (2). See Order for deadlines. Signed by Magistrate Judge Monte C. Richardson on 5/26/2023. (ADM)  (Entered: 05/26/2023) | |
| 265 | 05/30/2023 | EXHIBIT LIST by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 05/30/2023) | |
| 266 | 05/31/2023 | Joint MOTION to Continue trial  by Aaron Zahn, Ryan Wannemacher. (Felman, James) (Entered: 05/31/2023) | |
| 267 | 06/01/2023 | ORDER GRANTING 266 Joint Motion to Continue Trial. The Jury Trial of this matter is now scheduled for the trial term commencing on 2/5/2024 at 9:00 AM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. A Status Conference is set for 11/20/2023 at 4:00 PM in Jacksonville Courtroom 12 C before Judge Brian J. Davis. Signed by Judge Brian J. Davis on 6/1/2023. (AMP) (Entered: 06/01/2023) | |
| 268 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume I) as to Aaron Zahn, Ryan Wannemacher held on 5/15/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) . Modified on 6/6/2023 to replace corrected pdf (MDC). (Entered: 06/02/2023) | |
| 269 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume II) as to Aaron Zahn, Ryan Wannemacher held on 5/16/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) (Entered: 06/02/2023) | |
| 270 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume III) as to Aaron Zahn, Ryan Wannemacher held on 5/17/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) (Entered: 06/02/2023) | |
| 271 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume IV) as to Aaron Zahn, Ryan Wannemacher held on 5/18/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) (Entered: 06/02/2023) | |
| 272 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume V) as to Aaron Zahn, Ryan Wannemacher held on 5/19/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) (Entered: 06/02/2023) | |
| 273 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume VI) as to Aaron Zahn, Ryan Wannemacher held on 5/23/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozacheko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) (Entered: 06/02/2023) | |
| 274 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume VII) as to Aaron Zahn, Ryan Wannemacher held on 5/24/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozacheko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) (Entered: 06/02/2023) | |
| 275 | 06/02/2023 | TRANSCRIPT of Kastigar Hearing (Volume VIII) as to Aaron Zahn, Ryan Wannemacher held on 5/25/23 before Judge Richardson. Court Reporter/Transcriber: Shelli Kozacheko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/23/2023. Redacted Transcript Deadline set for 7/3/2023. Release of Transcript Restriction set for 8/31/2023. (SMK) (Entered: 06/02/2023) | |
| 288 | 06/20/2023 | Hearing BRIEF by Ryan Wannemacher (Felman, James) (Modified on 6/21/2023 to edit docket text) (JDR). (Entered: 06/20/2023) | |
| 289 | 06/22/2023 | NOTICE of Filing Supplemental Post Kastigar Hearing Exhibit List with one addition (Exhibit 20(j)) which replaces Doc. 265 by USA as to Aaron Zahn, Ryan Wannemacher re 265 Exhibit List. (Duva, Andrew)  (Additional attachment(s) added on 7/11/2023: # 1 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Exhibit 2, # 1 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 9, # 8 Exhibit 10, # 9 Exhibit 11, # 10 Exhibit 12, # 11 Exhibit 13, # 12 Exhibit 14, # 13 Exhibit 15, # 14 Exhibit 16, # 15 Exhibit 17, # 16 Exhibit 18, # 17 Exhibit 19, # 18 Exhibit 20aa5, # 19 Exhibit 20ff, # 20 Exhibit 20p5, # 21 Exhibit 43A, # 22 Exhibit 43B, # 23 Exhibit 46A, # 24 Exhibit 48, # 25 Exhibit 51, # 26 Exhibit 52, # 27 Exhibit 53, # 28 Exhibit 54, # 29 Exhibit 55, # 30 Exhibit 56, # 31 Exhibit 57, # 32 Exhibit 58, # 33 Exhibit 59, # 34 Exhibit 20A1, # 35 Exhibit 20A2, # 36 Exhibit 20A3, # 37 Exhibit 20A4, # 38 Exhibit 20B1, # 39 Exhibit 20B2, # 40 Exhibit 20H1, # 41 Exhibit 20H2, # 42 Exhibit 20J, # 43 Exhibit 20K, # 44 Exhibit 20L1, # 45 Exhibit 20M, # 46 Exhibit 20N, # 47 Exhibit 20P2, # 48 Exhibit 20P3, # 49 Exhibit 20P5), # 51 Exhibit 21A, # 52 Exhibit 21B, # 53 Exhibit 21C, # 54 Exhibit 21D - May 16, 2023, # 55 Exhibit 21E # 56 Exhibit 21F, # 57 Exhibit 21G, # 58 Exhibit 21H, # 59 Exhibit 21I# 60 Exhibit 21J , # 61 Exhibit 21K, # 62 Exhibit 21L, # 63 Exhibit 21M, # 64 Exhibit 21N), # 65 Exhibit 22A, # 66 Exhibit 22B, # 67 Exhibit 23A, # 68 Exhibit 23B, # 69 Exhibit 23C, # 70 Exhibit 23D, # 71 Exhibit 24, # 72 Exhibit 26A, # 73 Exhibit 28, # 74 Exhibit 29B, # 75 Exhibit 33A, # 76 Exhibit 54, # 77 Exhibit 50, # 78 Exhibit 55, # 79 Exhibit 61, # 80 Exhibit 69, # 81 Exhibit 70, # 82 Exhibit 71), # 83 Exhibit 20W, # 84 Exhibit 20Y, # 85 Exhibit 20Y2, # 86 Exhibit 20Y3, # 87 Exhibit 20BB, # 88 Exhibit 20CC, # 89 Exhibit 20CC2, # 90 Exhibit 20DD, # 91 Exhibit 20EE, # 92 Exhibit 20A5, # 93 Exhibit 30, # 94 Exhibit 31A, # 95 Exhibit 31C, # 96 Exhibit 31B, # 97 Exhibit 31E, # 98 Exhibit 32A, # 99 Exhibit 32B, # 100 Exhibit 32C, # 101 Exhibit 32D, # 102 Exhibit 34A, # 103 Exhibit 34B, # 104 Exhibit 34D, # 105 Exhibit 36A, # 106 Exhibit 37, # 107 Exhibit 38, # 108 Exhibit 39A, # 109 Exhibit 39B, # 110 Exhibit 39C, # 111 Exhibit 39D, # 112 Exhibit 39, # 113 Exhibit 40A, # 114 Exhibit 40B, # 115 Exhibit 40C, # 116 Exhibit 40D, # 117 Exhibit 41A, # 118 Exhibit 41B, # 119 Exhibit 42, # 120 Exhibit 43A, # 121 Exhibit 43B # 122 Exhibit 44A, # 123 Exhibit 44B, # 124 Exhibit 56, # 125 Exhibit 57, # 126 Exhibit 58 , # 127 Exhibit 59, # 129 Exhibit 48 , # 130 Exhibit 49, # 131 Exhibit 20P4), (133) Exhibit 31B, # 134 Exhibit 46A, # 135 Exhibit 46B, # 136 Exhibit 47, # 137 Exhibit 9, # 138 Exhibit 20F2, # 139 Exhibit 20P4, # 140 Exhibit 33B, # 141 Exhibit 20AA1, # 142 Exhibit 20AA2, # 143 Exhibit 20AA3, # 144 Exhibit 20AA4, # 145 Exhibit 51-1, # 146 Exhibit 53-1. Modified on 7/13/2023 (SHS). (Entered: 06/22/2023) | |
| 290 | 06/29/2023 | TRIAL BRIEF, redacted-titled "Post Kastigar Hearing Brief" by USA as to Aaron Zahn, Ryan Wannemacher (Pardo, David) Modified to edit text on 6/30/2023 (RLK). (Entered: 06/29/2023) | |
| 292 | 07/05/2023 | NOTICE of Filing Government Response to Wannemacher Post-Kastigar Hearing Brief as to Diamond-Salem Hearing by USA as to Ryan Wannemacher re 288 Trial Brief. (Duva, Andrew) (Entered: 07/05/2023) | |
| 293 | 07/12/2023 | EXHIBIT LIST by Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 07/12/2023) | |
| 294 | 07/12/2023 | NOTICE of Filing Corrected Kastigar Exhibits by Aaron Zahn, Ryan Wannemacher re 115 MOTION for Hearing on Defendant Zahn's Motion for Kastigar Hearing, 114 MOTION for Hearing Pursuant to Kastigar v. United States. (Attachments: # 1 Exhibit Redacted 02-24-2020 SIC Session 2 Transcript)(Albritton, A.) (Entered: 07/12/2023) | |
| 296 | 07/14/2023 | Redacted Response to Hearing Brief by Ryan Wannemacher (Felman, James) Modified text on 7/17/2023 (MCB). (Entered: 07/14/2023) | |
| 298 | 07/14/2023 | HEARING BRIEF and RESPONSE to Government's Kastigar Brief | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | by Aaron Zahn as to Aaron Zahn (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Albritton, A.) Modified text on 7/17/2023 (BD). (Entered: 07/14/2023) | |
| 300 | 07/27/2023 | TRANSCRIPT of Criminal Status Conference as to Aaron Zahn, Ryan Wannemacher held on 11/14/22 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/17/2023. Redacted Transcript Deadline set for 8/28/2023. Release of Transcript Restriction set for 10/25/2023. (SMK) (Entered: 07/27/2023) | |
| 301 | 08/02/2023 | NOTICE OF RESCHEDULING HEARING: The Status Conference Hearing previously scheduled for 11/20/2023 at 4:00 PM is rescheduled as to Aaron Zahn, Ryan Wannemacher. New hearing date and time: Status Conference set for 11/27/2023 at 04:00 PM in Jacksonville Courtroom 12 C before Judge Brian J. Davis (CKS) (Entered: 08/02/2023) | |
| 302 | 09/26/2023 | REPORT AND RECOMMENDATION regarding 288 Ryan Wannemacher's Post-Kastigar Hearing Brief Regarding Diamond-Salem Hearing Issues. Signed by Magistrate Judge Monte C. Richardson on 9/26/2023. (ADM)  (Entered: 09/26/2023) | |
| 303 | 10/10/2023 | OBJECTION by Ryan Wannemacher as to Ryan Wannemacher re 302 REPORT AND RECOMMENDATIONS as to Ryan Wannemacher  (Felman, James) (Entered: 10/10/2023) | |
| 304 | 10/17/2023 | MOTION to Compel Compliance with Federal Rule of Criminal Procedure 16, MOTION for Miscellaneous Relief, specifically for Particularized Discovery Order  by Aaron Zahn, Ryan Wannemacher. (Felman, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 10/17/2023) | |
| 305 | 10/19/2023 | Unopposed MOTION for Leave to File Document to File Supplemental Exhibit of Recent Pretrial Publicity in Support of Defendant Zahn's Motion for Intradistrict Transfer 118 by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Ramirez Jefferson, Raquel) Modified on 10/20/2023 to edit docket text (AJS). (Entered: 10/19/2023) | |
| 306 | 10/20/2023 | ENDORSED ORDER: 305 Defendant Aaron Zahn's Unopposed Motion for Leave to File Supplemental Exhibit is GRANTED. Defendant shall file his supplemental exhibit on or before October 27, 2023. Signed by Judge Brian J. Davis on 10/20/2023. (AMP) (Entered: 10/20/2023) | |
| 307 | 10/23/2023 | RESPONSE 303 Objection by USA as to Ryan Wannemacher Regarding Diamond-Salem Hearing Issues (Duva, Andrew) (Entered: 10/23/2023) | |
| 308 | 10/27/2023 | NOTICE of Filing Third Supplemental Exhibit in Support of Defendant Aaron Zahn's Motion for Intradistrict Transfer by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 306 Order on Motion for Leave to File Amicus Brief / Document, 305 Unopposed MOTION for Leave to File Document to File Supplemental Exhibit of Recent Pretrial Publicity in Support of Defendant Zahn's Motion for Intradistrict Transfer [Dkt 118]. (Attachments: # 1 Exhibit Exh 3 Combined Articles)(Ramirez Jefferson, Raquel)  (Entered: 10/27/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 309 | 10/30/2023 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 304 MOTION to Compel Compliance with Federal Rule of Criminal Procedure 16 MOTION for Miscellaneous Relief, specifically for Particularized Discovery Order (Duva, Andrew) (Entered: 10/30/2023) | |
| 311 | 11/13/2023 | REPORT AND RECOMMENDATION as to 290 United States' Post-Kastigar Hearing Brief, 298 Aaron Zahn's Post-Kastigar Hearing Brief, 296 Ryan Wannemacher's Post-Kastigar Hearing Brief. Signed by Magistrate Judge Monte C. Richardson on 11/13/2023. (ADM) pdf replaced on 11/27/2023 (jkl). (Entered: 11/13/2023) | |
| 313 | 11/20/2023 | OBJECTION to 311 Report and Recommendations by Ryan Wannemacher regarding the Defendants' Garrity Statements (Felman, James) (Entered: 11/20/2023) | |
| 314 | 11/20/2023 | OBJECTION by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 311 REPORT AND RECOMMENDATIONS as to Aaron Zahn, Ryan Wannemacher, 69 Order on Motion for Miscellaneous Relief Order on Motion for Leave to File Amicus Brief / Document (Attachments: # 1 Exhibit 1)(Albritton, A.) (Entered: 11/20/2023) | |
| 316 | 11/27/2023 | MOTION for Leave to File Motion to Sever by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit Motion to Sever Redacted, # 2 Exhibit A to Motion to Sever)(Albritton, A.) Modified text on 11/28/2023 (JK). (Entered: 11/27/2023) | |
| 318 | 11/27/2023 | ORDER denying 304 Motion to Compel or for Particularized Discovery Order. Signed by Magistrate Judge Monte C. Richardson on 11/27/2023. (ADM) (Entered: 11/27/2023) | |
| 319 | 11/27/2023 | Minute Entry for In Person proceedings held before Judge Brian J. Davis: STATUS Conference as to Aaron Zahn, Ryan Wannemacher held on 11/27/2023. Court Reporter: Shelli Kozachenko (CKS) (Entered: 11/28/2023) | |
| 320 | 11/30/2023 | NOTICE of filing supplemental authority by Ryan Wannemacher re: 303 Objection filed by Ryan Wannemacher. (Attachments: # 1 Exhibit US v. Jeremy Elloitte)(Felman, James) (Entered: 11/30/2023) | |
| 321 | 11/30/2023 | MOTION to Continue trial by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Entered: 11/30/2023) | |
| 322 | 11/30/2023 | TRANSCRIPT of Criminal Status Conference as to Aaron Zahn, Ryan Wannemacher held on 11/27/23 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 12/21/2023. Redacted Transcript Deadline set for 1/2/2024. Release of Transcript Restriction set for 2/28/2024. (SMK) (Entered: 11/30/2023) | |
| 323 | 11/30/2023 | MOTION for Miscellaneous Relief, specifically Request for Oral Argument re 102 MOTION to Sever Defendant, 118 MOTION to Change Venue / Transfer Case Intradistrict Transfer, 316 MOTION for Leave to File Motion to Sever, 314 Objection, 313 Objection to Report and Recommendations by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Entered: | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | 11/30/2023) | |
| 324 | 12/01/2023 | MEMORANDUM in opposition by USA as to Aaron Zahn re 323 MOTION for Miscellaneous Relief, specifically Request for Oral Argument re 102 MOTION to Sever Defendant , 118 MOTION to Change Venue / Transfer Case Intradistrict Transfer, 316 MOTION for Leave to File Motion to Sever, 316 MOTION for Leave to File Motion to Sever  (Duva, Andrew) (Entered: 12/01/2023) | |
| 325 | 12/04/2023 | RESPONSE 314 Objection, 313 Objection to Report and Recommendations by USA as to Aaron Zahn, Ryan Wannemacher.  (Pardo, David) Modified text on 12/5/2023 (GL). (Entered: 12/04/2023) | |
| 327 | 12/06/2023 | Unopposed MOTION to Extend Time to File Objections  by Ryan Wannemacher as to Aaron Zahn, Ryan Wannemacher. (Breslow, Brandon) (Entered: 12/06/2023) | |
| 328 | 12/08/2023 | ENDORSED ORDER: 327 Defendants' Unopposed Motion for Extension of Deadline to File Objections is GRANTED. Defendants' Objections to 318 Order Denying Motion to Compel shall be filed no later than December 21, 2023. Signed by Judge Brian J. Davis on 12/8/2023. (AMP)  (Entered: 12/08/2023) | |
| 329 | 12/18/2023 | ORDER and NOTICE OF HEARING: The Government shall provide the Court and Defendants with a witness list on or before December 29, 2023, containing the names of witnesses likely to be called at trial; Motions in Limine shall be filed by January 5, 2024 and responses thereto shall be filed on or before January 12, 2024. A hearing on these matters is scheduled to be held on January 17, 2024, at 10:00 AM in Jacksonville Courtroom 12 C before the Honorable Brian J. Davis. See order for other details. Signed by Judge Brian J. Davis on 12/18/2023. (AMP)  (Modified on 1/2/2024, to edit text) (BGR). (Entered: 12/18/2023) | |
| 330 | 12/21/2023 | OBJECTION by Aaron Zahn, Ryan Wannemacher as to Aaron Zahn, Ryan Wannemacher re 318 Order on Motion to Compel, Order on Motion for Miscellaneous Relief  (Felman, James) (Entered: 12/21/2023) | |
| 331 | 12/28/2023 | RESPONSE 330 Objection by USA as to Aaron Zahn, Ryan Wannemacher  (Corsmeier, Arnold) (Entered: 12/28/2023) | |
| 332 | 12/29/2023 | WITNESS LIST by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 12/29/2023) | |
| 333 | 01/05/2024 | OBJECTION by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 332 Witness List  (Ramirez Jefferson, Raquel) (Entered: 01/05/2024) | |
| 335 | 01/05/2024 | MOTION in Limine to Exclude Witness Testimony and Evidence on Kastigar Grounds by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit Summary of Interviews and Testimony for Trial Witnesses who did not Testify at the Kastigar Hearing)(Ramirez Jefferson, Raquel) (Entered: 01/05/2024) | |
| 336 | 01/05/2024 | MOTION in Limine regarding the scope of the Government Witness Testimony by Ryan Wannemacher. (Felman, James) (Entered: 01/05/2024) | |
| 337 | 01/05/2024 | MOTION in Limine regarding Witnesses Not Called at the Kastigar Hearing by Ryan Wannemacher. (Felman, James) (Entered: 01/05/2024) | |
| 339 | 01/05/2024 | JOINT MOTION in Limine to Prohibit Improper Lay Opinion Testimony by Aaron Zahn, Ryan Wannemacher. (Ramirez Jefferson, Raquel) Modified text on 1/8/2024 (KME). (Entered: 01/05/2024) | |
| 340 | 01/05/2024 | MOTION in Limine to Exclude the Government's Proposed | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Summary Exhibits by Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit What is JEA, # 2 Exhibit Plant Vogtle, # 3 Exhibit Actual Electric Sales v 2019 JEA Forecasts, # 4 Exhibit Solar, # 5 Exhibit 2019.04 TYSP DISC-297411, # 6 Exhibit IRP 2019 Final Draft April 2020 DISC-024608, # 7 Exhibit 2020.02.06 Dykes letter to JEA Board Members, # 8 Exhibit 2019 RA Excerpts - JEASR-00257686 and 90)(Ramirez Jefferson, Raquel) (Entered: 01/05/2024) | |
| 341 | 01/05/2024 | JOINT MOTION in Limine to Exclude Hindsight Evidence by Aaron Zahn, Ryan Wannemacher. (Ramirez Jefferson, Raquel) Modified text on 1/8/2024 (KME). (Entered: 01/05/2024) | |
| 342 | 01/05/2024 | MOTION in Limine to Preclude Defendants from Improper Use of Co-Defendants Garrity Statement During Trial by USA as to Aaron Zahn, Ryan Wannemacher. (Duva, Andrew) (Entered: 01/05/2024) | |
| 343 | 01/11/2024 | ORDER OVERRULING 234 Defendants' Objections to the Magistrate Judge's Order on Defendants' Motion for Order to Show Cause and Pillsbury Winthrop Shaw Pittman LLP's Motion to Quash Subpoena Duces Tecum; OVERRULING 330 Defendants' Objections to Order Denying Motion to Compel Compliance with Federal Rule of Criminal Procedure 16 or for Particularized Discovery Order. Signed by Senior Judge Brian J. Davis on 1/11/2024. (AMP)  (Entered: 01/11/2024) | |
| 344 | 01/11/2024 | ORDER DENYING Defendant Aaron Zahn's Motion for Intradistrict Transfer (Docs. 118/S-117). Signed by Senior Judge Brian J. Davis on 1/11/2024. (AMP)  Modified on 1/12/2024 to remove sealed restriction (NAS). (Entered: 01/11/2024) | |
| 345 | 01/12/2024 | Proposed Jury Instructions by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 01/12/2024) | |
| 346 | 01/12/2024 | PROPOSED Voir Dire by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 01/12/2024) | |
| 347 | 01/12/2024 | STATEMENT of the case for trial by USA. (Duva, Andrew) (Entered: 01/12/2024) | |
| 348 | 01/12/2024 | PROPOSED verdict form filed by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 01/12/2024) | |
| 349 | 01/12/2024 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 339 MOTION in Limine to Prohibit Improper Lay Opinion Testimony  (Duva, Andrew) (Entered: 01/12/2024) | |
| 350 | 01/12/2024 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 340 MOTION in Limine to Exclude the Government's Proposed Summary Exhibits  (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Duva, Andrew) (Entered: 01/12/2024) | |
| 351 | 01/12/2024 | MEMORANDUM in opposition by USA as to Aaron Zahn, Ryan Wannemacher re 341 MOTION in Limine to Exclude Hindsight Evidence  (Duva, Andrew) (Entered: 01/12/2024) | |
| 352 | 01/12/2024 | WITNESS LIST by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 01/12/2024) | |
| 353 | 01/12/2024 | RESPONSE in Opposition by USA as to Aaron Zahn, Ryan Wannemacher re 335 MOTION in Limine to Exclude Witness Testimony and Evidence on Kastigar Grounds, 336 MOTION in Limine regarding the scope of the Government Witness Testimony, 337 MOTION in Limine regarding Witnesses Not Called at the Kastigar Hearing  (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Pardo, David) (Entered: 01/12/2024) | |
| 354 | 01/12/2024 | RESPONSE in Opposition by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 342 MOTION in Limine to Preclude Defendants | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | from Improper Use of Co-Defendants Garrity Statement During Trial  (Albritton, A.) (Entered: 01/12/2024) | |
| 355 | 01/12/2024 | RESPONSE in Opposition by Ryan Wannemacher re 342 MOTION in Limine to Preclude Defendants from Improper Use of Co-Defendants Garrity Statement During Trial  (Felman, James) (Entered: 01/12/2024) | |
| 357 | 01/12/2024 | MOTION for Miscellaneous Relief, specifically Juror Questionnaire Enhanced Voir Dire Procedures  by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit 1 - Declaration)(Ramirez Jefferson, Raquel) (Entered: 01/12/2024) | |
| 359 | 01/16/2024 | ORDER GRANTING 316 Defendant Zahn's Motion for Leave to File Motion to Sever; GRANTING IN PART (Docs. 102 and S-103) Defendant Wannemacher's Motion to Sever; GRANTING IN PART (Docs. 316.1 and S-317.1) Defendant Zahn's Motion to Sever. The Court will empanel separate juries to consider the evidence and charges against each Defendant. Signed by Senior Judge Brian J. Davis on 1/16/2024. (AMP)  (Entered: 01/16/2024) | |
| 361 | 01/16/2024 | ORDER OVERRULING 303 Defendant Wannemacher's Objections to Report and Recommendation Regarding Diamond-Salem Hearing Issues; ADOPTING 302 Report and Recommendation; OVERRULING (Docs. S-312, 313, 314 and S-315) Defendant Wannemacher's Objections to Report and Recommendation regarding Defendants' Garrity Statements; ADOPTING (Docs. S-310 and 311) Report and Recommendation as the opinion of the Court. Signed by Senior Judge Brian J. Davis on 1/16/2024. (AMP)  (Entered: 01/16/2024) | |
| 362 | 01/17/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: Hearing held on 1/17/2024 as to Aaron Zahn, Ryan Wannemacher. Court Reporter: Shelli Kozachenko (CKS) (Entered: 01/18/2024) | |
| 363 | 01/18/2024 | ORDER Setting Kastigar Hearings for 1/25/2024 and 1/31/2024. The hearings will begin at 9:00 a.m. each day and be held in Jacksonville Courtroom 12 C before Senior Judge Brian J. Davis. The Government shall provide to Defendants 2 separate lists of all witnesses it will call on January 25th and January 31st. See order for other details. Signed by Senior Judge Brian J. Davis on 1/18/2024. (AMP)  (Entered: 01/18/2024) | |
| 364 | 01/19/2024 | EXHIBIT LIST by Ryan Wannemacher (Felman, James) (Entered: 01/19/2024) | |
| 365 | 01/19/2024 | EXHIBIT LIST by USA as to Aaron Zahn, Ryan Wannemacher (Attachments: # 1 Exhibit 1)(Duva, Andrew) (Entered: 01/19/2024) | |
| 366 | 01/19/2024 | WITNESS LIST by Ryan Wannemacher (Felman, James) (Entered: 01/19/2024) | |
| 367 | 01/19/2024 | EXHIBIT LIST by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 01/19/2024) | |
| 368 | 01/19/2024 | WITNESS LIST by Aaron Zahn (Albritton, A.) (Entered: 01/19/2024) | |
| 369 | 01/22/2024 | MOTION to Continue trial Defendants' Renewed Motion to Continue Trial by Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Entered: 01/22/2024) | |
| 370 | 01/23/2024 | RESPONSE in Opposition by USA as to Aaron Zahn, Ryan Wannemacher re 369 MOTION to Continue trial Defendants' Renewed Motion to Continue Trial  (Duva, Andrew) (Entered: 01/23/2024) | |
| 371 | 01/23/2024 | ORDER directing the Government to be prepared at the conclusion of the Kastigar hearing on January 25, 2024, to discuss 369 Defendants' Motion to Continue Trial. See order for other details. Signed by Senior Judge Brian J. Davis on | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 1/23/2024. (AMP) (Entered: 01/23/2024) | |
| 372 | 01/23/2024 | Amended EXHIBIT LIST by Ryan Wannemacher (Felman, James) Modified on 1/24/2024 as to docket text (ARL). (Entered: 01/23/2024) | |
| 373 | 01/24/2024 | ORDER DENYING 93 Defendants' Motion to Dismiss the Indictment for Failure to State An Offense. Signed by Senior Judge Brian J. Davis on 1/24/2024. (AMP) (Entered: 01/24/2024) | |
| 374 | 01/24/2024 | NOTICE of Filing Supplemental Exhibit List for Kastigar Hearing on January 25 and 31, 2024 by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 01/24/2024) | |
| 379 | 01/25/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: Kastigar hearing held on 1/25/2024 as to Aaron Zahn, Ryan Wannemacher. Court Reporter: Shelli Kozachenko (CKS) (CKS). (Additional attachment(s) added on 7/11/2024: # 1 Exhibit Gov 72, # 2 Exhibit Gov 73, # 3 Exhibit Gov 74, # 4 Exhibit Gov 75, # 5 Appendix Gov 76, # 6 Exhibit Gov 77, # 7 Exhibit Gov 78, # 8 Exhibit Gov 79, # 9 Exhibit Gov 80, # 10 Exhibit Gov 81, # 11 Exhibit Gov 82, # 12 Exhibit Gov 83, # 13 Exhibit Def Exhibit 233 Part 1, # 14 Exhibit Def Exhibit 233 Part 2) (CKS). (Entered: 01/30/2024) | |
| 375 | 01/29/2024 | ORDER GRANTING 369 Defendants' Renewed Motion to Continue Trial; DENYING 321 Defendant Zahn's Motion to Continue Trial; DENYING AS MOOT 323 Defendants' Motion for Oral Argument. Jury Selection shall occur on 2/15/2024 and 2/16/2024 beginning at 9:00 AM each day. Trial will begin with opening statements on 2/20/2024 at 9:00 AM. Jury selection and trial shall occur in Jacksonville Courtroom 13 A before Senior Judge Brian J. Davis. See order for other details and deadline. Signed by Senior Judge Brian J. Davis on 1/29/2024. (AMP) (Entered: 01/29/2024) | |
| 376 | 01/29/2024 | MOTION to Withdraw as Attorney of Record by Niels P. Murphy. by Ryan Wannemacher as to Aaron Zahn, Ryan Wannemacher. (Murphy, Niels) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 01/29/2024) | |
| 377 | 01/29/2024 | MOTION to Withdraw as Attorney of Record by Catherine M. Licardo. by Ryan Wannemacher as to Aaron Zahn, Ryan Wannemacher. (Licardo, Catherine) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 01/29/2024) | |
| 378 | 01/29/2024 | Unopposed MOTION to Allow Electronic Equipment, specifically personal computers, computer with trial software, cell phones by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Albritton, A.) (Entered: 01/29/2024) | |
| 380 | 01/31/2024 | ORDER granting 376 Motion to Withdraw as Attorney Catherine M. Licardo and Niels P. Murphy withdrawn from case. as to Ryan Wannemacher (2); granting 377 Motion to Withdraw as Attorney Catherine M. Licardo and Niels P. Murphy withdrawn from case. as to Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 1/30/2024. (SHS) (Entered: 01/31/2024) | |
| 381 | 01/31/2024 | ORDER granting 378 Defendant Aaron Zahn's Unopposed Motion to Allow Electronic Equipment at Upcoming Hearing and Trial. Signed by Senior Judge Brian J. Davis on 1/31/2024. (CKS) (Entered: 01/31/2024) | |
| 389 | 01/31/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: Kastigar Hearing held on 1/31/2024 as to Aaron Zahn, Ryan Wannemacher. Court Reporter: Shelli Kozachenko (CKS) (CKS). (Additional attachment(s) added on 7/11/2024: # 1 Exhibit Defendant Zahn 234) (CKS). (Entered: 02/07/2024) | |
| 382 | 02/01/2024 | ORDER SCHEDULING TRIAL as to Aaron Zahn, Ryan Wannemacher. Jury Selection shall commence on February 15 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | and 16, 2024, at 9:00 a.m. before the Honorable Brian J. Davis, Senior United States District Judge in Jacksonville Courtroom 13A. The parties shall be prepared to present their cases on February 20, 2024, at 9:00 a.m. in Jacksonville Courtroom 13A. See Order for deadlines and details. Signed by Senior Judge Brian J. Davis on 2/1/2024. (Attachments: # 1 Instructions to Counsel Regarding Jury Selection, # 2 Instructions to Counsel Regarding Pre-Marking Exhibits)(CKS)  (Entered: 02/01/2024) | |
| 383 | 02/01/2024 | NOTICE OF HEARING: On February 14, 2024, beginning at 2:00 PM in Jacksonville Courtroom 12 C before Senior Judge Brian J. Davis, the Court will hold a continuation of the January 31, 2024, Kastigar hearing. Signed by Senior Judge Brian J. Davis on 2/1/2024. (AMP)  (Entered: 02/01/2024) | |
| 384 | 02/01/2024 | TRANSCRIPT of Kastigar Hearing (Volume IX) as to Aaron Zahn, Ryan Wannemacher held on 1/25/24 before Judge Brian J. Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/4/2024. Release of Transcript Restriction set for 5/1/2024. (SMK) (Entered: 02/01/2024) | |
| 386 | 02/02/2024 | MOTION in Limine to Exclude Government Trial Exhibit by Ryan Wannemacher. (Yanes, Katherine) (Entered: 02/02/2024) | |
| 388 | 02/02/2024 | NOTICE Regarding Additional Kastigar Witnesses Pursuant to Court's January 29, 2024 Order by Aaron Zahn, Ryan Wannemacher re 375 Order on Motion to Continue, Order on Motion for Miscellaneous Relief. (Albritton, A.)  (Entered: 02/02/2024) | |
| 390 | 02/07/2024 | WITNESS LIST by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 02/07/2024) | |
| 391 | 02/08/2024 | TRANSCRIPT of Kastigar Hearing (Volume X) as to Aaron Zahn, Ryan Wannemacher held on 1/31/24 before Judge Brian J. Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 2/29/2024. Redacted Transcript Deadline set for 3/11/2024. Release of Transcript Restriction set for 5/8/2024. (SMK) (Entered: 02/08/2024) | |
| 393 | 02/08/2024 | PROPOSED Voir Dire by Ryan Wannemacher (Felman, James) (Entered: 02/08/2024) | |
| 394 | 02/08/2024 | STATEMENT of the case for trial (Felman, James) (Entered: 02/08/2024) | |
| 395 | 02/08/2024 | PROPOSED verdict form filed by Ryan Wannemacher (Felman, James) (Entered: 02/08/2024) | |
| 396 | 02/08/2024 | Proposed Jury Instructions by Ryan Wannemacher (Felman, | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | James) (Entered: 02/08/2024) | |
| 397 | 02/08/2024 | PROPOSED verdict form filed by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 02/08/2024) | |
| 398 | 02/08/2024 | Proposed Jury Instructions by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Albritton, A.) (Entered: 02/08/2024) | |
| 399 | 02/08/2024 | STATEMENT of the case for trial by Aaron Zahn. (Albritton, A.) (Entered: 02/08/2024) | |
| 400 | 02/08/2024 | PROPOSED Voir Dire by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Ramirez Jefferson, Raquel) (Entered: 02/08/2024) | |
| 401 | 02/10/2024 | MOTION for Miscellaneous Relief, specifically Exclude or Limit Defendant Zahn's Tendered Expert Witness Ernest N. Dixon  by USA as to Aaron Zahn. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Duva, Andrew) (Entered: 02/10/2024) | |
| 402 | 02/12/2024 | ENDORSED ORDER taking under advisement 401 Motion as to Aaron Zahn. Defendant Zahn shall respond to the Motion on or before February 13, 2024 at 11:00 a.m. Signed by Senior Judge Brian J. Davis on 2/12/2024. (MCW)  (Entered: 02/12/2024) | |
| 403 | 02/12/2024 | JOINT NOTICE Regarding Differences in Their Proposed Jury Instructions by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher re 382 Order. (Albritton, A.)  Modified on 2/13/2024 to edit docket text (JDR). (Entered: 02/12/2024) | |
| 404 | 02/12/2024 | MOTION to Adopt re 386 Motion in Limine  by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Albritton, A.) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/12/2024) | |
| 405 | 02/12/2024 | WITNESS LIST by Ryan Wannemacher (Felman, James) (Entered: 02/12/2024) | |
| 406 | 02/12/2024 | EXHIBIT LIST by Ryan Wannemacher (Felman, James) (Entered: 02/12/2024) | |
| 407 | 02/12/2024 | ORDER GRANTING IN PART and DENYING IN PART (Docs. S-334 and 335) Defendant Zahn's Motion in Limine to Exclude Witness Testimony and Evidence on Kastigar Grounds; GRANTING IN PART and DENYING IN PART (Doc. 336) Defendant Wannemacher's Motion in Limine Regarding the Scope of Government Witness Testimony; GRANTING IN PART and DENYING IN PART (Docs. 337 and S-338) Defendant Wannemacher's Motion in Limine Regarding Witnesses Not Called at Kastigar Hearing. Signed by Senior Judge Brian J. Davis on 2/12/2024. (AMP)  (Entered: 02/12/2024) | |
| 408 | 02/12/2024 | RESPONSE to Motion re 386 MOTION in Limine to Exclude Government Trial Exhibit by USA as to Aaron Zahn, Ryan Wannemacher  (Attachments: # 1 Exhibit 2)(Pardo, David) (Entered: 02/12/2024) | |
| 410 | 02/12/2024 | EXHIBIT LIST by Aaron Zahn (Albritton, A.) (Entered: 02/12/2024) | |
| 411 | 02/13/2024 | RESPONSE to Motion re 401 MOTION for Miscellaneous Relief, specifically Exclude or Limit Defendant Zahn's Tendered Expert Witness Ernest N. Dixon  by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher  (Attachments: # 1 Exhibit Declaration of E Dixon)(Albritton, A.) (Entered: 02/13/2024) | |
| 412 | 02/13/2024 | ORDER and Information Regarding Trial for Members of the Press and the Public. Signed by Senior Judge Brian J. Davis on 2/13/2024. (AMP)  (Entered: 02/13/2024) | |
| 413 | 02/13/2024 | Unopposed MOTION for Leave to File Document /Supplemental Exhibit by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit X posting (redacted))(Ramirez Jefferson, Raquel) (Entered: 02/13/2024) | |
| 414 | 02/13/2024 | MOTION for Miscellaneous Relief, specifically for Independent Opening Statements, Cross-Examinations, and Closing Statements from those of Defendant Ryan Wannemacher  by | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Ramirez Jefferson, Raquel) (Entered: 02/13/2024) | |
| 415 | 02/14/2024 | MOTION for Leave to File Document Specifically to File a Reply to Response to Motion in Limine regarding Government's Trial Exhibit by Ryan Wannemacher. (Yanes, Katherine) (Entered: 02/14/2024) | |
| 417 | 02/14/2024 | ORDER DENYING (Doc. 339) Defendants' Joint Motion in Limine to Prohibit Improper Lay Opinion Testimony; DENYING (Doc. 340) Defendants' Joint Motion in Limine to Exclude the Government's Proposed Summary Exhibits; DENYING (Doc. 341) Defendants' Joint Motion in Limine to Exclude Hindsight Evidence; DENYING (Doc. 342) United States' Motion in Limine to Preclude Impermissible Use of Defendants' Garrity Statements; DENYING (Docs. 357 and S-358) Defendant Zahn's Motion for Juror Questionnaire Enhanced Voir Dire Procedures; DENYING (Docs. 386 and S-387) Defendant Wannemacher's Motion In Limine Regarding Government Trial Exhibit 28; DENYING (Doc. 404) Defendant Zahn's Motion to Adopt and Join Defendant Wannemacher's Motion in Limine Regarding Government Trial Exhibit 28. Signed by Senior Judge Brian J. Davis on 2/14/2024. (AMP) (Entered: 02/14/2024) | |
| 418 | 02/14/2024 | NOTICE OF ATTORNEY APPEARANCE Angela Bray appearing for USA. (Bray, Angela) (Entered: 02/14/2024) | |
| 419 | 02/14/2024 | MOTION in Limine to Exclude Certain Video Clips of the Diamond-Salem Hearing by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit Transcript of Diamond-Salem Hearing Highlighted)(Ramirez Jefferson, Raquel) (Entered: 02/14/2024) | |
| 420 | 02/14/2024 | Second Amended EXHIBIT LIST by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher (Ramirez Jefferson, Raquel) Modified on 2/15/2024 to edit docket text (AJS). (Entered: 02/14/2024) | |
| 431 | 02/14/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: Kastigar hearing held on 2/14/2024 as to Aaron Zahn, Ryan Wannemacher. Court Reporter: Shelli Kozachenko (CKS) (Entered: 02/21/2024) | |
| 421 | 02/15/2024 | NOTICE to counsel Raquel Ramirez Jefferson of Local Rule 2.01(a), which requires membership or special admission in the Middle District bar to practice in the Middle District, except for the limited exceptions identified in the Rule. To apply for membership in the Middle District, visit www.flmd.uscourts.gov/for-lawyers as to Aaron Zahn (Signed by Deputy Clerk). (AJS) (Entered: 02/15/2024) | |
| 422 | 02/15/2024 | NOTICE OF ATTORNEY APPEARANCE Ann Shannon appearing for USA. (Shannon, Ann) (Entered: 02/15/2024) | |
| 423 | 02/15/2024 | STIPULATION Joint regarding Admissibility of Exhibits. (Breslow, Brandon) (Entered: 02/15/2024) | |
| 432 | 02/15/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY SELECTION as to Aaron Zahn held on 2/15/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 02/21/2024) | |
| 424 | 02/16/2024 | ORDER GRANTING (Doc. 413) Defendant Zahn's Unopposed Motion for Leave to File Supplemental Exhibit; GRANTING (Doc. 414) Defendant Zahn's Motion for Independent Opening Statements, Cross-Examinations, and Closing Statements from Those of Defendant Wannemacher; DENYING AS MOOT (Docs. 415 and S-416) Defendant Wannemacher's Motion for Leave to File Reply. Signed by Senior Judge Brian J. Davis on 2/16/2024. (AMP) (Entered: 02/16/2024) | |
| 433 | 02/16/2024 | Minute Entry for In Person proceedings held before Senior Judge | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Brian J. Davis: JURY SELECTION as to Ryan Wannemacher held on 2/16/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 02/22/2024) | |
| 425 | 02/18/2024 | MEMORANDUM in opposition by USA as to Aaron Zahn re 419 MOTION in Limine to Exclude Certain Video Clips of the Diamond-Salem Hearing  (Duva, Andrew) (Entered: 02/18/2024) | |
| 426 | 02/19/2024 | Unopposed MOTION to Allow Electronic Equipment, specifically allow witnesses and their lawyers to bring electronic devices into the Courthouse  by USA as to Aaron Zahn, Ryan Wannemacher. (Duva, Andrew) Modified on 2/20/2024 to edit docket text (AJS). (Entered: 02/19/2024) | |
| 427 | 02/19/2024 | MOTION in Limine to Exclude Testimony and Exhibits from Council Auditor's Office Witnesses by Aaron Zahn as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Exhibit GX7, # 2 Exhibit GX20ff, # 3 Exhibit GX42)(Ramirez Jefferson, Raquel) (Entered: 02/19/2024) | |
| 428 | 02/19/2024 | ORDER denying 401 Motion as to Aaron Zahn (1); granting in part and denying in part 419 Motion in Limine as to Aaron Zahn (1), Ryan Wannemacher (2). Signed by Senior Judge Brian J. Davis on 2/19/2024. (MCW)  (Entered: 02/19/2024) | |
| 429 | 02/20/2024 | ORDER GRANTING (Doc. 426) Unopposed Motion to Allow Witnesses and Their Attorneys to Bring Laptops and Phones into the Courthouse. See order for details. Signed by Senior Judge Brian J. Davis on 2/20/2024. (AMP)  (Entered: 02/20/2024) | |
| 434 | 02/20/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY SELECTION as to Aaron Zahn held on 2/20/2024. Court Reporter: Katharine Healey (CKS) (Entered: 02/22/2024) | |
| 430 | 02/21/2024 | RESPONSE to Motion re 427 MOTION in Limine to Exclude Testimony and Exhibits from Council Auditor's Office Witnesses by USA as to Aaron Zahn  (Attachments: # 1 Transcript of Testimony of Auditor in U.S. v. Thomas, Case No. 1:13-cr-241 (N.D. Ga. Dec. 4, 2014))(Corsmeier, Arnold) (Entered: 02/21/2024) | |
| 435 | 02/21/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 1) as to Aaron Zahn, Ryan Wannemacher held on 2/21/2024. Court Reporter: David Walker-Collier (CKS) (Entered: 02/22/2024) | |
| 436 | 02/22/2024 | TRANSCRIPT of Excerpt of Kastigar Hearing (Testimony of Lynne Rhode) as to Aaron Zahn, Ryan Wannemacher held on 2/14/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 3/14/2024. Redacted Transcript Deadline set for 3/25/2024. Release of Transcript Restriction set for 5/22/2024. (SMK) (Entered: 02/22/2024) | |
| 437 | 02/22/2024 | NOTICE of filing supplemental authority by Aaron Zahn, Ryan Wannemacher re: 414 MOTION for Miscellaneous Relief, specifically for Independent Opening Statements, Cross-Examinations, and Closing Statements from those of Defendant Ryan Wannemacher  filed by Aaron Zahn (Albritton, A.)  (Entered: | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | 02/22/2024) | |
| 438 | 02/22/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 2) as to Aaron Zahn, Ryan Wannemacher held on 2/22/2024. Court Reporter: David Walker-Collier (CKS) (Entered: 02/23/2024) | |
| 439 | 02/23/2024 | ORAL MOTION for Mistrial by Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 02/26/2024) | |
| 440 | 02/23/2024 | ORAL Motion to Strike and Motion for Curative Instruction by Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 02/26/2024) | |
| 441 | 02/23/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 3) as to Aaron Zahn, Ryan Wannemacher held on 2/23/2024; Defendants' Motion for Mistrial (Doc. 439) is DENIED and Defendants' Motion to Strike and Motion for Curative Instruction (Doc. 440) is DENIED as to Aaron Zahn (1), Ryan Wannemacher (2). Court Reporter: David Walker-Collier (CKS) (Entered: 02/26/2024) | |
| 442 | 02/26/2024 | ORDER DENYING 427 Defendant Zahn's Motion to Exclude Testimony and Exhibits from Council Auditor's Office Witnesses. Signed by Senior Judge Brian J. Davis on 2/26/2024. (AMP) (Entered: 02/26/2024) | |
| 443 | 02/26/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 4) as to Aaron Zahn, Ryan Wannemacher held on 2/26/2024. Court Reporter: Shannon Bishop (CKS) (Entered: 02/27/2024) | |
| 444 | 02/27/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 5) as to Aaron Zahn, Ryan Wannemacher held on 2/27/2024. Court Reporter: Shannon Bishop (CKS) (Entered: 02/28/2024) | |
| 445 | 02/28/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 6) as to Aaron Zahn, Ryan Wannemacher held on 2/28/2024. Court Reporter: Shannon Bishop (CKS) (Entered: 02/29/2024) | |
| 446 | 02/29/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 7) as to Aaron Zahn, Ryan Wannemacher held on 2/29/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/01/2024) | |
| 451 | 03/01/2024 | ORAL MOTION for Mistrial by Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 03/04/2024) | |
| 453 | 03/01/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 8) as to Aaron Zahn, Ryan Wannemacher held on 3/1/2024. Defendants' Joint Oral Motion for Mistrial (Doc. 451) is DENIED as to Aaron Zahn (1), Ryan Wannemacher (2). Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/05/2024) | |
| 447 | 03/02/2024 | Second MOTION to Intervene and MOTION to Open Future Kastigar Hearings During Trial by Florida Times-Union, First Coast News as to Aaron Zahn, Ryan Wannemacher. (Mansfield, Jennifer) (Modified on 3/4/2024, to edit text) (BGR). (Entered: 03/02/2024) | |
| 448 | 03/03/2024 | TRANSCRIPT of Excerpt of Jury Trial (Proffered Testimony of Jeffrey Panger) as to Aaron Zahn, Ryan Wannemacher held on 2/29/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 3/25/2024. Redacted Transcript Deadline set for 4/3/2024. Release of Transcript Restriction set for 6/3/2024. (SMK) (Entered: 03/03/2024) | |
| 449 | 03/03/2024 | WITNESS LIST by USA as to Aaron Zahn, Ryan Wannemacher (Duva, Andrew) (Entered: 03/03/2024) | |
| 450 | 03/04/2024 | Proposed Jury Instructions by Ryan Wannemacher (Felman, James) (Entered: 03/04/2024) | |
| 452 | 03/04/2024 | TRANSCRIPT of Excerpt of Jury Trial (Direct and Wannemacher's Cross of Melissa Dykes) as to Aaron Zahn, Ryan Wannemacher held on 2/29/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 3/25/2024. Redacted Transcript Deadline set for 4/4/2024. Release of Transcript Restriction set for 6/3/2024. (SMK) (Entered: 03/04/2024) | |
| 454 | 03/04/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 9) as to Aaron Zahn, Ryan Wannemacher held on 3/4/2024. Court Reporter: Shelli Kozachenko and Katharine Healey (CKS) (Entered: 03/05/2024) | |
| 455 | 03/05/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 10) as to Aaron Zahn, Ryan Wannemacher held on 3/5/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/06/2024) | |
| 456 | 03/06/2024 | ORDER DENYING 447 First Coast News and the Florida Times-Union's Second Motion to Intervene and Motion to Open Future Kastigar Hearings During Trial. Signed by Senior Judge Brian J. Davis on 3/6/2024. (AMP)  (Entered: 03/06/2024) | |
| 457 | 03/06/2024 | Emergency Non-Party Camille Lee-Johnson's SEALED MOTION for leave to file MOTION to be Excused from Appearing and Invocation of Constitutional Rights under seal by All Plaintiffs as to Aaron Zahn, Ryan Wannemacher. (Attachments: # 1 Main Document Non-Party's Assertion of Rights and Motion to be Excused)(Citro, Vincent) Modified on 3/8/2024 to edit document restriction (ELM). (Entered: 03/06/2024) | |
| 462 | 03/06/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 11) as to Aaron Zahn, Ryan Wannemacher held on 3/6/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/08/2024) | |
| 458 | 03/07/2024 | ORDER and NOTICE OF HEARING: Non-Party Camille Lee-Johnson's Emergency Motion for Leave to File a Document Under Seal (Doc. S-457) is GRANTED IN PART and DENIED IN PART. On or before March 8, 2024, Camille Lee-Johnson shall file a redacted version of her Motion to be Excused from Being Forced to Appear in Person to Invoke Her Fifth Amendment Right. The Court will hold a hearing in Jacksonville Courtroom 13A before Senior Judge Brian J. Davis on 3/7/2024 at 3:00 PM to consider Camille Lee-Johnson's Motion to be Excused from Being Forced to Appear in Person to Invoke Her Fifth Amendment Right (Doc. | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | S-457-1). See order for other details.(AMP)  (Entered: 03/07/2024) | |
| 459 | 03/07/2024 | TRANSCRIPT of Excerpt of Jury Trial (Redirect of Melissa Dykes) as to Aaron Zahn, Ryan Wannemacher held on 3/4/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 3/28/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/5/2024. (SMK) (Entered: 03/07/2024) | |
| 460 | 03/07/2024 | MOTION to Quash Subpoena to Testify and Assertion of Constitutional Rights by USA as to Aaron Zahn, Ryan Wannemacher. (Citro, Vincent) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 03/07/2024) | |
| 468 | 03/07/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 12) as to Aaron Zahn, Ryan Wannemacher held on 3/7/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/11/2024) | |
| 478 | 03/07/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: MOTION Hearing as to Aaron Zahn, Ryan Wannemacher held on 3/7/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/22/2024) | |
| 461 | 03/08/2024 | NOTICE of Appearance for Non-Party Camille Lee-Johnson by USA as to Aaron Zahn, Ryan Wannemacher (Citro, Vincent) (Entered: 03/08/2024) | |
| 463 | 03/08/2024 | TRANSCRIPT of Excerpt of Jury Trial (Argument of Anne Shannon) as to Aaron Zahn, Ryan Wannemacher held on 3/7/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 3/29/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/6/2024. (SMK) (Entered: 03/08/2024) | |
| 464 | 03/08/2024 | ORDERED: Defendant Wannemacher will be permitted to offer those excerpts of Defendant Zahn's Garrity statements submitted to the Court on proffer at trial. Defendant Wannemacher's introduction must be made after altering the Court outside the jury's presence of his intent, to ensure that Defendant Zahn's jury is not tainted by the statements. Signed by Senior Judge Brian J. Davis on 3/8/2024. (AMP)  (Entered: 03/08/2024) | |
| 465 | 03/08/2024 | TRANSCRIPT of Excerpt of Kastigar Hearing (Testimony of Camille Lee-Johnson and Herschel Vinyard) as to Aaron Zahn, Ryan Wannemacher held on 3/8/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: | |

3:22cr23, USA v. Zahn et al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 3/29/2024. Redacted Transcript Deadline set for 4/8/2024. Release of Transcript Restriction set for 6/6/2024. (SMK) (Entered: 03/08/2024) | |
| 479 | 03/08/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: Kastigar Hearing held on 3/8/2024 as to Aaron Zahn, Ryan Wannemacher. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/22/2024) | |
| 466 | 03/09/2024 | TRANSCRIPT of Excerpt of Jury Trial (Cross of Jason Gabriel) as to Aaron Zahn, Ryan Wannemacher held on March 5 and 6, 2024, before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/1/2024. Redacted Transcript Deadline set for 4/9/2024. Release of Transcript Restriction set for 6/7/2024. (SMK) (Entered: 03/09/2024) | |
| 467 | 03/10/2024 | Proposed Supplemental Jury Instructions by USA as to Aaron Zahn, Ryan Wannemacher (Corsmeier, Arnold) Modified on 3/11/2024 to edit docket text (AJS). (Entered: 03/10/2024) | |
| 480 | 03/11/2024 | JOINT ORAL MOTION for Judgment of Acquittal by Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 03/22/2024) | |
| 481 | 03/11/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 13) as to Aaron Zahn, Ryan Wannemacher held on 3/11/2024; taking under advisement 480 Defendants' Joint Oral Motion for Judgment of Acquittal as to Aaron Zahn (1), Ryan Wannemacher (2). Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/22/2024) | |
| 470 | 03/12/2024 | EXHIBIT LIST by Aaron Zahn, Ryan Wannemacher (Felman, James) (Additional attachment(s) added on 5/7/2024: # 1 Exhibit 1.30, # 2 Exhibit 2.35, # 3 Exhibit 2.38, # 4 Exhibit 3.2, # 5 Exhibit 3.4, # 6 Exhibit 3.5, # 7 Exhibit 3.8, # 8 Exhibit 6.72, # 9 Exhibit 4, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 12, # 13 Exhibit 17.1, # 14 Exhibit 18, # 15 Exhibit 20, # 16 Exhibit 23, # 17 Exhibit 29, # 18 Exhibit 31, # 19 Exhibit 32, # 20 Exhibit 35, # 21 Exhibit 38, # 22 Exhibit 39, # 23 Exhibit 51, # 24 Exhibit 69, # 25 Exhibit 70, # 26 Exhibit 71, # 27 Exhibit 74, # 28 Exhibit 93, # 29 Exhibit 101, # 30 Exhibit 110, # 31 Exhibit 126, # 32 Exhibit 128, # 33 Exhibit 134, # 34 Exhibit 137, # 35 Exhibit 143, # 36 Exhibit 150, # 37 Exhibit 157, # 38 Exhibit 158, # 39 Exhibit 159) (CKS). (Additional attachment(s) added on 5/7/2024: # 40 Exhibit 161, # 41 Exhibit 164, # 42 Exhibit 170, # 43 Appendix 181, # 44 Exhibit 191, # 45 Exhibit 200, # 46 Exhibit 205, # 47 Exhibit 209, # 48 Exhibit 210, # 49 Exhibit 211, # 50 Exhibit 217, # 51 Exhibit 219, # 52 Exhibit 228, # 53 Exhibit 232, # 54 Exhibit 232.1, # 55 Exhibit 247, # 56 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Exhibit 247.1, # 57 Exhibit 247.2, # 58 Exhibit 247.3, # 59 Exhibit 247.4, # 60 Exhibit 247.5, # 61 Exhibit 250, # 62 Exhibit 250.1, # 63 Exhibit 257, # 64 Exhibit 258, # 65 Exhibit 268, # 66 Exhibit 270, # 67 Exhibit 272) (CKS). (Additional attachment(s) added on 5/7/2024: # 68 Exhibit 281, # 69 Exhibit 292, # 70 Exhibit 301, # 71 Exhibit 301.1, # 72 Exhibit 302, # 73 Exhibit 302.1, # 74 Exhibit 307, # 75 Exhibit 309, # 76 Exhibit 323, # 77 Exhibit 333.1, # 78 Exhibit 366, # 79 Exhibit 373, # 80 Exhibit 386, # 81 Exhibit 387, # 82 Exhibit 402, # 83 Exhibit 402.1, # 84 Exhibit 407, # 85 Exhibit 407.1, # 86 Exhibit 418, # 87 Exhibit 422, # 88 Exhibit 427, # 89 Exhibit 427.1, # 90 Exhibit 441, # 91 Exhibit 462, # 92 Exhibit 464, # 93 Exhibit 469, # 94 Exhibit 470, # 95 Exhibit 471, # 96 Exhibit 473, # 97 Exhibit 480, # 98 Exhibit 480.1) (CKS). (Additional attachment(s) added on 6/5/2024: # 99 Exhibit 482 Part 1, # 100 Exhibit 482 Part 2, # 101 Exhibit 483, # 102 Exhibit 484, # 103 Exhibit 611, # 104 Exhibit 616, # 105 Exhibit 621, # 106 Exhibit 623, # 107 Exhibit 625, # 108 Exhibit 630, # 109 Exhibit 631, # 110 Exhibit 632) (CKS). (Entered: 03/12/2024) | |
| 471 | 03/12/2024 | EXHIBIT LIST by USA as to Aaron Zahn, Ryan Wannemacher (Corsmeier, Arnold) (Entered: 03/12/2024) | |
| 472 | 03/12/2024 | EXHIBIT LIST by USA as to Aaron Zahn, Ryan Wannemacher (Corsmeier, Arnold) (Entered: 03/12/2024) | |
| 482 | 03/12/2024 | JOINT ORAL MOTION to Strike by Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 03/22/2024) | |
| 483 | 03/12/2024 | JOINT RENEWED MOTION for Judgment of Acquittal by Aaron Zahn, Ryan Wannemacher. (CKS) (Entered: 03/22/2024) | |
| 484 | 03/12/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 14) as to Aaron Zahn, Ryan Wannemacher held on 3/12/2024. Defendants' Joint Oral Motions (Docs. 480, 482, and 483) are DENIED as to Aaron Zahn (1), Ryan Wannemacher (2). Court Reporter: Shelli Kozachenko (CKS) (Additional attachment(s) added on 4/2/2024: # 1 Main Document-Sealed Portion of Hearing) (CKS). (Entered: 03/22/2024) | |
| 473 | 03/13/2024 | FINAL JURY INSTRUCTIONS as to Aaron Zahn. (CKS)  (Entered: 03/13/2024) | |
| 474 | 03/13/2024 | FINAL JURY INSTRUCTIONS as to Ryan Wannemacher. (CKS) (Entered: 03/13/2024) | |
| 475 | 03/13/2024 | FINAL VERDICT FORM as to Aaron Zahn, Ryan Wannemacher. (CKS)  (Entered: 03/13/2024) | |
| 485 | 03/13/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 15) as to Aaron Zahn, Ryan Wannemacher held on 3/13/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/22/2024) | |
| 476 | 03/14/2024 | EXHIBIT LIST by USA as to Aaron Zahn, Ryan Wannemacher (Corsmeier, Arnold) (Additional attachment(s) added on 5/1/2024: # 1 Supplement Completed Trial Exhibit List, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6A, # 7 Exhibit 6C, # 8 Exhibit 6D, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19) (CKS). (Additional attachment(s) added on 5/1/2024: # 20 Exhibit 20a1, # 21 Exhibit 20a2, # 22 Exhibit 20a3, # 23 Exhibit 20a4, # 24 Exhibit 20a5, # 25 Exhibit 20b1, # 26 Exhibit 20b2) (CKS). (Additional attachment(s) added on 5/1/2024: # 27 Exhibit 20f1, # 28 Exhibit 20f2, # 29 Exhibit 20f4, # 30 Exhibit 20h1, # 31 Exhibit 20i, # 32 Exhibit 20j, # 33 Exhibit 20k, # 34 Exhibit 20l1, # 35 Exhibit 20l2, # 36 Exhibit 20m) (CKS). (Additional attachment(s) added on 5/7/2024: # 37 Exhibit 20P1, # 38 Exhibit 20P2, # 39 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Exhibit 20P3, # 40 Exhibit 20P4, # 41 Exhibit 20P5, # 42 Exhibit 20W, # 43 Exhibit 20Y1, # 44 Exhibit 20Y2, # 45 Exhibit 20Y3, # 46 Exhibit 20aa1, # 47 Exhibit 20aa2, # 48 Exhibit 20aa3, # 49 Exhibit 20aa4, # 50 Exhibit 20aa5) (CKS). (Additional attachment(s) added on 5/7/2024: # 51 Exhibit 20BB, # 52 Exhibit 20cc1, # 53 Exhibit 20cc2, # 54 Exhibit 20dd, # 55 Exhibit 20ee, # 56 Exhibit 20ff) (CKS). (Additional attachment(s) added on 5/7/2024: # 57 Exhibit 21c, # 58 Exhibit 21d, # 59 Exhibit 21e, # 60 Exhibit 21f, # 61 Exhibit 21g, # 62 Exhibit 21h, # 63 Exhibit 21j, # 64 Exhibit 21k, # 65 Exhibit 22a) (CKS). (Additional attachment(s) added on 5/7/2024: # 66 Exhibit 22b, # 67 Exhibit 23A, # 68 Exhibit 23B, # 69 Exhibit 23C, # 70 Exhibit 23D, # 71 Exhibit 24, # 72 Exhibit 25A, # 73 Exhibit 26A) (CKS). (Additional attachment(s) added on 5/7/2024: # 74 Exhibit 28, # 75 Exhibit 29A, # 76 Appendix 29B, # 77 Appendix 30, # 78 Appendix 31A, # 79 Exhibit 31B, # 80 Exhibit 31C, # 81 Exhibit 31D, # 82 Exhibit 32A, # 83 Exhibit 32B, # 84 Exhibit 32C, # 85 Exhibit 32D, # 86 Exhibit 33A, # 87 Exhibit 33B, # 88 Exhibit 33C, # 89 Exhibit 33D, # 90 Exhibit 34A, # 91 Exhibit 34B, # 92 Exhibit 34C, # 93 Exhibit 34D, # 94 Exhibit 34E, # 95 Exhibit 35, # 96 Exhibit 36A, # 97 Exhibit 36B, # 98 Exhibit 36C, # 99 Exhibit 37, # 100 Exhibit 38, # 101 Exhibit 39A, # 102 Exhibit 39B, # 103 Exhibit 39C, # 104 Exhibit 39D, # 105 Exhibit 39E) (CKS). (Additional attachment(s) added on 5/7/2024: # 106 Exhibit 40A, # 107 Exhibit 40B, # 108 Exhibit 40C, # 109 Exhibit 40D, # 110 Exhibit 41A, # 111 Exhibit 41B, # 112 Exhibit 42, # 113 Exhibit 43A, # 114 Exhibit 43B, # 115 Exhibit 44A, # 116 Exhibit 44B, # 117 Exhibit 46A, # 118 Exhibit 46B, # 119 Exhibit 46C, # 120 Exhibit 47A, # 121 Exhibit 47B, # 122 Exhibit 47C, # 123 Exhibit 47D, # 124 Appendix 47E, # 125 Exhibit 47G, # 126 Exhibit 48B, # 127 Exhibit 51, # 128 Exhibit 54, # 129 Exhibit 55) (CKS). (Additional attachment(s) added on 5/7/2024: # 130 Exhibit 20x, # 131 Exhibit 49) (CKS). (Entered: 03/14/2024) | |
| 477 | 03/14/2024 | ORDER GRANTING Defendant Wannemacher's Ore Tenus Motion to Allow Electronic Equipment. See order for details. Signed by Senior Judge Brian J. Davis on 3/14/2024. (AMP) (Entered: 03/14/2024) | |
| 486 | 03/14/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 16) as to Aaron Zahn, Ryan Wannemacher held on 3/14/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/22/2024) | |
| 487 | 03/15/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: JURY TRIAL (DAY 17) COMPLETED as to Aaron Zahn; Ryan Wannemacher held on 3/15/2024. Court Reporter: Shelli Kozachenko (CKS) (Entered: 03/22/2024) | |
| 488 | 03/15/2024 | JURY VERDICT as to Aaron Zahn (1) Guilty on Count 1, 2. (Originally filed with the Court on 3/14/2024) (Attachments: # 1 Restricted Unredacted Jury Verdict)(CKS) (Entered: 03/22/2024) | |
| 489 | 03/15/2024 | JURY VERDICT as to Ryan Wannemacher (2) Not Guilty on Count 1, 2. (Attachments: # 1 Restricted Unredacted Jury Verdict)(CKS) (Entered: 03/22/2024) | |
| 490 | 03/22/2024 | NOTICE OF HEARING as to Aaron Zahn: Sentencing set for 6/18/2024 at 09:00AM in Jacksonville Courtroom 12 C before Senior Judge Brian J. Davis. (CKS)  (Entered: 03/22/2024) | |
| 491 | 03/25/2024 | Unopposed MOTION for Return of Passport for Ryan Wannemacher  by Ryan Wannemacher. (Felman, James) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 03/25/2024) | |
| 492 | 03/25/2024 | Unopposed MOTION to Extend Time to File Fed R Crim P 29 33 | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | and 34 Motion by Aaron Zahn. (Albritton, A.) (Entered: 03/25/2024) | |
| 493 | 03/26/2024 | ORDER granting 491 Motion for Return of Passport as to Ryan Wannemacher (2). Signed by Magistrate Judge Monte C. Richardson on 3/26/2024. (ADM) (Entered: 03/26/2024) | |
| 494 | 03/28/2024 | ENDORSED ORDER: Defendant Zahn's Motion for Extension of Time 492 is GRANTED. Defendant Zahn shall file Rule 29, 33 and 34 motions on or before April 15, 2024. Signed by Senior Judge Brian J. Davis on 3/28/2024. (AMP) (Entered: 03/28/2024) | |
| 495 | 03/28/2024 | JUDGMENT OF ACQUITTAL as to Ryan Wannemacher (2), Count(s) 1, 2, Not Guilty. Signed by Senior Judge Brian J. Davis on 3/27/2024. (CKS) (Entered: 03/28/2024) | |
| 496 | 03/29/2024 | RECEIPT for return of Passport as to Ryan Wannemacher. Passport Number: 518777940. Issuing Country: United States. (ELM) (Entered: 03/29/2024) | |
| 497 | 04/15/2024 | MOTION for Acquittal or, in the Alternative, a New Trial and MOTION to Arrest Judgment by Aaron Zahn. (Albritton, A.) (Modified on 4/16/2024, to edit text) (BGR). (Entered: 04/15/2024) | |
| 498 | 04/23/2024 | TRANSCRIPT of EXCERPT of JURY TRIAL - opening statement by United States as to Aaron Zahn, Ryan Wannemacher held on February 21, 2024 before Judge Brian J. Davis. Court Reporter: David J. Collier. Email address: david_collier@flmd.uscourts.gov. Telephone number: 813-301-5575. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/14/2024. Redacted Transcript Deadline set for 5/24/2024. Release of Transcript Restriction set for 7/22/2024. (DJC) (Entered: 04/23/2024) | |
| 499 | 04/24/2024 | Unopposed MOTION to Extend Time to Deadline to Respond to Defendant Aaron Zahn's post-Trial Motion for Acquittal, New Trial, and to Arrest Judgment by USA as to Aaron Zahn. (Duva, Andrew) (Entered: 04/24/2024) | |
| 500 | 04/26/2024 | TRANSCRIPT of Excerpt of Jury Trial (Government Closings- Zahn) as to Aaron Zahn held on 3/13/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/17/2024. Redacted Transcript Deadline set for 5/28/2024. Release of Transcript Restriction set for 7/25/2024. (SMK) (Entered: 04/26/2024) | |
| 501 | 04/30/2024 | TRANSCRIPT of Excerpt of Jury Trial (Zahn Cross of Melissa Dykes) as to Aaron Zahn held on 2/29/24 to 3/1/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/21/2024. Redacted Transcript Deadline for 5/31/2024. Release of Transcript Restriction set for 7/29/2024. (SMK) (Entered: 04/30/2024) | |
| 502 | 05/04/2024 | MEMORANDUM in opposition by USA as to Aaron Zahn re 497 MOTION for Judgment of Acquittal or, in the Alternative, a New Trial and Motion to Arrest Judgment  (Duva, Andrew) (Entered: 05/04/2024) | |
| 503 | 05/09/2024 | Unopposed MOTION to Continue sentencing hearing set on June 18, 2024  by USA as to Aaron Zahn. (Duva, Andrew) (Entered: 05/09/2024) | |
| 504 | 05/14/2024 | TRANSCRIPT of JURY TRIAL - DAY 1 as to Aaron Zahn, Ryan Wannemacher held on February 21, 2024 before Judge Brian J. Davis. Court Reporter David J. Collier. Email address: david_collier@flmd.uscourts.gov. Telephone number: 813-301-5575. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/4/2024. Redacted Transcript Deadline set for 6/14/2024. Release of Transcript Restriction set for 8/12/2024. (DJC) (Entered: 05/14/2024) | |
| 505 | 05/14/2024 | TRANSCRIPT of JURY TRIAL - DAY 2 as to Aaron Zahn, Ryan Wannemacher held on February 22, 2024 before Judge Brian J. Davis. Court Reporter: David J. Collier. Email address: david_collier@flmd.uscourts.gov. Telephone number: 813-301-5575. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/4/2024. Redacted Transcript Deadline set for 6/14/2024. Release of Transcript Restriction set for 8/12/2024. (DJC) (Entered: 05/14/2024) | |
| 506 | 05/14/2024 | TRANSCRIPT of JURY TRIAL - DAY 3 as to Aaron Zahn, Ryan Wannemacher held on February 23, 2024 before Judge Brian J. Davis. Court Reporter: David J. Collier. Email address: david_collier@flmd.uscourts.gov. Telephone number: 813-301-5575. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/4/2024. Redacted | |

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
|   |      | Transcript Deadline set for 6/14/2024. Release of Transcript Restriction set for 8/12/2024. (DJC) (Entered: 05/14/2024) |   |
| 507 | 05/14/2024 | ORDER granting 503 Motion to Continue sentencing as to Aaron Zahn. The sentencing is continued to July 30, 2024, at 2:00 p.m. in courtroom 12C. Signed by Senior Judge Brian J. Davis on 5/14/2024. (SJW) (Entered: 05/14/2024) |   |
| 508 | 05/15/2024 | TRANSCRIPT of Jury Selection (Volume 1) as to Aaron Zahn, Ryan Wannemacher held on 2/15/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) |   |
| 509 | 05/15/2024 | TRANSCRIPT of Jury Selection (Volume 2) as to Aaron Zahn, Ryan Wannemacher held on 2/16/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) |   |
| 510 | 05/15/2024 | TRANSCRIPT of Jury Selection (Volume 3) as to Aaron Zahn, Ryan Wannemacher held on 2/20/24 before Judge Davis. Court Reporter/Transcriber: Katharine Healey. Email address: katharinehealey@bellsouth.net. Telephone number: 904.301.6843. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) |   |
| 511 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 4) as to Aaron Zahn, Ryan Wannemacher held on 2/26/24 before Judge Davis. Court Reporter/Transcriber: Shannon Bishop. Email address: dsmabishop@yahoo.com. Telephone number: 904.549.1307. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after |   |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set to 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 512 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 5) as to Aaron Zahn, Ryan Wannemacher held on 2/27/24 before Judge Davis. Court Reporter/Transcriber: Shannon Bishop. Email address: dsmabishop@yahoo.com. Telephone number: 904.549.1307. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set to 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 513 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 6) as to Aaron Zahn, Ryan Wannemacher held on 2/28/24 before Judge Davis. Court Reporter/Transcriber: Shannon Bishop. Email address: dsmabishop@yahoo.com. Telephone number: 904.549.1307. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set to 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 514 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 7) as to Aaron Zahn, Ryan Wannemacher held on 2/29/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set to 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 515 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 8) as to Aaron Zahn, Ryan Wannemacher held on 3/1/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 516 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 9) as to Aaron Zahn, Ryan Wannemacher held on 3/4/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 517 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 10) as to Aaron Zahn, Ryan Wannemacher held on 3/5/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 518 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 11) as to Aaron Zahn, Ryan Wannemacher held on 3/6/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 520 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 12) as to Aaron Zahn, Ryan Wannemacher held on 3/7/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to | |

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 522 | 05/15/2024 | TRANSCRIPT of Kastigar Hearing as to Aaron Zahn, Ryan Wannemacher held on 3/8/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 523 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 13) as to Aaron Zahn, Ryan Wannemacher held on 3/11/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 524 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 14) as to Aaron Zahn, Ryan Wannemacher held on 3/12/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 526 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 15) as to Aaron Zahn, Ryan Wannemacher held on 3/13/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 527 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 16) as to Aaron Zahn, Ryan Wannemacher held on 3/14/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 528 | 05/15/2024 | TRANSCRIPT of Jury Trial (Volume 17) as to Aaron Zahn, Ryan Wannemacher held on 3/15/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/5/2024. Redacted Transcript Deadline set for 6/17/2024. Release of Transcript Restriction set for 8/13/2024. (SMK) (Entered: 05/15/2024) | |
| 529 | 05/30/2024 | TRANSCRIPT of Criminal Status Conference as to Aaron Zahn, Ryan Wannemacher held on 5/22/23 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/20/2024. Redacted Transcript Deadline set for 7/1/2024. Release of Transcript Restriction set for 8/28/2024. (SMK) (Entered: 05/30/2024) | |
| 530 | 05/30/2024 | TRANSCRIPT of Pretrial Hearing as to Aaron Zahn, Ryan Wannemacher held on 1/17/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/20/2024. Redacted Transcript Deadline set for 7/1/2024. Release of Transcript Restriction set for 8/28/2024. (SMK) (Entered: 05/30/2024) | |
| 531 | 05/30/2024 | TRANSCRIPT of Kastigar Hearing (Volume XI) as to Aaron Zahn, Ryan Wannemacher held on 2/14/24 before Judge Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 6/20/2024. Redacted Transcript Deadline set for 7/1/2024. Release of Transcript Restriction set for 8/28/2024. (SMK) (Entered: 05/30/2024) | |
| 535 | 07/23/2024 | Unopposed MOTION for Leave to File Document - 30 Page Sentencing Memorandum by Aaron Zahn. (Ramirez Jefferson, Raquel) (Entered: 07/23/2024) | |
| 536 | 07/23/2024 | SENTENCING MEMORANDUM by USA as to Aaron Zahn (Duva, Andrew) (Entered: 07/23/2024) | |
| 537 | 07/23/2024 | SENTENCING MEMORANDUM by Aaron Zahn (Albritton, A.) (Entered: 07/23/2024) | |
| 538 | 07/24/2024 | ORDER permitting members of the media to enter the Courthouse with a cell phone, laptop computer, tablet and/or personal hotspot device while attending the Sentencing Hearing for Aaron Zahn scheduled to be held on July 30, 2024, at 2:00 p.m. in Courtroom 12C. See order for other details. Signed by Senior Judge Brian J. Davis on 7/24/2024. (AMP)  (Entered: 07/24/2024) | |
| 539 | 07/24/2024 | ENDORSED ORDER: 535 Defendant Aaron Zahn's Unopposed Motion for Leave to File a 30-Page Sentencing Memorandum is GRANTED. The Court will accept and consider Doc. 537 Defendant's Sentencing Memorandum as filed. Signed by Senior Judge Brian J. Davis on 7/24/2024. (AMP)  (Entered: 07/24/2024) | |
| 540 | 07/26/2024 | ORDER DENYING 497 Defendant Zahn's Motion for Acquittal or, in the Alternative, A New Trial and Motion to Arrest Judgment; DENYING AS MOOT 499 Government's Motion to Extend Time to Respond to Defendant Zahn's Post Trial Motion for Acquittal, New Trial and to Arrest Judgment. Signed by Senior Judge Brian J. Davis on 7/26/2024. (AMP)  (Entered: 07/26/2024) | |
| 541 | 07/30/2024 | Minute Entry for In Person proceedings held before Senior Judge Brian J. Davis: SENTENCING held on 7/30/2024 for Aaron Zahn (1), Counts 1 and 2: Imprisonment: 48 months to run concurrently; Supervised Release: 1 year to run concurrently; Special Assessment: $200.00. Defendant shall self surrender to the institution designated by the Bureau of Prison no later than 90 days, as notified by the USM. Court Reporter: Shelli Kozachenko (BD) (Entered: 08/01/2024) | |
| 542 | 08/01/2024 | JUDGMENT as to Aaron Zahn (1), Counts 1 and 2: Imprisonment: 48 months to run concurrently; Supervised Release: 1 year to run | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | concurrently; Special Assessment: $200.00. Signed by Senior Judge Brian J. Davis on 8/1/2024. (BD) (Entered: 08/01/2024) | |
| 544 | 08/02/2024 | NOTICE OF ATTORNEY APPEARANCE: Samuel J. Salario, Jr appearing for Aaron Zahn  (Salario, Samuel)  (Entered: 08/02/2024) | |
| 545 | 08/02/2024 | NOTICE OF ATTORNEY APPEARANCE: Paul Courtney Huck, Jr appearing for Aaron Zahn  (Huck, Paul)  (Entered: 08/02/2024) | |
| 546 | 08/06/2024 | TRANSCRIPT of Excerpt of Sentencing as to Aaron Zahn held on 7/30/24 before Judge Brian J. Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/27/2024. Redacted Transcript Deadline set for 9/6/2024. Release of Transcript Restriction set for 11/4/2024. (SMK) (Entered: 08/06/2024) | |
| 547 | 08/12/2024 | Unopposed MOTION to Correct 542 Judgment  by Aaron Zahn. (Attachments: # 1 Exhibit A - Judgment, # 2 Exhibit B - Transcript Excerpt)(Albritton, A.) (Entered: 08/12/2024) | |
| 548 | 08/13/2024 | NOTICE OF APPEAL by Aaron Zahn re 542 Judgment. Filing fee paid $ 605, receipt number AFLMDC-22402133. (Huck, Paul) (Entered: 08/13/2024) | |
| 549 | 08/14/2024 | TRANSMITTAL of initial appeal package as to Aaron Zahn to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 548 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (JOS) (Entered: 08/14/2024) | |
| 550 | 08/14/2024 | UNOPPOSED MOTION for a Specific Reporting Date re 542 Judgment, 547 Unopposed MOTION to Correct 542 Judgment by Aaron Zahn. (Albritton, A.) Modified on 8/15/2024 to edit text (ELM). (Entered: 08/14/2024) | |
| | 08/14/2024 | USCA Case Number as to Aaron Zahn. USCA Number: 24-12617-A for 548 Notice of Appeal filed by Aaron Zahn. (SJW) (Entered: 08/16/2024) | |
| 551 | 08/16/2024 | AMENDED JUDGMENT as to Aaron Zahn (1), Count(s) 1, Imprisonment: 48 months to run concurrently with Count II; Supervised Release: 1 year to run concurrently with Count II; Special Assessment: $100.00; Count(s) 2, Imprisonment: 48 months to run concurrently with Count I; Supervised Release: 1 year to run concurrently with Count I; Special Assessment: $100.00. Signed by Senior Judge Brian J. Davis on 8/16/2024. (SJW)  (Entered: 08/16/2024) | |
| 552 | 08/23/2024 | Amended NOTICE OF APPEAL by Aaron Zahn re 551 Amended/Corrected judgment. Filing fee not paid (Salario, Samuel) Modified on 8/26/2024 as to docket text (ARL). (Entered: 08/23/2024) | |
| 553 | 08/26/2024 | TRANSMITTAL of initial appeal package as to Aaron Zahn to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 552 Amended Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | counsel at www.flmd.uscourts.gov under Forms and Publications/General. (ARL) (Entered: 08/26/2024) | |
| 554 | 08/27/2024 | TRANSCRIPT information form filed by Aaron Zahn for proceedings held on 7/30/24 before Judge Davis re 552 Notice of Appeal. USCA number: 24-12617. Electronic notification sent to Court Reporter Shelli Kozachenko (Salario, Samuel) (Entered: 08/27/2024) | |
| 555 | 08/28/2024 | COURT REPORTER ACKNOWLEDGMENT by Shelli Kozachenko re 552 Notice of Appeal as to Aaron Zahn. Estimated transcript filing date: 9/26/24. USCA number: 24-12617-A. (SMK) (Entered: 08/28/2024) | |
| 556 | 09/06/2024 | Unopposed MOTION for Miscellaneous Relief, specifically Access Video Trial Exhibits  by Aaron Zahn. (Huck, Paul) (Entered: 09/06/2024) | |
| 557 | 09/06/2024 | Unopposed MOTION for Miscellaneous Relief, specifically Access the Complete Docket and View Sealed Documents  by Aaron Zahn. (Huck, Paul) (Entered: 09/06/2024) | |
| 558 | 09/26/2024 | TRANSCRIPT of Sentencing as to Aaron Zahn held on 7/30/24 before Judge Brian J. Davis. Court Reporter/Transcriber: Shelli Kozachenko. Email address: shellikoz@gmail.com. Telephone number: 904.301.6842. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 10/17/2024. Redacted Transcript Deadline set for 10/28/2024. Release of Transcript Restriction set for 12/26/2024. (SMK) (Entered: 09/26/2024) | |
| 559 | 09/30/2024 | NOTIFICATION that transcript has been filed by Shelli Kozachenko re: 552 Notice of Appeal as to Aaron Zahn. USCA number: 24-12617-A. (SMK) (Entered: 09/30/2024) | |
| 560 | 10/04/2024 | ORDER granting 556 Motion to Access Video Trial Exhibits; granting 557 Motion to Access the Complete Docket. Signed by Senior Judge Brian J. Davis on 10/4/2024. (MCW)  (Entered: 10/04/2024) | |
| 561 | 10/04/2024 | MOTION for Release from Custody Pending Appeal by Aaron Zahn. (Salario, Samuel) (Entered: 10/04/2024) | |
| 562 | 10/10/2024 | MEMORANDUM in opposition by USA as to Aaron Zahn re 561 MOTION for Release from Custody Pending Appeal  (Duva, Andrew) (Entered: 10/10/2024) | |
| 563 | 10/11/2024 | NOTICE of possible conflict of interest by USA as to Aaron Zahn's appellate counsel. A possible conflict of interest does exist. (Duva, Andrew)  Modified docket text on 10/15/2024 (EVK). (Entered: 10/11/2024) | |
| 564 | 10/17/2024 | Unopposed Time-Sensitive MOTION to Extend Time of Reporting Date  to Address Hurricane Damage to Family Home by Aaron Zahn. (Attachments: # 1 Exhibit Hurricane Helene Damage Pictures, # 2 Exhibit Hurricane Milton Damage Pictures, # 3 Exhibit Allstate steps to take when filing claim)(Albritton, A.) Modified text on 10/18/2024 (GL). (Entered: 10/17/2024) | |
| 565 | 10/23/2024 | ORDER GRANTING 564 Defendant Aaron Zahn's Unopposed, Time-Sensitive Motion for Extension of Reporting Date to Address Hurricane Damage to His Family's Home. Defendant shall surrender for service of his sentence at an institution designated by the Bureau of Prisons on January 27, 2025, or on a later date | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | as determined by the Bureau of Prisons and as notified by the United States Marshal. Signed by Senior Judge Brian J. Davis on 10/23/2024. (AMP)  (Entered: 10/23/2024) | |
| 566 | 10/23/2024 | NOTICE OF ATTORNEY APPEARANCE: Bryan Scott Gowdy appearing for Aaron Zahn  (Gowdy, Bryan)  (Entered: 10/23/2024) | |
| 567 | 10/25/2024 | UNOPPOSED MOTION for Leave to File Response to 563 Notice of Potential Conflict as to Appellate Counsel for Defendant Aaron Zahn by Aaron Zahn. (Gowdy, Bryan) Modified on 10/25/2024 to edit text (ELA). (Entered: 10/25/2024) | |
| 568 | 11/04/2024 | RESPONSE 563 Notice of possible conflict of interest by Aaron Zahn  (Gowdy, Bryan) (Entered: 11/04/2024) | |
| 569 | 11/07/2024 | ORDER DENYING 561 Defendant Aaron Zahn's Motion for Release Pending Appeal. Signed by Senior Judge Brian J. Davis on 11/7/2024. (AMP)  (Entered: 11/07/2024) | |
| 570 | 11/07/2024 | ENDORSED ORDER: 567 Defendant's Unopposed Motion for Leave to Respond to the Government's Notice of Potential Conflict is GRANTED. The Court accepts and will consider Doc. 568 Defendant's Response. Signed by Senior Judge Brian J. Davis on 11/7/2024. (AMP)  (Entered: 11/07/2024) | |
| 571 | 11/22/2024 | ORDER directing Defendant to file on or before December 11, 2024, a notice that reflects counsel's representations to the Court or a separate document acknowledging that he understands the Government's Notice and waives any potential conflict. The Government may file a response to Defendant's filing on or before December 18, 2024, if it feels one is necessary. Signed by Senior Judge Brian J. Davis on 11/22/2024. (AMP)  (Entered: 11/22/2024) | |
| 572 | 11/25/2024 | NOTICE of Filing by Aaron Zahn re 571 Order (Attachments: # 1 Exhibit Written Consent to Representation)(Gowdy, Bryan) (Entered: 11/25/2024) | |
| 573 | 01/23/2025 | MOTION to Unseal Document (copy of sealed documents to USAO Appellate Division) by USA as to Aaron Zahn, Ryan Wannemacher. (Pardo, David) (Entered: 01/23/2025) | |
| 574 | 02/14/2025 | Unopposed MOTION to Amend for Copy of Unredacted and Sealed Documents by USA as to Aaron Zahn. (Pardo, David) (Entered: 02/14/2025) | |
| 575 | 03/03/2025 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Florida certifies that the record is complete for purposes of this appeal re: 552 Notice of Appeal as to Aaron Zahn. The following items will be forwarded for the record on appeal to the USCA in addition to the electronic record. (Exhibits: Consists of 21 thumb drives). USCA number: 24-12617-A. (SJW) (Entered: 03/03/2025) | |
| 576 | 03/06/2025 | ORDER GRANTING 574 Unopposed Amended Motion for Copy of Unredacted and Sealed Documents. Signed by Senior Judge Brian J. Davis on 3/6/2025. (AMP)  (Entered: 03/06/2025) | |
| 577 | 03/12/2025 | Unopposed Supplemental MOTION to Amend 574 MOTION to Amend for Copy of Unredacted and Sealed Documents by USA as to Aaron Zahn. (Pardo, David) Modified on 3/13/2025 as to docket text (ARL). (Entered: 03/12/2025) | |
| | 03/12/2025 | ACKNOWLEDGMENT by USCA of receiving Exhibits on 3/11/25 re 552 Notice of Appeal. USCA number: 24-12617-AA. (SJW) (Entered: 03/12/2025) | |
| 578 | 03/22/2025 | MOTION for Miscellaneous Relief, specifically for Copy of Unredacted and Sealed Documents (112, 126, and 192)  by USA as to Aaron Zahn. (Pardo, David) (Entered: 03/22/2025) | |
| 579 | 03/25/2025 | ENDORSED ORDER granting 578 The Government's Motion for Copy of Unredacted and Sealed Documents. The Clerk of the | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | Court shall provide Christina Licardi with the United States Attorney Office an unredacted copy of docket entries 112, 126, and 192, to be provided only to the Government's appellate counsel. Signed by Senior Judge Brian J. Davis on 3/25/2025. (MCW)  (Entered: 03/25/2025) | |
| 580 | 03/26/2025 | Final MOTION for Miscellaneous Relief, specifically Copy of Unredacted and Sealed Documents to Appellate AUSAs  by USA as to Aaron Zahn. (Pardo, David) (Entered: 03/26/2025) | |
| 581 | 04/10/2025 | ORDER GRANTING IN PART and DENYING IN PART 580 Final Motion for Copy of Unredacted and Sealed Documents. Signed by Senior Judge Brian J. Davis on 4/10/2025. (AMP)  (Entered: 04/10/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# Doc. 268

```
 1                 IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                       JACKSONVILLE DIVISION

 3
      UNITED STATES OF AMERICA,        Jacksonville, Florida
 4
              Plaintiff,               Case No. 3:22-cr-23-BJD-MCR
 5
      -vs-                             May 15, 2023
 6
      AARON ZAHN,                      9:41 a.m.
 7    RYAN WANNEMACHER,
                                       Courtroom 5C
 8            Defendants.

 9    _____

10              TRANSCRIPT OF KASTIGAR HEARING
                        (VOLUME I)
11            BEFORE THE HONORABLE MONTE C. RICHARDSON
                 UNITED STATES MAGISTRATE JUDGE
12

13

14

15

16

17

18

19

20

21    OFFICIAL COURT REPORTER:

22
           Shelli Kozachenko, RPR, CRR, CRC
23         221 North Hogan Street, #185
           Jacksonville, FL  32202
24         Telephone:  (904) 301-6842

25                    (Proceedings reported by stenography;
                       transcript produced by computer.)
```

```
 1                    A P P E A R A N C E S

 2
      COUNSEL FOR THE GOVERNMENT:
 3
           Tysen Duva, Esquire
 4         Arnold Corsmeier, Esquire
           United States Attorney's Office
 5         300 North Hogan Street, Suite 700
           Jacksonville, FL  32202
 6
           David Pardo, Esquire
 7         United States Attorney's Office
           400 North Tampa Street, Suite 3200
 8         Tampa, FL  33602

 9

10    COUNSEL FOR DEFENDANT ZAHN:

11         Eduardo Suarez, Esquire
           The Suarez Law Firm, PA
12         1011 West Cleveland Street
           Tampa, FL  33606
13
           Brian Albritton, Esquire
14         Raquel Jefferson, Esquire
           Phelps Dunbar, LLP
15         100 South Ashley Drive, Suite 2000
           Tampa, FL  33602
16

17    COUNSEL FOR DEFENDANT WANNEMACHER:

18
           James Felman, Esquire
19         Kynes, Markman & Felman, PA
           100 South Ashley Drive, Suite 1300
20         Tampa, FL  33601

21         Niels Murphy, Esquire
           Catherine Licandro, Esquire
22         Murphy & Anderson, PA
           1501 San Marco Boulevard
23         Jacksonville, FL  32207

24

25
```

Vol. 1-3

```
 1            T A B L E   O F   C O N T E N T S

 2

 3  DEFENDANT WANNEMACHER'S WITNESSES:          Page No.

 4    RYAN WANNEMACHER

 5      DIRECT EXAMINATION BY MR. FELMAN.........    31

 6      CROSS-EXAMINATION BY MR. DUVA............    35

 7      REDIRECT EXAMINATION BY MR. FELMAN.......    74

 8

 9    LYNNE RHODE

10      DIRECT EXAMINATION BY MS. LICANDRO.......    79

11      CROSS-EXAMINATION BY MR. DUVA............    84

12      CROSS-EXAMINATION BY MR. SUAREZ..........   100

13      REDIRECT EXAMINATION BY MS. LICANDRO......  105

14      RECROSS-EXAMINATION BY MR. DUVA...........  105

15

16

17  GOVERNMENT WITNESSES:                       Page No.

18    ROBERT W. BLYTHE

19      DIRECT EXAMINATION BY MR. DUVA...........   131

20

21

22

23

24

25
```

Vol. 1-4

```
 1            P R O C E E D I N G S

 2  May 15, 2023                           9:41 a.m.

 3                    -  -  -

 4        COURT SECURITY OFFICER:  All rise.  United States

 5  District Court in and for the Middle District of Florida is now

 6  in session, the Honorable Monte C. Richardson presiding.

 7        Please be seated.

 8        THE COURT:  We're here in Case No.

 9  3:22-cr-23-BJD-MCR, United States of America versus Aaron Zahn

10  and Ryan Wannemacher.

11        And who speaks -- well, will counsel state their

12  appearance for the record.

13        MR. DUVA:  Good morning, Your Honor.  Tysen Duva for

14  the United States.  To my left is AUSA Chip Corsmeier and then

15  Agent Bobby Blythe, FBI, Joanne Stockholm with our office in

16  litigation support.

17        Behind me is Angela Bray, Deputy Chief Counsel at

18  FBI; Ann Shannon, Chief Counsel at FBI; and David Pardo, AUSA,

19  and those last three are our filter team.

20        THE COURT:  Welcome.

21        And for the defense?

22        MR. SUAREZ:  Good morning, Your Honor.  Eddie Suarez

23  on behalf of Aaron Zahn.  With me is Brian Albritton and Raquel

24  Jefferson.

25        THE COURT:  Welcome, Counselors.
```

Vol. 1-5

```
 1          MS. FELMAN:  Good morning, Your Honor.  Jim Felman on
 2   behalf of Mr. Wannemacher, and I have with me Niels Murphy and
 3   Catherine Licandro.
 4          THE COURT:  Welcome, Counsel.
 5          And before we start, I think I will recite some
 6   relevant procedural history in order to put this case in some
 7   context.  I'll also go over some housekeeping matters before we
 8   start so we're all on the same page with regard to the Court's
 9   previous order.
10          A two-count indictment for conspiracy and wire fraud
11   was returned against the defendants on March 2nd of last year.
12   On November 7th of 2022, the defendants filed a motion to
13   dismiss the indictment for failure to state an offense, which
14   remains pending before Judge Davis.
15          On November 11th of 2022, Mr. Wannemacher filed a
16   motion to sever his case for trial from his codefendant, which
17   is also pending before Judge Davis.
18          On November 14th of last year, Mr. Zahn filed a
19   motion for intradistrict transfer of this case to the Tampa
20   Division, which also remains pending before the Court.
21          On November 14th of 2022, both defendants filed
22   motions for a hearing pursuant to *Kastigar versus United
23   States*, which was referred to me on December 16th of last year
24   after the Government filed its combined response on November
25   30th of last year.
```

Vol. 1-6

```
 1          On December 19th of last year, the Court entered an
 2   order taking the *Kastigar* motions under advisement and directed
 3   the parties to file a joint notice regarding the requested
 4   hearing by December 23rd of 2022, which they did.
 5          On November 10th of this year, Judge Davis held a
 6   status conference, and on January 25th he entered an order
 7   continuing the trial to the October 2023 trial term and setting
 8   a status conference for later this month.
 9          On November 14th of this year, the Government filed
10   the grand jury record, consisting of 357 attachments under
11   seal, as directed by Judge Davis.
12          On February 15th of this year, we held a status
13   conference to discuss the parameters of the *Kastigar* hearing
14   and entered an order setting aside dates for that hearing.
15          And on March 28th of this year, with leave of the
16   Court, the defendants filed their joint pre-*Kastigar* hearing
17   brief regarding requested procedures, and Mr. Wannemacher filed
18   his pre-*Kastigar* hearing brief regarding the Diamond-Salem
19   hearing issues with exhibits.
20          Defendant Wannemacher also filed his summary of
21   responses at the Diamond-Salem hearing and Mr. Wannemacher's
22   summary of *Garrity* statements.  Mr. Zahn also filed a summary
23   of *Garrity* statements, which was filed with the Court.
24          On March 2nd of this year, this Court denied the
25   media motions to intervene and set the procedures for the
```

Vol. 1-7

1   *Kastigar* hearing.

2          Pursuant to that order, on May 5th, the Government

3   filed its witness and exhibit lists, and the defendants filed

4   their joint exhibits and respective witness lists.

5          Now, at issue in these *Kastigar* motions are two sets

6   of statements:  first, the sworn statements taken from

7   Mr. Wannemacher on January 23rd of 2020 and Mr. Zahn on January

8   21st through the 22nd of 2020 by the attorneys from the City of

9   Jacksonville's Office of General Counsel and an investigator

10  from the City's Office of Inspector General, which are the

11  *Garrity* statements.

12         And, secondly, we have to deal with Mr. Wannemacher's

13  responses to questions posed to him at the December 16th, 2019,

14  hearing set by the City of Jacksonville Council Members Roy

15  Diamond and Ron Salem, which we will refer to as the

16  Diamond-Salem hearing.

17         Now, we will start with the Diamond-Salem portion of

18  the hearing before we move on to the defendants' *Garrity*

19  statements.

20         Also, what I wanted to make clear, and just as far as

21  the standard we'll have to look at with regard to the

22  Diamond-Salem hearing, Mr. Wannemacher must show that he

23  subjectively believed that his statements were compelled on the

24  threat of job loss, and secondly, that belief must have been

25  objectively reasonable at the time the statements were made,

Vol. 1-8

1   considering the totality of the circumstances.

2          And I'll repeat that.  The law is the totality of the

3   circumstances.  I have to determine whether that belief was

4   objectively reasonable.

5          With regard to other housekeeping matters, I entered

6   an order on May 2nd with regard to hearing procedures.  In that

7   order it indicated that any exhibits not objected to by May

8   10th are deemed admitted at the *Kastigar* hearing.

9          Also, I instructed the prosecution team not to confer

10  with witnesses about the defendants' compelled testimony or

11  anything learned from such testimony in advance of the *Kastigar*

12  hearing.

13         Also, at the beginning of any interview or

14  preparation session, the prosecution team was also told to

15  instruct witnesses not to disclose the contents of the

16  defendants' *Garrity* statements or anything learned from those

17  statements.

18         Further, the prosecutor assigned to the trial of this

19  case shall not be present when a cross-examination of the

20  Government's witnesses or the examination of the defendants'

21  witnesses regarding their exposure to the defendants' compelled

22  statements.

23         Further, the courtroom will be closed to the public

24  for those portions of the *Kastigar* hearing during which the

25  defendants' compelled statements may be discussed, including

Vol. 1-9

1   the defendants' examination or cross-examination of any witness
2   who may have been exposed to the defendants' compelled
3   statements and any other portion of the *Kastigar* hearing that
4   the parties provide notice to the Court that the contents of
5   the defendants' compelled statements or evidence derived
6   therefrom may be discussed.
7           Further, the post-hearing transcripts and briefs
8   filed on the public docket shall be redacted to exclude
9   discussions of the defendants' compelled statements, but
10  unredacted versions of those documents shall be filed with the
11  Court under seal and ex parte.
12          Now, with regard to the hearing procedures regarding
13  the Government's cross-counsel team, per my May 9th order, any
14  *Garrity*-related pleadings and/or *Garrity*-related submissions to
15  the Court relating to the defendants' *Kastigar* motions are
16  partially unsealed for viewing solely by the Government's
17  cross-counsel team, specifically AUSA David Pardo and two
18  independent FBI agents working with him.
19          Further, during the *Kastigar* hearing, the prosecution
20  team will excuse itself from the courtroom during the
21  defendants' cross-examination of Government witnesses or the
22  examination of defendants' witnesses when such witnesses relate
23  to the defendants' *Garrity*-protected testimony.
24          Secondly, the Government's cross-counsel team will
25  serve as independent counsel to represent the interests of the

Vol. 1-10

1   United States during the excused portions of the *Kastigar*
2   hearing.
3           Further, the Government's cross-counsel team will be
4   independent of and separate from the prosecution team and will
5   report to supervisors who are separate from and who do not in
6   any way oversee the prosecution team.  The Government
7   cross-counsel team member supervisors will observe the same
8   precautions set forth in this order as to the Government
9   cross-counsel team.
10          Further, the members of the Government's
11  cross-counsel team will store any materials containing
12  *Garrity*-protected information in such a way that no one outside
13  of the Government's cross-counsel team or their supervisors
14  will have access to them.
15          Also, the Government cross-counsel team shall not
16  discuss with or reveal to the prosecution team or any third
17  party the contents of the *Garrity*-protected statements, related
18  materials, or examinations.
19          Further, the Government cross-counsel team shall not
20  have any substantive communications with the prosecution team.
21  To the extent any communications are necessary, such
22  communications will be governed by the Department of Justice
23  policies concerning the conduct of filter teams, and the
24  Government cross-counsel team and prosecution team will adhere
25  to such policies.

Vol. 1-11

```
1              Now, this prohibition includes but is not limited to
2    participating in any discussion or preparation of the
3    prosecution team for the upcoming Kastigar hearing,
4    participating in any discussion or decision by the prosecution
5    team about any aspect of the prosecution of this case, or
6    providing the prosecution team with any information, advice,
7    theory -- or any theory regarding the prosecution of this case.
8              And finally, following the conclusion of the Kastigar
9    hearing, the Government cross-counsel team shall not
10   participate in the further litigation of this case except as
11   necessary for the Government's cross-counsel team to prepare
12   any post-Kastigar hearing briefing relating to matters within
13   the scope of that responsibility, including the Garrity
14   materials or the excused portions of the Kastigar hearing.
15             The Government's cross-counsel team will not
16   communicate or confer with the prosecution team regarding the
17   contents of the post-Kastigar hearing briefing, and any such
18   briefing prepared by the Government's cross-counsel team will
19   be filed under seal and will not be shared with or served on
20   the prosecution team.
21             Now, I know that was a lot, but I wanted -- it was
22   obviously important.  As counsel know, this is an involved
23   case, and we want to make precautions available to make sure
24   that there is no cross contamination, if you will, with regard
25   to the Garrity statements and with regard to how things will
```

Vol. 1-12

```
1    proceed during the course of this bifurcated hearing,
2    essentially, is what we have here.
3              Also, we need to establish deadlines for post-hearing
4    briefs.
5              Any idea, Counsel, with regard to post-hearing briefs
6    as far as deadlines?
7              MR. FELMAN:  I would think we'd be in a position to
8    file within two to three weeks of getting the transcripts.
9              THE COURT:  Mr. Duva?
10             MR. DUVA:  Seems reasonable.  I think instead of
11   setting a day now, maybe we'll just see when we finish, and
12   then --
13             THE COURT:  All right.
14             MR. DUVA:  -- set it.
15             Is that acceptable?
16             THE COURT:  Yes, yes.  We'll do that.
17             Any other issues we need to address, Counsel?
18             MR. DUVA:  May I be heard on the Diamond-Salem issue?
19             THE COURT:  Yes.  Is this concerning the parameters
20   of the cross-examination?
21             MR. DUVA:  Yes, and sort of the order of operation as
22   well.
23             THE COURT:  Okay.
24             MR. DUVA:  And to alert the Court, and I'm not
25   expecting the Court to have read every page of all the grand
```

1   jury transcripts, but none of these statements that

2   Mr. Wannemacher made at the Diamond-Salem hearing were

3   presented to the grand jury.

4         So in terms of that having to go first, the

5   Government's view is that doesn't make much sense sequentially

6   because it's really at the end of the story.

7         I think the Court will have a better -- and I don't

8   know that the Court's going to even rule on that issue if the

9   Diamond-Salem hearing goes first, because I don't think you're

10  going to have all of the information that you'll need to make

11  that determination.  It really is about the entire story from

12  beginning to end.

13        And we're going to start in late 2017 with Bobby

14  Blythe, the case agent from the FBI, and sequentially go

15  forward in time and really end in the December of 2019/January

16  of 2020 time frame.  In terms of -- so I don't know that the

17  Court will have great context of what that meeting is.

18        And, now, I know the Court can glean quite a bit from

19  the pleadings, but I think there's just a lot more evidence

20  that will be presented in terms of what that hearing really was

21  and whether protection should be afforded to it.

22        I will say, and I've told -- we've told the defense,

23  we've -- we've watched that meeting.  I watched that back in

24  early COVID days, a publically noticed hearing, open to the

25  public.

1         So we've watched it, and we intended to present, at

2   the end of our case, certain video clips about it because it --

3   whether we do it in cross-examination of Mr. Wannemacher or

4   other times -- but the Court has to also delve into the

5   usefulness of what was said during the Diamond-Salem hearing.

6         We're going to be making an argument that really what

7   they said wasn't very useful at all and that we didn't use that

8   information to develop leads.  In fact, our position is there

9   was just quite a bit of lying that went on, so it's hard to

10  make derivative use of things that aren't true.

11        So I think the Court will just be in a better

12  position to assess what that meeting really was and any

13  protections that should be afforded to it.

14        Getting to the usefulness part, there are two

15  exhibits --

16        THE COURT:  Well, let me ask you this, Mr. Duva.  Are

17  you suggesting that we don't take up the Diamond-Salem hearing

18  first?

19        MR. DUVA:  Correct.  I'm suggesting that that should

20  be at the end because the Government has the burden, by a

21  preponderance of the evidence, to show what we presented to the

22  grand jury and what resulted in the allegations in the

23  indictment, that we have an independent source for those

24  allegations.

25        And what I'm informing the Court -- and there's a

1  reason this isn't in the defense pleadings -- we didn't present
2  Mr. Wannemacher's statements to the -- in the Diamond-Salem
3  hearing to the grand jury, not one word.
4          So the only thing about the Diamond-Salem hearing
5  that we intend to cover with other witnesses are, for example,
6  there's a two-minute period of time where Kelly Flanagan, who
7  was a former board member, talks about sort of her realizations
8  that she had on that day as she's coming into the Diamond-Salem
9  hearing about the Performance Unit Plan.  And we'll be asking
10  her about those in her testimony as well.
11          So just in terms of the order of operation -- because
12  we have the burden on the overall motion.  We have to show by a
13  preponderance of the evidence that we obtained our evidence
14  independently.
15          If the Court decides that we didn't, we don't even
16  get to the Diamond-Salem hearing.  It's not relevant.  So I
17  think starting with that first, it just doesn't make a whole
18  lot of sense contextually.
19          Because as the defense knows, we didn't -- we didn't
20  present anything about it, and now we're going to argue about
21  it and question witnesses about it.  And the Court can -- you
22  know, I think we can make argument whether the Court should, in
23  open -- you know, in open court, consider the statements that
24  Mr. Wannemacher made.  We intend to present those because it
25  bears on the usefulness issue about exactly what he said and

1  how the statements could have been used.
2          Different situation with the actual *Garrity*
3  statements.  We have not read those.  I think the defense will
4  argue that we've been exposed to them.  We will argue
5  differently.  But we're asking to go first because we have the
6  overall burden.  Mr. Wannemacher has the burden on a very small
7  part of this.
8          In terms of cross-examination, there are spreadsheets
9  that we allege in the indictment and -- that were not divulged,
10  I think, in any setting, not because we read the *Garrity*
11  statements, but you can put two and two together when the *Daily*
12  *Record* headline, after the return of the indictment, is,
13  "Secret Spreadsheets Come to Light in Federal Indictment," so
14  very unlikely that anybody talked about those before.
15          So I intend to show those to Mr. Wannemacher and
16  present evidence otherwise to the Court about the metadata in
17  those spreadsheets, what they mean, and, you know, ask him,
18  "Did you cover these in the Diamond-Salem hearing?  Why didn't
19  you talk about these?"
20          So I think the defense will have some objection to
21  that, but it is relevant to the usefulness of Mr. Wannemacher's
22  statements in the Diamond-Salem hearing.
23          If he didn't talk about something, how could we make
24  derivative use of things he didn't talk about, and how could
25  that lead to things that we developed otherwise?

Vol. 1-17

1           So that's the Government's argument in terms of order
2    of operation and scope of cross-examination.
3           THE COURT:  All right.  Counsel?
4           Mr. Felman.
5           MR. FELMAN:  Good morning, Your Honor, and may it
6    please the Court.
7           THE COURT: Yes, sir.
8           MR. FELMAN:  We acknowledged in our prehearing
9    briefing that as to a couple of elements of our claim regarding
10   the Diamond-Salem hearing, we bear the initial burden of making
11   a prima facie showing.
12          We had to make a prima facie showing that
13   Mr. Wannemacher was directed or otherwise compelled to be
14   present and to answer the questions there and that he
15   subjectively believed that he would suffer adverse employment
16   consequence.
17          Your Honor had said he would have to suffer job loss.
18   I think the law is just any adverse employment consequence
19   would do.  In this case it probably would have been job loss,
20   but --
21          THE COURT:  That's right.
22          MR. FELMAN:  So it may be that we have now met that
23   initial burden through the exhibits that are now in evidence
24   before the Court.  At the time we filed our brief, we didn't
25   have any evidence before the Court.  We now have all of our

Vol. 1-18

1    exhibits in evidence.
2           I think it's probable or possible that those exhibits
3    carry our burden of proof and do show a prima facie case, and
4    if you'd like, I can walk you through what I'm talking about
5    there.  But it had been our assumption that we would carry our
6    burden first and so then, when the Government went, they would
7    rebut everything it wants.
8           If Mr. Duva is inclined to agree that we've met our
9    burden of showing a prima facie case, then we'd be fine with
10   letting him proceed with rebuttal, and if we have to put
11   somebody on in rebuttal of our case, if I have to call
12   Mr. Wannemacher in rebuttal or Ms. Rhode in rebuttal, I could
13   do it that way.
14          But if Mr. Duva doesn't yet agree that we've made our
15   prima facie showing, to me it doesn't make a lot of sense for
16   him to start rebutting something that hasn't been -- where I
17   haven't made my prima facie showing yet.
18          So I'm happy to do it however the Court wishes.  What
19   I can say is I do think that our portion of the Diamond-Salem
20   piece, if we have not yet shown a prima facie case, probably
21   wouldn't take very long.  I would put on Mr. Wannemacher, and
22   then we would put on Ms. Rhode, who is available today.
23          Regarding the scope of cross of Mr. Wannemacher, I,
24   as you might imagine, do not agree with Mr. Duva's assessment
25   that -- that if Mr. Wannemacher gets on the stand and limits

1 his testimony to the -- to the circumstances that brought him

2 into that room and the fact that he felt compelled to be there

3 and the fact that he felt compelled to answer the questions

4 there or face an adverse employment consequence -- we're going

5 to keep it tight.

6   That, in my mind, does not in any way, shape, or form

7 open the door to a cross-examination about the substance of

8 what he said there.  That would be completely inappropriate; in

9 my view, well beyond the scope.  I think it's Rule 104.

10   You know, we're supposed to have the ability to have

11 a hearing on these preliminary matters, like a motion to

12 suppress, where the defendant gets to testify to the key issues

13 that are necessary without a broad cross-examination.

14   So to me there's just no question that any

15 cross-examination regarding the substance of what

16 Mr. Wannemacher said once he got to the hearing would be well

17 beyond the scope of the direct examination and completely

18 inappropriate here.

19   THE COURT:  Well, hold on, Mr. Felman.

20   Mr. Duva, do you agree that counsel has made a

21 preliminary showing with regard to Mr. Wannemacher?

22   MR. DUVA:  We're going to be arguing on the

23 objectively reasonable portion of the test.

24   We understand that Mr. Wannemacher will likely get up

25 there and say, "I thought I had to go because Mr. Zahn told

1 me."

2   And I don't know if Mr. Zahn's going to testify, "I

3 told him that he had to go."  It's going to be some permutation

4 to that.  I get that.

5   THE COURT:  Okay.  So you agree to that portion.

6   MR. DUVA:  Yes.

7   THE COURT:  All right.

8   MR. DUVA:  I mean, now, I think there's -- there's

9 got to be some evidence of it.

10   THE COURT:  Of course.

11   MR. DUVA:  Whether it's Mr. Wannemacher saying it or

12 some exhibit that they've marked that shows it, or Mr. Zahn

13 sent a writing to Mr. Wannemacher that "You have to go,"

14 there has to be some evidence of it.  But I'm not -- I'm not

15 contesting that that's what is going to be said.

16   Now, we're going to obviously cross on the thought

17 process as well, about whether he actually subjectively

18 believed that or not.  So we do agree that he's going to say,

19 "I thought I had to go," and then, you know, we have some

20 cross-examination about -- about that generally.

21   But in terms of rebuttal, what I envision is, you

22 know, we're not going to address that part of it, other than

23 with Kelly Flanagan in a way, I think, the Court will

24 understand.  It's just her statements at the Diamond-Salem

25 hearing.  Doesn't have anything to do with Ryan Wannemacher's

Vol. 1-21

```
 1   statements.
 2          Then when we've finished, what I understood would
 3   happen, or what I thought would happen, is then Mr. Felman, for
 4   Mr. Wannemacher, would call his client, or Mr. Felman will call
 5   his client, Mr. Wannemacher, and also Lynne Rhode.  And then we
 6   would rebut that.  We plan to call Rory Diamond, Ron Salem,
 7   Daniel Nunn, Kerri Stewart, Melissa Dykes.  So those are the
 8   witnesses that we intend to call in rebuttal.
 9          Melissa Dykes may be a little bit of a hybrid.  I
10   would just ask the Court, in her testimony in our case in
11   chief, to ask a few limited questions about Diamond-Salem.
12          So with her we intend to ask a few questions of, you
13   know, "You were told not to go."  You know, "Did you think you
14   could go even though you were told not to go?  What was the
15   plan there?"  Because she didn't go, and Lynne Rhode didn't
16   initially go either until Jason Gabriel called her and told her
17   to come there.  That was her boss at the time, Mr. Gabriel, the
18   general counsel at the time.
19          So there will be some limited evidence through
20   Ms. Dykes and Mr. Gabriel about that during our case because
21   they're going to testify about other things.  But I -- I would
22   hold the overwhelming portion of the rebuttal to the
23   Diamond-Salem issue until after Mr. Felman's presented whatever
24   evidence that he intends to present.
25          THE COURT:  Let me see counsel at sidebar.
```

Vol. 1-22

```
 1                      *  *  *  *  *
 2   (Sidebar No. 1 sealed and under separate cover.)
 3                      *  *  *  *  *
 4          THE COURT:  Mr. Felman.
 5          MR. FELMAN:  Your Honor, one other issue that came up
 6   relating to the role of cross-counsel -- the cross-counsel
 7   team, we certainly are aware of and in agreement with all of
 8   what the Court just said in terms of the procedural posture and
 9   the orders that have been entered.
10          Our understanding -- and this is just my
11   understanding.  Of course, they'll have a full opportunity to
12   correct me if I'm wrong.  But the cross-counsel team went
13   through the prosecution team's file, and they found newspaper
14   stories in that file, some of which may quote some of the
15   Garrity testimony.  And that -- that part I have no issue with,
16   and they made a disclosure to the defense of that information.
17          They then met with the prosecution team, the agents,
18   and had a conversation with the agents about whether or not
19   they had reviewed these materials or not and made them aware of
20   what they had found.  I'll allow them to fill in any other
21   details in terms of what that conversation consisted of.
22          But our -- our concern is that it looked like a
23   substantive conversation with the prosecution team that could
24   be viewed as preparing Agent Blythe for his testimony and these
25   agents for their testimony, because there was a direct
```

Vol. 1-23

1    conversation between cross-counsel team and these agents about
2    what they had seen or not seen in the file regarding what this
3    hearing is about.
4            So we didn't think that was consistent with the
5    spirit or the letter of the Court's order.  So we brought this
6    to the attention of the Government cross-counsel team, and we
7    cited the part of the order that prohibits substantive
8    communications or witness preparation.
9            They do not agree with us that what they did was not
10   appropriate.  We met this morning in an effort to try to reach
11   an agreement going forward that such meetings would not occur
12   again, and they just simply do not agree with what I've just
13   said is our view of what they can and cannot do.
14           So I think we have no choice but to put it before the
15   Court.  I think Mr. Pardo probably should have an opportunity
16   to explain what they were thinking.
17           But I think we need guidance from the Court in terms
18   of what that team can and cannot do, because I don't think they
19   should be having any substantive conversations with the
20   prosecution team about anything other than scheduling, and I
21   certainly don't think they should be meeting with the agents or
22   witnesses to discuss what their testimony might be.
23           THE COURT:  Mr. Duva.
24           MR. DUVA:  I think I can fill in a lot of gaps here,
25   Your Honor.  I got a call from Angela Bray, who is on the

Vol. 1-24

1    cross-counsel team or filter team, and it was on Friday at
2    about 12:30.  And she said, "In the FBI file there are indexed
3    a lot of articles relating to JEA," some -- some of which had
4    nothing to do with this actual case.
5            They were compiled by an administrative assistant at
6    the FBI at the request of Agent Hill back in 2019.  And
7    periodically every month, the administrative assistant would
8    put articles in -- in the file.  I didn't know this until
9    Friday at 12:30 when I got this call.
10           But that is common in public corruption cases.  In
11   fact, it's kind of a standard operating procedure.
12           Very early on we had meetings with the prosecution
13   team and said, "Look, we're aware of these *Garrity* statements.
14   We're" -- and we'll talk about having Ryan Wannemacher's for a
15   period of time and then not reviewing it and then providing it
16   back to the Office of General Counsel.  That will come up
17   during the agent's testimony.
18           But we were cognizant to stay away from news media
19   about this.  Now, I will say I read a lot of articles about
20   JEA, none with respect to the *Garrity* material but lots of
21   informational articles.  And that's -- if you're not doing
22   that, as a prosecutor or an agent, you're not good at these
23   public corruption investigations.  It's part of the deal.
24           So we made -- and I guess the defense disagrees with
25   us.  I think they're saying that we're misrepresenting to the

Vol. 1-25

1  Court about staying away from *Garrity* material.  We did that.
2  We did absolutely everything we could to do it.
3          And, you know, it is well known that these statements
4  are on the Internet.  They were reported by the newspapers.  We
5  knew all that from the very beginning.
6          So what the phone call was about from the
7  cross-counsel team agent, Ms. Bray, to me was, "I found this.
8  Did you know about it?"
9          I said, "No."  I said, "You need -- you are the
10  filter agent.  You should ask the agents did they read this."
11          And she did, and they said -- that's the point of the
12  filter team.  They said, "No.  I didn't -- I didn't read that
13  material.  We made a decision early on not to review it."
14          I said to Ms. Bray, "You need to get with David
15  Pardo, the cross-counsel team AUSA, and make an appropriate
16  disclosure.  My suggestion is you take whatever's in that file
17  and you turn it over."
18          There was no witness prep at all.  It was
19  informational to Ms. Bray about did the agents review this
20  material or not.
21          And then I asked --
22          THE COURT:  There were no -- there were no
23  substantive communications or conversations?
24          MR. DUVA:  None.
25          And so then I asked the agents, "Go in your email and

Vol. 1-26

1  see if this person, your administrative assistant, ever emailed
2  you any of these materials."
3          They did that.  The answer's no.
4          So Ms. Bray was operating as a cross-counsel team
5  agent should to just discuss that issue and then communicate
6  with me and ultimately with Mr. Pardo about the scope of the
7  disclosure, which we made.
8          THE COURT:  All right.  Well, based on Mr. Duva's
9  representation, it appears that the cross-counsel team was
10  essentially doing what they're supposed to do.
11          They discovered there was an issue with regard to
12  articles that was in the file.  They made inquiry with the
13  agents, were satisfied that the information had not been
14  compromised, and apparently took custody of those -- those
15  documents.
16          So with regard to that issue, Mr. Felman, I am
17  satisfied at this point.
18          MR. SUAREZ:  Your Honor, may I be heard on that?
19          THE COURT:  Yes.
20          MR. SUAREZ:  May it please the Court, Your Honor.
21  Eddie Suarez, again, on behalf of Mr. Zahn.
22          THE COURT:  Yes, sir.
23          MR. SUAREZ:  It may be helpful if I read to the Court
24  a section of the email that was sent to us by Mr. Pardo which
25  was really forwarding Agent Bray's email to him, because I

1  think it will contextualize for the Court more clearly what our
2  concern is.
3          And I want to say at the outset, Judge, I don't
4  believe anybody was acting in bad faith or not adhering to the
5  court order.  I recognize that these agents and Mr. Pardo are
6  in an unusual role and trying to navigate these waters as best
7  they can, so their intent is not in question.
8          But here's what concerns us.  I'm just going to read
9  to you from the second paragraph of Angela Bray's email, which
10  is dated May 12th, 2023, at 6:16 p.m., to Mr. Pardo and to Ann
11  Shannon, another -- the other filter FBI agent.
12          And in the second paragraph it reads, "I spoke with
13  the agents, Robert Blythe and Angela Hill, separately and
14  independent.  They each advised that the JEA matter was covered
15  heavily by the media, and they were unable to keep up with the
16  media coverage, as their investigation was intensive and
17  time-consuming.
18          "They requested their squad support employee --
19  neither was able to recall which one of them or both of them --
20  conduct periodic search for media and put it in the file as an
21  administrative matter and for the media reports to be available
22  if they needed.
23          "My review of the title of the entries indicated that
24  the support employee did search for 'JEA' and included any
25  media that was discussed" -- "that discussed JEA.  Per the

1  title of the articles, I observed that several articles were
2  unrelated to the investigation.  However, some reference" --
3  "some reference aspects of the investigation."
4          The agent then goes on to report in the third
5  paragraph -- and this is the part that concerns us the most --
6  "I asked both agents if they had reviewed the articles in the
7  electronic file.  Agent Hill advised that she did not review
8  any of the articles.  Agent Blythe advised that he may have
9  reviewed a few as time allowed, but he did not spend any
10  significant time looking through the media and did not have
11  specific memory of reading the articles in the file.
12          "I asked both agents what they would do if they were
13  reading an article in which a *Garrity* statement or sworn
14  statement was referenced, and both independently advised they
15  would immediately stop the article.  They each recalled
16  discussions with the AUSA about staying away from *Garrity*
17  statements.  Both volunteered that they would have remembered
18  if they came across *Garrity* statements in an article and
19  stopped reading it.  However, neither of them had a memory of
20  such an event happening."
21          This is -- that third paragraph, Your Honor, is what
22  concerns us, is the question of, "What would you have done if
23  you encountered that?"  To us, we think that crosses the line
24  into witness preparation.
25          First of all, the witness has now been alerted of the

Vol. 1-29

1  presence of potentially -- of articles containing *Garrity*
2  statements.  The witnesses have been asked to be prepared to
3  address what they would have done.  And I know that wasn't
4  their intent, but I think that's the practical effect of what
5  happened.
6          And what we are asking is for them to be instructed
7  going forward not to engage in that kind of dialogue with the
8  prosecution team.
9          Thank you, Your Honor.
10         THE COURT:  Anything, Mr. Duva?
11         MR. DUVA:  Yes, Your Honor.
12         I'm missing the part where anything about the actual
13 *Garrity* statements were talked about in that exchange.  And
14 this is why we advocated for the version of the motion -- or
15 the order that we asked the Court for to have these kind of
16 logistical types of one-way conversations.
17         That's not witness prep.  That is the filter agent
18 doing what the filter agent is supposed to do to figure these
19 things out, which is why the defense wanted the court order the
20 way it was so there's no communication.  And they know if
21 there's no communication, it's very, very difficult for these
22 filter agents and the AUSA to know anything about this case to
23 serve an actual purpose.
24         That's why we advocated for we can talk about things
25 related to the hearing that are unrelated to the substance of

Vol. 1-30

1  the *Garrity* statements.  The Court, you know, ruled in the
2  defendants' favor about that, but that's kind of a -- this is
3  sort of a gotcha moment.  "Oh, my gosh.  You asked an agent
4  what you would do if you came across *Garrity* material."
5          I think Mr. Suarez probably knows that I've been
6  doing this long enough that I was going to ask the agent myself
7  that within about five minutes of the examination.  I don't
8  need Ms. Bray to help me prepare a witness.  That's not what
9  was going on at all, in our minds.
10         So to me, I don't get it, and I think that the filter
11 agent was doing exactly what her job is.
12         THE COURT:  All right.  Moving forward, the Court is
13 satisfied with regard to Mr. Duva's explanation, and let's
14 proceed.
15         Counsel, you ready?
16         MR. FELMAN:  Yes, Your Honor.  We would call Ryan
17 Wannemacher to the stand.
18         THE COURT:  Mr. Wannemacher, come forward, sir.
19         COURTROOM DEPUTY:  Good morning.  Raise your right
20 hand to be sworn in.
21         Do you solemnly swear or affirm the testimony you're
22 about to give before this Court will be the truth, the whole
23 truth, and nothing but the truth, so help you God?
24         THE WITNESS:  Yes, I do.
25         COURTROOM DEPUTY:  Please be seated and state your

1  full name for the record and spell your last name.

2          THE WITNESS:  My name is Ryan Wannemacher.  Last name

3  is W-a-n-n-e-m-a-c-h-e-r.

4          MR. FELMAN:  May it please the Court?

5          THE COURT:  Yes, sir.

6          MR. FELMAN:  Has he been sworn?  I might have missed

7  it.

8          THE COURT:  Yes.

9      RYAN WANNEMACHER, DEFENDANT WANNEMACHER'S WITNESS, SWORN

10                  DIRECT EXAMINATION

11  BY MR. FELMAN:

12  Q.    Would you please state your name for the record, sir.

13  A.    Yes.  Ryan Wannemacher.

14  Q.    How were you employed on December the 5th of 2019?

15  A.    I was the chief financial officer at JEA.

16  Q.    On or about December the 5th of 2010 [verbatim], did you

17  learn that the Jacksonville City Council had sent a letter to

18  the CEO of JEA announcing a hearing to thoroughly examine JEA's

19  Performance Unit Plan on December the 16th of 2019?

20  A.    Yes.

21  Q.    And did you also learn on or about December the 5th that

22  that letter requested that the CEO provide for the attendance

23  at that hearing of the persons from JEA most knowledgeable

24  about the Performance Unit Plan?

25  A.    Yes.

1  Q.    Were you given any direction from the CEO of JEA regarding

2  your attendance at and participation in the December 16th,

3  2019, public hearing?

4  A.    I was.  He instructed me to attend the meeting and to

5  answer questions.  And he also informed me that Mr. Vinyard

6  would be collecting responsive documents and to work with

7  Mr. Vinyard to provide any -- any materials that he would need.

8          THE COURT:  Mr. Wannemacher, pull the microphone up a

9  little closer to you.

10         THE WITNESS:  I'm sorry.  Yep.

11         THE COURT:  Thank you, sir.

12         THE WITNESS:  Is that better?

13         THE COURT:  Yes, sir.

14         MR. FELMAN:  I'm going to show him exhibits.  From a

15  logistical standpoint, Your Honor, do you want me to try to

16  arrange to have these put up on the screen?  Would you like me

17  to just hand you a courtesy copy of the exhibit?  What do you

18  think would be the most -- I can give him copies as well.

19         THE COURT:  Yes.  You can just hand it to my

20  courtroom deputy.

21         MR. FELMAN:  Sure.

22  BY MR. FELMAN:

23  Q.    So, Mr. Wannemacher, I'm going to show you what have been

24  entered as Defendants' 215 and 216.

25         MR. FELMAN:  And for the Court and for counsel, the

WANNEMACHER - DIRECT                                    Vol. 1-33

1   first page of that document is 215, and the second page is 216.
2   And I've provided a copy to Mr. Duva.
3   BY MR. FELMAN:
4   Q.   Mr. Wannemacher, showing you what's been admitted as
5   Defendants' Exhibits 215 and 216, are you able to identify
6   those documents?
7   A.   Yes.  This is an email that I'm -- I'm on that was a draft
8   of the response letter that went back to City Council in
9   response to that request for the hearing.
10  Q.   So is -- 215 is the email that sends you the draft letter,
11  which is 216; is that correct?
12  A.   Correct.  There's a -- the letter was attached.
13  Q.   Does the -- do you recall that on or about -- well, does
14  this letter in this email confirm that the CEO had instructed
15  you to appear at this hearing on December 16th?
16  A.   Yes.  The letter states that Mr. Zahn had instructed the
17  senior leadership team to provide any and all information and
18  be available to answer questions, and that's consistent with
19  what he instructed me to do.
20  Q.   Do you recall that on or about December the 10th of 2019,
21  members of the Jacksonville City Council held a public meeting
22  regarding, among other matters, the JEA employees whose
23  attendance at the December 16th, 2019, public hearing had been
24  confirmed by JEA?
25  A.   Yes.  I do recall that there was a pre-meeting, if you

WANNEMACHER - DIRECT                                    Vol. 1-34

1   will.  It was a publicly noticed meeting.  We were -- we were
2   aware of it, and I believe there was some media coverage of the
3   event as well.
4   Q.   Did you comply with your CEO's direction to attend and
5   answer questions at a December 16, 2019, public hearing?
6   A.   Yes.
7   Q.   Why did you comply with your CEO's direction to attend and
8   answer questions at the December 20 -- December 16, 2019,
9   public hearing?
10  A.   Well, he was my boss, and so he instructed me to go and
11  answer questions and so I did.
12       But moreover, I believe I didn't have a choice in
13  whether or not to attend.  Given -- given the political and the
14  media environment around that meeting in particular, the -- for
15  me to not follow those instructions would have been such a
16  blatant public act of insubordination that I felt as though it
17  certainly would have warranted a disciplinary action.  And in
18  that instance I think that disciplinary action would have been
19  termination.
20       MR. FELMAN:  Thank you.
21       Nothing further.
22       THE COURT:  Cross-examination, Mr. Duva?
23       MR. DUVA:  Yes, Your Honor.  I just need to retrieve
24  some exhibits.
25       THE COURT:  Yes, sir.

WANNEMACHER - CROSS                                      Vol. 1-35

```
1            MR. DUVA:  Permission to approach?
2            THE COURT:  Yes, sir.
3            MR. DUVA:  I'm handing you Government's Exhibits 43B,
4   51, 52, and 53.
5                       CROSS-EXAMINATION
6   BY MR. DUVA:
7   Q.   Sir, you received no subpoena to appear at Diamond-Salem,
8   correct?
9   A.   Correct.
10  Q.   You were not under oath.
11  A.   I was not under oath.
12           MR. DUVA:  And so Your Honor has context, if we can
13  play clip 1 from Diamond-Salem?  This is just -- this does not
14  contain statements of Mr. Wannemacher.  It's just the first
15  part of the meeting.  It's about six minutes where the council
16  members are explaining the setup and what's happening.
17           THE COURT:  Yes, sir.
18           MR. DUVA:  This is Exhibit 45.
19      (Video played.)
20           MR. DUVA:  Pause it.
21      (Video stopped.)
22  BY MR. DUVA:
23  Q.   So this is, in essence, kind of the lead-in to the
24  meeting.  It's the beginning, and at that point, that's
25  Councilman Diamond that's been talking most of the time,
```

WANNEMACHER - CROSS                                      Vol. 1-36

```
1   correct?
2   A.   Yes, I believe so.
3   Q.   He's asking Jason Gabriel to ask Lynne Rhode to come,
4   correct?
5   A.   That's what he said.
6   Q.   Yeah.  And she wasn't -- obviously she wasn't there at
7   that --
8   A.   She was not there --
9   Q.   -- at that point.
10  A.   -- at that point.
11  Q.   So she made her own independent decision not to come to
12  the beginning of the hearing, but then she was told by her
13  boss, different from yours, to come as well.
14           MR. FELMAN:  Your Honor, I'm going to object to this.
15  Beyond the scope.  He didn't say anything about Ms. Rhode.
16  This has no relevance to him whatsoever.
17           MR. DUVA:  I think it's relevant that she wasn't
18  there.  She is the next witness, but I'm just trying to make
19  the record clear that --
20           THE COURT:  I'll allow it.
21           MR. DUVA:  -- she was -- she wasn't there.
22           THE COURT:  Go ahead.
23           MR. SUAREZ:  Your Honor, just for the record, I do
24  object because he's asking the witness to speculate.
25           THE COURT:  Noted.
```

WANNEMACHER - CROSS                                    Vol. 1-37

```
 1              Go ahead, Counselor.
 2   BY MR. DUVA:
 3   Q.   So, Mr. Wannemacher, I just want to kind of note those
 4   things for the record.  We're going to finish this clip, and
 5   then we'll go on to some of the exhibits.
 6        (Video played.)
 7   BY MR. DUVA:
 8   Q.   Okay.  So not only were you not under subpoena,
 9   Mr. Wannemacher, nobody was, correct?
10   A.   I believe that's correct.
11   Q.   And this wasn't even a standing committee of the City
12   Council.  This was, in essence, an ad hoc committee with two
13   council members at that point; is that right?
14            MR. FELMAN:  Objection.  Scope, Your Honor.
15            MR. DUVA:  I think it's relevant to whether he
16   actually reasonably believed that he should have to attend
17   because of the subpoena power of this type of committee, which
18   was none.
19            THE COURT:  Overruled.
20   BY MR. DUVA:
21   Q.   So, Mr. Wannemacher, I want to back up a little bit.
22   We're going to go back to the July 23rd, 2019, board meeting,
23   okay?
24            And you have in front of you Government's Exhibit
25   43B; is that right?
```

WANNEMACHER - CROSS                                    Vol. 1-38

```
 1   A.   I see that here.
 2   Q.   And that's your employment agreement with JEA?
 3   A.   It appears to be, yes.
 4   Q.   Okay.  You can take all the time you need if you're not
 5   sure.
 6   A.   Yeah.  I see that it was executed, so yes.
 7   Q.   Okay.  So this is your employment agreement with JEA,
 8   which actually your boss, Aaron Zahn, sponsored; is that right?
 9   I mean, he's the one who asked the JEA board for you to be
10   under contract.
11            MR. FELMAN:  Objection.  Scope.
12            MR. DUVA:  I think it gets to the heart of the scope
13   of his employment and who and who cannot fire Mr. Wannemacher.
14            MR. FELMAN:  I think the origins of his contract are
15   so far afield, they can't possibly be within the scope of --
16            MR. DUVA:  We're going to play the video of the July
17   23rd, 2019, board meeting where that happens.
18            THE COURT:  I'll allow it.
19            MR. DUVA:  We're not going to play that now, but
20   just ...
21   BY MR. DUVA:
22   Q.   So at that meeting, not only you became a contracted
23   employee with JEA, there were other senior leadership team
24   members as well; is that right?
25   A.   Which meeting?
```

WANNEMACHER - CROSS                                    Vol. 1-39

```
 1   Q.   The July 23rd, 2019, board meeting.
 2   A.   Yes.  That was the meeting where a number of us got
 3   employment agreements --
 4   Q.   Okay.
 5   A.   -- executed.
 6   Q.   And so this document, from that point forward, governed
 7   your employment with JEA.
 8   A.   I don't know that this document, like, governed my full --
 9   fully governed my employment with JEA.  This was a piece of it,
10   but I think there was probably other documents or policies and
11   those sorts of things that would be outside of this document.
12   Q.   But this was one of them.
13   A.   This was one of them.
14           MR. DUVA:  If we can publish, Ms. Stockholm, the
15   signature page that is page 11 of the exhibit.
16   BY MR. DUVA:
17   Q.   So you signed that document.  It's dated July 26th of
18   2019; is that right?
19   A.   I see that, yes.
20   Q.   And Mr. Zahn signed it as well?
21   A.   Yes.
22   Q.   And Ms. Rhode signed it?
23   A.   Yes.
24   Q.   Okay.
25           MR. DUVA:  Let's go to page 1.
```

WANNEMACHER - CROSS                                    Vol. 1-40

```
 1           If we could do the top half.
 2   BY MR. DUVA:
 3   Q.   So there in the introductory paragraph it talks about the
 4   operative date, July 23rd, 2019; is that correct?
 5   A.   Yes.
 6   Q.   And it's entered into between JEA, which is defined as a
 7   body politic and corporate under the laws of the State of
 8   Florida and an independent agency of the Consolidated City of
 9   government [verbatim], correct?
10   A.   Yes.
11   Q.   And so that's an agreement that you have with JEA, the
12   entity, correct?
13   A.   That -- that's what it says here, yes.
14   Q.   Okay.  And at that point Mr. Zahn served at the pleasure
15   of the JEA board, did he not, on July 23rd, 2019?
16           MR. FELMAN:  Objection.  Scope.
17           MR. DUVA:  I think it gets to who has the authority
18   to make termination decisions as to --
19           THE COURT:  Overruled.
20   BY MR. DUVA:
21   Q.   So the JEA board -- Mr. Zahn served at the pleasure of the
22   JEA board, correct?
23   A.   I don't -- I don't know that I can answer that.  I know
24   that the board hired Mr. Zahn.
25   Q.   Do you know whether or not Mr. Zahn had an employment
```

WANNEMACHER - CROSS                                    Vol. 1-41

1   agreement with JEA?

2   A.   Yes, he did.

3   Q.   Okay.  And I'll actually show that to you.

4         Showing you what's been marked as 43A, and this is

5   the employment agreement Mr. Zahn had with JEA as well.

6         I'm not asking you to go through line by line and

7   page by page, but as you flip to the different sections, it

8   looks very similar to yours, does it not?

9         MR. FELMAN:  Objection.  Scope again.  I don't

10  understand the relevance of Mr. Zahn's employment agreement

11  whereas it relates to Mr. Wannemacher's.

12        MR. DUVA:  I think it comes down to the decision of

13  who can terminate Mr. Zahn and Mr. Wannemacher based on their

14  employment status with JEA.

15        THE COURT:  I'll allow some latitude on this.

16        Go ahead, Counsel.

17  BY MR. DUVA:

18  Q.   So if you look at your employment agreement -- I know

19  you're looking through Mr. Zahn's as well -- Mr. Wannemacher,

20  on page 1 there are different whereas clauses, and they talk

21  about what JEA is.

22        MR. DUVA:  And I won't belabor the point, but

23  illustrating the top half for the Court and also for those in

24  attendance.

25  BY MR. DUVA:

---

WANNEMACHER - CROSS                                    Vol. 1-42

1   Q.   Do you see that?

2   A.   The various whereas clauses?

3   Q.   Yes.

4   A.   Yes, I do.

5   Q.   Okay.

6         MR. DUVA:  And let's go towards the bottom.  It's

7   actually the third from the bottom.

8   BY MR. DUVA:

9   Q.   And it says, "Whereas, the JEA governing body is made up

10  of a seven-member board of directors (board) appointed by the

11  mayor and confirmed by the City Council."

12        Do you see that?

13  A.   I do.

14  Q.   And then the next whereas clause says, "Whereas, the board

15  is tasked with appointing a chief financial officer to operate

16  the eighth largest community-owned electric utility company in

17  the United States and the largest in Florida, with total assets

18  of 8.4 billion (2018), total equity of 2.8 billion (2018), and

19  approximately 2,000 employees (2018)."

20        Do you see that?

21  A.   I do.

22  Q.   So it says the board is tasked with appointing you as the

23  chief financial officer, correct?

24  A.   That's what it says, yes.

25  Q.   And that's what this contract did, didn't it?

1          MR. FELMAN:  Objection, Your Honor.  That calls for a
2    legal conclusion.
3    BY MR. DUVA:
4    Q.   What do you understand that to mean, Mr. Wannemacher?
5          THE COURT:  Do you know, Mr. Wannemacher?
6          THE WITNESS:  Do I -- I'm sorry.
7          THE COURT:  Do you know what that means?
8          THE WITNESS:  I -- I can read this whereas clause
9    that says the board is tasked with appointing a chief
10   officer.
11         I can tell you that I didn't believe that the board
12   was my boss.  I believed that Aaron Zahn was my boss, and I
13   served just as -- as you said Aaron Zahn served at the pleasure
14   of the board, I believed that I served at the pleasure of Aaron
15   Zahn, and he could fire me at any time.
16   BY MR. DUVA:
17   Q.   All right.  And that's what I'm asking you questions
18   about, is to kind of probe about whether that belief is
19   reasonable.  That's what I'm getting at, and that's why I had
20   you read the language of the board is appointing you as the
21   CFO.
22   A.   I see that.
23   Q.   Do you understand that?
24   A.   I see that whereas clause, yes.
25         MR. FELMAN:  Objection, Your Honor.  That's not what

1    the document says.
2    BY MR. DUVA:
3    Q.   Mr. Wannemacher, can you read that whereas clause again,
4    please.
5    A.   It says, "Whereas, the board is tasked with appointing a
6    chief financial officer to operate the eighth largest
7    community-owned electric company in the United States" --
8    Q.   You can stop there.
9          MR. DUVA:  Okay.  Let's go to Section 2.1 on page 2.
10         If we can show that, Ms. Stockholm, the bottom of
11   page 2.
12   BY MR. DUVA:
13   Q.   And that has your annual compensation set forth in this
14   agreement, correct?
15   A.   Yes.
16   Q.   $369,262, and that's set forth as the annual base salary;
17   is that right?
18   A.   Yes.  That's what it's defined as, yeah.
19   Q.   And then on page 3, which we won't cover the specifics,
20   but there's other aspects of your compensation, correct?
21   A.   Yes, business allowance, vehicle, pay performance.  I see
22   those, yes.
23   Q.   Okay.  Let's go to page 4, Section 3, termination.
24   A.   Uh-huh.
25   Q.   So this provision sets forth the different provisions with

WANNEMACHER - CROSS                                    Vol. 1-45

```
 1  respect to your termination -- is that right? -- if it were to
 2  occur?
 3  A.   Yes.  This deals with termination of employment, this
 4  section.
 5  Q.   Yeah.  And so in 3.1 it says that essentially -- and, you
 6  know, I'm just paraphrasing; I'm not reading exactly as it's
 7  set forth.  I will read some of it, but that you can be
 8  terminated (1) by JEA immediately for cause, as defined in and
 9  subject to the notice and cure provisions of Section 3.1.1 of
10  this agreement.
11            Is that accurate?
12  A.   Yes.
13  Q.   And (2) for good reason, as defined in Subsection 3.1.2 of
14  this agreement, correct?
15  A.   So it's referring to the termination of this agreement by
16  the employee for good reason.
17  Q.   Right.  But you're deciding --
18  A.   Correct.
19  Q.   -- in that instance to terminate your employment for good
20  reason, correct?
21  A.   Correct.
22  Q.   Okay.  And then Section 3, it talks about employee death
23  or disability.  We're not talking about that.
24            And Section 4, it says "by either party without cause
25  or good reason upon 30 days' advance notice to the other
```

WANNEMACHER - CROSS                                    Vol. 1-46

```
 1  party."
 2            Do you see that?
 3  A.   I do.
 4  Q.   Okay.  And so then there are -- there's Section 3.1.1,
 5  which talks about a cause termination in the following
 6  instances.
 7            You do you see those listed there, sir?
 8  A.   I do.
 9  Q.   Okay.  And the first one is, "A willful breach by employee
10  of material duties, obligations, and policies of JEA which
11  employee fails to cure within 10 days after written notice from
12  JEA specifically identifying such breach."
13            Do you see that?
14  A.   I do.
15  Q.   And then No. 2 is, "Employee's gross negligence or gross
16  neglect of duties and obligations required in performance of
17  employee's duties or willful misconduct."
18            Do you see that?
19  A.   I do.
20  Q.   And then there's other provisions that are displayed on
21  the screen.  We won't go through all of them.  I just really
22  wanted to cover those two.
23            And then go over to Section 3.1.5 on the next page.
24  A.   (Complies.)
25  Q.   On 3.1.5, can you read that language ending with Section
```

WANNEMACHER - CROSS                                    Vol. 1-47

1  (d), which is about nine lines down, sir?
2  A.   Ending with Section (d).
3  Q.   Out loud.
4  A.   So from the beginning through -- the beginning of section
5  (d)?
6  Q.   Yes, sir.
7  A.   Okay.  "If employee's employment is terminated by JEA
8  without cause or by employee for good reason, then subject to
9  employee's compliance with the covenants set forth in this
10 agreement and employee's execution and non-revocation of the
11 release of claims substantially in the form of Exhibit A
12 attached hereto, employee shall be paid all amounts and shall
13 receive all benefits earned through the date of termination of
14 employment.  JEA shall pay employee a lump-sum payment equal 20
15 weeks of current annual base salary, less applicable taxes and
16 deductions.  Such payment made" -- or "Such payment will be
17 made within 30 days of the date employee's termination occurs.
18      "Employee shall become fully vested in any unvested
19 amounts contributed on his behalf to any available retirement
20 plan that may then be in effect to the extent allowable under
21 the terms of the applicable plan and applicable law."
22 Q.   So if you're terminated without cause, you're getting 20
23 weeks of pay and other benefits as well -- is that correct? --
24 as set forth in that provision?
25 A.   Yes.

WANNEMACHER - CROSS                                    Vol. 1-48

1  Q.   Okay.  Let's go down to 3.1.6.
2       And it says, "JEA and employee further agree that if,
3  during the first five years following the effective date,
4  employee's employment is terminated by JEA without cause or by
5  employee for good reason, then beginning on the first Monday
6  after the effective date of termination of employee's
7  employment with JEA, employee shall serve as a consultant to
8  JEA for a period of six months, in accordance with the terms of
9  the separation and transition agreement substantially in the
10 form of Exhibit A hereto."
11      So terminated without cause or you leave for good
12 reason, you get six months of consulting work with JEA,
13 correct?
14 A.   Correct.
15 Q.   Okay.  So looking at this contract, ultimately, is
16 Mr. Zahn's name in here anywhere as having authority to
17 terminate you pursuant to this agreement?
18 A.   No.
19 Q.   Okay.  So would you expect that if there were an analysis
20 of these termination provisions, that these would be decided by
21 the JEA board in consultation with the Office of General
22 Counsel?
23 A.   Maybe.  I mean, again, I -- Aaron Zahn was my boss --
24 Q.   And I'm not asking you that.
25 A.   -- and --

WANNEMACHER - CROSS                                           Vol. 1-49

1  Q.   I'm asking about the process with the JEA board, which
2  appointed you as the CEO [verbatim], and whether or not you
3  think, at that time, on Diamond-Salem day, December 16th, 2019,
4  that they might confer with the Office of General Counsel about
5  your termination.
6          MR. FELMAN:  That all assumes facts not in evidence.
7  Particularly, that last part, I guess, assumed that it was the
8  board that had that authority.
9          Object to the form of the question.
10         MR. DUVA:  I'm going by what the agreement says, Your
11 Honor.  I'm just asking about the language of the agreement.
12         THE COURT:  Restate the question again.
13 BY MR. DUVA:
14 Q.   Based on the board being tasked, in page 1, as appointing
15 you as the chief financial officer, with this employment
16 agreement, you are no longer an at-will employee of JEA,
17 correct?
18 A.   I don't know.  I always --
19 Q.   Mr. Wannemacher --
20 A.   -- thought I was an at-will employee of JEA.
21 Q.   Well, what's the point of the employment agreement if
22 you're still an at-will employee?
23 A.   I can quit at any time.
24 Q.   For good reason, right?
25 A.   Or not good reason.  I had the ability to leave JEA at any

WANNEMACHER - CROSS                                           Vol. 1-50

1  time under my own at will.
2  Q.   But this sets forth -- there's a specific provision that
3  governs your termination for cause and without cause in the
4  agreement, correct?
5  A.   There is.
6  Q.   And then the things that would flow from that if you were
7  terminated with cause or without cause, right?
8  A.   Yes.  It --
9  Q.   But the day --
10 A.   -- lays out those provisions.
11 Q.   The day before, July 22nd, you didn't have this.  You were
12 an at-will employee of Aaron Zahn.  On July 22nd he could have
13 walked in your office, said, "Mr. Wannemacher, you're fired.
14 Get out," correct?
15 A.   Correct.
16 Q.   And then the difference the next day, which Mr. Zahn did
17 for you, is this agreement, correct?
18 A.   I don't believe that this agreement, in and of itself,
19 would have practically changed Aaron Zahn's ability to say, "I
20 want to fire Ryan."
21 Q.   Well, it -- he could have decided to do that, right, and
22 then don't you -- isn't it logical, based on this employment
23 agreement that you signed, that there would be a process after
24 that, meaning Aaron Zahn at that point, July 23rd, 2019, is not
25 the sole arbiter of whether Ryan Wannemacher gets terminated,

WANNEMACHER - CROSS                                                     Vol. 1-51

1  correct?
2  A.   I don't know.  Again, I'm not a -- I'm not a -- I'm not a
3  contract attorney.  I don't --
4  Q.   And that's the point of the Office of General Counsel, is
5  it not?  Those are the lawyers for the City, correct?
6  A.   The Office of General Counsel is the lawyers of the City.
7  Q.   Yes.  And Lynne Rhode, who worked for the Office of
8  General Counsel at the time, approved this agreement and signed
9  it.
10 A.   Yes, she did sign it.
11 Q.   Okay.  Let's go back to -- I'm going to bring you two
12 additional exhibits, 46A and 46B.
13      Now, Defense Exhibit 215 and 216, we saw the email
14 and a draft letter that was attached.
15      MR. DUVA:  And I want to display 46A for the Court,
16 and if we can go ahead and put that up, Ms. Stockholm, 46A.
17      And just for the Court, this is a December 5th, 2019,
18 letter by Council Members Diamond and Salem to Mr. Zahn.
19      THE COURT:  Very well.
20 BY MR. DUVA:
21 Q.   Now, Mr. Wannemacher, did Mr. Zahn show you this letter?
22 A.   The letter that he received from City Council?
23 Q.   Yes.
24 A.   Yes, I saw this letter.
25 Q.   Okay.  So in the first paragraph --

WANNEMACHER - CROSS                                                     Vol. 1-52

1       MR. DUVA:  If we can go -- yeah.  We're just going to
2  cover the first paragraph, the second to last sentence
3  beginning with "from a distance."
4  BY MR. DUVA:
5  Q.   It says, "From a distance it appears the PUP plan could
6  have been intended to enrich JEA employees and executives at
7  the expense of JEA rate-payers and the people of Jacksonville
8  generally should a recapitalization occur."
9       I'm not asking you about intent.  I'm just saying
10 that's what the document says, correct?
11 A.   That's what that sentence says, yes.
12 Q.   Then in paragraph 2, fourth sentence beginning with,
13 "Thus, the purpose of" -- "the purpose of this letter is to (1)
14 inform you," Mr. Zahn, "we are noticing a meeting for December
15 16, 2019, at 1:00 p.m. at Jacksonville City Hall to thoroughly
16 examine the PUP plan (the official notice of which this letter
17 is attached), and (2) request you provide for said meeting
18 persons with the most knowledge of the PUP plan, and (3)
19 request from ... all documents related to the PUP plan be
20 produced to us not later than close of business on Wednesday,
21 December 11, 2019."
22      Is that an accurate reading of the letter?
23 A.   Yes.  That's what it says.
24 Q.   Any mention of a subpoena in there?
25 A.   No, not in this letter.

WANNEMACHER - CROSS                                    Vol. 1-53

1   Q.   Any formal -- other than a request for documents, was
2   there any subpoena duces tecum for documents mentioned in this
3   letter?
4   A.   I'm sorry?
5   Q.   Any subpoena for documents mentioned in this letter?
6   A.   No.
7   Q.   And so the word that is used is just "request," right?
8   A.   Yes.  Request to provide persons and request to provide
9   documents.
10  Q.   So what Council Members Diamond and Salem are asking for
11  is, "Please give us documents," and there's a listing on the
12  second page, correct?
13          MR. FELMAN:  Objection, Your Honor.  The letter
14  speaks for itself.  He's now characterizing it in a way that I
15  don't think Mr. Wannemacher's capable of agreeing or
16  disagreeing.
17          MR. DUVA:  I can rephrase.
18  BY MR. DUVA:
19  Q.   But it's a request for documents, is it not?
20          MR. FELMAN:  The letter speaks for itself, Your
21  Honor.  I just think that's a legal question that
22  Mr. Wannemacher is not capable of answering.
23          THE COURT:  I'll allow it.
24  BY MR. DUVA:
25  Q.   Were you aware of any subpoena for documents?

---

WANNEMACHER - CROSS                                    Vol. 1-54

1   A.   No.
2   Q.   And then item 3, and I'm just -- we're going to go
3   paragraph by paragraph here.
4          Paragraph 3, I'm sorry, says, "With respect to
5   persons to be present at said meeting, we would appreciate your
6   appearance or that of your designees with the most knowledge of
7   the PUP plan, including but not limited to persons," and then
8   there's items 1 through 7, correct?
9   A.   Yes, 1 through 7.
10  Q.   Those are displayed.  I won't read them so I'm not wasting
11  time.
12          But in other words, having read this letter, did you
13  have an understanding of this letter asking Mr. Zahn to attend
14  and persons that fit in those seven buckets to attend the
15  meeting?
16  A.   I'm sorry.  Can you repeat the question?
17  Q.   Did you understand this letter to be saying, "Mr. Zahn,
18  please attend, and if you're not going to attend" -- it says
19  "your appearance and that of your designees" of people that fit
20  within those following seven requests.
21          MR. FELMAN:  Your Honor, I'm going to object to the
22  form of the question.  There's nothing in here about Mr. Zahn
23  not attending.
24          MR. DUVA:  Well, it actually says, "We would
25  appreciate your appearance or that of your designees."

WANNEMACHER - CROSS                                    Vol. 1-55

```
1   BY MR. DUVA:
2   Q.   So I'm asking you, when you read this letter,
3   Mr. Wannemacher -- because you testified that you saw it --
4   what did you understand this to mean?
5   A.   It meant that people who could fit into any of these
6   categories were requested to come.
7   Q.   And then Mr. Zahn told you to go.
8   A.   Correct.
9   Q.   Okay.  Next paragraph, this is talking about the document
10  production.  It says, in the second sentence, "When gathering
11  and producing these documents, please understand we make this
12  request under the Florida Public Records Law and the oversight
13  authority of the Jacksonville City Council over any City
14  entity, including JEA."
15          Is that accurate?
16  A.   I see that written here, yeah.
17  Q.   So the request for documents was pursuant to the Florida
18  public records laws.
19          MR. FELMAN:  Oh, objection, Your Honor.  He's just
20  omitted the second half of the sentence that's critically
21  important to this case.
22          MR. DUVA:  Yes.  So -- getting there.
23  BY MR. DUVA:
24  Q.   It says, "Thus, the assertion of any privilege will not
25  apply."
```

WANNEMACHER - CROSS                                    Vol. 1-56

```
1           Do you see that?
2   A.   I see that.
3   Q.   Okay.  What did you understand that to mean?
4   A.   I don't know what that means.
5   Q.   Okay.  We'll move on.
6           MR. DUVA:  Next page, and starting with "in
7   accordance" -- in the second paragraph, if we can grab in
8   accordance with the seven requests.
9   BY MR. DUVA:
10  Q.   "In accordance with the requirements above, please provide
11  the following documents," and then there's a listing of
12  documents that are requested, correct?
13  A.   I see those.
14  Q.   Okay.  All right.  So you saw this, and then you saw the
15  email that was Defense Exhibit 215 with the attached draft
16  response.
17          Do you see that?
18          I'm talking about Defense 215 and 216.
19  A.   Sorry.  That -- those were the exhibits that Mr. Felman
20  gave me?
21  Q.   Yes, sir.
22  A.   Yes.
23  Q.   Do you have those in front of you?
24  A.   I do, yes.
25  Q.   Okay.  So you covered a portion of that which says,
```

WANNEMACHER - CROSS                                    Vol. 1-57

```
 1  "Please know that I've instructed our senior leadership team,
 2  along with the support of our entire JEA staff, to provide you
 3  with any and all information you need.  We will be available
 4  for question-and-answer sessions in addition to the
 5  documentation you request."
 6         That's paragraph 3, right?
 7  A.  Yes.
 8  Q.  Did this letter actually get sent to Councilman Diamond
 9  and Councilman Salem?
10  A.  Yes.
11  Q.  Okay.
12  A.  I should say I don't know if there were any changes at all
13  to it after this draft, but there was a letter substantially
14  the same that did go back to the council members.
15  Q.  All right.  And the only letter they would have received
16  would have been the final version as of December 6th of 2019.
17  A.  Correct.  Whatever --
18  Q.  To the extent it was different.
19  A.  Correct.  The only -- the only version they would have
20  received is what they received.
21  Q.  Let's look at 46B.
22  A.  (Complies.)
23  Q.  These are minutes of the December 10th, 2019, meeting,
24  sort of a planning meeting before the Diamond-Salem hearing on
25  December 16th of 2019; is that right?
```

WANNEMACHER - CROSS                                    Vol. 1-58

```
 1  A.  Yes.
 2  Q.  And it references the attendees.
 3         MR. DUVA:  And this is more just for record purposes,
 4  Your Honor.
 5  BY MR. DUVA:
 6  Q.  Mr. Salem's listed.  Mr. Diamond's listed; is that
 7  correct?
 8  A.  Sorry.
 9         Oh, at the top, in attendance?
10  Q.  Yes, in attendance.
11  A.  Yes, Mr. Salem and Mr. Diamond.
12  Q.  And about halfway down, two other attendees listed are
13  Kyle Billy and Jeff Rodda; is that right?
14  A.  Yes.  I see their names as well.
15  Q.  And in the defense exhibits, you have a transcript of this
16  particular meeting, correct?
17  A.  I believe so.
18  Q.  Okay.  You did not attend this meeting, correct?
19  A.  No.
20  Q.  So moving forward to December 14th of 2019, you were
21  present at a planning meeting at the Dalton Agency with
22  Mr. Zahn, Ms. Dykes, Kerri Stewart, Michael Munz, and Kevin
23  Hyde; is that right?
24  A.  I believe -- I do recall the meeting.  I don't recall -- I
25  don't know that I could confirm everybody that was at the
```

WANNEMACHER - CROSS                          Vol. 1-59

1    meeting.  There was a group of people there.
2    Q.    During that meeting you discussed the -- how JEA would
3    respond -- I'm not trying to get into the substance, but there
4    were discussions about how JEA would respond at the
5    Diamond-Salem hearing and who would attend, correct?
6    A.    Yes.
7    Q.    And it was decided that you were going to attend but
8    Ms. Dykes was not going to attend, correct?
9    A.    Correct.
10   Q.    And was there any discussion of subpoenas to attend that
11   hearing at that meeting?
12   A.    No.
13   Q.    And you never felt that you would be under subpoena by the
14   City Council to attend.
15   A.    If I did not attend?
16   Q.    If you -- were you under -- were you thinking you'd
17   received a subpoena before the December 16th, 2019, hearing?
18   A.    Before the hearing, no.
19   Q.    Did you get one?
20   A.    No.
21   Q.    Ever?
22   A.    No.
23   Q.    Was there any discussion at this meeting about you being
24   under oath?
25   A.    No.

WANNEMACHER - CROSS                          Vol. 1-60

1    Q.    So is it here at this meeting that Mr. Zahn told you to
2    go?
3    A.    It was when he reiterated it.  He told me to go before
4    that.
5    Q.    He told you to go before that?  Where was that?
6    A.    It was in our offices.
7    Q.    Just you two?
8    A.    It was in the hallway.
9    Q.    Just you two in the conversation?
10   A.    In the conversation, yes.
11   Q.    Anybody else there?
12   A.    I don't believe so.
13   Q.    Okay.  And at the Dalton Agency meeting, this was
14   discussed, and it was decided that Mr. Zahn was going to attend
15   and you were going to attend as well.
16   A.    As well as others.
17   Q.    And Mr. Zahn was telling people at this Dalton Agency
18   meeting that he was going to resign the next day, did he not?
19   A.    Yeah.  He did say that he was going -- he was no longer
20   going to be the CEO.  I don't recall if it was a resignation or
21   if he was --
22   Q.    Was he going to --
23   A.    -- being told that he was no longer going to be the CEO.
24   Q.    Okay.  So -- and that was very public knowledge at that
25   meeting, that Mr. Zahn was saying, "One way or the other, I'm

WANNEMACHER - CROSS                                    Vol. 1-61

```
 1  gone."
 2  A.   Correct.
 3          MR. DUVA:  Let's go to clip 2 of the Diamond-Salem
 4  hearing.  This is Mr. Zahn's opening statement at the
 5  Diamond-Salem hearing.
 6      (Video played.)
 7  BY MR. DUVA:
 8  Q.   Okay.  So Mr. Zahn, in those comments, confirms that he
 9  serves at the pleasure of the JEA board, correct?
10  A.   I did hear him say that in those comments, yes.
11  Q.   And you hadn't said a word at the Diamond-Salem hearing
12  yet when Mr. Zahn said those things, other than acknowledging
13  maybe that you were there, right?
14  A.   I -- I think so.  I don't know where that is in the
15  timestamp, but I think that's correct.
16  Q.   Okay.  And that's a meeting that was open to the public --
17  A.   Yes.
18  Q.   -- correct?
19  A.   Yes, it was open to the public.
20  Q.   Publicly noticed, right?
21  A.   Yes.
22  Q.   Literally anybody could come, right?
23  A.   Yes.
24  Q.   And I'm not getting into the substance of your *Garrity*
25  statements, but that's not the case when you gave your
```

WANNEMACHER - CROSS                                    Vol. 1-62

```
 1  statement to the Office of General Counsel, right?  It was not
 2  open to the public.  Not anybody could come, correct?
 3  A.   Correct.
 4  Q.   Okay.  It was you and the lawyers and any representation
 5  that you might have had.
 6  A.   Yes.
 7  Q.   Now, even before the Diamond-Salem hearing, you could have
 8  consulted a lawyer if you wanted to, correct?
 9  A.   I believe I could consult a lawyer anytime.
10  Q.   Right.
11          Did you do that?
12  A.   No.
13  Q.   Now, Mr. Zahn, in those opening comments, before you spoke
14  substantively, said a couple of things that I just want to
15  point out.
16          He said that he made an error in judgment, correct?
17  A.   I -- yes.  I heard him say that.
18  Q.   He said, "My mistake," correct?
19  A.   Something to that effect.
20  Q.   And he even said, "Sorry," or apologized generally,
21  correct?
22          MR. FELMAN:  Your Honor, this is like some sort of
23  memory test.  There's not an actual question of substance here.
24  We all heard the tape.
25          I object to the form of the question.
```

WANNEMACHER - CROSS                                    Vol. 1-63

```
 1            MR. DUVA:  Just pointing those things out for the
 2   record, you know, that Mr. Wannemacher is at the meeting, and
 3   he can hear these things real time before he says anything at
 4   the Diamond-Salem hearing.
 5            THE COURT:  You heard it, correct, Mr. Wannemacher?
 6            THE WITNESS:  Yes, sir.
 7            THE COURT:  All right.
 8   BY MR. DUVA:
 9   Q.   And Mr. Zahn made other comments about the reputation of
10   JEA, did he not?
11   A.   He did.
12   Q.   Okay.  So -- and you had the opportunity to take all that
13   in connection with Mr. Zahn telling you previously, two days
14   before, that he was going to resign, correct?
15            MR. FELMAN:  Objection.  That misstates the
16   testimony.
17   BY MR. DUVA:
18   Q.   You were there when Mr. Zahn made those statements, were
19   you not?
20   A.   I was.
21   Q.   Okay.  And I've tried to refresh your recollection with
22   what he said, right?
23   A.   By playing the tape, yes.
24   Q.   Does it?
25   A.   Yes.
```

WANNEMACHER - CROSS                                    Vol. 1-64

```
 1   Q.   Okay.  And then that, together with two days before, he
 2   told you that he was going to resign, you had that in your mind
 3   as you sat there at that moment in the Diamond-Salem hearing.
 4            MR. FELMAN:  That misstates Mr. Wannemacher's
 5   testimony about what Mr. Zahn told him two days earlier.  He
 6   learned that he was going to resign or that he was going to be
 7   fired.
 8            MR. DUVA:  Thank you, Mr. Felman.  I'll clean that
 9   up.
10   BY MR. DUVA:
11   Q.   So, again, having heard and had your memory refreshed
12   about what Mr. Zahn said in his opening statement and what
13   Mr. Zahn told you about either resigning or being terminated,
14   you're sitting there at the Diamond-Salem hearing, and you have
15   that in your mind, correct?
16   A.   I don't know what I had in my mind.  I knew both of those
17   things.
18   Q.   You were aware of those things --
19   A.   Yes.
20   Q.   -- correct?
21   A.   Correct.
22   Q.   And you were so unconcerned at the point -- at that point
23   about speaking at this public hearing that you did not hire a
24   lawyer, correct?
25            MR. FELMAN:  Object to the form of the question, Your
```

WANNEMACHER - CROSS                                              Vol. 1-65

1   Honor.  It's not an appropriate question.

2   BY MR. DUVA:

3   Q.   You did not hire a lawyer, correct?

4           THE COURT:  I'll allow it.

5           THE WITNESS:  I did not hire a lawyer, correct.

6   BY MR. DUVA:

7   Q.   Okay.  Let's go to -- and I'm just going to show you a

8   couple of exhibits, really to ask if you're aware of these

9   things, okay?

10          Let's go to Exhibit 51.

11          MR. DUVA:  If we can publish 51.

12  BY MR. DUVA:

13  Q.   This is Jacksonville Municipal Code Ordinances 602.1205

14  and 602.1206.

15          Do you see that, sir?

16          MR. FELMAN:  Object.

17          Mr. Duva, is this the version that was in effect at

18  the time, or is this --

19          MR. DUVA:  Yes.

20          MR. FELMAN:  -- the newer version?

21          MR. DUVA:  It's printed off, but this is one that was

22  in effect at the time.  I printed it on 5/10 of '23.  That's

23  the --

24          MR. FELMAN:  Well, it's been amended.

25          MR. DUVA:  Okay.  And I believe I printed the one --

---

WANNEMACHER - CROSS                                              Vol. 1-66

1   and if not, I'll circle back and get the right one.  I think

2   it's the correct one.

3   BY MR. DUVA:

4   Q.   What I'm asking, Mr. Wannemacher, is were you aware of

5   these ordinances on December 16th of 2019.

6   A.   I was not aware of the specifics.  You know, I wasn't an

7   expert in the city code and that kind of thing.  I was not

8   aware of the specifics of the ordinances themselves.

9   Q.   Okay.

10  A.   I --

11          MR. DUVA:  If we can publish 602 --

12          MR. FELMAN:  Excuse me, Your Honor.  Objection.  He

13  was not done with his answer.

14          THE COURT:  Go ahead and finish your answer,

15  Mr. Wannemacher.

16          THE WITNESS:  Thank you.

17          I was -- I was generally aware that there were

18  provisions related to these topics, but, again, I did not know

19  kind of the code and specifically where to find it.

20          MR. DUVA:  Okay.  If we can publish 602.1206.

21  BY MR. DUVA:

22  Q.   So same answer for that code?

23          I know you're looking at the document as a whole, but

24  your testimony is that you're generally aware but not

25  specifically as to the contents of those sections.

WANNEMACHER - CROSS                                    Vol. 1-67

```
 1              Is that accurate?
 2   A.   Yes.
 3   Q.   Okay.
 4   A.   I think that's accurate.
 5   Q.   So you're familiar with your Fifth Amendment right to not
 6   incriminate yourself, correct?
 7   A.   I'm much more familiar now than I was at that time.
 8   Q.   But you were familiar with it.  I mean, most -- most
 9   people are generally familiar with that, are they not?
10   A.   I'd heard of it, yes.
11   Q.   You'd heard of it.  That's it.
12   A.   Yeah.  I mean, I understood that you could say, "I take
13   the Fifth," and not speak.
14   Q.   And what I'm getting at is you decided not to do that
15   during the Diamond-Salem hearing.  You did not invoke your
16   Fifth Amendment rights at any time.
17   A.   I did not.
18              MR. DUVA:  Let's go to Exhibit 52.
19   BY MR. DUVA:
20   Q.   A little bit more discrete.  This is the provision in the
21   City Council code that deals with committees.
22              And rather than get into the details of all of this,
23   I'm just going to ask you, are you familiar with these
24   provisions 2.101 through 2.214?
25              Were you aware of sort of the general rules with
```

WANNEMACHER - CROSS                                    Vol. 1-68

```
 1   respect to standing committees and special committees and what
 2   they could and could not do?
 3   A.   I mean, not really, no.  I wouldn't have said that I
 4   was --
 5   Q.   Do you know what type of committee the Diamond-Salem group
 6   was at that point, on December 16th of 2019?
 7   A.   I did not know.
 8   Q.   So you don't know whether it was a standing committee, a
 9   special committee, or some ad hoc committee?  You don't know
10   either way?
11   A.   No, I don't know, and I don't believe I would have known.
12   Q.   So are you -- you're not familiar with the different
13   types, so is it safe to say -- I'm just trying to avoid wasting
14   time here -- that you're not familiar with the subpoena powers
15   that come with a standing committee or a special committee or
16   an ad hoc committee?
17   A.   No.  It would have been far outside of my purview.
18   Q.   Okay, Mr. Wannemacher.  Now, did Mr. Zahn tell you to
19   attend the June 2019 board meeting and the July 2019 board
20   meeting?
21   A.   Yes.
22   Q.   And you thought that you had to go, right?
23   A.   I did.
24   Q.   Okay.  So under your theory, should your statements that
25   you made to the JEA board in that public hearing be given
```

WANNEMACHER - CROSS                                    Vol. 1-69

1   *Garrity* protections also?

2   A.   I don't know -- I don't know the answer to that question

3   from a legal standpoint.  You're asking me a legal question.

4   Q.   Well, do you think that Mr. Zahn, if you didn't go to the

5   June or July hearing -- board meeting -- if you just said, "No,

6   I'm not going," do you think he would have fired you?

7   A.   I think he very well could have carried out some

8   disciplinary action.

9   Q.   Okay.  So, then, what would flow from that is that -- what

10  you're saying is that you should get the same protections at

11  all the JEA board meetings that Mr. Zahn told you to go to as

12  you are claiming for the Diamond-Salem hearing, correct?

13           MR. FELMAN:  Objection, Your Honor.  This is a legal

14  question.  It's not a factual question.  I don't know how he

15  could possibly answer that.

16           THE WITNESS:  Yeah.

17           THE COURT:  Mr. Duva?

18           MR. DUVA:  I think it's a relevant question as to

19  what's in his mind about the statements that he makes at JEA

20  public board meetings as compared to the Diamond-Salem hearing.

21  I'm trying to -- what protections should those get?

22           And I know it's more argument, but I think I can ask

23  him the question of what he thinks he's entitled to in terms of

24  protections when he speaks to the JEA board.

25           THE COURT:  Do you know, Mr. Wannemacher?

WANNEMACHER - CROSS                                    Vol. 1-70

1            THE WITNESS:  I don't know.

2   BY MR. DUVA:

3   Q.   Let's go back to your employment agreement, 43B.

4   A.   (Complies.)

5   Q.   On the signature page, which is page 11 -- I meant to

6   point this out earlier, but April Green signed that as well; is

7   that correct?

8   A.   Yes.

9   Q.   And she was the chair of the JEA board at the time?

10  A.   Yes.

11  Q.   She had just recently taken over as the chair?

12  A.   I believe that's right.  I don't remember when she became

13  the chair.

14  Q.   So going back to the Diamond-Salem hearing, if you told

15  Mr. Zahn, "No, I'm not going to go to the Diamond-Salem

16  hearing," and he told you that you would be terminated, I mean,

17  wouldn't a logical next step be for you to take this employment

18  agreement to the chair of the JEA board and fight Mr. Zahn over

19  that?

20           MR. FELMAN:  Objection, Your Honor.  This is pure

21  argument.

22           THE COURT:  Mr. Duva.

23           MR. DUVA:  I'm just asking if he thought he had that

24  option in the hypothetical.  If Mr. Zahn said, "You're fired,"

25  you're not -- once Mr. Wannemacher said, "I'm not going to the

WANNEMACHER - CROSS                                          Vol. 1-71

1    Diamond-Salem hearing," I'm asking if he thought he had the
2    option of taking his contract to the JEA board chair to dispute
3    that.
4              THE WITNESS:  No.
5    BY MR. DUVA:
6    Q.    You didn't?
7    A.    No.  Look, as a practical matter, if Aaron Zahn wanted me
8    to be fired and didn't want to work with me as the CFO anymore,
9    I don't care if it's the board who has the ultimate say or
10   Aaron, the practical matter is that if the CEO, who the board
11   has appointed, says, "I don't want to work with this CFO
12   anymore," then they're not going to do anything other.
13   Q.    But ultimately, didn't Mr. Zahn give up some of that
14   control by asking the board for you to be a contracted
15   employee?
16   A.    I don't know what control he gave up.  I don't know --
17   again, I don't know what, from a legal standpoint -- I think
18   there's a difference between the legal aspects of what you're
19   asking -- and, again, I'm not an attorney -- and the practical
20   reality, which is that if the CEO of an organization does not
21   want the CFO of the organization there anymore, the CFO of the
22   organization's not there anymore.
23   Q.    Okay.  And what I'm asking -- I know it's more of a legal
24   question that the judge can consider -- is that on July 3rd,
25   you had this employment agreement that you could take and try

WANNEMACHER - CROSS                                          Vol. 1-72

1    to make some use of, correct?
2    A.    On July 23rd.
3    Q.    23rd of 2019, yes, sir.
4    A.    Correct.
5    Q.    Okay.  And your testimony is you thought you had to go to
6    the Diamond-Salem hearing or you'd suffer an adverse employment
7    action of some sort, correct?
8    A.    Yes.  I would have -- I think -- my belief is that I
9    certainly would have experienced a disciplinary action.  And
10   that disciplinary action could have been carried out by Aaron
11   Zahn independent of any board action.
12   Q.    And that would have been the same if you refused to go to
13   a JEA board meeting.
14              Is that what you said earlier?
15   A.    I believe that that would probably be a career-limiting
16   move for me to just refuse to go to board meetings anymore.
17   Q.    Okay.  And the fear that you had on December 16th of 2019
18   was from a person who had told you that he was either going to
19   resign or be terminated, correct?
20   A.    The fear was not specifically of an individual person.  I
21   believe that I could have received disciplinary action from
22   Aaron Zahn or from the next CEO regardless of -- again, it
23   wouldn't have mattered who -- whether it was Aaron Zahn or
24   somebody else, that kind of public insubordination of a direct
25   instruction would have received disciplinary action, whether it

WANNEMACHER - CROSS                                    Vol. 1-73

1   was Aaron or somebody else, including the board.
2   Q.   And ultimately you were terminated on December 27th of
3   2019 by Ms. Dykes, correct?
4   A.   Correct.
5   Q.   That was before your *Garrity* statement?
6   A.   Correct.
7   Q.   And your *Garrity* interview, I'm assuming, was about
8   whether or not you were going to be terminated for cause or
9   without cause, correct?
10  A.   It was not.
11  Q.   Okay.  I'll stop with that.
12       But ultimately, on December 16th of 2019, did you
13  have an idea that the JEA board was going to be looking into
14  the things that Mr. Diamond and Mr. Salem were asking you about
15  that there -- regardless if you went or did not go to that
16  hearing, that there was going to be a subsequent process where
17  your employment was going to be evaluated?
18  A.   I don't know what I was thinking at that time about what
19  the future JEA board may do post that hearing.
20  Q.   And there was a subsequent process after the Diamond-Salem
21  hearing, correct?
22  A.   Subsequent process of what?
23  Q.   Of an evaluation of your employment with JEA, right?
24  A.   By the board, no.
25  Q.   No, by Ms. Dykes.

WANNEMACHER - CROSS/REDIRECT                           Vol. 1-74

1   A.   By Ms. Dykes, yes.
2   Q.   Yeah, she fired you --
3   A.   She did.
4   Q.   -- on December 27th, right?
5            MR. DUVA:  May I have a moment, Your Honor?
6            THE COURT:  Yes.
7            MR. DUVA:  Nothing further, Your Honor.
8            THE COURT:  All right.  Nothing further from
9   Mr. Duva.
10           Any redirect?
11           MR. FELMAN:  Yes, Your Honor.
12                    REDIRECT EXAMINATION
13  BY MR. FELMAN:
14  Q.   So, Mr. Wannemacher, regardless of what was in your
15  contract, the person who actually fired you was the CEO, not
16  the board, correct?
17  A.   That is correct.
18  Q.   Is there any doubt in your mind that if the CEO had not
19  fired you for failing to show up at Diamond-Salem, that the
20  board would have?
21  A.   No, there's no doubt in my mind.
22  Q.   And you knew that Mr. Zahn had fired other members of the
23  leadership team prior to December 16th?
24  A.   Yes.
25  Q.   And when you went to the meeting on December the 14th, was

WANNEMACHER - REDIRECT                                    Vol. 1-75

1   that a meeting to decide who was going to go to the
2   Diamond-Salem hearing two days later?
3   A.   Well, it was a prep meeting for the hearing.  However, I
4   don't think the express intent of the meeting was to decide who
5   was going to go.  I think what happened was Aaron came and
6   said -- again, I don't remember whether it was "I'm resigning"
7   or "I'm getting fired," but he was no longer going to be the
8   CEO at some point and that Melissa was going to be appointed as
9   the new CEO and that Melissa should not attend.
10  Q.   So you already knew before that meeting that you were
11  going?
12  A.   Yes.
13  Q.   In fact, if we were to look at the public transcript of
14  the December 10th hearing, it would reflect, would it not, that
15  you had already -- your name had already been told to the City
16  Council as someone who would be at the hearing.
17  A.   I believe --
18  Q.   Well, I'll withdraw the question.
19       MR. FELMAN:  Your Honor, I'll just note that at some
20  point in time --
21       THE WITNESS:  Yes.
22       MR. FELMAN:  -- we may either want to play the tape
23  of the December 10th hearing or we may want to draw Your
24  Honor's attention, because there's fairly important stuff here,
25  but I don't think it makes much sense for me to try to cover

WANNEMACHER - REDIRECT                                    Vol. 1-76

1   that with the --
2       THE WITNESS:  The notes to the meeting -- the minutes
3   do state that Councilman Salem listed attendees from JEA that
4   have confirmed attendance, and I'm on that list.
5   BY MR. FELMAN:
6   Q.   So you knew -- in fact, this meeting of December the 14th,
7   that was a meeting of the people that were already determined
8   to be the people that were going to go, along with some others?
9   A.   On the 10th, that was the list that had already been
10  determined, yes.
11  Q.   On the 14th when you-all met, that was basically the
12  meeting of the people that had already been --
13  A.   Yes.
14  Q.   -- decided were going?
15  A.   Yeah.  That's where Ms. Dykes was there.
16  Q.   And then it was at that meeting that it was decided
17  Ms. Dykes would not go?
18  A.   Correct.
19  Q.   And you knew that you could be compelled without a
20  subpoena to --
21       MR. DUVA:  Object as to leading, Your Honor.
22       MR. FELMAN:  Fair enough.  I'll withdraw the
23  question, Your Honor.
24  BY MR. FELMAN:
25  Q.   Did you have an understanding of whether the law of the

WANNEMACHER - REDIRECT                                    Vol. 1-77

1   City of Jacksonville could compel you to show up at a public
2   hearing even though you had not been subpoenaed to go?
3   A.   Again, I was generally aware of the, I guess, Exhibit 51,
4   the ordinances.  I was generally aware.  I did not know the
5   specifics of, you know, under what circumstances and that kind
6   of situation.  But I was generally aware that they could, you
7   know, say, "You need to show up here and answer questions,"
8   yes.
9   Q.   Even without a subpoena?
10  A.   Even without a subpoena, yes.
11  Q.   Had you seen that power be exercised in the past regarding
12  JEA?
13  A.   Yes.
14  Q.   And what --
15  A.   When -- when they were going through the -- the first
16  iteration of the recapitalization conversation in, I think it
17  was, 2018, there were a number of public meetings that were
18  held, and there were threats of subpoena being -- being lobbied
19  about if people did not show up, and compelling people to show
20  up, and, you know, putting them under oath and that sort of
21  thing.
22  Q.   Did you learn through that experience that an employee or
23  particular employees of JEA could be compelled to attend a
24  meeting of City Council without being subpoenaed?
25  A.   Yes.

                                                          Vol. 1-78

1        MR. FELMAN:  Nothing further, Your Honor.
2        THE COURT:  Mr. Duva, anything else?
3        MR. DUVA:  No, Your Honor.
4        THE COURT:  All right.  You can step down,
5   Mr. Wannemacher.
6        THE WITNESS:  Should I take all these with me or --
7        MR. DUVA:  No.
8        THE COURT:  Leave them there.
9        MR. FELMAN:  Just leave them up there, yeah.
10       Now, Your Honor, I did -- I did want to ask,
11  ordinarily when we're doing a trial, we'd be giving the
12  exhibits that are in and putting them up on the table.  Now,
13  all the exhibits are already admitted into evidence.
14       Would you still prefer that when we use an exhibit,
15  that we put it up at counsel table or we just take them back
16  with us?
17       THE COURT:  The table would be fine.  Whatever works
18  for you.  I mean --
19       MR. FELMAN:  Well, some of these are yours, Mr. Duva.
20  I'll just set them up here.
21       So we will call Lynne Rhode next, Your Honor.
22       THE COURT:  Very well.
23       (The witness entered the courtroom.)
24       THE COURT:  Come forward, ma'am.
25       COURTROOM DEPUTY:  If you'd please step into the

RHODE - DIRECT                                          Vol. 1-79

1   witness box.  Remain standing to be sworn in.

2             Raise your right hand.

3             Do you solemnly swear or affirm that the testimony

4   you're about to give before this Court will be the truth, the

5   whole truth, and nothing but the truth, so help you God?

6             THE WITNESS:  I do.

7             COURTROOM DEPUTY:  Please be seated and state your

8   name for the record and spell your last name.

9             THE WITNESS:  Lynne Rhode, R-h-o-d-e.

10            MS. LICANDRO:  May it please the Court, Your Honor?

11            THE COURT:  Yes, ma'am.

12        LYNNE RHODE, DEFENDANT WANNEMACHER'S WITNESS, SWORN

13                     DIRECT EXAMINATION

14  BY MS. LICANDRO:

15  Q.   Good afternoon, Ms. Rhode.

16  A.   Good morning.

17  Q.   Ms. Rhode, were you assigned to JEA on or about

18  December 16th, 2019?

19  A.   I was.

20  Q.   In your role as an attorney for JEA, did you become aware

21  of the public meeting being called by Council Members Diamond

22  and Salem that was to take place on December 16, 2019?

23  A.   Yes.

24  Q.   How did you learn about it?

25  A.   I believe I was told about it by Lawsikia Hodges, first,

RHODE - DIRECT                                          Vol. 1-80

1   who was my direct supervisor at OGC.

2   Q.   Leading up to the Diamond-Salem hearing, did you have any

3   conversation with Ryan Wannemacher about his attendance at the

4   hearing?

5   A.   Yes.  Maybe the day before.

6   Q.   And what was the substance of that conversation?

7   A.   Just asking around who was going to go, and he said yes,

8   he needed to go there.

9   Q.   Did he indicate he had to go?

10  A.   Yes.

11  Q.   On the day of the Diamond-Salem hearing, did you initially

12  go to the hearing?

13  A.   No.

14  Q.   Why not?

15  A.   Because I'd been told by Jason Gabriel, the general

16  counsel, and Lawsikia Hodges, my direct supervisor, not to

17  attend.

18  Q.   Did you ultimately attend that hearing?

19  A.   I did.  I was in another meeting, which they had asked me

20  to cover, and I got a phone call from Jason Gabriel telling me

21  to come -- come to the hearing maybe 20, 30 minutes after it

22  started.

23  Q.   Did you feel compelled to go to the hearing once

24  Mr. Gabriel called you?

25  A.   Yes.

RHODE - DIRECT                                     Vol. 1-81

1   Q.   When you arrived at the hearing, was there a seat
2   designated for you with your nameplate?
3   A.   Yes.  At the very front of the room.
4        MS. LICANDRO:   And if I can show the witness Defense
5   Exhibit 129.
6   BY MS. LICANDRO:
7   Q.   Is this an accurate depiction of the room?
8   A.   Yes.
9   Q.   And, Ms. Rhode, was the seat designated for you actually
10  next to Mr. Wannemacher's seat?
11  A.   Yes.
12  Q.   And, Ms. Rhode, once Jason Gabriel called you and directed
13  you to go to the Diamond-Salem hearing, did you believe that
14  you would be fired or otherwise suffer some sort of adverse
15  employment consequence if you failed to attend?
16  A.   Yes.  I believed that there was a lot of attention and
17  potential negative consequences.  I didn't know what that would
18  be, but yes.  When he called me, it was very clear I had to go.
19  Q.   How would you generally describe the environment around
20  JEA, specifically the senior leadership team, around that time
21  period?
22  A.   Extremely tense.  Everyone was under tremendous scrutiny
23  and feeling a lot of pressure because of a lot of media
24  coverage, very, very -- very, very intense and negative media
25  coverage about JEA and the procurement process that was ongoing

RHODE - DIRECT                                     Vol. 1-82

1   and the Performance Unit Plan.
2        All of that created sort of a political maelstrom
3   that everyone felt very caught up in.  And I don't think there
4   was anyone in senior management or at the Office of General
5   Counsel who had been involved with JEA who wasn't feeling
6   incredibly stressed.
7   Q.   And to be clear, would that include Mr. Wannemacher as
8   well?
9   A.   Yes.
10  Q.   Ms. Rhode, do you believe that Mr. Wannemacher would have
11  been terminated from JEA or otherwise suffer an adverse
12  employment consequence if he did not attend the Diamond-Salem
13  hearing?
14       MR. DUVA:   I'm going to object as to foundation, how
15  Ms. Rhode could know this.
16       THE COURT:   Lay a foundation if you can.
17  BY MS. LICANDRO:
18  Q.   Ms. Rhode, having attended the Diamond-Salem hearing, do
19  you have a perception as to whether others were required to
20  attend that hearing?
21       MR. DUVA:   Objection.  Foundation and not relevant as
22  to what Ms. Rhode thought.
23       MS. LICANDRO:   Your Honor, I would submit this is a
24  relevant lay opinion under 701.  It's a witness who was there,
25  so she has a rational basis for her perception, and it's also

RHODE - DIRECT                                    Vol. 1-83

```
 1  helpful to understanding the issues before the Court.
 2        THE COURT:  Well, I think she can testify as to what
 3  her concerns were, but I'm not sure whether she can testify as
 4  to what Mr. Wannemacher was thinking.
 5        Is that what your question is?
 6        MS. LICANDRO:  My question is if she believed that
 7  Mr. Wannemacher would suffer adverse consequences had he not
 8  attended.
 9        MR. DUVA:  I don't see the relevance of that, Your
10  Honor, as to either his subjective intent or whether it's
11  objectively reasonable.  I think Ms. Licandro, if she wants to
12  examine Ms. Rhode about the conditions of his employment that
13  she knew about, like his employment agreement or something like
14  that, that's fair, but not as to what other people are thinking
15  about whether or not they're going to lose their jobs.
16        Both individuals worked for different entities at
17  that time.
18        MS. LICANDRO:  And, Your Honor, as Mr. Duva pointed
19  out, the Office of General Counsel was the legal entity
20  representing JEA, the entity that Mr. Wannemacher was employed
21  by at the time.
22        THE COURT:  Sustained.
23        MS. LICANDRO:  Your Honor, may I have a moment?
24        Nothing further at this time.
25        THE COURT:  All right.
```

RHODE - CROSS                                     Vol. 1-84

```
 1                    CROSS-EXAMINATION
 2  BY MR. DUVA:
 3  Q.   Good morning, Ms. Rhode.  And we've met multiple times,
 4  correct?
 5  A.   Yes.
 6  Q.   Okay.
 7        MR. DUVA:  And I'm just going to retrieve an exhibit.
 8  BY MR. DUVA:
 9  Q.   We're not going to cover this in great depth, Ms. Rhode,
10  but I'm handing you what is Exhibit 2OFF, and it is the council
11  auditor email and memo dated November 18th, 2019, that
12  Mr. Billy, the council auditor, sent to all council members
13  regarding the Performance Unit Plan.
14        MR. DUVA:  And if we could publish page 1 of that
15  exhibit and highlight the email.
16        This is just for record purposes, Your Honor.
17  BY MR. DUVA:
18  Q.   I know you're not a party to this email, Ms. Rhode, but
19  does it appear, based on the email and the attachment, that
20  this is Mr. Billy publishing the council auditor's memo dealing
21  with the Performance Unit Plan on November 18th of 2019?
22        MS. LICANDRO:  Your Honor, I would object to beyond
23  the scope and also relevance and speculation.
24        MR. DUVA:  It gets to the point of the Diamond-Salem
25  hearing.  And also there are some aspects of the line of
```

RHODE - CROSS                                      Vol. 1-85

1   questions I'd like to ask Ms. Rhode about her own employment
2   that is sort of part of the overall analysis of what she was
3   actually thinking on that day as to her continued employment
4   with the Office of General Counsel.
5            THE COURT:  All right.  Mr. Duva, I'll allow you some
6   latitude on it.  Go ahead.
7            MR. DUVA:  And I'm not going to cover the memo in
8   great detail.
9            If we could publish the next page.
10  BY MR. DUVA:
11  Q.   Ms. Rhode, did you become familiar with this memo, the
12  council auditor memo, dated November 18th of 2019?
13  A.   Not really.
14  Q.   Did you become aware that it had been published?
15  A.   Yes.
16  Q.   When?
17  A.   I believe the first time one of the newspaper articles
18  came out about it.
19  Q.   Did you read the memo after you saw the news accounting of
20  it?
21  A.   Just -- just took a quick look at it.  I did not read it
22  in depth.
23  Q.   I'm sorry?
24  A.   I did not read it in depth.
25  Q.   Okay.

RHODE - CROSS                                      Vol. 1-86

1            MR. DUVA:  If we can publish the bottom of the
2   following page.
3   BY MR. DUVA:
4   Q.   There is a portion of the memo -- and we'll cover this
5   more with other witnesses -- that sets forth the costs of the
6   plan in connection with recapitalization; is that right?
7   A.   That's what it looks like.
8   Q.   And I'm not asking you to agree or disagree with the math.
9   I'm just simply illustrating that it's present.
10           So after reading news accounts of this, were those
11  news accounts before the Diamond-Salem hearing on December 16th
12  of 2019?
13  A.   Yes, I believe so.
14  Q.   Okay.  Now, you were -- as Ms. Licandro asked you, you
15  were the lawyer for the Office of General Counsel that was
16  assigned to JEA during all of the strategic planning.
17  A.   Correct.  I was one of two OGC lawyers.
18  Q.   And the other was Miriam Hill?
19  A.   Correct.
20  Q.   And you attended board meetings, correct?
21  A.   Yes.
22  Q.   Including June and July of 2019 board meetings?
23  A.   Yes.
24  Q.   So you were privy to the scenario-based planning and the
25  presentation of scenario 2, the traditional utility response,

RHODE - CROSS                                    Vol. 1-87

1   correct?
2   A.   Yes.
3   Q.   And also the presentation of scenario 3, the
4   non-traditional utility response on July 23rd of 2019?
5   A.   Correct.
6   Q.   Now, you worked on -- did you do any work on the formula
7   itself with respect to the --
8        MS. LICANDRO:   Your Honor, I would object that this
9   has gone way beyond the scope of direct.
10       MR. DUVA:   I think it gets to -- in terms of --
11  again, she's ultimately terminated by Jason Gabriel, and I
12  think it gets to the why, is what I'm trying to get to, not
13  just about going to Diamond-Salem hearing or not going there,
14  but there's other things that are afoot after the council
15  auditor's memo, and I'm going to ask her some questions about
16  some newspaper reportings about it --
17       THE COURT:   Why don't you do that, then, Mr. Duva,
18  and just get to the why.
19  BY MR. DUVA:
20  Q.   The point I'm trying to make, Ms. Rhode, is you were
21  involved with the Performance Unit Plan in some way, correct?
22  A.   I was involved in the Office of General Counsel legal
23  review of the Performance Unit Plan, that's right.
24       And I was not terminated.   I resigned.
25  Q.   Sorry.   You resigned.

RHODE - CROSS                                    Vol. 1-88

1   A.   Yes.
2   Q.   Thank you for correcting me.
3        And we're going to get to that and kind of the
4   timeline.
5   A.   Okay.
6   Q.   But, Ms. Rhode, in the work that you did on the
7   Performance Unit Plan, did you have any viewpoint that it was
8   actually going to be connected to a recapitalization event?
9        MS. LICANDRO:   Your Honor, again, objection.   This is
10  beyond the scope.
11       MR. DUVA:   Your Honor, part of the hearing, too,
12  is -- I mean, we could call Ms. Rhode back, but --
13       THE COURT:   Well, we are --
14       MR. DUVA:   Can we approach?
15       THE COURT:   Sure.
16            *  *  *  *  *
17  (Sidebar No. 2 sealed and under separate cover.)
18            *  *  *  *  *
19  BY MR. DUVA:
20  Q.   Ms. Rhode, going back to the question of before the
21  council auditor's memo that came out, which is Exhibit 20FF,
22  did you have any -- did you believe that the Performance Unit
23  Plan was tethered to or connected to recapitalization such that
24  it could be funded at these levels?
25  A.   No.

RHODE - CROSS                                    Vol. 1-89

1   Q.   Okay.  So when the council auditor's memo came out and you
2   read newspaper articles about it, that would have been after
3   November 18th, 2019, but before the Diamond-Salem hearing,
4   correct?
5   A.   Correct.
6   Q.   And there was a lot of media scrutiny about the
7   Performance Unit Plan and what it was after the council
8   auditor's memo, and there were a number of newspaper articles
9   about it, correct?
10  A.   Yes.
11  Q.   And there was a newspaper article on December 4th -- I
12  don't have it marked -- of 2019, and it had writing about you
13  in it, correct?
14  A.   Yes.
15  Q.   Can you tell the Court what that was and what, in essence,
16  bothered you about it?
17       In other words, the reporting in the article -- I'm
18  sorry I don't have it in front of me -- or in front of you.
19  But the best that you can recall, I'm not trying to hold you to
20  line by line or anything like that, but talk about that news
21  story and the subsequent conversation that you had with Jason
22  Gabriel.
23  A.   As I recall, the news story was about a memo to self that
24  Mr. Gabriel had written a few weeks prior in November that
25  he -- he had put in a drawer, which essentially disclaimed his

RHODE - CROSS                                    Vol. 1-90

1   very intimate knowledge of, involvement with, discussions on,
2   and legal scrutiny of both the ITN process and the Performance
3   Unit Plan.
4        He had had daily meetings with Mr. Zahn.  He had had
5   a lot of communication, a lot of involvement in the entire
6   process of analyzing both the ITN process and the PUP,
7   including very detailed redlining of the entire PUP plan
8   document package before it went to the board.
9        And in this memo, however, which was right around the
10  time where there was very salacious one-sided media coverage
11  coming out, he wrote a memo to himself essentially saying he
12  knew nothing about any of this.
13       I mean, that's my very, very 10,000-foot description
14  of a memo that was written more than three years ago.
15       MR. DUVA:  I'm going to approach with 20AA-5.
16       And if you can publish that.
17  BY MR. DUVA:
18  Q.   And as that's coming up, Ms. Rhode, is that the memo that
19  you're talking about?
20  A.   I believe so.
21  Q.   Okay.
22  A.   So what happened was, my understanding --
23  Q.   Hold on.
24  A.   I'm sorry.
25  Q.   So the date of this is November 12th, 2019.

RHODE - CROSS                                          Vol. 1-91

1           That's before the council auditor memo in 20FF that
2    we looked at that came out on November 18th of 2019, correct?
3    A.   Yes, this is dated November 12th, correct.
4    Q.   Okay.  So this is a memo to the file that Jason Gabriel
5    wrote.
6           Did you see this at the time on November 12th, 2019?
7    A.   No.  The first time I knew of its existence was when he
8    gave it to the news media and it was published in an article on
9    December 4th -- or maybe the memo wasn't published, but it was
10   described.
11   Q.   So -- and I'll try to kind of get to the point.
12          You took issue with some things that were in that
13   memorandum and the way they were portrayed in the December 4th,
14   2019, article?
15   A.   Yes.  My recollection was I felt scapegoated by
16   Mr. Gabriel in that article.
17   Q.   And so that was before the Diamond-Salem hearing, correct?
18   A.   Correct.
19   Q.   And so you and Mr. Gabriel were sort of at odds about that
20   in terms of what was reported in the story and your viewpoint
21   about what was contained in this November 12th, 2019, memo,
22   correct?
23   A.   I hadn't thought we were until that article came out on
24   December 4th.
25   Q.   Okay.

RHODE - CROSS                                          Vol. 1-92

1    A.   Yeah.
2    Q.   So moving forward, Mr. Gabriel and Lawsikia Hodges, who is
3    also a lawyer at the Office of General Counsel, initially told
4    you not to go to the Diamond-Salem hearing, correct?
5    A.   Yes.
6    Q.   Okay.
7           MR. DUVA:  And if we could publish Exhibit 46A.
8    BY MR. DUVA:
9    Q.   Now, Ms. Rhode, this is a letter from Councilman Salem and
10   Councilman Diamond to Mr. Zahn dated the 25th of 2019.
11          Do you see that?
12   A.   Yes.
13   Q.   Were you aware of this at the time the letter was sent to
14   Mr. Zahn?
15   A.   I don't believe so.
16   Q.   Have you seen that letter before?
17   A.   I'm not sure.
18   Q.   Okay.  You can put that to the side.
19          How did it come about that Mr. Gabriel and Ms. Hodges
20   decided that you -- or communicated to you that you were not
21   going to go to the Diamond-Salem hearing initially?
22   A.   There was another meeting that I believe needed OGC
23   coverage, and they told me that they would be at the
24   Diamond-Salem hearing, and since they had essentially the same
25   knowledge I had, that I wouldn't need to attend and I should

RHODE - CROSS                                          Vol. 1-93

```
 1  instead cover -- I believe it was a meeting related to the ITN
 2  process at JEA.
 3  Q.   And that was that same day?
 4  A.   Correct.
 5  Q.   So Mr. Gabriel decided -- and you say "they."  I just want
 6  to make sure it's clear.  He and Lawsikia Hodges were going to
 7  go to Diamond-Salem, and you were going to an ITN meeting that
 8  same day, December 16, 2019, with respect to JEA?
 9  A.   Correct.
10  Q.   Okay.  So we all know that you weren't at the
11  Diamond-Salem hearing initially.
12       Have you -- you weren't privy to Mr. Diamond asking
13  Mr. Gabriel where you were, correct?
14       I mean, you were not there, so you were on the other
15  end of a phone call.  You don't know how that request
16  originated, correct?
17  A.   Only since when I've seen clips and transcript clips.
18  Q.   Okay.  So you, on the back end, became aware that
19  Mr. Diamond was asking Mr. Gabriel where you were, correct?
20  A.   Correct.
21  Q.   And he was doing that on the back end -- or you're putting
22  this together at the back end that Mr. Diamond is the one that
23  wanted you there to answer questions about the Performance Unit
24  Plan?
25  A.   Yes.
```

RHODE - CROSS                                          Vol. 1-94

```
 1  Q.   And when Mr. Gabriel told you to come to the hearing, you
 2  came.  And it was about -- I think it was about minute 55 of
 3  the hearing.  And then later in the hearing, you asked -- you
 4  answered questions about the Diamond-Salem -- I'm sorry, you
 5  answered questions about the PUP?
 6  A.   That's right.
 7  Q.   Okay.  And you were -- other than Mr. Gabriel telling you
 8  to be there, you weren't under a subpoena or anything like
 9  that?
10  A.   I was not under subpoena.
11       MR. DUVA:  Let's go to ...
12  BY MR. DUVA:
13  Q.   As an OGC lawyer, are you aware of any municipal code
14  provisions that if an ad hoc committee of the City Council
15  wants to ask you questions, whether or not you're compelled or
16  required to be there?
17  A.   Only what you showed me.
18  Q.   So you didn't know --
19       MR. DUVA:  If we can show Exhibit 50 -- I'm sorry.
20  Not 50.  53.
21       Sorry, 51.  My fault.  51.
22  BY MR. DUVA:
23  Q.   So I'm not going to get too far into this, but as to
24  provision 602.1205 and 602.1206, you were not specifically
25  aware of these provisions in the municipal code at the time you
```

RHODE - CROSS                                      Vol. 1-95

1   went to the Diamond-Salem hearing?
2   A.   No, I don't believe I was.
3   Q.   Okay.  You can put that to the side.
4        MS. LICANDRO:  And, Your Honor, we'd just ask if that
5   was the version that was in effect at the time.
6        MR. DUVA:  I believe so, but I'll check on that.
7        THE COURT:  All right.
8        MR. DUVA:  Since she said she wasn't aware, I just
9   wanted to show her the sections.
10  BY MR. DUVA:
11  Q.   So after the December 4th article in the news media about
12  the PUP and the disagreement that you had with Mr. Gabriel, was
13  it in your mind that regardless of Diamond-Salem, that your
14  employment with OGC was going to be evaluated?
15  A.   Not at the time.  I talked with Jason the night that the
16  article came out, December 4th.  I called him to ask him what
17  was going on.  And he was extremely upset, screaming, very,
18  very -- sort of beside himself with stress, et cetera, but --
19  Q.   And this was on December 4th?
20  A.   It was.
21  Q.   Okay.  Go ahead.
22  A.   Said he was under tremendous pressure by the media,
23  et cetera.  But he ultimately ended that conversation saying
24  that he had my back and he understood why I was upset.
25        So I would -- you know, there was definitely a very

RHODE - CROSS                                      Vol. 1-96

1   bad feeling that I had coming out of that, but it wasn't -- I
2   wasn't at that point thinking that I was going to lose my job.
3   Q.   Okay.  And after the Diamond-Salem hearing, was it
4   December 18th of 2019 where you had a meeting with Lawsikia
5   Hodges and Sean Granat, or did I get the date wrong?
6   A.   I think it was the 19th.
7   Q.   Of December?
8   A.   But it was two or three days after the hearing.
9        Yes, of December, correct.
10  Q.   And when you got into the meeting with Ms. Hodges and
11  Mr. Granat, were they asking questions about your knowledge of
12  the Performance Unit Plan with respect to how it came about and
13  what it was and topics like that?
14  A.   Yes.  It was -- it was supposed to be a meeting about the
15  ITN that was a regularly scheduled meeting, but when I showed
16  up, I got shown into a conference room, which was strange, and
17  I waited for 30, 40 minutes before they came in.
18        And then it was Lawsikia, Sean Granat, and Jon
19  Phillips.  And they all three came in and sat down across from
20  me at a table and then immediately -- they said, "We're not
21  talking about the topic," and immediately started asking me
22  about the hearing and the PUP, that kind of thing.
23  Q.   You talked about the PUP?
24  A.   Yes.
25  Q.   Okay.  And what happened after -- at what point did you

RHODE - CROSS                                    Vol. 1-97

```
 1  leave the meeting and effectively resign?
 2  A.   They began -- I was trying to have a reasonable
 3  conversation, and they made it very clear that every time I
 4  brought up the fact that the entire Office of General Counsel
 5  team, including Mr. Gabriel and Ms. Hodges, had been in every
 6  meeting and more than I was and that they were very intimately
 7  involved, they kept changing the subject and tried to imply
 8  that it was only me.
 9          And so I realized very quickly what was happening.
10  So maybe an hour in, I -- maybe not even that long, maybe 45
11  minutes, I said, "I resign effective immediately," and they
12  escorted me out.
13  Q.   And when you say essentially everyone knew, are you
14  talking about the Performance Unit Plan?  Is that the substance
15  of the discussion?
16  A.   There was some discussion about the ITN process as well,
17  but it was primarily -- what I recall, primarily about the
18  Performance Unit Plan.
19  Q.   Okay.
20          MR. DUVA:  I'm going to approach with one more
21  exhibit.  This is 43B.  And this is Mr. Wannemacher's
22  employment agreement with JEA.
23  BY MR. DUVA:
24  Q.   Now, look at page 11.
25          MR. DUVA:  Publish page 11 of 43B.
```

RHODE - CROSS                                    Vol. 1-98

```
 1          Thank you.
 2  BY MR. DUVA:
 3  Q.   Did you sign this document, ma'am?
 4  A.   Yes.
 5  Q.   Did you prepare it?
 6  A.   No.
 7  Q.   Did you review it before you signed it?
 8  A.   Yes.
 9  Q.   And going back to page 1, this is an employment agreement
10  for Ryan Wannemacher as the CFO for JEA, correct?
11  A.   Correct.
12  Q.   And it sets forth -- there's a number of "whereas"
13  clauses.  And if you look at the second one from the bottom of
14  page 1, it says, "Whereas, the board is tasked with appointing
15  a chief financial officer to operate the eighth largest
16  community-owned electric utility company in the United
17  States ..." and then it goes on, correct?
18  A.   Correct.
19  Q.   Okay.  So there are also termination provisions on page 4.
20          Can you look at those?
21  A.   (Complies.)
22  Q.   Do you see those, ma'am?
23  A.   I do.
24  Q.   Okay.  We're not going to get into those specifically
25  other than were you aware of kind of the general nature of the
```

RHODE - CROSS                                          Vol. 1-99

```
 1  contract when you signed it?
 2  A.   Yes.
 3  Q.   So going back to the July 23rd, 2019, board meeting, was
 4  this actually an idea of Mr. Zahn to have additional contracted
 5  employees with the City of Jacksonville?
 6  A.   I don't know whose idea it was.
 7  Q.   But ultimately at that meeting, these employment
 8  contracts -- which you attended -- these employment contracts
 9  were agreed to by the board, correct?
10  A.   I believe so, yes.
11  Q.   So that took JEA from having one contracted employee,
12  Mr. Zahn, the day before, to about 11 contracted employees,
13  including Mr. Wannemacher?
14  A.   Okay.  I don't recall the number, but that sounds --
15  Q.   You're not disputing the number?
16  A.   No.
17  Q.   Okay.  So ultimately, for whatever reason, we'll kind of
18  take Diamond-Salem out of the mix, if Mr. Zahn wanted to
19  terminate Mr. Wannemacher, then that agreement that you're
20  holding would have to be contended with in some way, correct?
21  A.   Yes.
22  Q.   And would you expect, since Mr. Wannemacher had an
23  employment contract, if Mr. Zahn wanted to terminate him, that
24  he would have had to consult the JEA board and ultimately the
25  OGC would have been consulted based on that agreement?
```

RHODE - CROSS                                          Vol. 1-100

```
 1       MS. LICANDRO:  Objection.  Speculation.
 2       MR. DUVA:  She signed the agreement, Your Honor.
 3  She's familiar with it.
 4       THE COURT:  Do you know?
 5       THE WITNESS:  I believe the Office of General Counsel
 6  would have been involved, yes, if there were an attempted
 7  termination.
 8  BY MR. DUVA:
 9  Q.   And that's typical of City employees that have contracts
10  with the City of Jacksonville, correct?
11  A.   I believe so.
12       MR. DUVA:  Nothing further, Your Honor.
13       THE COURT:  Redirect?
14       MR. SUAREZ:  Your Honor, may I cross-examine the
15  witness?
16       THE COURT:  Yes.
17       MR. SUAREZ:  Thank you, Your Honor.  May it please
18  the Court.
19       THE COURT:  Yes, sir.
20              CROSS-EXAMINATION
21  BY MR. SUAREZ:
22  Q.   Good afternoon, Ms. Rhode.  My name is Eddie Suarez.
23       We haven't met before, right?
24  A.   No, we have not.
25  Q.   I have questions on one specific area you were asked
```

RHODE - CROSS                                              Vol. 1-101

1    about.
2    A.    Okay.
3    Q.    You were asked around July 23rd of 2019, when the board
4    approved moving forward with exploring recapitalization and
5    approved Resolution 29-10 [verbatim] for the creation of the --
6    what became known as the Performance Unit Plan, and you were
7    asked whether or not that was tethered to the recapitalization.
8          And I believe your answer was no; is that right?
9    A.    I believe the question was whether I had an awareness of
10   the numbers that were -- he was showing on the board at the
11   time, and my answer was I don't believe so.
12   Q.    Okay.  So let's just kind of go back to around that.
13         Prior to the July 23rd, 2019, meeting, there'd been a
14   number of meetings with lawyers from -- I think you said
15   Mr. Gabriel was involved.  Other lawyers from OGC were
16   involved.  And, in fact, OGC had engaged and was in dialogue
17   with outside specialized counsel.
18   A.    Correct.
19   Q.    And these were really talented lawyers, right?  We had
20   lawyers from Foley Lardner.
21         Mr. Hyde was one of the lawyers?
22   A.    Correct.
23   Q.    And, in fact, he was present at the July 23rd, 2019, board
24   meeting, correct?
25   A.    Yes.

RHODE - CROSS                                              Vol. 1-102

1    Q.    And Pillsbury had also been engaged.
2    A.    Yes.
3    Q.    And they're a New York-based international firm with
4    thousands -- over a thousand lawyers?
5    A.    I believe so.
6    Q.    And, in fact, the resolution itself, 2019-10, was drafted
7    by one of their lawyers, Jessica Lutrin, correct?
8    A.    Yes.
9    Q.    And you and Mr. Gabriel, folks at OGC reviewed that
10   resolution before it was presented to the board?
11   A.    Yes.
12   Q.    Okay.  And all of this was happening at the same time as
13   the SLT, the senior leadership team, with input from the
14   lawyers, was exploring this idea if the board approved it, of
15   looking at the options that JEA had going forward into the
16   future, including the possibility of recapitalization?
17   A.    That's correct.
18   Q.    And there was some understanding that should there be a
19   recapitalization event, that could impact the Performance Unit
20   Plan?
21   A.    There was language about truncating the performance
22   period.
23   Q.    That's right.
24   A.    Yes.
25   Q.    And then determining the value of the Performance Unit

1    Plan on July 23rd of 2019 would have required knowing things
2    that at that time were unknown.  For example, what would be the
3    amount -- would there -- would anybody bid on this -- on JEA to
4    begin with; but if yes, what would be the amount that somebody
5    was willing to pay if they were going to buy JEA.  That was an
6    unknown.  That would impact the value of the PUP.  Correct?
7    A.  I believe so, yes.
8    Q.  And then there were other things like the debt of JEA.
9    There were things that -- like the value of the power purchase
10   agreement with Vogtle, that could ultimately impact what was
11   generated --
12           MR. DUVA:  I'm going to object.
13   BY MR. SUAREZ:
14   Q.  -- in the sale and --
15           MR. DUVA:  Your Honor, I'm going to object.  Is a
16   question coming?
17           And also, what's the relevance of JEA's debt and
18   Plant Vogtle and things like that?
19           All I asked Ms. Rhode was did she understand the
20   formula or had any belief that the formula was going to spit
21   out numbers that the council auditor talked about.  That's the
22   one question that was asked.  I think now this line of
23   questioning is going beyond that.
24           THE COURT:  Mr. Suarez?
25           MR. SUAREZ:  Your Honor, I'm just explaining --

1    having Ms. Rhode explain her answer of "no" is based on a whole
2    lot of factors, including what was unknown on July 23rd of
3    2019, which leads her to conclude that she doesn't know the
4    values.  And I don't disagree with that.  There's lots of
5    reasons why she -- no one could possibly know the values on
6    July 23rd of 2019.
7           And these unknowns are critical in framing her view
8    and the SLT, the senior leadership team, members and the
9    various lawyers that were working on this on July 23rd.
10          And that's why I think it's important that that all
11   be set forth before the Court and not just a simple answer
12   "no."
13          THE COURT:  Go ahead, Counsel, but kind of succinctly
14   as you can --
15          MR. SUAREZ:  I will, Your Honor.  I'll button it up.
16          THE COURT:  Yeah.
17   BY MR. SUAREZ:
18   Q.  The bottom line, Ms. Rhode, is you knew, as did the senior
19   leadership team and the other lawyers, you knew on July 23rd of
20   2019, that there was an awful lot of work to be done --
21   A.  Correct.
22   Q.  -- on this Performance Unit Plan and the ITN?
23   A.  Correct.
24   Q.  And you knew that determining the values of the
25   Performance Unit Plan would be a very complex thing, depending

RHODE - RECROSS/REDIRECT/RECROSS                    Vol. 1-105

1  on lots of possibilities that no one could possibly have known
2  on July 23rd of 2019.  They needed to be worked out as the
3  program got finalized.
4          Is that accurate?
5  A.  Yes.
6          MR. SUAREZ:  Thank you very much.
7          Thank you, Your Honor.
8          THE COURT:  Uh-huh.
9          Counsel?
10                 REDIRECT EXAMINATION
11 BY MS. LICANDRO:
12 Q.  Ms. Rhode, now that we've reviewed Mr. Wannemacher's
13 employment agreement, do you believe that Mr. Zahn or the JEA
14 board could have terminated Mr. Wannemacher on December 16th,
15 2019, if he disobeyed Mr. Zahn's instruction to be there?
16 A.  Yes.
17         MS. LICANDRO:  I have nothing further.
18                 RECROSS-EXAMINATION
19 BY MR. DUVA:
20 Q.  Ms. Rhode, however, there would have been a process,
21 because of the employment agreement, for the JEA board to
22 evaluate Mr. Wannemacher's continued employment, based on the
23 employment agreement?
24 A.  I believe so.  I don't know what the parameters of the for
25 cause are, and I don't know how that's divided between the CEO

RHODE - RECROSS                                     Vol. 1-106

1  and the board.  At this time, I don't recall.  But there would
2  have been some process, depending on whether this was
3  insubordination or anything else, that would be considered for
4  cause.  I don't know what this process would be at this time.
5  Q.  So because of that, this was not Aaron Zahn's call alone.
6          If Mr. Wannemacher said, "I'm not going to the
7  Diamond-Salem hearing," Mr. Zahn was not the sole arbiter of
8  whether he continued his employment with JEA, correct?
9  A.  I don't recall if it was Mr. Zahn or the board's for-cause
10 prerogative to fire Mr. Wannemacher.  I -- I don't remember.  I
11 could review it, but I don't remember.
12 Q.  Is Mr. Zahn discussed anywhere in that contract as having
13 that opportunity?
14 A.  It just says "JEA."  I don't know what "JEA" refers to.  I
15 don't recall.
16 Q.  And the first page talks about JEA as an entity, and then
17 the second "whereas" clause talks about the JEA board
18 appointing the CFO, correct?  The "whereas" clause second from
19 the bottom?
20 A.  It does say the board is tasked with appointing, correct.
21 Q.  Okay.  I want to ask you one question about the formula of
22 the Performance Unit Plan.
23         Mr. Suarez was asking you, there's all this work to
24 be done, it was undetermined.
25         But, in essence, the formula was final as of

RHODE - RECROSS                                          Vol. 1-107

```
 1  July 23rd, 2019, correct?
 2  A.   The formula for determining what the payout was --
 3  Q.   Yes.
 4         The formula and how it worked --
 5  A.   -- in the plan documents?
 6  Q.   -- was final.
 7         It was an attachment in the resolution, correct?
 8  A.   The plan documents were attached.  I don't -- the
 9  direction of the board was to continue to work on the plan.  I
10  don't know if that would have resulted in anything changing.
11  Q.   I'll be more precise about it.
12         MR. DUVA:  I'm going to get 20P-5.  This will be the
13  last exhibit.
14         MS. LICANDRO:  I'm sorry, Mr. Duva.  I didn't hear
15  the exhibit number.
16         MR. DUVA:  20P-5.
17         MS. LICANDRO:  Thank you.
18         MR. DUVA:  If we can publish 20P-5.
19  BY MR. DUVA:
20  Q.   Ms. Rhode, this is the resolution 2019-10, correct?
21  A.   Yes.
22  Q.   And I should have put that in front of you without asking
23  questions first, so I apologize for that.
24  A.   That's fine.  It's been a long time.
25  Q.   It's been a while.
```

RHODE - RECROSS                                          Vol. 1-108

```
 1         MR. DUVA:  I've got the wrong book here.
 2  BY MR. DUVA:
 3  Q.   If you can go to -- now, page 1, that's the resolution
 4  itself, correct?
 5  A.   Yes.
 6  Q.   And there is an Exhibit 1 which has definitions beginning
 7  on -- it's page 4 of the exhibit; is that right?
 8  A.   Yes.
 9  Q.   Okay.  And then on page 9 of the exhibit, which is
10  Exhibit 2 -- I'm sorry, Exhibit 2 to the resolution, that's
11  the -- in essence, the redemption price schedule, 2019
12  redemption price schedule, correct?
13  A.   Correct.
14  Q.   And so there's -- there's different terms used:  Base year
15  value, challenge value target, current year value, value change
16  percentage, and threshold value target, correct?
17  A.   Yes.
18  Q.   So that's, in essence, the formula, isn't it?
19  A.   Yes.
20  Q.   Okay.  I'm getting there.
21  A.   Okay.
22  Q.   And my question is -- it's a real high-level one -- that
23  never changed, did it?
24  A.   Between when the resolution was approved and --
25  Q.   Yes.
```

RHODE - RECROSS                                                    Vol. 1-109

1   A.   -- the process was terminated?

2   Q.   I'll clean it up.

3           Between when the resolution was approved on

4   July 23rd, 2019, and when Mr. Gabriel wrote the memo that you

5   looked at earlier and had the back-and-forth with Aaron Zahn on

6   November 20th, 2019, that formula stayed the same?

7   A.   I -- yeah.  I don't -- I don't remember it changing,

8   so ...

9           MR. DUVA:  Nothing further, Your Honor.

10          THE COURT:  Anything else, Counsel?

11          MR. SUAREZ:  Your Honor, may I have a moment to just

12  confer briefly?

13          THE COURT:  Sure.  Sure.

14          MR. SUAREZ:  I have no further questions, Your Honor.

15  Thank you.

16          THE COURT:  Anything else, Counsel?

17          MS. LICANDRO:  No, Your Honor.

18          THE COURT:  You can step down.

19          Who's your next witness?

20          MR. FELMAN:  I don't have another witness, Your

21  Honor.  My suggestion was if you give me maybe two or three

22  minutes to just talk about that transcript that I had mentioned

23  that I wasn't going to address with my client, then I think

24  that would probably conclude our remarks with respect to

25  Diamond-Salem.

                                                                  Vol. 1-110

1           THE COURT:  Okay.  Excellent.  All right.

2           MR. FELMAN:  So, Your Honor, Exhibit 124 -- and I

3   don't have an extra copy, but we'll -- and we're going to brief

4   this, but I just wanted to mention it while we're fresh here.

5           THE COURT:  That's all right.

6           MR. FELMAN:  Exhibit 124 is the transcript of that

7   December 10 hearing.  And Diamond and Salem convened that

8   meeting, and they invited Mr. Gabriel, the general counsel of

9   the City, to come to the meeting to explain to the people there

10  how this Diamond-Salem hearing was going to go.

11          And at some point, Mr. Diamond -- or Mr. Salem turns

12  this over to Mr. Gabriel to explain what's the process here and

13  how are we going to get people here and what are we doing here.

14  And I just wanted to read what Mr. Gabriel says.

15          "Sure.  This did come up, some of you may remember,

16  over a year ago, two years ago maybe.  I did a memo."

17          That's the thing that Mr. Wannemacher was talking

18  about happened in 2018.  There was a big kerfuffle and Paul

19  McElroy was ordered to come down before City Council.  And at

20  that time in March -- it's in the exhibits, but in March of

21  '18, Jason Gabriel wrote a memo about subpoenas and what do you

22  do if you want to issue a subpoena.  Mr. McElroy wasn't

23  subpoenaed; he was just told to come.

24          But in any event, he did this -- Mr. Gabriel had done

25  this memo about how you would go about doing a subpoena a year

Vol. 1-111

```
 1    earlier, and that's what he's referencing.
 2              "This was at the outset of that special committee on
 3    the potential sale of JEA that was headed up by Council Member
 4    (inaudible).  And I've got a memo dated March 14th, 2018.  If
 5    anyone wants it, I can provide a copy.  But basically it went
 6    through what was the process if you wanted to put a person or
 7    persons under oath.  You know, and it's related -- and the oath
 8    thing is related to subpoena power.  In any event, there's a
 9    process for that.
10              "The council does have the right to do that at any
11    given time.  There's a process.  And you have to go to council
12    or the committee of record, and if it's appropriate to get that
13    power, then you invoke it.
14              "What we said at the time and we say this now is,
15    again, you're right.  When that's invoked, obviously there's
16    penalties of perjury and things like that, which are obviously
17    very serious.
18              "You know, typically the way it's been done in the
19    past is you do your investigatory review of something.  You
20    analyze it.  You take -- you do the give-and-take and then
21    review of everything, the comprehensive review with the
22    appropriate officials and whatnot.  And at the end of that, if
23    you find that the veracity's still in question, the
24    comprehensiveness of the documents, if you think there's still
25    something missing, typically it's a power that you would
```

Vol. 1-112

```
 1    invoke, you know, judiciously when you're in a spot where feel
 2    like you don't have all the information before you or you feel
 3    like the information you've been given in the testimony is not
 4    satisfactory.
 5              "So anyway, a policy call on your part if you want to
 6    invoke it or not.  You always have the power if you need it.
 7              "I'll bring to your attention that there's already
 8    codified provisions in the code.  It's 602.1205 and 1206.  And
 9    that has requirements under the law as it stands today.  One
10    deals with the cooperation of appointed employees in official
11    investigations, and then the other is the testimony and
12    questioning of public officials and employees related to public
13    affairs.
14              "But folks are supposed to get the truth, nothing but
15    the truth, so help you God, and they're supposed to cooperate.
16              "So there are these codified requirements that are
17    already there and in play today, and I bring that to your
18    attention just as a point, you know, so you decide what you'd
19    like to do."
20              And Mr. Salem says to Mr. Diamond:  "It would be my
21    feeling strictly not to go in the direction of putting people
22    under oath initially.  And if these people are forthcoming with
23    our questions, I think that would be sufficient.  If they're
24    not, we could always move in the direction of putting people
25    under oath."
```

Vol. 1-113

```
1        Mr. Diamond responds:  "Yeah, I mean, like, I've
2   placed hundreds of witnesses under oath.  I've put witnesses in
3   the grand jury.  I don't have any particular order in doing it.
4   I think we could do this as a two step.  We'll see how Monday
5   goes.  If there's a feeling, one, we're not getting answers to
6   questions; or, two, that there's a question of veracity of what
7   we're hearing, just kind of general two-stepping, then we can
8   issue subpoenas.  I have no problem with that."
9        So the code provisions that Mr. Gabriel is referring
10  to are Exhibits 135 and 136.  And the versions that are our
11  exhibits are different than the exhibits Mr. Duva's putting on
12  the screen.
13       The exhibits Mr. Duva's putting on the screen are the
14  amended versions of these ordinances that were not in effect on
15  December the 10th or December the 16th of 2018.
16       Exhibit 135, Defense Exhibit 135, is the -- it
17  contains the definitions for the code provisions.
18       Our Exhibit 136 is the version of 1205 that was in
19  effect on that date.  What it says is, "All appointed
20  employees" -- and what you're going to learn through these
21  other current provisions is Mr. Wannemacher is an appointed
22  employee -- "as a condition of employment shall agree to
23  cooperate truthfully, honestly and completely with official
24  government investigations, including, not limited to,
25  investigations by ethics commission, ethics officers, state
```

Vol. 1-114

```
1   attorneys, or the United States Attorney's Office concerning
2   his or her official duties or matters related to City
3   government or business."
4        That's the provision Mr. Gabriel said at the time was
5   in effect that day that required Mr. Wannemacher to show up.
6        He also cited Section 1206, and that is our
7   Exhibit 137.
8        THE COURT:  You said the language was "shall"?
9        MR. FELMAN:  Shall.
10       THE COURT:  Okay.
11       MR. FELMAN:  And then 137 is Section 1206, and it
12  provides that "No officer or employee who is called as a
13  witness before any City, State, or Federal administrative
14  tribunal shall refuse to answer before any tribunal any proper
15  question concerning the performance of his or her official
16  duties or to produce records, provided that the office shall
17  retain his or her privileges and immunities against
18  self-incrimination."
19       Then it further says that "No employee shall refuse
20  to answer any question directed by a supervisor" -- "when
21  directed by a supervisor related to the employee's performance
22  or fitness."
23       So there are two different -- and then, again, the
24  employee retains his privileges and immunities under the Fifth
25  Amendment.
```

Vol. 1-115

1          These code provisions are the codification of *Garrity*
2  in the Jacksonville City code.  They are the laws that govern
3  what happened here.  And Mr. Gabriel explained
4  contemporaneously to Mr. Diamond and Mr. Salem on the public
5  record that it was these laws that were in effect on that day,
6  and these are the laws that were going to require these people
7  to show up.  And those are the laws that did require
8  Mr. Wannemacher to show up so far as we're concerned, whether
9  he knew it or not.
10         Now, one of them was obviously directed because his
11 boss told him to.  But legally, even if Mr. Zahn had not told
12 him to come, once he learns that he has been requested or
13 persons most knowledgeable would include him and he has been
14 told that he's coming, he has an independent legal obligation
15 to come whether Mr. Zahn had told him to go or not.  And
16 there's a separate provision that would have made it a
17 misdemeanor.  It would have actually been a crime for him not
18 to go.
19         So this, again, is what we'll put in our briefing,
20 but I didn't think there was much point in trying to prove that
21 through a witness.  It's already in evidence.  Those are our
22 exhibits.
23         And there may be some other things that we would say,
24 I guess, about Diamond-Salem.  I don't want to waive our right
25 to argue the point any further, but I think in terms of

Vol. 1-116

1  evidence and what we wanted to present to Your Honor to try to
2  carry our burden to show a prima facie showing, that's what
3  we've got.
4          THE COURT:  Thank you.
5          MR. FELMAN:  Thank you.
6          MR. DUVA:  So just briefly, Your Honor, since
7  Mr. Felman kind of gave a closing argument there, I'd like just
8  a few minutes to do the same.
9          I don't think that his own argument helps
10 Mr. Wannemacher much because -- and I apologize for having --
11 if I had the wrong provision, but the part that's important in
12 there is you retain your privileges and immunities.
13         Mr. Wannemacher could have taken the Fifth.  He
14 didn't have to talk at Diamond-Salem.  And he was only required
15 to go by the provision itself, the law.  So Mr. Zahn telling
16 him -- and that's our argument -- it doesn't really matter if
17 Mr. Zahn told him to go or not go.
18         Under this provision, he had to go.  He was going.
19 And he retained his privileges and immunities to invoke if he
20 thought -- if he'd wanted to, if he was going to answer
21 questions that would tend to incriminate him.  So their own
22 argument cuts against their position.
23         Mr. Wannemacher had to go regardless, and that's the
24 point that we were going to make, and that's the point that I
25 was illustrating in that provision.  I'll get the right

Vol. 1-117

```
 1   version, but I intend to ask Mr. Gabriel that when he testifies
 2   down the road in further rebuttal of that position.
 3          So Mr. Zahn, who, with his own words, was a lame-duck
 4   CEO, he was either going to resign or be fired by the JEA
 5   board, his words of Ryan Wannemacher "must go to this hearing"
 6   have no value whatsoever.  They don't matter.  And we believe
 7   that Mr. Wannemacher's objective belief, based on his
 8   employment contract, the fact that Mr. Zahn was a lame duck and
 9   that was clear, and also the codified provision in the
10   municipal code, that it is not objectively reasonable for Ryan
11   Wannemacher to believe that Aaron Zahn had the capacity to fire
12   him if he did not go to the Diamond-Salem hearing.
13          There were other provisions at issue that required
14   his attendance that perhaps some other entity like the JEA
15   board or the City Council would evaluate because he was a
16   contracted employee, but Mr. Zahn was not the guy who was going
17   to do that.
18          THE COURT:  Very well.
19          Mr. Suarez, you don't have any additional witnesses
20   to present?
21          MR. SUAREZ:  I do not.  No, Your Honor, not on this
22   issue.
23          THE COURT:  Okay.  So, Mr. Duva, do you have rebuttal
24   witnesses?
25          MR. DUVA:  Yes, Your Honor, but for later in the
```

Vol. 1-118

```
 1   hearing.
 2          I'd like to proceed with Bobby Blythe and then call
 3   Councilman Diamond, Councilman Salem, and Kerri Stewart at the
 4   end of the hearing.
 5          THE COURT:  Okay.  All right.  This perhaps is a good
 6   time to take a break.  And what do you think, gentlemen, as far
 7   as returning?  You think 1:30?
 8          MR. DUVA:  That's fine, Your Honor.
 9          THE COURT:  All right.  We'll return at 1:30 to
10   reconvene.  So we'll break for lunch and start back up there.
11          Court will be in recess.
12          COURT SECURITY OFFICER:  All rise.
13     (Recess from 12:33 p.m. until 1:32 p.m.; all parties
14   present.)
15          COURT SECURITY OFFICER:  All rise.  This Honorable
16   Court is now in session.
17          Please be seated.
18          THE COURT:  Mr. Duva, I believe you're in rebuttal
19   phase?
20          MR. DUVA:  Your Honor, I would ask to call those
21   witnesses in rebuttal at the end of the hearing --
22          THE COURT:  Yes.
23          MR. DUVA:  -- and start our burden in the *Kastigar*
24   hearing with Agent Blythe.
25          THE COURT:  All right.
```

BLYTHE - DIRECT                                    Vol. 1-119

```
 1              COURTROOM DEPUTY:  Agent Blythe, if you'd please
 2    raise your right hand to be sworn in.
 3              Do you solemnly swear or affirm that the testimony
 4    you're about to give before this Court will be the truth, the
 5    whole truth, and nothing but the truth, so help you God?
 6              THE WITNESS:  I do.
 7              COURTROOM DEPUTY:  Please state your full name for
 8    the record and spell your last name.
 9              THE WITNESS:  Robert W. Blythe, R-o-b-e-r-t.  Last
10    name Blythe, B-l-y-t-h-e.
11              MR. SUAREZ:  Your Honor, at this time, we'd like to
12    invoke the rule.
13              THE COURT:  Yes.
14              If there are any witnesses slated to be called, you
15    need to leave the courtroom.
16         (No response.)
17              THE COURT:  Apparently there are no witnesses.
18              All right.  Go ahead, Counsel.
19              MR. DUVA:  Thank you, Your Honor.
20         ROBERT W. BLYTHE, GOVERNMENT'S WITNESS, SWORN
21                   DIRECT EXAMINATION
22    BY MR. DUVA:
23    Q.   Agent Blythe, tell the Court about your professional
24    background and your education and how you came to be an FBI
25    agent and the different assignments that you've had with the
```

BLYTHE - DIRECT                                    Vol. 1-120

```
 1    FBI.
 2    A.   Sure.
 3              I joined the FBI in June of 2008.  And prior to that,
 4    I obtained a bachelor's degree in accounting from the
 5    University of North Florida.  I conducted some
 6    postbaccalaureate work to get the credits I needed to sit for
 7    the CPA exam.  I obtained my certified public accountant
 8    license in 2007.  And during that time, I was working in public
 9    accounting as an auditor.
10              I worked in auditing for three and a half years prior
11    to joining the FBI.  My first assignment in the FBI was in the
12    New Orleans field office, where I worked a variety of criminal
13    matters, but primarily public corruption, on one of two public
14    corruption squads in New Orleans.  I also worked on various
15    white-collar crimes cases, civil rights cases, and some violent
16    crime cases as well.
17              I transferred to Jacksonville in June of 2018 and
18    continued to work primarily public corruption matters.
19    Q.   Agent Blythe, we won't do too much about this, but as part
20    of the beginnings of this investigation and -- probably fairly
21    obvious that you knew generally what JEA was and how it
22    operated, but did you, in the beginning of the investigation,
23    take it upon yourself to learn more about JEA, what it was, the
24    customer base, and how it operated?
25    A.   Yes, I did.  Myself and the investigative team, we spent a
```

BLYTHE - DIRECT                                           Vol. 1-121

```
 1   lot of time reviewing news articles.  There are some people
 2   that came forward with information during that time and that
 3   gave us some good background and the lay of the land.  But
 4   primarily we looked at a lot of the board meetings and
 5   materials that were, you know, provided during those board
 6   meetings.
 7   Q.   So it gave you also a background of what JEA was and that
 8   it's been in existence since 1895 and different points in time
 9   in terms of consolidated City government and also when JEA took
10   over the water -- wastewater portion of the business --
11   A.   Yes.
12   Q.   -- is that accurate?
13   A.   Yes.
14   Q.   Okay.  Now, we'll get more into the history of JEA with
15   other witnesses like Paul McElroy, who will talk in more detail
16   about that, but what I want to get to immediately is the
17   beginnings of the investigation.
18        And in late -- in December of 2019, did you and I
19   begin to communicate about this JEA matter may be something
20   worth looking into?
21   A.   Yes.  In December 2019, we began to discuss -- late
22   December, we began to discuss this matter.  There was a lot of
23   different potential things that we could look into, and you
24   informed the FBI that you were opening a matter.  I think it
25   was on December 20th of 2019.  And we were shortly behind you.
```

BLYTHE - DIRECT                                           Vol. 1-122

```
 1   We opened a case in January of 2020.
 2   Q.   And I know this is fairly obvious from the motion practice
 3   and the backdrop, but it's fair to say that the potential sale
 4   of JEA was a source of great media interest in the summer and
 5   fall of 2019?
 6   A.   Yes, it was.
 7   Q.   And with an agent -- being an agent in public corruption
 8   and having worked in New Orleans, which I'm sure provided
 9   plenty of action for you to investigate and make cases, talk
10   about percolating news and sort of, you know, how that plays
11   into being a public corruption FBI agent and kind of piquing
12   your interest about different matters and how that has happened
13   in this case and how that has happened throughout your career.
14   A.   Sure.
15        A good public corruption FBI agent reads the paper.
16   If you're not, you're doing yourself and the FBI a disservice.
17        In New Orleans and here, it is very clear that there
18   are people that are willing to speak to the media who are not
19   willing to go directly to the federal government, the FBI,
20   who -- which could put them on the hook to testify in court, to
21   be on record in a report.  And so there's very useful
22   information you can obtain by reading reporting, especially
23   when they cite sources or documents.  And those are things that
24   I can follow up on and independently verify or go talk to those
25   people or obtain those documents independently.
```

BLYTHE - DIRECT                                      Vol. 1-123

1           Does that answer your question?
2  Q.   Yes.
3           Now, we're going to get to some of these publicly
4  available documents.  I want to start with --
5           MR. DUVA:  It's already been admitted.  All the
6  exhibits have.  And I'm not going to go back and forth with the
7  originals because Agent Blythe has notebooks, so to cut out
8  some time, I think.
9           THE COURT:  Yes.
10  BY MR. DUVA:
11  Q.   But, Agent Blythe, you're familiar with 20FF; is that
12  right?
13  A.   Yes.
14  Q.   Okay.  And that is the council auditor's memo that was
15  ultimately authorized by Kyle Billy dated November 18th of
16  2019?
17           MR. DUVA:  If we can publish page 1 of 20FF.
18  BY MR. DUVA:
19  Q.   That was sent by email to members of the City Council; is
20  that right?
21  A.   Correct.
22  Q.   So that "to" line, the CAUDIT, that's a group name for the
23  Jacksonville City Council members, correct?
24  A.   Yes, and/or the council auditor's office.
25  Q.   So ultimately this memo was released publicly and

BLYTHE - DIRECT                                      Vol. 1-124

1  available, and it was also reported on by the *Times-Union*,
2  correct?
3  A.   Yes.
4  Q.   Okay.  And did you have an opportunity to read this memo
5  around the time that it was released?
6  A.   You know, within a month after, I reviewed it.
7           MR. DUVA:  If we can publish page 2.
8  BY MR. DUVA:
9  Q.   And while we're doing that, can you just explain generally
10  what this memo is and some of your takeaways from it?
11  A.   Sure.
12           So the council auditor is an important, you know, arm
13  of the local government.  They provide counsel, you know, and
14  auditing work to the council to answer their questions, and,
15  you know, look at the presentations given by the different
16  independent authorities.  They look at their budgets.
17           And so one of the things that they did was review the
18  Performance Unit Plan and try to gain an understanding of the
19  formula and what the potential implications for that
20  Performance Unit Plan were.
21           And so they -- so from mid-August 2019 after the
22  board meeting in July 23rd authorizing the Performance Unit
23  Plan, they engaged in a dialogue and a back-and-forth with Ryan
24  Wannemacher and others at JEA and had a meeting with them.  And
25  ultimately Kyle Billy, the council auditor, decided to put pen

BLYTHE - DIRECT                                              Vol. 1-125

1   to paper to give a written discussion of the issues that the
2   council auditor saw with this plan and what the potential
3   implications were of this plan.
4   Q.   You're talking about some emails internally between
5   members of the council auditor's office, including Kyle Billy,
6   Jeff Rodda, Kim Taylor, Heather Reber, and Phillip Peterson?
7   A.   Right.  Yeah.
8          MR. SUAREZ:  I'm going to ask the witness -- excuse
9   me.  I'm going to object to leading questions.
10         MR. DUVA:  I don't think it's controversial who works
11  in the council auditor's office.  I would like to lead on
12  things like that.  But when I'm asking for what his conclusions
13  were with respect to a document, which I've done so far, I'm
14  definitely going to ask that open-ended.
15         But if I don't lead in certain areas like that with
16  who works in the council auditor's office, this is going to
17  last a lot longer than it needs to.
18         MR. SUAREZ:  Your Honor, I just don't think he can
19  lead.  It's direct examination.  He's got to ask questions that
20  are open-ended and not suggest the answer in the question.
21         MR. DUVA:  We're in an evidentiary hearing.  The
22  rulings with respect to leading is that it is permissible on
23  direct on noncontroversial things or things that can easily be
24  determined.
25         So that's not my intent to lead otherwise.

BLYTHE - DIRECT                                              Vol. 1-126

1          THE COURT:  All right.  Go ahead, Counsel.
2   BY MR. DUVA:
3   Q.   So, Agent Blythe, page 3 of 20FF, there's a title that
4   says "How Does the Plan Work"?
5   A.   Yes.
6   Q.   And what is essentially laid out in the rest of this
7   memo -- we're not going to cover it song and verse, but I'm
8   just talking about the general reaction that you had to it when
9   you were able to review this.
10  A.   My first reaction?
11  Q.   Yes, just in terms of the content.
12  A.   It sounded like an employee stock ownership plan to me.
13  It was confusing and I didn't quite understand it.
14  Q.   And in this memo at the bottom of page 3, is there a table
15  that makes calculations with respect to the plan in connection
16  with recapitalization?
17  A.   Yes.
18  Q.   And you saw that.
19         Just trying to give the order of operation, you were
20  talking about some emails between the council auditor's
21  employees.
22         Did you see this memo first, or did you see those
23  emails first?
24  A.   This memo.
25  Q.   So what did this memo -- and talk about the calculations

BLYTHE - DIRECT                                           Vol. 1-127

1  that you see here and what you understood them to mean.  And I
2  know I'm going to do this, but the point is what you knew when
3  or what we knew when, so I'm going to have to freeze things in
4  time as we go.
5        So you said you read this about a month after it came
6  out.
7        When you saw this table and the payouts in connection
8  with recapitalization, what were your thoughts?
9  A.   So my thoughts were that this is a municipally owned
10 utility.  This is a potential benefit to certain employees in
11 the event of a recapitalization or sale of JEA.  And it's a
12 very large potential payout based on -- that are dependent upon
13 the sale price of JEA and the net proceeds to the City of
14 Jacksonville as a result of that sale after all the debt is
15 retired.
16 Q.   Because of this memo, what did this lead you to want to do
17 in terms of interviews with individuals at the council
18 auditor's office?
19 A.   Sure.
20       I wanted to talk to Mr. Kyle Billy.  I wanted to talk
21 to any other staff at the council auditor's office that worked
22 on this, including Jeff Rodda, Heather Reber, Kim Taylor, and
23 others.
24 Q.   And your reviewing this memo, that was before any *Garrity*
25 statements were given by Mr. Wannemacher or Mr. Zahn?

BLYTHE - DIRECT                                           Vol. 1-128

1  A.   Correct.
2  Q.   Going to the next page, there's a provision in the memo,
3  page 4, that talks about overall weaknesses and concerns.
4        Can you just kind of summarize the first five that
5  you see there and what your reaction was to those?
6  A.   Sure.
7        So these are his -- Mr. Billy's concerns.  One is
8  that it's not been vetted or approved by the council.  There's
9  no cap to the value of a performance unit.  The challenge value
10 target is too easy to achieve, meaning -- basically making the
11 implication that it's baked in that no matter what, they're
12 going to be able to exceed this challenge value target.
13       And the -- you know, there's also some issues about
14 the value could be affected by different things, such as a
15 change in governmental accounting standards.
16       MR. DUVA:  And go to the next page, Ms. Stockholm,
17 2OFF.  It's the fifth page of the exhibit.
18 BY MR. DUVA:
19 Q.   And there's a section called "Weaknesses and Concerns that
20 Apply to a Recapitalization Event."  It's referenced there on
21 the screen.  I don't want to have a habit of you, you know,
22 reading into the record a bunch of things, because it will take
23 a lot of time, but what were your takeaways with respect to
24 this particular section of the memo?
25 A.   Sure.

BLYTHE - DIRECT                                    Vol. 1-129

1      So it made it clear that Mr. Billy thought that the
2  plan had significant implications in the event of a
3  recapitalization or sale of JEA and that -- that, you know,
4  over $300 million could be distributed to the holders of the
5  performance unit for every billion dollars over that -- over
6  the 3 billion in the minimum table stakes that the City
7  received.
8  Q.  So fair to say this memo piqued your interest in terms of
9  further investigation?
10 A.  Definitely.
11 Q.  Now, talk about the other publicly available information,
12 specifically from JEA, JEA board meetings, and comments that
13 Mr. Zahn gave to City Council early on in the investigation
14 after reviewing this memo.  Talk about the different buckets of
15 things that we determined were available to us to watch and
16 review.
17 A.  Sure.
18     So on JEA's website are the videos of the board
19 meetings.  There's transcripts of those meetings.  There's
20 minutes of those meetings.  The board packages are attached.
21 There's also -- the compensation committee meeting materials
22 are there for anybody to access.
23     There's also -- you know, there was media coverage
24 summarizing these things.  There's folks that, you know, we
25 talked to in January and February.  And so there's a ton of

BLYTHE - DIRECT                                    Vol. 1-130

1  publicly available information to review that we spent months
2  digesting.
3  Q.  So if you wanted to learn all about JEA with respect to
4  everything that went on at a JEA board meeting, you can just go
5  to the website, click on the link, and watch it?
6  A.  Correct.
7  Q.  Is that what you did?
8  A.  Yes.
9  Q.  And we did that kind of independently, but that was the
10 plan, for both of us to do that.
11     MR. SUAREZ:  Your Honor, I'm going to keep objecting
12 to leading questions.  If we're going to -- he's going to keep
13 doing this --
14     THE COURT:  Mr. Duva?
15     MR. DUVA:  I think it's relevant that -- I have to
16 put in the record I watched all of these.  And I can tell the
17 Court, you know, and maybe in argument, I watched all of these.
18 It's the first thing I did during COVID when we were all
19 sitting in our living rooms.  That's the first thing that I did
20 in terms of this.
21     So I think we should have a little latitude of --
22     THE COURT:  Try to restructure it some if you can on
23 direct, if you can.
24     MR. DUVA:  Yes, sir.
25     THE COURT:  Go ahead.

BLYTHE - DIRECT                                          Vol. 1-131

1   BY MR. DUVA:
2   Q.   So did you watch the board meetings from 2019?
3   A.   Yes, and even before that.
4   Q.   You watched board meetings from 2018?
5   A.   Yes.
6   Q.   How about Mr. Petway's comments at the end of the board
7   meeting in 2017 late in the year?
8   A.   Yes, I watched that.
9   Q.   We'll get to that.  That's Exhibit 1.  We'll play that.
10           How about comments that Mr. Zahn made publicly about
11  the ITN process or the Performance Unit Plan, did you seek
12  those out?
13  A.   Yes.
14  Q.   Did those include comments that Mr. Zahn made to -- in
15  Jacksonville City Council meetings?
16  A.   Yes.  There's a lunch-and-learn workshop where he talked
17  about the ITN and privatization, JEA's strategic planning
18  efforts.
19  Q.   Did you go back before Mr. Zahn was even the CEO and watch
20  the privatization workshop on March 20th of 2018 and other
21  board meetings where Mr. McElroy served as the CEO and
22  Ms. Dykes as the COO?
23  A.   Yes, I reviewed and watched that meeting.
24  Q.   What steps did you take to learn about the process of JEA
25  privatization from even before 2017 all the way through the ITN

BLYTHE - DIRECT                                          Vol. 1-132

1   process and, you know, culminating with the July 23rd, 2019,
2   board meeting and events thereafter with respect to the ITN?
3   A.   So obviously we reviewed those board materials we've
4   discussed.  I looked at -- also talked to witnesses who had
5   historical knowledge of the -- of JEA and previous
6   conversations around privatization.
7            Does that answer your question, Mr. Duva?
8   Q.   Yeah, and if not, I'll ask you a follow-up.
9            But in December of 2019, did you have a viewpoint
10  whether or not the sale of JEA was a -- was a hot-button issue
11  that had been covered extensively in the news in Jacksonville,
12  Florida, and beyond?
13  A.   Oh, absolutely it was a hot-button issue.  There's a lot
14  of controversy in December 2019 surrounding the issue.  And
15  part of our effort to understand the matter was to sift through
16  what's rumor, what's controversy, what's political, and get
17  down to the root of whether there's a federal criminal
18  violation.
19  Q.   I want to focus on an interaction that you had with Jon
20  Phillips at the Office of General Counsel on January 15th of
21  2020.
22           Talk about that and items that he provided to you
23  based on our request.
24  A.   Sure.
25           So he provided basically transcripts from some of the

BLYTHE - DIRECT                                          Vol. 1-133

1   interviews they conducted after -- in January 2020 to determine
2   whether Aaron Zahn could be fired for cause.
3          So I told him -- I think Aaron Zahn hadn't been
4   interviewed yet as of that date.  They didn't have that,
5   obviously.  I told him I didn't want it and to stay away from
6   that.
7          At that point in time, we had identified that Aaron
8   Zahn was definitely a subject of our investigation, and there
9   were others we weren't sure about.
10         So he provided probably at least a dozen transcripts,
11  to include Ryan Wannemacher's interview, which had already
12  taken place.  I went ahead and took it, didn't read it, and we
13  had a conversation about that.
14  Q.   And describe when that conversation was in connection with
15  that June 15th, 2020, meeting that you had with Jon Phillips
16  and what the prosecution team decided with respect to
17  Mr. Wannemacher's statement.
18  A.   Sure.
19         It was January 15th, right?  So --
20  Q.   Yeah.  Sorry, January 15th of 2020.
21  A.   So after collecting those items, I recall calling you and
22  we discussed it either in one of our many meetings or before
23  one of our interviews at that time.  And we discussed that we
24  weren't sure about his status at that time, and so we were
25  going to take the precaution of not reading it.  And we -- we

BLYTHE - DIRECT                                          Vol. 1-134

1   decided that at that time that would be our course of action.
2   Q.   And at that point, talk about the level of uncertainty
3   that we had in terms of how Ryan Wannemacher figured in to the
4   investigation at that time.
5   A.   Sure.
6          So certainly we knew that he was the one that made
7   some of these presentations to the board, but we didn't really
8   know enough to know whether any of his statements to the board
9   at that time were untruthful or were misleading or were meant
10  to be that way or were part of any scheme or artifice to
11  defraud.
12         So we just didn't know enough, but we were concerned
13  that, you know, things might come to light that could, you
14  know, lead to a prosecution, so we decided basically put him in
15  a potential subject category, if you will, and didn't review
16  it.
17  Q.   There were other interviews that were collected that day;
18  is that correct?
19  A.   Correct.
20  Q.   And can you tell us who some of those were?
21         And if you need your recollection refreshed, I can
22  get them to you.
23  A.   Yeah, sure.  Could you find that?  I'm sure I could name
24  several, but ...
25  Q.   Go ahead and name what you can name.

BLYTHE - DIRECT                                          Vol. 1-135

1  A.   So I believe Herschel Vinyard was on that list.  Karen
2  Anderson.
3  Q.   Karen Anders?
4  A.   Anders, I apologize.  Karen Anders.
5       Deryle Calhoun and several other senior leadership
6  team members.
7  Q.   I don't think I have that one 302.  I'll gather that and
8  come back to it later.
9       Talk about an initial conversation that you had with
10 Jody Brooks, who was a former OGC lawyer that was assigned to
11 JEA.
12 A.   Sure.
13      So at that time, Jody Brooks was no longer employed
14 by JEA.  She had left in the midst of this strategic planning
15 process previously and was working in another facility or
16 function, another organization.
17      And so we interviewed her and she provided some
18 detailed information about the process that JEA went through,
19 from -- from Paul McElroy resigning, all the efforts in 2018
20 around privatization, the strategic -- or, excuse me, the value
21 of JEA as discussed in the March 20th, 2018, board workshop,
22 because there was a report made by their financial advisor,
23 PFM.  It showed the potential value of JEA in a sale, what it
24 could demand on the market, essentially.
25      And she also walked us through, in broad-brush

BLYTHE - DIRECT                                          Vol. 1-136

1  strokes, the timeline of events that took place and who all the
2  key players were, who some of the consultants were.  And that
3  gave us a decent road map moving forward to know what companies
4  we needed to obtain records from, what consultants, that is,
5  and who we needed to begin talking to as a starting point to
6  get an understanding of what had happened.
7  Q.   Do you remember when that meeting with Ms. Brooks took
8  place?
9  A.   I think it was in March 2020 --
10      MR. DUVA:  Can I approach with a 302 --
11      THE WITNESS:  -- February or March.
12      Oh, I apologize.  It was January 16th, 2020.
13 BY MR. DUVA:
14 Q.   So it was a day after the meeting with Jon Phillips?
15 A.   Correct.
16 Q.   And there was another interview with Jody Brooks after
17 that, correct?
18 A.   Yes.  We met with her two or three times, I think.
19 Q.   So were you able to obtain some kind of JEA institutional
20 knowledge from Ms. Brooks based on her time there with OGC?
21 A.   Correct.  She -- I should have mentioned she was detailed
22 to JEA from OGC, similar to the way Lynne Rhode was after her.
23 So, yes.
24 Q.   Okay.  Did Ms. Brooks inform you that essentially she
25 actually quit working for OGC because of Mr. Zahn?

BLYTHE - DIRECT                                              Vol. 1-137

```
 1              MR. SUAREZ:  Your Honor, I'm going to object to
 2   hearsay.  And I'm going to object again to leading.
 3              THE COURT:  Rephrase the question, Counselor.
 4   BY MR. DUVA:
 5   Q.   Did Ms. Brooks tell you why she quit working at JEA?
 6   A.   Yes.
 7   Q.   What did she tell you?
 8              MR. SUAREZ:  Objection, Your Honor.  Hearsay.
 9              MR. DUVA:  It's an evidentiary hearing, Your Honor,
10   and I think, one, it's just a reason that Ms. Brooks stopped
11   working at JEA and what we did in terms of taking advantage of
12   her knowledge base as a former employee.
13              MR. SUAREZ:  Your Honor, I think he can say --
14   without having the witness talk about what she said, he can
15   say, "Based on your conversations with her, what did you do
16   next?"  But I don't think he can put in her statement unless he
17   wants to call her as a witness.
18              And the fact it is an evidentiary hearing is why the
19   rules of evidence apply.
20              THE COURT:  Mr. Duva?
21              MR. DUVA:  Your Honor, typically in evidentiary
22   hearings, some of the evidentiary rules are relaxed a little
23   bit.  I don't think it's -- it is -- it's not -- I mean, I can
24   move on.  I mean, I don't think it's -- we can call Ms. Brooks.
25   We can do that if Mr. Suarez wants us to call her and she can
```

BLYTHE - DIRECT                                              Vol. 1-138

```
 1   talk about all the reasons she left JEA.  We can supplement the
 2   witness list and do that later.
 3              And in addition, I mean, the focus is on what Agent
 4   Blythe knew and when he knew it and the steps that he took
 5   next.
 6              THE COURT:  All right.
 7              MR. DUVA:  And the idea being there was some kind of
 8   problem brewing there that confirmed -- you know, I'm not
 9   trying to testify for him, but it confirmed the desire to look
10   into these matters further.
11              MR. SUAREZ:  Your Honor, I don't mean to take the
12   Court's time, but it is hearsay.  And it is being offered for
13   the truth of the matter asserted, and that should not come into
14   evidence.  It's as simple as that.
15              MR. DUVA:  I can move on, Your Honor.
16              THE COURT:  All right.  Go ahead.
17   BY MR. DUVA:
18   Q.   In that conversation -- we'll ask Ms. Brooks later -- did
19   you learn why she left JEA?
20   A.   Yes.
21   Q.   Okay.  And did that pique your interest in terms of
22   looking into the ITN and bonus plans, generally, as those
23   things progressed together?
24   A.   Yes.
25   Q.   And ultimately, after having that conversation with
```

BLYTHE - DIRECT                                      Vol. 1-139

1   Ms. Brooks on January 16th of 2020, in terms of the JEA board
2   meetings, what did you decide to do next?
3   A.    Yeah, so we decided to go back and review all of those
4   board meetings and presentations and materials surrounding the
5   presentations to the board related to the strategic planning,
6   the lead-up to authorizing the ITN, and the Performance Unit
7   Plan.
8   Q.    And did you watch the JEA board meetings that you talked
9   about earlier?
10  A.    Yes.
11  Q.    Now, we'll get to some specifics, but just generally, go
12  through the process that you went through to watch them and the
13  time it took watching them and when you did that.
14  A.    Yes, so, you know, starting in -- before -- even before
15  COVID, we started looking at -- reviewing some of these
16  meetings.  But mid-March 2020, the COVID pandemic shut
17  everything down, and we -- instead of redoing my kitchen like a
18  lot of people did, I sat down and reviewed JEA board meetings
19  and board packages and, you know, continued on through that
20  process.
21           And we started doing interviews over the phone as we
22  felt like we knew what questions to ask.  And we, you know,
23  took a month-long process there in January, February, March,
24  and into April of 2020 really figuring out what we needed to
25  ask for from JEA, all the consultants, the bidders who bid on

BLYTHE - DIRECT                                      Vol. 1-140

1   JEA ultimately to purchase them, JEA, and what witnesses at
2   those companies and JEA we needed to talk to.
3   Q.    At that time or at any time, did you read Aaron Zahn's
4   *Garrity* statement?
5   A.    No.
6   Q.    At that time or at any time, did you read Ryan
7   Wannemacher's *Garrity* statement?
8   A.    No.
9   Q.    With respect to news articles, talk about -- and this was
10  discussed a bit this morning -- the administrative assistant of
11  the squad, what was she asked to do with respect to newspaper
12  articles and collecting those things?
13  A.    So just to back up one step is, as I mentioned before, you
14  know, I like to, as an investigator, know what the press is out
15  there, especially, you know, investigative reporting where it's
16  clear that there's witnesses or sources that are speaking to
17  the press and providing inside information.
18           And so one of the things -- there was so much press
19  in this case, it was, you know, difficult to keep up with
20  making sure that we put any pertinent articles into our file.
21  That's something that I want to do as a case agent, is to
22  memorialize things like that so that if I get hit by a bus and
23  I'm not on the case anymore, someone can pick up the baton,
24  pick up the ball and move forward with the case and understand
25  where it's been and where it's going.

BLYTHE - DIRECT                                                    Vol. 1-141

1          So I asked the admin assistant, myself or Agent Hill,
2     who worked on the case with me, we asked -- we talked about
3     doing this and we asked her to periodically go grab JEA-related
4     articles related to our investigation and put those in the
5     file.
6          And that's something that she did periodically
7     without our, you know, direct supervision, if you will.
8     Q.   And how did you approach reviewing that material and also
9     how did you approach references in articles to *Garrity*
10    statements that Mr. Zahn or Mr. Wannemacher made?
11    A.   Sure.
12          So if I could tell from the title of an article or
13    the subtitle that, you know, it was something that was going in
14    that direction, I just didn't read it.  I didn't open that
15    article.  I didn't look at it.
16          If I was reading an article and it appeared to me
17    that they're leading up to -- or going to -- about to say
18    something or quote something or discuss, regurgitate something
19    that, you know, was derived from those statements, I stopped
20    reading it, put it down.
21          So that was, you know, something that we discussed.
22    It wasn't -- we didn't put any type of, you know, procedure in
23    place beyond just don't read it.  We didn't have a filter team,
24    if you will.
25    Q.   Do you know the substance, even generally, of what

BLYTHE - DIRECT                                                    Vol. 1-142

1     Mr. Zahn said in his *Garrity* statement?
2     A.   No.
3     Q.   Do you know the substance of what Mr. Wannemacher said in
4     his *Garrity* statement?
5     A.   No.
6     Q.   Did you derive any -- or engage in coming up with any
7     investigative leads because of what Mr. Zahn or Mr. Wannemacher
8     said in their *Garrity* statement?
9     A.   No, absolutely not.
10    Q.   Let's go to Exhibit 50.  It would be in book 4 of 4 there.
11          Is this the grand jury subpoena to JEA?
12    A.   Yes, it is.
13    Q.   Okay.
14          MR. DUVA:  And if we can go down to the bottom.
15    BY MR. DUVA:
16    Q.   And it was issued on April 21st of 2020?
17    A.   That's correct.
18    Q.   And did you serve it around that time?
19    A.   We did.  The same day or the next day.
20    Q.   Okay.
21          MR. DUVA:  And if we could go to page 3.
22    BY MR. DUVA:
23    Q.   There's itemized requests and there are different
24    sections.  And I think overall, if my math is correct, there's
25    about 50 itemized requests in the subpoena.

BLYTHE - DIRECT                                      Vol. 1-143

1  A.   Correct.
2  Q.   Okay.  And section A deals with the invitation to
3  negotiate the long-term incentive plan or the Performance Unit
4  Plan; is that correct?
5  A.   Yes.
6        MR. DUVA:  If we can illustrate the entire first page
7  of the subpoena.
8  BY MR. DUVA:
9  Q.   Okay.  Agent Blythe, did we work together in coming up
10 with the requests that were made in this subpoena, the specific
11 itemized entries requesting the documents?
12 A.   Yes, we did.  As an investigative team, we all went back
13 and forth in reviewing this and adding items and talking about
14 what we needed to ask for.
15 Q.   JEA is a public employer, correct, or a public entity?
16 A.   Yes.
17 Q.   So they're subject to public records requests?
18 A.   They are.
19 Q.   So we could have made a public records request, but
20 ultimately was the decision made to issue a grand jury
21 subpoena?
22 A.   Yes.
23 Q.   Was that because we wanted to be formal about the process
24 so that there was a subpoena issued and we could track the
25 response time?

BLYTHE - DIRECT                                      Vol. 1-144

1        MR. SUAREZ:  Your Honor, again, I'm going to object
2  to leading.
3        THE COURT:  I'll allow it.  Go ahead.
4  BY MR. DUVA:
5  Q.   So in terms of the requests about the Performance Unit
6  Plan, did you use any information from any *Garrity* statement
7  that Mr. Zahn or Mr. Wannemacher made in coming up with these
8  requests?
9  A.   No.
10 Q.   And did you learn about the -- tell the Court how you
11 learned about the Performance Unit Plan.
12 A.   So we learned about the Performance Unit Plan from the
13 memo from the council auditor's office, from talking to
14 witnesses at the council auditor's office, from reviewing the
15 board meetings packages, and as we began to talk to witnesses
16 from JEA, their consultant, that provided information about the
17 prevalence of plans like this, and etc.
18        There's a lot of investigation, witness interviews,
19 and document review that went into understanding what this was.
20 Q.   Ultimately is that what led to the itemized requests in
21 the subpoena?
22 A.   Yes.
23 Q.   And we won't go through all the entries, but -- and the
24 Court will have, obviously, the exhibit available, so try to
25 move it along, but do the entries require disclosure of email

BLYTHE - DIRECT                                                Vol. 1-145

1   communications involving Mr. Zahn, Mr. Wannemacher, Ms. Dykes,
2   and others with respect to the long-term incentive Performance
3   Unit Plan?
4   A.   Yes.
5   Q.   Talk about item 5A, if we can hone on that a little
6   better.  It's a specific request about a memo that we referred
7   to as the Nixon Peabody memo dated May 20th of 2019.
8        Tell the Court how you learned about the Nixon
9   Peabody memo and what it is.
10  A.   Sure.
11       So my recollection is Jody Brooks, the former general
12  counsel detailee to the JEA, told us about this.  She was still
13  employed there at that time or was aware of it.  And basically
14  that they had been asked to look at the legality of a plan like
15  this for a publicly-owned utility -- or, excuse me, a public
16  utility, community-owned utility like JEA.
17       And, you know, that -- so this was something that we
18  wanted to see because the understanding was is that this memo
19  essentially said that the audit would provide for doing a --
20  having a plan like this.
21       And so, you know, we wanted to know who this memo was
22  shared with and who had seen it and what was done with it.
23  Q.   And how did you -- you may have said this and I missed it,
24  but how did you come into possession of that memo?
25  A.   We -- we received that -- this memo from the subpoena

BLYTHE - DIRECT                                                Vol. 1-146

1   productions from JEA and/or the Office of General Counsel
2   provided it on their behalf.
3   Q.   And did the Office of General Counsel actually provide it
4   in March of 2020?
5   A.   Yes.
6   Q.   And did that lead to additional requests about the memo
7   and its origin and who it was shared with as set forth in the
8   subpoena?
9   A.   Yes, it did.
10  Q.   Let's go to the next page of the subpoena, itemized
11  request 6.
12       This requests documents and records in any manner
13  pertaining to communications with the firm Willis Towers
14  Watson.
15       What is Willis Towers Watson and how did you learn
16  about it?
17  A.   Willis Towers Watson was a national firm that essentially
18  was hired as a consultant by JEA and had previously worked for
19  JEA around the HR -- in the HR realm and compensation.  So they
20  provided advice and materials to JEA regarding incentive plans
21  for employees and compensation schemes.
22  Q.   Did you learn references to Willis Towers Watson because
23  of watching board meetings?
24  A.   Yes.
25  Q.   And those are publicly available on the Internet?

BLYTHE - DIRECT                                            Vol. 1-147

1  A.   Yes.

2  Q.   JEA website?

3  A.   Yes.

4  Q.   Item 7 specifically mentions a David Wathen.

5       Who did you learn David Wathen was in connection to

6  Willis Towers Watson?

7  A.   Sure.

8       He was a senior person, an executive director, or

9  high-level person at some point that was in charge of the

10 engagement with JEA.  And he dealt with various JEA executives

11 on down to the director level related to what JEA wanted from

12 them in developing a plan.

13 Q.   Because of that, were you interested in his communications

14 with membership -- with employees of JEA with compensation,

15 short-term incentives and long-term incentives?

16 A.   Yes.

17 Q.   Item 8 mentions JEA compensation committee meetings,

18 specifically June 18th, 2019, and also a full JEA board meeting

19 on June 25th, 2019, and then the July 23rd, 2019, meeting.

20      Do you see that?

21 A.   Yes.

22 Q.   And did you specifically request -- or we specifically

23 request PowerPoint presentations that were prepared by Willis

24 Towers Watson?

25 A.   Yes.

BLYTHE - DIRECT                                            Vol. 1-148

1  Q.   And any other PowerPoint presentations that were made

2  during those particular meetings?

3  A.   Yes.

4  Q.   Talk about item 11.  There's a reference to McKinsey &

5  Company.

6       How did you learn about McKinsey & Company?

7  A.   McKinsey was basically a company that JEA engaged with and

8  signed a contract with in 2018 to provide strategic planning

9  counsel and advice.  And they helped JEA with developing what

10 we'll go over later as status quo 1 management and status quo

11 2, which is like management's response given the traditional

12 levers available to a public utility like JEA.

13      And they were also -- there's discussion of

14 developing a strategic plan to transform JEA into a utility of

15 the future, 2030 strategy, essentially.

16 Q.   Did you have an opportunity to interview Mr. Derkach?

17 A.   Yes, we did.

18 Q.   And we'll get into the substance of that in a moment, but

19 did you see him when you watched the video from the January

20 2019 JEA board meeting?

21 A.   Yes.

22 Q.   That he presented at that meeting?

23 A.   Yes.

24 Q.   Ultimately is that one of the reasons, the identity of

25 McKinsey, that led us to want to make a request in the grand

BLYTHE - DIRECT                                          Vol. 1-149

1  jury subpoena with respect to documents and records pertaining
2  to McKinsey and McKinsey's work with respect to JEA and the
3  strategic planning exercise?
4  A.   Yes.
5  Q.   Talk about 14 and 15 on the next page.  There's references
6  to law firms Foley & Lardner in 14 and Pillsbury Winthrop in
7  15.
8        How did you learn about the involvement of Foley &
9  Lardner and Pillsbury Winthrop with respect to the ITN process?
10 A.   Sure.
11       They both -- you know, Foley & Lardner presented at
12 JEA board meetings.  We were able to learn from interviews that
13 Pillsbury was a law firm that was engaged to provide advice on
14 certain implications of the Performance Unit Plan.  And Foley &
15 Lardner was looking at it from a different perspective, more
16 related to Florida law and Florida statutes.
17       And so, you know, those were people that we wanted to
18 get records from and information about their communications
19 with JEA management.
20 Q.   Foley & Lardner, was that specifically Kevin Hyde?
21 A.   Yes.
22 Q.   And were you aware that Mr. Hyde was a former president of
23 the Jacksonville City Council?
24 A.   Yes.
25 Q.   And Pillsbury Winthrop, the request that was made in the

BLYTHE - DIRECT                                          Vol. 1-150

1  grand jury subpoena, did you learn about their involvement
2  through watching the publicly available meetings as well?
3  A.   Yes.
4  Q.   And was that what drove the requests to obtain
5  communications from lawyers at Pillsbury Winthrop and lawyers
6  at JEA?
7  A.   Yes.
8  Q.   Looking at entry 18 on the same page, there are references
9  to Kyle Billy dated November 18th of 2019.
10       Is that memo what spawned this request?
11 A.   The council auditor's memo?
12 Q.   Yes.
13 A.   Certainly that -- that memo was sort of what started the
14 Jacksonville City Council's scrutiny surrounding this plan and
15 the ITN in general.  And it's what led to a lot of the media
16 interest and allegations that were made that led to us opening
17 an investigation.
18 Q.   And because of that memo, were you interested in
19 communications between employees of JEA?
20 A.   Certainly.
21 Q.   And as a result of that subpoena, did you receive those?
22 A.   Yes.
23 Q.   Okay.  Let's look at 19.  There's a reference to
24 Ms. Rhode, who testified earlier today.
25       Did you also want communications that Ms. Rhode had

BLYTHE - DIRECT                                              Vol. 1-151

```
 1   with JEA employees about those listed items, the ITN, co-op,
 2   the IPO, and/or the LTI PUP?
 3   A.   Yeah.  We saw that, you know, she was on the record
 4   regarding the legal review at board meetings.  We learned from
 5   other witnesses about her involvement in that process and going
 6   back and forth with Pillsbury.  And so we wanted to be able to
 7   have those communications to review.
 8   Q.   And ITN is the invitation to negotiate, correct?
 9   A.   Yes.
10   Q.   Is that the formal process that was kicked off by the
11   board approvals on July 23rd, 2019?
12   A.   Yes.  It's essentially the statutory process that JEA
13   would have had to go through to solicit bids like this.
14   Q.   Co-op and the IPO, it might be less clear what those are,
15   but for record purposes, can you explain this request?
16   A.   Sure.
17        A co-op would be similar to an electrical co-op, a
18   community ownership, like the Clay Electrical co-operative, for
19   example.
20        An IPO would be an initial public offering where
21   essentially JEA would write an S1 with the SEC, get all the
22   approvals it needed, and essentially go through a stock
23   offering.
24        And -- does that answer your question?
25   Q.   So the co-op and the IPO, those were two of multiple
```

BLYTHE - DIRECT                                              Vol. 1-152

```
 1   options in scenario 3 in terms of how JEA could transition in
 2   the future?
 3   A.   Yes.  There are several options that were presented as
 4   possibilities.
 5   Q.   And did you learn that by watching the July 23rd, 2020,
 6   board meeting?
 7   A.   Yes.
 8   Q.   Item 20 is aimed at what?
 9   A.   "All documents and records related to" -- oh, okay.  So
10   basically the bids.  We were looking to get all the bids for
11   JEA.
12   Q.   And if we go over to the next page of the exhibit, do we
13   itemize certain entities that submitted revised replies?
14   A.   Yes.
15   Q.   And NextEra, the umbrella company for Florida Power &
16   Light is listed in item A, correct?
17   A.   NextEra, correct.
18   Q.   And then Duke Energy is B?
19   A.   Yes.
20   Q.   Okay.  Moving forward to No. 23, why is it early in the
21   investigation, in your mind, that Florida Power & Light stood
22   out?  What was it about the history with Florida Power & Light
23   and JEA and the service territory that stood out and why we
24   were interested more particularly in them?
25   A.   Sure.
```

BLYTHE - DIRECT                                        Vol. 1-153

1          So Florida Power & Light had had partnerships with
2     JEA in certain matters and/or contracts with them.  JEA sits in
3     the middle of their service territory and has been described to
4     us in interviews as a donut hole in Florida Power & Light.
5          MR. SUAREZ:  I'm going to object to any reference to
6     hearsay statements such as the one he just made as to what was
7     told in interviews --
8          MR. DUVA:  Your Honor, this is going to be a
9     recurring theme here, but if Agent Blythe is not allowed to
10    testify about information that he learned and what he did next,
11    then I'm not sure what we're doing here.  I mean, we don't have
12    to call every witness that we talked to.  We'd be here for two
13    months.
14         THE COURT:  I'll allow it.
15         MR. DUVA:  We might be anyway at this rate.  But
16    ultimately he has to be able to talk about things that he
17    learned.  Now, specific words that somebody said, I get that;
18    but things that he learned which then caused the investigation
19    to pivot to the next step, that's what this is all about.  This
20    is all about what we learned, when we learned it, and what we
21    did with it.
22         And it's an odd construct, it really is, but that's
23    what we're efforting to make a record of.
24         THE COURT:  The objection's noted, Counsel.
25         MR. SUAREZ:  Thank you, Your Honor.

BLYTHE - DIRECT                                        Vol. 1-154

1          THE COURT:  I'll allow it.
2     BY MR. DUVA:
3     Q.   So go ahead, Agent Blythe.  With respect to -- without
4     attributing it to specific words of another person, you know, a
5     lot of reporting about Florida Power & Light and what it was
6     and its interests, kind of talk about how that impacted the
7     decision to seek records and ultimately interviews later of
8     specific employees of that company.
9     A.   Sure.
10         Well, frankly, there are allegations that,
11    quote/unquote, the fix was in for Florida Power & Light to
12    purchase JEA; that there was efforts strategically to make sure
13    that they were the winning bidder.  That was something that --
14    a rumor that we had to sift through early on in the
15    investigation.  That certainly gave us reason to be concerned.
16         Also, in their revised reply to bid -- to purchase
17    JEA in November 2019, they bid $2 billion more than the other
18    bidders at that time.  Would that bid have changed ultimately,
19    given further due diligence?  Probably.  But certainly, if you
20    just look at the bid prices, JEA was more valuable to them than
21    anybody else.
22    Q.   Now, ultimately --
23         MR. DUVA:  And I will also note for the record, Your
24    Honor, replete in the defense exhibits are 302s that are
25    already admitted.  That has what other people said to Agent

BLYTHE - DIRECT                                      Vol. 1-155

```
 1  Blythe.  So, I mean, with that objection maintained, then I
 2  think they're objecting to some of their own exhibits, which
 3  I'm not even objecting to.  Those 302s are renditions of what
 4  other individuals that are not on the witness list said to
 5  Agent Blythe and they're already admitted.
 6            THE COURT:  Noted.
 7  BY MR. DUVA:
 8  Q.  Agent Blythe, ultimately with respect to Florida Power &
 9  Light, with records and the production received, did you
10  ultimately determine -- or we ultimate determined to interview
11  an individual named Mark Hickson?
12  A.  Yes.
13  Q.  How about Pam Rauch?
14  A.  Yes.
15  Q.  And at a later time, Mr. Silagy, Eric Silagy?
16  A.  Correct.
17            MR. DUVA:  Okay.  If we can go to No. 24 and 25
18  together.  I want to pull those up together.
19  BY MR. DUVA:
20  Q.  These are requests aimed at JPMorgan Chase and Morgan
21  Stanley.
22            Why is that, Agent Blythe?
23  A.  Sure.
24            Not only -- you know, they are two of the most
25  prominent financial advisors who assist entities in going
```

BLYTHE - DIRECT                                      Vol. 1-156

```
 1  through recapitalizations or mergers and acquisitions.  And so
 2  they were both contracted with on -- during the ITN by JEA to
 3  provide advice in this recapitalization ITN process.
 4            And so they are in this industry, and they see
 5  mergers and acquisitions.  That's their line of business.  And
 6  so they had -- you know, were people that we thought would have
 7  critical insight into this process, and so we tried to get --
 8  we got records from them, because they also provided
 9  presentations to JEA at board meetings and at workshops
10  off-site, and we also -- you know, they were an integral part
11  of this, so we needed to get their records, their
12  communications, and talk to them.
13  Q.  We'll get more into the substance of records later, but
14  did it become clear after receiving productions that the
15  process with Morgan Stanley and JPMorgan becoming the bankers
16  for the ITN occurred well before the July 23rd, 2019, board
17  meeting?
18  A.  Yes.
19  Q.  And were you able to glean that from the documents that we
20  obtained from Morgan Stanley and JPMorgan based on this request
21  to JEA and also additional grand jury subpoenas to those banks?
22  A.  Yes.
23  Q.  Let's go to section C on the next page.  That's page 7 of
24  the exhibit.
25  A.  (Complies.)
```

BLYTHE - DIRECT                                    Vol. 1-157

1  Q.   Now, this section was directed at the selection of
2  Mr. Zahn as the permanent CEO on November 27th of 2018, and
3  that's the board meeting where that occurred, correct?
4  A.   That's correct.
5  Q.   And this request was aimed at what?
6  A.   There were, you know, allegations related to the process
7  of the CEO selection.  That was something that, you know, we
8  were -- wanted to learn a little bit more about.  But, you
9  know -- so, you know, we asked for records related to that
10 selection process, those board meetings, the communications
11 about that.
12 Q.   And there was some sort of swirling thought that, you
13 know, that process wasn't legitimate, right?
14 A.   Correct.
15 Q.   And we were looking for records from JEA to either confirm
16 that or dispel that, correct?
17 A.   Correct.
18 Q.   Okay.  Let's go to section D of the following page, the
19 JEA itemized subpoenas, with respect to the IPO.
20       There's ten itemized requests.  With your background
21 being a CPA and your knowledge of initial public offerings and
22 what it takes to do one, explain generally, without going
23 through every itemized request, you know, what was in our minds
24 in terms of what we wanted to seek from JEA with respect to
25 whether an IPO was really even considered and how heavily

BLYTHE - DIRECT                                    Vol. 1-158

1  considered it was.
2  A.   Correct.
3       So in my background, I, you know, certainly wasn't a
4  Wall Street guy, but I audited a couple small public companies
5  and provided consulting services to a couple small public
6  companies.  And in the process of doing that, I learned the
7  detailed and lengthy process an entity has to go through to
8  sort of get to a point of being able to issue an initial public
9  offering.  And so, you know, one of the things I discussed with
10 the team and Prosecutor Duva is, okay, well, if they're really
11 seriously considering this, if they go to the SEC and do all
12 these steps of due diligence, to actually investigate that and
13 see what an IPO, an initial stock price, would be to put out
14 there on the market.
15       And our investigation showed that none of that
16 happened.  And, essentially, there was just a PowerPoint
17 presentation given.  It would essentially be like a college
18 class on how to do an IPO.
19       And so we wanted to look into that because we could
20 also see that a ton of work and resources went into soliciting
21 bids for the sale of JEA.
22       MR. DUVA:  And if we can illustrate items 6 through
23 10, since we've illustrated 1 through 5.
24 BY MR. DUVA:
25 Q.   Talk about generally the different steps that have to

BLYTHE - DIRECT                                        Vol. 1-159

```
 1  occur with respect to an IPO, and talk about your takeaway in
 2  terms of the Morgan Stanley PowerPoint that you prepared,
 3  whether it really went anywhere beyond the PowerPoint or these
 4  steps are that are required.
 5           MR. SUAREZ:  Your Honor, I'm going to continue to
 6  object to the leading questions.  It's one after another.  The
 7  entire answer --
 8           THE COURT:  I'm going to give him latitude on this.
 9  This is a pretrial proceeding and may fall under 1101(d)(2)
10  exception.
11           But go ahead, Counsel.
12  BY MR. DUVA:
13  Q.   Agent Blythe, I'm going to talk about the process that we
14  undertook to either confirm or dispel that information that we
15  were requesting in items 6 through 10 happened or didn't
16  happen.
17  A.   Sure.  So the first thing you do, based on my background
18  and understanding, is somebody's got to help the entity draft
19  an S-1, which is a filing with the SEC.
20           So I asked -- I wanted to know did anybody draft an
21  S-1?  Did anybody, you know, formulate registration statements?
22  Were there any EDGAR filings with the SEC?  Did they go to
23  market?  Did they shop around to exchanges and talk to
24  consultants about what a potential price could be for JEA
25  stock?
```

BLYTHE - DIRECT                                        Vol. 1-160

```
 1           And our investigation showed none of those steps ever
 2  got off the ground beyond a PowerPoint presentation.
 3           MR. DUVA:  So, Your Honor, I want to illustrate some
 4  additional grand jury subpoenas.  They're Exhibits 54 through
 5  59.  I'm going to go through these in detail later, but I just
 6  want to make the point about when they were issued.
 7           If we can pull up grand jury Exhibit 54.
 8  BY MR. DUVA:
 9  Q.   And as that's going on, Agent Blythe, is it correct that
10  ultimately -- and we'll get into more specifics later -- that
11  we issued approximately over 40 grand jury subpoenas to
12  different entities?
13  A.   That's correct.
14  Q.   Okay.  I'm going to talk about these five or six that I
15  think are most germane.
16           Is this Exhibit 54 a grand jury subpoena to Willis
17  Towers Watson?
18  A.   Yes.
19  Q.   And you've already talked about who Willis Towers Watson
20  is, and we won't repeat that.  But what I want to focus on --
21  and we'll get into the itemized requests later -- is the date
22  of this grand jury subpoena at the bottom.
23           Is that April 21st of 2020?
24  A.   It is.
25  Q.   So this was issued at or about the same time as
```

BLYTHE - DIRECT                                                    Vol. 1-161

1   the Exhibit 50, the JEA grand jury subpoena.

2   A.   Yes.

3           MR. DUVA:   We can go to 55.

4   BY MR. DUVA:

5   Q.   And is Exhibit 55 the grand jury subpoena to McKinsey &

6   Company?

7   A.   Yes, it is.

8           MR. DUVA:   Okay.  And if we can illustrate the date

9   for that one.

10  BY MR. DUVA:

11  Q.   Same.  April 21st, 2020?

12  A.   Yes.

13          MR. DUVA:   If we can go to Exhibit 56.

14  BY MR. DUVA:

15  Q.   Is this the grand jury subpoena to Morgan Stanley?

16  A.   It is.

17  Q.   And was it issued at about the same date, April 21st of

18  2020?

19  A.   Yes, it was.

20  Q.   Let's go to 57.  And we'll cover these more, in more

21  detail later, a JPMorgan Chase.

22  A.   Yes.  That's our subpoena issued to them.

23  Q.   And was it the same day, April 21st of 2020?

24  A.   Yes, it was.

25  Q.   And then NextEra, Exhibit 58, same situation there?

BLYTHE - DIRECT                                                    Vol. 1-162

1   A.   Correct.  That's our subpoena to NextEra issued on the

2   same date.

3   Q.   And we're going to get into the itemized requests of each

4   at a later time when we're talking more specifically about each

5   entity.

6           S&P Global, we haven't talked about them quite yet,

7   but was it -- that subpoena issued the same date --

8           MR. FELMAN:  Can I get the exhibit number on that

9   one?

10          MR. DUVA:  59.  Sorry.

11          THE WITNESS:  Yes.  This is the subpoena issued to

12  S&P Global, one of the three major rating agencies.

13  BY MR. DUVA:

14  Q.   Why were you interested in S&P Global?

15  A.   Sure.  So S&P is like your credit bureau, to put it real

16  simply, your TransUnion/Equifax/Experian but for companies that

17  hold debt.

18          JEA held a significant amount of municipal debt at

19  that time, and so essentially S&P, Moody's, and Fitch, they

20  rate entities that hold debt like that, and they look at

21  different industries.  And, you know, so there are people at

22  S&P that specifically analyze, you know, the companies and

23  entities in JEA's industry, the public power.

24          And so they, in their review process, in providing

25  ratings, they actually watch the board presentations and look

BLYTHE - DIRECT                                    Vol. 1-163

1   at the -- and/or review the board packages and presentations
2   outside of just the presentations that the senior leadership
3   team gives them.
4           And they provide periodic formal ratings, and in
5   between, if they see any material events, they provide -- issue
6   publications and give analysis on that.  And so they provide
7   ratings to companies anywhere from B minus to AAA.  They vary
8   slightly depending on the rating agency.
9           But we wanted to talk to the analyst at S&P that
10  provided the -- wrote and analyzed -- wrote the publications on
11  JEA and also reviewed the meetings and had conversations with
12  JEA senior executives.
13  Q.   And were those -- some of those individuals Jeff Panger
14  and David Bodek?
15  A.   Yes.
16  Q.   And ultimately did we receive a production from S&P based
17  on the grand jury subpoena to it?
18  A.   We did.
19  Q.   And the same question for the other -- Exhibits 54 through
20  58.  Those entities therein, did we receive productions,
21  pursuant to the grand jury subpoena, from those entities?
22  A.   Yes, we did.
23  Q.   Okay.  So ultimately, between January of 2020 and issuing
24  those grand jury subpoenas essentially around the same time,
25  did it take a few months to get educated about this matter to

BLYTHE - DIRECT                                    Vol. 1-164

1   know what to ask for?
2   A.   Yes, it did.
3           And I remember specifically I was eager to start
4   slinging subpoenas out and serving those to get records.  And I
5   recall you and I having a conversation on the street,
6   basically, "Well, I'm not sure we even know what to ask for
7   yet."
8           And so we continued this process of going through
9   these meetings and trying to better understand what had
10  happened over the course of 2018 and 2019 before we prematurely
11  sent out a subpoena, because we knew that issuing a subpoena to
12  JEA was going to be a very public thing because they're under
13  the Sunshine Law.  So any document issued to them is going to
14  immediately become a public record.
15  Q.   And it did, right?
16  A.   So we wanted to make sure that we -- it did, and we wanted
17  to make sure that we were asking -- gave them a pretty thorough
18  and complete request for what we needed.
19  Q.   And the newspaper, the *Times-Union*, reported on exactly
20  what we asked for in the subpoena to JEA.
21  A.   They did.
22  Q.   And the *Times-Union* is not privy to the grand jury
23  subpoenas that we issued to other entities that same day.
24  A.   No.
25  Q.   And kind of talk about the process of once the grand jury

BLYTHE - DIRECT                                              Vol. 1-165

1    subpoenas are issued, the process that one goes through, based
2    on your experience and what you lived in this investigation, in
3    terms of talking to attorneys that represent those entities and
4    production schedules.  Just generally, not trying to get to too
5    many specifics, but talk about the process that that entails.
6    A.    Sure.  So as one of the -- the case agent and lead
7    investigators on the case, we reach out to counsel for these
8    entities.  Sometimes we -- you know, it -- you've got to figure
9    out who those people are, figure out who to serve the subpoena
10   on.
11         And then there's the, "Agent Blythe, do you realize
12   that we have 20-, 30-, 40-, 50-, 100,000 emails or documents or
13   tens of thousands of pages of documents?  Do you really want
14   all this?"  You know, "Here's what we have.  Here's what we
15   don't have."
16         And going through that process and dialogue,
17   sometimes it's me and their attorneys directly or AUSA Duva
18   with their attorneys.
19         Usually they provide their productions on a rolling
20   basis as things become available in an attempt to be
21   expeditious and provide a response in a timely manner.
22         And then we have to put that into a mechanism to be
23   able to review it and into a document review tool.  And we
24   spent, you know, a lot of time reviewing those records before
25   we -- one, to figure out who was the best person at those

BLYTHE - DIRECT                                              Vol. 1-166

1    entities to talk to.  Sometimes we learned that from the
2    attorneys themselves.  Sometimes we've learned that from the
3    document review, who was really the lead person or who was the
4    person with the most knowledge.
5          And then we sought to interview those people.
6    Q.    And ultimately, kind of getting to some of the personnel
7    in April of 2020, after Mr. Zahn was terminated for cause on
8    January 28th of 2020, Ms. Dykes became the interim CEO; is that
9    correct?
10   A.    Correct.
11   Q.    And then in or about April of 2020, Ms. Dykes was
12   terminated without cause, and Mr. McElroy came back as the
13   interim CEO, correct?
14   A.    He did.
15   Q.    Was that for a period of about six months?
16   A.    Yes.
17   Q.    And do you recall when Jody Brooks came back to -- or
18   began working at JEA at that point?
19   A.    Sometime in that spring/summer of 2020.
20   Q.    And did Ms. Brooks become the chief administrative
21   officer?
22   A.    She did.
23   Q.    And did she kind of become a go-to person if we wanted to
24   interview somebody from JEA or talk about a follow-up
25   communication?  Is she someone we communicated with regularly

BLYTHE - DIRECT                                    Vol. 1-167

```
 1   about these mechanics?
 2   A.   That's correct.
 3   Q.   And ultimately did JEA engage in the process you were
 4   talking about, the rolling production of documents to us?
 5   A.   They did.
 6   Q.   And was the first one on May 8th, 2020?
 7   A.   Yes.
 8   Q.   Talk generally -- and we'll get into some more specifics
 9   when we talk about Willis Towers Watson, but what types of
10   documents did you receive in the May 8th, 2020, production?
11   A.   They provided the production, you know, in several
12   different buckets or tranches.  There were the documents
13   related to the invitation to negotiate the Performance Unit
14   Plan.
15        There were contracts with different vendors, like
16   Morgan Stanley and JPMorgan, McKinsey in that production, and
17   there were board packages and a lot of the -- you know, the
18   easiest to grab and produce documents that were at their
19   fingertips pursuant to the subpoena.
20   Q.   Was there a lot of information in that initial production
21   about Willis Towers Watson and the involvement of David Wathen?
22   A.   Yes.  There was a bucket or a folder in that production
23   related to Willis Towers Watson and some of their presentations
24   and materials provided to JEA.
25   Q.   And we'll get to this more specifically later, but is
```

BLYTHE - DIRECT                                    Vol. 1-168

```
 1   that -- in that production, is that when you received a first
 2   rendition of something called the performance unit scratch
 3   sheet?
 4   A.   Yes.
 5   Q.   Okay.  We'll put a pin in that and come back to it.
 6        Was there another production by JEA on May 22nd of
 7   2020?
 8   A.   Yes, there was.
 9   Q.   And was there a subsequent production on August 20th of
10   2020?
11   A.   Yes.
12   Q.   And then another on October 16th of 2020?
13   A.   Yes.  There were also some in June.
14   Q.   And then later, post-indictment, on August 16th of 2022,
15   based on a missing tranche of emails?
16   A.   Yes.  That was the one I was referring to in June 2020.
17   Q.   And what I'm referring to is there was another production
18   of additional emails post-indictment in August of 2022.
19   A.   I apologize.  Yes.
20   Q.   Okay.  So receiving these documents from JEA and other
21   grand jury subpoenas we covered, you know, talk about the
22   breadth and scope and things that you did to review those
23   materials to determine additional individuals that we wanted to
24   interview.
25   A.   Sure.  So it was really important to me to review these
```

BLYTHE - DIRECT                                    Vol. 1-169

```
 1   documents, to review the emails provided by JEA.  I wanted to
 2   see the communications between the executives, so the
 3   communications between Aaron Zahn and Ryan Wannemacher, their
 4   communications with other executives, people in their chain of
 5   command, about these presentations, about the Performance Unit
 6   Plan.
 7           And I wanted to see their direct communications with
 8   these vendors and consultants who were providing advice and
 9   services related to the ITN and the Performance Unit Plan.  So
10   we spent a lot of time reviewing those emails, the attachments,
11   and to prepare for interviews with all of those people.
12           Usually, whenever we would interview folks -- just,
13   you know, for example, the people who worked with the bankers,
14   Morgan Stanley and JPMorgan, we would send them, you know,
15   documents to review during the interview, that we would show
16   them in the course of the interview, you know, 20, 30-plus
17   documents sometimes.
18           So all that was obtained through this document
19   review.
20   Q.   Talk about the understandings that were reached with JEA
21   with respect to production pursuant to our grand jury subpoena
22   and the timing of it as connected to any productions that would
23   be made to the special investigative committee.
24   A.   So, you know, our deadline with the first subpoena was May
25   20th.  They, obviously, needed more time, and we developed
```

BLYTHE - DIRECT                                    Vol. 1-170

```
 1   search terms with them and -- but I'm -- can you show me
 2   something to refresh my memory?
 3   Q.   Was that -- any search terms that we used, was that
 4   anything we shared with the special investigative committee,
 5   specifically the Smith Hulsey & Busey attorneys?
 6   A.   No.  That was direct through -- you know, we had a
 7   back-and-forth with Jody Brooks, with JEA directly, related to
 8   the search terms.  Or, essentially, I think we started with a
 9   tranche of 800,000 emails or more, and we narrowed that down to
10   300,000.
11   Q.   And in early 2020 was there news media and did you learn
12   about, sort of, the evolution and what would happen with the
13   special investigative committee on behalf of the City Council?
14   A.   Yes.
15   Q.   So you learned that Smith Hulsey & Busey lawyers were the
16   ones that were going to lead that?
17   A.   Yes.
18   Q.   And ultimately, understanding that they would be
19   interested in documents like we were, were there understandings
20   with JEA personnel as to who would be produced -- as to what
21   entity, the Government or the SIC committee, who was going to
22   receive documents first?
23   A.   Well, my position was the federal grand jury subpoena has
24   a trump card, and so we would get the documents as soon as
25   possible.
```

BLYTHE - DIRECT                                    Vol. 1-171

1   Q.   And did we communicate that to JEA, that the expectation
2   was, "We're first.  They're second"?
3   A.   Yeah.  We made that pretty clear.
4   Q.   Meaning we -- I'll clean that up -- the FBI and the U.S.
5   Attorney's Office, and then the SIC committee was second, and
6   we, in fact, said, "If you want to produce anything that you
7   produce to us to them, fine."
8        Does that summarize it?
9   A.   Yes.
10  Q.   Okay.  So a several-month process, fair to say, upon
11  receiving productions, in terms of reviewing them and deciding
12  additional witnesses to talk to?
13  A.   Yes.
14  Q.   And did we begin grand jury testimony with agent-only
15  testimony in December of 2020?
16  A.   We did.
17       MR. SUAREZ:  Your Honor, I have really tried to be
18  patient.  The last five questions --
19       THE COURT:  Mr. Duva, if you could tailor your
20  questions.  I understand we want to move it along as far as the
21  progression of the testimony, but to the extent you can,
22  rephrase your questions.
23       MR. DUVA:  And, Your Honor, these are -- I'm trying
24  to do this on some noncontroversial things.
25       THE COURT:  I understand.

BLYTHE - DIRECT                                    Vol. 1-172

1        MR. DUVA:  I can hand him the grand jury transcript
2   and say, "When is the first time you testified?"
3        And he can say, "December 3rd of 2020."
4        We can do that, and we're going to add a lot of time.
5   I mean, I probably -- I think we're probably going to take up
6   the full eight days, if not more.
7        THE COURT:  Mr. Suarez, these are pretty uncontested,
8   really, as far as --
9        MR. DUVA:  And Mr. Suarez has all of these.  He knows
10  when Agent Blythe testified.
11       MR. SUAREZ:  You know, the rules of evidence are
12  there for a reason.
13       THE COURT:  I understand, Mr. Suarez, with regard to
14  the rules, but, again, this is -- these are pretrial matters,
15  and --
16       MR. SUAREZ:  Your Honor, if I --
17       THE COURT:  And the Court -- the Court does have some
18  discretion with regard to giving the prosecution, or any
19  questioner, some latitude in these types of hearings.  So
20  that's why I've been giving them a little leeway with regard to
21  structure, particularly when they're uncontroverted, so we can
22  move things along.
23       MR. SUAREZ:  And, Your Honor, first of all, let me
24  apologize for interrupting you.  That was --
25       THE COURT:  No.

BLYTHE - DIRECT                                    Vol. 1-173

1          MR. SUAREZ:  I apologize.

2          THE COURT:  I understand, sir.

3          MR. SUAREZ:  The -- my concern is when Mr. Duva --

4   which he does periodically -- he'll ask a series of simple,

5   noncontroversial questions, and then he'll add specific dates,

6   specific names of individuals, rather than letting the witness

7   identify those people.

8          That's where I get concerned.

9          THE COURT:  Okay.

10         MR. SUAREZ:  I'm also troubled by the inclusion of

11  Mr. Duva into the question.  He's not a witness here, and

12  unless he's prepared to be cross-examined, then I think what

13  matters is what this witness has to say.

14         So those are my two primary concerns, Your Honor.

15         THE COURT:  I understand.

16         MR. SUAREZ:  Thank you.

17         MR. DUVA:  And the reality is these aren't all the

18  FBI's ideas.  We worked on this together, so there's a

19  collaboration.  And it's, again, it's an odd construct, but

20  it's more on what did we collectively decide.

21         Now, Agent Blythe is the witness.  Of course, I'm --

22  but I -- you know, I was involved and, in fact, made a lot of

23  these decisions or participated in making these decisions as to

24  what to do when.

25         So I know it like the back of my hand, and what I'm

BLYTHE - DIRECT                                    Vol. 1-174

1   trying to do is move it along.  I mean, I don't -- if Mr.

2   Suarez disputes the first time Mr. Blythe testified -- or Agent

3   Blythe testified before the grand jury is December 3rd, 2020,

4   I'm sure he'll point that out.  But he knows that's true.

5          THE COURT:  And I know Mr. Suarez will have

6   opportunity for a thorough cross-examination when that comes

7   up.  But, again, just be mindful of what Mr. Suarez's concerns

8   are, but let's move on.

9          Go ahead, Counsel.

10         MR. DUVA:  May I confer?

11         THE COURT:  Yes.

12  BY MR. DUVA:

13  Q.   Agent Blythe, I'm handing you your grand jury transcripts.

14  I'm not seeking to admit these.  I'm just showing you those for

15  date purposes.

16         When is the first date you testified before the grand

17  jury?

18  A.   December 3rd, 2020.

19  Q.   Did you testify five times?

20  A.   Yes.

21  Q.   Did you testify additional times in December of 2020?

22  A.   December 17th of 2020.

23  Q.   When was the next one?

24  A.   January 28th of 2021.

25  Q.   When was the next one?

BLYTHE - DIRECT                                           Vol. 1-175

1   A.   March 18th of 2021.

2   Q.   And when was the last one?

3   A.   March 2nd of 2022.

4   Q.   That was the date the indictment was returned and sealed?

5   A.   Correct.

6   Q.   Did Agent Hill likewise testify before the grand jury?

7   A.   Yes, several times.

8   Q.   Did you sort of split the load on that?

9   A.   We did.  I had a family medical emergency that lasted

10  quite some time, so she was nice enough to fill in for me for

11  several weeks.

12  Q.   Now, during those presentations, did we present any

13  statement that Ryan Wannamacher made in the Diamond-Salem

14  hearing to the grand jury?

15  A.   No, we did not.

16  Q.   I'm going to hand you Exhibit 48.  Since it's a bulkier

17  one, I just wanted to hand that to you directly.

18       What is that, sir?

19  A.   This is the Special Investigatory Committee report that

20  was authored by Smith Hulsey & Busey, specifically Steve Busey

21  and Kevin Blodgett, and it also gives a chronology and document

22  references for an index of documents that were attached as

23  exhibits to this.

24  Q.   When was that released?

25  A.   This was released in December 2020.

BLYTHE - DIRECT                                           Vol. 1-176

1   Q.   Well, it's marked December 2020 --

2   A.   I'm sorry.

3   Q.   -- but was it held until right after the first of the

4   year?

5   A.   Yes.

6   Q.   And then that chronology and actual report that went with

7   it were divulged and made public, correct?

8   A.   Yes.

9   Q.   Now, the grand jury subpoenas that we covered before, the

10  six or so, those were issued on April 21st of 2020?

11  A.   Correct.

12  Q.   So roughly six and a half months before this chronology

13  comes out and also the report itself.

14  A.   Yes.  We had received productions from all those subpoenas

15  by this time and had been reviewing documents from those

16  subpoena productions for months in advance of this report being

17  issued.

18  Q.   So this is a 243-page chronology, correct?

19  A.   Correct.

20  Q.   In addition to the documents that we received, how did we

21  use this chronology in terms of the timeline?

22  A.   They did a really good job of developing a timeline and

23  a -- you know, I would call it a repository of HotDocs, you

24  know, pertinent or relevant documents to the -- to the matter.

25  Specifically, a lot of them did relate to the same parallel

BLYTHE - DIRECT                                    Vol. 1-177

1    path that are -- as -- you know, with the Performance Unit
2    Plan.
3            And so it was kind of just a quick reference
4    sometimes to be able to go to to find a document if we didn't
5    already have it set aside in my HotDocs folder or interviews.
6    Q.   So it was used as a resource.
7    A.   Yes.
8    Q.   Were you present at a meeting on December 7th of 2020 at
9    Smith Hulsey & Busey with myself and Investigator Tim Adams,
10   who was a former FBI agent then working at the State Attorney's
11   Office?
12   A.   Yes, I was.
13   Q.   And that was before the release of the chronology and the
14   report, correct?
15   A.   Correct.
16   Q.   And we met with Steve Busey and Kevin Blodgett?
17   A.   We did.
18   Q.   What was discussed, and talk about the flow of
19   information.  Which way did it go?
20   A.   Well, it was one way, from them.  They provided sort of a
21   presentation on their findings and, you know, walked through
22   some of the more significant documents they attached to the
23   report and their findings.
24           And we said, "Thank you," and left.
25   Q.   What did you learn from it?

BLYTHE - DIRECT                                    Vol. 1-178

1            MR. SUAREZ:  Objection, Your Honor, to any hearsay.
2            MR. DUVA:  Your Honor, this whole hearing is about
3    what was learned and when.
4            THE COURT:  Overruled.
5            THE WITNESS:  So (1) I learned that, you know, the
6    vast majority of the stuff that, you know -- that a lot of the
7    things that we had found, they had also found.  But there were
8    a lot of things that we had found in our investigation that
9    they didn't know about because they didn't have the federal
10   grand jury subpoena power to go get certain things.
11           You know, it was interesting because they did find a
12   lot of the things that we found, and so from that perspective
13   it was kind of -- it was, you know, nice to know that we had
14   done a good job to that point, but ...
15   BY MR. DUVA:
16   Q.   Is it fair to say there was a lot of overlap between what
17   we found pursuant to our subpoena requests and then the
18   timeline that they built into this chronology?
19   A.   Yes.
20   Q.   Okay.  We're going to kind of transition now and go back
21   to 2017 and go a bit more chronologically.
22           MR. DUVA:  Let's go to Exhibit 1.
23   BY MR. DUVA:
24   Q.   Were you familiar with the JEA board meeting on November
25   28th of 2017 where Mr. Petway made some comments as the

BLYTHE - DIRECT                                              Vol. 1-179

1  outgoing board chair?

2  A.   Yes.  At that board meeting -- I reviewed it -- he

3  presented several questions and items for consideration for the

4  JEA board.

5  Q.   Did you watch it --

6  A.   I did.

7  Q.   -- in the early parts of the investigation?

8  A.   Yes.

9       MR. DUVA:  If we can publish Exhibit 1, Your Honor.

10 This is about a six-minute clip.

11      THE COURT:  Very well.

12      (Video played.)

13      MR. DUVA:  Can we stop it for a second?

14      THE COURT:  Yes.

15      (Video stopped.)

16      MR. DUVA:  Just kind of go around the horn.

17 BY MR. DUVA:

18 Q.   The person on the far left, who is that?

19 A.   The person on the far left is Husein Cumber, one of the

20 board members.

21 Q.   Next to Mr. Cumber, to his left?

22 A.   That was the CEO at the time, Paul McElroy.

23 Q.   And Mr. McElroy, to his left?

24 A.   A board member at the time, Alan Howard.

25 Q.   Next to Mr. Howard, to his left?

BLYTHE - DIRECT                                              Vol. 1-180

1  A.   That's Jody Brooks, who was the OGC counsel detailed to

2  JEA at the time.

3  Q.   Next to Ms. Brooks?

4  A.   Fred Newbill.

5  Q.   And next to Mr. Newbill?

6  A.   I believe that's Tom Petway.  He's cut off at the moment.

7       (Video played.)

8       MR. DUVA:  Call a time-out here.

9       THE COURT:  Yes.  Let's pause.

10      (Video stopped.)

11      MR. DUVA:  I'd just note that Mr. Zahn just left the

12 courtroom.  I think he has a right to be here during all

13 proceedings.

14      MR. ALBRITTON:  I'm sure he's --

15      MR. DUVA:  He's standing in the courtroom doorway.

16      MR. SUAREZ:  I'm sure he's running to the restroom.

17      MR. DUVA:  I don't think we can keep going without

18 him in here.

19      MR. SUAREZ:  Well, we can waive his presence for a

20 few minutes.  That's fine, Judge.  I don't -- there's no reason

21 to stop the proceedings.

22      MR. ZAHN:  Your Honor, may I use the restroom?

23      THE COURT:  Well, we can take a break anyway.  We're

24 getting close to that anyway.

25      Why don't we take a --

BLYTHE - DIRECT                                    Vol. 1-181

1          MR. ZAHN:  I apologize.

2          THE COURT:  That's quite all right.  But, no, it's --

3   I understand it's a concern, and when we have proceedings,

4   obviously defendants are usually in the courtroom.

5          But, yeah, let's go ahead and take a ten-minute

6   break.

7          MR. ZAHN:  I apologize, sir.

8          THE COURT:  Quite all right.

9          COURT SECURITY OFFICER:  All rise.

10      (Recess from 2:54 p.m. until 3:07 p.m.; all parties

11  present.)

12          COURT SECURITY OFFICER:  All rise.  This Honorable

13  Court is back in session.

14          Please be seated.

15          THE COURT:  Mr. Duva?

16          MR. DUVA:  Thank you, Your Honor.

17          And if -- I think just for probably record purposes,

18  I think I'd like to put on the record that Mr. Zahn was not

19  entirely out of the courtroom at any point.  He was walking out

20  but stood in the doorway when I called the Court's attention to

21  it --

22          THE COURT:  That's correct.

23          MR. DUVA:  -- just to make clear that he was not

24  outside the courtroom.

25          THE COURT:  He was not.

BLYTHE - DIRECT                                    Vol. 1-182

1          MR. DUVA:  Okay.  If we can continue with Exhibit 1.

2      (Video played.)

3   BY MR. DUVA:

4   Q.  So, Agent Blythe, did it become clear that Mr. Petway was

5   on his way out, and Alan Howard took over as the board chair of

6   JEA?

7   A.  Yes.

8   Q.  And did Mr. Howard, even in that clip, essentially ask

9   Paul McElroy, the current CEO, to evaluate the privatization

10  issue?

11  A.  Yes.

12  Q.  And I'm going to show you Exhibit 5.

13          What is Exhibit 5, this resolution?

14  A.  It's Resolution 2018-67-A.  It's a resolution confirming

15  the mayor's appointment of Aaron F. Zahn, a Duval County

16  resident, to the JEA board, replacing Thomas Petway on -- whose

17  term was expiring February 28, 2022.  That would be the end of

18  Aaron Zahn's term.  I apologize.

19  Q.  So then effective -- Mr. Zahn became a board member on or

20  before February 28th, of 2020 -- well, it says 2022, but I

21  think it means 2019?

22  A.  Yes.

23  Q.  Or expiring -- I'm sorry, expiring February 28, 2022; is

24  that right?

25  A.  Yes.

BLYTHE - DIRECT                                    Vol. 1-183

1   Q.   Okay.
2   A.   This was in April, I believe, of 2019.
3          MR. DUVA:  Let's go to the signature page there on
4   the back in terms of when this was approved.  I said the wrong
5   year.
6   BY MR. DUVA:
7   Q.   When was this resolution passed and approved?
8   A.   I apologize.  February 27th, 2018.
9   Q.   And does the date there "approved" say, by the mayor,
10  February 28th, 2018?
11  A.   Yes.
12  Q.   It's also signed by Anna Lopez Brosche?
13  A.   Yes.
14  Q.   Who was she at the time?
15  A.   She was the council president at the time.
16  Q.   So talk about, sort of historically, Mr. Petway's
17  comments.
18         Did that spark discourse and communication that
19  involved privatization discussions, and were there a string of
20  events that happened after that in terms of specific meetings
21  with the council and workshops that ensued?
22         Just kind of talk at a high level about that first
23  before we get into specifics.
24  A.   Yes.  In February 2018, the PFM report came out.  There's
25  a presentation to the Jacksonville City Council.

BLYTHE - DIRECT                                    Vol. 1-184

1          In March of 2018, there's a privatization workshop
2   where Paul McElroy, the CEO, went through PFM's report and also
3   provided, you know, the lay of the land as to where JEA was at
4   in its performance, its potential value, and what a process
5   might look like to privatize JEA.
6   Q.   Let's go to Exhibit 2.
7   A.   (Complies.)
8   Q.   It's a letter dated February 9th of 2018 from Mr. McElroy
9   to Anna Lopez Brosche, as the president of the City Council.
10         What is this letter, and what is it conveying with
11  respect to the Public Financial Management, or PFM?
12  A.   Sure.  So it's -- Mr. McElroy is informing Ms. Brosche
13  that PFM, Public Financial Management Inc., the consulting firm
14  contracted by JEA to conduct an evaluation in privatization
15  research on behalf of the JEA board, that it will conclude its
16  work by the morning of Wednesday, February 14th, 2018.
17         And it basically asked for President Brosche, Council
18  President Brosche, to call a special City Council meeting that
19  day, February 14th.
20  Q.   And the language of a special City Council meeting, did
21  you come to learn the importance of that and what that means?
22  A.   Yes.  Essentially, my understanding is that he was asked
23  to include that language by Brian Hughes because that word
24  means that the council would be able to take action at that
25  meeting.

BLYTHE - DIRECT                                              Vol. 1-185

1   Q.   Let's go to Exhibit 3.

2   A.   (Complies.)

3   Q.   What is Exhibit 3, this memorandum?

4   A.   So this is a memo from the Office of the General Counsel

5   to the mayor and the City Council and the JEA board of

6   directors essentially outlining the statutory process for any

7   transaction or process to privatize JEA.

8   Q.   And the letter itself, grand jury Exhibit 2, the February

9   9th letter, and then this memo, February 13th, 2018, a memo by

10  Jason Gabriel, in essence, these are public records.

11  A.   Yes.

12  Q.   And paragraph 2 of the memo, beginning with, "In an effort

13  to respond to these inquiries" -- this is on Exhibit 3 -- "the

14  current JEA board chair, Mr. Alan Howard, requested that JEA

15  management engage a qualified firm 'to appraise the value of

16  JEA's constituent utilities: electric, water, wastewater, and

17  district cooling.'"

18       Do you see that?

19  A.   I do.

20  Q.   And describe what you learned and how you learned it about

21  PFM, or Public Financial Management, undertaking this task?

22  A.   Sure.  So PFM had been working with JEA for quite some

23  time, and they issued a report, created a report, wherein they

24  basically went through and looked at the comps, similar to if

25  you're selling any asset, to look at companies of similar size

BLYTHE - DIRECT                                              Vol. 1-186

1   and structure, as best as possible, to get the best

2   apples-to-apples comparison of how you would apply certain

3   multiples and ratios from those entities and the prices they

4   sold for to an entity JEA's size and scale it to them.

5        And they used several different commonly used

6   valuation methodologies to do that.  And they also walked

7   through a lot of the considerations that JEA's board and the

8   council should take into account in that process.

9   Q.   Are you familiar with those valuation methodologies

10  because of your training and experience as a CPA?

11  A.   Yes.

12  Q.   I want to go to page 5 of this memo.

13       Does this February 13th memo kind of outline

14  general -- and we'll get more specific -- legal considerations

15  in the process of -- the process that privatization may

16  undergo?

17  A.   Yes.

18  Q.   Okay.  Let's look at item 4.  It's titled Exploration and

19  Transaction Process.

20  A.   Okay.

21  Q.   What is this explaining, generally?

22  A.   Sure.  It's saying, "Should the evaluation conducted by

23  PFM provide justification for further exploration by government

24  for examining and considering further action towards

25  privatization, the" -- it's saying the -- the draft PFM report

BLYTHE - DIRECT                                          Vol. 1-187

1   outlines a six-phased approach to that:  (1) commitment to the
2   process, (2) documentation and disclosure, (3) preparing for
3   the sale, (4) gathering indications of interest, (5) due
4   diligence and final bids, (6) regulatory approvals.
5   Q.   So take away from this -- what were your takeaways in
6   terms of what an exploration of this transaction process would
7   entail and the length of it?
8   A.   It would be a very detailed -- it would be a long process,
9   probably more than months to a year or more, and it would have
10  to go through multiple stages and stages of approval.
11  Q.   And then the last line there, it says, "Incorporating" --
12  and this is on page 5.  "Incorporating the six phases from the
13  PFM draft report, the following is an outline of the process
14  for the benefit of the City Council and JEA."
15          And then the following page -- we won't go through
16  all of these -- but they're listed A through F; is that
17  correct?
18  A.   Yes.
19  Q.   I just want to focus on A.
20          What does A say?
21  A.   It says, "The City Council and JEA evaluate the PFM final
22  report and decide whether to support further exploratory
23  consideration and action.  This can be accomplished through a
24  council resolution.  A cohesive, collaborative, and cooperative
25  approach by the entire consolidated government is highly

BLYTHE - DIRECT                                          Vol. 1-188

1   recommended while the market is tested for such a comprehensive
2   transaction in order to achieve the highest and best potential
3   valuation by interested entities on behalf of the taxpayers."
4   Q.   And the other itemized entries, B through F, talk about
5   additional sort of phases or things that will have to happen in
6   this exploration.
7   A.   Yes.
8   Q.   Let's go to Exhibit 4.
9          Is this the PFM report?
10  A.   It is.
11  Q.   Is it dated February 14 of 2018?
12  A.   Yes.
13  Q.   Let's go to page 3 of the exhibit where it says
14  introduction.
15          MR. DUVA:  If you can highlight that.
16          Perfect.
17  BY MR. DUVA:
18  Q.   And does this essentially recapitulate the questions that
19  Mr. Petway posed on November 28th of 2017?
20  A.   Yes, it does.  It references that board meeting and
21  Mr. Petway's comments, and his questions are in bold there in
22  that paragraph.
23  Q.   And then can you read that first paragraph beginning with
24  "this topic"?
25  A.   "This topic has been raised and studied in the past.  The

BLYTHE - DIRECT                                          Vol. 1-189

1  conclusions of prior studies were that the City and the
2  rate-payers would be better served by having JEA remain in
3  place as a municipally owned utility.
4         "But as Mr. Petway accurately stated at the November
5  meeting, the utility market is vastly different than when JEA
6  was formed in 1967.  Further, in the utility market" -- excuse
7  me.  "Further, the utility market is quite different than it
8  was just five years ago when this topic was last studied."
9  Q.  And we'll go to page 5 of the exhibit.
10        MR. DUVA:  Some of this, Your Honor -- we're not
11 going to read a ton of this.  This is a 27-page report, but I'm
12 just kind of, for the record, pointing out different parts of
13 this that we advocate that the Court might be interested in.
14        THE COURT:  Okay.
15        MR. DUVA:  So highlight that JEA asset summary.
16 BY MR. DUVA:
17 Q.  Is this essentially a summary of, you know, at a very high
18 level, what JEA is as an asset to the City of Jacksonville?
19 A.  Yes.  It shows the number of accounts or customers on the
20 water and electric side in Northeast Florida, and it talks
21 about some of their accolades.
22 Q.  Let's go to page 16 of the exhibit.  It's page 15 of the
23 report but page 16 of the exhibit.  The title is Overview of
24 JEA's Balance Sheet.
25        Can you just kind of summarize what's going on in

BLYTHE - DIRECT                                          Vol. 1-190

1  that section?  What is set forth in that portion of the report?
2  A.  Sure.  It's showing JEA's cash and cash equivalents,
3  long-term debt, and then netting that, the net capital assets.
4  Q.  And the next page, page 17, which is page 16 of the
5  report, there's a portion titled Summary of JEA Potential Value
6  Ranges.
7  A.  Yes.
8  Q.  And kind of looking at that -- and we'll illustrate that
9  portion for a second.  I don't want to go over to the next page
10 yet.
11        But putting together what's on page 17 of the exhibit
12 and page 18, talk about what it says with respect to the
13 summary of JEA potential value ranges and what your takeaways
14 from that were.
15 A.  Sure.  So they used four of the commonly used valuation
16 methodologies.  They, you know, applied -- they looked at
17 entities as comparable as possible.  JEA is a bit unique.  And
18 so they used these four different methodologies and showed the
19 range, the low and high range, for each of those methodologies.
20        And they ranged anywhere from a value -- enterprise
21 value of about seven and a half billion -- excuse me, seven and
22 a half billion all the way up to 11 billion to give
23 decision-makers, stakeholders, an idea of what the potential
24 value for JEA could be.
25 Q.  So those different valuation methods include the

1   discounted cash flow, the price-earnings ratio, the cash-flow
2   multiple, and the rate-based multiple; is that correct?
3   A.   Yes.
4   Q.   Are you familiar with those from being a CPA?
5   A.   Yeah, somewhat.
6   Q.   Okay.  And there's different ranges.  There's -- for each
7   particular method; is that correct?
8   A.   Yes.  Again, they're looking at other entities in the
9   marketplace.  They're doing this analysis, creating a multiple,
10  and scaling it to JEA to come up with potential value of JEA.
11           MR. DUVA:  And if we can go to -- that's the second
12  full paragraph on that page beginning with "one of the first
13  and most."
14  BY MR. DUVA:
15  Q.   Can you read the first sentence of that into the record,
16  sir?
17  A.   "One of the first and most important things that we
18  observed from the table above is that the implied value ranges
19  are very wide.  The lower implied valuation is seven and a half
20  billion, and the higher implied valuation is 11 billion, a
21  difference of three and a half billion dollars.  The upper end
22  of the potential value range provides very large valuation
23  numbers."
24  Q.   Okay.  You can stop there.
25           Can you go to the first sentence in the next

1   paragraph?
2   A.   "While there is good reason to manage expectations when
3   approaching the sale of any large asset, it should also be
4   noted that these lower and higher range figures do not
5   represent the lowest possible or the highest possible values
6   for JEA.  These are the figures supported by reasonable
7   assumptions and historic price comparisons.  However, JEA
8   represents a unique scarce asset which is strategically located
9   in an attractive regional utility market."
10  Q.   Okay.  You can stop.
11           So, again, this page talks about potential value
12  ranges.  There's different accounting methods or methodologies.
13  And kind of summarize what the report is saying as to the
14  breadth of the ranges and what it's cautioning there.
15  A.   It's saying that, you know, it is a wide range, that JEA
16  is unique, so there's limitations in applying these kind of
17  ratios.  But it's also saying that, hey, JEA's in a strategic
18  spot.  And I don't know if that's what they intended.  It could
19  be a reference to other large utilities like Duke and NextEra.
20  Q.   Now, was this talked about at great length at the workshop
21  on March 20th of 2017?
22  A.   Yes.
23  Q.   And was there public discourse about it?
24  A.   Yes.
25  Q.   How did you learn about the PFM report?

BLYTHE - DIRECT                                    Vol. 1-193

1   A.   I learned about it through watching these board meetings
2   and workshops and the presentations that were made to the
3   council.
4   Q.   And was the presentation of the PFM itself made in a
5   public council meeting on February 14th of 2018?
6   A.   Yes.
7   Q.   Okay.  Let's go to 6A, and we won't go through much of
8   this.  I just want to show the face page of 6A, and then we're
9   going to get into another reporting.
10       What is 6A?
11  A.   6A is the package that was provided to the board on March
12  20th, 2018, for the JEA privatization discussion materials at
13  that workshop.
14  Q.   And in that meeting did Mr. McElroy cover, essentially,
15  this presentation?
16  A.   Yes.
17  Q.   And Mr. Zahn was a board member during this March 20th,
18  2018, privatization workshop.
19  A.   Yes, he was.
20  Q.   Okay.  Let's go with clip 1 of 6B.
21       (Video started and stopped.)
22       MR. DUVA:  Sorry.
23       Your Honor, just so the record's clear, instead of
24  going through the 6A separately, you will see pages of this
25  displayed during the video, and so rather than cover it twice,

BLYTHE - DIRECT                                    Vol. 1-194

1   I'm just going to kind of let the video speak for itself.
2        THE COURT:  All right.
3        (Video played and stopped.)
4   BY MR. DUVA:
5   Q.   So, Agent Blythe, kind of working around the table, just
6   waiting for this spot, to Mr. McElroy's right, that is Melissa
7   Dykes, correct?
8   A.   Correct.
9   Q.   Who is to her left?
10  A.   Husein Cumber, a board member.
11  Q.   Who is to Mr. Cumber's left?
12  A.   Kelly Flanagan, board member.
13  Q.   Who is to Ms. Flanagan's left?
14  A.   Alan Howard, board member.
15  Q.   Was he the board chair at that time?
16  A.   Yes.
17  Q.   Who is to his left?
18  A.   Jody Brooks.
19  Q.   And to her left?
20  A.   April -- excuse me, Fred Newbill and then April Green.
21  Q.   And Mr. Newbill and Ms. Green were board members at the
22  time?
23  A.   Yes.
24  Q.   And Ms. Brooks was assigned because she was working with
25  OGC.

BLYTHE - DIRECT                                    Vol. 1-195

1    A.    Correct --

2    Q.    Okay.

3    A.    -- at that time.

4          MR. DUVA:  There's a few more minutes of this clip,

5    and then we'll go on and move forward to a different one.

6          (Video played.)

7          MR. DUVA:  Okay.  That's the end of that clip.

8    BY MR. DUVA:

9    Q.    Mr. Cumber talked about a monopoly, and the only time you

10   want to sell a monopoly is when it's threatened.

11         Did you have an opportunity to talk to him about

12   that?

13   A.    Yes, I did.

14   Q.    And what did you -- what were your takeaways from

15   listening to this and the conversation -- not specifically what

16   he said.

17         But in terms of even deciding whether to sell or

18   privatize JEA, what did you learn from watching this March

19   20th, 2018, meeting and talking to Mr. Cumber?

20   A.    Well, you know, JEA was -- they had the right to provide

21   power here.  So, you know, they also, as a municipal utility --

22   from talking to -- they have the ability to -- usually in the

23   past they would have a lower cost of capital, and they would --

24   you know, but that reality at that time seemed to be changing,

25   for example.

---

BLYTHE - DIRECT                                    Vol. 1-196

1          And so, like he said, the only time you want to give

2    up that monopoly is if it's threatened.  And so one of the --

3    some of the things they were looking at were headwinds in the

4    market or changing market conditions that would make it

5    potentially more difficult to continue, as it were.

6    Q.    And, you know, probably sort of obvious, but with the word

7    "monopoly," it's meaning JEA has no competitors for delivering

8    electricity and water and wastewater --

9    A.    Correct.

10   Q.    -- at that point.

11   A.    Correct.

12   Q.    Okay.  Another clip.  Now, this is, I believe, Mr. Zahn's

13   first meeting or workshop; is that right?

14   A.    Yes.

15   Q.    And he wasn't pictured when I did the still, but he was

16   there and presented, kind of, his own viewpoints during that

17   meeting; is that right?

18   A.    Correct.  He was to April Green's left there, I believe.

19   Q.    Did you watch that?

20   A.    I did.

21   Q.    Okay.  Let's play that.

22         MR. DUVA:  This is about nine minutes, Your Honor.

23   We're not playing the whole meeting.  We're splicing it up.

24   This is fast-forwarding the first clip of the meeting.  It was

25   about 2 minutes and 15 seconds to 14 minutes, and we're picking

BLYTHE - DIRECT                                        Vol. 1-197

```
1   back up at about 21 minutes and 5 seconds, going to 30 minutes
2   and 40 seconds.
3              MR. SUAREZ:  Same exhibit?
4              MR. DUVA:  Same exhibit, 6B.
5              (Video played.)
6   BY MR. DUVA:
7   Q.   Okay.  Agent Blythe, we're in the process of watching
8   these board meetings, and you talked about having watched that
9   presentation as well.
10             Talking specifically about Mr. Zahn's presentations,
11  what piqued your interest about it?
12  A.   You know, it was clear he'd done his homework.  He'd been
13  watching the board meetings.  He knew -- seemed to know a lot
14  about the business, and he was bringing up some of the key
15  market forces or headwinds that electric utilities are dealing
16  with.
17             And so that was something that I know I and the
18  investigative team wanted to better understand from talking
19  to -- as the investigation progressed -- real experts on the
20  matter, people in the industry.  What is the current impact and
21  future expected impact of these different things on an electric
22  utility.
23  Q.   There were some discussions about some very large
24  corporations and their involvement in the utility industry.
25  There was mentions of Microsoft and Airbnb and Amazon.
```

BLYTHE - DIRECT                                        Vol. 1-198

```
1              When those big private, you know, international
2   corporations are mentioned, you know, what are your takeaways
3   in terms of what might be in Mr. Zahn's mind as kind of time
4   goes on and you watch these meetings?
5   A.   You know, are they a -- you know, they're -- he mentioned
6   that they're entering the electric or utility marketplace,
7   becoming power companies, essentially.  I know that later on
8   there is talk at board meetings about large companies like
9   Amazon, for example, going off the grid and becoming
10  essentially, you know, independent, producing their own power,
11  so that was an issue.
12             And also there's -- as part of the strategic planning
13  process, one of the potential options that was referenced was a
14  technology company conversion, essentially JEA being acquired
15  by a technology company, like a Microsoft, etc., or an Amazon.
16  And --
17  Q.   Mr. Zahn mentioned the black swan event.
18             What did you come to learn that he meant by that?
19  A.   My understanding of that is that's the type of --
20  basically becoming irrelevant type thing.  You know, Kodak with
21  digital -- film versus digital photography and sort of being
22  left behind, Blackberry versus smartphones and this and that.
23  Q.   And, in fact, in later board meetings, Mr. Zahn gave
24  exactly those and other examples.
25  A.   Yes.
```

BLYTHE - DIRECT                                        Vol. 1-199

1        MR. DUVA:  Let's go to the final clip.  This is about
2   three and a half minutes, or three minutes and 48 seconds.
3   It's at timestamp 34 minutes to 37 minutes and 48 seconds.
4        (Video played.)
5   BY MR. DUVA:
6   Q.   Okay.  And, Agent Blythe, that's sort of Mr. McElroy kind
7   of wrapping up his presentation.  We just played a portion of
8   it, but he's talking about kind of the general financial
9   metrics and health of JEA; is that correct?
10  A.   Yes.
11  Q.   So I want to ask some questions based on the investigation
12  of reviewing meetings like this and looking at ratings agency
13  presentations and things of that nature in 2018.
14       What were your takeaways as an investigator as to the
15  financial strength of JEA?
16  A.   One of the biggest takeaways was during that time period,
17  from 2012 to 2018, JEA had been able to pay down a huge amount
18  of debt, a billion -- over a billion dollars, if not a couple
19  billion.  I apologize, I can't recall the exact number, but it
20  was significant.
21       And that is part, essentially, of what increased the
22  book value, net book value, of JEA.  You know, if you look at
23  their assets versus liabilities, they had increased in value in
24  that manner.
25       They were -- sales had -- were basically increasing

BLYTHE - DIRECT                                        Vol. 1-200

1   modestly or flat in the electric system, that essentially those
2   efficiencies, energy efficient -- energy efficient technology,
3   although the population continued to increase, you know,
4   revenues weren't quite increasing like they expected them to in
5   the past.  But they weren't, you know, at that time taking a
6   dive.
7   Q.   And nonetheless, with sort of all that analysis as -- and
8   it's -- we know Mr. McElroy resigned on April 6 of 2018, but
9   kind of leading up to that, was there any messaging at all by
10  the CEO, Mr. McElroy, that JEA was facing a death spiral or
11  there was some doom and gloom ahead that no one had seen
12  before?
13  A.   No.  That -- that wasn't Paul McElroy's message.
14  Essentially, he was saying he thought that, yeah, JEA is at
15  peak or a higher value than it has been in the past.  There are
16  changing market conditions that need to be considered, but --
17  but, yeah, he didn't take the same approach.
18  Q.   Okay.  Let's go to Exhibit 7.
19  A.   (Complies.)
20  Q.   And this is a council auditor memo.  It's Special Report
21  No. 807 dated March 27, 2018.
22       Looking at the next page, the introduction, and then
23  there's a chart that has some of those familiar figures, the
24  seven and a half billion to 11 billion under the minimum and
25  maximum under the introduction.

BLYTHE - DIRECT                                          Vol. 1-201

1          MR. DUVA:  If we can kind of grab that.

2   BY MR. DUVA:

3   Q.   Talk about, generally, this report.  We're not going to

4   cover every page.  Just we're going to hit a few highlights.

5          But I want to talk about specifically this table and

6   what the council auditor is setting forth with respect to this

7   introductory language in this report.

8   A.   Sure.  So the biggest things here is that it shows that

9   wide gross value potential for JEA of between seven -- at a low

10  end, seven and a half billion to the maximum 11 billion.

11         And then if you go down to the bottom line, net

12  proceeds to the City based on those two scenarios.  In the

13  low-end scenario, it would net -- net proceeds to the City

14  would be approximately 1.7 billion, and in the maximum scenario

15  of $11 billion, the net proceeds to the City would be 5.2

16  billion, approximately.

17  Q.   So there's some approximations here, but these numbers in

18  terms of net proceeds to the City are being talked about in

19  March of 2008 -- 2018?

20  A.   Yes, sir.

21  Q.   And go ahead and read that language "in the chart above."

22  If you could read that paragraph into the record, and then

23  we'll go forward and talk about other provisions in this

24  report.

25  A.   "In the chart above, we can see that the net proceeds to

BLYTHE - DIRECT                                          Vol. 1-202

1   the City from selling JEA could range from a low of 1.7 billion

2   to a high of 5.2 billion.  However, these numbers alone do not

3   answer the question of JEA's value, and numbers alone do not

4   answer the question as to whether the City should sell JEA.

5   What else needs to be considered?"

6   Q.   Let's go to the next page.  It says, "JEA's contribution

7   to the City general fund."  This is a short section.  There's a

8   figure in there.

9          How much did JEA contribute to the City general fund

10  in fiscal year 2017 and '18?

11  A.   $116.6 million.

12  Q.   And explain what that is and what you learned about that

13  contribution.

14  A.   Sure.  JEA doesn't pay taxes to the City like a private

15  entity would.  So this contribution to the City is in lieu of

16  that, and it's a significant revenue source to the City

17  government.

18         And I -- my investigation showed at different times

19  it's been about, you know, 10 percent of the budget.  And so

20  it's very significant, and that number is something that JEA

21  from time to time received pressure to increase.

22         And so there was question, you know, during the

23  investigation brought up in some of these presentations about

24  JEA's ability to continue doing that in the face of energy

25  efficiency and headwinds in the industry.

BLYTHE - DIRECT                                    Vol. 1-203

1    Q.    And we'll get there, but that was part of the scenario
2    presentation in May of 2019, and also the scenario 2, the
3    traditional utility response presentation to the JEA board in
4    June of 2019; is that right?
5    A.    Correct.
6    Q.    Okay.  Let's go to -- and, again, this is a nine-page
7    report.  We're not going to cover much more about it.  But
8    essentially is this -- and it's titled The Potential Sale of
9    JEA, Things to Consider.
10         Are these sort of thinking points that the council
11   auditor is setting forth about benefits or detriments of a
12   potential sale of JEA?
13   A.    Yes.  It pointed out that the City wouldn't have that
14   consistent revenue source and also goes through some potential
15   drawbacks, pros and cons, of a change in structure.
16         One example is FEMA reimbursement for -- in the event
17   of a natural disaster.  You know, JEA, as a municipally owned
18   utility, is able to receive FEMA reimbursement for the costs to
19   repair the grid, for example.
20   Q.    Page 9 of the exhibit, page 8 of the report, is there a
21   section that summarizes benefits to the City of selling JEA?
22   A.    I'm sorry.  What page are we on?
23   Q.    Page 9 of the exhibit, page 8 of the report.
24   A.    Got it.  Yes.
25   Q.    And I won't have you read those, but just kind of noting

BLYTHE - DIRECT                                    Vol. 1-204

1    that for the record.
2         Below that is there a section that says, "Benefits to
3    the City of keeping the JEA"?
4    A.    Yes, there is.
5    Q.    And on the final page are there some recommendations if
6    the City decides to sell JEA and if the City decides to keep
7    JEA?
8    A.    Yes.  And this is authored by Kyle Billy, the council
9    auditor at the time.
10   Q.    And this was a publicly available document?
11   A.    Yes.
12   Q.    Okay.  Let's go to Exhibit 8.  It's a short video from the
13   April 6, 2018, board meeting.
14        (Video played.)
15   BY MR. DUVA:
16   Q.    Agent Blythe, did you have an opportunity to review that
17   publicly available board meeting?
18   A.    Yes, I did.
19   Q.    And sort of Mr. McElroy gave an extended resignation
20   speech, and he was touting his record and the finances of JEA;
21   is that right?
22   A.    Yes.
23   Q.    And Mr. Howard, in essence, agreed with that, the
24   individual who spoke after, Alan Howard?
25   A.    Yes.

BLYTHE - DIRECT                                    Vol. 1-205

1  Q.   And did you have an opportunity to interview Mr. McElroy

2  and Mr. Howard about sort of the pressure on Mr. McElroy to

3  resign?

4  A.   Yes, I did.

5  Q.   Okay.  And we'll hear directly from Mr. McElroy and

6  Mr. Howard about that later in the hearing.

7        But, ultimately, this was Mr. McElroy's last day as

8  the JEA CEO?

9  A.   Yes.

10 Q.   And did you become aware, kind of, just for timeline

11 purposes, in putting together the timeline, that Aaron Zahn

12 resigned from the JEA board?

13 A.   Yes.

14 Q.   Do you recall when that was?

15 A.   It was shortly after this, within a week or two.

16 Q.   So a matter of about six days?

17 A.   Yes.

18 Q.   And then ultimately, a short time later, April 17th of

19 2018, was Mr. Zahn named the interim CEO of JEA?

20 A.   Yes.

21 Q.   And the JEA board approved; is that correct?

22 A.   Correct.

23 Q.   So Mr. Zahn had been on the JEA board since February 28th

24 of 2018?

25 A.   Yes.

BLYTHE - DIRECT                                    Vol. 1-206

1  Q.   And then finds himself as the interim CEO as of April 17th

2  of that same year.

3  A.   Correct.

4  Q.   Let's go to Exhibit 9.

5  A.   (Complies.)

6  Q.   What is Exhibit 9?

7  A.   It's an email with attached presentation to the

8  Jacksonville City Council.  The date of the presentation is

9  April 27th, 2018.

10 Q.   And looking at the email, is that from a Melissa Charleroy

11 to JEA board members, and also copying Mr. Zahn, Melissa Dykes,

12 Jody Brooks, Ryan Wannamacher, and other individuals?

13 A.   Yes.

14 Q.   And this is a presentation to the Jacksonville Civic

15 Council?

16 A.   Yes.

17 Q.   What is the Jacksonville Civic Council?

18 A.   My understanding is it's a group of, you know, concerned

19 citizens, some of whom have been in public office before.  Such

20 as, for example, John Delaney, a former mayor of Jacksonville,

21 the then president of the University of North Florida, were

22 members.  And, you know, they would have meetings and take

23 presentations from folks in City/County government.

24 Q.   Let's go to page 3 of the exhibit.

25        And this was a public presentation that was made,

BLYTHE - DIRECT                                          Vol. 1-207

1  correct?

2  A.  Yes.

3  Q.  Okay.  And we sort of have the old-style horse with a cart

4  there on page 3; is that right?

5  A.  Yes.

6  Q.  Okay.  Let's go to page 5 of the exhibit.

7  A.  (Complies.)

8  Q.  And there's a listing of JEA's path forward.

9      Can you talk about what's represented here?

10 A.  Yes.  There's four items listed:  (1) focus on the core

11 business, (2) listen and align our purpose with shareholder

12 trustees and stakeholders, (3) align an updated strategic plan

13 to become the utility of the future, and (4) execute as a

14 community.

15 Q.  And then let's go to page 11 of the exhibit.

16 A.  (Complies.)

17 Q.  This is titled Bold Leaders Drive Innovation; is that

18 right?

19 A.  Yes.

20 Q.  And there's various pictures there, including old-style

21 vehicles, and in the middle there's Walmart, and then there's

22 other photographs thereafter.

23 A.  Yes.

24 Q.  Let's go to page 14.

25 A.  (Complies.)

BLYTHE - DIRECT                                          Vol. 1-208

1  Q.  Okay.  This says on the bottom, "Estimated time frame, 6

2  to 12 months."

3      What is this?  And I know it's kind of a busy slide,

4  but what is this sort of laying out?

5  A.  So it's outlining a strategic planning process to

6  determine the future structure of JEA and, you know, a path

7  forward.

8  Q.  And ultimately, under outcomes, underneath, does it say,

9  "Roadmap of vision for JEA's future"?

10 A.  Yes.

11 Q.  And one bullet point on the far right from the bottom,

12 second one from the bottom, "Framework as basis for common

13 working approach for policymakers, board, and senior team to

14 evaluate and implement strategy."

15     Do you see that?

16 A.  Yes, I do.

17 Q.  Okay.  Let's go to Exhibit 10.

18     Before we get there -- actually, I want to show the

19 date.  This is a Future of JEA Workshop.  It says May 30 --

20     MR. DUVA:  You can bring that back up.

21 BY MR. DUVA:

22 Q.  May 31st of 2018.

23     Do you see that?

24 A.  I do.

25 Q.  Did you watch the board meeting on May 15th of 2018,

BLYTHE - DIRECT                                    Vol. 1-209

1  specifically Husein Cumber's comments?

2  A.   Yes.

3  Q.   And what happened -- we're not going to play a clip, but

4  having seen that, what was your -- what happened during that

5  board meeting on May 15th of 2018?

6  A.   Essentially, the board asked management to stop, pause any

7  further work towards privatization at that time.

8  Q.   This Future of JEA Workshop, what were you able to learn

9  about this meeting that occurred at White Oak on May 31st,

10  2018?

11  A.   Sure.  This is an off-site JEA workshop with management,

12  and they, you know, had a speaker, and they went through some

13  of the items about changes in the culture and the future of

14  JEA.

15  Q.   And going underneath the bullet points, it says, in the

16  middle of the page, "The senior leadership team broke into

17  small groups."

18       MR. DUVA:  Can you capture that?

19  BY MR. DUVA:

20  Q.   And there were discussion points that are set forth there

21  on that document, correct?

22  A.   Correct.

23  Q.   And there's a reference to senior leader, and it says:

24  "Big picture thinker.  Forward-looking/anticipatory."

25       Do you see that?

BLYTHE - DIRECT                                    Vol. 1-210

1  A.   Yes, I do.

2  Q.   Okay.  I want to go to page 7 of the exhibit.  There's

3  a -- at the bottom of page 7 of the exhibit, there's question

4  set 2.

5  A.   Yes.

6  Q.   And it says, "What are three conditions that will limit

7  the effectiveness of JEA?"

8       And under, "Truth," what does it say?

9  A.   "Sunshine Law," first bullet.  Second bullet,

10  "Charter/Independent," and third bullet, "Political Intrusion."

11  Q.   And the Sunshine Law is a government in the sunshine.

12       Explain what that is.

13  A.   Sure.  It's a Florida law that's very -- a little bit

14  unique, coming from working in law enforcement in another

15  state.

16       But it essentially makes it very easy for outside

17  persons to make public records requests of public entities and

18  be able to obtain documents.  Meetings have to be held in

19  what's called the sunshine.  Political leaders -- for example,

20  the JEA board -- can't have open discussion about certain

21  things without it being in a publicly noticed meeting.

22       And so it makes it challenging in some ways because,

23  for example, certain things that private companies might keep

24  private, other -- JEA has to make public.

25  Q.   And charter, what do you understand that to mean?

BLYTHE - DIRECT                                          Vol. 1-211

```
 1   A.    So charter is the City Charter, is what they're referring
 2   to, that, you know, allows JEA to operate as an independent
 3   authority, but it's still a municipal asset.
 4   Q.    And, again, publicly available document?
 5   A.    Yes.
 6   Q.    Let's go to Exhibit 11.
 7   A.    (Complies.)
 8   Q.    What is Exhibit 11?
 9   A.    Exhibit 11 is an email from Aaron Zahn to the JEA
10   senior -- or La'Trece Bartley, and it's copying a lot of the
11   senior leadership team and the subject is "Future of JEA SLT,"
12   senior leadership team, "Workshop."  And it's giving an agenda
13   for that meeting.
14   Q.    And this email's June 28th of 2018?
15   A.    Yes.
16   Q.    On that first page under goals, there's -- there's two
17   boxes on the bottom.
18         The one that intersects with, "External market review
19   and 2030 vision exercise," what does it say?
20   A.    Point 1 in the goals column is, "What does JEA look like
21   in 2030?"
22         "What" -- "2, what could the key metrics (see July
23   9th meeting output) look like in 2030?"
24         And third point, "What is JEA doing in 2030 that is
25   different from today?"
```

BLYTHE - DIRECT                                          Vol. 1-212

```
 1   Q.    Let's go to the next page, page 2 of the exhibit, under
 2   JEA -- or Future of JEA Workshop, June 26th of 2018.
 3         MR. DUVA:  If we can highlight that top part.
 4         Thank you.
 5   BY MR. DUVA:
 6   Q.    It says, "Competition for electric revenue - Team Dykes."
 7         What does it say the problem is?
 8   A.    The problem's listed as, quote/unquote, "Get bigger or
 9   die," end quote.  And then it states, "Charter restrictions
10   limit the business type and service territory."
11   Q.    Let's go to the next page under step 2.
12         What does it say?
13   A.    First bullet is, "Rethink the structure of JEA and how it
14   fits into COJ," the City of Jacksonville.
15         Second bullet, "Enhance partnerships with local trade
16   schools and universities," and then, "Funnel back to high
17   schools to get it to be part of their curriculum."
18   Q.    And under Change Management, what does that say?
19   A.    Two points:  "1, Engage in political process to change
20   structures; 2, construct a campaign to educate employees about
21   benefits for them from changing employment structure."
22   Q.    Did you obtain this document from -- because of the
23   Garrity statements of Mr. Zahn and Mr. Wannemacher?
24   A.    No.
25   Q.    Okay.  Let's go to Exhibit 12.
```

BLYTHE - DIRECT                                    Vol. 1-213

1  A.    (Complies.)

2  Q.    This is an email from Elaine Selders dated July 18, 2019,

3  and there are a number of recipients.  It's a little difficult,

4  but in kind of the middle of the recipients, there's an email

5  address for Anton Derkach.

6         Is that correct?

7  A.    Yes.  Derkach@McKinsey.com.

8  Q.    And remind us who Mr. Derkach is.

9  A.    Anton Derkach is an executive director at McKinsey.  He

10  was the lead of the engagement team with JEA to assist them in

11  their strategic planning process.

12  Q.    So this July 19, 2018, email --

13         MR. DUVA:  If we can kind of bring up the bottom

14  portion after, "Good morning."

15  BY MR. DUVA:

16  Q.    What is this?

17  A.    "Please see attached the Addendum 1 for requests for

18  information for strategic planning and implementation

19  consulting services."

20         So, essentially, it's sending out a request for a

21  proposal to get these companies to respond with proposals to

22  provide services for strategic planning.

23  Q.    And let's go to page 7 of the exhibit under Section 2.2,

24  scope.

25  A.    Yes.

BLYTHE - DIRECT                                    Vol. 1-214

1  Q.    And you don't have to read this, but what is the scope of

2  the request for information?

3  A.    Yeah.  So it's looking for -- to determine interest in

4  companies to participate in the solicitation to get a -- JEA's

5  trying to get a consultant -- or, excuse me, the City's trying

6  to get consultants to look at City assets to provide strategic

7  planning and implementation services.

8         And it says -- it says, "JEA is seeking a consultant

9  (also referred to as the company) that provides strategic

10  planning and implementation services.  The consultant will be

11  required to work directly with the JEA board (both collectively

12  and individually), JEA's CEO (chief operating officer), and the

13  entire senior leadership team in order to develop and implement

14  a strategic plan for JEA."

15  Q.    You testified earlier about learning about Mr. Derkach

16  from publicly available board meetings, including the January

17  2019 board meeting?

18  A.    Correct.

19  Q.    So as of this email and the attached request for

20  information, what were your takeaways in terms of strategic

21  planning and what was upcoming at JEA after July of 2018?

22  A.    So, you know, there were -- despite, you know, Husein

23  Cumber's motion and then that direction at that board meeting,

24  they were lining up consultants to move this process of

25  strategic planning forward.

BLYTHE - DIRECT                                     Vol. 1-215

1   Q.   And ultimately McKinsey was involved in developing the
2   scenario 1, or the status quo presentation that the board
3   received in January of 2018?
4   A.   Yes.
5   Q.   And did McKinsey ultimately become a subcontractor to the
6   Pillsbury law firm during the -- that lead-up to the invitation
7   to negotiate?
8   A.   Yes.  Their contract or services were put under the
9   auspices of the outside counsel Pillsbury.
10  Q.   And kind of jumping forward, and then we're going to kind
11  of toggle back, but in watching the May through July 2019 board
12  meetings, is it correct that Mr. Wannemacher addressed the JEA
13  board at various times?
14  A.   Yes, he did.
15  Q.   And Mr. Zahn addressed the JEA board at various times?
16  A.   Yes.
17  Q.   And Ms. Dykes addressed the JEA board at various times?
18  A.   Yes.  They all did.
19  Q.   Let's go to Exhibit 13, and this is titled Special
20  Committee on the Future of JEA - Final Report.
21       It's dated July 25th, 2018?
22  A.   It is.
23  Q.   What is this?
24  A.   So this is the Jacksonville City Council, they formed a --
25  God bless you.

BLYTHE - DIRECT                                     Vol. 1-216

1        MR. FELMAN:  Excuse me.
2        THE WITNESS:  They formed a special committee as a
3   result of the City's conversation and the council's
4   conversation surrounding a possible recapitalization or
5   privatization of JEA.
6        And so they -- you recall we had talked about Kyle
7   Billy's memo, and so this was their report, after having heard
8   from PFM and Kyle Billy about this process and what the
9   implications were for the City.
10       MR. SUAREZ:  Your Honor, I'm sorry.  Could I have
11  that exhibit number again?
12       MR. DUVA:  Yeah.  It's 13.
13       MR. SUAREZ:  Thank you.
14  BY MR. DUVA:
15  Q.   Under Special Committee, if you can -- if you can read
16  that, sir, just the first couple sentences.
17  A.   Number one?
18  Q.   Yes.
19  A.   "The entity that eventually became the Special Committee
20  on the Future of JEA was created in response to activities by
21  JEA board members that generated interest and concern in the
22  community about the future of the utility.
23       "At his last meeting before leaving the board in
24  November 2017, outgoing board member and former chairman Tom
25  Petway suggested that the time was right for the JEA to

BLYTHE - DIRECT                                    Vol. 1-217

1   consider whether the services and financial benefits derived
2   from a privatization of JEA would better serve its customers
3   and the citizens of Jacksonville."
4   Q.   Okay.  And you can stop.
5        Going down to the next paragraph, it says at the
6   bottom, "The committee was charged with four tasks," and
7   there's four bullet points.
8        Can you elaborate on those?
9   A.   Sure.  So the point of the committee and their work was to
10  understand all the aspects and implications of who, what, when,
11  where, and why of this potential sale of JEA, the roles of the
12  parties and stakeholders and what role they play in that
13  process; to conduct the necessary meetings and hearings to
14  gather the relevant facts that the council should consider
15  related to a potential sale of JEA; offer monthly updates on
16  the progress of this work; and make recommendations to ensure
17  transparent and open progress for the citizens of Jacksonville
18  as the sale of JEA was considered.
19  Q.   Okay.  Let's go to page 7 of the exhibit under Value of
20  JEA.
21  A.   (Complies.)
22  Q.   And we've seen this type of information before, but is
23  there a section here in this report that talks about the value
24  of JEA in terms of the different modeling and the four bullet
25  points that are just below that paragraph?

BLYTHE - DIRECT                                    Vol. 1-218

1   A.   Sure.  It summarizes the same valuation comparables that
2   PFM came up with in their report, just in a different format,
3   of seven and a half billion to $11 billion, so the potential
4   estimated value of JEA based on comparisons to other utilities
5   sold.
6   Q.   Let's go to page 9.
7   A.   (Complies.)
8   Q.   In the middle of the page there's a paragraph that begins
9   with, "In 2013," and there's four bullet points underneath
10  that.
11       Do you see that?
12  A.   I do.
13  Q.   And what is this talking about?
14  A.   So it is sort of stating the other benefits besides just
15  the net value of JEA to the City of Jacksonville in the event
16  of a sale.
17       For example, JEA contributed between 860 to 910
18  million to Gross County Product, GCP.  JEA's contribution was
19  1.4 to 1.5 percent of Duval County's gross -- GCP.
20       JEA directly and indirectly impacted 4,500 to 4,700
21  jobs.
22       And JEA impacted earnings/personal income was 206 to
23  $310 million.
24  Q.   Let's go to page 16 of this exhibit, and I'm just kind of
25  pointing this out for the record.

BLYTHE - DIRECT                                    Vol. 1-219

```
 1              According to the City Council report, are there
 2   unanswered questions that are listed and also a list of
 3   conclusions?
 4   A.   Yes.
 5   Q.   And we won't cover those specifically, just kind of
 6   pointing those out for the record in terms of where JEA sits at
 7   that time per the City Council, July 25th of 2018.
 8   A.   Yes.  Yeah.  It provides some of the intangible benefits
 9   of JEA remaining in its current structure and items for
10   considerations along with that.
11   Q.   So in this report -- and I know this is a City Council
12   report -- is there, you know, doom-and-gloom talk that, you
13   know, things have to change immediately or JEA is in
14   significant financial distress?
15   A.   No.
16   Q.   Let's go to Exhibit 14.
17   A.   (Complies.)
18   Q.   And is this an email exchange on September 4th of 2018
19   involving Juli Crawford and Aaron Zahn?
20   A.   Yes.
21   Q.   If we can go to the middle.  There's three emails.  I want
22   to focus on the middle one first.
23              And can you read that, sir.  It's just one line.
24   A.   Sure.  It's an email from Juli Crawford, Manager of
25   Financial Planning and Rates, to Aaron Zahn, 1:19 p.m.  She
```

BLYTHE - DIRECT                                    Vol. 1-220

```
 1   wrote, "Aaron, per your conversation with Ryan, attached and
 2   below is the execution plan for the status quo JEA case.  Thank
 3   you, Juli."
 4   Q.   And what did Mr. Zahn respond?
 5   A.   "This works great.  Thanks.  Happy to review it anytime
 6   that you're ready."
 7   Q.   So in terms of reviewing this email, this September 4th,
 8   2018, email, the mention of the status quo JEA case --
 9              MR. DUVA:  And if we can show the next page.
10   BY MR. DUVA:
11   Q.   It's a little bit blurry, but is this one of the first
12   mentions of the status quo case?
13   A.   Yes.
14   Q.   And what did you understand that to mean?
15   A.   Status quo is what I understand -- understood to mean is
16   that if JEA didn't take action to address the changing market
17   forces, how would that play out from a financial perspective
18   for JEA going forward, and how would it impact its business?
19              And so this was an execution plan, a tentative
20   timeline of how to develop that -- that case.
21   Q.   And did the status quo ultimately develop into the
22   scenario 1 presentation which was made in May of 2019 to the
23   JEA board?
24   A.   Yes.  That's my understanding.
25   Q.   And did this presentation, as it ultimately was given,
```

BLYTHE - DIRECT                                      Vol. 1-221

1  become known as the death spiral or the basis for the
2  doom-and-gloom outlook?
3  A.   That's what some folks have called it.
4  Q.   And Juli Crawford -- just to go back and tie that off --
5  at the time was she JEA's manager of financial planning and
6  rates?
7  A.   Yes, she was.
8  Q.   Let's go to Exhibit 15.
9  A.   (Complies.)
10 Q.   What is Exhibit 15?
11 A.   It's an email from Juli Crawford dated September 14th,
12 2018, to Ryan Wannemacher, the interim chief financial officer
13 at the time, copying Paul Steinbrecher, the VP, and Raynetta
14 Marshall.
15      The subject is, "Status quo JEA case draft," with the
16 attachment "Draft JEA Status Quo Case PowerPoint."
17 Q.   And the email says, "Ryan, attached is our first draft of
18 the status quo JEA presentation.  Notes are in red.  I'm
19 copying Ray and Paul to see if they have any information to add
20 regarding market forces and their impacts on water sales."
21      And then it continues, "Thanks, Juli," after there's
22 some additional language; is that correct?
23 A.   That's correct.
24 Q.   Let's go to the next page that's sort of the face page of
25 the exhibit.

BLYTHE - DIRECT                                      Vol. 1-222

1  A.   (Complies.)
2  Q.   So this is one of many iterations of the status quo JEA
3  case, sort of the beginnings of it, correct?
4  A.   Yes.  There were several drafts.
5  Q.   Let's go to page 5 of Exhibit 15.
6  A.   Okay.
7  Q.   Talk about this.
8       And is this one of the first places you started to
9  see this JEA electric sales and projections?
10 A.   Yes.  There were several iterations of this graph or chart
11 that, you know, showed JEA sales going back to 1979 -- electric
12 sales -- and projections.
13      And it was used to illustrate, if you looked at the
14 trend line from 1979 and sort of the reality of steady growth
15 based on population increases, seeing a sort of corresponding
16 increase in electric sales to the growth in population, that,
17 you know, that trend has sort of changed.  And, you know,
18 certainly there's discussion about why and the implications of
19 that.
20      And also looking at the current trend lines from
21 2006, it draws the green line from 2006, comparing the highest
22 year of electric sales to 2017.
23      It has a red line showing JEA's 2017 sales projection
24 based on the ten-year site plan and a blue line illustrating
25 JEA's 2006 sales projection based on its integrated resource

BLYTHE - DIRECT                                             Vol. 1-223

```
 1  plan and sort of the disparity between the two -- or the
 2  multiple trend lines.
 3  Q.   So from 1979 to 2006, I mean, growth was essentially a
 4  given.
 5  A.   Yes.
 6  Q.   And the green line from 2006, what was selected was the
 7  highest level of sales in the history of JEA to draw that green
 8  line going forward two additional years; is that right?
 9  A.   Yes.
10  Q.   So if you picked a different year like 2012, that line
11  would actually be going up a little bit, wouldn't it?
12  A.   Yeah, slightly.
13  Q.   And 2012, that was the beginning of Mr. McElroy's tenure
14  as the CEO?
15  A.   Yes.
16  Q.   Let's go to page 7.
17  A.   (Complies.)
18  Q.   So this says, "Doing nothing," and then it just says after
19  the language there on page 7, "Results are in."
20       What are the results?
21  A.   Additional revenue required from customers from 2018 to
22  2030 would be a billion dollars.  It's essentially a cash gap.
23  Q.   And going to page 9, and I think page 8 begins the water
24  presentation.
25       What is -- what is page 9 with respect to the water
```

BLYTHE - DIRECT                                             Vol. 1-224

```
 1  portion?  What does this say as to "doing nothing" and then
 2  "the results are in"?
 3  A.   Sure.  Regarding doing nothing, there would be no change
 4  in cost structure, no change in capital structure, no change in
 5  rate structure.  And continuing to comply with their current
 6  pricing policy, the results would be new debt for capital
 7  investments but no additional revenue required from customers.
 8  Q.   Let's go back to page 5.
 9  A.   (Complies.)
10  Q.   I want to cover -- you mentioned some of these additional
11  colored lines, and you mentioned the integrated resource plan,
12  and we'll cover that in more specific later.
13       But what is the integrated resource plan and how did
14  you go about getting those different planning documents for
15  five-year periods for JEA?
16  A.   Sure.  Integrated resource plan is a long-term strategic
17  planning document related to, you know, Jacksonville's
18  resources for generation of electricity and water and, you
19  know, making sure that they have the right amount of capacity
20  with a certain buffer.  And part of that is a -- is a sales
21  production.
22  Q.   And talk about other planning documents that you became
23  aware of and how you became aware of them, including ten-year
24  site plans.
25  A.   Sure.  The ten-year site plan was a little bit different,
```

BLYTHE - DIRECT                                    Vol. 1-225

1   but it's updated every year, and it's something that looks ten
2   years into the future.
3        And it's also looking at -- the IRP is looking at,
4   "Hey, do we need to build this type of power plant versus that
5   type of power plant?  Is that investment worth it?  Is that the
6   right kind of power plant to build?" for example.
7        Whereas the ten-year site plan is looking more at
8   capacity, and can you meet customer capacity with a certain
9   buffer.
10  Q.   And that's a rolling ten-year projection.  In other words,
11  every year there's a ten-year site plan.
12  A.   Yes.
13  Q.   And that is a document that is provided to the Public
14  Service Commission?
15  A.   Yes.
16  Q.   So if you wanted to review the ten-year site plans, you
17  can get them from JEA and also the Public Service Commission.
18  A.   Yes.
19  Q.   And then that buffer you mentioned in terms of the
20  ten-year site plan, does that involve what JEA can deliver on
21  its highest demand day in a given year and then factors in --
22  for electricity, and then factors in a 15 percent buffer?
23  A.   Yes.
24  Q.   And so ultimately, what is the Public Service Commission
25  looking for in those types of documents from JEA and other

BLYTHE - DIRECT                                    Vol. 1-226

1   municipal utilities in terms of their capacity?
2   A.   The Public Service Commission wants to make sure the
3   utility can meet customer demand.
4   Q.   And did you have the opportunity during the investigation
5   to review the ten-year site plans for 2017, 2018, and 2019?
6   A.   Yes, I did.
7   Q.   And also you mentioned the integrated resource plans.
8        Did you gather and analyze those as well?
9   A.   Yes.
10  Q.   And how about rating agency presentations to Standard &
11  Poor's and Fitch and Moody's that were given over the years,
12  including 2018 and 2019?
13  A.   Yes, I did.  And the rating agency presentations are a
14  five-year look forward and, you know, are essentially trying to
15  prove to those rating agencies that they're able to meet their
16  debt financing obligations going forward.
17  Q.   So in the investigation, did it become clear, like,
18  exhibits like Exhibit 15 were sort of the baseline for what was
19  going to become scenario 1 and delivered to the JEA board?
20  A.   Yeah.  It's part of the -- you know, as part of those,
21  there's a sales projection showing modest sales growth.
22  Q.   And what I'm asking is, did you have the opportunity to
23  review exhibits like Exhibit 15, sort of the beginnings of
24  scenario 1 --
25  A.   Yes.

BLYTHE - DIRECT                                        Vol. 1-227

1  Q.   -- and then also compare those to the ten-year site plan,
2  the integrated resource plan, and then also presentations made
3  to the rating agencies?
4  A.   Yes.  Those were all things we looked at in our
5  investigation.
6  Q.   Let's go to Exhibit 16.
7  A.   (Complies.)
8  Q.   What is that?
9  A.   Exhibit 16 is the contract between the JEA and McKinsey &
10 Company dated September 28, 2018.  That's the company that
11 Anton Derkach was the executive director or the leader of that
12 engagement team, and they assisted JEA with the status quo case
13 and the strategic planning process.
14 Q.   And is this contract dated September 28th of 2018?
15 A.   It is.
16 Q.   So this is about a little more than two months after that
17 request for information that we looked at previously, which was
18 Exhibit 12; is that correct?
19 A.   Correct.
20 Q.   So McKinsey gets the work; is that fair?
21 A.   Yes.
22 Q.   In terms of paragraph 1, the agreement, what is the
23 agreement?
24 A.   "JEA hereby engages the company and the company hereby
25 accepts that engagement for the purpose of performing the

BLYTHE - DIRECT                                        Vol. 1-228

1  services as described in JEA's solicitation 124-18 designated
2  as strategic planning and implementation consulting services."
3  Q.   Did you obtain this document from JEA and from McKinsey
4  pursuant to the grand jury subpoenas that were issued?
5  A.   Yes, I did.
6  Q.   And let's go to the signature page on page 3.
7  A.   (Complies.)
8  Q.   And that's the signature page for this contract?
9  A.   Yes.
10 Q.   And let's go to page 45 of this exhibit.
11 A.   (Complies.)
12 Q.   Are there various amendments contained, and this being an
13 example of increasing the amount that JEA would pay to
14 McKinsey -- and let's go to the whereas clause from second to
15 the bottom.
16      Periodic amendments of the amounts that JEA was
17 paying to McKinsey in terms of what the allowable ceiling would
18 be?
19 A.   Yes.
20 Q.   And this -- the new maximum indebtedness here, as of this
21 addendum, became $1,053,000?
22 A.   That's correct.
23 Q.   And let's go to the following page.
24 A.   (Complies.)
25 Q.   Is this April 19th of 2019?

BLYTHE - DIRECT                                          Vol. 1-229

1   A.   Yes.

2   Q.   Let's go to Exhibit 17.

3   A.   (Complies.)

4   Q.   What is Exhibit 17?

5   A.   Exhibit 17 is an email from Ryan Wannemacher to Jason

6   Gredell.

7   Q.   Who is Jason Gredell?

8   A.   Jason Gredell was one of the bankers that helped with the

9   privatization process.

10  Q.   With JPMorgan?

11  A.   Correct.

12  Q.   Did you interview him?

13  A.   We did.

14  Q.   Did we issue a grand jury subpoena, which we talked about

15  before, to JPMorgan?

16  A.   Yes, we did.

17       MR. DUVA:  And just for record purposes, that was

18  Exhibit 57.

19       MR. FELMAN:  Mr. Duva, I thought you said that was

20  Exhibit 17.  I might be wrong.

21       MR. DUVA:  What I meant, Mr. Felman, is the grand

22  jury subpoena to JPMorgan was Exhibit 57.

23       MR. FELMAN:  Okay.  Sorry.

24       MR. DUVA:  We're talking about Exhibit 17 also.

25       MR. FELMAN:  Okay.

BLYTHE - DIRECT                                          Vol. 1-230

1   BY MR. DUVA:

2   Q.   So this email, Exhibit 17, from Ryan Wannemacher to

3   Mr. Gredell, it says what?

4   A.   It says, "You can use this presentation for slides and

5   templates.  Thanks, Ryan."

6        And it attaches a sample JEA presentation with

7   their -- their template, and it's got some information about

8   JEA's financial condition.

9   Q.   And JPMorgan is one of the investment banks that

10  ultimately is involved in the ITN.

11  A.   Yes.  They're the -- you know, one of the two advisors for

12  that process, to handle that transaction.

13  Q.   Let's go the page 2 of this presentation.

14       What is page 2?

15  A.   Page 2 is JEA's financial strength -- it's entitled JEA's

16  Financial Strength Revised.

17  Q.   And just kind of cover generally some of the high points

18  there.

19  A.   Sure.  It states that JEA has an increased revolver by

20  $200 million at the same pricing/terms and conditions.

21       It negotiated a contribution agreement extension,

22  providing stability through 2023.

23       Maintaining solid AA financial credit metrics.

24  That's the rating agency designation or grade.

25       Increased cash flow by an average of $80 million

BLYTHE - DIRECT                                  Vol. 1-231

1   annually through 2023.

2           Their plan is to pay off a billion dollars of debt by

3   2023, all debt maturing before 2028.

4           And cash funding, $1.6 billion in capital

5   expenditures over the next four years.

6           And increasing capital expenditures by over 40

7   percent over the next five years versus the last five.

8   Q.   So this talks about maintaining the AA credit metrics for

9   the electric system.

10          What is a AA credit rating?

11  A.   It's a very high rating for -- given by the rating

12  agencies.

13  Q.   And you referenced paying off 1 billion of debt by 2023,

14  and what did you understand all debt maturing before 2028 to

15  mean?

16  A.   That that's when their municipal bonds that they have out

17  there on the market in various forms would mature.

18  Q.   Okay.  And this email, again, this was November 16th of

19  2018?

20  A.   Yes.

21  Q.   Okay.  Let's go to the next slide, page 3 of the exhibit.

22  A.   (Complies.)

23  Q.   Now, does this assess capital expenditures, the plan in

24  the next five years versus the previous five?

25  A.   Yes.

BLYTHE - DIRECT                                  Vol. 1-232

1   Q.   Let's go to page 6 of Exhibit 17.

2   A.   (Complies.)

3   Q.   The chart on the left is entitled Long-Term Debt.  The

4   chart on the right is Revenue and Sales.

5           Talk about what this shows from fiscal year 2011

6   going forward in terms of the long-term debt that is retired at

7   JEA and then projections from 2018 to 2023.

8   A.   Sure.  So the -- it gives the red trend line from fiscal

9   year 2011 to fiscal year 2023.  Keep in mind, this is being

10  given in 2018, so the, you know, present year here is fiscal

11  year 2018, and the years in gray and blue are moving forward in

12  time five years.

13          But it's stating in four years, at the bottom, total

14  debt of JEA will be the lowest in almost a quarter century.

15  Q.   And the revenue and sales information, including in 2018,

16  and what is that looking like in terms of staying above the

17  12,000 megawatts-per-hour threshold?

18  A.   It's showing flat sales going forward five years.

19  Q.   And that's the electric system, correct?

20  A.   Correct.

21  Q.   Let's go to page 11 of Exhibit 17, and -- let's actually

22  go to 10.  I'm sorry.

23          I just want to make the illustration for the record

24  that these next charts pertain to the water system.

25  A.   Correct.

BLYTHE - DIRECT                                          Vol. 1-233

1   Q.   Okay.  Let's go to page 11.

2        What is this showing in terms of retirement of

3   long-term debt from about fiscal year 2012 going towards 2018

4   and then projections five years out?

5   A.   So similar to the electric slide, it's the same format.

6   It's showing a, you know, decreasing trend in the amount of

7   JEA's debt.  Essentially, they've paid off this debt from 2011,

8   2012, going forward to the present in 2018, and they intended

9   for that to continue through 2023.

10       It states at the bottom, "In four years, the total

11  debt will be the lowest in 35 years."

12  Q.   So this is an email communication between Ryan Wannemacher

13  to Jason Gredell, and did we obtain this pursuant to the grand

14  jury subpoena to JEA?

15  A.   Yes.

16  Q.   So this isn't a public document yet.  It's something

17  that -- I mean, could be pursuant to a public records request,

18  but this is a communication privately that Mr. Wannemacher and

19  Mr. Gredell are having?

20  A.   At this time, yes.  It probably became public at some

21  point.

22  Q.   Page 11 of the exhibit it says, "In four years, the total

23  debt will be the lowest in 35 years," and that's for the water

24  system, correct?

25  A.   Correct.

---

BLYTHE - DIRECT                                          Vol. 1-234

1   Q.   Okay.  Let's go to Exhibit 18.  We're going to talk about

2   long-term incentive plans and Pat Maillis and Willis Towers

3   Watson.

4        So this email from Pat Maillis to other individuals

5   at Willis Towers Watson, was this November 26th of 2018?

6   A.   Yes.

7   Q.   Let's go down to the paragraph that begins -- it's about

8   middle of the page.  It says, "However, there is an additional

9   ask."

10  A.   Yes.  Ms. Maillis wrote, "However, there is an additional

11  ask.  The CEO is seeking to put LTI in place."  LTI stands for

12  long-term incentive.

13       "Looking at some public/government survey info, it

14  appears this form of comp is only used at about 25 percent of

15  public-sector companies.  I'm planning to dust off and use the

16  percentages provided for the SLT analysis in 2017."

17  Q.   And then there's some information about directors and

18  managers and supervisors and other individuals, correct?

19  A.   Yes.

20  Q.   Who is Pat Maillis?

21  A.   Pat Maillis was the director of employee services.  She

22  was in the human resources chain of command under Angie Hiers

23  at the time.

24  Q.   And did you ultimately interview Pat Maillis?

25  A.   Yes.

BLYTHE - DIRECT                                    Vol. 1-235

1   Q.   And did you interview Angie Hiers?

2   A.   I did.

3   Q.   And these documents received from JEA and also watching

4   the board meetings that you talked about, what did you learn

5   Willis Towers Watson to be?

6   A.   Sure.  So I learned that Willis Towers Watson is a leading

7   compensation consultant that, you know, numerous companies hire

8   to help them develop a compensation strategy.

9   Q.   And, ultimately, the next day, November 27th of 2019, is

10  that the day that Mr. Zahn, at the JEA board meeting, became

11  the permanent CEO?

12  A.   That's correct.

13  Q.   We won't show that board meeting, but kind of talk about,

14  did you watch it?

15  A.   Yes.

16  Q.   And what were -- what was the process?  What occurred

17  during that meeting that led to Mr. Zahn becoming the permanent

18  CEO?

19  A.   Sure.  So -- so, as we said before, you know, Mr. Zahn

20  became the interim CEO.  And there was -- after that point in

21  time, there was a consultant hired to undertake a national

22  search and go through a selection process.  And they vetted

23  various applicants and presented sort of a narrow group of

24  those to the board.

25       The board selected a certain number of folks to

BLYTHE - DIRECT                                    Vol. 1-236

1   interview for the position.  They were scored, and ultimately

2   they narrowed it down to three applicants, Mr. Zahn and two

3   other folks who were interviewed formally in front of the -- in

4   a public board meeting there.

5        And, ultimately, Mr. Zahn was selected as the

6   permanent CEO that day.

7   Q.   And the other individuals, was that Chris Eugster and

8   Pamela Hill?

9   A.   Yes.

10  Q.   And did we present clips of this meeting, this publicly

11  available meeting on the JEA website, to the grand jury?

12  A.   We did.

13  Q.   And in the investigation, was there interest in Mr. Zahn's

14  rise to the JEA board and then his resignation soon thereafter

15  to become the interim CEO and then his, ultimately, pursuit of

16  the permanent CEO position?

17  A.   Yes, we were interested in that.  We initially received

18  allegations that that process, maybe, wasn't fair or was

19  predetermined.

20  Q.   And, ultimately, did you interview individuals about that?

21  A.   We did.

22  Q.   And did that include Alan Howard?

23  A.   It did.

24  Q.   Did it include Melissa Dykes?

25  A.   Yes.

BLYTHE - DIRECT                                          Vol. 1-237

1  Q.  And did that include Brian Hughes?
2  A.  Yes.
3  Q.  Let's go ahead, and we'll get to more specifics about that
4  later, but I want to show you Exhibit 19.
5         This is Ordinance 2018-142-E, and explain -- and we
6  won't get into too much detail, but what is this ordinance that
7  was passed or enacted on November 27th, 2018, the same day that
8  Mr. Zahn became the permanent CEO of JEA?
9  A.  Sure.  It's an ordinance relating to the City Council's
10 power to sell the JEA, amending Section 21.04, City of
11 Jacksonville charter, to provide that any approval by the
12 council of the sale of 10 percent or more of the JEA must
13 include the call for a subsequent referendum of voters.
14        So essentially, if the board and the council approved
15 the sale of JEA, then it would have to go to the voters for a
16 referendum, a vote.
17        MR. DUVA:  And, Your Honor, just a note as to
18 numbering, items in the 20 series are meant to correspond to
19 allegations in the overt acts paragraph of the indictment,
20 which is also No. 20.
21        So these are documents that we are going to examine
22 Agent Blythe about that we used and how we found them to allege
23 the specific overt acts in Count One, of which there are 30,
24 ranging from A to DD.
25        Now, some of the documents cover multiple overt acts,

Vol. 1-238

1  so there are some breaks.  Like sometimes there might be 20B1
2  and 20B2 but not a 20C, so we'll make that kind of clear later
3  on.
4         We're going to skip the 20 series and go into 21,
5  which is some emails in November and December of 2018 about the
6  long-term incentive plan with Willis Towers Watson.
7         So with that sort of wind-up, it's 4:59.  It might be
8  a good stopping point.
9         THE COURT:  Yeah, I think so.  I think it would be a
10 good break point.
11        One second.  Madam Deputy?
12        (Pause in proceedings.)
13        THE COURT:  I'm thinking we'll start court tomorrow
14 at nine o'clock.
15        MR. DUVA:  Yes, sir.
16        THE COURT:  So 9:00 a.m. tomorrow.
17        Anything else for the order before we adjourn?
18        MR. DUVA:  One thing we talked about among the
19 lawyers, and it's obviously the Court's calendar and Court's
20 preference.  We were talking about whether the Court would
21 entertain having, like, a couple hours' worth of the hearing on
22 Wednesday late in the afternoon.  It just would allow us to
23 plow some additional ground.
24        I think Agent Blythe will be on the stand the entire
25 day tomorrow --

Vol. 1-239

```
 1            THE COURT:  Okay.
 2            MR. DUVA:  -- and we may be able to finish the
 3   direct, I think, if we used a little bit of Court time late on
 4   Wednesday.
 5            THE COURT:  You say a couple hours?
 6            MR. DUVA:  I think so, 2:30 to 5:00 or 3:00 to 5:00,
 7   whatever the Court's calendar allows.  I know counsel came from
 8   out of town, most of them.
 9            THE COURT:  Right.
10            MR. DUVA:  So I'm obviously here.  I'd sort of throw
11   it out to them of whether or not they're in agreement with
12   that.
13            THE COURT:  I'll discuss that, and that's maybe a
14   possibility, yes.
15            MR. DUVA:  Thank you, sir.
16            THE COURT:  Okay.  All right.  We'll adjourn and
17   reconvene tomorrow at 9 o'clock.
18            COURT SECURITY OFFICER:  All rise.
19       (The proceedings were adjourned at 5:00 p.m., to be
20   continued on May 16, 2023.)
21                         -  -  -
22
23
24
25
```

Vol. 1-240

```
 1            CERTIFICATE OF OFFICIAL COURT REPORTER
 2
 3
 4   UNITED STATES DISTRICT COURT )
 5   MIDDLE DISTRICT OF FLORIDA   )
 6
 7       I hereby certify that the foregoing transcript is a
 8   true and correct computer-aided transcription of my stenotype
 9   notes taken at the time and place indicated therein.
10
11       DATED this 17th day of May, 2023.
12
13                         s/Shelli Kozachenko_____
14                         Shelli Kozachenko, RPR, CRR, CRC
                           Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```

# Doc. 269

Vol. 2-1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                    MIDDLE DISTRICT OF FLORIDA
                        JACKSONVILLE DIVISION
 3

 4   UNITED STATES OF AMERICA,        Jacksonville, Florida

 5            Plaintiff,              Case No. 3:22-cr-23-BJD-MCR

 6   -vs-                             May 16, 2023

 7   AARON ZAHN,                      9:01 a.m.
     RYAN WANNEMACHER,
 8                                    Courtroom 5C

 9            Defendants.
     _____

10

11             TRANSCRIPT OF KASTIGAR HEARING
                         (VOLUME II)
12        BEFORE THE HONORABLE MONTE C. RICHARDSON
               UNITED STATES MAGISTRATE JUDGE
13

14

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22        Shelli Kozachenko, RPR, CRR, CRC
          221 North Hogan Street, #185
23        Jacksonville, FL  32202
          Telephone:  (904) 301-6842
24

25                 (Proceedings reported by stenography;
                    transcript produced by computer.)
```

Vol. 2-2

```
 1                  A P P E A R A N C E S

 2

 3   COUNSEL FOR THE GOVERNMENT:

 4        Tysen Duva, Esquire
          Arnold Corsmeier, Esquire
 5        United States Attorney's Office
          300 North Hogan Street, Suite 700
 6        Jacksonville, FL  32202

 7        David Pardo, Esquire
          United States Attorney's Office
 8        400 North Tampa Street, Suite 3200
          Tampa, FL  33602

 9

10   COUNSEL FOR DEFENDANT ZAHN:

11        Eduardo Suarez, Esquire
          The Suarez Law Firm, PA
12        1011 West Cleveland Street
          Tampa, FL  33606

13

14        Brian Albritton, Esquire
          Raquel Jefferson, Esquire
15        Phelps Dunbar, LLP
          100 South Ashley Drive, Suite 2000
16        Tampa, FL  33602

17

18   COUNSEL FOR DEFENDANT WANNEMACHER:

19        James Felman, Esquire
          Kynes, Markman & Felman, PA
20        100 South Ashley Drive, Suite 1300
          Tampa, FL  33601

21        Niels Murphy, Esquire
          Catherine Licandro, Esquire
22        Murphy & Anderson, PA
          1501 San Marco Boulevard
23        Jacksonville, FL  32207

24

25
```

Vol. 2-3

```
 1            T A B L E   O F   C O N T E N T S
 2
 3   GOVERNMENT WITNESS:                        Page No.
 4     AGENT ROBERT BLYTHE
 5       DIRECT EXAMINATION (CONT'D) BY MR. DUVA...      6
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Vol. 2-4

```
 1                  P R O C E E D I N G S
 2   May 16, 2023                             9:01 a.m.
 3                        -  -  -
 4        COURT SECURITY OFFICER:  All rise.  United States
 5   District Court in and for the Middle District of Florida is now
 6   in session, the Honorable Monte C. Richardson presiding.
 7        Please be seated.
 8        THE COURT:  Good morning.
 9        ALL:  Good morning, Your Honor.
10        THE COURT:  We're back.
11        Mr. Duva, you are continuing examination of the
12   agent?
13        MR. DUVA:  Yes, sir.
14        THE COURT:  And, Agent, you're still under oath.
15        THE WITNESS:  Yes, Your Honor.
16        MR. DUVA:  Just a couple housekeeping matters, Your
17   Honor.
18        THE COURT:  Yes.
19        MR. DUVA:  I replaced Exhibits 51 and 53.  Mr. Felman
20   made the correct point that those were -- the ones that I had
21   marked were not from the prior time.  I found those --
22        THE COURT:  Okay.
23        MR. DUVA:  -- marked them, sent them to defense
24   counsel.
25        We have marked new exhibits, which I've provided to
```

Vol. 2-5

```
 1  defense counsel.  They are Exhibit 61 -- and we'll update the
 2  exhibit list -- is a 302 of David Wathen.  Exhibit 62 is a 302
 3  of Anton Derkach.  63 is a 302 of Jason Gredell.  64 is a 302
 4  of Eddie Manheimer.  65 is a 302 of Mark Hickson.  66 is a 302
 5  of Stephen Amdur.  67 is a 302 of Jeff Panger.
 6          68A is a 302 of Jody Brooks.  68B is another 302 of
 7  Jody Brooks.  69 is Pat Maillis; 70, Angie Hiers; and 71,
 8  Elizabeth Columbo.  And those have been provided electronically
 9  to defense counsel.
10          THE COURT:  Thank you, Mr. Duva.
11          Also, I heard, as Mr. Duva and defense counsel
12  indicated, maybe some time for tomorrow afternoon for hearing,
13  and I was able to block off some time, and I'll throw this out
14  to see if this could work.
15          I blocked off from 1:00 to 5:00 tomorrow afternoon.
16  Is that doable?
17          MR. DUVA:  Yes, sir.
18          MR. FELMAN:  Yes, Judge.
19          THE COURT:  Okay.
20          MR. SUAREZ:  Yes, sir.
21          THE COURT:  Excellent.  Excellent.
22          MR. DUVA:  So with that timing -- I don't want to
23  make predictions I can't make happen, but I think with that
24  timing, we will finish the direct of Agent Blythe -- I think
25  we've got a chance today, but I don't think that's entirely
```

```
 1  realistic.
 2          But given the time tomorrow, I think we can do that,
 3  and I think that will put us sort of back where I thought we
 4  would be --
 5          THE COURT:  Good.
 6          MR. DUVA:  -- heading into Thursday.
 7          THE COURT:  Good.  Excellent.
 8          MR. DUVA:  Okay.  We're ready to proceed when the
 9  Court's ready.
10          THE COURT:  I'm ready, Counsel.
11          MR. DUVA:  Thank you.
12          AGENT ROBERT BLYTHE, GOVERNMENT'S WITNESS, SWORN
13              DIRECT EXAMINATION (CONTINUED)
14  BY MR. DUVA:
15  Q.  We left off yesterday, and we were talking about the end
16  of 2018.  I want to circle back, though, to Government's
17  Exhibit 28 and try to clear up some timing about that --
18  A.  Yes.
19  Q.  -- since this is about when we received certain things and
20  what we did with them during the investigation.
21          And Exhibit 28, for record purposes, is the email --
22  if we can display 28 -- from Elizabeth Columbo dated May 20th,
23  2019, to Ryan Wannemacher and Herschel Vinyard, copying other
24  lawyers at the Pillsbury law firm.
25          And then there's a memorandum on page 3 of the
```

DIRECT - BLYTHE                                              Vol. 2-7

1  exhibit dated that same day, May 20th of 2019.
2        We'll get into the substance of this later, but I
3  just want to ask you, how did you obtain this?
4  A.   Yes.  I was thinking about this, and I think I wanted to
5  correct a couple things I said yesterday.
6        I looked back at my file and, you know, essentially I
7  received this document on March 23rd, 2020, from the Office of
8  General Counsel.  That was my first awareness of this document.
9        My confusion came with we did interview Jody Brooks
10 about this document but not until April 13th, 2020.  She had
11 since returned to JEA.  She had been gone from JEA from shortly
12 after Mr. Zahn became CEO until early March or April 2020.
13       And so she had been informed about and questioned
14 about this document, then, after her return to JEA.
15       MR. DUVA:  If we can go to page 3 of the exhibit.
16 BY MR. DUVA:
17 Q.   And, again, we're not going to get into much substance
18 with this, but that top half there, what is the attachment to
19 the email in Government's Exhibit 28?
20 A.   Sure.  It's a legal memorandum drafted by Elizabeth
21 Columbo and to other attorneys at Nixon Peabody.
22       And it sets forth the issue, that JEA had asked Nixon
23 Peabody whether JEA may create or establish a long-term
24 employee incentive program to pay a bonus or additional amounts
25 to employees of JEA for a period of one to three years if JEA

DIRECT - BLYTHE                                              Vol. 2-8

1  were to choose specific and mechanical financial metrics, such
2  as an increase in the net asset value of JEA or an increase in
3  the amount of transferred -- excuse me, or an increase in the
4  amount transferred annually to the City of Jacksonville.
5  Q.   Did this surround an iteration of what we believe to be
6  the Performance Unit Plan in connection with a bond issuance?
7  A.   Yes.  That was an earlier iteration or draft form or
8  concept for the Performance Unit Plan.
9  Q.   And if we look at the brief answer -- and, again, we'll
10 cover this more later in the hearing, but in summary, it speaks
11 for itself on page 1 of the memo, page 3 of the exhibit.
12       But in essence, what is -- what is the brief answer?
13 A.   It's saying that Florida law doesn't allow for a plan like
14 this for a municipally owned electric utility.
15 Q.   We'll come back to this later.  I just wanted to cover
16 that at this point.
17       Let's go back to where we left off, and we were about
18 to cover Exhibit 21A.
19       MR. DUVA:  If we can go to 21A.  It's an email.
20       Let's start from the bottom and go up.
21 BY MR. DUVA:
22 Q.   What is 21A?
23 A.   21A's a November 29th, 2018, email exchange between Angie
24 Hiers, Dale Swain, Ryan Wannemacher, and Angie Hiers -- and
25 Melissa Dykes on the second email down.

DIRECT - BLYTHE                                        Vol. 2-9

1   Q.    So the bottom email is actually the prior day, November
2   28th, 2018, from Ms. Hiers to Ms. Dykes and Mr. Wannemacher,
3   and it says, "Attached is a copy of the document with the
4   changes we discussed."
5          And then above that, what does Mr. Wannemacher reply
6   that same day?
7   A.    Mr. Wannemacher replies, "Angie, I added a few items.
8   Please take a look in the morning and incorporate your other
9   changes.  Thanks, Ryan."
10         MR. DUVA:  If you can go to page 2 of the exhibit.
11  BY MR. DUVA:
12  Q.    And what is this titled?
13  A.    Fiscal Year '19 Pay for Performance Plan, Corporate
14  Performance, with Appointed Individual Performance Model.
15  Q.    And read the third bullet point down.
16  A.    "The proposed target incentive opportunity (TIO) reflects
17  cash incentive and total cash compensation amounts at market
18  50th percentile for the utility industry (IOU and public)."
19  Q.    That 50th percentile for the utility industry, talk about,
20  from this point forward in the materials that you obtained
21  pursuant to the grand jury subpoena to JEA and reviewed, how
22  does this 50th percentile sort of play in to the long-term
23  incentive plan analysis as it's presented to the JEA board in
24  the future?
25  A.    Sure.  So as part of JEA's total market compensation

DIRECT - BLYTHE                                        Vol. 2-10

1   strategy that, you know, Mr. Zahn and others in the senior
2   leadership team were putting forth to the board, is they wanted
3   to basically benchmark JEA employees' compensation against
4   other utilities in the market and have -- make sure that JEA's
5   compensation for its employees at various levels was at the
6   50th percentile in the market.
7          And so part of that was benchmarking JEA against --
8   and looking at the long-term incentives -- as it relates to
9   long-term incentives, looking at the long-term incentives of
10  other companies in the market, including investor-owned
11  utilities, making sure that they aligned it with similar
12  companies.
13  Q.    And was that 50th percentile pitched over a period of
14  years?
15  A.    So I think that had changed -- there had been a policy,
16  and that was something that the senior leadership team was
17  trying to get practice and alignment with.
18         MR. DUVA:  Let's go to the fourth bullet from the
19  bottom.  That's the longer one.
20         Yes.
21  BY MR. DUVA:
22  Q.    Beginning with long-term incentives or LTI, can you read
23  that, sir?
24  A.    "Long-term incentives (LTI) are typically a component of
25  total compensation designed to align employees who have the

DIRECT - BLYTHE                                    Vol. 2-11

1   greatest influence on the 35-year strategic goals of the
2   company.  LTI is most typically used in investor-owned
3   utilities (IOUs) and publicly traded companies.  About 25
4   percent of government, public sector, and nonprofits use LTIs.
5        "The most prevalent population to receive LTI are the
6   CEOs, C-suite executives, and director level (direct reports to
7   executives).  The prevalence dramatically declines at
8   management/supervisory levels and is typically not used at all
9   for individual contributors and line employees.
10       "LTI can have cliff or prorated vesting typically
11  over a period of three to five years.  Payout is commensurate
12  with risk.  Target incentive is a percentage of the
13  individual's base salary."
14  Q.   Let's go to the next page, which is titled FY19 Pay For
15  Performance Plan Corporate Performance Plan and Profit Sharing.
16       MR. DUVA:  And if we can go to the fourth bullet
17  point down beginning with, "The combination."
18  BY MR. DUVA:
19  Q.   What does that say?
20  A.   "The combination of the corporate performance plan and the
21  profit-sharing plan result in total cash compensation of market
22  50th percentile."
23  Q.   And the second bullet from the bottom, merging those two
24  concepts, what does that say?
25  A.   "Estimated payout at meets, 9.4 million and exceeds, 11.8

DIRECT - BLYTHE                                    Vol. 2-12

1   million.  (Does not include CEO at 20 percent for CFO/COO.)"
2   Q.   And let's go to the next page, which is titled Long-Term
3   Incentives, and can you read that first sentence in the first
4   paragraph.
5   A.   "Long-term incentives" -- excuse me, "Long-term incentive
6   are a form of variable compensation typically reserved for top
7   management (vice presidents and above) in private-sector
8   organizations and are designed to reward long-term strategic or
9   financial objectives of the corporation.  The metrics
10  associated with these plans are typically stretch/high to
11  correlate with a higher risk and thus a higher payout.  The
12  prevalence or usage of LTI in the public sector is less than 25
13  percent of companies have an LTI plan."
14  Q.   And the short third paragraph, can you read that?  And
15  then we'll move to the assumptions.
16  A.   "JEA has not had a plan of this nature, and therefore
17  finance and SLT would need to be engage," sic, "to develop the
18  factors associated with the measurements and agree to
19  thresholds."
20  Q.   And the assumptions, what are those in this document?
21  A.   "Market 50th percentile target LTI as a percentage of base
22  pay.
23       "Target LTI is based on information from private
24  industry.
25       "For budgeting purposes, thresholds of payout have

DIRECT - BLYTHE                                    Vol. 2-13

1   been assumed of plus or minus 25 percent of target, 100 percent
2   (lowest payout is 75 percent, target is 100 percent, and exceed
3   is 125 percent)."
4   Q.   And this table under that -- we'll just display it and
5   move on -- but is that a three-year vesting involving
6   directors, SLT, and the COO for a period -- sort of a rolling
7   three-year period beginning with fiscal year 2019 to 2022?
8   A.   Yes.  The years are the rows, and the three columns to the
9   right show the 75 percent of target, target, and then 125
10  percent of target for exceeds.
11  Q.   So for 2019/2022, the target is $3.704 million.
12  A.   Yes.
13  Q.   Okay.  Let's go to 22A.  I want to talk about strategic
14  planning with McKinsey.  And we're going to look at some emails
15  with Mr. Derkach, and then we're going to go back to 21B and
16  then cover some materials with respect to David Wathen at
17  Willis Towers Watson.
18       If you can -- at 22A, the email that reads, "Dear
19  Aaron, Melissa, and Ryan," can you read that, sir?
20  A.   "We would like to follow up on our conversation and share
21  with you a draft of a more detailed work plan combining all
22  phases of the strategic planning effort, including
23  organizational culture baseline.
24       "Please let us know your thoughts and feedback.  In
25  the meantime, we will continue to push on the activities of the

DIRECT - BLYTHE                                    Vol. 2-14

1   pre-work phase and get ready to launch organizational culture
2   baselining effort."
3   Q.   And above, where -- the email, is that Mr. Derkach from
4   McKinsey?
5   A.   Yes.  That's correct.
6   Q.   And you testified yesterday that you saw him present
7   during the January 2019 board meeting when you watched the
8   board meetings at the beginning of the COVID shutdown?
9   A.   Yes.
10  Q.   And did that cause you to want to seek documents from
11  McKinsey and also interview Mr. Derkach?
12  A.   Yes, absolutely.  He was clearly somebody that was
13  participating and providing advice to JEA and developing these
14  presentations in consultation with JEA, so he's, of course,
15  somebody we wanted to talk to.
16  Q.   This is a bit of a lengthy PowerPoint presentation, and
17  we'll try to hit the highlights.
18       MR. DUVA:  But if you can display the first page of
19  the PowerPoint, which is page 2 of the exhibit.
20  BY MR. DUVA:
21  Q.   And it says, "Building a Strategic Framework for JEA:  The
22  Work Plan," and it's dated December 17th of 2018, and it's
23  listed as a discussion document; is that right?
24  A.   Yes.
25  Q.   Just generally -- and we'll display --

DIRECT - BLYTHE                                    Vol. 2-15

1           MR. DUVA:  Let's go to page 4 of the exhibit, which
2    is page 3 of the presentation.
3    BY MR. DUVA:
4    Q.   What is this?
5    A.   So it lays out a pathway or -- and a timeline to an
6    executable strategic plan, starting out with a base case and
7    business-as-usual projections, then scenario development, and
8    looking forward to, you know, JEA's goals and initiatives JEA
9    could undertake to transform itself.
10   Q.   And there are phases in the slide sort of to the right and
11   the middle, Phase 1, Phase 2, and Phase 3?
12   A.   Yes.
13   Q.   And it's working towards an executable plan with no
14   regrets.  Near-term actions and options for a long-term path;
15   is that correct?
16   A.   Correct.
17   Q.   Let's go to the next page.  There's an overview of
18   Phase 0.  And, again, there's a lot of words on these slides,
19   and I'm going to try to break the habit of us reading a bunch
20   of information, just trying to flag a lot of these things for
21   the record.
22           But generally, what is the overview of Phase 0?
23   A.   That's basically looking at -- you know, that's the
24   beginning of looking at the baseline draw.
25           It says, "Draw from off-the-shelf scenario modeling

DIRECT - BLYTHE                                    Vol. 2-16

1    and strategy development work completed to co-develop scenarios
2    of how technology, penetration, regulatory outcomes, and
3    customer behavior will impact JEA over the 2030 time frame."
4           So basically looking at those factors in the market
5    and industry, how it will affect JEA during that time.
6    Q.   And that was the basis for -- next to 0.2, developing
7    alternative scenarios?
8    A.   Yes.
9    Q.   Let's go to the next page, "Overview of Phase 1:  Set
10   Ambition and Aspiration."  And 1.2 says, "Test JEA future
11   performance."
12           What is that getting at?
13   A.   It's looking at forecasting sales of revenue based on, you
14   know, different scenarios.
15   Q.   Is this a planning tool as well for the development of the
16   scenario planning?
17   A.   Yes.
18   Q.   Let's look at page 8 of the exhibit.  It's "Overview of
19   Phase 2:  Develop Strategic Portfolio Initiatives."
20           2.1 says, "Establish teams against priority topics,"
21   and it talks about developing work streams to meet performance
22   and health targets using JEA's strategic framework combined
23   with "utility of the future" key themes for utilities to
24   improve performance."
25           Now, that "utility of the future" language, you

DIRECT - BLYTHE                                        Vol. 2-17

1   interviewed Anton Derkach, correct?
2   A.   Yes, I did.
3   Q.   We're going to talk about specifics of that later, but
4   ultimately what did you learn was McKinsey's charge in this
5   strategic planning?  What was it supposed to do to help JEA in
6   terms of the future?
7   A.   So one of the -- sort of the second phase in their view at
8   the outset was to help JEA develop a plan to become -- to
9   transform itself to become a utility of the future and be
10  successful even in its current form for structure as a
11  municipally owned utility.
12  Q.   And I was going to get to that.
13       What kind of utility of the future, a private one or
14  a municipal one?
15  A.   Municipal.
16  Q.   So was there any discussion that you learned of at this
17  time, in December of 2018, where the words sale, ITN, or
18  recapitalization were discussed with McKinsey?
19  A.   In that interview Mr. Derkach --
20       MR. SUAREZ:  Your Honor, I'm going to object to
21  hearsay.
22       MR. DUVA:  Your Honor, the 302 is in evidence -- of
23  the entire interview is in evidence, and the defense admitted
24  302s with no objection of the government, like yesterday, and I
25  was pretty surprised by this.

DIRECT - BLYTHE                                        Vol. 2-18

1       But we have to illustrate what Agent Blythe and
2   myself knew and when and what we did with that information.
3   It's offered for that purpose of knowledge and decisions of
4   what happened next, not for the truth of what about Derkach
5   says.
6       If there's a trial in this case, we would call
7   Mr. Derkach, but for the purposes of this hearing, we don't
8   need to.
9       THE COURT:  I'll allow it.  Overruled.
10  BY MR. DUVA:
11  Q.   Agent Blythe, go ahead.
12       You were talking about generally the conversation
13  with Mr. Derkach about assisting JEA to become a municipal
14  utility of the future.  And I asked about did the discussion of
15  sale or recapitalization -- I also mentioned the ITN.  Did that
16  occur in December of 2018?  And you began to answer that
17  question.
18  A.   The answer -- the short answer's no, at that point in
19  time.  It wasn't until much later that he was informed of that,
20  of JEA's intent to move in that direction.
21       MR. DUVA:  Let's go to page 11, and that will be the
22  last slide that we'll show in this slide deck.
23  BY MR. DUVA:
24  Q.   This is the "Overview of Phase 3:  Finalize an Executable
25  Plan."  And the deliverable is the executable strategic plan

DIRECT - BLYTHE                                    Vol. 2-19

1  for JEA on the right, and the description, just kind of distill
2  those things.
3          What were the -- in terms of mapping potential
4  constraints to execution, what are the types of things that --
5  or the overview of how this sort of strategic planning is going
6  to end in the later phases?
7  A.   Well, so one of the things was -- in coordination with JEA
8  is to map out which -- what constraints out there might prevent
9  them from going into certain lines of business, for example,
10 things such as the City charter or regulatory issues related to
11 JEA being a municipally owned utility.
12         And then also to 3.2, refine the initiatives and test
13 those initiatives against the constraints through stakeholder
14 engagement.
15         And then develop detailed initiative-level
16 implementation plans to look at the financial impact of all
17 milestones to achievement, KPIs, and timeline to realize
18 impact.
19 Q.   Let's go to --
20 A.   Finalize a plan.
21 Q.   Okay.  Let's go to 21B, and we're going to -- going to
22 toggle back to -- and I'm trying to kind of keep a timeline
23 here and go chronologically as -- most of the time.
24         But this is an email communication spanning December
25 20th and December 27th of 2018 involving Angie Hiers and Ryan

DIRECT - BLYTHE                                    Vol. 2-20

1  Wannemacher, and there are other JEA individuals, employees
2  that are copied.
3          But the bottom email on page 1, the December 20th
4  email, 2018, from Ms. Hiers and Mr. Wannemacher, what does that
5  say?
6  A.   Ms. Hiers wrote, "Ryan, can you send me the final new
7  incentive document?  Didn't know which one of you has access to
8  Ryan's files, thus I cc'd all of you."
9  Q.   And ultimately that same day, Mr. Wannemacher responded,
10 "Attached"?
11 A.   Correct.
12 Q.   And then did Ms. Hiers send an email on December 27th,
13 looks like after the holidays, to Pat Maillis, a JEA employee,
14 that just says, "The latest version to send to Andrea"?
15 A.   Yes.
16 Q.   Is Andrea Andrea Deeb at Willis Towers Watson?
17 A.   That's my understanding.
18 Q.   Let's go to the next page, and we won't do too much with
19 this one.  I just want to illustrate that this attachment is
20 similar to what we looked at in 21A in terms of the pay for
21 performance plan and long-term incentives.
22 A.   Correct.
23 Q.   And if you can go to page 4 of the exhibit.
24 A.   (Complies.)
25 Q.   Does that contain the three-year vesting table with the 75

DIRECT - BLYTHE                                      Vol. 2-21

1   percent of target, target, and 125 percent of target and the
2   rolling three-year period that's listed?
3   A.   Yes, very similar to what we saw in the last version of
4   this exhibit.
5   Q.   Were you able to obtain this email and interview Ms. Hiers
6   and Ms. Maillis about it?
7   A.   Yes.
8   Q.   I'm going to go to 23A next.  I'm going to talk about
9   compensation committee.  And this is an email from David
10  Goldberg to Mr. Zahn, copying Kerri Stewart.
11           And was Ms. Stewart the VP and chief customer officer
12  at the time at JEA?
13  A.   Yes, she was.
14  Q.   Can you read the email into the record, sir.
15  A.   Mr. Goldberg wrote, "Aaron, you will want to click through
16  this in presentation mode as some of the slides will appear
17  blank otherwise.  Looking forward to your feedback."
18  Q.   And David Goldberg, he's the director of customer and
19  community engagement for JEA?
20  A.   Correct.
21  Q.   Okay.  Let's go to the next page.
22  A.   (Complies.)
23  Q.   And is this a first iteration of what became known or we
24  referred to as the slide presentation of total market
25  compensation strategy?

DIRECT - BLYTHE                                      Vol. 2-22

1   A.   Yes.
2   Q.   So that same photograph here in the beginning, that's
3   common and kind of stays with this presentation throughout.
4   A.   Yes.
5   Q.   Okay.  Let's go look at some detail on this.
6            Page 8 of 23A, there's a question that says, "How do
7   we define total compensation?" and there's base, short-term
8   incentive, long-term incentive.
9            Can you explain this slide?
10  A.   So the title is How Do We Define Total Compensation?  It
11  goes through base compensation, a short-term incentive, and
12  then it's adding on long-term incentive in pink.
13           It shows JEA is currently at zero.  50 percent of the
14  market, or the 50th percentile in the market, would be at 6
15  million, and -- for JEA, and the difference is, you know,
16  obviously 6 minus 0 is 6, or 0 minus 6 is negative 6.  So it
17  shows that JEA is not, you know, outside the market on that.
18  Q.   Let's go to the next slide.
19           Is this an excerpt from the JEA board policy manual
20  that existed as of June 17th of 2014?
21  A.   Yes.
22  Q.   And can you read that, sir?
23           And before you do that, is this language we will see
24  in future presentations that is amended and adjusted by various
25  individuals?

DIRECT - BLYTHE                                    Vol. 2-23

1   A.   Yes, it is.
2   Q.   Okay.  Go ahead and read that, sir.
3   A.   "Providing a total rewards package that encompasses
4   salary/wages, retirement benefits, incentives, and health and
5   welfare benefits.
6        "Salaries/wages will meet the market (50th
7   percentile), which is where the majority of companies in the
8   geographical area reside.  The 50th percentile pays
9   competitively for behavior that meets expectations.
10       "Additional consideration will be given to behaviors
11  that exceed expectations, which are typically rewarded at the
12  75th percentile.  Internal equity will be achieved by
13  evaluating differences in skill, effort, responsibility, and
14  working conditions among jobs."
15  Q.   Let's go to 23B.
16  A.   (Complies.)
17  Q.   I'm going to show some changes of this language and how
18  that occurred.
19       This is an email from Mr. Zahn to David Goldberg
20  January 3rd of 2019.
21       MR. DUVA:  And let's look at the next page.
22  BY MR. DUVA:
23  Q.   This is the same photograph for the -- introductory
24  photograph for this slide, the total market compensation
25  strategy; is that right, sir?

DIRECT - BLYTHE                                    Vol. 2-24

1   A.   Yes.
2   Q.   Okay.  Let's go to page 10.
3   A.   (Complies.)
4   Q.   It's a market comparison of compensation, and there's red
5   letters, "Need to revise slide."
6        Do you see that?
7   A.   Yes.
8   Q.   Let's go to page 12 of the exhibit.
9   A.   (Complies.)
10  Q.   And is this essentially kind of a redline change to the
11  JEA board policy that we looked at before in the prior exhibit,
12  23A, the JEA board policy manual that existed as of June 17th
13  of 2018?
14  A.   Yes.
15  Q.   So there's some redlining on page 12 of 23B, and I want to
16  focus on the middle paragraph.
17       Can you read the red writing beginning with "the
18  align"?
19  A.   "... the align with and drive JEA's corporate measures of
20  value:  1) customer, 2) financial, 3) environmental, and 4)
21  community impact."
22  Q.   And did this become known down the road as CCEF, the four
23  measures of value:  customer, community impact, environmental,
24  and financial?
25  A.   Yes.  And that was sort of a measure of value that

DIRECT - BLYTHE                                    Vol. 2-25

1   Mr. Zahn was passionate about and explained in board meetings.

2   Q.   The salary and wages is removed and total compensation is

3   set forth; is that right?

4   A.   Yes.

5   Q.   And the remainder of this slide is illustrated.  We'll

6   move on to the next slide, page 13 of the exhibit.

7        What is -- what is this slide?  What is it showing?

8   A.   It's titled Establish a Formal Compensation Policy to

9   Align With 1) Talent Market and 2) Guiding Principles.

10       It, you know, starts on the left with the 50th

11  percentile market compensation, and includes components for

12  base salary, short-term incentive, and long-term incentive.

13       For long-term incentive, it breaks out into financial

14  value, annual contribution growth -- I think that's a reference

15  to the -- JEA's annual contribution to the City -- and

16  profitability.

17  Q.   And is the term -- based on various interviews that you

18  did, the word "profitability," is that something Mr. Zahn used

19  on a regular basis?

20  A.   Yes.  That was a little bit of a paradigm shift from

21  previous management.

22  Q.   Let's go to 23C.

23  A.   (Complies.)

24  Q.   Is this an email from Mr. Wannemacher to Mr. Zahn,

25  Ms. Hiers, and Ms. Dykes dated January 7th of 2019?  And it's

DIRECT - BLYTHE                                    Vol. 2-26

1   talking about seeing attached slide 9.

2   A.   Yes, revised slide 9.

3   Q.   Let's go to that.

4   A.   (Complies.)

5   Q.   And it's actually page 12 of the exhibit.

6   A.   Is it page 10?

7   Q.   Sorry, it's page 10.  My fault, page 10.

8        This is a revision of the prior iteration that we

9   looked at in 23A with the long-term incentive figure changing

10  and other figures changing as well.

11  A.   Yes.

12  Q.   So the delta showing that JEA has no long-term incentive

13  plan is -- in this particular slide is $3.7 million?

14  A.   Correct.

15  Q.   Okay.  And continued on page 12 there's the JEA board

16  policy again, and it essentially has the same redlining; is

17  that correct?

18  A.   Yes, that's correct.

19       Similar.  It looks like it changed a little bit from

20  the last version.

21       THE WITNESS:  I'm sorry.

22       MR. FELMAN:  I was going to object because it's not

23  correct, what you said, but you just corrected it --

24       THE WITNESS:  Yeah.

25       MR. FELMAN:  -- so I withdraw the objection.

DIRECT - BLYTHE                                           Vol. 2-27

1           THE WITNESS:  The bottom part is different.

2   BY MR. DUVA:

3   Q.    Bottom part, sure.

4   A.    I'd have to put them side by side.  I think the last

5   version said something about 40 to 60th percentile.

6   Q.    Yeah.  Read that beginning with "Total compensation."  I'm

7   seeing that difference there as well.

8   A.    "Total compensation will include base salary, short-term

9   incentives, and long-term incentives."

10          The next redline portion states, "Short-Term and

11  long-term incentives will align to and drive JEA's corporate

12  measures of value."

13  Q.    So as Mr. Felman pointed out, the short-term incentive and

14  long-term incentive plan is being essentially kind of part and

15  parcel of the JEA policy with respect to compensation.

16  A.    Yes.  It's one of the three components of total

17  compensation, based on these presentations.

18  Q.    Let's go to 23D.

19  A.    (Complies.)

20  Q.    And 23D, for the record is a -- in addition to the email,

21  there's a CD as well that goes with this.

22          And this is an email from Mr. Wannemacher to Scott

23  Strackbine, and what does this say?

24  A.    Mr. Wannemacher wrote, "Scott, per our conversation I

25  modified the spreadsheet a little to reflect market 50th across

DIRECT - BLYTHE                                           Vol. 2-28

1   the board.  Please review the calculations and call me if you

2   have any comments.  Thanks, Ryan."

3           MR. DUVA:  Let's go to the CD, 23D, which we have

4   loaded in our system.

5           And if we can go to the -- it's actually the STI

6   slide there that is displayed.

7           And if you could just kind of scroll up.

8           There we go.

9   BY MR. DUVA:

10  Q.    There's different columns and charts here, Agent Blythe,

11  but just talk generally about what this is illustrating.

12  A.    So on the group column to the far left, it's showing

13  different categories of employees, going from non-appointed all

14  the way down to the CEO.

15          And it shows the employee count in the next column to

16  the right, column B.

17          It shows the current payout, then current payout

18  totals for those categories of employees totaling $5.17 million

19  for the STI or short-term incentive.  It lists the proposed

20  payout per employee in that category.

21          And then column F is a proposed payout total to

22  increase that STI amount to about -- about 10.5 million.

23  Q.    So the S T I is the table on the left.  That's the

24  $10,494,588 figure?

25  A.    Correct.

DIRECT - BLYTHE                                    Vol. 2-29

1   Q.   And that's the proposed total.

2        And then in that chart -- and there's other tabs in

3   23D that cover LTI.

4        MR. DUVA:  Don't click on that just yet.  Thank you.

5   BY MR. DUVA:

6   Q.   It says LTI, $5,463,327.

7   A.   I'm sorry.  Where's the 5 --

8   Q.   Under the Meets - Total under columns I and J.

9   A.   I'm sorry.  This screen's cutting me off, so -- I can see

10  it up here though.

11       Yes, that's correct.

12  Q.   Okay.  And so talk about kind of the general projections

13  that you started to see in December of 2018/January of 2019

14  about the total value of this long-term incentive plan.

15  A.   So, yeah, this is -- I'm sorry.  Could you rephrase that

16  question?

17  Q.   Yeah.  So this is -- is this the beginnings of kind of

18  projections in December of 2018 and January of 2019 of, you

19  know, what the long-term incentive plan total pool would be in

20  terms of the amount of money involved?

21  A.   Yes, the economic impact for JEA for this plan.  This is

22  an estimate of what it could look like.

23  Q.   In essence, an estimate of what it would cost?

24  A.   Yes.

25  Q.   And those numbers change, but they kind of hovered around

---

DIRECT - BLYTHE                                    Vol. 2-30

1   the 5 million range, and there some iterations at 4 million and

2   then later 3.4 million?

3   A.   Yes.  There was the 3.4 million that was listed in the

4   board presentation on July 23rd, and there's different

5   iterations in spreadsheets we'll look at, and there were some

6   figures stated in the meeting.

7   Q.   And were there other figures, like 6 percent of the

8   payroll and figures of that nature?

9   A.   Yes.

10  Q.   Okay.  And we'll tie that off and be more specific as we

11  go, but I wanted to illustrate this chart in 23D.

12       MR. DUVA:  And there's an LTI tab, if we can just

13  kind of click on that for illustration purposes.

14  BY MR. DUVA:

15  Q.   I don't think we're going to do a whole lot with this.

16       But does this look like the beginnings of a

17  calculation to get to that $5.463 million number?

18  A.   Yeah.  So in your -- your column that starts on the -- in

19  B with the categories of employees going from the director J

20  level down to CEO, it gives the census on the column C; the

21  market, a total there; then the average percent for those

22  employees that they would receive in a long-term incentive,

23  going from 20 down to the CEO at 240 percent of their -- the

24  50th percentile base salary.

25       And that created a pool size for each category of

DIRECT - BLYTHE                                    Vol. 2-31

```
 1  employee and -- to total for the 5.463 million.
 2  Q.   So even under this 5.463 million, the CEO, with a market
 3  salary of $693,443, the average percentage listed in this chart
 4  is 240 percent; is that right?
 5  A.   Yes.
 6  Q.   So then according to this, the market pay, including
 7  long-term and short-term incentives, would be $1,664,000.
 8  A.   Yes.
 9       MR. DUVA:  Let's go to 21C.
10  BY MR. DUVA:
11  Q.   Is this an email -- there's two emails here, but I want to
12  look at the one from Mr. Wannemacher to Scott Strackbine,
13  copying other JEA employees, including Mr. Zahn, Angie Hiers,
14  and Pat Maillis.
15       What does this email say, dated January 7th, 2019?
16  A.   I think it's the one I read just a moment ago that
17  Mr. Wannemacher said -- wrote, "Scott, per our conversation, I
18  modified the spreadsheet a little to reflect market 50th across
19  the board.  Please review the calculations and call me if you
20  have any questions."
21  Q.   And did Ms. Hiers send this forward to an individual named
22  Dale Swain, who's an executive assistant, on January 11th of
23  2019?
24  A.   Yes.  She wrote, "This is the first" -- Ms. Hiers wrote,
25  "This is the first of a set of emails that I will be sending
```

DIRECT - BLYTHE                                    Vol. 2-32

```
 1  you asking that you place them in a compensation folder for me
 2  (print)."
 3  Q.   For record purposes, 21C, a spreadsheet, is also on a CD?
 4       MR. DUVA:  And if we could display 21C.
 5  BY MR. DUVA:
 6  Q.   Does this appear to be another iteration of those
 7  calculations similar to what we looked at in the prior exhibit
 8  in 23D?
 9  A.   Yes.  A similar document, same format.
10       MR. DUVA:  If we can go to the LTI slide.
11  BY MR. DUVA:
12  Q.   And is that same arithmetic presented there that we looked
13  at in the prior exhibit in 23D?
14  A.   Yes.
15  Q.   Let's go to Exhibit 24.
16  A.   (Complies.)
17  Q.   What is 24, Agent Blythe?
18  A.   It's the January 15th, 2019, compensation committee agenda
19  for 9:00 a.m. at JEA's headquarters.
20  Q.   What is the compensation committee, and how does that
21  pertain to the JEA board?
22  A.   Sure.  So the compensation committee is essentially a
23  subcommittee, if you will, of the board.  It's led by, at that
24  time, Camille Lee-Johnson.  She's the chairman of the
25  compensation committee.
```

DIRECT - BLYTHE                                    Vol. 2-33

1          And it's a public meeting.  It's noticed.  There's
2    minutes kept.  And, you know, there's a package, like a --
3    similar to, like, a board package, the presentations that are
4    made and the materials presented during that meeting are made
5    public on JEA's website.
6    Q.   And did you -- were you able to obtain the minutes and the
7    different presentations and packages for the compensation
8    committee meetings in 2018 and 2019?
9    A.   Yes.
10   Q.   And that was from the JEA website?
11   A.   Correct.
12   Q.   Let's look at page 2 just for orientation purposes.
13   Here's our familiar introduction for the total market
14   compensation strategy.
15          And then let's go to page 10.  We're going to talk
16   about the CCEF again, the corporate measures.
17          Those corporate measures, those are familiar.  You've
18   talked about those before.  And it states, "The fundamental
19   goal is to maximize each value both now and in the future"; is
20   that right?
21   A.   Yes.  That's what it states.
22   Q.   Okay.  And we'll go to page 14.
23          And, again, there's a familiar slide, just a
24   different iteration of the "How Do We Define Total
25   Compensation?"

DIRECT - BLYTHE                                    Vol. 2-34

1    A.   Correct.  It's got the three categories, base, short-term
2    incentive, and long-term incentive with a 5.5 million number
3    this time for the 50th percentile.
4    Q.   Let's go to page 15, the next page.
5    A.   (Complies.)
6    Q.   This is a graph we've seen before.  This is familiar.
7          And explain what this is on page 15 of Exhibit 24.
8    A.   Sure.  It's showing sales from -- going all the way back
9    to 1979, the trend line for that, if you took the trend line
10   from 1979 to '06, continuing that on in the black.  The blue
11   line is the 2006 sales projection from the IRP and then
12   comparing 2006 to 2017, showing the red trend line.
13   Q.   And, again, just for review, 2006 was the highest net
14   sales in the history of JEA?
15   A.   Yes.
16   Q.   Let's go to the next page, page 16.
17   A.   (Complies.)
18   Q.   These are revisions to the board policy, correct, that
19   we've talked about before?
20   A.   Yes.
21   Q.   And the language in the second paragraph that "Total
22   compensation will include base salary, short-term incentives,
23   and long-term incentives," is similar to the prior iteration
24   that we looked at.
25   A.   Correct.

DIRECT - BLYTHE                                          Vol. 2-35

1    Q.   And, again, the next slide, that term "profitability" on
2    page 17 of the exhibit is one of the branches off of the
3    long-term incentive.
4    A.   Yes.
5    Q.   Okay.  The next slide is a physical exhibit.
6            MR. DUVA:  Just for record purposes, these are board
7    materials for the January 22nd, 2019, board meeting, and this
8    is Exhibit 25A.
9            It is on a CD -- and this is just for record
10   purposes -- with other exhibits that we'll talk about at a
11   later time and those are numbered 20F1, 20P1, 26A, and 29A.
12           And what those are are board materials.  A lot of
13   these are 300-page documents, so rather than print them, we put
14   them on a CD for the Court to have.
15           So what I'd like to do now, Your Honor, is we're
16   going to get into playing -- we're going to get into playing
17   some board meetings, beginning with the January 22nd, 2019,
18   meeting.  This is Exhibit 25B.
19           There are four clips of this, and the first is going
20   to be time stamped 24 minutes and 35 seconds to 31 minutes and
21   20 seconds.
22           And this is just for record purposes to find this,
23   because the -- we can provide the clips after the hearing, but
24   the CD itself is just the entire meeting, so this might be hard
25   to find without the timestamps.

DIRECT - BLYTHE                                          Vol. 2-36

1            THE COURT:  What was the timestamp again?
2            MR. DUVA:  24 minutes and 35 seconds to 31 minutes
3    and 20 seconds.
4            Clip 2 is at the 1 hour, 11 minute mark and 35
5    seconds to the 1 hour and 19 minute mark and 30 seconds.
6            And that is all that we're playing from that January
7    22nd, 2019, board meeting.
8            So if we can play, Ms. Stockholm, the first clip
9    beginning at 24 minutes, 35 seconds.
10           (Video played.)
11           MR. DUVA:  If we can pause it for a second --
12           (Video stopped.)
13           MR. DUVA:  -- just to kind of orient things, for
14   record purposes, who's on the screen.
15   BY MR. DUVA:
16   Q.   Agent Blythe, if you can go left to right, starting
17   with -- all the way on our left.
18   A.   Sure.  That's Kelly Flanagan, who was a board member at
19   the time and the CEO of the Jacksonville Jaguars -- excuse me,
20   CFO of the Jacksonville Jaguars.
21           That's Aaron Zahn, Alan Howard, Jody Brooks, Fred
22   Newbill, April Green ...
23   Q.   Is that Matt Schellenberg, council member?
24   A.   Yes.  And there's somebody between April Green and --
25   Q.   And we'll -- after that, we'll see that person.  I believe

1    that's Camille Lee-Johnson, but we'll get there.

2              MR. DUVA:  Okay.  We can go ahead and press play.

3         (Video started and stopped.)

4    BY MR. DUVA:

5    Q.   Okay, Agent Blythe.  Who is that?

6    A.   Anton Derkach with McKinsey & Company.

7    Q.   And this is him presenting here in the January 22nd, 2019,

8    board meeting?

9    A.   Yes.

10   Q.   Which is a meeting that you watched?

11   A.   Yes, in my home office during COVID.

12   Q.   And that spurred the idea of the grand jury subpoena to

13   McKinsey and wanting to interview Mr. Derkach?

14   A.   Yes.

15   Q.   Was there unanswered questions in your mind at this point

16   how McKinsey fit in to the overall strategic planning and what

17   parts exactly they were involved in?

18   A.   Yes, definitely.  So there was allegations that the

19   windfalls -- or, excuse me, headwinds facing JEA were being

20   overplayed in an effort to push the board in a certain

21   direction.

22              And so we were keenly interested in understanding

23   what those were and, you know, taking an objective approach to

24   figure out is that a fair characterization or not.

25              MR. DUVA:  And, Your Honor, just to mention, this is

1    the only video that kind of has sound issues.  The original

2    quality off the website was not very good.  We did everything

3    we could.

4              So it is a little bit of a challenge, but you can

5    hear it better when you're at your computer terminal with

6    earbuds, but this is about as good as it gets.

7              Go ahead.

8         (Video played.)

9    BY MR. DUVA:

10   Q.   So in this clip, Agent Blythe -- and I know it was

11   difficult to hear and Mr. Derkach is from Russia, has a Russian

12   accent, so it makes it even more difficult.  But just talk

13   about generally -- I know the video speaks for itself.  I'm not

14   asking for, you know, many words here.

15              But talk about kind of the introduction of strategic

16   planning to the JEA board on January 22nd, 2019, including the

17   status quo presentation.

18   A.   Sure.  So he just showed the phased approach that they

19   intended to undertake, in coordination with JEA management.

20              You know, he started on the left with stabilizing

21   JEA, which happened over the months previous to that point, and

22   then developing that baseline status quo, which is basically if

23   JEA hits cruise control and doesn't do anything to change

24   itself to -- to basically adjust or adapt to the changing

25   market conditions going forward, what would JEA's financial

DIRECT - BLYTHE                                          Vol. 2-39

1   condition look like in, you know, 10 years, 10, 12, years.
2   Q.   So is that kind of the "come to work and put your feet up
3   on the desk and do nothing" model for ten years?
4   A.   Figuratively.  Doing nothing to adapt to those changing
5   market forces and conditions, such as, you know, energy
6   efficiency and things like that.
7   Q.   That's what became the status quo 1 or scenario 1 that was
8   presented to the board in May of 2019?
9   A.   Yes.
10  Q.   We'll watch that at a later time, but let's go to clip 2
11  of this January 22nd, 2019, board meeting.
12       (Video played.)
13  BY MR. DUVA:
14  Q.   Okay.  Agent Blythe, we're going to move forward to
15  Exhibit 21D.  I'm trying to kind of keep with our timeline
16  here.
17       MR. DUVA:  And just for the record, Your Honor, the
18  board materials that were displayed in the video are just
19  certain slides.  The complete package is -- on the CD is 25A.
20       THE COURT:  Thank you, Counsel.
21       MR. DUVA:  Looking at 21D.
22       Now look at the bottom email.
23  BY MR. DUVA:
24  Q.   There are a series of emails.  On the bottom of page 1, is
25  this an email from Angie Hiers, on February 12th, 2019, to Pat

DIRECT - BLYTHE                                          Vol. 2-40

1   Maillis and Scott Strackbine?
2   A.   Yes.
3   Q.   And can you read that into the record, sir?
4   A.   Ms. Hiers wrote, "The first compensation committee meeting
5   is scheduled April 16th, and the second one is May 21st.  Aaron
6   would like for TWW" -- I think she meant WTW for Willis Towers
7   Watson -- "to be here for April and May's compensation
8   committee and April and May's board meeting.
9        "The board meeting dates are April 23rd and May 28.
10  We still need to have the comp info ready for a cursory review
11  the first week of March."
12  Q.   Okay.  Seeing the references to Willis Towers Watson --
13  we've talked about that before, and we mentioned yesterday the
14  grand jury subpoena.
15       MR. DUVA:  I want to move to Exhibit 54 and display
16  this grand jury subpoena just at the top so that Willis Towers
17  Watson is shown.
18       And then if we can go to the bottom for the date.
19  BY MR. DUVA:
20  Q.   That's April 21st of 2020, about when this was issued?
21  A.   Yes, sir.
22  Q.   Okay.
23       MR. DUVA:  If we can go to the itemized requests on
24  page 3.
25       And start with 1 through 5.

DIRECT - BLYTHE                                    Vol. 2-41

1   BY MR. DUVA:
2   Q.   So this requests documents and records, and we'll get to
3   this, but on the following page documents and records has a
4   definition that includes email and email attachments; is that
5   right?
6   A.   Yes.
7   Q.   Okay.  Focusing on items 2 through 5, knowing that Willis
8   Towers Watson was the consultant for compensation analysis,
9   what types of information were you interested in from them, as
10  well as from JEA, with respect to this subpoena that was
11  issued?
12  A.   Sure.  I wanted to see their email communications, text
13  messages, letters, any other written correspondence in any way,
14  shape, or form to understand the back-and-forth that took
15  place, if that's possible, and, you know, draft documents,
16  things like that, anything attached to the emails.
17       So that's important for any investigator in
18  understanding intent and what happened.
19  Q.   Okay.  Item 4 -- even at this point of issuing the grand
20  jury subpoena, it wasn't entirely clear how much Willis Towers
21  Watson, you know, fit in to ultimately what was presented in
22  terms of the long-term incentive plan.
23       So was that the plan to determine how?  Did they drop
24  off at some point?  Were they in it for the duration?  Was the
25  ultimate PUP plan anything that they sponsored?  Was that the

---

DIRECT - BLYTHE                                    Vol. 2-42

1   thinking that you were engaging in to figure this out?
2        MR. SUAREZ:  Your Honor, I don't want to do this,
3   again, all day if he's going to lead the witness again.  He
4   could just ask questions.  So I'm going to object to the
5   leading nature of these questions.
6        MR. DUVA:  I can clean that up.
7        THE COURT:  Go ahead, Counsel.
8   BY MR. DUVA:
9   Q.   What were we trying to figure out in terms of Willis
10  Towers Watson and their involvement through the duration with
11  the PUP or if it stopped at some point?  What was the analysis?
12  A.   Sure.  We wanted to figure out what their role was, who
13  was involved, what communications they had, what was said to
14  whom and when.
15       You know, did they develop the presentations, or did
16  management develop them, or was it -- you know, was it
17  somewhere in between, and, you know, what was that timeline?
18  Q.   Did you know that at the point of issuing this grand jury
19  subpoena?
20  A.   No.
21  Q.   And generally you just knew they were a consultant that
22  was involved.
23  A.   Correct.
24  Q.   Okay.
25       MR. DUVA:  Let's display items 6 through 8, just sort

DIRECT - BLYTHE                                             Vol. 2-43

1  of for record purposes.  We're not going to cover those.  I'm
2  trying to move this along where we're not reading as much.
3  BY MR. DUVA:
4  Q.   But items 6 through 8 are the remainder of -- and there's
5  item 9 on the following page, but those are some of the
6  additional asks in the grand jury subpoena?
7  A.   Yes.
8  Q.   And we'll get into some of the email communications.
9            MR. DUVA:  I want to go to Exhibit 61.
10 BY MR. DUVA:
11 Q.   Do you have a copy of 61 in front of you?  It wouldn't --
12 A.   I do.
13 Q.   -- be in the binders.  It's one of the new ones.
14           Did you interview David Wathen?
15 A.   I did.
16 Q.   And is 61 the 302 of that interview?
17 A.   It is.
18 Q.   Okay.  Let's just go to the date.
19           What was the date of that interview?
20 A.   May 14th, 2020.
21 Q.   And at that point -- we talked about this a little bit
22 earlier -- had we received a production from JEA on May 8th of
23 2020?
24 A.   Correct.
25 Q.   We'll get into the substance of 61 a little bit later.

DIRECT - BLYTHE                                             Vol. 2-44

1            I want to go back to the email that is 21D.  The
2  second email, Pat Maillis sends an email to David Wathen and
3  Andrea Deeb on February 12th, 2019.
4            What does Ms. Maillis say?
5  A.   "Please see below.  We will still want to stay on our
6  design schedule to allow time to meet with Aaron prior to these
7  meetings.
8            "I will be sending you the meeting notifications.
9  Pat."
10 Q.   And the following day, on February 13th, David Wathen
11 responds to Pat Maillis and Andrea Deeb -- copies his colleague
12 Andrea Deeb and other Willis Towers Waters employees and says
13 what?
14 A.   "Thanks for the updated meeting dates."
15           Second paragraph, "Given the additional analysis
16 yesterday requested (CEO pricing, review appointed and
17 non-appointed roles), we are going to need more time to
18 complete the review of the market data and in turn develop
19 competitive LTI values," LTI for long-term incentive values,
20 "that go with the LTI design options.
21           "Can we target the middle of March for the initial
22 review?  This would still allow ample time to review with you
23 and Angie and then with Aaron, whereby we can make edits based
24 on your feedback for presenting at the April meetings."
25 Q.   And in essence, what did this mean to you once you

DIRECT - BLYTHE                                         Vol. 2-45

1   received this email from JEA?

2   A.    So, you know, one, it tells me who is in the dialogue with

3   Willis Towers Watson, that they're asking for more time because

4   of the LTI ask, and that, you know, they plan to come back with

5   a draft and have a discussion with Ms. Hiers and with Aaron

6   Zahn.

7   Q.    Do we ultimately receive a production as well from Willis

8   Towers Watson?

9   A.    Yes.

10  Q.    Let's go to 22B.

11  A.    (Complies.)

12  Q.    Again, keeping with our timeline, let's go to -- this is

13  an email.

14          MR. DUVA:  Let's go to page 2 -- well, let's

15  illustrate the bottom of page 1 -- I'm sorry -- who this email

16  is from and to.

17  BY MR. DUVA:

18  Q.    On the screen it's an email from Aaron Zahn to Sarah Brody

19  at McKinsey, copying other McKinsey and JEA employees,

20  including Mr. Derkach; is that right?

21  A.    Yes.

22  Q.    And it's dated March 6, 2019?

23  A.    Correct.

24  Q.    All right.  If we can read the top of page 2.

25  A.    "Sarah, it would seem to me that the status quo case is

---

DIRECT - BLYTHE                                         Vol. 2-46

1   locked now that we have the entire SLT consensus.  Therefore,

2   it would be appropriate for McKinsey to obtain risk/legal

3   review at this time.  Only changes on that case going forward

4   will be around how to convey the message most clearly and

5   concisely.  Thanks, Aaron Zahn."

6   Q.    When it says status quo case is locked, what did you

7   understand that to mean?

8   A.    It's finished or done.

9   Q.    And going back to page 1, Ms. Brody responds to Mr. Zahn

10  and copies other individuals, including Mr. Derkach and

11  Mr. Wannemacher and Ms. Dykes and others.

12          And what does that say?

13  A.    "Hi, Aaron" -- or, excuse me, "Thanks, Aaron.  That makes

14  sense.  Attached is the draft presentation I would run by our

15  legal team, knowing that there may be some changes in

16  communication.  If there are other slides we've shared with you

17  and the SLT that you would want to include in the public

18  presentation as assumptions backup, please let me know so we

19  can run those by our team as well.  Sarah."

20  Q.    And Mr. Zahn responds that same day, March 6th, 2019, at

21  11:36 a.m. what?

22  A.    "Yes, that works.  Thanks."

23  Q.    Let's go to 21E.

24  A.    (Complies.)

25  Q.    What is 21E?

DIRECT - BLYTHE                                           Vol. 2-47

1   A.   21E is a discussion draft presentation dated March 19th,
2   2019, titled Long-Term Incentive Plan Market Practices and
3   Proposed Design.  It states it's prepared for Jacksonville
4   Electric Authority and it's got the Willis Towers Watson logo
5   or name on the bottom right.
6   Q.   This particular document, it's got a Bates stamp at the
7   bottom of JEA0519.
8        Was this pulled ultimately from the SIC committee
9   report?
10  A.   No.  This version's from the JEA production, right?  Or is
11  it?
12  Q.   Well, that Bates number, JEA0519, that's consistent with
13  the Special Investigative Committee report.
14       I'm just asking about this version, but I also want
15  to ask, did we obtain these materials from Willis Towers Watson
16  and JEA also?
17  A.   Yes.  We obtained these documents from all three sources.
18  Q.   Let's go to page 3 of the exhibit.
19  A.   (Complies.)
20  Q.   In this introduction summary, what is this?
21  A.   It -- it basically states the engagement, the summary of
22  the engagement, that JEA had engaged Willis Towers Watson to
23  complete the following.
24       And it lists several bullets, including, "Conduct an
25  analysis of market-competitive long-term incentive plan design

DIRECT - BLYTHE                                           Vol. 2-48

1   practices in the utility industry, covering both investor-owned
2   utilities and public power utilities," and, "Develop an LTI
3   plan design that align JEA -- excuse me, that aligns with JEA's
4   compensation philosophy and business strategy."
5        And then it summarizes the ensuing pages 4 through
6   15 --
7   Q.   Kind of moving --
8   A.   -- competitive market strategies.
9   Q.   Moving down just to the last bullet point, pages 16
10  through 23, it says that it presents LTI plan design
11  alternatives and a strawman design for JEA's consideration.
12  A.   Yes.
13  Q.   So in essence -- we're going to look at these
14  individually, all eight of them.
15       Is this Willis Towers Watson's work product?
16  A.   Yes.
17  Q.   Let's go to page 5.
18  A.   (Complies.)
19  Q.   This is a chart, and there's -- highlighted in yellow at
20  the intersection of public power utilities on the top and
21  prevalence on the left, it says, "LTI plans are uncommon."
22       Whose language is that?
23  A.   That's Willis Towers Watson language based on their market
24  survey or their understanding of the industry.
25  Q.   Let's go to page 17 of the exhibit.

1  A.   (Complies.)

2  Q.   Okay.  This is long-term incentive plan design

3  alternatives, and it says, "Option 1, voluntary deferred

4  compensation program without company match."

5       Again, just for the record, whose work product is

6  this?

7  A.   Willis Towers Watson.

8  Q.   And can you just kind of -- the chart is illustrated.

9  There's advantages, disadvantages to JEA and the employee, and

10 the Court can consult that as it desires.

11      But just give an overall, as it says, description of

12 the plan and what it is.

13 A.   It's a 401(k) without a company match.

14 Q.   And let's go to the next slide.

15 A.   (Complies.)

16 Q.   And this is option 2.

17      Is this option 2 of 7, and then the strawman is

18 ultimately the eighth; is that right?

19 A.   Yes.  It's the last one.

20 Q.   Okay.  Option 2 is voluntary deferred compensation program

21 with company match.

22      What is this?

23 A.   It's like a 401(k) with a match where, like, the company

24 gives a percentage of a match for -- based on the employees'

25 contributions.

1  Q.   Again, option 2 is a Willis Towers Watson recommendation

2  for the framework for a potential long-term incentive plan?

3  A.   Yes.

4  Q.   What is option 3 on the following page titled Separate

5  Long-Term Retention Award Budget?

6  A.   It basically says that the organization has a separate

7  budget, similar to a merit budget, that focuses entirely on

8  long-term retention awards for high performers in key roles.

9       So that if a -- so the way Mr. Wathen -- the way

10 Mr. Wathen described it is --

11      MR. SUAREZ:  Your Honor, I have a series of

12 objections.  I'm going to begin with a hearsay objection about

13 Mr. Wathen's description.

14      First of all, this has nothing to do with the issues

15 that are before the Court at this hearing.  We continue to have

16 Agent Blythe give his opinion about a document that we have

17 agreed to admit without objection.  And now we're expanding

18 into his opinion about what these documents say, which is

19 hearsay.

20      And, Your Honor, I -- Mr. Duva has repeatedly told

21 the Court, particularly in relations to the 302s, that we

22 didn't object to those.  We didn't object to a number of

23 exhibits in order to save the Court time, because we understand

24 they have a burden to show what they knew and when they knew

25 it.

DIRECT - BLYTHE                                      Vol. 2-51

1           THE COURT:  Right.

2           MR. SUAREZ:  But that doesn't mean that we're waiving

3    all hearsay objections and giving Agent Blythe a license to

4    just simply give his interpretation of these documents.

5           So my objection, my continuing objection, is to the

6    hearsay and really to the lack of relevance of this explanation

7    to the issues before the Court.

8           THE COURT:  Mr. Duva, with regard to the relevance

9    objection, what's your response?

10          MR. DUVA:  The relevance for Your Honor, what we're

11   displaying, is what Willis Towers Watson came up with for JEA

12   as sort of acceptable alternatives for a long-term incentive

13   plan.

14          And if I can just give a proffer, ultimately Willis

15   Towers Watson is discarded in about May of 2019.  None of their

16   work is really used.  In fact, it's kind of plagiarized and

17   passed off, as it's changed by Mr. Zahn and others and

18   presented to the JEA board to make them believe that Willis

19   Towers Watson signed off on what ultimately became the

20   Performance Unit Plan.

21          David Wathen gave an interview and told Agent

22   Blythe -- who we interviewed on May 14th of 2020, "Yeah, this

23   PUP plan was not our plan.  Ultimately we were never allowed to

24   present it to the compensation committee.  We were never

25   allowed to come to a board meeting."

DIRECT - BLYTHE                                      Vol. 2-52

1           Mr. Suarez knows this is coming so he doesn't want

2    this in the record.  That's why the objection.

3           Ultimately it's absolutely relevant because it shows

4    how these different entities at times were siloed, and this was

5    a habit.  Willis Towers Watson is consulted.  They give

6    PowerPoint presentations about modest long-term incentive

7    plans.  When Mr. Zahn -- and this is argument here -- doesn't

8    like them, they're gone.

9           When McKinsey serves their purpose to present

10   scenario 1 and kind of in the background with scenario 2 which

11   JEA developed and that's over on June 25th, there's evidence of

12   a conversation on June 28th of 2019 where Mr. Zahn tells

13   Mr. Derkach, "We're privatizing.  We're done with you."

14          And so this is all relevant where these companies --

15   it makes it appear that they're sort of involved in this

16   endeavor, and they both sort of die their death along the way.

17          And it brings us to July 23rd of 2019, with respect

18   to what is ultimately presented in terms of the options, and

19   the only option is scenario 3, which is the ITN.  And the Court

20   will see after that the very short presentation of the

21   Performance Unit Plan.

22          So this is absolutely relevant to the investigation

23   itself, what we learned from Willis Towers Watson, how when

24   they were involved Mr. Zahn, in a couple of exhibits, is going

25   to express his displeasure about their work, and they're gone

DIRECT - BLYTHE                                         Vol. 2-53

1   in a certain period of time.

2          So this is the background -- this is not a hearing

3   about facts for a trial.  This is a hearing about what the

4   Government knew, when we knew it, how we interpreted it, how we

5   reacted to it, and what we did next.

6          And so ultimately, since it is critical of what we

7   knew when and how we knew it and then what we decided to do

8   based on what we knew, I have to elicit testimony from Agent

9   Blythe of, "What did this mean to you?  What are these

10  different options, options 1 through 7 and the strawman?"

11         And ultimately I'm building up towards a question to

12  Mr. Blythe of -- or Agent Blythe of, you know, "Did it appear

13  that any of these sort of made it into the ultimate Performance

14  Unit Plan?"  And that's based on investigative decisions and

15  acumen, and the answer is no.

16         So ultimately -- I think Mr. Suarez has some idea in

17  this hearing that we have to call every witness we ever talked

18  to.  That's not our burden.  Our burden is to show what we

19  obtained, how we obtained it, what it meant to us, and what we

20  did next.

21         So necessarily there is going to be some testimony,

22  and I'm trying to limit it, about what certain individuals told

23  us in interviews, how we reacted to it, pivoted, and what we

24  decided to do next.

25         It's not offered for the truth of the matter

DIRECT - BLYTHE                                         Vol. 2-54

1   asserted.  We're not suggesting that we can do that with

2   Mr. Blythe, or Agent Blythe, testifying what Mr. --

3          THE COURT:  That would be very different, obviously,

4   if it were trial, and in essence what we're dealing with is an

5   evidentiary hearing.  And I have allowed some latitude with

6   regard to -- Mr. Duva, with regard to questioning of Agent

7   Blythe in order to get that information so we're able to

8   process and get a full picture of what transpired.

9          Mr. Duva's proffer has indicated, and it would appear

10  that the information he's trying to elicit has some relevance

11  in order to paint a picture as to what transpired ultimately

12  with regard to the proposal with Mr. Zahn and the other

13  individuals involved.

14         So I will overrule the objection.

15         Go ahead, Counsel.

16  BY MR. DUVA:

17  Q.  With respect to option 3, Agent Blythe, what iteration of

18  the long-term incentive plan is this, according to Willis

19  Towers Watson?

20  A.  If a -- if a -- you know, certain key employees stick

21  around long enough, they can get an incentive.

22  Q.  Sort of a merit budget option, as it says in the slide?

23  A.  Yeah, and a retention incentive.

24  Q.  Let's go the slide option 4.

25  A.  (Complies.)

DIRECT - BLYTHE                                      Vol. 2-55

1   Q.    It says profit-sharing plan.

2              Can you do the general description, then we're going

3   to talk about some of the disadvantages to JEA of this plan in

4   the slide.

5   A.    Sure.  The description states, "An employer shares a

6   percentage of earnings or profit with employees based on

7   preestablished multiyear financial goals.  Payouts would be at

8   the end of the performance cycle and in cash, assuming

9   requisite performance goals are achieved."

10  Q.    And what are some of the disadvantages to JEA that are set

11  forth there?

12  A.    "Limited retention value given relatively small gain

13  compared to investor-owned-utility LTI programs.

14             "Does not align with public power utility market

15  practices.

16             "Subject to criticism/scrutiny from outside observers

17  given not common among public power utilities."

18  Q.    You can stop.  We'll move to the next one.  We'll try to

19  move along to option 5, long-term incentive -- I'm sorry,

20  long-term performance cash plan with non-overlapping cycles.

21             What is this?

22  A.    So the description is, "Employee receives a triannual

23  non-overlapping grant of performance cash based on

24  predetermined financial, operational, and/or strategic

25  objectives."

DIRECT - BLYTHE                                      Vol. 2-56

1              And it gives the illustration below of a target

2   established and an award payout every three years.

3   Q.    So in this model, every three years stands alone, and

4   there's no overlap.

5   A.    Right.

6   Q.    Let's go to option 6.

7   A.    This is a long-term performance cash plan with overlapping

8   cycles.  So the employee receives an annual overlapping grant

9   of performance cash based on predetermined goals and

10  objectives, and each three-year period overlaps by two years.

11  Q.    So this contemplates a rolling three-year analysis where

12  awards would be paid out each year based on the prior three

13  years.

14  A.    Yes.

15  Q.    And what is option 7?

16  A.    Option 7 is the long-term performance cash and retention

17  cash plan.  It's a mix of long-term cash linked to both company

18  performance and continued employment, so it's a mix of the

19  retention payment and a performance cash award based on a

20  performance-based component.

21  Q.    And what is the strawman design in the next slide?

22             And you can look at the description and anything in

23  the table that you'd like to take a look at.

24  A.    Sure.  So it says, "Given consideration of the overarching

25  goal to allow all employees to share in the long-term success

DIRECT - BLYTHE                                    Vol. 2-57

1   of the company and public-power-utility LTI market practices,
2   Willis Towers Watson proposes the multi-pronged LTI design
3   approach for consideration."
4           And then in the table below, for employee population,
5   it states -- it gives three categories, select executives or
6   all employees or employees with critical skills or retention
7   risk.  And it gives a -- some bullets around each of those
8   categories for a potential plan design overview of strawman.
9   Q.   And, again, this is a design.  It's a three-year
10  performance cycle?
11  A.   Yes.
12          MR. DUVA:  Let's go to 21F.
13          Let's go to page 2.
14  BY MR. DUVA:
15  Q.   In the middle of the page, there's an email from Pat
16  Maillis to David Wathen and Andrea Deeb of Willis Towers Watson
17  dated March 25th of 2019.
18          And read that one into the record.
19  A.   Ms. Maillis wrote, "David, Angie received some feedback
20  from Aaron today regarding our meeting last week.  Aaron
21  indicated he had expected to receive an example of a plan, not
22  just a few options.
23          "Based on the feedback and input that you received in
24  the meeting last week, will you be providing a draft plan that
25  will detail more of the values by grade or level, the metrics,

DIRECT - BLYTHE                                    Vol. 2-58

1   thresholds, timing of payouts, etc.?  If so, what is the timing
2   on receipt of this information?  Pat."
3   Q.   And going back to page 1, did Mr. Wathen provide a fairly
4   lengthy response on March 25th, 2019, at 2:40 p.m.?
5   A.   Yes, he did.
6   Q.   Read the introductory paragraph and then skip to the fifth
7   bullet with respect to long-term incentive plan design.
8   A.   "Pat, yes, based on the input from last week's meeting, we
9   are pulling together materials for the April committee meeting
10  that will address the following."
11          And skipping to the fifth bullet?
12  Q.   Yes.
13  A.   "Long-term incentive plan design:  We will provide a more
14  detailed LTI design, given Aaron's feedback, around the draft
15  strawman design we shared.  It will include target incentive
16  opportunities by level, where applicable, as well as
17  performance measure weightings, and a proposed formula for
18  determining a performance shared unit value.
19          "As it relates to the LTI plan performance measures
20  (rates customers pay, change in net book value, and
21  contributions to the City), we would like to" -- excuse me, "we
22  would look to Ryan to provide guidance on what performance
23  hurdles should be a threshold, target, and maximum, as he has
24  insights into historical performance, future projections,
25  business strategy, etc., but we can certainly provide --

DIRECT - BLYTHE                                    Vol. 2-59

1   Q.   You can stop.
2   A.   Okay.
3   Q.   And you understand the reference to Ryan to be Ryan
4   Wannemacher?
5   A.   Yes.  He's the chief financial officer.
6   Q.   Under the next bullet, there's a short three lines
7   beginning with "As it relates."
8        Can you read that, sir?
9   A.   "As it relates to determining an applicable formula for
10  valuing a PSU in the long-term incentive plan, we need some
11  additional information.  Would you please check with Ryan to
12  see if he could provide us information on key drivers of
13  long-term performance, such as historical financials," in point
14  one, "most importantly" --
15  Q.   You can stop there.
16  A.   Okay.
17  Q.   So there's an ask there for Mr. Wannemacher to provide
18  some information.
19  A.   Yes.
20  Q.   Okay.
21       MR. DUVA:  Let's go to 26A and 26B.
22       And just for record purposes, Your Honor, 26A is
23  another exhibit.  It's a board package for the March 26th,
24  2019, board meeting, and it is on a CD, with 20F1, 20P1, 25A,
25  and 29A.  They're all in the same CD.

DIRECT - BLYTHE                                    Vol. 2-60

1        THE COURT:  Very well.
2        MR. DUVA:  We have two clips.  The first one is about
3   9 minutes.  The second one's about 4 minutes.  The first one
4   begins at the 43 minute mark and ends at the 52 minute, 38
5   second mark.
6        The second begins at the 1 hour, 20 minute, 33 second
7   mark and ends at the 1 hour, 24 minute, 7 second mark.
8        And if we can publish the first clip at the 43 minute
9   mark.
10       And this is of the March 26th, 2019, JEA board
11  meeting.
12       (Video played and stopped.)
13  BY MR. DUVA:
14  Q.   And who is that speaking?  I think it's fairly obvious but
15  just for the record.
16  A.   It's Ryan Wannemacher.
17       MR. DUVA:  Okay.  Go ahead.
18       (Video played.)
19  BY MR. DUVA:
20  Q.   So, Agent Blythe, I know the video speaks for itself, but
21  in terms of, when you watched this, your reaction, you know, as
22  of this presentation on March 26th of 2019, I mean, how did it
23  appear, based on Mr. Wannemacher's words, that JEA was doing?
24       MR. SUAREZ:  Your Honor, I'm going to object to the
25  relevance of this.  Why is his reaction to watching a board

DIRECT - BLYTHE                                    Vol. 2-61

1   presentation relevant to the issues before the Court?

2            MR. DUVA:  It's because of what's presented two

3   months later, that if JEA doesn't do something really drastic,

4   it's going to fall off the cliff.  That's why it's relevant.

5            MR. SUAREZ:  Your Honor, we could be here forever.

6   The issue is was any of this evidence presented to the grand

7   jury or that will be presented at trial derived from the

8   *Garrity*-protected statements.

9            The issue isn't what was in his mind or what

10  motivated him to investigate.  It's is it derived from those

11  *Garrity*-protected statements, and so this is irrelevant to that

12  issue that is before the Court.

13           THE COURT:  Mr. Duva?

14           MR. DUVA:  Yeah.  The issue is -- and Mr. Suarez

15  knows that this was presented to the grand jury because we did,

16  and he has all the transcripts and all the exhibits that go

17  thereto.

18           It's relevant to educate the Court on the facts and

19  what we were thinking as we learned these things.  Now, Agent

20  Blythe has testified, "I watched these videos at the beginning

21  of COVID."  He said, "I didn't read the *Garrity* materials."

22           And I assume they're going to cross-examine him.

23  Maybe he's either lying, or (2) they have information that he

24  did read the *Garrity* materials or was exposed to it and then

25  somehow used that information to go decide to watch board

DIRECT - BLYTHE                                    Vol. 2-62

1   meetings that are on the Internet.

2            So his testimony is, "I watched these board meetings

3   on the Internet to begin with."

4            This meeting begins sort of the critical pivot to,

5   "JEA'S doing great," according to Mr. Wannemacher right now,

6   but very soon it's going to be doing very, very poorly as

7   things project out.

8            So it's absolutely relevant for the story.  We

9   covered all of the end of 2017 and most of 2018 yesterday, and

10  we're already into March of 2019 here today.

11           And, yes, this hearing's going to take a long time.

12  I think the defense originally said three weeks.  I think I

13  said three or four days.  They're probably more right than I

14  am.  But we're going to try to land the ship here in the

15  middle.

16           So we are trying to move this along.  We're not

17  trying to cover the -- try the Court's patience.  I'm about

18  halfway through my outline with Agent Blythe, and it hasn't

19  been a full day yet.  So I think we're going to come in about

20  where I think we are if we have the court time tomorrow.

21           But to answer the relevance question, it's absolutely

22  relevant as to what we learned, when, what happened, and then

23  what we decided to do based on the information of watching

24  these board meetings.

25           The Court wouldn't have any framework for, "Oh, we

DIRECT - BLYTHE                                    Vol. 2-63

```
 1  watched a board meeting and then we did this."
 2          Like, "Well, okay.  I don't know what happened at the
 3  board meeting."
 4          Again, these are two and three hours, and we're
 5  presenting 18 minutes of this one.
 6          THE COURT:  Mr. Suarez, I understand your concern,
 7  but in the interest of completeness, so that this Court does
 8  have a full picture as to the chain of events that transpired,
 9  I will allow the prosecutor to continue.
10          Go ahead, Counsel.
11          MR. FELMAN:  Mr. Murphy has asked me to ask the Court
12  for a brief bathroom break.
13          THE COURT:  Yes.  Let's take a ten-minute break.
14          COURT SECURITY OFFICER:  All rise.
15      (Recess from 10:34 a.m. until 10:48 a.m.; all parties
16  present.)
17          COURT SECURITY OFFICER:  All rise.  This Honorable
18  Court is now in session.
19          Please be seated.
20          THE COURT:  Mr. Duva.
21          MR. DUVA:  Thank you, Your Honor.  We're continuing
22  with the first clip of 26B.
23          Ms. Stockholm?
24      (Video played.)
25          MR. DUVA:  And if we can go to the next clip, which
```

DIRECT - BLYTHE                                    Vol. 2-64

```
 1  begins at the 1 hour, 24 minute, 7 second mark.
 2      (Video played.)
 3  BY MR. DUVA:
 4  Q.  Okay, Agent Blythe.  In terms of when you watched this
 5  publicly available meeting -- and just be high level about it
 6  and we'll move on to another exhibit -- you know, what were
 7  your takeaways in terms of strategic planning and what was
 8  going to be next presented to the JEA board?
 9  A.  Sure.  Mr. Zahn's view was that this was JEA's time to
10  pivot, as it said there on the slide, that market forces are
11  coming, and now's the time that JEA needs to change or migrate
12  its business plan or its business in some way to meet those
13  challenges.
14  Q.  And we'll look at that in connection with other planning
15  tools.  We mentioned some of these yesterday, the integrated
16  resource plan, the ten-year site plans, and the rating agency
17  presentations, which I believe Mr. Zahn mentioned in that last
18  clip.  But we'll talk about those later.
19          At this point let's go back to the exhibits.  We'll
20  go to 21G.
21          And this is an email from Mr. Wannemacher.  This is a
22  day after that board meeting -- is it not? -- March 27th, 2019?
23  A.  Yes.
24  Q.  And it's to Mr. Wathen and copying Angie Hiers and Pat
25  Maillis.
```

DIRECT - BLYTHE                                    Vol. 2-65

1           And if you can read Mr. Wannemacher's email from
2   March 27, 2019, at 11:25 a.m.
3   A.   "David, per our conversation last week, we did some work
4   on a strawman of what an LTIP might look like.  We are still
5   working on the exact vehicle (performance units or some kind of
6   bond security), but generally we are thinking of something that
7   has a redemption value based on book value and distribution
8   based on the City contribution.
9           "The attached spreadsheet kind of gives you an
10  illustration of this structure.  These numbers are hypothetical
11  and based on 2016 to 2018 results to show how these grants
12  would work over a series of years.
13          "The terms of the vesting schedule and redemption
14  would still need to be determined.  I think that your
15  recommendation about the three-year rolling program makes
16  sense.  Please review and then give me a call if you have any
17  questions or comments.
18          "Thanks, Ryan."
19  Q.   And one minute later, Angie Hiers forwarded this email to
20  Pat Maillis and another individual.
21          Can you read that one.
22  A.   Sure.  Ms. Hiers wrote, "Pat, I believe you had a question
23  about the budget for the LTIP.  The budget is whatever the
24  amount is that will have us attain the 50th percentile."
25  Q.   Okay.  There's an attachment in 21G.

DIRECT - BLYTHE                                    Vol. 2-66

1           MR. DUVA:  And this is on a CD, Your Honor.  This is
2   another exhibit that is on a CD, submitted.  It's a
3   spreadsheet.
4   BY MR. DUVA:
5   Q.   And, Agent Blythe, did you come to learn over the
6   investigation, from the email productions of JEA and Willis
7   Towers Watson, of this spreadsheet, commonly referred to as the
8   Performance Unit Scratch Sheet?
9   A.   Yes.
10  Q.   And did you see different iterations of this throughout
11  those productions?  And then there's other methods of obtaining
12  these later, which we'll talk about later in your testimony.
13  A.   Yes.
14  Q.   And what -- what is this?
15  A.   It's essentially an estimate and a sample of how one could
16  calculate the performance unit value.  It's looking at the --
17  it's based -- it says on the top it's based on 2016 to 2018
18  book value.
19          It has a certain number of assumed units outstanding
20  for each year as a target pool, and it lists the book value
21  from JEA's financial statements.  And then -- for those years,
22  and then it does the math to calculate a distribution per share
23  and then a distribution based on the City contribution.
24          MR. DUVA:  Let's go to 21H.
25          Let's go to the bottom email, Mr. Wannemacher to

DIRECT - BLYTHE                                    Vol. 2-67

1   Mr. Zahn on April 10th, 2019.

2   BY MR. DUVA:

3   Q.   Can you read that one into the record, sir?

4   A.   Sure.  Mr. Wannemacher wrote, "Per our conversation,

5   here's the spreadsheet I've been playing around with.  Based on

6   the latest due diligence, I think we're turning towards a

7   structure closer to the first tab than the second."

8   Q.   And Mr. Zahn does what with this email above?

9   A.   At 4:35 a.m. on April 10th, 2019, Mr. Zahn forwarded it to

10  Herschel Vinyard, the chief administrative officer of JEA.

11          MR. DUVA:  This is another exhibit, Your Honor,

12  that's on a CD, 21H.

13  BY MR. DUVA:

14  Q.   Agent Blythe, did you have the opportunity to look at this

15  spreadsheet in connection with 21G as well?

16  A.   I did.

17  Q.   Okay.

18          MR. DUVA:  And back out of that a little bit.

19          There we go.

20  BY MR. DUVA:

21  Q.   When you reviewed this, what did you understand this to

22  be?

23  A.   This is a little bit different iteration.  It's got --

24  it's -- basically it's also -- says it's based on the 2016 to

25  2018 book value, but it's assuming a different number of

DIRECT - BLYTHE                                    Vol. 2-68

1   cumulative units outstanding and has some, you know, apparently

2   different calculations.  Because if you look at the share

3   values, they're -- they're different, a little bit different.

4   The distributions per share are at a smaller scale.

5   Q.   And talk about, again, what the book value is.

6   A.   You know, book value is JEA's value, netting assets and

7   liabilities.

8   Q.   Did this spreadsheet, in terms of book value, use audited

9   financial statements of JEA from 2017 and 2018?

10  A.   Yes.  Yes.

11  Q.   And is this another iteration of the Performance Unit

12  Scratch Sheet, as you came to know it?

13  A.   Yes.

14  Q.   And did you receive these -- this email from the

15  productions from JEA?

16  A.   Yes, we did.

17          MR. DUVA:  Let's go to 21I.

18          And looking at the first half of that.  Just go from

19  the top to the middle.

20  BY MR. DUVA:

21  Q.   Just going to tie this up with 21H.

22          After Mr. Zahn sends this to Mr. Vinyard, Mr. Vinyard

23  sends it to who?

24  A.   He sent it to Stephen Amdur.

25  Q.   Who is Stephen Amdur?

DIRECT - BLYTHE                                    Vol. 2-69

1   A.    Stephen Amdur's a partner with Pillsbury, an international

2   law firm.  He's based in New York.

3   Q.    And it had that attachment that we looked at in 21H just

4   as a forward?

5   A.    Yes.

6   Q.    Did you interview Stephen Amdur?

7   A.    We did.

8   Q.    And how did you come to determine to do that?

9   A.    You know, we -- looking at documents like this, other

10  interviews of folks, you know, talking about the -- who

11  described to us the back-and-forth with Pillsbury and who the

12  players were, and looking at the different contracts and

13  materials and drafts that were going around, the email

14  communications between Pillsbury and JEA personnel with drafts.

15        And so that was, you know, somebody we thought it was

16  important to talk to to understand what his understanding was

17  of the PUP, the Performance Unit Plan, how the formula was

18  derived, whether it was their formula or JEA's formula, you

19  know, and what their specific role and scope was.

20  Q.    And who was Stephen Amdur specifically with Pillsbury?

21  What was -- is he an associate, a partner, kind of a leader of

22  the group, or who was he?

23  A.    He's a partner, so my understanding was he was the head of

24  that engagement.

25  Q.    And did you also obtain from JEA the contract between

DIRECT - BLYTHE                                    Vol. 2-70

1   Pillsbury and JEA as well?

2   A.    Yes.

3   Q.    And did you come to learn, through evaluating that

4   contract, that Pillsbury worked in connection with JPMorgan and

5   Morgan Stanley on the mergers and acquisitions portion of the

6   ITN?

7   A.    Yes.

8         MR. DUVA:  Your Honor, we're going to go to Exhibit

9   27.  This is another CD.  It's about a nine-minute clip --

10  sorry, it's a seven-minute clip of Mr. Zahn presenting to the

11  City Council on April 17th, 2019.

12        THE COURT:  Very well.

13        (Video played.)

14  BY MR. DUVA:

15  Q.    Okay, Agent Blythe.  Mr. Zahn references the "frog in the

16  pot" theory.

17        What is that?

18  A.    Yes.  The boiled frog theory is that if a frog is thrown

19  directly into boiling hot water, they'll jump right out, but if

20  they're put in there at room temperature and you gradually

21  increase the temperature, you can boil the frog and he won't

22  jump out.

23        And so, you know, I understood that to mean that, you

24  know, it was a metaphor, an analogy for the position JEA could

25  find itself in if they didn't address change, develop a

DIRECT - BLYTHE                                          Vol. 2-71

1   different strategy for the trouble that's coming, or the market
2   headwinds.
3   Q.   Let's move to 21J.  We're going to cover a few additional
4   Willis Towers Watson emails.
5        And starting with the middle where it says, "Angie,
6   Pat, and Scott," is this an email on April 22nd, 2019, from
7   David Wathen to Angie Hiers, Pat Maillis, and Scott Strackbine?
8        MR. DUVA:  And we might need to grab the -- yeah.  My
9   fault.
10       Thank you.
11       THE WITNESS:  Yes.
12  BY MR. DUVA:
13  Q.   And what does this email say?
14  A.   Mr. Watson wrote, "Angie, Pat, and Scott, attached is the
15  updated committee meeting materials.  We incorporated all the
16  edits we discussed on our last call.  Please review and let us
17  know if there are any additional changes."
18  Q.   And if we can go to the next page.
19  A.   (Complies.)
20  Q.   Is this the compensation program review kind of building
21  towards the compensation committee meeting, ultimately, June
22  18th of 2019?
23  A.   Yes.  This is the April 22nd, 2019, discussion draft of
24  Willis Towers Watson's presentation.
25  Q.   So let's go to page 5 of 21J.

DIRECT - BLYTHE                                          Vol. 2-72

1   A.   (Complies.)
2   Q.   Is there a description or summary on page 5 of 21J as to
3   why JEA engaged Willis Towers Watson and what they're to
4   complete?
5   A.   Yeah, to "Conduct a competitive market assessment for
6   JEA's CEO position;
7        "Review JEA's competitive market assessments across
8   all employee populations;
9        "Provide a summary" --
10  Q.   You can stop.  It's illustrated, and we'll try to do that
11  a little bit more for time purposes.
12       But let's go to -- let's go to slide -- or page 15 of
13  the exhibit.
14  A.   (Complies.)
15  Q.   And is this a compensation benchmarking summary slide, and
16  it's talking about appointed population versus market 50th
17  percentile variances by job level?
18  A.   Yes.
19  Q.   So the 50th percentile, that's a theme that keeps
20  repeating itself; is that correct?
21  A.   Yes.
22  Q.   Let's go to slide -- page 25 of 21J.
23  A.   (Complies.)
24  Q.   Is this an introduction to the long-term incentive plan
25  design?

DIRECT - BLYTHE                                    Vol. 2-73

1   A.   Yes.
2   Q.   And let's go to page 26.
3           And with respect to long-term incentive plan design,
4   public power utilities and prevalence, that language has
5   changed from a prior iteration.
6           Can you discuss that?
7   A.   Yes.  The previous version that we looked at in the
8   earlier draft, in the part of the matrix here under prevalence
9   for public power utilities, that previously stated, "LTI plans
10  are uncommon," and this added the additional language of, "but
11  used selectively."
12  Q.   And do you know who made that change?
13  A.   Our understanding is that, you know, the -- there was a
14  couple changes.  This was one of two of those, and that this
15  was a request made for this to be changed.
16          MR. DUVA:  Let's go to the next slide.
17          Let's go to page -- I'm sorry, page 29.  My fault.
18  BY MR. DUVA:
19  Q.   Okay.  This long-term incentive plan design, this
20  "Proposed Design Details" references a performance unit; is
21  that right?
22  A.   Yes.
23  Q.   And is it an overlapping three-year analysis, where
24  there's an award payout each year based on the prior three
25  years?

---

DIRECT - BLYTHE                                    Vol. 2-74

1   A.   Yes.
2   Q.   And what are the performance measures?
3   A.   Net book value is used to determine the performance unit
4   value, customer rates, performance measures used to modify the
5   number of performance units earned.
6   Q.   And net book values, that's the figures that we saw on the
7   Performance Unit Scratch Sheet in 21G and 21H?
8   A.   Yes.  It's a measure of value that, you know, management
9   is -- basically the stated purpose is to get management to work
10  towards the common purposes of increasing that enterprise or
11  value.
12  Q.   And then there's a payout range of threshold, 50 percent
13  of target, and maximum, 150 percent of target?
14  A.   Yes.
15  Q.   What about estimated cost?  What does that say?
16  A.   It says the estimated cost of the annual performance unit
17  awards to all employees, based on current incumbent base
18  salaries, is $4 million.
19  Q.   Let's go to the next slide, the time-based unit.
20          What is this, and what is the estimated cost of a
21  time-based unit?
22  A.   $1.2 million.
23  Q.   And what is the award vehicle?  What is the time-based
24  unit?
25  A.   It's -- it's a unit of value tied to JEA's net book value,

DIRECT - BLYTHE                                          Vol. 2-75

1   and it's a -- a valuation formula that is to determine that.
2   Q.    And in terms of award frequency, is that different?  It's
3   sort of an ad hoc award as to time -- as determined by a period
4   of time.
5   A.    Yes, it's with a vesting period.
6   Q.    Okay.
7             MR. DUVA:  We'll move forward to 21K.
8             And if we can just illustrate the top half of the
9   page.
10  BY MR. DUVA:
11  Q.    And on April 24th, 2019, what is Mr. Zahn saying about the
12  PowerPoint?
13  A.    He wrote to Pat Maillis, "Can you please get me the power
14  point?  Thanks."
15            And our understanding is -- from our investigation is
16  he's referring to the PowerPoint -- the Willis Towers Watson
17  discussion draft that we just looked at.
18  Q.    Let's go to 21L.
19  A.    (Complies.)
20  Q.    Is this an email from Mr. Zahn to Jon Kendrick, who at
21  that point was the interim VP and HR officer?
22  A.    Yes.
23  Q.    Is it dated May 6th of 2019?
24  A.    Correct.
25  Q.    And was it attaching that -- a version of the PowerPoint,

DIRECT - BLYTHE                                          Vol. 2-76

1   the JEA compensation committee draft?
2   A.    Yes.  It's a draft dated April 22nd, 2019, and it's got
3   "draft-v3," and it's got a PowerPoint file extension.
4             He wrote to Mr. Kendrick, "Jon, see attached.  We
5   should talk.  I've edited but still have a number of comments
6   in red."
7   Q.    Let's go to page 33 of 21L.
8   A.    (Complies.)
9   Q.    Up on the top, there's a 1 and 2.
10            What do those say?
11  A.    There's two items.  One states, "Struggling to understand
12  why proposed adjustments don't equal market."
13            And the second one is, "Please come talk to me."
14  Q.    And what is the estimated cost impact on this slide where
15  that writing is set forth?
16  A.    "4 million based off of the current incumbent base
17  salaries for the performance unit award (5.2 million if
18  time-based unit award is also included)."
19  Q.    So it's adding the three-year period of 4 million to the
20  time-based unit of 1.2 for the total of 5.2 million?
21  A.    Yes.  That's -- that's my understanding.
22  Q.    And go to 21M.
23  A.    (Complies.)
24  Q.    What is that?
25  A.    It's an email from Pat Maillis dated May 9th, 2019, at

DIRECT - BLYTHE                                          Vol. 2-77

1   7:44 p.m., to Aaron Zahn, Ryan Wannemacher, Herschel Vinyard,

2   copying Jon Kendrick.

3           The subject is "Compensation Study PowerPoint," and

4   it's got an attachment dated May 9th, 2019, "JEA Comp Committee

5   Draft."

6           Ms. Maillis wrote, "Attached is the updated version

7   of the compensation study and recommendations from Willis

8   Towers Watson."

9   Q.   Let's go to page 9 of 21M.

10  A.   (Complies.)

11  Q.   There at the bottom the estimated cost over the three-year

12  period, does that change a little bit here in this draft?

13  A.   Yes.  It went down a little bit to 3.4 million.

14  Q.   Go to page 31 -- I'm sorry, page 33 of the exhibit.

15  A.   (Complies.)

16  Q.   And there at the bottom, LTI costs, what does that say?

17  A.   "3.4 million based off current incumbent base salaries for

18  performance unit award (total cost of 4.6 million if the

19  time-based award is included.)"

20  Q.   So as you looked at these different iterations and

21  building up with the back-and-forth with Willis Towers Watson,

22  did you see any slides about the long-term incentive plan being

23  funded by a recapitalization event?

24  A.   No.

25  Q.   Let's go to 21N.

DIRECT - BLYTHE                                          Vol. 2-78

1   A.   (Complies.)

2   Q.   Is this a January 8th, 2020, letter that David Wathen

3   wrote to Melissa Dykes at the point she'd taken over as the

4   interim CEO after Mr. Zahn was removed?

5   A.   Yes.

6   Q.   And what does Mr. Wathen write to Ms. Dykes there in those

7   first three paragraphs?

8   A.   Mr. Wathen wrote, "Based on recent media articles

9   published over the last several weeks, we feel it is imperative

10  to clarify Willis Towers Watson's role in the development of

11  the JEA long-term incentive plan.

12          "Willis Towers Watson provided JEA management a draft

13  discussion document for the June 18th, 2019, compensation

14  committee meeting.  The document was not a fully developed

15  long-term incentive plan design but a strawman design that

16  required further discussion and refinement, a discussion that

17  Willis Towers Watson never had with the compensation committee

18  and/or full board as was initially planned.

19          "Several months have passed, and we learned via

20  various media stories that a final long-term incentive plan

21  design had been developed.  Based on our reading of the media

22  stories, the final plan design is one Willis Towers Watson

23  never would have proposed nor endorsed, yet we are identified

24  in the media as being involved with the final long-term

25  incentive plan design as we were the compensation consultant

DIRECT - BLYTHE                                              Vol. 2-79

```
 1  engaged by JEA."
 2  Q.   You can stop there.
 3            That reference in paragraph two to the June 18, 2019,
 4  compensation committee, based on reviewing that, publicly
 5  available on the Internet, the JEA website, did you -- did
 6  Willis Towers Watson present there?
 7  A.   No.
 8  Q.   And the materials, the minutes -- I should be more
 9  specific -- are available on the JEA website?
10  A.   Right.
11  Q.   And did you interview Mr. Wathen about whether he was
12  permitted to present to the compensation committee or the JEA
13  board?
14  A.   I did, and he said that he wasn't invited --
15            MR. SUAREZ:  Objection, again, to hearsay.  His 302
16  is in evidence.  He doesn't need to elaborate on what he thinks
17  he said.
18            MR. DUVA:  I don't think it's what he thinks he said.
19  I think he's saying what he said, which then led Agent Blythe
20  to take whatever the next steps were in the investigation with
21  respect to Willis Towers Watson and conclude how Willis Towers
22  Watson was used for a period of time and then not used at a
23  later time.
24            MR. SUAREZ:  You could ask him --
25            THE COURT:  Rephrase the question, Counsel.
```

DIRECT - BLYTHE                                              Vol. 2-80

```
 1            MR. SUAREZ:  Thank you, Your Honor.
 2  BY MR. DUVA:
 3  Q.   What did you learn from speaking with Mr. Wathen?
 4            MR. SUAREZ:  Your Honor, same objection.  He can ask
 5  him what did he do based on his interview but not what he said.
 6  I think that's just classic hearsay.
 7            MR. DUVA:  It goes to his state of mind.  The Court
 8  has to understand the investigative leads that are being
 9  developed, which is what the defense is fighting against.
10            When you talk to a witness, an investigative lead is
11  developed, and Agent Blythe, based on -- again, this is about
12  what the Government knew, when it knew it, and how it knew it.
13            And that's why it's -- I know it's an odd construct
14  to do this, and I've never done it before, but it is the links
15  in the chain, the periods of time.  That's why the chronology
16  is so important about what Agent Blythe knew and when we knew
17  it and then what we decided to do next.
18            MR. SUAREZ:  And that's why the 302 -- we have
19  admitted the 302 without objection for that very purpose.  We
20  don't need him now to elaborate on what he thinks that witness
21  told him.  The 302 is in evidence for that very purpose.
22            MR. DUVA:  There's another factor.  May we approach,
23  Your Honor?
24            THE COURT:  Yes.
25                           * * * * *
```

1           (Sidebar No. 1 sealed and under separate cover.)

2                         *  *  *  *  *

3    BY MR. DUVA:

4    Q.    Okay.  Agent Blythe, we were talking about an interview of

5    Mr. Wathen, and I believe we talked about the date of that

6    earlier.  I want to probe a couple other 302s just for date

7    purposes.

8           So I have, Agent Blythe, Exhibit 69, which is the 302

9    for Pat Maillis, and Exhibit 72, which is the 302 for Angie

10   Hiers.  We're not going to get into the substance of these.

11   A.    Okay.

12   Q.    When did you interview Pat Maillis?

13   A.    I interviewed Pat Maillis on June 2nd, 2020.

14   Q.    How about Angie Hiers?

15   A.    May 21st, 2020.

16   Q.    So Mr. Wathen was before those two individuals?

17   A.    Yes.

18   Q.    After receiving your first production that you talked

19   about yesterday from JEA on May 8th of 2020?

20   A.    Correct, that included Willis Towers Watson documents.

21   Q.    In terms of -- and let's continue with the letter that is

22   21N, and we'll go to the fourth paragraph.

23           There's a sentence four lines up from the bottom that

24   begins with, "Willis Towers Watson was not contacted by JEA

25   management."

1           Can you read that into the record?

2    A.    "Willis Towers Watson was not contacted by JEA management,

3    nor was permission requested to make modifications to our

4    document."

5    Q.    And continue with the first sentence in the next

6    paragraph.

7    A.    "Willis Towers Watson provided preliminary help in the

8    development of the long-term incentive plan, but we do not

9    support the final plan design as developed."

10   Q.    And you had an opportunity -- and we're not going to go

11   song and verse through the 302 and the interview.  The Court

12   has that, but I want to just hit some high-level points.

13           In terms of reviewing the production from JEA that

14   you received on May 8th of 2020, what did you learn generally

15   from David Wathen about Willis Towers Watson's participation

16   and their ultimate involvement in what became Resolution

17   2019-10, which is the Performance Unit Plan?

18   A.    Sure.  So they were included up to the point where we've

19   seen them providing these discussion drafts in April -- up to

20   late April of 2019.

21           But then, going forward, they weren't included in the

22   compensation committee meeting, and they weren't included in

23   the board presentation on the matter.

24   Q.    Did you ask Mr. Wathen about any conversations that he's

25   had with Mr. Zahn or Mr. Wannemacher about any long-term

DIRECT - BLYTHE                                        Vol. 2-83

1  incentive plan being part of a potential sale or
2  recapitalization of JEA?
3  A.   Yes.
4  Q.   What did he say?
5  A.   He said that he didn't have any conversation with them
6  about that.  That wasn't brought up.
7  Q.   And getting to the estimated cost of the Performance Unit
8  Plan -- and there were different iterations of the PowerPoint
9  presentation that we looked at, $4 million, $3.4 million --
10 what was Mr. Wathen's expectation in terms of what ultimate
11 payouts would be if a long-term incentive plan was decided upon
12 and authorized?
13 A.   That they would be modest, in alignment with their
14 discussion draft.
15 Q.   Was there any discussions about payouts in connection with
16 recapitalization?
17 A.   No.
18 Q.   And did you talk to Mr. Wathen about this letter?
19 A.   Yes.
20 Q.   And ultimately, did you show him Resolution 2019-10?
21 A.   Yes.
22        MR. DUVA:  If we can bring up Exhibit 20P5.
23 BY MR. DUVA:
24 Q.   Now, this is the resolution -- is it not? -- that
25 authorized the Performance Unit Plan that the JEA board passed

DIRECT - BLYTHE                                        Vol. 2-84

1  on July 23rd, 2019, at the July board meeting?
2  A.   It is.
3  Q.   Did Mr. Wathen have any role, or did Willis Towers Watson
4  have any role, in preparing this or do any work on this?
5  A.   No.
6  Q.   Did Mr. Wathen talk about 2019-10 and the long-term
7  incentive plan and the presentation to the JEA board on July
8  23rd, 2019?
9  A.   Did he present to the board?
10 Q.   Did he talk about that presentation?
11 A.   Yes.
12 Q.   And did he say whether or not Willis Towers Watson had any
13 role in developing that PUP presentation that was made to the
14 JEA board on July 23rd, 2019?
15 A.   He said that although -- you know, (1) he wasn't there,
16 but -- and wasn't afforded the opportunity to present; (2) that
17 although it contained parts of their discussion draft, it
18 wasn't ultimately their presentation that was provided.
19 Changes --
20 Q.   In 2019-10 --
21 A.   -- were made --
22 Q.   Sorry.  Go ahead.
23 A.   Changes were made to it.
24 Q.   And ultimately did he say that 2019-10 was not a Willis
25 Towers Watson plan?

DIRECT - BLYTHE                                    Vol. 2-85

1  A.   Correct.

2         MR. DUVA:  And by that, for record purposes, I'm

3  talking about Exhibit 20P5.

4  BY MR. DUVA:

5  Q.   Did Mr. Wathen generally talk about having to have caps on

6  long-term incentive plans, especially for public utilities?

7  A.   Yes.  He thought it was a public policy issue,

8  essentially, and that, you know, it was unusual to have a --

9  not have a cap.

10 Q.   Move to Exhibit 55.

11 A.   (Complies.)

12 Q.   And that is a grand jury subpoena (unintelligible).

13        THE COURT:  Could you repeat that, Counsel?

14        MR. DUVA:  I'm sorry.  Yes.

15        Grand Jury Exhibit -- I'm sorry, not grand jury

16 exhibit.

17        Exhibit 55, which is a grand jury subpoena to

18 McKinsey & Company.

19        If we can publish 55.

20        So we're moving from Willis Towers Watson to

21 McKinsey.

22        Let's show the bottom portion of page 1.

23 BY MR. DUVA:

24 Q.   So was this subpoena issued, the McKinsey subpoena, on or

25 about April 21st of 2020?

DIRECT - BLYTHE                                    Vol. 2-86

1  A.   Yes.

2  Q.   Okay.  Let's go to the itemized requests.

3        And on page 4 of the subpoena, documents and requests

4  includes emails and email attachments; is that right?

5  A.   (No response.)

6  Q.   You can look at the physical copy if you need to.

7  A.   Unfortunately, I don't have that one in my binder.

8        The -- yeah, I mean, we -- I know that was something

9  that we -- "13.  Documents and records (including any

10 communications of any kind) in any manner involving Aaron Zahn,

11 Ryan Wannemacher, Melissa Dykes, Herschel Vinyard, or any other

12 JEA executive team or senior leadership team member."

13        And then there's a documents and records definition

14 below.

15        MR. DUVA:  Let's go -- based on the screen there,

16 let's go to the itemized requests, which are on page 3.

17 BY MR. DUVA:

18 Q.   And let's look at items 1 through 3.

19 A.   Sure.  We asked for documents and records regarding

20 McKinsey & Company's consulting engagement with JEA, including

21 their engagement letter, contracts, subcontracts with any other

22 companies, and invoices, all accounting of billable hours; and

23        2.  Reports and draft reports provided to JEA

24 executive team members, all correspondence related to those,

25 any feedback provided or requested changes related to

DIRECT - BLYTHE                                    Vol. 2-87

1  McKinsey's reports;
2          3.  Documents and records of PowerPoint presentations
3  prepared for the JEA board.
4          MR. DUVA:  And if we can just illustrate 4 through 8,
5  briefly, just for record purposes.
6  BY MR. DUVA:
7  Q.  And ultimately, Agent Blythe, there are 16 itemized
8  requests in this grand jury subpoena to McKinsey; is that
9  right?
10 A.  Yes.  We -- we wrote those.
11         MR. DUVA:  And if we can illustrate 9 through 12.
12         And 13 through 16.
13         Rather than read these, I'm just kind of making a
14 note of where this is in the record.
15 BY MR. DUVA:
16 Q.  And did you ultimately -- did we receive a production from
17 McKinsey?
18 A.  Yes.  We received several productions on a rolling basis
19 from them.
20 Q.  And did this lead to an interview of Anton Derkach?
21 A.  Yes, it did.
22 Q.  And do you have Exhibits 61 through 71 in front of you?
23 A.  I do.
24 Q.  And what date did you -- did we interview Mr. Derkach?
25 A.  On January 29th of 2021.

DIRECT - BLYTHE                                    Vol. 2-88

1  Q.  And, of course, this is the same Mr. Derkach that we saw
2  in the board meeting on January 22nd, 2019.
3  A.  Correct.
4  Q.  Again, because the Court has the interviews of
5  Mr. Derkach, we'll kind of do this from a high level to move
6  forward.
7          But talk about what you learned in terms of
8  McKinsey's charge and what the general nature of its work was
9  through this interview of Mr. Derkach and your review of
10 documents.
11 A.  Sure.  So leading up to this interview, we spent time
12 looking through the documents and presentations and iterations
13 of it, who was involved, like Sarah Brody, who worked for
14 Mr. Derkach.  We interviewed her as well.
15         And so we -- our understanding was that they were
16 asked to create the status quo 1.  We were interested in
17 talking to Mr. Derkach about whether -- what their role was in
18 status quo 2, which was basically management taking the
19 traditional utility -- using the traditional utility levers, if
20 you will, of raising rates and cutting costs to right the ship
21 financially, as it were.
22         And also we understood that they were in the process
23 of developing a 2030 plan to transform JEA into a more
24 competitive utility.
25 Q.  And were you aware, from prior exhibits and records

DIRECT - BLYTHE                                    Vol. 2-89

1  provided by JEA, that McKinsey responded to the requests for
2  proposal back in July of 2018?
3  A.  Yes.
4  Q.  And we looked at emails earlier referencing kick-off
5  meetings at the -- in December of 2018 with the senior
6  leadership team as to strategic planning.
7  A.  Yes.  I think that was an email we showed Mr. Derkach, and
8  that was, you know, sort of a -- one of the first documents we
9  had him review.
10       And in these documents we came -- these interviews,
11 we came to him prepared with a litany of documents that sort of
12 guided the outline of the interview.
13 Q.  And talk about that in terms of how you prepared for these
14 interviews with an individual like Mr. Derkach.  What's the
15 process that you go through?
16 A.  Sure.  So the first step was I would go through and look
17 at other interviews we'd already done.  When people mentioned
18 them, I would look at -- go into my document review tools I was
19 using to manage the large amounts of emails, for example, and
20 productions.
21      And I'd run search terms with his name, the people's
22 names that were on communications I already had, in an effort
23 to find additional communications that were pertinent or
24 relevant for this.
25      And that was something, you know, we would -- I would

DIRECT - BLYTHE                                    Vol. 2-90

1  put together in the week, days before these interviews so that
2  we'd be able to share those and guide the interview and get the
3  best and most complete amount of information out of these
4  witnesses.
5  Q.  And, of course, on the publicly available JEA board
6  meetings on the JEA website, one of which we showed earlier,
7  the January 22, 2019, meeting, you got to see who Mr. Derkach
8  was.
9  A.  Yes.  And, you know, we -- one other thing we wanted to
10 get was their -- their copy of the presentations they gave and
11 things like that from their own production.
12 Q.  And those were requested in the grand jury subpoena?
13 A.  Yes.
14 Q.  Okay.  Talk about generally, kind of at a high level, what
15 was McKinsey's charge?  What were they -- what was -- what were
16 they hired to do?
17 A.  Strategic planning, to walk JEA through that process and
18 develop a plan to move JEA into a municipal utility of the
19 future.
20 Q.  So did McKinsey work together with JEA to prepare and
21 deliver status quo 1 or the scenario 1?
22 A.  Yes.
23 Q.  And who was the leader in the development of scenario 2,
24 based on what you learned from your interview of Mr. Derkach?
25 A.  Primarily JEA management, the senior leadership team.

DIRECT - BLYTHE                                          Vol. 2-91

1   Q.    And that was the traditional utility response?
2   A.    Yes.
3   Q.    And was that an added step that the JEA management team
4   wanted in this whole process?
5   A.    Yes.  That was a -- that was a JEA management ask of
6   McKinsey, to include that as part of the -- as an additional
7   step.
8   Q.    Was McKinsey's charge or thought that they were going to
9   go from status quo 1 to then develop what Mr. Derkach referred
10  to as a dynamic plan of how to address that to have JEA become
11  a leading municipal utility of the future?
12  A.    Yes.
13  Q.    So in other words, McKinsey wasn't hired to guide the JEA
14  board towards any privatization discussion.
15  A.    No.  In their view, no.
16  Q.    Ultimately, did McKinsey have a proposal for JEA that
17  involved putting up McKinsey's own capital to try to recoup it
18  later if JEA hit certain performance metrics?
19  A.    Yes.  McKinsey was willing to put up $20 million of their
20  own capital to enter into sort of an agreement with JEA in
21  which they would share in the increase in profit or value based
22  on implementing that strategy at some point down the road.
23  Q.    And ultimately was that option declined by Mr. Zahn --
24  A.    Yes.
25  Q.    -- according to Mr. Derkach?

DIRECT - BLYTHE                                          Vol. 2-92

1   A.    Yes, according to Mr. Derkach.
2   Q.    So kind of going to a moment in time, and we'll see clips
3   of this later, but the June 25th, 2019, board meeting, is that
4   when the traditional utility response was delivered?
5   A.    Yes.
6   Q.    And that was a JEA management team creation.
7   A.    Primarily, yes.
8   Q.    And ultimately did you ask Mr. Derkach about a phone call
9   that he had with Aaron Zahn on June 28th of 2019?
10  A.    Yes, I did.  He received a call three days after that
11  board meeting from Aaron Zahn.
12  Q.    What did he tell you about that, he being Mr. Derkach?
13  A.    That Mr. Zahn informed him that, you know, they weren't --
14  they were going to move towards privatization.  They didn't --
15  in the engagement with McKinsey, McKinsey kept working on that
16  strategy document, but ultimately it was never -- it was never
17  presented to the board.
18        And so he was informed that JEA decided that the
19  constraints in front of JEA as far as being able to change and
20  pursue different business lines in its current structure as a
21  municipal utility were kind of too great to work around, so
22  they were going to pursue privatization.
23  Q.    And up to that point, on June 28th, 2019, had Mr. Derkach
24  had any privatization discussions with Mr. Zahn?
25  A.    No.

DIRECT - BLYTHE                                          Vol. 2-93

1   Q.   Or anyone else at JEA.
2   A.   Not according to Mr. Derkach.
3   Q.   And did it become clear to Mr. Derkach during that
4   interview, according to him, that any performance partnership
5   with JEA was dead and not happening?
6   A.   Yes.  That's the way he put it, that it was done.  That
7   option was no longer viable.
8   Q.   You mentioned this other strategy document.
9        Did Mr. Derkach refer to this as the unconstrained
10  strategy development?
11  A.   Yes.
12  Q.   And did he -- did McKinsey continue to work on that from
13  July 2019 into December of 2019?
14  A.   They did.
15  Q.   Was that ever presented to the JEA board or the City
16  Council?
17  A.   No.
18  Q.   And did the engagement with McKinsey end in the third week
19  of December of 2019?
20  A.   Yes.
21  Q.   I'm going to go to 28, Exhibit 28.  It's kind of where we
22  started this morning.  Trying to stay chronological in time.
23       Was this the May 20th, 2019, Nixon Peabody memo that
24  was ultimately emailed to Mr. Wannemacher and other lawyers
25  with Nixon Peabody?

DIRECT - BLYTHE                                          Vol. 2-94

1   A.   Correct.
2   Q.   Okay.
3        MR. DUVA:  If we can show the issue again on page 3.
4   BY MR. DUVA:
5   Q.   So is this the -- and there are other legal memoranda, and
6   we're not going to get too much into the guts of those.  They
7   kind of speak for themselves on what they address and don't
8   address.
9        But was this the first, kind of in sequence, of
10  different legal memoranda that were obtained during this
11  investigation?
12  A.   Yes.
13  Q.   And, again, did you receive this from the Office of
14  General Counsel?
15  A.   I did.
16  Q.   When was that?
17  A.   March 23rd, 2020.
18  Q.   And do you understand how this was located by them and
19  where it was located at JEA?
20  A.   My understanding, it was found in a former assistant
21  general counsel's desk drawer.
22  Q.   Was that Kort Parde?
23  A.   Yes.
24  Q.   K-o-r-t --
25  A.   Yes.

DIRECT - BLYTHE                                      Vol. 2-95

```
 1   Q.   -- P-a-r-d-e?
 2   A.   Yes.
 3   Q.   And ultimately, was this then provided to Sean Granat and
 4   Mr. Gabriel shortly after it was found in March of 2020?
 5   A.   Yes.
 6   Q.   Okay --
 7        THE COURT:  Mr. Duva, you said this was found in a
 8   desk?
 9        MR. DUVA:  Found in a desk in someone's office, an
10   OGC lawyer named Kort Parde.
11        THE COURT:  Okay.
12   BY MR. DUVA:
13   Q.   And the issue is what, if you can read that into the
14   record?
15   A.   "You have asked us to analyze whether JEA may create or
16   establish a long-term employee incentive program (the program)
17   to pay a bonus or additional amounts to the employees of JEA
18   over a period of one to three years if JEA were to achieve
19   specific and mechanical financial metrics, such as an increase
20   in the net asset value of JEA or an increase in the amount
21   transferred annually to the City of Jacksonville.
22        "In addition, you've asked us, if JEA could create
23   the program, whether JEA could pay such additional amounts to
24   the employees for such a program in the form of a JEA bond that
25   JEA would issue directly to the employee."
```

DIRECT - BLYTHE                                      Vol. 2-96

```
 1   Q.   So, Agent Blythe, you testified earlier that you did not
 2   read Garrity statements of Mr. Zahn and Mr. Wannemacher, so you
 3   do not know whether or not Mr. Zahn or Mr. Wannemacher, one way
 4   or the other, addressed this Nixon Peabody memo in their
 5   Garrity statements.
 6   A.   No clue.
 7        MR. DUVA:  And let's go back to Exhibit 50.  That's
 8   the grand jury subpoena to JEA.
 9        If we can go to the itemized requests.
10   BY MR. DUVA:
11   Q.   Is there a series in item 5, beginning with 5a, a series
12   of requests about background information and additional
13   information with respect to this Nixon Peabody memo?
14   A.   Okay.
15   Q.   Do you see it on the screen or no?
16   A.   Yes.
17   Q.   Okay.  So is that a yes or a no, that there was a specific
18   request in the JEA grand jury subpoena about additional
19   information with respect to this memo?
20   A.   Yes.
21   Q.   Okay.
22   A.   We had learned about it in advance of our subpoena issued
23   on April 21st.
24   Q.   Going back to 28, the brief answer?
25   A.   The brief answer is no, as Florida law doesn't allow for
```

1  it.
2  Q.   And we won't belabor the point, but is there an analysis
3  throughout of different statutes, including Florida law or
4  Florida Statutes, Section 215.425, and also 116.1101, and also
5  other conflicts of interest laws?
6  A.   Yes.
7  Q.   Was this -- was this memo ever presented to the JEA board?
8  A.   No.
9  Q.   Let's go to Exhibit 33A.  I'm going to have to get a
10 different set of books.
11       This is along the lines of that -- I'm sorry.  You
12 know what?  I do want to cover 33A.
13       We're going to get to 20H1 in a little bit, but was
14 there a phone call -- based on the interview of Elizabeth
15 Columbo, was there a phone call on Sunday, June 30th of 2019,
16 that Mr. Wannemacher made to Ms. Columbo?
17 A.   Yes.
18 Q.   And what was going on on June the 30th, 2019, in terms of
19 planning, with Ms. Dykes, Mr. Wannemacher, and Mr. Zahn?
20 A.   So this is in the lead-up to the July 23rd board meeting.
21 The June 25th status quo 2 board meeting had been five days
22 before, and so they've already had the June 18th compensation
23 committee meeting, which had green-lighted this plan to go to
24 the board, essentially.
25       And so he called Ms. Columbo asking if they'd be able

1  to issue a bond, essentially, to fund this Performance Unit
2  Plan.
3  Q.   And did Mr. -- according to Ms. Columbo, did
4  Mr. Wannemacher tell her that this bond or plan had been
5  approved internally by the JEA compensation committee?
6  A.   Yes.
7  Q.   And did he ask if Nixon Peabody would be -- would prepare
8  bond resolutions for bond issuance to fund the Performance Unit
9  Plan?
10 A.   Yes.
11 Q.   And what was Ms. Columbo's reaction?  What did she say?
12 A.   Her reaction --
13 Q.   In the interview.
14 A.   Yeah.  Her reaction was, well -- she asked him if he read
15 her memo, because she couldn't understand why he was asking her
16 that based on what was in the memo.
17 Q.   And ultimately -- do you have Exhibit 70 in front of you?
18 I'm sorry, 71.
19 A.   Yes.
20 Q.   When did we email -- I'm sorry.
21       When did we interview Ms. Columbo?
22 A.   April 23rd, 2020.
23 Q.   So about two days after issuing the grand jury subpoena to
24 JEA?
25 A.   Correct.

DIRECT - BLYTHE                                                Vol. 2-99

1   Q.    According to Ms. Columbo, did she say that Mr. Wannemacher
2   was referencing another memo that they received from the Office
3   of General Counsel that cleared the Performance Unit Plan?
4   A.    Yes.  He said that they had received another legal memo
5   that cleared those concerns as listed by Nixon Peabody in their
6   memo.
7   Q.    And did Ms. Columbo ask to see it?
8   A.    Yes, I think so.
9   Q.    Let's look at 33A.
10  A.    (Complies.)
11  Q.    This is a memo from Lynne Rhode to Kort Parde and Sean
12  Granat of the Office of General Counsel regarding compensation
13  plans, and it's dated June 17th of 2019.
14        And is this an analysis -- if we go to the issue, it
15  says, "You have asked whether JEA may create or establish a
16  long-term employee incentive program to pay a bonus or
17  additional amounts to the employees of JEA over a period of
18  years."
19        Is that right?
20  A.    Correct.
21  Q.    And the answer starts out with an analysis of Florida
22  Statute 215.425.
23  A.    Yes.
24  Q.    And let's go to the analysis on page 2, and we won't cover
25  all of this.

DIRECT - BLYTHE                                               Vol. 2-100

1         Were there provisions of that statute, 215.425, set
2   forth, and then there's an analysis of that and also Florida
3   Constitution provisions?
4   A.    Correct.
5   Q.    Now, you interviewed Ms. Rhode, and Ms. Rhode testified
6   yesterday.
7         At any point did Ms. Rhode have any belief, according
8   to her statements and testimony, that the PUP was connected to
9   large payouts with respect to recapitalization?
10  A.    No.
11  Q.    So this June 17th, 2019, memo, did you have the
12  opportunity to interview Ms. Rhode about this?
13  A.    Yes.
14  Q.    And did she say that this was just a general assessment of
15  a multiyear plan pursuant to the Florida Statutes/Florida
16  Constitution provisions listed in the memo?
17  A.    Yes.
18  Q.    And is this the memo that Elizabeth Columbo wanted to look
19  at?
20  A.    Yes.
21  Q.    And if we can go to 20H1.
22  A.    (Complies.)
23        THE COURT:  Mr. Duva, we'll probably break in a
24  moment.  We're --
25        MR. DUVA:  Yes.  If I could finish 20H1, and then

DIRECT - BLYTHE                                                    Vol. 2-101

```
 1   we're going to get to the May 28th, 2019, board meeting with
 2   some videos, so it would be -- that would be a great time.
 3           THE COURT:  Okay.
 4   BY MR. DUVA:
 5   Q.  Okay.  Agent Blythe, I know it took me a little bit to get
 6   there, but is this the July 1st, 2019, email -- so the next
 7   day -- from Mr. Wannemacher to Ms. Columbo about the JEA
 8   employee retention bond?
 9   A.  Yes.
10   Q.  And it says, "Liz, per our conversation, please see
11   attached.  Let's chat tomorrow."
12           And let's look at the employee retention bond, just
13   portions of it, on the next page.
14   A.  (Complies.)
15   Q.  It says, "JEA Employee Benefit Bond," and if you could
16   read the first paragraph.
17   A.  "JEA employee benefit bonds will be an employee benefit
18   similar to JEA providing life insurance" -- or, excuse me,
19   "JEA-provided life insurance available to every currently
20   employed JEA employee and full-time OGC attorneys directly
21   supporting JEA (eligible participant).  JEA shall, based on
22   formal authorization by the board of directors, issue a series
23   of benefit bonds."
24   Q.  Okay.  And having received Mr. Wannemacher's emails from
25   the JEA grand jury subpoena and looking at paragraph 10 on the
```

DIRECT - BLYTHE                                                    Vol. 2-102

```
 1   attachment, were there some familiar defined terms when you
 2   compare that to the July 23rd, 2019, board meeting, which is on
 3   the JEA website?
 4   A.  Yes.
 5   Q.  And there's mentions of a current year value and a City
 6   contribution, and then in paragraph 11, there's a redemption
 7   right and in paragraph 12, a redemption price?
 8   A.  Yes.
 9   Q.  And what were your takeaways when you looked at paragraph
10   13, the extraordinary mandatory redemption?
11           Can you -- can you read that and talk about your
12   takeaway from this provision in this attachment to the July
13   1st, 2019, email.
14   A.  Sure.  Regarding extraordinary mandatory redemption, "In
15   the event of repayment of substantially all of the debt
16   outstanding under either subordinate bond resolution, the
17   benefit bonds associated with such resolution will be subject
18   to extraordinary mandatory redemption.
19           "In an extraordinary mandatory redemption, the
20   current-year value will be calculated based upon the expected
21   net position immediately after the extraordinary redemption."
22   Q.  The language of "extraordinary redemption," what did that
23   mean to you?
24   A.  I learned through the investigation that that meant a
25   sale, that if a recapitalization event occurred, this would go
```

DIRECT - BLYTHE                                              Vol. 2-103

1  from a long-term three-year plan to a whatever term it was from
2  the time of conception to a recapitalization or sale.
3          And in this case it seemed like it would be even less
4  than a year, the event.  And essentially that would cause the
5  calculation of -- that current-year value for the PUP
6  calculation, that would trigger that immediately upon a
7  recapitalization or sale.
8  Q.   So did this look like an iteration of the PUP connected to
9  recapitalization?
10 A.   Yes.
11 Q.   And did we receive Mr. Wannemacher's emails pursuant to
12 our subpoena to JEA?
13 A.   Yes.
14 Q.   And did we talk to Jeff Rodda about this language in
15 Section 13 or paragraph 13, the extraordinary mandatory
16 redemption, when we interviewed him?
17 A.   Yes.
18 Q.   And Mr. Rodda's with the Council Auditor's Office?
19 A.   Yes, he is.
20      MR. DUVA:  Your Honor, at this time I was going to
21 transition to the May 28th, 2019, board meeting, so it may make
22 sense to take a break.
23      THE COURT:  All right.  We'll take a break and
24 reconvene, let's say, 1:15.
25      COURT SECURITY OFFICER:  All rise.

DIRECT - BLYTHE                                              Vol. 2-104

1      (Recess from 12:05 p.m. until 1:19 p.m.; all parties
2  present.)
3      COURT SECURITY OFFICER:  All rise.  This Honorable
4  Court is now in session.
5      Please be seated.
6      THE COURT:  Mr. Duva.
7      MR. DUVA:  Yes, sir.  Ready to proceed.
8      THE COURT:  All right.
9      MR. DUVA:  We are on the May 28th, 2019, board
10 meeting, focusing on Exhibits 29A, 29B, and 29C.
11      29A, Your Honor, is the entire board package that's
12 on that same CD I've referenced before with 20F1, 20P1, 25A and
13 26A.
14      And 29B is a -- the status quo baseline presentation,
15 and 29C is the entire video of the May 28th board meeting.
16      And we're going to publish certain clips of that.
17 There are -- there are ten.  They're all relatively short.
18 It's a total -- the meeting's very long.  This is a total of
19 about 31 minutes spliced up.
20      THE COURT:  Okay.
21      MR. DUVA:  Most of these are -- range from 1 minute
22 to 5 minutes.
23      THE COURT:  Very well.
24      MR. DUVA:  When we play the clips, I will call out
25 the -- just for purposes of the record, I will call out the

DIRECT - BLYTHE                                    Vol. 2-105

```
 1   timestamps that are involved.
 2          So if we could pay clip 1 of the May 28, 2019, board
 3   meeting.  This is from the 1 hour, 11 minute, 5 second mark to
 4   the 1 hour, 17 minute, 5 second mark.
 5      (Video played and stopped.)
 6   BY MR. DUVA:
 7   Q.  So, Agent Blythe, this is the "frog in the pot"
 8   illustration, correct?
 9   A.  Yes.
10          MR. DUVA:  Okay.  You can go ahead and play it.
11      (Video played.)
12   BY MR. DUVA:
13   Q.  Okay, Agent Blythe.  That, more or less, at the May 28,
14   2019, board meeting was an introduction of Mr. Zahn of what was
15   going to come with respect to the status quo 1 presentation?
16   A.  Yes, that's correct.
17          MR. DUVA:  If we can go into -- there's a
18   presentation about the water system.  It's very short.  It's
19   clip 2, time-stamped at 1 hour, 17 minutes, 11 seconds to 1
20   hour, 17 minutes, 40 seconds.
21          If we can play that.
22      (Video played and stopped.)
23   BY MR. DUVA:
24   Q.  That's, for the record, Ms. Dykes pictured as the screen
25   transitioned as she's delivering this part of clip 2?
```

DIRECT - BLYTHE                                    Vol. 2-106

```
 1   A.  Correct.
 2   Q.  Okay.
 3      (Video played.)
 4          MR. DUVA:  And if we could move into clip 3, which is
 5   an overview of the energy business, and it's from Ms. Dykes
 6   from 1 hour, 23 minutes, 20 seconds, to 1 hour, 25 minutes, 20
 7   seconds.
 8      (Video played.)
 9          MR. DUVA:  Okay.  Agent Blythe, we'll go to clip 4.
10   This is at the 1 hour, 26 minute, 46 second mark to the 1 hour,
11   32 minute, 34 second mark.
12      (Video played.)
13          MR. DUVA:  Okay.  We're going to go to the next clip.
14   This is a short one at the hour, 32 minute, 36 second mark to 1
15   hour, 33 minutes, and 10 seconds.
16      (Video played.)
17          MR. DUVA:  We can go to the next section.  This is
18   clip 6 at the hour, 33 minute, 15 second mark to 1 hour, 36
19   minutes, and 22 seconds.
20      (Video played.)
21          MR. DUVA:  Go ahead and stop it.
22      (Video stopped.)
23   BY MR. DUVA:
24   Q.  Agent Blythe, this is the beginning of the status quo
25   presentation, or scenario 1; is that right?
```

DIRECT - BLYTHE                                          Vol. 2-107

```
 1   A.   Yes.

 2        MR. DUVA:  So just for purposes of the record,

 3   there's going to be slides from the presentation that are

 4   presented, and this presentation is 29B.  This is pulled from

 5   the overall board package, which is 29A, so it's a smaller

 6   subset.

 7        THE COURT:  All right.

 8        (Video played and stopped.)

 9   BY MR. DUVA:

10   Q.   So, Agent Blythe, this says, "By 2030 JEA customers may

11   likely increase by 16 percent and energy sales may likely fall

12   by 8 percent."

13        Was there some email communications between

14   Mr. Wannemacher and S&P analyst Jeff Panger about what "may

15   likely" means?

16   A.   Yes.

17   Q.   And we'll cover those later.

18        MR. DUVA:  Okay.  Let's keep going.

19        (Video played.)

20        MR. DUVA:  If we can go to the next portions, set 7.

21   It's the 1 hour, 36 minute, 23 second mark to 1 hour, 37

22   minutes and 58 seconds.

23        (Video played.)

24        MR. DUVA:  Okay.  Let's go to No. 8, clip 8.  That's

25   the 1 hour, 36 minute, 58 second mark to the 1 hour, 41 minute,
```

DIRECT - BLYTHE                                          Vol. 2-108

```
 1   40 second mark where Mr. Wannemacher takes back over on status

 2   quo 1.

 3        (Video played and stopped.)

 4   BY MR. DUVA:

 5   Q.   Agent Blythe, just briefly, on the right where it says

 6   cash gap with the $2.3 billion going out to 2030, and to avoid

 7   that, is this slide saying there would have to be a 52 percent

 8   increase in the base rate or, alternatively, the 40 percent

 9   increase and no City contribution past 2023, meaning no payment

10   of 115 or so, approximately, million dollars per year to the

11   City of Jacksonville?

12   A.   Correct.

13        MR. DUVA:  Go ahead.

14        (Video played.)

15        MR. DUVA:  Let's go to clip 9 at 1 hour, 41 minute,

16   42 second mark to 1 hour, 46 minutes, 24 seconds.

17        (Video played.)

18        MR. DUVA:  Okay.  If we can go with the final clip

19   of 29C, which is the 1 hour, 48 minute, 18 second mark to the 1

20   hour, 49 minute, 10 second mark.

21        (Video played and stopped.)

22   BY MR. DUVA:

23   Q.   And, Agent Blythe, that's Board Member April Green

24   speaking there --

25   A.   Yes.  Correct.
```

DIRECT - BLYTHE                                    Vol. 2-109

1   Q.   -- in clip 10?

2   A.   Yes.

3        (Video played.)

4   BY MR. DUVA:

5   Q.   So Agent Blythe there in clip 10, is that Board Member

6   Green asking for options as if there are no constraints?

7   A.   Yes.

8   Q.   What did you understand that to mean?

9   A.   That means that assuming that restrictions in place, such

10  as, you know, items in the City charter that limited the lines

11  of business JEA could go into, were lifted or could be worked

12  through somehow.

13  Q.   Did you watch the different scenario presentations,

14  scenario 1, or the status quo, in the May 2019 board meeting;

15  scenario 2, the traditional utility response, June 25th, 2019,

16  board meeting; and then July 23rd, 2019, the non-traditional

17  utility response sort of in conjunction with one another to

18  evaluate what they were?

19  A.   Yes.

20  Q.   And those are on the JEA website?

21  A.   Yes.

22  Q.   Okay.  We're going to transition to some exhibits,

23  beginning with 20A1.

24       MR. DUVA:  And I mentioned this yesterday, Your

25  Honor.  This is meant -- so the Court can track this, they're

DIRECT - BLYTHE                                    Vol. 2-110

1   meant to more or less correlate to the overt acts in the

2   indictment, which begins on page 16.

3        So, for example, 20A, there's an allegation about,

4   "On or about March 18, 2019, Mr. Wannemacher prepared an Excel

5   spreadsheet titled the 'Performance Unit Scratch Sheet.xlsx'

6   using JEA financial statements from 2016 through 2018 to

7   perform an example LTI calculation in which Wannemacher added

8   $4 billion to JEA's book value for 2018."

9        So 20A1 is a spreadsheet that illustrates that.  I'll

10  ask Agent Blythe some questions in a moment, if we can go ahead

11  and bring that up.

12       And then some additional exhibits with respect to

13  communications about it, about where it was found and how it

14  was transmitted.

15       THE COURT:  Okay.

16       MR. DUVA:  So if we can look at 20A1.

17       And let's go to the book value, if we can illustrate

18  that, beginning with 2016.

19       And it's $2.376 billion, if you can highlight that.

20  BY MR. DUVA:

21  Q.   And the numbers are a little small, but, Agent Blythe, for

22  the book value for 2016 and 2017, talk about what this is, and

23  then we'll get into 2018.

24  A.   Sure.  This is from JEA's audited financial statements, is

25  my understanding, and that's historical, looking at previous

DIRECT - BLYTHE                                          Vol. 2-111

1  years.

2  Q.   And so the audited financial statement book value for 2016

3  is what's set forth in the exhibit and the same for 2017?

4  A.   Yes.

5  Q.   And let's look at 2018.

6         What was added to the book value for 2018 for this

7  spreadsheet?

8  A.   Roughly a little over $4 billion.  And as you see, the

9  City contribution, instead of the typical 115 to $120 million

10 range, it -- there was a City contribution of over

11 $4.1 billion.

12 Q.   We'll get to where in the JEA production this is located,

13 but talk about how this initially came to light.

14        Who provided this document?

15 A.   The council auditor.  I mean, it was a document that we

16 had in subpoena productions from JEA, but it was sort of

17 brought to our attention by the Council Auditor's Office.

18 Q.   Is that Jeff Rodda?

19 A.   Yes.

20 Q.   And was that by email in June of 2021?

21 A.   Yes.  And although we had seen previous iterations of this

22 document, it -- we hadn't caught on to this version of that

23 document.

24 Q.   And this -- so this is another iteration of the

25 Performance Unit Scratch Sheet, which we've shown earlier, 21G

DIRECT - BLYTHE                                          Vol. 2-112

1  and 21H, but different in terms of the numbers with respect to

2  the book value in 2018.

3  A.   Correct.

4  Q.   In talking with Mr. Rodda and other council auditors, is

5  there anything other than a sale of JEA that could add

6  $4 billion to the book value in one year?

7  A.   No.

8  Q.   And did there appear to be calculations based upon

9  performance unit value based on the addition of the $4 billion

10 to the book value for 2018?

11 A.   Yes.

12 Q.   Let's go to 20A2.

13        This is an email from you to me involving Agent Hill,

14 titled Performance Unit Scratch Sheet.

15        And what is this illustrating with respect -- you

16 don't have to read it, but with respect to Mr. Wannemacher on

17 March 18th of 2019?

18 A.   Sure.  I was just letting you and Angela, Agent Hill, know

19 that that document, per the metadata that I could see from the

20 original copy provided by JEA, saved in JEA's executive team

21 folder in a subfolder labeled Zahn -- was that only the SLT --

22 it was important that only the SLT had access to that folder.

23 Q.   And you say you were informed.

24        Is the person who did the work FBI Computer Scientist

25 Tim McCrohan?

DIRECT - BLYTHE                                         Vol. 2-113

1  A.    So he's conducted a more formal analysis on this, you
2  know, as an expert after, you know, I looked at it and Agent
3  Hill looked at it.  We also talked to personnel at, you know,
4  JEA regarding who had access to that drive.
5  Q.    So ultimately you obtained this pursuant to the grand jury
6  subpoena to JEA, which responded with, one, Mr. Wannemacher's
7  computer and also the JEA's executive team folder.
8  A.    Yes.
9  Q.    Let's go to 20A3.
10        There's an email about a file path from you to me.
11  Explain what this is, 20A3.
12  A.    This is a -- I'm basically cut and pasting the file path
13  from JEA's server for the Performance Unit Scratch Sheet.xlsx.
14  So it's on JEA's root server under a folder SLT, for senior
15  leadership team, executive team, and then a folder for Zahn.
16  Q.    Let's go to 20A4, another email from you to me.
17  A.    And -- and just to explain where I got that file path
18  from, is there's a manifest, a document manifest, provided with
19  some of the productions that, you know, listed each document.
20        And if you look at that manifest, it would show the
21  file path in one of the columns.  So I was copy-pasting that
22  cell from the manifest.
23  Q.    Another email in 20A4 from you to me on July 8th, 2021,
24  the same day, what is this?
25  A.    This is regarding the Performance Unit Scratch Sheet copy

DIRECT - BLYTHE                                         Vol. 2-114

1  with the 002 designator on the end, and it's providing the file
2  path of that -- that document.
3        And according to, you know, my review of the metadata
4  at that time, it -- the metadata showed in the properties that
5  it was edited by user Ryan on March 18th, 2019, and also
6  discussed another document, the fiscal year 2022 LTI estimate.
7  It was in the same folder, last saved on July 10th, 2019.
8  Q.    And we'll get to that later.
9        Is that a document of kind of allocations of what
10  groups might get how many PUP units?
11  A.    Yes.
12  Q.    Okay.  And we'll skip 20A5.  This is a report by Computer
13  Scientist Tim McCrohan dated May 2nd, 2023.  We'll come back to
14  that towards the end.
15        Let's move to --
16        MR. DUVA:  And this is a report about metadata, Your
17  Honor.  We're going to come back to that at the end.
18  BY MR. DUVA:
19  Q.    Let's go to 20B1 and 20B2.
20        What is 20B1?
21  A.    So it's a total market compensation strategy presentation
22  that we've seen other drafts of before.
23  Q.    Let's go to slide 5 or page 5 of the exhibit.
24  A.    (Complies.)
25  Q.    And does this have the old JEA board policy in terms of

1  compensation that we've looked at before?

2  A.   Yes, the one dated from June 17th, 2014.

3  Q.   Let's go to slide 11.

4  A.   (Complies.)

5  Q.   Does this reference the long-term incentive plan design?

6  A.   Yes, it does.

7  Q.   What is this?

8  A.   So it outlines an option for what a performance unit is.

9  Q.   And was this presentation, this PowerPoint, made to the

10  compensation committee on June 18th of 2019?

11  A.   Yes.

12  Q.   Are these materials on the JEA website?

13  A.   Yes.

14  Q.   And does it talk about, under performance period, an

15  overlapping three-year period such that there's an award payout

16  every year?

17  A.   Yes.

18  Q.   And what is the estimated cost as this was presented to

19  the compensation committee on June 18th of 2019?

20  A.   Estimated cost of 3.4 million.

21  Q.   Let's go to 20B2.

22  A.   (Complies.)

23  Q.   And this is the compensation program appendix for the

24  compensation committee meeting on June 18th, 2019.

25          Is this additional material presented to the

1  compensation committee that day?

2  A.   It was.

3  Q.   Let's go to page 18 of 20B2.

4  A.   (Complies.)

5  Q.   This is another iteration of this chart where it says

6  public power utilities and prevalence, and now instead of

7  saying, "Uncommon," or, "Uncommon and used selectively," it

8  says, "LTI plans are used selectively."

9          Do you see that?

10  A.   I do.

11  Q.   What did you learn about kind of the evolution of that

12  language from talking with David Wathen at Willis Towers

13  Watson?

14  A.   So in their first discussion draft provided to JEA, it

15  said LTI plans are -- the prevalence is uncommon in public

16  power utilities.  A request was made by someone to add the

17  words "and used selectively."

18          And between that time and this version, Mr. Zahn

19  asked for the PowerPoint -- had Pat Maillis ask for the

20  PowerPoint.  Pat Maillis requested a copy of the PowerPoint

21  from Willis Towers Watson, received it, and then this change

22  was made to the document.

23  Q.   Let's go to page 21 of the exhibit.

24  A.   (Complies.)

25  Q.   Now, you're seeing the insignia of Willis Towers Watson.

DIRECT - BLYTHE                                              Vol. 2-117

```
 1           Were select pages of the Willis Towers Watson
 2   PowerPoint ultimately presented to the compensation committee?
 3   A.   Yes.  This is their -- their template, and a lot of it is
 4   the same information as their discussion drafts we looked at
 5   before.
 6   Q.   Let's go to the next page, page 22.
 7   A.   (Complies.)
 8   Q.   And the estimated cost of the time-based unit, what is
 9   that?
10   A.   It's estimated at $1.2 million that we previously talked
11   about, a separate component of the long-term incentive.
12   Q.   Let's go to page 24, the last page of this exhibit.
13   A.   (Complies.)
14   Q.   The estimated cost impact, we've seen something like this
15   before at the bottom.
16           What is this showing?
17   A.   An estimated -- it says the LTI cost, in the last bullet,
18   "3.4 million based off the current incumbent base salaries for
19   performance unit of award (with a total cost of 4.6 million if
20   the time-based unit award is included)."
21   Q.   Let's move to the June 25th, 2019, board meeting.
22           MR. DUVA:  20F1, Your Honor, that is on that same CD
23   that I mentioned before, this is board materials for the June
24   25th, 2019, board meeting, together with 20P1, 25A, 26A, and
25   29A.
```

DIRECT - BLYTHE                                              Vol. 2-118

```
 1           And 20F2, for record purposes, when we get there in
 2   the video, is the scenario 2 presentation.  And 20F3 is the
 3   entirety of the meeting, and we have different clips from that
 4   that we're going to play.
 5           THE COURT:  Very well.
 6           MR. DUVA:  So, Ms. Stockholm, if we can go to the
 7   first video.  There are seven clips in this one.  The first
 8   clip is the hour, 3 minute, 29 second mark to hour, 9 minute,
 9   43 second mark.
10   (Video played.)
11   BY MR. DUVA:
12   Q.   Agent Blythe, before we go to clip 2, I want to go back to
13   the compensation committee minutes.
14           Were you able to obtain those from the JEA website?
15   A.   Yes.
16   Q.   And did they reference that Mr. Zahn and Mr. Wannemacher
17   presented at the June 18, 2019, compensation committee?
18   A.   Yes.
19           MR. DUVA:  Let's go to clip 2.
20           Your Honor, this is the scenario 2 presentation by
21   Ms. Dykes at one hour, 9 minutes, 48 seconds, to one hour, 16
22   minutes, and 26 seconds.
23   BY MR. DUVA:
24   Q.   Before we play that, Agent Blythe, did you interview
25   Ms. Dykes?
```

DIRECT - BLYTHE                                    Vol. 2-119

```
 1   A.   Yes.
 2   Q.   And what were the circumstances in terms of how she became
 3   the person who delivered scenario 2 to the board?
 4   A.   She was essentially ordered to.  She didn't want to.
 5   Q.   By who?
 6   A.   Aaron Zahn.
 7        MR. DUVA:  Let's go to clip 2.
 8        (Video played.)
 9        MR. DUVA:  Okay.  We'll go to clip 3, Agent Blythe,
10   from one hour, 16 minutes, 29 seconds to one hour, 18 minutes,
11   45 seconds.
12        (Video played and stopped.)
13   BY MR. DUVA:
14   Q.   So, Agent Blythe, these are board meetings.  They're live
15   streamed on the Internet, correct?
16   A.   Correct.
17   Q.   So as traditional -- as scenario 2 is being delivered, if
18   ultimately that's what JEA landed on, the senior leadership
19   team is telling essentially the entire JEA employee group that
20   "30 percent of you are getting fired at some point."
21   A.   Under -- under scenario 2, yes.
22   Q.   And that's 30 percent of the workforce.
23   A.   Yes.
24   Q.   Okay.  And we'll go ahead and get a preview here of the
25   non-traditional path.
```

DIRECT - BLYTHE                                    Vol. 2-120

```
 1        MR. DUVA:  Go ahead.
 2        (Video played.)
 3        MR. DUVA:  We're going to go to clip 4.  This is the
 4   1 hour, 23 minute, 8 second mark to 1 hour, 34 minutes, 16
 5   seconds.
 6        (Video played and stopped.)
 7   BY MR. DUVA:
 8   Q.   So at that point Mr. Zahn is asking the board to implement
 9   or kind of previewing a resolution to implement scenario 2, the
10   traditional utility response, if there is no authorization for
11   scenario 3, the non-traditional response.
12   A.   Yes.
13        MR. DUVA:  Go on.
14        (Video played and stopped.)
15   BY MR. DUVA:
16   Q.   And here in clip 4, we're going to get some board member
17   response to what has been delivered as scenario 1 and scenario
18   2.
19   A.   Correct.
20        (Video played and stopped.)
21   BY MR. DUVA:
22   Q.   And just for record purposes, after April Green spoke,
23   this is Reverend Fred Newbill, a board member, who's talking?
24   A.   Yes, sir.
25        MR. DUVA:  Go ahead.
```

DIRECT - BLYTHE                                    Vol. 2-121

1          (Video played and stopped.)

2     BY MR. DUVA:

3     Q.   Who is that, Agent Blythe, speaking?

4     A.   That's Andy Allen, a newer board member.

5     Q.   Is this his first board meeting?

6     A.   Yes, actually.

7          MR. DUVA:  Go ahead.

8          (Video played.)

9          MR. DUVA:  Okay.  Let's go to clip 5 at the 1 hour,

10    34 minute, 40 -- sorry, 1 hour, 34 minute, 52 second mark to 1

11    hour, 37 minutes, 17 seconds.

12         (Video played.)

13         MR. DUVA:  Okay.  If we can go to clip 6.  This is

14    the 1 hour, 40 minute mark, 45 seconds, to 1 hour, 43 minutes,

15    13 seconds.

16         (Video played and stopped.)

17    BY MR. DUVA:

18    Q.   So at that point, Agent Blythe, in clip 6, Mr. Howard, a

19    board member's making a motion to have the JEA senior

20    leadership team come back with a plan for implementation of

21    scenario 2 and also to remove constraints or pursue scenario 3,

22    the non-traditional utility response.

23    A.   Yes.

24         (Video played.)

25         MR. DUVA:  Okay.  Let's go to clip 7, 1 hour, 43

DIRECT - BLYTHE                                    Vol. 2-122

1     minutes, 25 seconds, to 1 hour, 46 minutes, 55 seconds.

2          And this is the last for the June 25th, 2019, board

3     meeting.

4          (Video played.)

5          MR. DUVA:  Okay.  That concludes the June 25th, 2019,

6     board meeting.

7     BY MR. DUVA:

8     Q.   Agent Blythe, I want to go to Exhibit 2OH1, and we've

9     shown this before earlier today.

10         This is the email on July 1st, 2019, between

11    Mr. Wannemacher and Elizabeth Columbo with the Nixon Peabody

12    firm.

13         MR. DUVA:  And let's go to page 2, the JEA employee

14    benefit bond.

15         Could you just highlight the first half of that?

16    BY MR. DUVA:

17    Q.   Now, we talked about this earlier.  This was the

18    attachment to the July 1st, 2019, email that was after the June

19    30, 2019, telephone call that you talked about between

20    Mr. Wannemacher and Ms. Columbo on 2OH1?

21    A.   Yes.  I see the email between Mr. Wannemacher and

22    Ms. Columbo on July 1st, 2019.

23    Q.   And do you see the attachment, the JEA employee benefit

24    bond?

25    A.   I do.

DIRECT - BLYTHE                                           Vol. 2-123

1   Q.   Okay.  I want to -- we've already talked about that today.
2            I want to move to -- this is just for context for
3   what 20H2 is.
4            What is 20H2?
5   A.   20H2 is an email from myself dated July 8th, 2021, at
6   12:43 p.m., to you titled Benefit Bond Doc - Early Version of
7   PUP.
8            "Tysen, see attached the document titled JEA Employee
9   Benefit Bond Properties, last edits by Wannemacher.  This is
10  also in Executive Team/Team Docs/2019 Compensation Plan folder.
11  Here is the metadata," and I attached it.
12  Q.   So how did you receive that -- that document, the JEA
13  employee benefit bond properties?
14  A.   So I accessed the properties from a copy of the document
15  provided by JEA in the subpoena productions.
16  Q.   Was it both in the email, the Wannemacher email, and also
17  separately in that folder that is referenced in 20H2?
18  A.   Yes.
19  Q.   And that was from the JEA production?
20  A.   Yes.
21       MR. DUVA:  And let's go to page 2 and illustrate some
22  of the metadata.
23            Towards the bottom.
24  BY MR. DUVA:
25  Q.   What is that?  What did you take away from that, Agent

DIRECT - BLYTHE                                           Vol. 2-124

1   Blythe?
2   A.   So it states, "Last saved by WANNRF."  That just happens
3   to be -- the last two letters to be Ryan Wannemacher's first
4   and middle initial, and WANN is the first four letters of his
5   last name.
6   Q.   And is there a "content created" date, "date last saved,"
7   and "date last printed," all July 1st, 2019, with different
8   times associated?
9   A.   Yes.
10  Q.   What is 20I1?  And that's not in the binder.  We're going
11  to have to bring that up.
12       MR. DUVA:  This one, Your Honor, is on a CD.  This is
13  physical Exhibit 20I1, just for record purposes.
14       THE COURT:  Okay.  Mr. Duva, I believe Mr. Felman may
15  have given me a signal that it might be time to take a break.
16       MR. DUVA:  Totally fine, Your Honor.
17       THE COURT:  Was that right?  Is that correct,
18  Mr. Felman?
19       MR. FELMAN:  That was my intent, yes.
20       MR. DUVA:  I was trying to outlast the other side
21  every time.  That's my goal.
22       THE COURT:  All right.  Let's --
23       MR. SUAREZ:  He has the advantage of youth, Your
24  Honor.
25       MR. DUVA:  I was going to say that.

DIRECT - BLYTHE                                    Vol. 2-125

1            THE COURT:  Say what?

2            MR. SUAREZ:  He has the advantage of youth.

3            THE COURT:  Yeah, absolutely.  Absolutely.

4            Let's take a, just about, 20-minute break and then

5    we'll come back.

6            COURT SECURITY OFFICER:  All rise.

7            (Recess from 2:49 p.m. until 3:13 p.m.; all parties

8    present.)

9            COURT SECURITY OFFICER:  All rise.  This Honorable

10   Court is now in session.

11           Please be seated.

12           THE COURT:  We don't have as many people as we had

13   yesterday.  I guess people are out voting or something.

14           Our Tampa contingent here, we have a mayoral election

15   today, so -- pretty exciting, so I'm sure some folks are out

16   exercising --

17           MR. DUVA:  Or it could be we're just boring them to

18   death.

19           THE COURT:  Oh, maybe.  Maybe.

20           Mr. Felman, who's the mayor of Tampa now?

21           MR. SUAREZ:  It's Jane Castor, Your Honor.

22           MR. DUVA:  I think it's Eddie Suarez.

23           MR. SUAREZ:  No.  Jane Castor's still the mayor --

24           THE COURT:  Okay.

25           MR. SUAREZ:  -- the former chief of police.

DIRECT - BLYTHE                                    Vol. 2-126

1            THE COURT:  That's right.  I remember her.  Yeah,

2    okay.  Excellent.

3            I was -- the other guy before her --

4            MR. FELMAN:  Bob Buckhorn was there forever.

5            THE COURT:  Bob Buckhorn, that's right.  Yeah, he's a

6    good guy.  Yeah.

7            Okay.  Go ahead, Mr. Duva.

8            MR. DUVA:  Thank you, Your Honor.

9    BY MR. DUVA:

10   Q.   Agent Blythe, we left off on 20I1, and there's not a 20I2.

11   There was, and then it (unintelligible), so there's just 20I1.

12           What is 20I1?

13   A.   Sure.  It's a slide that shows an estimate and sort of the

14   allocation among the employee groups.

15           If you look at the chart, or table, rather, there

16   in -- to the left, it's got the group.  It starts at the top

17   with executive and goes down to the collective bargaining unit

18   employees.

19           And then the column to the right, column C, it shows

20   the LTI percentage as a percentage of their salary.

21           THE REPORTER:  Can you move the microphone in front

22   of you?

23           THE WITNESS:  Yes, ma'am.

24   BY MR. DUVA:

25   Q.   And on the right is there a chart as well, as to the LTI

DIRECT - BLYTHE                                          Vol. 2-127

```
 1   being a percentage of each group salary beginning with
 2   executive and going to PGK and PGJ, all the way to the CBUs,
 3   which is the collective bargaining unit employees?
 4   A.   Yes, and it gives the employee incentives for those
 5   different categories.
 6   Q.   And kind of going to column -- I'm sorry, tab 1 of the
 7   spreadsheet that's EE DL, is this a -- and it's been redacted,
 8   certain columns.
 9            Is this a listing of JEA employees and their salary?
10   A.   Yes.
11   Q.   And the group that they would be in, the LTI group, in
12   column AO?
13            You can see it on the big screen.
14   A.   Sorry.  Yes.
15   Q.   Okay.
16            MR. DUVA:  Let's go back to the worksheet.
17            Just scroll down on the worksheet to the bottom
18   there.
19            Let's go -- keep going.  Slide 5.
20            Keep going down.
21            Actually, sorry, go up.
22            There we go.
23   BY MR. DUVA:
24   Q.   Under slide 4 it says, "Sample grants, number of shares."
25            What have you -- what was your interpretation of
```

DIRECT - BLYTHE                                          Vol. 2-128

```
 1   this?
 2   A.   So it gives a sample of a group of -- I don't see them
 3   added up on this version or slide, but it's, you know, a sample
 4   of units that's listed in column D.  If you add that up and --
 5   it goes from executive on down to collective bargaining unit
 6   levels.
 7            And you can see that the number of units allocated to
 8   the different employee tranches or groups is heavily weighted
 9   to the executive team.
10   Q.   And it goes down to the CBUs of 8 units?
11   A.   Yes.
12   Q.   And there's 1,079 for the executive group?
13   A.   Yes.
14            MR. DUVA:  Can you scroll all the way down to the
15   bottom.
16   BY MR. DUVA:
17   Q.   And did you locate this in the JEA production?
18   A.   Yes, I did.
19   Q.   Was that pursuant to the grand jury subpoena?
20   A.   Yes.
21            MR. DUVA:  Let's go to 20J.
22   BY MR. DUVA:
23   Q.   What is 20J?
24   A.   20J is talking about the award under the 2019 pool would
25   be 300,000 units, and it defines the terms.
```

DIRECT - BLYTHE                                                    Vol. 2-129

1  Q.   And did you have an opportunity to interview Jessica
2  Lutrin from the Pillsbury law firm?
3  A.   Yes.
4  Q.   Did she talk about how she received this document?
5  A.   Yes.
6  Q.   What did she tell you?
7  A.   So, again, this document is sort of laying out the PUP
8  formula and how it would be calculated.  And it's kind of
9  unusual that -- usually things like this were emailed back and
10 forth, but she said that this was physically handed to her.
11 Q.   By who?
12 A.   By Ryan Wannemacher.
13 Q.   And was this during the Club Continental meetings that
14 spanned July 10th through July 12th in 2019?
15 A.   Yes.
16 Q.   And just briefly explain what the Club Continental
17 meetings are.  We'll get into that a little bit later.
18 A.   Sure.  It was a workshop from July 10th through 11th where
19 the bankers, such as Morgan Stanley and JPMorgan, were present
20 to talk about workflow and task assignment for, you know,
21 issuing the ITN and handling the ITN process moving forward.
22          MR. SUAREZ:  Forgive me, Your Honor.  If I could have
23 that exhibit number again.
24          MR. DUVA:  20J.
25          MR. SUAREZ:  20J?  Thank you.

DIRECT - BLYTHE                                                    Vol. 2-130

1  BY MR. DUVA:
2  Q.   And, Agent Blythe, did you review any *Garrity* material to
3  make a determination to interview Ms. Lutrin from the Pillsbury
4  law firm?
5  A.   No.
6  Q.   Let's go to 20K.
7  A.   (Complies.)
8  Q.   Is 20K an email from Madricka Jones, an executive
9  assistant at JEA, blind copying the JEA board members with
10 their email addresses listed, with respect to -- first look at
11 the date, July 17th, 2019, at 8:36 p.m.?
12 A.   Yes.
13 Q.   And what does this email say?
14 A.   So Ms. Bartley is informing the board members that this
15 month's JEA board meeting, the package will be given to them in
16 hard-copy format, versus in electronic format, and won't be in
17 Diligent, a system they would have normally accessed it through
18 before the meetings.
19          And that she would have the board packages for the
20 July 23rd meeting delivered to their homes.
21 Q.   And was it anticipated it would be later that week?
22 A.   Yes.
23 Q.   It says delivered on Friday, and the email is Wednesday,
24 July 17th, of 2019?
25 A.   Yes.

DIRECT - BLYTHE                                    Vol. 2-131

1   Q.   Let's go to 20L1.

2   A.   (Complies.)

3   Q.   We'll get into some email communications about this and

4   how and when it was located and what it is, and we'll talk more

5   about this with respect to the JEA productions as well.

6           But what is 20L1?

7   A.   So 20L1 is another iteration, sample calculation of

8   potential payouts for the Performance Unit Plan and calculating

9   the value of PUPs --

10  Q.   And on the --

11  A.   -- based on different net book values.

12  Q.   And that first column which begins with $2,955,632,000, is

13  that a net book value that is used for the calculation?

14  A.   Yes.  It's not labeled, but it appears to be either, you

15  know, a current-year-value calculation or net-book-value

16  calculation.

17  Q.   Does that grow in the bottom row to $6,650,172,000?

18  A.   Yes.

19  Q.   And what did you notice with respect to --

20          MR. DUVA:  Let's go to column 4 with 100.

21          And just grab that and pull that down.

22          Perfect.

23  BY MR. DUVA:

24  Q.   When you looked at this, what did you understand this to

25  mean?

DIRECT - BLYTHE                                    Vol. 2-132

1   A.   The column to the left is the -- I understood was the

2   share value of the PUP, and to the right is the overall payout

3   for the PUP based on 30,000 units.

4   Q.   And was this document in JEA production?

5   A.   Yes.

6   Q.   And ultimately did you have Computer Scientist Timothy

7   McCrohan evaluate the metadata and do a little bit more of a

8   detailed search on that?

9   A.   Yes.

10  Q.   And the growth from 100 to 11,500, based on your knowledge

11  of this investigation, what did you interpret that to mean?

12  A.   That's extraordinary growth.

13  Q.   And what did -- how does it correspond to the figure on

14  the right next to 11,500, the $345 million figure?

15  A.   That would be a payout based on -- for all of the units

16  to, you know, all the employees who bought into it if all the

17  units were sold.

18  Q.   Does this appear to be a calculation based on 30,000 units

19  initially instead of 100,000 units?

20  A.   That is my understanding.

21  Q.   Okay.  Let's talk about 20L3.  There is no 20L2.

22          I want to illustrate some email communications

23  involving Jeff Rodda and Kevin Blodgett first and then

24  involving other individuals, including myself.

25          MR. DUVA:  Let's go to the email.

DIRECT - BLYTHE                                    Vol. 2-133

BY MR. DUVA:

1  Q.   And this is the native form of the email; is that right?

3  A.   Yes.

4       MR. DUVA:  And this is an exhibit, Your Honor, that

5  is on a CD, 20L3, so you'll have the native version of the

6  email with the attachments.

7       And if we can go down to page 2 of the email.

8  BY MR. DUVA:

9  Q.   This is from Mr. Rodda to Kevin Blodgett?

10 A.   Yes.

11 Q.   We've already talked about who Mr. Rodda is.

12      Who is Kevin Blodgett?

13 A.   Kevin Blodgett is an attorney that works for Smith Hulsey

14 Busey.  That was a firm hired to be -- to represent the special

15 investigatory committee for the Jacksonville City Council

16 related to JEA.

17 Q.   Now, the date of this email, June 14th, 2021, this is more

18 than five months after the release of the Special Investigative

19 Committee report, correct?

20 A.   Yes, I think so.

21 Q.   And we looked at the chronology, which is Exhibit 48,

22 yesterday, which is dated December 20 -- December 2020 but was

23 formally released after the first of the year in early January

24 of 2021?

25 A.   That's correct.

DIRECT - BLYTHE                                    Vol. 2-134

1  Q.   Is this spreadsheet in this chronology?

2  A.   No.

3  Q.   And ultimately were you able to locate that spreadsheet in

4  the production that JEA made pursuant to the grand jury

5  subpoena that was issued on April 21st of 2020?

6  A.   Yes, I was.

7  Q.   Now, it came to light after this email from Jeffrey Rodda

8  to Kevin Blodgett, and there's kind of an explanation in the

9  email about this particular spreadsheet; is that correct?

10 A.   Yes.

11 Q.   And if we can go -- can you read, "The impact is shown in

12 cells H9 and H11"?

13      Can you read that, sir?

14 A.   Yes.  Mr. Rodda wrote, "The impact is" -- I think he meant

15 to write "as" -- "shown in cells H9 and H11 by adding

16 $4 billion to the book value net position of JEA from the 2018

17 audited financial statements into the City contribution of $116

18 million as required by ordinance.

19      "After searching through the documents provided by

20 OGC, the Performance Unit Scratch Sheet file from Ryan was

21 included in the records" -- I'm sorry.  I'm having to go back

22 and forth because I can't see on the screen" -- was included in

23 the records in four different" -- oh, thanks -- "four different

24 versions.  SIC23609 is the only version that contemplates a

25 sale.  I do not recall seeing it before."

DIRECT - BLYTHE                                          Vol. 2-135

1   Q.   And, now, the *Garrity* statements were taken in January of
2   2021?
3   A.   Correct -- or, I mean, 2020.
4   Q.   2020.  I'm sorry.
5        So until you received this document pursuant to an
6   email forward -- this is obviously Mr. Rodda to Mr. Blodgett --
7   had you ever seen this before?
8   A.   So I'd seen the earlier -- or other versions of that
9   document, the Performance Unit Scratch Sheet, that didn't have
10  that $4 billion added in.  And so, you know, I'd seen that
11  other version, not this version with the $4 billion infusion
12  into the net book value.
13  Q.   And that Performance Unit Scratch Sheet that we're talking
14  about is 20A1, correct, Exhibit 20A1?
15  A.   Yes.
16  Q.   And did you see any news reporting about that version of
17  this Performance Unit Scratch Sheet 20A1?
18  A.   No.
19  Q.   Did you see any news reporting about 20L1 that we just
20  looked at, the notes.xlsx file?
21  A.   No.
22       MR. DUVA:  If we could go to higher in the email.
23       All the way to the top.
24  BY MR. DUVA:
25  Q.   There's another email from Mr. Rodda to Mr. Blodgett on

DIRECT - BLYTHE                                          Vol. 2-136

1   June 16th, 2021, copying Kim Taylor, Phillip Peterson, and
2   myself.
3        Do you see that?
4   A.   Yes.
5   Q.   And I ultimately forwarded this email to you, right?
6   A.   Correct.
7   Q.   And there's some language about, in the first bullet, the
8   file named notes.xlsx.
9        Can you read that?
10  A.   "The file named notes.xlsx appears to be a PUPs value
11  calculation created on July 11th, 2019, by 'Ryan,'" in quotes,
12  "and last modified on July 18th, 2019, also by 'Ryan.'  It
13  shows the value of 30,000 PUPs starting at zero dollars and
14  increasing to $11,500 each, for a total of $345 million."
15       And this is essentially a summary of what we just
16  looked at on the actual document.
17  Q.   And the exhibit that we looked at was 20L1?
18  A.   Yes.
19  Q.   And did you see any reporting in the news about Exhibit
20  20L1?
21  A.   No.
22  Q.   Not until after the return of the indictment?
23  A.   Correct, much later than this.
24  Q.   And that was in March of 2022?
25  A.   Yes.

DIRECT - BLYTHE                                                Vol. 2-137

1   Q.   Okay.  If we can go to 20L4.
2          MR. DUVA:  And this is -- likewise, Your Honor, this
3   is on a CD so the email's in native form.
4          THE COURT:  Okay.
5   BY MR. DUVA:
6   Q.   And is this an email from Mr. Rodda to me, copying Kim
7   Taylor and Phillip Peterson?
8   A.   Yes.
9   Q.   Kim Taylor and Phillip Peterson are with the Council
10  Auditor's Office?
11  A.   Correct.
12  Q.   And is there an analysis of metadata of the Performance
13  Unit Scratch Sheet which is Government Exhibit 20A1?
14  A.   Yes, there is.
15  Q.   And is there an explanation -- we covered this in 20L3,
16  but a contemplation of the value due to a sale as shown in
17  cells H9 and H11 and further explanation about that?
18  A.   Yes.
19  Q.   And we'll get into a further metadata analysis later, but
20  I just wanted to illustrate 20L4.
21          MR. DUVA:  Let's go to 20M, as in Mike.
22          If we can go to page 2.
23          Sorry.  Actually, let's go -- let's just do page 1.
24  BY MR. DUVA:
25  Q.   There's an email on July 20th from Madricka Jones to

DIRECT - BLYTHE                                                Vol. 2-138

1   Melissa Dykes and Aaron Zahn, and it's titled Full Board
2   Package.
3          Do you see that?
4   A.   I do.
5   Q.   And then there's a forward of another email from Kerri
6   Stewart to communications employees to, "Please post."
7          Is that right?
8   A.   Yes.
9   Q.   Is that dated July 20th of 2019?
10  A.   It is.
11  Q.   And was this ultimately a portion of the July 23, 2019,
12  board package, about 126 pages of it?
13  A.   Yes, sir.
14  Q.   Was this the full board package?
15  A.   No.
16  Q.   And that was -- was that posted after -- the full board
17  package posted on the JEA website after the July 23rd, 2019,
18  meeting?
19  A.   Correct, about 2:15 p.m. on the 23rd.
20  Q.   Let's go to 20N as in Nancy.
21          MR. DUVA:  And just for record purposes, Your Honor,
22  this is a bit of a misnumbering.  20N is an overt act that
23  alleges a conversation or a meeting between certain
24  individuals.  There's no document that pertains to it.
25          So this Exhibit 20N does not pertain to the overt act

DIRECT - BLYTHE                                              Vol. 2-139

1   allegation 20N in the indictment.  It's just numbered that way,
2   but it doesn't -- there's no correlation.  That was my mistake,
3   but I just -- I didn't renumber it.
4   BY MR. DUVA:
5   Q.   Agent Blythe, what is 20N?
6   A.   It's an email from myself to you and Agent Hill dated July
7   8th, 2021.  I attached the JEA performance unit presentation
8   PowerPoint from the July 23rd, 2019, board meeting and wrote --
9   go ahead.
10  Q.   And did you look at metadata for this?
11  A.   I did.
12  Q.   And what did you see on page 2?
13  A.   So first of all, I saw that it was saved in that -- that
14  folder that I referenced in my email, that the "last saved by"
15  says "Ryan" and that the date created is August 12th, 2018.
16  The date last saved was July 16th, 2019.
17  Q.   Going over to 20P1.
18       MR. DUVA:  Your Honor, this is the JEA board
19  materials for the July 23rd, 2019, meeting, and it's on that CD
20  that I've mentioned multiple times, along with 20F1, 25A, 26A,
21  and 29A.
22       And then 20P2 is a recapture of the traditional
23  utility response.  And 20P3 is a presentation of the
24  non-traditional utility response, scenario 3.
25            20P4 is about 20 pages of the board materials

---

DIRECT - BLYTHE                                              Vol. 2-140

1   pertaining to the PUP.  And 20P5 is Resolution 2019-10, which
2   the board ultimately votes on, which we'll see in the clips,
3   that pertains to the performance unit plan.
4        So at this point I'd like to go to the video which is
5   20Q.  That's 20Q, the July 23rd, 2019, board meeting.
6        And this is a little bit lengthier.  This is about 60
7   minutes of clips from about a three-hour meeting, so this will
8   probably take us close to the end of the day.
9        So we won't finish Agent Blythe today, but we'll
10  finish him -- you know, gauge the time at the end of the day
11  for tomorrow, but he'll have a little additional time on direct
12  for tomorrow.
13       So for 20Q, if we can play -- there are nine clips,
14  and then there are some others that are interspersed that are
15  20R, 20S, and 20T, so we'll have to toggle back and forth a
16  little bit.
17       But for 20Q, we'll play clip 1, which is at the 20
18  minute, 23 second mark, to 21 minutes, 25 seconds.
19       (Video played.)
20       MR. DUVA:  Okay.  If we can go to clip 2, which is at
21  the 25 minute, 6 second mark to 28 minutes, 41 seconds.
22       (Video played.)
23       MR. DUVA:  And we'll go to clip 3, which is at the 35
24  minute, 55 second mark to 36 minutes, 21 seconds.
25       (Video played.)

DIRECT - BLYTHE                                          Vol. 2-141

```
 1   BY MR. DUVA:
 2   Q.   Okay.  This is mentioning the building of the new building
 3   under the traditional utility response, and it's not happening,
 4   right?
 5   A.   Right.
 6   Q.   Didn't that building just get built, about to open?
 7   A.   Right across the street.
 8   Q.   Did you have to read a *Garrity* statement to notice that?
 9   A.   No.  No, sir.
10        MR. DUVA:  We'll go to clip 4, 42 minutes, 52 seconds
11   to 47 minutes and 3 seconds.
12        (Video played and stopped.)
13   BY MR. DUVA:
14   Q.   Now it's displayed, the name, but just for record
15   purposes, who's speaking at the beginning of clip 4?
16   A.   Herschel Vinyard.
17   Q.   And was he the chief administrative officer at JEA
18   effective around April of 2019?
19   A.   Yes.
20        (Video played.)
21        MR. DUVA:  Okay.  We'll go to clip 5.  This is the 1
22   hour, 5 minute mark, 35 seconds, to 1 hour, 7 minutes, 55
23   seconds.
24        (Video played.)
25        MR. DUVA:  Okay.  If we can go to clip 6.  This is
```

DIRECT - BLYTHE                                          Vol. 2-142

```
 1   the 1 hour, 8 minute, 52 second mark to the 1 hour, 24 minute,
 2   2 second mark, and this is the presentation of scenario 3, the
 3   non-traditional utility response.
 4        (Video played and stopped.)
 5   BY MR. DUVA:
 6   Q.   Agent Blythe, those listed options 3a through 3f, do those
 7   become the six potential options in the ITN?
 8   A.   Yes.
 9        (Video played and stopped.)
10   BY MR. DUVA:
11   Q.   Agent Blythe, the minimum requirements in the video
12   references table stakes.  Did these become kind of the minimum
13   table stakes that would guide what could be garnered a
14   successful bid?
15   A.   Yes.  That was memorialized in the ITN and something that,
16   you know, was available to bidders.  Essentially these
17   requirements had to be met at a minimum for it to be a bid to
18   be considered.
19   Q.   There was some discussion about community impact.  I want
20   to talk about financial and customers.
21        So the minimum requirement financially is greater
22   than $3 billion of value to the City of Jacksonville.
23   A.   Correct.
24   Q.   And for customers it would be 400 million of value
25   distributed to customers, $350 each if you had all four
```

DIRECT - BLYTHE                                   Vol. 2-143

```
 1  systems, electric, water, sewer, and irrigation accounts.
 2  A.   Yes.
 3  Q.   So ultimately, kind of forecasting ahead, if there had
 4  been a referendum, each voter that had any of these systems
 5  would be going to vote for this one way or the other, and a yes
 6  vote, if it passed, gets the voter a rebate as set forth in the
 7  minimum requirements?
 8  A.   Correct.
 9  Q.   Okay.
10       (Video played.)
11            MR. DUVA:  Let's go to clip 7 at the 1 hour, 33
12  minute, 48 second mark to 1 hour, 35 minutes, 55 seconds.
13       (Video played.)
14            MR. DUVA:  We're going to move to Exhibit 20R.  We're
15  going to come back to 20Q in a moment, but 20R, if we can play
16  that clip.  It's the 1 hour, 35 minute, 55 seconds to 1 hour,
17  40 minutes, 35 seconds.
18       (Video played and stopped.)
19            MR. DUVA:  Just for record purposes, Your Honor, the
20  Resolution 2019-6 is both in 20P1 and then the condensed
21  version, 20P2.
22            THE COURT:  Noted.
23       (Video played and stopped.)
24            MR. DUVA:  Let's go to 20P2, page 65.
25  BY MR. DUVA:
```

DIRECT - BLYTHE                                   Vol. 2-144

```
 1  Q.   And is that the resolution, Agent Blythe, 2019-6 that
 2  Ms. Rhode just read that the board was prepared to vote on?
 3  A.   Yes.
 4  Q.   And the layoffs in the first whereas clause, is that the
 5  574 employees referenced there?
 6  A.   It is.
 7  Q.   And was the stated plan that that was going to be done
 8  within seven months?
 9       Not in this, but, I mean, generally --
10  A.   Yes.
11  Q.   -- from other documents that you reviewed.
12  A.   Yeah.  It was going to be put in place beginning
13  immediately.
14  Q.   And page 68, is that the layoff notification?
15  A.   Yes.  That was the draft.
16  Q.   And, again, these are JEA board meetings that are live
17  streamed, so any JEA employee listening to this is hearing "I
18  might be one of the 30 percent or I might not be."
19  A.   Correct.
20            MR. DUVA:  If we can go back to clip 8 on 20Q.
21       (Video played.)
22            MR. DUVA:  If we can go to 20P3, page 15.
23  BY MR. DUVA:
24  Q.   And, Agent Blythe, is this the resolution in the board
25  package 2019-7 that Ms. Rhode was just covering in the last
```

DIRECT - BLYTHE                                          Vol. 2-145

1    clip?
2    A.   Yes.
3    Q.   And in section -- paragraph 2, does it list the minimum
4    table stakes that were seen when Mr. Wannemacher was making the
5    PowerPoint presentation earlier?
6    A.   It does, in 2a through h there.
7    Q.   So at that point the resolutions have been presented.
8            MR. DUVA:  And clip 9, Your Honor, this is a little
9    long, but I'd like to play it.  It's at 1 hour, 49 minutes, 55
10   seconds, to 2 hours, 28 minutes and 18 seconds.  That will
11   probably be the duration of the day.
12           THE COURT:  All right.
13   (Video played.)
14           MR. DUVA:  Want to stop there, Your Honor?
15           THE COURT:  I think that's a good part to stop.
16   What do you think, Mr. Suarez?
17           MR. SUAREZ:  I'm in favor, Your Honor.
18           MR. DUVA:  He seconds, Your Honor.
19           THE COURT:  All right.  So we'll reconvene tomorrow
20   starting at 1:00 p.m.  It's set from 1:00 to 5:00.
21           MR. FELMAN:  Your Honor, can we get an indication
22   from the Government as to who the next few witnesses might be
23   and how long we might expect them to take?
24           THE COURT:  Mr. Duva?
25           MR. DUVA:  Yes, Your Honor.  I think Agent Blythe --

Vol. 2-146

1    I think we can probably land that tomorrow on the end of the
2    direct.  Maybe an hour and 45 minutes, I think I'll be done.
3            After this video, there's two short ones involving
4    the Performance Unit Plan.
5            THE COURT:  Okay.
6            MR. DUVA:  And we're going to continue with this
7    meeting, then we have some other exhibits to cover, which I
8    think will take about an hour and 45 minutes.
9            I imagine the cross will take the rest of the day.  I
10   don't know, but I will say after that, when Agent Blythe is off
11   the stand, the plan is to call Tim Adams, former FBI agent and
12   was with the State Attorney's Office as an investigator working
13   with the prosecution team; John Zipperer; and I imagine the
14   next witness will be Kevin Blodgett.
15           So I think that will take us well --
16           MR. FELMAN:  Thank you, Mr. Duva.
17           MR. DUVA:  I think that will take us well into
18   Thursday.  And then based on where we are at the end of
19   tomorrow, I can continue with the lineup after that.  I think
20   after Blodgett, it will probably be Paul McElroy.
21           THE COURT:  That will be helpful for Mr. Felman and
22   his group, so yeah.  Thank you, Mr. Duva.
23           MR. DUVA:  And I've got to juggle some things.  There
24   are some scheduling issues, and there are certain people that
25   we've told them, "You'll testify on Friday no matter what."

Vol. 2-147

```
 1          So there's going to be a little juggling going on,
 2   but I think that's a pretty good expectation of what we can
 3   expect on Wednesday and Thursday.
 4          THE COURT:  All right.  Excellent.
 5          All right.  I'll see you tomorrow at 1:00 p.m.
 6          COURT SECURITY OFFICER:  All rise.
 7      (The proceedings were adjourned at 4:57 p.m., to be
 8   continued on May 17, 2023.)
 9                          -  -  -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Vol. 2-148

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER
 2
 3
 4   UNITED STATES DISTRICT COURT )
 5   MIDDLE DISTRICT OF FLORIDA   )
 6
 7          I hereby certify that the foregoing transcript is a
 8   true and correct computer-aided transcription of my stenotype
 9   notes taken at the time and place indicated therein.
10
11          DATED this 1st day of June, 2023.
12
13                          s/Shelli Kozachenko_____
                             Shelli Kozachenko, RPR, CRR, CRC
14                           Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```