No. 24-12617-AA

In the

# United States Court of Appeals
## for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AARON ZAHN,

*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:22-CR-23-BJD-MCR-1

## SUPPLEMENTAL APPENDIX
### Volume II of XVII

GREGORY W. KEHOE
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

EMILY C. L. CHANG
Assistant United States Attorney
Appellate Division
USA No. 166
400 W. Washington St., Ste. 3100
Orlando, FL 32801
(407) 648-7500
emily.chang@usdoj.gov

August 21, 2025

# Index of Appendix

## Volume I

District Court Docket Sheet...................................................................Docket

Transcript of Kastigar Hearing, Vol I (05/15/2023)............................ Doc. 268

Transcript of Kastigar Hearing, Vol II (05/16/2023) .......................... Doc. 269

## Volume II

Transcript of Kastigar Hearing, Vol III (05/17/2023) ........................ Doc. 270

Transcript of Kastigar Hearing, Vol IV (05/18/2023) ........................ Doc. 271

## Volume III

Transcript of Kastigar Hearing, Vol V (05/19/2023)........................... Doc. 272

Transcript of Kastigar Hearing, Vol VI (05/23/2023) ........................ Doc. 273

## Volume IV

Transcript of Kastigar Hearing, Vol VII (05/24/2023) ....................... Doc. 274

Transcript of Kastigar Hearing, Vol VIII (05/25/2023)....................... Doc. 275

Order Adopting Report and Recommendations................................. Doc. 361

## Volume V

Defendant Exhibit 134 ....................................................................Doc. 470-33

Defendant Exhibit 482 Part 1 (pp. 1-144) ......................................Doc. 470-99

## Volume VI

Defendant Exhibit 482 Part 1 (pp. 145-152)...................................Doc. 470-99

Government Exhibit 4.................................................................. Doc. 476-4

Government Exhibit 5................................................................. Doc. 476-5

Government Exhibit 6C .............................................................. Doc. 476-7

Government Exhibit 13 .............................................................Doc. 476-13

Government Exhibit 17 .............................................................Doc. 476-17

Government Exhibit 20A1 .........................................................Doc. 476-20

Government Exhibit 20A4 .........................................................Doc. 476-23

Government Exhibit 20B1...........................................................Doc. 476-25

Government Exhibit 20B2...........................................................Doc. 476-26

## Volume VII

Government Exhibit 20F2...........................................................Doc. 476-28

Government Exhibit 20K ...........................................................Doc. 476-33

Government Exhibit 20L1...........................................................Doc. 476-34

Government Exhibit 20M ...........................................................Doc. 476-36

Government Exhibit 20P3 ..........................................................Doc. 476-39

Government Exhibit 20P5 ..........................................................Doc. 476-41

Government Exhibit 20AA1.........................................................Doc. 476-46

Government Exhibit 20AA2.........................................................Doc. 476-47

Government Exhibit 21C ............................................................Doc. 476-57

Government Exhibit 21H ............................................................Doc. 476-62

Government Exhibit 21J ...............................................................Doc. 476-63

Government Exhibit 23B...............................................................Doc. 476-68

## Volume VIII

Government Exhibit 24 ...............................................................Doc. 476-71

Government Exhibit 29B...............................................................Doc. 476-76

Government Exhibit 30 ...............................................................Doc. 476-77

Government Exhibit 31D ...............................................................Doc. 476-81

Government Exhibit 32C ...............................................................Doc. 476-84

Government Exhibit 33B...............................................................Doc. 476-87

Government Exhibit 33C ...............................................................Doc. 476-88

Government Exhibit 36A ...............................................................Doc. 476-96

## Volume IX

Government Exhibit 37 ...............................................................Doc. 476-99

Government Exhibit 40B...............................................................Doc. 476-107

Government Exhibit 40C ...............................................................Doc. 476-108

Government Exhibit 41A ...............................................................Doc. 476-110

Government Exhibit 43A ...............................................................Doc. 476-113

Government Exhibit 44A ...............................................................Doc. 476-115

Government Exhibit 20X ...............................................................Doc. 476-130

## Volume X

Transcript of Jury Trial, Day 1 (02/21/2024) .................................... Doc. 504

Transcript of Jury Trial, Day 2 (02/22/2024) .................................... Doc. 505

## Volume XI

Transcript of Jury Trial, Day 3 (02/23/2024) .................................... Doc. 506

Transcript of Jury Trial, Vol IV (02/26/2024) ................................... Doc. 511

## Volume XII

Transcript of Jury Trial, Vol V (02/27/2024) .................................... Doc. 512

Transcript of Jury Trial, Vol VI (02/28/2024) (pp. 1-172) .................. Doc. 513

## Volume XIII

Transcript of Jury Trial, Vol VI (02/28/2024) (pp. 173-274)............... Doc. 513

Transcript of Jury Trial, Vol VII (02/29/2024) ................................. Doc. 514

## Volume XIV

Transcript of Jury Trial, Vol VIII (03/01/2024)................................. Doc. 515

Transcript of Jury Trial, Vol IV (03/02/2024) (pp. 1-206) .................. Doc. 516

## Volume XV

Transcript of Jury Trial, Vol IV (03/02/2024) (pp. 207-270)............... Doc. 516

Transcript of Jury Trial, Vol X (03/05/2024) .................................... Doc. 517

Transcript of Jury Trial, Vol XI (03/06/2024) (pp. 1-110).................. Doc. 518

## Volume XVI

Transcript of Jury Trial, Vol XI (03/06/2024) (pp. 111-293) .............. Doc. 518

Transcript of Jury Trial, Vol XII (03/07/2024)................................. Doc. 520

Transcript of Jury Trial, Vol XVI (03/14/2024)................................ Doc. 527

Certificate of Service

## Volume XVII, Sealed

Report and Recommendations.......................................................... Doc. 310

Zahn's Objections ............................................................................ Doc. 315

Zahn's Inferences........................................................................... Doc. 315-1

# Doc. 270

Vol. 3-1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3
   UNITED STATES OF AMERICA,       Jacksonville, Florida
 4
              Plaintiff,           Case No. 3:22-cr-23-BJD-MCR
 5
   -vs-                            May 17, 2023
 6
   AARON ZAHN,                     1:02 p.m.
 7 RYAN WANNEMACHER,

 8         Defendants.             Courtroom 5C

 9   _____

10            TRANSCRIPT OF KASTIGAR HEARING
                       (VOLUME III)
11      BEFORE THE HONORABLE MONTE C. RICHARDSON
            UNITED STATES MAGISTRATE JUDGE
12

13

14

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22
          Shelli Kozachenko, RPR, CRR, CRC
23        221 North Hogan Street, #185
          Jacksonville, FL  32202
24        Telephone:  (904) 301-6842

25              (Proceedings reported by stenography;
                  transcript produced by computer.)
```

Vol. 3-2

```
 1                A P P E A R A N C E S

 2
   COUNSEL FOR THE GOVERNMENT:
 3
        Tysen Duva, Esquire
 4      Arnold Corsmeier, Esquire
        United States Attorney's Office
 5      300 North Hogan Street, Suite 700
        Jacksonville, FL  32202
 6
        David Pardo, Esquire
 7      United States Attorney's Office
        400 North Tampa Street, Suite 3200
 8      Tampa, FL  33602

 9

10   COUNSEL FOR DEFENDANT ZAHN:

11      Eduardo Suarez, Esquire
        The Suarez Law Firm, PA
12      1011 West Cleveland Street
        Tampa, FL  33606
13
        Brian Albritton, Esquire
14      Raquel Jefferson, Esquire
        Phelps Dunbar, LLP
15      100 South Ashley Drive, Suite 2000
        Tampa, FL  33602
16

17   COUNSEL FOR DEFENDANT WANNEMACHER:

18      James Felman, Esquire
        Kynes, Markman & Felman, PA
19      100 South Ashley Drive, Suite 1300
        Tampa, FL  33601
20
        Niels Murphy, Esquire
21      Catherine Licandro, Esquire
        Murphy & Anderson, PA
22      1501 San Marco Boulevard
        Jacksonville, FL  32207
23

24

25
```

Vol. 3-3

```
 1            T A B L E   O F   C O N T E N T S
 2
 3   GOVERNMENT WITNESSES:                          Page No.
 4     SPECIAL AGENT ROBERT BLYTHE
 5       DIRECT EXAMINATION (CONT'D) BY MR. DUVA...     4
 6       CROSS-EXAMINATION BY MR. SUAREZ...........    89
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BLYTHE - DIRECT                                   Vol. 3-4

```
 1              P R O C E E D I N G S
 2   May 17, 2023                           1:02 p.m.
 3                    -  -  -
 4        COURT SECURITY OFFICER:  All rise.  United States
 5   District Court in and for the Middle District of Florida is now
 6   in session, the Honorable Monte C. Richardson presiding.
 7        Please be seated.
 8        THE COURT:  We're back in Case No. 3:22-cr-23, United
 9   States of America versus Aaron Zahn and Ryan Wannemacher, and
10   this is a continuation of the Kastigar hearing.
11        Mr. Duva?
12        MR. DUVA:  Yes, sir.
13        THE COURT:  You have the floor, right?
14        MR. DUVA:  Yes, Your Honor.  Thank you.
15        THE COURT:  Yes.
16        MR. DUVA:  We're going to proceed with about --
17   there's just about 12 more minutes of tape, and then we'll,
18   thankfully, I think for everybody, move on with that to some
19   different topics.  And I'm going to try to do this in about 90
20   minutes, if I can --
21        THE COURT:  Very well.
22        MR. DUVA:  -- finish Agent Blythe.
23     SPECIAL AGENT ROBERT BLYTHE, GOVERNMENT'S WITNESS, SWORN
24              DIRECT EXAMINATION (CONTINUED)
25   BY MR. DUVA:
```

BLYTHE - DIRECT                                              Vol. 3-5

1   Q.   So, Agent Blythe, you're back and you understand you're
2   still under oath, sir?
3   A.   Yes, sir.
4   Q.   Okay.  I want to go back and clean up one thing from
5   yesterday that I kind of led you into.  It's my fault.
6          The compensation committee meeting on June 18th of
7   2019, the minutes reflect the attendees from the senior
8   leadership team being Mr. Zahn and Mr. Vinyard but not
9   Mr. Wannemacher; is that right?
10  A.   Yes.  I had a chance to look back over that.  That's
11  correct.  I apologize.
12          MR. DUVA:  Let's go ahead and continue with Exhibit
13  20S.  That is one of the videos.  And this is -- the timestamp
14  for 20S is from the July 23rd, 2019, board meeting.  It's at 2
15  hours and 44 minutes to 2 hours and 47 minutes and 19 seconds.
16          THE COURT:  Very well.
17      (Video played.)
18          MR. DUVA:  Okay.  And the next exhibit is 20T.  There
19  are two clips, and we'll go ahead and play those.  And I have
20  some brief questions, and then we'll move on.
21          20T, clip 1, is from the 2 hour, 47 minute, 19 second
22  mark of that same meeting to the 2 hour, 51 minute, 10 second
23  mark.
24      (Video played.)
25  BY MR. DUVA:

BLYTHE - DIRECT                                              Vol. 3-6

1   Q.   Okay.  And before we get to clip 2, Agent Blythe, if we
2   can go to Exhibit 20P5, which is the Resolution 2019-10 that
3   Ms. Rhode, in the video, in 20T, clip 1, just read.
4          I want to focus on one point, and then we'll move to
5   clip 2.
6   A.   Okay.
7   Q.   Paragraph 2 on page 1 of 20P5 represents that, "The chair
8   of the compensation committee of the board is appointed as the
9   administrator of the Long-Term Performance Unit Plan, with full
10  power and authority to administer the Long-Term Performance
11  Unit Plan in accordance with" -- and then the language
12  continues in paragraph 2 of page 1 of the resolution.
13          Who are the chair of the compensation committee?
14  A.   Ms. Camille Lee-Johnson.
15          MR. DUVA:  If we can illustrate it there on the
16  screen.
17          If we can toggle back to 20T and play clip 2.  This
18  will be the final video.
19      (Video played.)
20  BY MR. DUVA:
21  Q.   Okay.  And, Agent Blythe, that was -- the presentation
22  began about 2 hours and 44 minutes into the July 23rd board
23  meeting?
24  A.   That's correct.
25  Q.   And having --

BLYTHE - DIRECT                                        Vol. 3-7

1      MR. DUVA:  Let's go to 20FF, briefly, page 3.  It's
2  20FF.
3  BY MR. DUVA:
4  Q.   So, Agent Blythe, this is the council auditor's memo,
5  dated November 18th, 2019.  And looking at page 3 of the
6  exhibit, the table there at the bottom -- we've talked about
7  this before.  I won't belabor the point.
8      But having had the opportunity to read this shortly
9  after it was divulged by the Council Auditor's Office and then
10 watching the July 23rd board meeting, which was publicly
11 available on the JEA website, and comparing the two, did that
12 pique your investigative interest?
13 A.   Certainly.
14 Q.   Why?
15 A.   Well, if -- the one way to rapidly increase the net book
16 value of a company is if you know you're going to be in the
17 money when you go to the market.  They had received the PFM
18 report which was -- gave a range of values for JEA, most of
19 which would have shown, you know, if a purchase happened at
20 those prices, you know, 8, 9, 10, $11 billion, it would have
21 increased that net book value.
22      So if the calculation is done at the time of a
23 transaction, that would, you know, trigger these -- potentially
24 this 4 and 5 billion row, which would generate a larger payout
25 from the PUP than anticipated by a rolling three-year plan

BLYTHE - DIRECT                                        Vol. 3-8

1  where the company continues as a going concern in its present
2  form, and net book value has to kind of be increased through
3  more traditional means, like paying down debt or, you know,
4  increasing the net book value.
5  Q.   We'll leave for another day the level of discussion about
6  recapitalization during that Performance Unit Plan presentation
7  and what it meant.
8      But what I want to get at as well is, did -- did you
9  have interest in speaking with the council auditors and
10 obtaining email communications from anybody at JEA that
11 communicated with them about this Performance Unit Plan?
12 A.   Certainly.
13 Q.   And was that called for by this grand jury subpoena to JEA
14 that was issued on April 21st of 2020, which is Exhibit 50?
15 A.   Yes.
16 Q.   And did you receive Mr. Wannemacher's emails pursuant to
17 that grand jury subpoena?
18 A.   Yes.  And also we met with the council auditors and
19 interviewed a few of them and, you know, got copies of those
20 documents from them.  And they also can be found in JEA's
21 production.
22 Q.   Okay.  And we will cover some of that later, and more so
23 with the council auditors' witnesses who testify.
24      So that will move us off of the July 23rd meeting.  I
25 want to go to 20W briefly.  And this is an email from Madricka

BLYTHE - DIRECT                                    Vol. 3-9

```
 1   Jones, an executive staff assistant, to individuals in the
 2   communications department on July 23rd, 2019, at 2:15 p.m.
 3           And what is this email communicating and what happens
 4   thereafter?
 5   A.   So the email from Madricka Jones, on the 23rd she writes
 6   to Carla -- excuse me, Clara Barton, Jay McGee, and others,
 7   "Good afternoon.  Please post the attached update board package
 8   to JEA.com."
 9   Q.   So the JEA board package was -- the entirety of it was
10   posted on the JEA website after this meeting closed.
11   A.   Yes.
12   Q.   Meaning the July 23rd, 2019, meeting.
13   A.   Correct.
14   Q.   Okay.  I want to just briefly approach with two employment
15   agreements.  43A is Mr. Zahn's, and 43B is Mr. Wannemacher's.
16   And I'm not looking for a page-by-page, line-by-line analysis
17   of this.  They do speak for themselves.
18           But I just want to make the quick point of -- have
19   you had the opportunity to review those and become familiar
20   with them?
21   A.   Yes, I've reviewed them.
22   Q.   And obviously there's some differences.
23           But with respect to termination provisions and other
24   provisions in the employment agreement, are they substantially
25   similar?
```

BLYTHE - DIRECT                                    Vol. 3-10

```
 1   A.   What page are those on?
 2   Q.   The termination begins 3.1.  That 3.1, I believe, is page
 3   4 of each agreement.  Let me get my binder.
 4   A.   Yeah.  It's page 4, 3.1.
 5           They look essentially -- they look very similar.
 6   However, the 3.1.6 looks different for Mr. Zahn versus
 7   Mr. Wannemacher.
 8   Q.   Okay.  And we'll leave that to the language of the
 9   documents and move on.  I just wanted to make the general
10   point.
11           Let's go to Exhibit 30.  We're going to transition to
12   some ITN-related documents.  And I'll take those originals back
13   from you, please.
14           Agent Blythe, what is -- what is Exhibit 30?
15   A.   Exhibit 30 is the invitation to negotiate, or ITN, 127-19
16   for strategic alternatives.  That was issued on August 2nd,
17   2019.
18   Q.   And it is an 87-page document.  We're certainly not going
19   to cover every page, but there's a couple of pages I want to
20   highlight for record purposes.
21           Let's go to page 10 of Exhibit 30.
22   A.   Okay.
23           MR. DUVA:  Towards the top, if we can grab the "JEA
24   Opportunity, a recapitalization of JEA is unique," and
25   "once-in-a-generation opportunity."
```

BLYTHE - DIRECT                                    Vol. 3-11

1  BY MR. DUVA:
2  Q.   What is this essentially laying out?  You don't have to
3  read it, but -- and I know it -- again, it's displayed.  It
4  speaks for itself.
5          But this slide, is it introducing the
6  recapitalization concept as being a potential option in the
7  ITN?
8  A.   Yes.  And it's displaying JEA's accolades and how great a
9  purchase opportunity it would be.
10 Q.   Kind of illustrating its accolades, as you said, and
11 positive points?
12 A.   Sure.  Yes.
13 Q.   Let's go to page 16.
14 A.   (Complies.)
15 Q.   This is titled JEA's Strategic Planning Process Revealed
16 the Current Government-Affiliated Structure Creates Significant
17 Constraints to Business and Development.
18          And we've seen some charts like this on the right,
19 the opportunity.  And is this sort of an itemized list of can
20 JEA do certain things in the public space, as opposed to what
21 can be accomplished in -- in the private space?
22 A.   Correct.  Red Xs are things that JEA -- the view was -- or
23 the position of management was that they couldn't do in their,
24 you know, form of a municipal utility.
25 Q.   Let's go to page 19.

BLYTHE - DIRECT                                    Vol. 3-12

1  A.   (Complies.)
2  Q.   I want to focus -- I know we've seen these, so we'll do
3  this briefly.
4          Are the minimum requirements, or the minimum table
5  stakes as they've been referred to, set forth on page 19 with
6  respect to a successful -- a potentially successful ITN
7  transaction?
8  A.   Yes, on the left side in the table.
9  Q.   The left side is status quo.  And then the minimum
10 requirements on the right, what are those?
11 A.   I'm sorry.  Did I say left side?  I meant right side of
12 the table.
13          Minimum requirements, 3 billion value to the City,
14 the $400 million in rebates, commitment to develop and provide
15 renewable energies to Duval County Public Schools, and several
16 others.
17 Q.   Let's go to page 24 of Exhibit 30.
18 A.   (Complies.)
19 Q.   This talks about the solicitation process, evaluation,
20 negotiation, and award methodology.  And there is a timeline of
21 events there on the right; is that correct?
22 A.   Yes.
23 Q.   And, again, I know this speaks for itself.  But just to
24 highlight, for anticipated dates from negotiation phase, at
25 least in this document, is that a beginning of October 15th of

BLYTHE - DIRECT                                          Vol. 3-13

1   2019?
2   A.   Yes.
3   Q.   And what do you understand that to mean?  Negotiation
4   phase with whom?
5   A.   Bidders, people who are -- you know, who responded to the
6   ITN and negotiating.  One of the options under it are ...
7   Q.   Let's go to page 74 of Exhibit 30.
8   A.   (Complies.)
9   Q.   And, again, this page speaks for itself, too.  But does
10  this, in essence, list various companies, Macquarie, Amazon,
11  UPS, Anheuser-Busch, and others, and just a blurb about
12  Jacksonville's success stories in the private sector?
13  A.   Correct.
14  Q.   Let's go to 31A.
15  A.   (Complies.)
16  Q.   And we're getting into a phase where we're going to jump
17  around a little bit to different exhibits.
18       But 31A, it's a letter to Stephen Amdur, dated June
19  28th, 2019.
20       What is this?
21  A.   It's an engagement letter essentially to hire Pillsbury to
22  be outside counsel for JEA.
23  Q.   And let's go to the bottom.  There's a listing of scope of
24  services.  There's four items on that page and another -- a
25  fifth on the second page.

BLYTHE - DIRECT                                          Vol. 3-14

1        But can you just read those items into the record on
2   page 1 of Exhibit 31A.
3   A.   "1:  Advise JEA and OGC on JEA corporate, transactional,
4   and litigation matters.
5        "2:  Advise JEA and OGC on JEA governance matters.
6        "3:  Advise JEA and OGC on internal and
7   intergovernmental JEA delegation of authority matters.
8        "4:  Engage third-party consultants subject to prior
9   approval by JEA and OGC who may assist with matters beneficial
10  to supporting the matter described."
11  Q.   And then going to the second page, is there a fifth?  You
12  don't have to read that one, but just highlighting it.
13  A.   Okay.
14  Q.   There's a fifth in the scope of work, correct?
15  A.   Correct.
16  Q.   Let's go to page 4, which is a signature page.
17  A.   (Complies.)
18  Q.   Are there signatures on that page from Mr. Gabriel, the
19  general counsel; Mr. Amdur, partner at Pillsbury Winthrop; and
20  Mr. Wannemacher?
21  A.   Correct.
22  Q.   And are those dated as they're set forth, June -- July
23  1st, 2019, and July 2nd, 2019?
24  A.   They are.
25  Q.   Let's go to 31C.

BLYTHE - DIRECT                                        Vol. 3-15

1    A.    (Complies.)
2    Q.    What is 31C?
3    A.    31C's an email conversation beginning on July 24th, 2019,
4    at noon, between Ted Powers at Pillsbury and Aaron Zahn, and
5    Stephen Amdur's copied, as well as Herschel Vinyard and Ryan
6    Wannemacher.
7    Q.    And does it attach the contracts that JEA entered into
8    with Morgan Stanley and JPMorgan?
9    A.    It does.
10   Q.    Let's look at page 3 of 31C.
11   A.    (Complies.)
12   Q.    And this is a writing this says, "Dear Aaron and Ryan."
13         And you can see there on paragraph 1 that Morgan
14   Stanley is referenced, correct?
15   A.    Correct.
16   Q.    All right.  And just a brief -- brief testimony on --
17   going to page 5.  And we won't get into the nitty-gritty of
18   this.  I know it's a little bit complicated.
19         But in terms of Morgan Stanley, does page 5 sort of
20   explain in part how it will be paid if there was some kind of
21   transaction involved?
22   A.    Yes, a success fee.
23   Q.    And then going to page 14 of the exhibit, is this a
24   signature page for Morgan Stanley and JEA?
25   A.    It is.

BLYTHE - DIRECT                                        Vol. 3-16

1    Q.    And it references the signatures of Todd Giardinelli,
2    managing director of Morgan Stanley, and also Mr. Zahn and
3    Mr. Wannemacher from JEA, dated July 24th, 2019?
4    A.    Yes, it does.
5    Q.    And beginning on page 17 of the exhibit, is this
6    essentially the same for JPMorgan?
7    A.    Yes.  It's a similar contract between JEA and JPMorgan
8    Chase.
9    Q.    And, again, on page 19, does that reference how JPMorgan
10   would be paid, a success fee or a transaction fee, as it's
11   described in subparagraph (c) there for Section 2?
12   A.    Yes, a very -- very similar type success fee.
13   Q.    And on page 22, is this a signature page for JPMorgan
14   Securities LLC and signed by Ann Aiygnar, A-i-y-g-n-a-r, and
15   Mr. Zahn and Mr. Wannemacher?
16   A.    It is.
17   Q.    And is the date of this letter July 24th, 2019, as well,
18   or the date of this agreement?
19   A.    It is.
20         MR. DUVA:  And just for record purposes -- and this
21   is my mistake -- the JPMorgan contract is marked twice, so
22   that's also Exhibit 35, and the Morgan Stanley exhibit -- or
23   contract is marked twice.  It's 34C.
24         So those are stand-alones, but these two agreements
25   were part of this email communication as well.

BLYTHE - DIRECT                                    Vol. 3-17

1              THE COURT:  All right.
2    BY MR. DUVA:
3    Q.    So from the board videos themselves, was it -- was it
4    clear and also information in 2019 that was public about the
5    ITN and writings about it in the newspaper in 2019 -- did you
6    know that Morgan Stanley and JPMorgan were the banking entities
7    involved in the ITN process?
8    A.    Yes.
9    Q.    And based on that, when the matter was open, did you have
10   a desire to speak with whomever was involved with that with
11   respect to both investment banks?
12   A.    Certainly.  They were both involved in the process of
13   evaluating the different scenarios under option 3 in the
14   strategic planning.  And so, you know, I was interested to see
15   from them what efforts were done to pursue all of those
16   opportunities.
17   Q.    We'll go to Exhibit 56.  This is one of the grand jury
18   subpoenas we talked about earlier.  I think you have the
19   originals up there on your table.
20              Is Exhibit 56 the grand jury subpoena to Morgan
21   Stanley?
22   A.    It is.
23   Q.    And is that dated April 21st of 2020?
24   A.    It is.
25   Q.    And on page 4 of the exhibit, there's documents and

BLYTHE - DIRECT                                    Vol. 3-18

1    records.  And I know we've mentioned this before, but does that
2    include emails and email communications as well, email
3    attachments?
4    A.    Yes.
5    Q.    Okay.  And are there 14 itemized requests in this grand
6    jury subpoena?
7    A.    Yes, there are.
8    Q.    Okay.  I want to focus on just sort of five or four at a
9    time, as the case may be.
10              MR. DUVA:  If we can highlight the first five on page
11   3 of the exhibit.
12   BY MR. DUVA:
13   Q.    And you don't have to read each.
14              But just for display purposes, what types of
15   information are we looking for with respect to this subpoena to
16   Morgan Stanley?
17   A.    We wanted their contracts, all communications with JEA
18   executives and employees regarding scenario 3, an IPO, or
19   recapitalization.  We wanted all documents received from JEA or
20   other outside consultants for JEA, auditors in furtherance of
21   pursuing recapitalization, sale, or an IPO.
22              We wanted all documents reflecting the real market
23   value of JEA pursuant to recapitalization or sale to a private
24   utility or an investment group.
25              MR. DUVA:  If we can display 6 through 9, those

BLYTHE - DIRECT                                        Vol. 3-19

1   requests.
2          THE WITNESS:  We wanted any work product in
3   preparation for JEA board meetings, to the extent Morgan
4   Stanley and -- was assisting the board in preparing for those
5   meetings or preparing themselves for presentations; all
6   invoices reflecting the work performed during their -- the
7   entirety of their engagement with JEA; all documents and
8   records related to communications with the SEC regarding JEA
9   filings with the SEC and any such filings in preparation for an
10  IPO.
11  BY MR. DUVA:
12  Q.   Okay.  And we'll go to items 10 through 14 on the next
13  page.
14          In addition to financial statements and financial
15  prospectus, are most of these 10 through 14 requests aimed at
16  sort of the process of what would be required at an IPO?
17  A.   Yes.
18  Q.   Did you receive a production from Morgan Stanley?
19  A.   We did.
20  Q.   And in reviewing that, did you identify an individual
21  named Eddie Manheimer?
22  A.   I did.
23  Q.   And based on a review of the Morgan Stanley production,
24  who did you learn Eddie Manheimer to be?
25  A.   Eddie Manheimer was somebody -- he was a key person in

BLYTHE - DIRECT                                        Vol. 3-20

1   that engagement team with Morgan Stanley.  And, you know, he
2   shook out to be the best person to talk to with the most
3   knowledge.
4   Q.   And was Mr. Manheimer the managing director of Morgan
5   Stanley and the lead mergers and acquisitions banker on the JEA
6   transaction?
7   A.   Yes, I believe that was his title.
8   Q.   Okay.  We're going to come back to an interview of
9   Mr. Manheimer.
10          I want to go to Exhibit 57.  That's the grand jury
11  subpoena to JPMorgan.
12          And was that issued on or about the same day, April
13  21st of 2020?
14  A.   Yes.
15  Q.   And, again, I won't belabor this, because I think the 14
16  itemized requests are about the same, but just kind of
17  illustrating the first five, and then 6 through 9 here in a
18  moment.
19          You're essentially seeking the same type of records
20  from JPMorgan that you sought from Morgan Stanley.
21  A.   Yes.  They -- they divided up roles between them, and
22  that's something we figured out during the interviews, but --
23  and looking through the documents.  But it's common for
24  companies to hire both of these entities to work on
25  transactions or mergers.

BLYTHE - DIRECT                                    Vol. 3-21

1          MR. DUVA:  And if we can illustrate -- I see 6
2    through 9 is up there -- items 10 through 14 on the following
3    page.
4    BY MR. DUVA:
5    Q.   Okay.  Ultimately did we receive a production pursuant to
6    this subpoena from JPMorgan?
7    A.   Yes, several.
8    Q.   Did that lead to the identification of Jason Gredell?
9    A.   Yes.
10   Q.   Who is Mr. Gredell?
11   A.   Jason Gredell is an executive director, something to that
12   effect, for JPMorgan, and he was in charge of this engagement
13   team, and, you know, appeared from all the communications to be
14   the point person, somebody that would have the most knowledge
15   to be -- to talk to.
16   Q.   We'll get to the interview of Mr. Gredell in a moment, but
17   first I want to focus on Exhibit 34A and some materials that
18   preceded the July 23rd, 2019, board meeting.
19          What is 34A?
20   A.   34A is the Morgan Stanley discussion materials dated June
21   20th, 2019.
22   Q.   Was this for a June meeting in 2019 that occurred at
23   Morgan Stanley?
24   A.   Yes, it was.
25   Q.   And I just want to -- is it your understanding, based on

BLYTHE - DIRECT                                    Vol. 3-22

1    the investigation, that Mr. Zahn, Mr. Wannemacher, and
2    Ms. Dykes attended?
3    A.   Yes.  That sounds accurate.
4    Q.   Let's go to page 13 of 34A.  We're just going to -- this
5    is a -- again, it's a 98-page presentation.  We're just going
6    to look at a few of the pages.
7          Page 13, was this -- you know, what section was this
8    in, in terms of this presentation and this highlighting of
9    "Emera Acquires TECO Energy for 10.4 Billion"?
10   A.   This is kind of a comp section, you know, entities that
11   could be used for comparison to help in providing a market
12   value -- an estimated market value for JEA.
13   Q.   How about page 16?  It's titled Disruption Facing the
14   Utility Sector.
15          What is this?
16   A.   Sure.  It recaps some of the headwinds facing all electric
17   utility companies in the industry:  declining costs of
18   renewable energy; increased penetration of distributed energy
19   resources, such as rooftop solar; increased customer focus; new
20   competitors from the oil and gas industry.
21   Q.   Let's go to page 43.
22   A.   (Complies.)
23   Q.   This is titled Preliminary JEA Electric Financial
24   Analysis.
25          What did you find interesting about this?

BLYTHE - DIRECT                                              Vol. 3-23

```
1    A.   This is their football field, if you will.  That's the way
2    they describe it.  It shows the potential values for these
3    comparable companies based on different commonly used ratios.
4         Oh, I'm sorry.  These were applied to JEA.  So it was
5    showing -- I think they have it broken up by electric and
6    water.
7    Q.   So for -- this is the analysis for the electric system of
8    what, depending on the --
9    A.   Yeah.  This is just electric.
10   Q.   And it's depending on the type of model of whether it's
11   leveraged discounted cash flow or some other model, what may be
12   netted in a -- or what may be the gross in a particular sale of
13   the electrical system?
14   A.   Yes.
15        What page is this?  The screen --
16   Q.   43.
17   A.   The quality of the presentation is pretty low.
18        There we go.  This is better.
19        Yes.  And it also shows proceeds to the City of
20   Jacksonville in millions, in the column next to the -- second
21   from the right, based on a sale price in these -- each range.
22   Q.   And that's in billions, not millions.  Billions with a B.
23   A.   Well, it's in millions because it's in thousands, so 4,375
24   would be 4.375 billion.
25   Q.   Okay.  Just making that clear.  I understand.  Thank you.
```

BLYTHE - DIRECT                                              Vol. 3-24

```
1         Let's go to page 57.
2    A.   (Complies.)
3    Q.   I want to look at a few pages in succession here.
4         Is there a section about potential buyers in this
5    document?
6    A.   Do you mind if I point something out on page 46?
7    Q.   Sure.
8    A.   It showed the four pillars of a successful
9    transformation -- or privatization.
10   Q.   And on the left-hand side, what did you find interesting
11   about that?
12   A.   It says, "Benefits to the City and residents of
13   Jacksonville:  initial rate reduction," and, "Over 5 billion in
14   excess proceeds to the City of Jacksonville.'  And, you know,
15   somebody circled this copy.
16        But -- and one of the things that I just wanted to
17   point out when we interviewed the folks at Morgan Stanley is
18   they were --
19        MR. SUAREZ:  Your Honor, I'm going to object to
20   hearsay.
21        MR. DUVA:  I plan to get into the Manheimer interview
22   soon.  And the 302 is in evidence.  And I would stand on the
23   same argument as yesterday.
24        In addition, under Rule 1101(d)(3), proceedings such
25   as this, as Mr. Corsmeier pointed out at sidebar, the
```

BLYTHE - DIRECT                                        Vol. 3-25

1   evidentiary rules are a bit relaxed.  And the Court can make
2   whatever determination of this --
3           THE COURT:  Correct.  I'll sustain it -- or overrule
4   it under 1101(d)(3).
5   BY MR. DUVA:
6   Q.  Go ahead, Agent Blythe.  And we'll get more -- just be
7   careful with the folks at -- you're talking about
8   Mr. Manheimer.
9   A.  Eddie Manheimer.  I apologize.
10  Q.  Okay.
11  A.  The -- I just -- he emphasized point one in this four
12  pillars of a successful privatization regarding clearly
13  articulated public benefits/protections, and just the idea that
14  it's extremely important in a transaction like this with a
15  private -- excuse me, a municipally owned utility to be
16  transparent.
17          And that was in the context of the Performance Unit
18  Plan, asking him about that.
19  Q.  Let's go to page 58.  There are some slides about
20  potential buyers.  And we'll look at 59 as well.
21          There are different companies listed.  And I know the
22  document speaks for itself.  But kind of to move forward on to
23  page 59, are there some large investor-owned utilities set
24  forth on page 59, like Duke Energy, NextEra Energy, and Emera
25  as well?

BLYTHE - DIRECT                                        Vol. 3-26

1   A.  Yes.
2   Q.  And another entity, Southern Company, is listed as well.
3   A.  Correct.
4   Q.  Let's go to 34B.
5   A.  (Complies.)
6   Q.  What is 34B?
7   A.  It's a JPMorgan -- joint JPMorgan/Morgan Stanley
8   presentation titled Project Freebird, which is a reference to
9   the ITN process at one time.  And it's titled Organizational
10  Materials, July 2019.
11  Q.  Is this for the Club Continental meeting in Orange Park
12  that spanned July 10 through 12 of 2019?
13  A.  Yes.
14  Q.  Let's look at page 3.
15          Again, this is a -- says Key Process Deliverable
16  Timeline.  We don't have to get too deeply into this, but for
17  the ITN, what is this document, in terms of planning?
18  A.  It's a summary overview of their near-term deliverables.
19  It's a workflow chart and a timeline chart.
20          And it assigns responsible parties, which team is
21  going to handle which items, to get -- so keep in mind, this is
22  about two weeks before the July 23rd, 2019, board meeting.  So
23  they're assigning roles and responsibilities to -- on how to
24  handle the -- get the ITN prepped up and ready leading up to
25  that meeting, and then what they're going to do after.

BLYTHE - DIRECT                                    Vol. 3-27

1   Q.   Let's look at page 6 of 34B.
2   A.   (Complies.)
3   Q.   There's, on the right -- once we get there, there's a
4   chart or a table that says Indicative Process Timeline.
5        What is that?
6   A.   So it starts with the board meeting on July 23rd, 2019,
7   and "receive mandate and public announcement of the ITN," same
8   date, and then gives a rough month -- timelines for conducting
9   due diligence and preparing market materials, populating a data
10  room, which is an online digital data room where -- that's
11  available to -- to bidders that are -- have a responsive bid.
12  Q.   Does this flow in the ensuing months down to signing an
13  agreement and/or a definitive agreement on -- in or about March
14  of 2020?
15  A.   Yes, it does.
16  Q.   And is there a calendar entry that has a similar chart on
17  page 10 of Exhibit 34B?
18  A.   Yes.
19  Q.   And does this planning document target a referendum vote
20  of any successful transaction in August of 2020?
21  A.   It does, item F.
22  Q.   Okay.  Let's go back to the interview of Mr. Manheimer.
23       Was he interviewed on March 31st of 2021?
24  A.   Yes.
25  Q.   And was this after receiving the production from Morgan

BLYTHE - DIRECT                                    Vol. 3-28

1   Stanley pursuant to the grand jury subpoena?
2   A.   Yes, it was.
3   Q.   And had you received emails from JEA personnel pursuant to
4   the grand jury subpoena to JEA?
5   A.   Yes, we had, and we mined those in preparation for this
6   interview.
7   Q.   Did you do the same for emails from Morgan Stanley as
8   well?
9   A.   Correct.
10  Q.   And did you become aware that Morgan Stanley -- and we
11  just looked at 34B, the presentation -- attended the Club
12  Continental meeting in July 10th through 12th of 2019?
13  A.   He did.
14  Q.   And did you generally discuss the option in the ITN that
15  would have netted -- or the option or options, as the case may
16  be, that could potentially have netted the listed minimum table
17  stakes or minimum requirements of the ITN for a transaction?
18  A.   Yes, we did.
19  Q.   Did you talk about that in connection with an IPO, or an
20  initial public offering?
21  A.   We did.
22  Q.   What did Mr. Manheimer say, based on his experience?
23  A.   He said that it wasn't the most beneficial option for JEA,
24  and that JEA would take a, quote/unquote, haircut, meaning they
25  would likely get a lower value for JEA in an initial public

BLYTHE - DIRECT                                    Vol. 3-29

1   offering than in a sale to an investor-owned utility.
2   Q.    In his mind what was the clear option to satisfy those
3   minimum table stakes that were set forth in the ITN?
4   A.    He told me that an IOU purchase by an investor-owned
5   utility was clearly the most beneficial avenue for JEA to
6   pursue.
7   Q.    Did he even mention specific companies?
8   A.    Yes.
9   Q.    What did he mention, which companies?
10  A.    NextEra.
11  Q.    And what did he say as to NextEra and why?
12  A.    He felt as though NextEra was the clear buyer for JEA
13  because of their proximity of their service territory, and
14  essentially they had had the best economies of scale and
15  ability to have a better yield, as far as repositioning assets
16  of JEA and benefiting from cost savings.
17  Q.    In terms of the valuation methodologies and what could be
18  expected in a transaction for both the electric portion of the
19  business and the water portion of the business, what was
20  Mr. Manheimer's expectation as to a range for a gross sale
21  figure?
22  A.    For both?
23  Q.    For both.
24  A.    I can't recall if he said the ...
25        I apologize.  I can't recall what specific numbers he

BLYTHE - DIRECT                                    Vol. 3-30

1   referenced.  If you could -- there's something you could give
2   me to refresh my recollection.
3   Q.    Yeah, we can come back to that.
4         Did Mr. Manheimer --
5   A.    I'm -- I'm sorry.  He broke it out, but he -- he said that
6   their valuation methodologies projected on the high range, a
7   value of 4.975 billion to 5.8 billion for JEA's electric
8   business, and 4.825 to 6.075 billion for JEA's water business,
9   so --
10  Q.    So if you coupled that together, would that be math, on
11  the low end for both, of 9.8 billion and on the high end,
12  11.925 billion?
13  A.    Approximately, maybe even a little more than -- more like
14  11.85 billion on the high end.
15  Q.    And was the plan for the recapitalization, if that
16  occurred, to be on the ballot in August 2020?
17  A.    Yes.
18  Q.    And that would have coincided with the Florida primary and
19  the presidential election, national election?
20  A.    Yes.
21  Q.    Did Mr. Manheimer talk about the PUP already being in
22  place when Morgan Stanley joined the project?
23  A.    Yes.
24  Q.    And what did Mr. Manheimer say about the PUP and whether
25  or not Morgan Stanley was consulted about that or not?

BLYTHE - DIRECT                                          Vol. 3-31

1  A.    They weren't consulted.  He just thought that, you know,
2  the PUP was something that a potential buyer would want to know
3  about, know what the expectation was about who would paid for
4  it and, you know, how the payouts would be handled.
5         You know, he said if a company has an obligation to
6  pay a management incentive plan, you know, that would come out
7  of -- he said it would come out of the balance sheet and reduce
8  the consideration from a prospective buyer for the purchase
9  price, if that was going to be put on the buyer.
10 Q.    And that was something generally that would have to be
11 dealt with down the road?
12 A.    Correct.
13 Q.    And Morgan Stanley was not consulted about that?
14 A.    No.
15 Q.    In terms of the truncated timeline for best and final
16 offers being by mid-January of 2020, which occurred here in the
17 ITN, what was Mr. Manheimer's feeling about that?
18 A.    He -- he wasn't happy about it, but felt like it was, you
19 know, something that, you know, put more -- more pressure on
20 the process.
21 Q.    And did you have an opportunity to interview Jason Gredell
22 from JPMorgan?
23 A.    Yes.
24 Q.    And we already talked about Mr. Gredell being the lead
25 mergers and acquisitions banker for JPMorgan on the

BLYTHE - DIRECT                                          Vol. 3-32

1  transaction.
2         Was he interviewed on March 5th of 2021?
3  A.    Correct.
4  Q.    Did you go through the same process of collecting JEA
5  emails pursuant to the grand jury subpoena and emails and
6  records pursuant to the grand jury subpoena for -- to JPMorgan
7  to prepare for that interview?
8  A.    I did.
9  Q.    Did you talk to Mr. Gredell about his view of whether JEA
10 was in any real financial distress as of November of 2018?
11 A.    No.  He didn't think JEA was in financial distress.
12 Q.    So just to make sure the record's clear, yes, you talked
13 to him, but his view was no, it was not in financial distress.
14 A.    That's what I meant to say.
15 Q.    Okay.  What did Mr. Gredell say as to JEA's potential
16 value to NextEra and/or Duke Energy?
17 A.    Well, he said that, you know, (1) Duke and NextEra are in
18 a -- he described it as a tactical fight, if you will, and the
19 way they're getting bigger and making more money is by
20 acquiring other companies.
21        And so he thought that both companies would be a
22 natural to consider for purchasing JEA, and that when you have
23 two organizations that are looking for other smaller companies
24 to acquire, it creates a perfect situation for a potential sale
25 and a potentially higher value created because of that

BLYTHE - DIRECT                                    Vol. 3-33

```
1   competition to acquire other entities.
2   Q.   And did Mr. Gredell talk about how JPMorgan worked in
3   concert with Morgan Stanley in this banker capacity for the
4   ITN?
5   A.   Yes, he did.
6   Q.   Did Mr. Gredell talk about -- that there would be -- there
7   would have to be negotiations about how to handle the Plant
8   Vogtle liability, and there were different options as to how to
9   deal with that, differing opinions as well?
10  A.   Yes, there were.
11  Q.   And in terms of NextEra's revised reply of over $11
12  billion, did that surprise Mr. Gredell at all?
13  A.   No, it didn't.
14          MR. SUAREZ:  Your Honor, I just -- I know -- I
15  understand the Court's prior rulings, and I suspect they're
16  going to be consistent, but I just want to be sure that the
17  Court understands my continuing objection to the ongoing
18  hearsay.
19          THE COURT:  Noted, Mr. Suarez.
20          MR. SUAREZ:  Thank you, Your Honor.
21          MR. DUVA:  We're moving off of this interview.  We're
22  moving to a different -- different topic.
23  BY MR. DUVA:
24  Q.   I want to move to Exhibit 32A.  We're going to talk about
25  some of the law firms, and then we're going to get over to
```

BLYTHE - DIRECT                                    Vol. 3-34

```
1   talking about NextEra and S&P so we finish up.
2   A.   You said 32A?
3   Q.   32A.
4          The Foley & Lardner law firm -- and I want to
5   illustrate 32A -- that's a national law firm with an office
6   here in Jacksonville; is that right?
7   A.   That's correct.
8   Q.   And we've seen references already in this hearing to Kevin
9   Hyde, and he attended the Diamond-Salem hearing, and he
10  attended other board meetings as well?
11  A.   Yes, he did.
12  Q.   Okay.  Let's go to this email from Mr. Hyde there at
13  the -- kind of the middle of page 1 of 32A.  It's dated July
14  3rd, 2019.
15          What is Mr. Hyde asking, kind of internally, with
16  this Foley & Lardner email?
17  A.   Mr. Hyde was asking if anybody had time to help him draft
18  a performance bonus agreement for employees at JEA.  He said --
19  he wrote that, "They want it tied to specific performance
20  measurements of the entities.  Let me know.  There is some
21  urgency to the request."
22  Q.   And we'll get into some other details about that later,
23  but for purposes of moving forward, I want to show 32B.
24          Is this 32B the engagement of JEA and the Foley &
25  Lardner firm with this particular letter July 22nd of 2019?
```

BLYTHE - DIRECT                                    Vol. 3-35

1    A.   Yes, it is.  As you know with Pillsbury, the Office of
2    General Counsel engages outside counsel for them.
3    Q.   And there at the bottom, as displayed, is this the first
4    two tenets or points of the scope of services or legal
5    services?
6    A.   Yes.  1 and 2 is to advise JEA and OGC negotiations
7    regarding employee benefits, labor negotiations, collective
8    bargaining --
9    Q.   Okay.
10   A.   -- and other labor and employment matters.
11   Q.   And then on to the next page, page 2 of 34B, are items 2
12   through 6 listed, which are displayed now.  And I'm not asking
13   you to read those.
14   A.   3 through 6, yes.
15   Q.   Let's go to the signature page on page 6.
16   A.   (Complies.)
17   Q.   And is there an effective date of -- under -- above
18   Lawsikia Hodges' signature of July 1, 2019?
19   A.   Yes.
20   Q.   And there are signatures by Mr. Hyde, Mr. Gabriel --
21   Mr. Hyde being from Foley & Lardner, Mr. Gabriel from the
22   Office of General Counsel -- on July 22nd, 2019, and
23   Mr. Wannemacher for that same day?
24   A.   Yes.
25   Q.   Let's go to 32C and 32D.

BLYTHE - DIRECT                                    Vol. 3-36

1    A.   (Complies.)
2    Q.   And we're not going to get into too much detail about
3    these today.
4         But are these two legal memoranda that you obtained
5    from the Foley & Lardner law firm to the Office of General
6    Counsel, this one, 32C, dated September 25th, 2019, about the
7    Performance Unit Plan?
8    A.   Yes, that's correct.
9    Q.   And is there a more detailed one on -- that is Exhibit 32D
10   that is dated October 21st, 2019, that does some additional
11   analysis?
12   A.   Yes, there is.
13   Q.   Did either of these memos address substantively figures
14   with respect to if there was a recapitalization event that
15   would fund the Performance Unit Plan?
16   A.   No.  They -- you know, I think the -- one of them just
17   addressed the threshold under state law for extra compensation,
18   or something to that effect.
19   Q.   These memos were sent to JEA, so they were public records,
20   correct?
21   A.   Yes.
22   Q.   And, also, these memoranda were set forth in the
23   chronology of the Special Investigative Committee report?
24   A.   Yes, I believe so.
25   Q.   And did you have the opportunity to interview Kevin Hyde?

BLYTHE - DIRECT                                      Vol. 3-37

1   A.   I did.
2   Q.   And we're not going to get into the substance of that.
3   We'll move forward.
4        Let's go to 20X and move over to communications
5   between Mr. Wannemacher and others at JEA and the Council
6   Auditor's Office beginning in August of 2019.
7        Agent Blythe, we're going to do more of this with --
8   sorry.  Grabbed the wrong book here.
9        We're going to do more of this with Jeff Rodda, Kim
10  Taylor, and Kyle Billy from the Council Auditor's Office.  So I
11  just want to hit this -- kind of hit this with a high view.
12       Looking at 20X, if we can go to page 4 of the
13  exhibit -- this email is in this exhibit a couple of different
14  ways, but I want to look at the bottom of page 4.
15       Is this an email from Jeff Rodda to Juli Crawford,
16  Joe Orfano, copying Ryan Wannemacher, and then also Phillip
17  Peterson to Kyle Billy, Mr. Peterson and Mr. Billy being from
18  the Council Auditor's Office, asking a number of questions with
19  respect to the Performance Unit Plan?
20  A.   Yes.  Mr. Rodda had a list of 22 questions.
21       MR. DUVA:  If we can go to the next page,
22  Ms. Stockholm, page 5.
23  BY MR. DUVA:
24  Q.   And on page 5 of 20X, are those the questions that
25  Mr. Rodda emailed about on August 9th of 2019?

BLYTHE - DIRECT                                      Vol. 3-38

1   A.   Yes.
2   Q.   And then on the prior page, page 4 -- and we'll go over
3   those more specifically with Mr. Rodda and other council
4   auditors -- did Mr. Wannemacher respond five days later?
5   A.   He did, on August 14th, 2019.  He wrote, "Attached are the
6   latest drafts of the plan documents and award agreement that
7   was approved by the board.  This will answer many of these
8   questions.
9        "As we are still working on a number of the" -- "of
10  other pressing items, can we circle up in a few weeks on any
11  additional questions you may have after reviewing these
12  documents?
13       "I appreciate it.  Thank you, Ryan."
14  Q.   We'll ask Mr. Rodda questions about what was going on at
15  that time, including in September of 2019, but I want to look
16  at -- briefly at 20Y1.
17       Is there an email from Heather Reber to
18  Mr. Wannemacher, Sherry Hall, Herschel Vinyard, and then
19  copying council auditors' employees?
20  A.   Yes, on October 31st.
21  Q.   And is Ms. Reber -- was she a council auditor employee as
22  well?
23  A.   Yes.
24  Q.   And the email reads, "Ryan, Sherry, and Herschel, thank
25  you all for coming over to meet with us today."

BLYTHE - DIRECT                                    Vol. 3-39

1          What did you learn occurred -- and we'll get into the
2    substance with other witnesses.
3          What did you learn occurred on October 31st, 2019,
4    during your investigation?
5    A.   That Ryan Wannemacher and at least one or two other JEA
6    personnel had an in-person meeting with the Council Auditor's
7    Office staff, including Heather Reber and Jeff Rodda.
8    Q.   And what was that about, generally?
9    A.   It was to discuss the Performance Unit Plan and their
10   questions and concerns.
11   Q.   So was this email sent after the meeting that happened?
12   A.   Yes.
13   Q.   And is there a list of, on page 2 of 20Y1, additional
14   questions numbering 1 through 15, and then 15 having four
15   parts, 15(a) through (d)?
16   A.   Yes.
17   Q.   And was there a list of concerns on the following page,
18   20Y1-3, listed 1 through 8?
19   A.   Yes, there was.
20   Q.   And we won't get into these too specifically.
21          But is the first concern, "There is no cap to the
22   value of a performance unit"?
23   A.   It is.
24   Q.   And are 20Y2 and 20Y3, in addition to 20BB, 20CC1, and
25   20CC2 and 20DD, are those additional email communications

BLYTHE - DIRECT                                    Vol. 3-40

1    involving the Council Auditor's Office and Mr. Wannemacher
2    about that plan spanning from October 31st of 2019 to November
3    14th of 2019?
4    A.   Yes, they are.
5    Q.   Let's look at -- we won't look at all of these, but look
6    at 20CC1.
7    A.   (Complies.)
8    Q.   Having reviewed these -- and we'll start at actually the
9    top.  This is an email from Mr. Wannemacher to Kim Taylor on
10   November 13th, 2019, at 5:18 p.m.
11          The reference to -- Mr. Wannemacher writing, "Your
12   methodology is correct," just explain generally -- again, we'll
13   get into more specifics later with the other witnesses, but
14   what did you understand that to mean, that -- what was
15   Ms. Taylor trying to do here?
16   A.   They were trying to calculate the PUP and make sure that
17   the way they were calculating it according to the plan document
18   was correct.
19   Q.   And what was Mr. Wannemacher, at least according to your
20   interpretation, indicating in this email to Ms. Taylor that is
21   20CC1 at the top?
22   A.   So they -- they sent him a spreadsheet with a sample
23   calculation.
24          He apparently reviewed and updated the spreadsheet
25   and said in this email, on November 13th, "Your methodology is

BLYTHE - DIRECT                                              Vol. 3-41

1  correct," and that he actually went ahead and filled in the
2  table with fiscal year 2019 unaudited and projected fiscal year
3  2022 numbers, "so you can see how" the -- JEA was looking at
4  it, that "we are looking at it," and he fixed a formula error.
5  Q.   Is that on 20CC1-3, page 3?
6  A.   Yes, that's correct.
7  Q.   Let's go to -- and it shows the value of a performance
8  unit based on that arithmetic over a three-year period going up
9  to $167.78?
10 A.   Yes.
11 Q.   Let's go to 20CC2.
12        And this is an email after that one from Ms. Reber to
13 Mr. Wannemacher -- others are copied -- on November 14th of
14 2019 at 11:45 a.m.
15        And what is Ms. Reber saying in this email?  I know
16 it's displayed, but what did you learn the point of obtaining
17 the methodology was to do this calculation?
18 A.   So they wanted to see what the net proceeds to the City --
19 well, not see what the proceeds.  They were saying under the
20 scenarios that the net proceeds to the City were 4 or
21 $5 billion from a sale, how would that affect this calculation?
22        And they're also wondering how the rebates are
23 factored in to that calculation.
24 Q.   When you say "they," are you talking about the council
25 auditors?

BLYTHE - DIRECT                                              Vol. 3-42

1  A.   Yes.  Correct.
2  Q.   Okay.  So going to page 3 of 20CC2, is this the council
3  auditors' arithmetic pursuant to the methodology that, in the
4  prior email, in 20CC1, that Mr. Wannemacher confirmed?
5  A.   I'm sorry.  Can you repeat the question?
6  Q.   Why don't I do it like this.
7        What is this table on 20CC2, and what did you learn
8  about it?
9  A.   So this is the table that the council auditors -- yeah.
10 So they -- they attached the example calculation with current
11 year values of 3, 4, and $5 billion and calculated the net base
12 year value, and then calculated the performance unit value for
13 the 4 and $5 billion scenarios at $3,150.34 for the
14 $4 billion scenario.
15        So the value of the PUP -- that's what the value of
16 the PUP would be under that scenario.  And under the $5 billion
17 net proceeds scenario, that the PUP value would be $6,366.33.
18 Q.   So this is leading up to the release of the November 18th,
19 2019, memo that is 20FF, correct?
20 A.   Yes.  This is --
21 Q.   So on November 14th of 2019 with these email
22 communications, what were the council auditors trying to do
23 such that they could finish that memo?
24 A.   They were trying to understand the full magnitude of the
25 Performance Unit Plan, make sure their math was correct.

BLYTHE - DIRECT                                    Vol. 3-43

1  Q.   And then let's look at 20DD at the top.  This is an email
2  from Mr. Wannemacher to Heather Reber and Kim Taylor and
3  copying other council auditors' employees and then JEA
4  employees.
5       And can you just read that one into the record,
6  after, "Heather"?
7  A.   Mr. Wannemacher wrote, "Heather, as noted in my previous
8  email, you have been notified that this was a draft plan that
9  is not being finalized or implemented.  In addition, as Aaron's
10 letter noted, as a long-term incentive plan, it would be moot
11 in any recapitalization scenario.  No other questions or
12 answers are necessary at this time."
13 Q.   And we'll get into, with -- with other witnesses, the
14 back-and-forth with Mr. Gabriel and Mr. Zahn about the
15 Performance Unit Plan.
16      But I want to ask you, Agent Blythe, based on your
17 investigation and reviewing the JEA board meeting on July 23rd,
18 2019, and these materials you obtained from the JEA pursuant to
19 the grand jury subpoena, did the formula for the Performance
20 Unit Plan calculation change from July 23rd, 2019, going
21 forward to these emails that we looked at here from October
22 31st to November 14th of 2019?
23 A.   No, although there are many drafts and iterations prior to
24 that, going back to March at least.  My -- to the best of my
25 knowledge, after July 23rd that didn't change.

BLYTHE - DIRECT                                    Vol. 3-44

1  Q.   And let's go to 20EE.
2  A.   (Complies.)
3  Q.   What is 20EE?
4  A.   20EE is an email from Lynne Rhode, Currents, but it's
5  a -- it's a -- JEA Executive Currents is the substance of it,
6  based -- about the Long-Term Performance Unit Plan being
7  postponed on November 15th, 2019.
8  Q.   And what is this getting at?  What is -- in terms of JEA
9  employees, what's this notification?
10 A.   It's telling them that the Long-Term Performance Unit Plan
11 is -- is being postponed.  The implementation's being
12 postponed.
13 Q.   And that's a communication to all JEA employees?
14 A.   That's my understanding, yes.
15 Q.   Now let's go to -- we're going to talk briefly about --
16 we've already shown 20FF, so we're not going to do that again.
17 Let's go to 31E.  We're going to talk about the Pillsbury law
18 firm.
19      THE COURT:  Mr. Felman is giving a signal, so I think
20 it's probably a good opportunity to take a, let's say,
21 15-minute break.
22      Court will be in recess.
23      COURT SECURITY OFFICER:  All rise, please.
24 (Recess from 2:14 p.m. until 2:39 p.m.; all parties
25 present.)

BLYTHE - DIRECT                                          Vol. 3-45

```
1              COURT SECURITY OFFICER:  All rise.  This Honorable
2    Court is back in session.
3              Please be seated.
4              THE COURT:  Mr. Duva, proceed.
5              MR. DUVA:  Thank you, Your Honor.
6    BY MR. DUVA:
7    Q.   Let's go to 31E, Agent Blythe.  And we're not going to do
8    much with this one.
9              What is 31E?
10   A.   31E is a letter from Pillsbury to the Office of General
11   Counsel regarding the Performance Unit Plan.
12   Q.   And is it a legal memorandum about tax and securities
13   considerations?
14   A.   Yes.
15   Q.   And we'll just let that one speak for itself and move on.
16   A.   Yes.
17   Q.   And I want to talk about -- did you have the opportunity
18   to interview Stephen Amdur from the Pillsbury law firm?
19   A.   I did.
20   Q.   And when was that?
21   A.   Give me a moment.
22              February 11th, 2021.
23   Q.   And during that interview with Mr. Amdur and subsequent
24   statements that he made -- did you have a conversation with
25   Mr. Amdur about a conversation he claims to have had with
```

BLYTHE - DIRECT                                          Vol. 3-46

```
1    Mr. Zahn in or about June of 2019 about PUP payouts in
2    connection with recapitalization and what Mr. Zahn's
3    expectations were?
4    A.   Yes, I did.
5    Q.   What did he say?
6              MR. SUAREZ:  Your Honor, I'm just going to renew my
7    objection.  I understand the Court's prior ruling.
8              THE COURT:  Noted, Counsel.
9              THE WITNESS:  He -- he said that Mr. Zahn told him
10   that he expected to receive approximately $40 million as a
11   result of this plan in the event of a recapitalization.
12   BY MR. DUVA:
13   Q.   When was that conversation?
14   A.   If you'd give me just a moment to look.
15              MR. DUVA:  If I may approach, Your Honor?
16              THE COURT:  Yes, sir.
17   BY MR. DUVA:
18   Q.   I'm showing you a statement of Mr. Amdur --
19   A.   Is it on the last page here, on page 8?
20   Q.   Page 8, please.
21   A.   So this is the May 20th, 2021, grand jury transcript of
22   Stephen Amdur?
23   Q.   Yes.
24              Does that refresh your recollection, looking at the
25   page that I pointed to?
```

BLYTHE - DIRECT                                    Vol. 3-47

1   A.   Yes.
2   Q.   About when that conversation -- or Mr. Amdur's position as
3   to when that conversation occurred?
4   A.   Yes.
5   Q.   When was that?
6   A.   June of 2019, in advance of the meeting in New York.
7   Q.   According to Mr. Amdur, did Mr. Zahn talk about other
8   senior leadership team members generally and what they
9   expected -- or what he expected they would receive from a sale
10  of JEA connected with the Performance Unit Plan?
11  A.   Yes.  He said that other senior leadership team members
12  could receive up to $10 million as a result of the plan.
13  Q.   And according to Mr. Amdur, who was the lead lawyer on the
14  mergers and acquisitions transaction, was Pillsbury retained to
15  give any legal opinion about PUP payouts in connection with
16  recapitalization?
17  A.   No.
18  Q.   Did Pillsbury come up with the Performance Unit Plan
19  calculation?
20  A.   The formula?
21  Q.   The formula.
22  A.   No.  It was provided to them.
23  Q.   By who?
24  A.   Mr. Wannemacher.
25  Q.   Let's go to Exhibit 37.

BLYTHE - DIRECT                                    Vol. 3-48

1        We're going to move over to some -- a rating agency
2   presentation and Standard & Poor.
3   A.   (Complies.)
4   Q.   What is Exhibit 37?
5   A.   Exhibit 37 is the 2018 rating agency presentation.
6   Q.   Now, this is a lengthy document as well.  It's 103 pages.
7   We're just going to focus on seven or eight of these.
8        But just before we get to specifics, kind of at a
9   high level, when you evaluated this rating agency
10  presentation -- and how did you obtain this?  How were these
11  available?
12  A.   One could get it on the -- JEA's website, I believe.  I
13  also obtained these through grand jury subpoenas to JEA --
14  Q.   And --
15  A.   -- or a grand jury subpoena.  Sorry.
16  Q.   Just briefly for the record, what is the purpose of a
17  rating agency presentation?
18  A.   So it's a report that's presented to the rating agencies.
19  My understanding is they actually go meet with them in person
20  periodically.  And it is essentially a pitch about the
21  financial condition of the entity and why they should be rated
22  a certain way, as far as their ability to satisfy their ongoing
23  obligation to pay debt.
24  Q.   You mentioned rated.  Are you talking about bond ratings?
25  A.   Yes.

BLYTHE - DIRECT                                          Vol. 3-49

1    Q.   And what's the -- what interest would JEA have in
2    favorable bond ratings?  I know it's a basic question, but just
3    for purposes of the record.
4    A.   Well, it's the same as if you want to go buy a car.  Do
5    you want a high interest rate or a low interest rate?  So if
6    you have a good credit rating, you pay a lower cost for debt.
7    Q.   Let's look at page 2 of Exhibit 37.
8    A.   (Complies.)
9    Q.   It says on the left, "JEA is a superior electric utility."
10           And there are some things that -- the first three
11   bullet points, if you can just read those, that JEA is touting
12   to the rating agencies, and what are those?
13   A.   "Maintained excellent financial and operational metrics.
14           "Repaid $326 million of debt in fiscal year 2018, for
15   a total reduction of 1.9 billion since 2009, with a continued
16   commitment to aggressively accelerate deleveraging.
17           "Accelerated $100 million of debt reduction with
18   February 2019 defeasance and plan to drive debt to a 40-year
19   low.
20           "Continued to strategically plan to absorb the cost
21   of Plant Vogtle."
22   Q.   You can stop.
23           And let's go to the next page, page 3, where the
24   heading on the left is "JEA is a superior water and wastewater
25   utility."

BLYTHE - DIRECT                                          Vol. 3-50

1            And just a couple of those top points in the first
2    three bullets, what do those say?
3    A.   "All financial metrics are a fortress:  strong balance
4    sheet, ample liquidity, superior debt service coverage.
5            "Debt service coverage expected to be 3.5 times to 4
6    times over the next five years."
7            Do you want me to read the next one?
8    Q.   Yes, just the next one.
9    A.   "Paid down $74 million in debt in FY 2018, for a total
10   reduction of 532 million since 2011, projected to total $827
11   over the next five years."
12   Q.   Let's go to page 15 of Exhibit 37.
13   A.   (Complies.)
14   Q.   This is the energy system key financial metrics.  And
15   there's a comparison of what we, meaning JEA, said in December
16   of '17 and what we did in 2018.
17           And without getting into too many specifics -- I know
18   it's listed -- is this sort of touting that JEA did what it
19   said, in essence, and sometimes even better than what it said?
20   A.   Yes.
21   Q.   And that's with respect to the energy system?
22   A.   Yes.
23   Q.   And let's look at page 18 of Exhibit 37.
24   A.   (Complies.)
25   Q.   This is a slide about energy system unit sales and rates.

BLYTHE - DIRECT                                    Vol. 3-51

1          And just generally, what is this showing, including
2    in 2018 and forecasts out to 2023?
3    A.   Stable overall rates and bills.
4    Q.   Let's go to page 20 on Exhibit 37.
5    A.   (Complies.)
6    Q.   This is key water -- or, "Water and wastewater system key
7    financial metrics, what we said in December of 2017 and what we
8    did fiscal year 2018."
9          And similar to the prior slide about the energy
10   business, is this touting that, in essence, JEA did what it
11   said it was going to do, and in many cases better?
12   A.   Correct.
13   Q.   And let's look at page 23 with respect to water and sewer
14   system unit sales and rates.
15          And what is that showing with respect to water and
16   wastewater?
17   A.   Stable rates.
18   Q.   And sales as well?
19   A.   Yes.
20   Q.   In fact, a -- kind of a projected increase of 1.5 percent
21   going forward from 2018 to 2023?
22   A.   Yes, a slight increase.
23   Q.   And page 56, this is a slide about electrification
24   programs.
25          And if we go to page 57 of Exhibit 37, what does it

BLYTHE - DIRECT                                    Vol. 3-52

1    say there on the left about increasing or decreasing revenue
2    and values from these programs?  What is this generally getting
3    at, this slide?
4    A.   That there's opportunities to increase the scale and scope
5    of both on-road and non-road program.  By adding additional
6    technologies, program design elements, and budget, they might
7    be able to increase the amount of revenue generated from this
8    electrification program.
9    Q.   Let's go to page 90 of Exhibit 37.
10   A.   (Complies.)
11   Q.   And what is JEA asking for, in terms of a rating in the
12   energy system, in the water and wastewater system?
13          And based on your understanding of the credit
14   ratings, what does that mean?
15   A.   JEA is asking for a AA credit rating for the energy system
16   and a AAA credit rating for the water and wastewater system.
17          And they list some of the key bullets about why they
18   feel JEA merits that rating.  And those are both very good
19   ratings, water being as good as it gets, I think, and AA still
20   being very good.
21   Q.   Just from an overall takeaway, having had the opportunity
22   to compare the strategic planning in 2019 to rating agency
23   presentations in 2018 and 2019 and also presentations that
24   we'll get to in terms of the integrated resource plans and
25   ten-year site plans -- when you look at the rating agency

BLYTHE - DIRECT                                    Vol. 3-53

1   presentation in 2018, what takeaways did you have about the
2   strength of JEA going forward?
3   A.   Looks pretty good, that they're able to continue paying
4   down debt, finance capital expenditures without new debt,
5   stable rates.
6   Q.   Is there any presentation in 2018 about death spiral or
7   doom and gloom?  I know those are somewhat terms of art, but
8   anything of that nature in the rating agency presentation in
9   2018?
10  A.   No, not in this presentation.
11  Q.   Let's go to Exhibit 59.  This is the grand jury subpoena
12  to Standard & Poor's, or S&P Global.
13            And is this issued on April 21st of 2020?
14  A.   It was.
15  Q.   And are there six itemized requests?
16  A.   Yes.
17  Q.   Okay.
18            MR. DUVA:  If we can show those on page 3.
19  BY MR. DUVA:
20  Q.   Those are in the exhibit and are shown.
21            Ultimately does this lead to a production from S&P?
22  A.   Correct.
23  Q.   And then based on that and other email communications
24  involving Ryan Wannemacher, did you identify Jeff Panger?
25  A.   Yes.

BLYTHE - DIRECT                                    Vol. 3-54

1   Q.   Who is Jeff Panger?
2   A.   Jeff Panger is a longtime analyst.  He's been working
3   there since -- I think it was 2004.  And so he had a lot of
4   experience in the utility industry, as far as analyzing
5   companies for bond ratings in that industry.
6   Q.   And describe, briefly, his history of doing the same for
7   JEA.
8   A.   Sure.  So he's familiar with JEA, reviewed their rating
9   agency presentations.
10            And they go beyond just the presentation that's given
11  to them.  They keep up with news and EMMA filings.  And they
12  keep up with -- they even keep up with what's going on with
13  their boards, turnover with senior management.  And, you know,
14  they'll even take it upon themselves to ask questions to senior
15  management.
16  Q.   You mentioned an EMMA filing.  Is that E-M-M-A?
17  A.   Yes.
18  Q.   And I'm not asking you to produce the acronym.  But just
19  for a general description, what is an EMMA filing?
20  A.   EMMA is the Electronic Municipal Market Access.
21  Q.   What is that?
22  A.   My understanding is it's where bondholders -- or the
23  entity who holds -- has that debt, if there's a material event,
24  they report that there.
25  Q.   Did you interview Mr. Panger on December 17th of 2020?

BLYTHE - DIRECT                                     Vol. 3-55

```
 1   A.   Yes.
 2   Q.   And Mr. Panger, did he talk about JEA's financial
 3   condition based on his analysis and familiarity with JEA in
 4   2018 and 2019?
 5   A.   Yes, he did.
 6   Q.   What did he say about that?
 7   A.   He said, quote, "It was very, very quite good."
 8        "Quite strong," sorry.  "Very, very quite strong."
 9   Q.   And did you continue to interview him and elaborate on
10   what he meant by "very, very quite strong"?
11   A.   Yes, I did.
12   Q.   And did you have an opportunity to review some emails
13   between Mr. Panger and Mr. Wannemacher and other JEA employees
14   about his viewpoint of projections given during the strategic
15   planning exercise in 2019?
16   A.   Yes, I did.  He sent -- because I had come across an email
17   he sent to Mr. Wannemacher, I believe it was, or -- I don't
18   have the email in front of me, but it was calling into question
19   a number of components of that presentation.
20   Q.   Let's go to 40A.  We're going to look at three emails, and
21   specifically page 3 of 40A.
22        Is this an email from Joe Orfano to Mr. Panger on
23   August 2nd, 2019?
24   A.   Yes.
25   Q.   And just read that into the record.  It's brief.
```

BLYTHE - DIRECT                                     Vol. 3-56

```
 1   A.   Mr. Orfano wrote, "Jeff/David:  Per our discussion on
 2   Wednesday, attached is the voluntary EMMA filing posted this
 3   afternoon.  The ITN can be found at the following link."
 4   Q.   And is there a link set forth in the email?
 5   A.   There is.
 6   Q.   And on August 5th of 2019, did a David Bodek from S&P
 7   Global reply to Mr. Orfano and copy Mr. Wannemacher and also
 8   Mr. Panger?
 9   A.   Yes, he did.
10   Q.   What does that say?
11   A.   "Joe, please send the PowerPoint slides that are featured
12   in the video of the May 28th board meeting.  Our particular
13   interest is in those slides that relate to the board's decision
14   to explore the sale of the utility.  David."
15   Q.   Then on page 1 of 40A, on August 5th of 2019, at 8:43
16   p.m., did Mr. Wannemacher send what appears to be a reply
17   email?
18   A.   Yes.
19        MR. DUVA:  And if we can highlight the first two
20   paragraphs of that.
21        Actually, that's fine.  That's big enough, the whole
22   thing.
23   BY MR. DUVA:
24   Q.   Just specifically read in the first two paragraphs.
25   A.   "David" -- Mr. Wannemacher wrote, "David, we have been
```

BLYTHE - DIRECT                                    Vol. 3-57

1  undertaking a scenario-based approach to strategic planning,
2  which is evaluating multiple scenarios in order envision the
3  resulting future state.  We can pull together a complete set of
4  the work that has been done to date.
5          "The board made the decision to evaluate a
6  recapitalization based on the materials presented at the July
7  23rd board meeting.  That was the first time that the board
8  discussed the possibility of a recapitalization.
9          "I think it would make sense for us to come to New
10 York and sit down in person sometime over this" -- "over the
11 several weeks so that we can give you complete context for our
12 scenario planning process, as well as an update on our current
13 financial strength and outlook through 2023."
14 Q.   Okay.  And the rest of the email -- it's there for the
15 Court's consideration.
16         What, then, did Mr. Zahn send on August 5th of 2019
17 at 10:34 p.m.?
18 A.   Mr. Zahn wrote, "What's going on here?  Please note the
19 board didn't authorize the sale of JEA but an exploration of
20 all viable future states.  One constraint of government is our
21 inability to use anything other than a 'formal procurement
22 process' to explore these alternatives.  In normal course we
23 would have informal conversations to complete strategic
24 planning, but sunshine law and other constraints
25 prohibit/inhibit our ability to have such natural dialogues.

BLYTHE - DIRECT                                    Vol. 3-58

1          "It is entirely possible JEA remains a government
2  entity, implements traditional utility response, and
3  accelerates debt amortization to address changing market
4  dynamics."
5  Q.   In the interview with Mr. Panger, before we get to --
6  actually, let's illustrate 40B.
7          What is 40B?
8  A.   40B is a ratings bulletin dated August 23rd, 2019.
9  Q.   What are ratings bulletins?
10 A.   It's -- my understanding is it's a -- it's not their
11 formal rating, but it's a -- sort of an intermediate,
12 in-between document, where if there's a material event,
13 something they feel like they need to comment on, they will
14 issue a bulletin like this.
15 A.   So this bulletin was issued August 23rd, 2019.
16         And did you have an opportunity to discuss with
17 Mr. Panger why in terms of the predictions as to solar and
18 battery adoption that were set forth during strategic planning
19 to the JEA board?
20 A.   Yes.
21 Q.   And what did Mr. Panger say?  Was he buying it?
22 A.   No, not at all.
23 Q.   And ultimately, is that what led to this -- this bulletin
24 being released?
25 A.   Yes.  He basically said that -- he quotes and summarizes

BLYTHE - DIRECT                                          Vol. 3-59

1   some of the presentation and essentially says that S&P is --
2   disagrees with it, thinks it's a departure from the reality in
3   the marketplace, and that they're completely disregarding it
4   for purposes of their rating decisions.
5   Q.   And let's look at a couple paragraphs of this.  Let's look
6   at paragraph 1, and that's highlighted.
7        Can you read that into the record, and then we'll go
8   to paragraph 3.
9   A.   "S&P Global ratings today said its ratings on JEA,
10  Florida's electric and water and sewer utilities, are
11  unaffected by the decision of management and the board to
12  solicit proposals for the sale or restructuring of the
13  utilities.
14       "JEA finances the electric system separately from its
15  water and sewer utilities.  We based our conclusion on the two
16  utility systems' robust financial metrics, ability to finance
17  the next five years' capital needs without additional debt or
18  rate increases, and a plan to reduce debt balances."
19  Q.   Let's go to paragraph 3, which is after 2.  And it's
20  talking about the May 2019 board meeting.
21       Can you read paragraph 3 into the record?
22  A.   "In its May board presentation, management said that
23  perpetuating the utilities in their current form could 'cripple
24  JEA's ability to evolve and remain relevant' and that
25  business-as-usual 'traditional responses' will lead to

BLYTHE - DIRECT                                          Vol. 3-60

1   'organized decline.'
2        "We consider this assessment to be a departure from
3   the two utility systems' historical and projected financial
4   profiles and other public power and water and sewer utilities'
5   responses to similar challenges.  However, we do not see this
6   assessment as presenting an imminent challenge to our ratings."
7   Q.   You can stop there.
8        Let's go to the last line on page 1, about the
9   negative outlook assigned to the electric utility's "A+"
10  rating.  What does that say?
11  A.   "The negative outlook we assigned to the electrical
12  utility's 'A+' rating continues to reflect its exposure to the
13  cost overruns and delays relating to the Vogtle nuclear
14  construction project."
15  Q.   And let's go to the second page, the last line beginning
16  with "we assigned."
17  A.   "We assigned a stable outlook to JEA's AAA-rated water and
18  sewer system bonds based on our conclusion there is limited
19  risk of contagion of the electric system's Vogtel-related
20  disputes for the water and sewer utilities."
21  Q.   So, in sum, in this bulletin, what is Mr. Panger and S&P
22  saying about the strategic planning provided to the JEA board?
23  A.   It's -- they disagree with it.  It's a departure from what
24  they're seeing in the market, and it -- they're disregarding
25  it.

BLYTHE - DIRECT                                    Vol. 3-61

1   Q.   Let's go to 40C.  We're just going to note this for the
2   record and not cover it.
3        But is 40C a rating agency update for 2019?
4   A.   Yes.
5   Q.   Okay.  Let's go to 40D, which is an email communication,
6   on the first page, from Mr. Panger dated October 11, 2019, to
7   Mr. Wannemacher and Joe Orfano.
8        Did you have an opportunity to cover this email with
9   Mr. Panger during the interview?
10  A.   I did.
11  Q.   And did you receive this email from both S&P and JEA
12  pursuant to the productions?
13  A.   I did.
14  Q.   So after it says, "Gentlemen" -- and it's kind of cut off
15  the numbered paragraphs.  But what is it saying in paragraph 1
16  as to the McKinsey study suggesting a 35 percent decline in
17  sales related to energy efficiency and an 8 percent decline
18  related to distributed generation by 2030?
19       What is Mr. Panger writing and what is -- what did he
20  say in the interview about those predictions?
21  A.   Sure.  He said that he -- his understanding was that the
22  McKinsey study was the impetus for conducting the baseline
23  scenario 1 and traditional scenario 2 response, and that the
24  results of those two scenarios prompted the decision to explore
25  a non-traditional scenario 3 response -- responses.

BLYTHE - DIRECT                                    Vol. 3-62

1   Q.   And let's go to the -- it's in the middle --
2   A.   Yeah.
3   Q.   -- beginning with "insofar."  It's five lines down.  It's
4   in the same paragraphs -- or it's paragraph 1, and it's just
5   about five lines down.
6   A.   He wrote, "Insofar as I can find, no other utility's
7   suggesting this level of decline in sales related to energy
8   efficiency, and no other utility except perhaps outside of the
9   Southwest and certainly not in Florida with this level of
10  DG" -- or distributed generation -- "penetration, this seems
11  extraordinarily high.
12       "What is the basis for the McKinsey estimates?  And
13  why is this more acceptable than what the rest of the utility
14  industry is viewing?"
15  Q.   And in the next paragraph, Mr. Panger, is he asking about
16  the language that we talked about yesterday, the "may likely
17  increase" in one of the slides presented to the JEA board?
18  A.   Yes.
19  Q.   And what is Mr. Panger getting at in the fourth paragraph,
20  beginning with, "If JEA's expecting an 8 percent decline in
21  sales"?
22  A.   He said, "Why" -- "if you're expecting that 8 percent
23  decline in sales, why would you need to convert the Greenland
24  units from simple cycle to combined cycle?" and why that's not
25  in the current forecast.

BLYTHE - DIRECT                                    Vol. 3-63

1           Is that what you're talking about or no?
2    Q.   Yes, that paragraph.  But I think you've answered the
3    question.
4           Let's go to the final paragraph of this email on the
5    next page.
6           And what does Mr. Panger write with respect to -- in
7    that final paragraph, beginning with, "It seems that the
8    McKinsey study"?
9    A.   Mr. Panger essentially said that it seems as though the
10   McKinsey study in scenario 1 and 2 were being held up as the
11   motivation for pursuing scenario 3, privatization.
12          And then he says that he's unclear whether they form
13   a sound basis for that -- that conclusion, whether scenarios 1
14   or 2 really form a sound basis for going to scenario 3.  And
15   he's asking for a better understanding, for them to help him
16   better understand this.
17   Q.   We'll move on to some communications with respect to Fitch
18   Rating agencies.  And are there email communications in
19   Exhibits 41A and 41B involving Joe Orfano and an individual
20   named Andrew DeStefano at Fitch for 41A and then some email
21   communications in 41B involving Mr. Orfano and Mr. Zahn and
22   Mr. Wannemacher?
23   A.   Yes.
24   Q.   Okay.  We're going to cover those with Mr. Orfano, so
25   we're going to move forward at this point to talking about

BLYTHE - DIRECT                                    Vol. 3-64

1    NextEra.
2           Do you have Exhibit 58 in front of you?
3    A.   Is that the subpoena?
4    Q.   I wanted to talk but I was away from the microphone.
5           Is this the grand jury subpoena to NextEra?
6    A.   It is.
7    Q.   And was this issued on April 21st of 2020?
8    A.   It was.
9    Q.   And the request -- are they itemized 12 in number,
10   beginning with page 3, over on to page 4?
11   A.   Yes.
12          MR. DUVA:  And then if you can illustrate requests 1
13   through 5.
14          Thank you, Ms. Stockholm.
15   BY MR. DUVA:
16   Q.   What types of information were you interested in from
17   NextEra?
18   A.   We wanted all records and communications with JEA
19   involving JEA's ITN and any formal or informal discussions
20   regarding privatization of JEA.
21          We wanted all documents relating to proposals, and
22   the proposals, themselves regarding the valuation of JEA's
23   utility businesses pursuant to the ITN.
24          We wanted all documents and records pertaining to
25   assessment of JEA's real market value.

BLYTHE - DIRECT                                    Vol. 3-65

1  Q.   And, in addition, were we looking for records with respect
2  to how NextEra came up with its revised reply, which is Exhibit
3  36A?
4  A.   Yes.
5  Q.   Okay.  And did ultimately --
6          MR. DUVA:  And we can show items 6 through 8.
7  BY MR. DUVA:
8  Q.   Ultimately, did NextEra participate in the ITN and provide
9  that revised reply, which is Exhibit 36A?
10 A.   Yes, they did.
11 Q.   And did NextEra provide a production pursuant to this
12 grand jury subpoena?
13 A.   They did.
14 Q.   And in that, did you identify communications both
15 internally and externally with JEA employees and determine to
16 interview an individual named Brian Chung, Mark Hickson, Pam
17 Rauch, and at a later name, Eric Silagy?
18 A.   That's correct.
19 Q.   Let's go to 34D, which is a summary of the revised
20 replies.
21          Now, this is actually a JPMorgan and Morgan Stanley
22 document, is it not?
23 A.   It is.
24 Q.   Okay.  And we're going to get back to some of the NextEra
25 documents.  But I want to --

BLYTHE - DIRECT                                    Vol. 3-66

1  A.   That was part of their job -- or their role, is they
2  summarized the revised replies that came in.
3  Q.   Let's go to 34D and page 5.
4  A.   (Complies.)
5  Q.   Now, is this -- this is the summary you were talking
6  about?
7  A.   Yes.
8  Q.   Okay.  And on the summary of revised replies, in the
9  combined space, what was NextEra's revised reply as of
10 December -- I'm sorry, November 26, 2019?
11 A.   11.05 billion.
12 Q.   Is that a gross purchase price for both the electric
13 system and the water system?
14 A.   Yes.  That blue section at the top is whole company bids.
15 Q.   And this is sort of a football field layout of who's
16 furthest down the field?
17 A.   Yes.  The values to the far right are the highest.
18 Q.   Items in blue, that's the whole company -- correct? -- in
19 terms of bids or revised replies?
20 A.   Yes, electric and water.
21 Q.   Okay.  And electric only is in the orange, and water only
22 is in the green?
23 A.   Correct.
24 Q.   And so if you took the highest electric only -- and I'm
25 going to ask you to do a little math here since you're a CPA --

BLYTHE - DIRECT                                        Vol. 3-67

1   and the highest water only, the highest electric only being
2   Emera at 5 billion 500 million and American Water at 4.350
3   billion, is that a total gross of $9.850 billion?
4   A.   Good job, Mr. Duva.
5   Q.   So is that far below the whole company revised reply of
6   NextEra of 11.05 billion?
7   A.   It is.
8   Q.   Now, obviously there's a lot of work to be done after
9   this, correct, in terms of a best and final offer?
10  A.   Yes.  And key to that is the -- the provisions of the
11  purchase and sale agreement and what the buyer would be asked
12  to take on, such as the items in the minimum table stakes and
13  how Vogtle was handled, etc.
14  Q.   And ultimately there was never a final purchase and sale
15  agreement, correct?
16  A.   No.
17  Q.   I guess that's a double negative.
18       You're saying, yes, that's correct?
19  A.   No, there was never a final purchase and sale agreement.
20  Q.   Have it your way, Agent Blythe.
21       Okay.  Let's go to Exhibit 36A.  Is this NextEra's
22  revised reply?
23  A.   It is.
24  Q.   Okay.  Let's go to the -- and it's dated November 26,
25  2019?

BLYTHE - DIRECT                                        Vol. 3-68

1   A.   Correct.
2   Q.   Let's go to page 3.
3   A.   (Complies.)
4   Q.   On page 3 is there a chart that shows the gross proceeds?
5        And, again, this is some arithmetic at that point,
6   but ultimately net proceeds to the City of Jacksonville at the
7   $11.05 billion price tag.
8   A.   Yes.
9   Q.   What are expected net proceeds, at least according to this
10  document, to the City of Jacksonville?
11  A.   $6.452 billion
12  Q.   Let's go to page 9 of 36A.
13  A.   (Complies.)
14  Q.   On page 9 is there a discussion of how this revised reply
15  would satisfy the minimum requirements in paragraph IV there?
16  A.   Yes.
17  Q.   And then there's bullet points underneath that assess each
18  of the minimum requirements?
19  A.   Correct.
20  Q.   Ultimately did we interview Mark Hickson?
21  A.   We did.
22  Q.   And was that on June 30th of 2021?
23  A.   It was.
24       MR. DUVA:  For the record, Mr. Hickson's 302 is
25  Exhibit 65.

1    BY MR. DUVA:
2    Q.   Is Mr. Hickson the executive vice president of corporate
3    development?
4    A.   Yes.
5    Q.   And did you have an opportunity to review emails provided
6    by NextEra and also JEA pursuant to the grand jury subpoena
7    before interviewing Mr. Hickson?
8    A.   I did.
9    Q.   And is part of Mr. Hickson's job advising on acquisitions
10   both inside and outside of Florida?
11   A.   Yes.  And he owned the bid, as it were, for JEA.
12   Q.   And ultimately was it his job to provide options to
13   Mr. Silagy and Mr. Robo?
14   A.   Yes.
15   Q.   Now, what generally did you learn during the interview
16   from Mr. Hickson as to a rooftop solar analysis by JEA and
17   generally what NextEra saw as an opportunity -- I know it's
18   kind of a twofold question -- in terms of purchasing JEA?
19   A.   So, first, regarding rooftop solar, they advised that, you
20   know, the penetration level overall in the state of Florida was
21   relatively low, but they -- it's something that they keep a
22   close eye on.
23            And he also said that based on their cost model,
24   essentially they have economies of scale and are able to
25   provide power at a much lower cost for a megawatt hour as

1    compared to their competitors.  So they essentially
2    incentivized their customers not to do rooftop solar based on
3    their business model.
4            And related to JEA, they viewed it as a valuable
5    acquisition target.  And they viewed it from the perspective of
6    they could come in and yield profits by cutting costs and
7    continuing to operate JEA in a more efficient manner.
8    Q.   As to rooftop solar, did Mr. Hickson say that NextEra and
9    its service territory had seen less than 1 percent rooftop
10   solar adoption in Florida?
11   A.   Yes.
12   Q.   In terms of -- there was discussion internally based on
13   emails at -- with NextEra officials about a $10.25 billion
14   price tag.
15            And did you interview Mr. Hickson about that?
16   A.   Yes.  He said that that was what they determined their
17   competitors -- that was the maximum they thought their
18   competitors would be able to bid without putting themselves in
19   harm's way from a ratings agency debt perspective.
20   Q.   So was that number then presented to Mr. Silagy and
21   Mr. Robo as what you just said, "This is what the competitors
22   can do at the high end if they're acting rationally"?
23   A.   Yes.  Those are the words he used.
24   Q.   So generally, how was the $11.05 billion number decided
25   upon internally?

BLYTHE - DIRECT                                          Vol. 3-71

1   A.   You know, there are some email communications there where
2   it was discussed that, you know, there were members of
3   management at Florida Power & Light and NextEra that wanted to
4   go higher than the most that their competitors could afford, so
5   they went.
6   Q.   And ultimately, in terms of -- did you have discussions
7   with Mr. Hickson about fluctuations in terms of a best and
8   final offer after the $11.05 billion revised reply and how that
9   could fluctuate up or down?
10  A.   Yes, we did.
11  Q.   What did he say?
12  A.   He said that based on a number of factors, that number
13  could have gone up or down in the hundreds of millions of
14  dollars.
15  Q.   Did he say that in no event that that would change by a
16  billion dollars higher or a billion dollars lower?
17  A.   Correct.  He essentially said all they needed was a draft
18  purchase and sale agreement and some clarity around the
19  different positions, the table stakes, how things like employee
20  compensation protections would look, what actual form those
21  tenets would take.
22  Q.   Did Mr. Hickson talk about the truncated time frames that
23  JEA wanted, in terms of revised reply to a best and final offer
24  and purchase and sale agreement?
25  A.   Yes, he did.

BLYTHE - DIRECT                                          Vol. 3-72

1   Q.   And what did he say in terms of the ability for NextEra to
2   pull that off?
3   A.   He said that was fine.  Essentially they could meet that
4   deadline.  They just needed the draft purchase and sale
5   agreement and to iron out those -- those table stake issues.
6   Q.   I'm going to move forward to some other projection
7   analyses that we've mentioned in terms of different plans and
8   just kind of note for the record Exhibit 38.
9        Is this an integrated resource plan or a draft plan
10  as of March 21st of 2019?
11  A.   Yes.
12  Q.   And what is the integrated resource plan?  We're not going
13  to spend too much time on this.
14       MR. DUVA:  And I want to show page 12 of this
15  document.
16       THE WITNESS:  This is Exhibit 38?
17  BY MR. DUVA:
18  Q.   Yes.  38, page 12.
19  A.   It's essentially a planning document and a projection
20  looking forward.  It's a long-term planning document.  It's
21  something that -- it's not done or issued every year.  In fact,
22  I think they're still working on the next one.
23  Q.   And what is this aimed at?  Does this discuss how
24  energy -- and there's an integrated water resource plan that's
25  separate, correct?

BLYTHE - DIRECT                                        Vol. 3-73

1   A.    Yes.
2   Q.    And for this integrated resource plan, looking at page 12,
3   does this document talk about just different financial models
4   and also how JEA's going to deliver energy to its customers
5   over a period of time?
6   A.    Yes.
7   Q.    And what -- what is page 12 generally assessing?  I know
8   there's a lot and there's different areas, in terms of -- it's
9   listed as metric, baseline, load erosion, increased
10  electrification, and green economy.
11        Is this taking into account different variables about
12  what could happen under those different scenarios and annual --
13  average annual growth rates?
14  A.    Yes.  Like I said, it's the scenario matrix, and it's, you
15  know, trying to play out some of the challenges to the
16  business.  It has a baseline column, load erosion, increased
17  electrification, green economy, different challenges, and sort
18  of a different level of challenge from those and how it would
19  play out.
20  Q.    And were you able to obtain the integrated resource plans
21  from JEA during the investigation and from an entity named
22  Infront Consulting on page 1?
23  A.    Yes.
24  Q.    39A through E -- just for the record, 39A is the ten-year
25  site plan for 2018.  39B is the ten-year site plan for 2019.

BLYTHE - DIRECT                                        Vol. 3-74

1   39C is that for 2020.  39D is a revised ten-year site plan for
2   2021.  And 39E is a ten-year site plan for 2022.
3         Using 39B as an example, the April 2019 ten-year site
4   plan, what is the ten-year site plan?
5   A.    The ten-year site plan is something that's updated every
6   year, presented to the Public Service Commission.
7         And, you know, based on interviews and basic
8   understanding is that it's a planning document and to ensure --
9   it's a public regulation requirement that they prove to the
10  Public Service Commission that they're able to handle customer
11  demand with a buffer of 15 percent.  And it -- as part of that,
12  there's a sales projection, electric and water --
13  Q.    Let's look at that --
14  A.    -- or at least electric in this case.
15  Q.    -- for the electric system, for -- on page 27 of 39B.
16        And looking at 2019 to 2028, are these sale
17  projections and average kilowatt hour use and also gigawatt
18  hour sales for both rural and residential on the left,
19  commercial in the center, and industrial on the right?
20  A.    Yes.
21  Q.    And if you look, just by way of example, at rural and
22  residential from 2019 to 2028, is there an actual -- while it's
23  modest, a slight increase in sales during that period of time
24  in the ten-year site plan?
25  A.    Yes.

BLYTHE - DIRECT                                    Vol. 3-75

1  Q.   Moving over, just by way of example, to 39E, the April
2  2022 ten-year site plan, is there a similar chart on page 26?
3  A.   We moved on to 39B, correct?
4  Q.   Yeah -- 39E, as in elephant.  We noted some for the
5  record, but we're going to try to move off of this pretty
6  quickly.
7  A.   39E, page 26?
8  Q.   (Nods head up and down.)
9  A.   Okay.
10 Q.   And is this a similar chart for forecast of electric power
11 and energy consumption in the 2022 JEA site plan?
12 A.   Yes.
13 Q.   So this is three years after the strategic planning, and
14 this is a planning document from 2022; is that correct?
15 A.   Yes.
16 Q.   And same columns, rural and residential.
17       MR. DUVA:  If we can get the bottom of the page and
18 grab 2019 -- or 2022 to 2031.
19 BY MR. DUVA:
20 Q.   It has columns for rural and residential, commercial, and
21 industrial?
22 A.   Yes, sir.
23 Q.   And is this tracking anticipated gigawatt hour sales as
24 well?
25 A.   It does.

BLYTHE - DIRECT                                    Vol. 3-76

1  Q.   And using rural and residential as an example, did there
2  appear to be projected increases in sales during that period of
3  time?
4  A.   Yes.
5  Q.   And that's as the average kilowatt hours goes down, the
6  average number of customers actually goes up.  And I'm talking
7  about rural and residential.
8  A.   Yes.
9  Q.   Okay.  Let's go to Exhibit 42.  I just want to note that
10 for the record.  We're going to cover this with Kyle Billy.
11       What is Exhibit 42?
12 A.   It's a memorandum from the Office of General Counsel to
13 Council Member Randy DeFoor.
14 Q.   Is it dated January 23, 2020?
15 A.   It is.
16 Q.   And what is this -- what is this aimed at?  What is this
17 assessing?
18 A.   It's related to the future of JEA workshop and discussing
19 JEA's financial condition.
20 Q.   And is it, in essence, giving an assessment of projections
21 of decrease in sales and analysis of base and fuel rates, and
22 also employee counts that are set forth therein?
23 A.   Yes.
24       MR. DUVA:  If we can go to the bottom there and grab
25 those three.

BLYTHE - DIRECT                                          Vol. 3-77

1  BY MR. DUVA:

2  Q.   And I'm just kind of noting this as a placeholder.  We'll

3  cover that more with Mr. Billy.

4        I want to move on to 44A and 44B.

5        Now, just for purposes of the elements of Count One,

6  are 44A and 44B an assessment of federal funds that JEA

7  received in 2019 and 2020?

8  A.   Correct.

9  Q.   And did you obtain these pursuant to a request to JEA?

10 A.   I did.

11 Q.   Okay.  Last exhibit, Agent Blythe, is 20A5.

12       What is 20A5?

13 A.   20A5 is Computer Scientist Tim McCrohan's technical

14 analysis report related to documents that Agent Hill and I

15 asked him to review for metadata.

16 Q.   And on the agency label, there's a reference in that chart

17 to 1A30.

18       Do you see that?

19 A.   Yes.

20 Q.   Okay.  Let's go over to page 3.

21 A.   (Complies.)

22 Q.   And this is entitled Performance Unit Scratch Sheet 1A30.

23       Is this the Performance Unit Scratch Sheet version

24 that is Exhibit 20A1?

25       If you want to look at 20A1 in the binder.

BLYTHE - DIRECT                                          Vol. 3-78

1  A.   Yeah, it's right here.

2        Yes, I believe so.

3  Q.   All right.  And what -- based on your communications with

4  Mr. McCrohan, what was his analysis in terms of the metadata on

5  that document?

6  A.   That it was -- the author is -- just has the first name

7  Ryan, and the last modified -- or the created date is March

8  18th, 2019.

9  Q.   Let's go to page 9 of that exhibit.

10 A.   (Complies.)

11 Q.   And this is noted at the top, the notes.xlsx file?

12 A.   So I just want to correct one thing, because I think the

13 version that is the same as 21A1 is actually page 5.  I could

14 be -- could be wrong, but I remember there were multiple

15 versions of that spreadsheet.  The version that says -- has the

16 002 in it is the one that has the infusion of $4 billion to the

17 net book value.

18       It has the same metadata, essentially, as Ryan as the

19 author and the created date is March 18th, 2019, at the same

20 time.

21 Q.   Going back to page 3, did you have a conversation with

22 Jeff Rodda about the last modified being a Tori Simmons on May

23 20th of 2020 and who Tori Simmons is?

24 A.   Yes.  I think Tori Simmons is a lawyer at one of the firms

25 that was looking at this stuff, if I'm not mistaken.

BLYTHE - DIRECT                                    Vol. 3-79

1   Q.   Not a JEA employee?

2   A.   No.

3   Q.   Go to the -- page 9, the notes.xlsx file.

4            Is the notes.xls document what was shown in Exhibit

5   20L1?

6            MR. DUVA:  And if we could just show 20L1.  I'm

7   sorry, Ms. Stockholm.

8            THE COURT:  And, Mr. Duva, this is the information

9   obtained from the -- from a desktop?

10           MR. DUVA:  Yes, Your Honor.  It's displayed.  This

11  was obtained -- well, Agent Blythe testified, but this was

12  obtained pursuant to grand jury subpoena.  And the file path is

13  shown on these metadata reports, specifically for the notes.xls

14  file on page 9 of 20A5.

15           THE COURT:  Okay.

16  BY MR. DUVA:

17  Q.   So is that 20L1 that's displayed, Agent Blythe?

18  A.   It is.

19  Q.   And that's the notes.xlsx file?

20  A.   Yes.

21  Q.   And is the metadata analysis on page 9 of 20A5?

22  A.   Yes.

23  Q.   And what does it show in terms of date created and date

24  last modified and who did that?

25  A.   Date created is July 11th, 2019, at 3:55 p.m.  Last

BLYTHE - DIRECT                                    Vol. 3-80

1   modified is seven days later, July 18th, 2019, at 4:04 p.m.

2   Q.   And what was FBI Computer Scientist -- I'm sorry, and the

3   creator is who?

4   A.   Ryan.

5   Q.   And what was Computer Scientist McCrohan reviewing when he

6   did this metadata analysis?

7   A.   Ryan Wannemacher's hard drive from his device.

8   Q.   And was there also -- okay.

9   A.   Does that answer your question?

10  Q.   Yeah.  I was just going to ask an additional question

11  about the file path location.  But would your answer be the

12  same when you looked at the file path location?

13  A.   Right.  The end of the file path is

14  Ryan/Desktop/Freebird/notes.xls, the file name.

15  Q.   Did we obtain Mr. Wannemacher's hard drive from JEA

16  pursuant to the grand jury subpoena?

17  A.   Yes.

18           MR. DUVA:  Your Honor, may I have a moment?

19           THE COURT:  Yes, sir.

20           MR. DUVA:  Your Honor, I can't believe I'm saying

21  this, but no further questions for --

22           THE COURT:  Is that right?

23           MR. DUVA:  -- Agent Blythe.

24           THE COURT:  That was quite thorough, Mr. Duva.  Quite

25  thorough.

BLYTHE - DIRECT                                              Vol. 3-81

1              Counsel?

2              MR. SUAREZ:  Yes, Your Honor, I have a couple of

3     questions, so a little bit of directions from the Court.

4              I suspect, Your Honor, in my cross-examination of

5     Agent Blythe, there's going to come a time where I'm going to

6     be likely to reference some grand jury testimony.  And I

7     assumed that at that moment you would prefer that I alert the

8     Court and so that the courtroom can be cleared.

9              This would not involve *Garrity* material, just grand

10    jury materials that are under seal.

11             THE COURT:  Yes.

12             MR. DUVA:  Your Honor, I would just kind of point

13    out, before the Court rules, that this happens all the time in

14    trials.  You know, I mean, agents are cross-examined, "You

15    testified in the grand jury about," this or that.

16             So I view this as kind of of that ilk.  I don't have

17    any problem with it.

18             And obviously I know the *Garrity* analysis is

19    different and the Court has ruled, but we see impeachment in

20    trials of agents with the grand jury testimony, and I don't

21    think that's a problem.

22             MR. SUAREZ:  I hate to interrupt you.  We don't have

23    to argue about it.  I was doing it because you filed it under

24    seal.  If the Court is okay with me doing it in public, then I

25    have no problem with it.

BLYTHE - DIRECT                                              Vol. 3-82

1              THE COURT:  You have no objection, Mr. Duva?

2              MR. DUVA:  No, Your Honor.

3              THE COURT:  Okay.  All right.

4              MR. SUAREZ:  And, then, Your Honor, I -- with the

5     *Garrity* material, then, I will --

6              THE COURT:  Let the Court know and we'll take the

7     precautions to clear the courtroom, consistent with the order.

8              MR. SUAREZ:  Yes, Your Honor.  And my only other

9     request is -- oh, I'm sorry.  Yeah.

10             My only other request, Your Honor, would be if we

11    could take a recess.

12             THE COURT:  Yes.

13             MR. SUAREZ:  I'd like to organize.

14             THE COURT:  Of course.

15             MR. SUAREZ:  And also Mr. Felman and I had hoped to

16    huddle for a little bit in the hopes that we could synergize

17    and not duplicate a lot of questions.  I think we're trying

18    to --

19             THE COURT:  I think that's a good idea.  That's a

20    good idea.

21             The Court -- how much time do you need,

22    approximately?

23             Just let me know when you're ready.  I'll take a

24    recess.

25             MR. SUAREZ:  Okay.  Great.  Thank you, Judge.

BLYTHE - DIRECT                                    Vol. 3-83

1          SPEAKER:  Thank you, Your Honor.

2          COURT SECURITY OFFICER:  All rise.

3          (Recess from 3:34 p.m. until 3:55 p.m.; all parties

4     present.)

5          COURT SECURITY OFFICER:  All rise.  This Honorable

6     Court is now in session.

7          Please be seated.

8          MR. CORSMEIER:  Your Honor, before Mr. Suarez begins,

9     I just want to address the issue of when he gets to the point

10    where he might be asking about Special Agent Blythe's knowledge

11    of the *Garrity* statements.

12         THE COURT:  Right.

13         MR. CORSMEIER:  It's the Government's view that

14    unless defense counsel is going to quote *Garrity* statements or

15    ask about the substance of them, reveal the substance in their

16    questions, that Government counsel does not need to leave the

17    courtroom.

18         And also, secondly, that they shouldn't be doing that

19    with Special Agent Blythe, because his testimony is he was not

20    aware of them, didn't see them, didn't review news articles

21    about them.

22         If they introduce the substance of them and quote

23    them, that introduces the exact taint that they're saying needs

24    to be kept out of this case.  And so when it gets to trial --

25         THE COURT:  Are we getting feedback?

BLYTHE - DIRECT                                    Vol. 3-84

1          COURTROOM DEPUTY:  We are, and I've reached out

2     to IT.

3          THE COURT:  Okay.  Sorry.  Go ahead.

4          MR. CORSMEIER:  When it gets to trial, I guess the

5     argument may be made that he's now tainted because he's heard

6     these statements or heard the substance of them.

7          So I just wanted to make the Government's position

8     clear at this point so that when we get to that point the Court

9     knows what that is.

10         THE COURT:  Mr. Suarez?

11         MR. SUAREZ:  Your Honor, so I have a couple of -- I

12    may need to do that again.

13         Your Honor, I have a couple of responses.  The first

14    is, I have carefully crafted my questions in order to avoid

15    revealing the substance of any *Garrity* statements.

16         THE COURT:  Okay.

17         MR. SUAREZ:  I do generally talk about the subject

18    matter that was discussed in the *Garrity*-protected statement.

19    I don't know what Agent Blythe's responses are going to be to

20    my questions.  I don't know whether there are things --

21         THE COURT:  Well, it's my understanding, Agent

22    Blythe, you've never read -- are not familiar with any of the

23    *Garrity* statements, correct?

24         THE WITNESS:  No, sir.

25         THE COURT:  All right.  Go ahead, Counsel.

BLYTHE - DIRECT                                    Vol. 3-85

1          MR. SUAREZ:  No, but he interviewed a number of
2   witnesses who did, were exposed to it, and who may have
3   provided him with information that would have come from that,
4   and we don't know that.
5          THE COURT:  Right.
6          MR. SUAREZ:  So I -- I have tried not to reveal it,
7   although I think -- and I would defer to Mr. Albritton if the
8   Court would like to hear argument on this, because he's done a
9   far more in-depth study of the case law -- that we are, in
10  fact, permitted to question him about the specific -- not just
11  the subject matter, but the specific statements themselves in
12  this -- in a *Kastigar* hearing.
13         And in an abundance of caution, I have crafted my
14  questions to try and avoid that.  So my intent would be to
15  simply alert the Court that I am going to inquire generally
16  about the subject matter, that I don't intend to reveal the
17  statements.  But I at least want to --
18         THE COURT:  But the whole idea, though, if he's
19  exposed to the statements, the *Kastigar* -- I mean, the *Garrity*
20  statements, would he not be precluded from participating in the
21  trial?
22         MR. SUAREZ:  He may be, Judge.  And I would defer to
23  Mr. Albritton on the -- in terms of what the law holds with
24  regards to what we do in --
25         THE COURT:  I mean, that's the whole idea, in order

BLYTHE - DIRECT                                    Vol. 3-86

1   to eliminate the possibility of taint --
2          MR. SUAREZ:  Yeah.
3          THE COURT:  -- at this hearing.  That's why we have a
4   cross team as well, and we were going to clear the courtroom
5   when they are questioning specifics with regard to the
6   statements, so ...
7          MR. SUAREZ:  Judge, I assure you that I am not going
8   to reveal the contents of the statements in my question.  But
9   if he discovers as a result that he has heard something that
10  taints him, I don't know that.  We just don't know what we
11  don't know.
12         THE COURT:  Well, yeah.  I mean, you can ask him
13  questions about, you know, his interviews, who he talked to,
14  but obviously don't get into specifics of the statements.
15         MR. SUAREZ:  Okay.  I won't.
16         Would you nevertheless like me to just alert you when
17  I'm going to hit that subject matter?
18         THE COURT:  Is the prosecutor -- Counsel, are you in
19  accord with that?
20         MR. CORSMEIER:  Yes, Your Honor.  I mean, I would
21  maintain the same argument, that he shouldn't be asked about
22  the statements or the substance of them.
23         When it comes to witnesses who say, "Yes, I did read
24  the statements," or, "I read about them in the paper,"
25  obviously at that point there may be some questions related to

BLYTHE - DIRECT                                        Vol. 3-87

1   the specific substance or quotes of them.  But with this
2   witness, I don't think that's necessary.
3           And as the Court said, and as I said, I think that
4   introduces taint that this whole -- that the defendants say
5   should -- should not -- should be kept out of the trial.
6           THE COURT:  Mr. Albritton?
7           MR. ALBRITTON:  Just if I may, Your Honor.  The
8   *Schmiddoll* -- the *Schmidgall* case actually has a reference in
9   which there was a cross-examination of an agent, and then -- in
10  which the Court points out -- this is an Eleventh Circuit case.
11  I can give you the cite in just a second.
12          The circuit points out that then the agent was
13  successfully crossed on the fact that the -- certain facts from
14  the defendant's statement were facts that, in fact, the agent
15  was relying on, as identified in that manner.
16          I -- so I think there is at least some precedent in
17  the law in the Eleventh Circuit that permits at least the
18  general subject matter of the statement to be inquired about.
19          I think it's also a bit different where -- Mr. Suarez
20  can lay the predicate on this.  But if you don't have a taint
21  team and you didn't institute a taint team -- that's one thing
22  where, you know, "Okay.  We've done all the measures we're
23  supposed to take."
24          But if you haven't done those measures, then at least
25  asking about certain subject matters which might be a

BLYTHE - DIRECT                                        Vol. 3-88

1   misstatement would seem permissible in the absence of having a
2   taint team.
3           THE COURT:  I'm not sure I understand.  I mean, we do
4   have cross counsel here today in order to eliminate any
5   possibility of taint moving forward, so -- go ahead, Counsel.
6           MR. ALBRITTON:  Well, first off, we're not going to
7   unnecessarily reveal anything, all right?  You have that
8   commitment from us --
9           THE COURT:  Good.
10          MR. ALBRITTON:  -- which is all I'm stating, all
11  right?  So let's just be clear about that.
12          THE COURT:  Right.
13          MR. ALBRITTON:  What we're really talking about is
14  characterizing some of the subject matter in the statements, if
15  need be, to a witness for the United States who did not
16  participate in a taint team for the last three years.
17          So if we think we need to do that, then I think the
18  law permits us.  I don't see permission against that.  But
19  we're certainly not going to go running into something like
20  that.
21          THE COURT:  Oaky.
22          MR. ALBRITTON:  And if we do, we'll be quite cautious
23  about it and alert the Court.
24          THE COURT:  Certainly alert the Court.  All right.
25  Okay.  All right.  Very well.

BLYTHE - CROSS                                           Vol. 3-89

1          MR. SUAREZ:  May I inquire, Your Honor?

2          THE COURT:  Yes, sir.

3          MR. SUAREZ:  May it please the Court.

4          THE COURT:  Yes.

5                      CROSS-EXAMINATION

6    BY MR. SUAREZ:

7    Q.    Good afternoon, Agent Blythe.

8    A.    Good afternoon, Mr. Suarez.

9    Q.    Let's walk a little bit more through your background, if

10   we could.

11         You told us yesterday that you were a CPA?

12   A.    Yes, sir.

13   Q.    And you told us that you began your professional career as

14   a CPA doing audits.

15   A.    Yes, sir.

16   Q.    And, you know, my youngest son is a CPA at KPMG, so I've

17   got a little bit of knowledge or understanding of how tough

18   that is.

19         What accounting firm did you practice with when you

20   started?

21   A.    It was a local firm in Ponte Vedra Beach, Florida, called

22   the Griggs Group CPAs.  They've since rebranded to Pivot CPAs.

23   They were an alliance firm with BDOC.

24   Q.    Okay.  All right.  Now, I understand the -- when you start

25   out in auditing with a CPA firm, there's, like, different

BLYTHE - CROSS                                           Vol. 3-90

1    levels, like you -- junior auditor, and then you become like a

2    senior auditor, and then you become a manager, and then you

3    become a partner.

4    A.    Yes, sir.

5    Q.    And so what -- what level did you reach when you were

6    doing auditing with that firm?

7    A.    I was a senior assurance auditor, so that second level.

8    And I reached that about a year before I left to join the FBI.

9    Q.    Okay.  And you indicated that you had some experience

10   auditing publicly traded companies?

11   A.    Yes, a couple of small ones.

12   Q.    Okay.  Who did you audit?

13   A.    Trailer Bridge, TRBR.

14   Q.    Okay.  And was that the only one?

15   A.    And we performed work for Intrepid Capital.

16   Q.    Right.  Okay.  Now -- so did you -- that wasn't a

17   full-blown audit for publicly -- for purposes of the --

18   complying with the SEC?

19   A.    I remember their status had been -- I can't remember their

20   exact status, but -- I don't remember if they were maybe not

21   actively being traded at that time, if they still had to go

22   through a lot of the same compliance audit work.

23   Q.    I gather from your answer that none of them were in the

24   energy or power sector.

25   A.    No, sir.

BLYTHE - CROSS                                    Vol. 3-91

1   Q.   Okay.  And you would agree with me that, particularly in
2   municipally owned or government-owned energy companies, there's
3   some specific accounting rules that apply to those entities.
4   A.   Yes.
5   Q.   Okay.  And that's not what you were experiencing there.
6   A.   No.
7   Q.   Did you -- now, I got the impression yesterday from one of
8   your answers that you were suggesting to Judge Richardson that
9   your audit experience somehow gave you some knowledge as to
10  what is required for a company to explore an IPO.
11         Did you mean to give that impression?
12  A.   Sure.  As a -- having a bachelor's degree in accounting,
13  doing post-baccalaureate work to get my CPA license, and in
14  auditing some public companies, those are things that we looked
15  at for those companies and things that I learned about.
16         So I was, you know, somewhat familiar with the forms
17  that a company has to file and some of the due diligence, and I
18  knew where to look to find more details about that.  And so I
19  would know what to ask for to see if that process was pursued
20  further than just a concept.
21  Q.   Did you ever work in an actual IPO as an accountant?
22  A.   No.
23  Q.   Okay.  So you are auditing companies that are already a
24  publicly traded company, and your testimony here today is that
25  gives you some insight as to what those companies had to do in

BLYTHE - CROSS                                    Vol. 3-92

1   order to -- to get -- to do an initial public offering.
2   A.   Yes, from a basic perspective.
3   Q.   Okay.  Now, when did you join the bureau?
4   A.   June 2008.
5   Q.   Okay.  And you have significant experience as an FBI
6   agent?
7   A.   I've been working as an FBI agent since I graduated the
8   academy in 2009 and reported in New Orleans, Louisiana.  And my
9   primary experience has been in working public corruption
10  investigations that have some sort of white-collar component,
11  primarily.
12  Q.   That's significant experience.
13  A.   Yes.
14  Q.   Okay.  And you said you went to the academy and you've had
15  significant training in order to become an FBI agent; fair?
16  A.   Yes.
17  Q.   Okay.  And part of your training is to make sure that you
18  take careful -- you carefully document the interviews that you
19  do with people.
20  A.   Yes, sir.
21  Q.   Okay.  And you record those in what we generally refer to
22  as a 302.
23  A.   Yes, sir.
24  Q.   Okay.  And your -- you would take great care to make sure
25  those are accurate and complete.

BLYTHE - CROSS                                    Vol. 3-93

1   A.   To the best of my abilities, yes.
2   Q.   Absolutely.  And you did that in this case.
3   A.   Yes.  I think so.
4   Q.   Okay.  Did I hear you correctly yesterday?  I thought you
5   said you had done some civil rights cases when you were in
6   Louisiana.
7   A.   I did.
8   Q.   Okay.
9   A.   I've done some here as well.
10  Q.   Okay.  Okay.  And in those cases, did that involve
11  instances where law enforcement officers or correction officers
12  were accused of some sort of potential criminal conduct?
13  A.   Yes, usually excessive use of force.
14  Q.   Okay.  And in those instances, are those circumstances
15  where the officers are required to give *Garrity*-protected
16  statements?
17  A.   Correct.
18  Q.   So you have some experience with those?
19  A.   Yes.
20  Q.   Okay.  Tell me your understanding -- or tell Judge
21  Richardson your understanding of the protections that are
22  offered to a public employee who's required to give a
23  *Garrity*-protected statement.
24  A.   Sure.
25       THE WITNESS:  So, Your Honor, my perspective as it

BLYTHE - CROSS                                    Vol. 3-94

1   relates to *Garrity* statements is that -- primarily with law
2   enforcement, is that it -- it's a condition of their employment
3   for them to give this interview.  It's an internal affairs type
4   setting, not a criminal setting, and therefore, they're
5   afforded certain protections with those statements.  And those
6   statements can't be used against them for a criminal
7   prosecution.
8   BY MR. SUAREZ:
9   Q.   Okay.  So it's to protect their Fifth Amendment privilege,
10  because they're being compelled to answer questions?
11  A.   Sure.
12  Q.   Okay.  And you understand that that occurred in this
13  particular place -- in this particular case to Mr. Zahn and to
14  Mr. Wannemacher?
15  A.   Yes, and several other employees after --
16  Q.   That's right.  Thank you.  Okay.
17       And in those instances where you were involved in
18  matters -- or investigations involving Garrity-protected
19  statements, you told us that those protections are there to
20  protect the individual's Fifth Amendment privileges.  And it's
21  also true they're there to protect the integrity of your
22  investigation.
23  A.   Sure.
24  Q.   Okay.  All right.  And generally you put certain
25  procedures in place in order to protect your investigation,

1  correct?

2  A.   So in relation to civil rights cases -- what I think

3  you're referring to is DOJ Civil Rights has very strict

4  policies or procedures, if you will -- I don't know if they're

5  codified in writing, but related to how they handle *Garrity*

6  statements.

7          DOJ Civil Rights is a Main Justice component that

8  isn't local here.

9  Q.   Okay.  And are you familiar with what those procedures

10  are?

11  A.   From -- as far as how the agent in the field fits into

12  them, yes.

13  Q.   Yeah.  Okay.  Would you explain that to us?

14  A.   So typically the DOJ Civil Rights unit, they'll assign one

15  of their -- they call them trial attorneys instead of assistant

16  U.S. Attorneys.  One of their trial attorneys who's not part of

17  that case will be assigned as a filter team prosecutor.

18          There may be an agent assigned as a filter team agent

19  who's not on the same squad, usually, and certainly not working

20  on the investigation.

21          And they review materials produced from the police

22  department.  If there's an excessive-use-of-force type case,

23  they'll review materials to ensure -- for *Garrity*, to ensure

24  that that doesn't get passed on to the investigative team.

25  Q.   Okay.  Have you ever worked as the filter agent in one of

1  those investigations?

2  A.   I don't think I've actually been assigned as the filter

3  agent --

4  Q.   Okay.

5  A.   -- that I can recall.

6  Q.   And are you familiar, when you are a filter agent, what

7  efforts you take to document what you're doing in terms of

8  document reviews or questioning witnesses?

9          Does the filter agent take great care to document his

10  or her activities in that regard?

11  A.   I'm sure it would be incumbent upon them, if they're given

12  the task of reviewing a production, a subpoena production, for

13  example, or a voluntary production from a police

14  department/sheriff's office, as it were, for *Garrity* materials,

15  that they would -- they document what they reviewed and whether

16  they gave something to the investigative team or held it back.

17  Q.   So they would document the receipt of materials and what

18  was done to protect it.  That fair?

19  A.   That's my understanding what they normally do.

20  Q.   Okay.  Is there a -- any sort of a draft plan created of

21  how to approach the investigation in order to protect the

22  *Garrity* statements from dissemination to the trial team?

23  A.   If there is a draft plan, I haven't ever seen one of

24  those.  It's just been a personal interaction, a conversation

25  with the prosecutor about, "Hey, this is how we're going to

BLYTHE - CROSS                                            Vol. 3-97

```
 1  handle this."
 2          And, you know, I follow that procedure.
 3  Q.   So to the best of your knowledge, in the cases in which
 4  you were involved in, the procedure was not documented in some
 5  way; in other words, a document wasn't created in order to
 6  reflect that these are going to be the steps we're going to
 7  take?
 8  A.   Not in the cases I've worked on.  If they were, it wasn't
 9  something that was handed down from DOJ Civil Rights to me.
10  Q.   Okay.  When you are involved in the decision of whether or
11  not we need to bring in a filter team in order to protect the
12  Garrity statement -- and by "filter team" I mean another lawyer
13  or another agent or both who -- who's normally involved in
14  those discussions?
15  A.   I mean, frankly, it's one of those things that kind of
16  dictated -- you know, usually the prosecutor, you know, decides
17  with their management.  You know, in the context -- I've seen
18  filter teams.  It's always been with DOJ Civil Rights.
19          They sort of say, "Okay.  This is the plan.  This is
20  the filter AUSA or filter trial attorney.  You need to go find
21  a filter agent, and this is how we're going to do this."
22          And it varies, but it's not -- it's not something --
23  you know, if there's a question about does something need to be
24  Garrity reviewed, that's just something that we have a
25  conversation about.
```

BLYTHE - CROSS                                            Vol. 3-98

```
 1          But generally, like how it's going to actually play
 2  out, if something is going to be Garrity reviewed and screened
 3  is, you know, handed down to the agent, if you will, or that's
 4  sort of their role.  We rely on the prosecutor to tell us how
 5  they want to handle that.  They're the attorney.
 6  Q.   Okay.  And focusing on the bureau's end as an agent, does
 7  the agent discuss the prosecutor's plan or lack of plan with
 8  their supervising agent, whether the special agent in charge or
 9  their direct supervisor?
10  A.   So you would need to talk to, you know, whoever you want
11  to be the filter agent or whoever -- you might talk to your
12  supervisor to say, "Hey, boss.  I need a filter agent for this
13  case.  Who do you want that to be?"
14          If we have to go off the squad, which sometimes --
15  most of the times probably happens, say, "Who is that going to
16  be?"
17          And usually -- you know, my supervisor, for example,
18  would go talk to a supervisor on another squad to try to see
19  who has time to do it.
20  Q.   And are you familiar with the process that's undertaken at
21  the U.S. Attorney's Office when an AUSA is determining whether
22  a filter team should be brought in or not?
23  A.   Not particularly.  I mean, I think they go up some level
24  in their chain of command if they're going to institute one.  I
25  don't know exactly how that process works.
```

BLYTHE - CROSS                                          Vol. 3-99

1   Q.   Okay.  So in this case, right, did -- I think you
2   testified yesterday no *Garrity* procedures were put in place.
3   A.   Other than, you know, we're not -- just don't review it.
4   Don't get Aaron Zahn's *Garrity* statement.  That was what was
5   discussed.
6   Q.   Okay.  Just so that I'm clear, right -- don't review it,
7   right?
8        And by that you mean don't review Mr. Zahn's
9   statement?
10  A.   Correct.
11  Q.   Okay.  And I'm going to assume that it also means
12  Mr. Wannemacher's statement?
13  A.   Yes.
14  Q.   Okay.  Don't review it.  And what else did you say?
15  A.   And don't get Aaron Zahn's statement.  We didn't request
16  that from the Office of General Counsel.  When they offered it,
17  you know, or told us they were going to take that statement, we
18  told them, "Yeah, don't worry about it."
19       At that time we knew that Mr. Zahn was probably in
20  the subject category, so we wouldn't want to even obtain that
21  one.
22  Q.   Now, you did get Mr. Wannemacher's statement.
23  A.   We did.  As I said, I believe I testified we weren't sure
24  what his role was exactly at first --
25  Q.   Okay.

BLYTHE - CROSS                                          Vol. 3-100

1   A.   -- so he could have fallen in the witness category.
2   Q.   Okay.  And you said with regard to Mr. Zahn, "Don't get
3   it."
4        But you did get Volume 2 of the statement.
5   A.   I -- I didn't know I got it.  I didn't ask for it, or at
6   least I sure didn't think I did.  It was actually -- I think
7   you guys pointed out to us that we had it in one of the
8   productions.
9   Q.   And who'd you get it from?
10  A.   I think it was from JEA.  They had gathered up -- if I'm
11  not mistaken, I think they'd gathered up documents that were in
12  people's offices on the 16th floor, or the senior leadership
13  team floor, whatever floor that is, that they had had in their
14  offices.
15  Q.   Okay.  Any other procedures that you put in place in this
16  case in order to protect the investigation from being tainted
17  by *Garrity* -- by the *Garrity* statements of Mr. Zahn and
18  Mr. Wannemacher?  Anything else?
19  A.   So after -- at some point in time I had a discussion with
20  AUSA Duva, and he asked us to segregate it from our file.  You
21  know, so we had a squad admin -- it took a couple of requests
22  to make it accomplished, but had them remove it permanently
23  from our file, physically and electronically.
24       And our document review tools, I had the people that
25  manage that wall off -- basically redact that so that I

BLYTHE - CROSS                                                Vol. 3-101

1   couldn't access any places where it appeared in our document
2   review tool.
3   Q.   Okay.  And you said "segregate it from our file."
4        Just so that we have --
5   A.   *Garrity* transcripts.
6   Q.   Thank you.  I just wanted to make sure we had a clean
7   record as to what we're talking about.
8        So we've got don't review it, don't get it, and No. 3
9   was to segregate it from -- segregate the two statements, the
10  two transcripts, from your file, right?
11  A.   Yes.  And I forgot to mention, Mr. -- AUSA Duva also asked
12  that we avoid reading media articles, you know, that we
13  determined would be or were about the -- contained the content
14  of those statements.
15  Q.   All right.  Before we go there, on the "segregate the
16  transcripts from our file," when was that done?
17  A.   I requested it be done in September of 2021, I think.  I'm
18  not a hundred percent sure.  There was some misunderstanding on
19  the part of the person that was asked to do that.
20       And so it was some months later that I realized that
21  hadn't been properly handled.  And so I asked someone else to
22  do it, and then it got done.
23  Q.   But when --
24  A.   And I'd engaged with Ms. Bray and Ms. Shannon, who are in
25  the courtroom, to handle segregating those items.

BLYTHE - CROSS                                                Vol. 3-102

1   Q.   Okay.  All right.  So -- okay.  So let's back up a little
2   bit.
3        You first think you made this request in September of
4   2021, roughly?
5   A.   Yes.
6   Q.   Okay.  And then you discover that that had not been done,
7   at least not satisfactorily?
8   A.   Right.
9   Q.   Okay.  When did you make that discovery?
10  A.   So there is, I think, 302s that have been disclosed in
11  emails to you in the next year, in 2022, where I think I
12  documented that I had spoken with Ms. Bray and Ms. Shannon, and
13  that they were -- what had happened from the past year when I
14  had requested it and it didn't happen properly.
15       So it's sometime maybe March or April in 2022.  I
16  can't recall exactly when.  I'd have to see those reports.
17  Q.   Okay.  And so how did you discover that it had not been
18  done?  How did that come to your attention?
19  A.   I don't remember.  It could have been in a conversation
20  when Mr. Duva asked if that happened.  It might have been
21  preparing for discovery, when we're copying items to -- to go
22  over to the U.S. Attorney's Office that -- we realized that,
23  you know, that hadn't been done.
24  Q.   And by "that hadn't been done," meaning the statements,
25  the transcripts, were still in the file?  Is that what it means

BLYTHE - CROSS                                           Vol. 3-103

1   when you say it hadn't been done?
2   A.    Correct.
3   Q.    Okay.  And you think you're the one that made that
4   discovery, or did someone else make that discovery?
5   A.    I think it was me.
6   Q.    You think it was you.  Okay.
7           And you reference you think it was disclosed to us in
8   a 302.  Is that a 302 that you wrote or that someone else
9   wrote?
10  A.    It was either 302s or an email that I wrote that I
11  understood was -- I thought was provided in discovery to you
12  guys.
13  Q.    Okay.  And so you think AUSA Duva would have provided that
14  to us in discovery, whatever the documentation was of the fact
15  that you had discovered that, in fact, the transcripts had not
16  been segregated in September of 2021 when you made that
17  request.
18  A.    That's what I'm saying.
19  Q.    Okay.  When you -- just so that we're clear, when you
20  discovered that they had not -- the transcripts had not been
21  segregated, you did not read it?
22  A.    No.
23  Q.    You just saw that they were still there?
24  A.    Yeah.  I was upset, because I'd asked for them to be
25  moved.  And the person who I asked to do that said that -- in a

BLYTHE - CROSS                                           Vol. 3-104

1   written formal document that they had, and, you know, by
2   whatever mistake or misunderstanding, they -- maybe they
3   thought they did it but it didn't happen.
4   Q.    I don't want to embarrass anyone, but was it anybody in
5   the prosecution -- currently in the prosecution team?
6   A.    No.
7   Q.    Now, beyond the -- well, with regards to those two
8   transcripts that were not segregated when you made the request,
9   do you know if anyone in the prosecution --
10  A.    Oh, it was just Mr. Wannemacher's transcript that wasn't
11  segregated from the file.  Mr. Zahn's transcript was never in
12  our case file.
13  Q.    Okay.  All right.  So what happened to that when it came
14  in --
15  A.    "That" being?
16  Q.    The transcript.  Thank you.
17  A.    Mr. Zahn's transcript?
18  Q.    When Mr. Zahn's transcript comes in, you said it never was
19  in your case file.
20  A.    So there's the electric case file that documents, "Hey, we
21  received this subpoena production."
22          There's a hard drive with all these emails and
23  documents on it.  Whenever there's large electronic productions
24  greater than a certain size, they don't actually make it into
25  the electronic case file.  There's a reference to them, and

BLYTHE - CROSS                                               Vol. 3-105

```
 1   they're assigned a number, and, you know, those actual media
 2   are kept physically elsewhere.
 3          And, you know -- but we may put those electronic
 4   items in a document review tool.  And that's what I referred
 5   to, that I asked the program manager of that document review
 6   tool to segregate any references to that item.
 7          And I basically gave them the search term to search
 8   and segregate items that met that so that I wouldn't have
 9   access to them.
10   Q.   Okay.  So let me -- let's take Mr. Zahn's statement first.
11          Was Mr. Zahn's statement segregated from the document
12   review tool?
13   A.   Correct.
14   Q.   It was?
15   A.   Yes.
16   Q.   Okay.  And that was done successfully.  In other words,
17   when you made the request, it was taken out of the document
18   review tool?
19   A.   Yes.  It's a different -- different personnel --
20   Q.   Okay.
21   A.   -- at headquarters that handled that for me.
22   Q.   And when was that done?  When was it segregated from the
23   document review tool?
24   A.   I think it was in September of 2021, at the same time.  I
25   don't recall the exact date, but I would have -- I would think
```

BLYTHE - CROSS                                               Vol. 3-106

```
 1   I did it at the same time, made the request at the same time.
 2   Q.   Okay.  You said you would think.
 3          Did you document that somewhere?
 4   A.   I believe I did with the same -- I think I did.  I'm not a
 5   hundred percent sure.  I'd have to go back and look at my
 6   files.
 7   Q.   Okay.  So you think that in September -- just make sure
 8   that I'm understanding correctly.
 9          On September 2021 you made the request that
10   Mr. Zahn's statement be removed from the document review tool.
11   A.   Yes.  Certainly at a minimum have email correspondence
12   with that program manager asking them to do that.
13   Q.   So you think there's a record out there that supports that
14   you did it around September 2021; fair?
15   A.   Yes.
16   Q.   And you are confident that that was done?
17   A.   Yes.
18   Q.   Okay.
19   A.   I've had experience in other cases with that same program
20   manager when things like that had come up, and I have the
21   utmost confidence in that individual.
22   Q.   Okay.  All right.  Now, with Mr. Wannemacher's -- his
23   statement was not removed from the document review tool, even
24   though you made the request.
25   A.   So both -- I believe both statements were removed from the
```

BLYTHE - CROSS                                          Vol. 3-107

1  document review tool.  I may have failed to mention that.
2  Q.   Okay.
3  A.   But Mr. -- what I -- when I was talking about only
4  Wannemacher's was removed from the electronic case file, it's
5  because it was the only one that was in the electronic case
6  file, so it was digitally attached as an attachment to a serial
7  or an item in our case file --
8  Q.   Okay.
9  A.   -- sitting there.
10  Q.   And so you think both were removed from the document
11  review tool.  Mr. Wannemacher's stayed in the case file,
12  despite the fact that you had requested that it be removed.
13  A.   Correct.
14  Q.   And his was finally removed, do you think, in March of --
15  A.   Approximately.  And that's when I engaged with -- went to
16  Ms. Bray, our assistant division counsel, and our chief
17  division counsel, Ms. Shannon, and asked them to, you know,
18  handle that process to make sure that it actually happened.
19  Q.   And refresh my recollection.  That was finally done in
20  March of 2022?
21  A.   I think so.  I'd have to, again, look at my notes or ask
22  them, but I think that's when that happened.
23  Q.   Best recollection as you sit here --
24  A.   Yes.
25  Q.   -- unexpecting getting these questions, right?

BLYTHE - CROSS                                          Vol. 3-108

1  A.   Yes.
2  Q.   Okay.  Now, any other steps -- so just -- we've got don't
3  review, don't get it, segregate it.
4        Did you give me a fourth one?
5  A.   The media issue.
6  Q.   Tell me about the media issue.
7  A.   Like I said before, is -- simply put, avoid articles --
8  Q.   That's right.
9  A.   -- that you can tell have to do with the statements.
10  Q.   Okay.  And when -- when was that instruction given to you
11  by AUSA Duva?
12  A.   I'm not sure.  I couldn't give you a date.  It's something
13  that we talked about early on in the investigation.
14  Q.   Can you ballpark it?
15  A.   Early 2020.
16  Q.   All right.  And was that documented somewhere?
17  A.   No.
18  Q.   That was just a conversation that you had with AUSA Duva?
19  A.   Yes, sir.
20  Q.   Who was present for this conversation?
21  A.   It's -- I'm not -- again, I don't have a specific
22  recollection of, you know, who was in the room.  But oftentimes
23  when we would talk about the case or have interviews, it would
24  be myself, John Zipperer, Special Agent -- or retired Special
25  Agent Timothy Adams, who was an investigator at the State

BLYTHE - CROSS                                              Vol. 3-109

```
 1   Attorney's Office at the time -- John Zipperer was also an
 2   investigator at the State Attorney's Office -- and Special
 3   Agent Angela Hill.
 4   Q.   Were they all present when this conversation -- do you
 5   have a recollection of that conversation being had with all of
 6   you and AUSA Duva?
 7   A.   I'm fairly certain that -- at some point that he had that
 8   conversation with all of us, but I don't remember if, you know,
 9   there was one time where we were all in the same room when it
10   happened, when we talked about that.  I just remember -- I know
11   for certain that I had that conversation with AUSA Duva.
12   Q.   Okay.  You know he had it with you.  You think he had it
13   with others.  But you don't really know that --
14   A.   Correct.
15   Q.   -- fair?
16   A.   That's fair.
17   Q.   And the advice that AUSA Duva gave you was to avoid --
18   well, tell me what it was.  Avoid articles that have what?
19   A.   If you could tell from the title that it was going to go
20   towards the Garrity statements, or if, while reading the
21   article, you could see that it was about to discuss their
22   statements, stop reading it.
23   Q.   Okay.  And that was the extent of that instruction?
24   A.   Yes.
25   Q.   Basically try to see if you could peek ahead and see if
```

BLYTHE - CROSS                                              Vol. 3-110

```
 1   you can tell that it might have a Garrity-protected statement.
 2   If it does, don't read it.
 3   A.   Yes.
 4   Q.   And you followed those instructions?
 5   A.   Yes.
 6   Q.   Did you do -- were there any other procedures put in place
 7   to protect the investigation from any taint or exposure to
 8   Garrity-protected statements?
 9   A.   No.
10   Q.   Okay.  So -- and just -- I know I'm beating a dead horse,
11   and Judge Richardson is probably getting mad at me, but I just
12   want to make sure that I'm clear.
13        Basically four procedures:  don't review it, meaning
14   don't review the transcripts; don't get the transcripts;
15   segregate the transcripts from the case file and the electronic
16   review tool; and avoid any -- reading any media articles.
17        Have I got that right?
18   A.   Correct.
19   Q.   And there were no other instructions or procedures put in
20   place in order to protect the investigation from exposure to
21   the Garrity statements?
22   A.   Not that -- not that I'm thinking of, no.
23   Q.   Okay.  Tell me whether -- do you also -- I'll come back to
24   that.  Let me -- you mentioned yesterday the importance of
25   reading news accounts in public corruption cases.
```

BLYTHE - CROSS                                    Vol. 3-111

```
 1   A.   Yes.
 2   Q.   Okay.  And in this case you mentioned that in the early
 3   days of the investigation you were reading the newspapers.
 4   A.   Yes.
 5   Q.   Okay.  You were, in essence, mining them for information;
 6   fair?
 7   A.   I wanted to understand as best I could what was going on.
 8   Q.   Okay.  And in order to understand what was going on,
 9   right -- you mentioned yesterday sometimes people might not
10   talk to an FBI agent, but they'll talk to a news personality or
11   a news reporter.
12   A.   Yes.
13   Q.   And so it's important for you to sort of track that
14   information, read the articles, and mine it for information.
15   And you did that in the early days?
16   A.   Yes.  It's a source of intelligence --
17   Q.   Okay.
18   A.   -- potential leads.
19   Q.   Okay.  When did you open a file in this matter?
20   A.   So I initiated the opening in late December or early
21   January.  For whatever reason, it took a while to make it
22   through the five levels of chain of command.  I don't know if
23   they -- why it happened.  But I think I looked the other day
24   and it was either the end of January or beginning of February
25   2020 --
```

BLYTHE - CROSS                                    Vol. 3-112

```
 1   Q.   That it --
 2   A.   -- that it actually officially opened.
 3   Q.   But before that you had already requested that it be
 4   opened.  You think that was in late December/early January?
 5   A.   Yes.
 6   Q.   Okay.  And in late December/early January, you're
 7   beginning to review the news accounts and trying to get
 8   information from that.
 9   A.   Yes, and talking with the state attorney's investigators,
10   AUSA Duva about opening a matter.  You know, he told us on
11   December 20th he was planning to open a matter, of '19.  And so
12   that was something that -- you know, it just took
13   administratively a little while to get the case file opened.
14   Q.   Okay.  All right.  And in those early days when you're
15   reading all the news accounts that are coming out -- and it
16   isn't just you that's reading them, right?  There are other
17   agents that are also sort of looking out for stories in the
18   media that are relevant to the investigation.
19   A.   I'm assuming they also read some media articles.  I have,
20   you know, confidence in their abilities.  I think that's
21   something they would have wanted to do.
22   Q.   Okay.  I'm sorry.  Were there other agents that were
23   looking?
24   A.   I'm sure Agent Hill read articles about the case too, as
25   well as the other -- the two investigators that worked with us
```

BLYTHE - CROSS                                          Vol. 3-113

```
 1   on the case for a significant period of the case.
 2   Q.   Okay.  Now, so we have -- you're looking; Agent Hill is
 3   looking; Investigator Zipperer, Investigator Adams is looking.
 4          Is that accurate?
 5   A.   I'm sure that they were reading articles too.
 6   Q.   All right.  Do you know if Mr. -- if AUSA Duva was
 7   looking?
 8   A.   I'm sure he did.  I would -- it would shock me if he
 9   didn't read a single article during the course of the
10   investigation.
11          MR. DUVA:  I was, Your Honor.
12          THE COURT:  Thank you, Mr. Duva.
13          MR. SUAREZ:  Do I get to cross-examine him, Judge?
14          MR. DUVA:  And I acknowledged that in written
15   pleadings, which I think Mr. Suarez knows.
16   BY MR. SUAREZ:
17   Q.   Okay.  Let's talk about other people that were also -- in
18   the bureau that were looking at articles.
19          Kyle Stevens, he's, I think, a forensic accountant,
20   kind of like you, with the bureau?  He was also looking for
21   articles, right?
22   A.   Yes.  Kyle Stevens, he's a remarkable individual, but he
23   was assigned early on as a forensic accountant to the case to
24   assist in case it took on a financial angle, which it didn't
25   really from an investigative perspective.
```

BLYTHE - CROSS                                          Vol. 3-114

```
 1          So -- but he, you know, is a very engaging
 2   investigator, and he, you know, is very curious and wants to
 3   learn.  And so he, you know, wanted to be part of the team and
 4   saw something he felt was interesting and sent it on to us.
 5   Q.   Okay.  And was there anybody else, like Kyle -- is he
 6   Agent Stevens or is he --
 7   A.   No.  He's a -- there's a separate job category --
 8   Q.   Right.
 9   A.   -- professional support forensic accountants.  Some of
10   them are certified public accountants.  Some of them are
11   certified fraud examiners.  But they assist agents and work as
12   part of the case team from the forensic accounting and forensic
13   financial investigation perspective.
14   Q.   And so Mr. Stevens was part of the team, and he forwarded
15   at least one article for you.
16          Do you have a recollection of any other articles that
17   he may have forwarded?
18   A.   I don't recall what specific article or articles he
19   forwarded.  It doesn't surprise me that -- I believe you if you
20   tell me he did.
21   Q.   Okay.  All right.  And was there anybody else that was
22   assigned to the investigative team in those early days that was
23   mining the newspapers for -- or the news media for information?
24   A.   Besides me, Tim, Angela, and Kyle?
25   Q.   Right.  You know anybody else?
```

BLYTHE - CROSS                                    Vol. 3-115

1   A.   Not that I can think of.

2   Q.   Okay.  Now, in this -- let me just show you document --

3   it's part of Defense Exhibit No. 25.  I think it's page 194.

4          MR. SUAREZ:  Mr. Miller, can we get that up?  With

5   the feedback and everything.

6          THE WITNESS:  Would you mind showing me the physical

7   exhibit, because the -- or if it's in ours, if you can give me

8   the number, I can look at the binders.  It's just the screen's

9   really fuzzy.

10          Thanks.

11          That or I need glasses.  Maybe both.

12          MR. SUAREZ:  Yeah.

13          Mr. Miller, if you could -- Mr. Miller, can you

14   enlarge the bottom portion of that.

15          Yeah.  But I think some of this is -- go down to the

16   bottom, the very bottom of the --

17   BY MR. SUAREZ:

18   Q.   I just wanted to point that out to you.  There is, at the

19   bottom of that document --

20          MR. SUAREZ:  And, again, for the record, Your Honor,

21   this is page 194, Defense Exhibit No. 25.

22   BY MR. SUAREZ:

23   Q.   There's a Melissa Stevens with a gmail address.  Now --

24   A.   Oh.  That's Kyle Stevens' wife.

25   Q.   I was using deductive reasoning.  I thought it might be.

BLYTHE - CROSS                                    Vol. 3-116

1   So she --

2   A.   Kyle is legally blind.

3   Q.   Okay.  Oh, I see.

4   A.   And that's why I said he's a remarkable individual.

5   He, despite the fact that he's legally blind was very

6   successful in sports and is also an excellent forensic

7   accountant.

8          So he will ask his wife to do things for him --

9   Q.   Yeah.  All right.

10   A.   -- from an administrative perspective.

11   Q.   That makes sense.  I appreciate it.

12   A.   She's a good helpmeet in that way.

13   Q.   So her -- it wasn't that the investigative team was having

14   their wives mine the newspapers for information also.  It just

15   so happens that Mrs. Stevens helps him with that because of his

16   sight?

17   A.   Yes.  And I think since that time, or even maybe -- she

18   may have been back working for the FBI at that time.  She's an

19   FBI employee.

20   Q.   Oh, she is?

21   A.   Yes.

22   Q.   But she wasn't assigned?  It just so happened -- this is

23   because she was helping her husband?

24   A.   Correct.

25   Q.   Okay.  And I understood you yesterday, and I think you

BLYTHE - CROSS                                               Vol. 3-117

1   said today, from the instructions Mr. Duva gave you, that if
2   the headline of an article suggested that it would have a
3   *Garrity*-protected statement, you didn't read it?
4   A.   Correct.
5   Q.   You would go as far as the headline?
6   A.   If I could tell from that or if it was clear.  That's --
7   that was my mode of operation.
8   Q.   Did you have any discussions with any of your supervisors
9   or anybody inside of the bureau as to whether or not this was
10  an appropriate approach for this case?
11  A.   I deferred to -- you know, I asked AUSA Duva how he wanted
12  to handle it when we got the statements from OGC.  He
13  instituted the procedures we talked about in my testimony -- in
14  our testimony right here, and I deferred to him and his, you
15  know, legal prowess and wisdom.
16         And so, you know, I didn't know -- you know, civil
17  rights cases are sort of a context of their own.  It's a whole
18  different group.  It's a whole different type of case.
19         And so, you know, I didn't know -- I don't -- I'd
20  never really seen -- so it was unclear to me if it should or if
21  anybody else handled this type of thing outside the civil
22  rights context that way.
23         So I just asked him how he wanted to handle it, and
24  this is what we did.
25  Q.   Okay.  That's fair, and I appreciate the answer.

BLYTHE - CROSS                                               Vol. 3-118

1          I just want to make sure you did not discuss it with
2   your supervisors up your chain of command at the bureau.  You
3   just followed the instructions of the AUSA.
4   A.   I think that's the case.  I don't recall talking to my
5   supervisor about it.
6   Q.   And did you -- in your conversations with AUSA Duva, given
7   your background in civil rights cases, did you recommend to him
8   that additional measures be put in place or that a filter team
9   be used?
10         Did you ever make that recommendation?
11  A.   I didn't make a recommendation to AUSA Duva.  I have
12  confidence in his abilities as a prosecutor.  He's been doing
13  this for, you know, longer than I have.  He's handled a lot of
14  important cases.
15         So, you know, I'm sure we talked about the fact that
16  DOJ Civil Rights handles the things they do the way they do.
17  And, you know, I think that he disagreed with their approach in
18  the context of this case.
19  Q.   Okay.
20  A.   And so we -- we -- you know, he asked me to handle it the
21  way I did, and that's what --
22  Q.   Okay.
23  A.   I moved forward.
24  Q.   Now, so early on, as you're reading the news accounts, did
25  you also follow any of the postings on social media from any of

BLYTHE - CROSS                                                    Vol. 3-119

1   the reporters?
2   A.   Very little.
3   Q.   Okay.
4   A.   I have occasionally seen some postings on social media,
5   but it's not something that I follow regularly.
6   Q.   Okay.  Let's unpack that a little bit, Agent Blythe.
7        When we say social media, who do you -- first of all,
8   what platforms are we talking about?  Is it Twitter, Facebook,
9   Instagram, or -- there may be others.  That's just -- that's
10  the limit of a 63-year-old trying to follow social media.
11  A.   So I have a personal *Jacksonville.com* account.  So I read
12  the paper on *Jacksonville.com*, because you only get so many
13  articles a month if you don't pay.
14  Q.   Okay.
15  A.   And, you know, I think the FBI has its own, you know,
16  account, but it's just trying to deal with getting that and
17  other people being logged in to it or whatever.
18       So I just have my own personal account, and also look
19  at Twitter maybe once a -- once in a blue moon.  And so that's
20  about it.
21  Q.   Okay.  *Jacksonville.com*, I think I know that's the *Florida*
22  *Times-Union*?
23  A.   That's their website that articles are published on.
24  Q.   I see.  Okay.
25  A.   And I think -- you know, we all know that there's an

BLYTHE - CROSS                                                    Vol. 3-120

1   investigative reporter that published, quite prolifically on
2   that site, articles about this case.
3   Q.   All right.  That was -- that would be Mr. Monroe --
4   A.   Yes.
5   Q.   -- Nate Monroe?
6   A.   Yes.
7   Q.   Okay.  Now, you said that you also do Twitter.  This is
8   where I get into really dangerous waters.  I may have to look
9   to --
10  A.   I don't tweet.  I look at tweets.
11  Q.   Okay.  All right.  Now, I understand there are people you
12  follow -- I don't mean you personally.  But if you are a
13  Twitter user, you follow certain people or certain entities; is
14  that --
15  A.   Yes.
16  Q.   Okay.  And so who do you follow on Twitter?  I don't mean
17  personal stuff, but I mean, you know, related to this case.
18  Who do you follow?
19  A.   Yeah.  So, you know, in the context of wanting to know --
20  develop investigative leads from news media reporting, I follow
21  Nate Monroe.
22  Q.   Okay.  And when did you -- as best you can recall, when
23  did you begin following Nate Monroe?
24  A.   I have no idea.  I don't -- I don't remember.
25  Q.   Okay.  Did you begin following him before this

BLYTHE - CROSS                                                Vol. 3-121

1   investigation?

2   A.    I don't think so.

3   Q.    Okay.

4   A.    Sometime during the course of the investigation, but I

5   don't think it was at the beginning.

6   Q.    Okay.  All right.  So you think it was after you began the

7   investigation that you started to follow Nate Monroe, but you

8   don't remember specifically when; is that fair?

9   A.    Yes.

10  Q.    Okay.  And you say you periodically would check your --

11  you know, I'm going to be good about this -- your Twitter feed?

12  Is that -- is that what --

13  A.    I -- you know, so there's some people that are on social

14  media all the time every day.  It's something I would just

15  check periodically and scroll through alerts.  I don't -- it's

16  not something I want to distract myself with all the time.

17  Q.    Did you -- so let's focus on that, then.

18        When you did check and scroll through your alerts,

19  were you looking for articles regarding JEA?

20  A.    Yes.  That's the main reason I'd do that, or other

21  corruption matters.

22  Q.    Okay.  And did you -- did you -- anything that you found

23  potentially relevant, did you document that anywhere?

24  A.    If I found something, I would ask, you know, a squad admin

25  to memorialize it to the file, or, actually, you know, at one

BLYTHE - CROSS                                                Vol. 3-122

1   point Agent Hill and I -- we talked about it, and we

2   actually -- one or both of us asked the squad administrative

3   assistant to periodically go get the articles related to the

4   case, using the office's account, and to memorialize them in

5   the file.

6         And the purpose of that being so that, you know, if

7   Agent Hill and I get reassigned somewhere or aren't on the case

8   anymore, that somebody can pick up the case and kind of, you

9   know, as much as possible, what a new agent would need to

10  understand what's happened in this case would be there to -- to

11  view.

12  Q.    Okay.

13  A.    And so, you know -- go ahead.

14  Q.    No, no.  Go ahead.

15  A.    That's all.

16  Q.    Okay.

17  A.    That answers my -- finishes my answer.

18  Q.    So come back to the squad admin; is that right?

19  A.    Yes.

20  Q.    Okay.  So -- but on Twitter, when you found an article

21  that seemed like it had -- did you read it?

22  A.    If -- you know, if it was an article that I could tell

23  didn't have *Garrity* statements quoted or wasn't about that, if

24  it was just, you know, a general article that didn't -- you

25  know, didn't meet that criteria, I'd read it, sure.

BLYTHE - CROSS                                          Vol. 3-123

1   Q.   Okay.  And you had to -- I mean, look, you're reading an
2   article, and you're trying to divine the direction it's going,
3   and you're trying to divine is it going to have a *Garrity*
4   statement or not, right?
5   A.   Well, if it -- if it goes to "Aaron Zahn said," then I
6   know -- redline.
7   Q.   You would stop there.
8        Okay.  I mean, that's a fair -- that's a good red
9   line, yeah.
10  A.   That's the reddest line of redlines, because I know he
11  didn't give any statements other than the December 16th --
12  Q.   Okay.
13  A.   -- statement there in board meetings.
14  Q.   And maybe you'll help us and help the Court a little bit
15  if you tell what -- what other kind of redlines were you
16  looking for in this process of trying to make sure you didn't
17  get exposed?
18       So if it said "Aaron Zahn said," fair.  Okay.
19  What -- did you have any others like that?
20  A.   I don't know.  I'd have to look at the articles.  I mean,
21  if you want to go there and see if I can walk up to that
22  line -- I don't know.
23  Q.   I'm just trying to understand your process.
24  A.   I explained it.  I think that's the best I can explain it.
25  Q.   Okay.  "Aaron Zahn said," you stopped.

BLYTHE - CROSS                                          Vol. 3-124

1   A.   You know, or anything that -- I can't articulate, you
2   know, beyond that.  But anything that would lead me to believe
3   the article was going in a direction of discussing, either in
4   summary or quoting those statements, I was not going to
5   continue reading the article or not going to read it at all.
6   Q.   And when you were reading these on your -- on the Twitter
7   postings, you're doing that on your phone?
8   A.   So they go to -- mostly I just read -- I really don't care
9   about the tweets themselves.  If, you know -- if there's an
10  article, I want to go read that.  I want to go read the
11  article, because, you know, that's a well-thought-out, you
12  know, set of facts or statements.
13  Q.   Okay.  And did you do that on your phone, if it -- if the
14  Twitter feed referenced an article, did you then hit the link
15  and read it on your phone?
16  A.   Yes.
17  Q.   Okay.  And then so you're looking at your little screen,
18  and you're trying to figure out does it say "Aaron Zahn said"
19  or some -- whatever your process was.
20  A.   You know, that is something that I had in the back of my
21  head as a precaution.
22  Q.   Going back to the squad -- the squad admin folks, did --
23  and so I understand, that they -- at some point you and Agent
24  Hill got really busy with the investigation, and then this was
25  assigned to them to gather the newspaper articles and put them

BLYTHE - CROSS                                                    Vol. 3-125

1   in the file.
2   A.    Correct.
3   Q.    Okay.  Did that include the social media postings that
4   you've just described, the stuff that might have come up in
5   Twitter?
6   A.    No.  We didn't memorialize Twitter postings.  You know, to
7   the extent I found an article from the *Times-Union* or another
8   publication, such as the *Daily Record* or whatever, we'd -- or
9   any other publication, we would have the article memorialized
10  if it had to do with the investigation.
11        Now, you know, apparently we didn't do a very good
12  job of explaining what things related to JEA we wanted put in
13  the file.  So basically it was just carte blanche JEA articles
14  were grabbed and put in a file, so we could have done a better
15  job of explaining that.
16  Q.    Okay.  And who was the person that was assigned that task,
17  to grab the newspaper articles and make sure they were put in
18  the file?
19  A.    There's at least one person, maybe two.  There's --
20  different people have gone through that position during the
21  course of the investigation.  So they're simply carrying out a
22  task.
23  Q.    Okay.  Do we know -- do you know the identity of those
24  individuals carrying out those tasks, or that task?
25  A.    Yes.

BLYTHE - CROSS                                                    Vol. 3-126

1   Q.    Who are they?
2   A.    I don't -- I don't know how their name is pertinent.  It's
3   documented and was provided by -- is it --
4   Q.    Okay.
5   A.    I know we provided --
6   Q.    So you do know their identity.
7         Let's start with that.  You do know their identity?
8   A.    So of course I know who the squad administrative assistant
9   is.  I just --
10        THE COURT:  What was your question?
11        MR. SUAREZ:  I'm trying to find out, Judge, the
12  individuals who were tasked with grabbing the newspaper
13  articles that referenced JEA and put them in the case file.
14        THE COURT:  I see.
15  BY MR. SUAREZ:
16  Q.    And you know their identity, correct?
17  A.    Of course.
18  Q.    Okay.  All right.  And -- well, did you speak with Agent
19  Angela Bray about the grabbing of these emails and putting them
20  in the file?
21  A.    So -- yes, very briefly.  She just asked me a couple
22  questions about that.
23        MR. SUAREZ:  And could we -- if we could put Defense
24  Exhibit No. 2 up on the screen, Mr. Miller.
25        Do you have a hard copy of that, Defense Exhibit 2?

BLYTHE - CROSS                                              Vol. 3-127

1   BY MR. SUAREZ:
2   Q.   And I want to -- I've highlighted, if you go about
3   two-thirds of the page down, where it begins -- the sentence
4   begins with, "They requested their squad support employee --
5   neither was able to recall which one of them or both of them --
6   to conduct a periodic search for media and put it in the
7   file as an administrative matter."
8          MS. JEFFERSON:  May I approach?
9          THE WITNESS:  Thank you.
10         Okay.
11  BY MR. SUAREZ:
12  Q.   So when you spoke with Agent Bray, did she record this
13  incorrectly, the fact that neither you nor Agent Hill could
14  recall the individual that --
15  A.   What she -- I think you're misreading her email.
16  Q.   Okay.  Help me.
17  A.   Yeah.  She's -- we couldn't remember which -- whether it
18  was Angela or I that asked the administrative employee.
19  Q.   I got you.  Okay.
20  A.   So to be clear, what I recall is me and Angela talked
21  about it --
22  Q.   Okay.
23  A.   -- and one of us went to the administrative employee and
24  asked them to pull them.
25  Q.   Fair.  That clarifies it.

BLYTHE - CROSS                                              Vol. 3-128

1   A.   But everybody knows who the administrative employees were
2   during that time.
3   Q.   So who were they?
4   A.   So if --
5          THE WITNESS:  Your Honor, if you want me to state
6   their names, I'm happy to, but they really have absolutely
7   nothing to do with this case, other than the fact that they
8   carried out a simple administrative task to put articles in a
9   file that contained the letters "JEA" in them.
10         MR. SUAREZ:  Your Honor, I see no reason -- I mean,
11  if the Court wants to do that under seal or something, that's
12  fine with me.  I don't -- but I want to know who was tasked
13  with that process, given the --
14         THE COURT:  What's the Government's position on that?
15         MR. DUVA:  Your Honor, I don't know why it matters.
16  I mean, they have the entire contents of the -- they have the
17  entire contents of the disclosure that we provided.  I think
18  we're kind of beating a dead horse here.  He asked an
19  administrative assistant to do it.  She didn't follow the
20  instructions.  We realized it.  We made a disclosure.
21         I'm not really following the relevance of it.  You
22  know, we've let him have leeway.  We had leeway.  But in terms
23  of who the specific person is, I don't see what the point is.
24         THE COURT:  Mr. Suarez?
25         MR. SUAREZ:  Your Honor, they were tasked with

BLYTHE - CROSS                                    Vol. 3-129

1   segregating articles on -- regarding the JEA investigation.  It
2   is, I think, undisputable that those articles contained
3   *Garrity*-protected information, and those were in the case file.
4           And I think it is important and relevant for us to
5   identify who they are.  We may -- it may go nowhere.  I don't
6   know.  But it is important that we identify who those
7   individuals are.
8           And if there's an issue of their privacy, I have no
9   problem having that be done under seal.  I don't need -- I'm
10  not trying to embarrass anybody or make anybody's life
11  miserable, but I have an obligation to know who those
12  individuals are.
13          MR. DUVA:  So, Your Honor, those people, the staff
14  administrative assistants, are not privy to any meetings or
15  conversations with me or the prosecution team.  They are not on
16  the prosecution team.  They're clerical employees that grab
17  material and put it in a file, which now Mr. Suarez has the
18  entirety of.
19          So what that person did or who the person is, it
20  doesn't matter.  The question is:  What did Agent Blythe -- you
21  know, I understand the impeachment.  I follow it, and it's
22  fine, and it makes sense.  But did Agent Blythe review it?  Did
23  he read it?  That's the examination.  It's not, you know, what
24  particular person put it there.
25          They have the discovery.  They have the disclosure.

BLYTHE - CROSS                                    Vol. 3-130

1   So it matters what Agent Blythe did or didn't do with it.
2   That's the relevance.
3           THE COURT:  That's a good point, Counsel.
4           MR. SUAREZ:  Well, Your Honor, I'm glad that he
5   seems -- that he seems to have the monopoly on what is relevant
6   in this case.
7           I would suggest, Your Honor, that I have not yet --
8   no one has provided the Court with a single legal basis for
9   what guidance the identity of that individual, who was given an
10  important task of segregating that information, making sure it
11  got put in the file, should not be disclosed.  Not a single --
12          THE COURT:  All right.  We'll provide that
13  information under seal.
14          THE WITNESS:  Yes, Your Honor.
15          MR. SUAREZ:  Thank you, Your Honor.
16          THE COURT:  Yes.
17          MR. PARDO:  If I may, Your Honor?
18          THE COURT:  Yes.
19          MR. PARDO:  So just for the record, when I disclosed
20  that this past weekend -- do I need to get by a microphone?
21          THE COURT:  Yes.
22          MR. PARDO:  The names of the --
23          THE COURT:  And you are, Counsel?
24          MR. PARDO:  AUSA David Pardo.
25          THE COURT:  Yes.  Okay.  Good.

BLYTHE - CROSS                                      Vol. 3-131

1          MR. PARDO:  So the names of the people who actually
2    mine for this data are actually in the disclosure.  So if it's
3    a point of --
4          THE COURT:  Oh.
5          MR. PARDO:  -- so they're there.  They're listed in
6    the "drafted by" in the actual PDF disclosure.  It's in there.
7    It says who the names are.
8          THE COURT:  Oh, okay.  So you already have it,
9    Mr. Suarez.
10         MR. SUAREZ:  Your Honor, we will accept Mr. Pardo's
11   representation we have it.  And if for some reason --
12         THE COURT:  You have no reason to doubt Mr. Pardo, do
13   you?
14         MR. SUAREZ:  I do not.
15         THE COURT:  Okay.
16         MR. SUAREZ:  I was going to say, if for some reason
17   we find that we -- there's a disagreement --
18         THE COURT:  Okay.  All right.
19         MR. SUAREZ:  -- we'll be working collegially with
20   Mr. Pardo and with Mr. Duva.  We can circle back.
21         THE COURT:  Okay.
22         MS. JEFFERSON:  Eddie?
23         MR. SUAREZ:  May I have a moment, Your Honor?
24         THE COURT:  Sure.
25         Thank you, Mr. Pardo.

BLYTHE - CROSS                                      Vol. 3-132

1          MR. SUAREZ:  Thank you, Your Honor.
2    BY MR. SUAREZ:
3    Q.   Just a follow-up question.  Mr. Duva, in his response to
4    the Court, made the statement that -- regarding the
5    administrative folks that were putting the articles in the
6    file, that they didn't do something they were supposed to do.
7          Is that the same individuals that were doing -- that
8    were -- back in September of 2021 you asked them to segregate
9    the file, or was he talking about something else?
10   A.   So there was one person in that position back in September
11   2021 that didn't complete what they were asked to do.  I don't
12   think that person was around whenever the request was made
13   to -- was any -- was in that position any longer when the
14   request was made to a successor in that position to place
15   articles for us into the file.
16   Q.   All right.
17   A.   Does that make sense?
18   Q.   Yeah, I think so.
19         So let me ask you this.
20         With those individuals, did you or Agent Hill -- did
21   anybody in the investigative or prosecution team provide them
22   with any instructions to segregate the -- any articles that
23   contained the *Garrity* statements?
24   A.   I don't -- I don't know what Agent Hill may have said to
25   that person, but I don't recall providing that -- that warning.

BLYTHE - CROSS                                                    Vol. 3-133

 1    I simply said, you know, articles related to the investigation.
 2    Q.   Okay.  And were any efforts made to shield you or Agent
 3    Hill or anybody in the investigative or prosecution team from
 4    those articles that were being stored until some determination
 5    could be made whether or not they contained *Garrity*
 6    information?
 7    A.   No.
 8    Q.   And do you know if any of those articles that were -- that
 9    were gathered by the admin staff, if they were shared with
10    members of the prosecution team?
11    A.   I don't know.  I'm sure the admin person wasn't sharing
12    them with the prosecutor.  If I ever came across an article
13    that I thought was relevant or that I thought another member of
14    the prosecution team would want to read, I would share it with
15    them.
16    Q.   Okay.  So you would go in periodically and look at what
17    they had gathered?
18    A.   No.  I just wanted them to be memorialized in the file.  I
19    did my review of press on my own, you know, on the Internet.
20    Q.   On your own.  Okay.
21    A.   So it was simply -- you know, the file is the system of --
22    official system of record for the FBI.  So I wanted things to
23    be put there, but I didn't necessarily need to go -- didn't go
24    back to look at them there or access them there.
25            I don't recall going back to the file to say, "Okay,

BLYTHE - CROSS                                                    Vol. 3-134

 1    I need to review the articles for a certain period of time."
 2            I just, you know, would -- expected that they were
 3    being put in there, and I would read articles as they came on
 4    the Internet.
 5    Q.   On your own, rather than through that mechanism.
 6    A.   Correct.
 7    Q.   Okay.  And do you know if any members of the investigative
 8    or prosecution team followed that format, whether they were
 9    reading it on their own or whether they were going to that
10    file?
11    A.   I don't know what Agent Hill was doing.  So she's the only
12    other person that would be accessing -- the only other agent
13    that would be accessing our file.
14    Q.   Okay.
15            MR. SUAREZ:  Your Honor, I don't know if you want me
16    to keep going.  This is -- would be a good spot to stop for me,
17    if that's agreeable to the Court.
18            THE COURT:  All right.  I think it probably is a good
19    time to stop.
20            Let me see counsel at sidebar before we adjourn.
21                    *  *  *  *  *
22    (Sidebar No. 1 sealed and under separate cover.)
23                    *  *  *  *  *
24            THE COURT:  Okay.  We will reconvene tomorrow at
25    9 o'clock.

Vol. 3-135

```
 1            Court will be in recess.
 2            COURT SECURITY OFFICER:  All rise.
 3        (The proceedings were adjourned at 5:18 p.m., to be
 4   continued on May 18, 2023.)
 5                            -   -   -
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Vol. 3-136

```
 1            CERTIFICATE OF OFFICIAL COURT REPORTER
 2
 3
 4   UNITED STATES DISTRICT COURT )
 5   MIDDLE DISTRICT OF FLORIDA   )
 6
 7        I hereby certify that the foregoing transcript is a
 8   true and correct computer-aided transcription of my stenotype
 9   notes taken at the time and place indicated therein.
10
11        DATED this 26th day of May, 2023.
12
13                        s/Shelli Kozachenko_____
                          Shelli Kozachenko, RPR, CRR, CRC
14                        Official Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```

# Doc. 271

Vol. 4-1

```
 1              IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                     JACKSONVILLE DIVISION

 3
     UNITED STATES OF AMERICA,        Jacksonville, Florida
 4
             Plaintiff,               Case No. 3:22-cr-23-BJD-MCR
 5
     -vs-                             May 18, 2023
 6
     AARON ZAHN,                      9:07 a.m.
 7   RYAN WANNEMACHER,

 8           Defendants.              Courtroom 5C

 9   _____

10             TRANSCRIPT OF KASTIGAR HEARING
                      (VOLUME IV)
11       BEFORE THE HONORABLE MONTE C. RICHARDSON
             UNITED STATES MAGISTRATE JUDGE
12

13

14

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22       Shelli Kozachenko, RPR, CRR, CRC
23       221 North Hogan Street, #185
         Jacksonville, FL  32202
24       Telephone:  (904) 301-6842

25              (Proceedings reported by stenography;
                 transcript produced by computer.)
```

Vol. 4-2

```
 1                A P P E A R A N C E S

 2
     COUNSEL FOR THE GOVERNMENT:
 3
 4       Tysen Duva, Esquire
         Arnold Corsmeier, Esquire
 5       United States Attorney's Office
         300 North Hogan Street, Suite 700
         Jacksonville, FL  32202
 6
 7       David Pardo, Esquire
         United States Attorney's Office
 8       400 North Tampa Street, Suite 3200
         Tampa, FL  33602

 9

10   COUNSEL FOR DEFENDANT ZAHN:

11       Eduardo Suarez, Esquire
         The Suarez Law Firm, PA
12       1011 West Cleveland Street
         Tampa, FL  33606

13

14       Brian Albritton, Esquire
         Raquel Jefferson, Esquire
15       Phelps Dunbar, LLP
         100 South Ashley Drive, Suite 2000
16       Tampa, FL  33602

17

18   COUNSEL FOR DEFENDANT WANNEMACHER:

19       James Felman, Esquire
         Kynes, Markman & Felman, PA
20       100 South Ashley Drive, Suite 1300
         Tampa, FL  33601

21       Niels Murphy, Esquire
22       Catherine Licandro, Esquire
         Murphy & Anderson, PA
23       1501 San Marco Boulevard
         Jacksonville, FL  32207

24

25
```

Vol. 4-3

```
 1          T A B L E   O F   C O N T E N T S
 2
 3  GOVERNMENT WITNESSES:                        Page No.
 4    SPECIAL AGENT ROBERT BLYTHE
 5      CROSS-EXAM (CONT'D) BY MR. SUAREZ........     4
 6      CROSS-EXAMINATION BY MR. FELMAN..........    83
 7      REDIRECT EXAMINATION BY MR. DUVA.........    87
 8
 9    TIMOTHY ADAMS
10      DIRECT EXAMINATION BY MR. DUVA...........   100
11      CROSS-EXAMINATION BY MR. SUAREZ..........   111
12      CROSS-EXAMINATION BY MR. FELMAN..........   127
13
14    JOHN ZIPPERER
15      DIRECT EXAMINATION BY MR. DUVA...........   135
16      CROSS-EXAMINATION BY MR. SUAREZ..........   141
17
18    KEVIN BLODGETT
19      DIRECT EXAMINATION BY MR. DUVA...........   150
20      CROSS-EXAMINATION BY MR. SUAREZ..........   174
21      REDIRECT EXAMINATION BY MR. DUVA.........   200
22
23    PAUL McELROY
24      DIRECT EXAMINATION BY MR. DUVA...........   202
25
```

BLYTHE - CROSS                                    Vol. 4-4

```
 1              P R O C E E D I N G S
 2  May 18, 2023                            9:07 a.m.
 3                     -  -  -
 4          COURT SECURITY OFFICER:  All rise.  United States
 5  District Court in and for the Middle District of Florida is now
 6  in session, the Honorable Monte C. Richardson presiding.
 7          Please be seated.
 8          THE COURT:  Good morning.
 9          ALL:  Good morning, Your Honor.
10          THE COURT:  Mr. Suarez, how are you, sir?
11          MR. SUAREZ:  Doing well, Your Honor.  Could use a
12  little more sleep.
13          THE COURT:  Yeah.
14          Agent, you're still under oath.
15          THE WITNESS:  Yes, Your Honor.
16          THE COURT:  And before we proceed, I need a brief
17  sidebar.
18                   *  *  *  *  *
19      (Sidebar No. 1 sealed and under separate cover.)
20                   *  *  *  *  *
21          THE COURT:  All right.  Mr. Suarez, you have the
22  floor.
23          MR. SUAREZ:  Thank you, Your Honor.
24      SPECIAL AGENT ROBERT BLYTHE, GOVERNMENT'S WITNESS, SWORN
25              CROSS-EXAMINATION (CONTINUED)
```

BLYTHE - CROSS                                        Vol. 4-5

1   BY MR. SUAREZ:
2   Q.   Good morning again, Agent Blythe.
3   A.   Good morning.
4   Q.   Agent Blythe, I want to pick up by talking about the
5   collection of statements by the prosecution team, and
6   specifically *Garrity*-protected statements.
7        And when I say prosecution team, I think I'm using
8   the term as it's been defined in the various filings, which
9   include you and investigating agents, as well as the
10  prosecutors assigned to the case, okay?
11  A.   Understood.
12  Q.   Thank you.
13       All right.  In the course of your investigation, I am
14  aware of at least three *Garrity*-protected statements that were
15  obtained:  Ryan Wannemacher's, Volume 2 of Aaron Zahn's
16  statement, and the transcript of Herschel Vinyard.
17       Did you collect any others?
18  A.   There are several others that were taken by OGC during the
19  course of their investigation on whether to terminate Aaron
20  Zahn for cause.
21  Q.   Okay.  And which ones --
22  A.   We considered those persons witnesses in the
23  investigation.
24       I couldn't name all of them to you, but it was mainly
25  members of the senior leadership team.

BLYTHE - CROSS                                        Vol. 4-6

1   Q.   Okay.  Let's see how many we can catalog, and I recognize
2   there's no reason for you to have a perfect recall of every one
3   of them.
4        But Lynne Rhode would be one?
5   A.   I think so.  Deryle Calhoun, Karen Anders, Herschel
6   Vinyard as we said, Jonathan Kendrick, maybe Paul Steinbrecher.
7   Q.   Okay.
8   A.   There's a few more at least.
9   Q.   All right.  So let's talk a little bit about -- let's
10  start with Ryan Wannemacher's.
11       When did you collect Ryan Wannemacher's
12  *Garrity*-protected statement?
13  A.   That was on January 15th, 2020, when the Office of General
14  Counsel offered them to us.
15  Q.   Okay.  And you said when -- when you first received it, I
16  think you had a conversation with the rest of the prosecution
17  team, and a decision was made not to read that statement,
18  correct?
19  A.   Correct.
20  Q.   And who was involved in that decision?
21  A.   As I testified yesterday, we had a -- I had a conversation
22  with AUSA Duva.
23  Q.   And no one else was involved in that decision.
24  A.   That was a conversation that was at AUSA Duva's direction.
25  I don't know if he consulted with anybody else or not.

BLYTHE - CROSS                                    Vol. 4-7

1   Q.   And outline for me the factors that led you to decide not
2   to read Mr. Wannemacher's statement.
3   A.   At that time I didn't know whether he was somebody that
4   would turn out to be a subject or a witness, so out of an
5   abundance of caution, we decided to not review that statement.
6   He wasn't firmly in the witness category, but we did think it
7   was possible that down the road we might exclude him, if you
8   will.
9   Q.   Okay.  And if you made that decision, then you would read
10  it then.  Would that be accurate?
11  A.   Yes, if we made the firm decision that he was a witness.
12  Q.   Okay.  And when did you collect Herschel Vinyard's
13  statement?
14  A.   At the same time, I think.
15  Q.   January 15th?
16  A.   Yes, sir.
17  Q.   Now, let's outline a little bit for the Court the
18  involvement of Mr. Vinyard both at JEA and specifically in the
19  creation of the PUP.
20       Mr. Vinyard was the chief administrative officer at
21  JEA, correct?
22  A.   Correct.
23  Q.   And you know that he is a former secretary of the Florida
24  Department of Environmental Protection, correct?
25  A.   Yes.

BLYTHE - CROSS                                    Vol. 4-8

1   Q.   And he was also a former -- he's a lawyer and a former
2   partner at Foley Lardner before he joined JEA.
3   A.   Yes, sir.
4   Q.   Okay.  And you would agree with me that Mr. Vinyard is a
5   respected lawyer and respected member of the Jacksonville
6   community.
7   A.   Sure.  That's -- that's the impression I received from
8   other people.
9   Q.   And while at JEA in his capacity as the chief
10  administrative officer, one of the things he saw was -- he
11  oversaw was the legal team, legal affairs.
12  A.   Yes.
13  Q.   Okay.  And during the creation of the PUP and the lead-up
14  to the ITN, he had regular meetings with the lawyers that were
15  working on this, specifically with OGC lawyers.
16  A.   Correct.
17  Q.   And he had regular and repeated interactions with outside
18  counsel.
19  A.   He did.
20  Q.   Including and specifically with the outside counsel that
21  were developing the PUP.
22  A.   I don't --
23       MR. DUVA:  Objection.  Mischaracterizes the
24  testimony.  There's been no testimony that outside counsel
25  developed the PUP.

BLYTHE - CROSS                                          Vol. 4-9

1          The testimony was that the formula was provided to
2     outside counsel and that outside counsel drafted plan documents
3     for employees to participate, but the testimony was the formula
4     was prepared by JEA.
5          MR. SUAREZ:  I think there is ample evidence in this
6     record that the -- that the PUP was -- in fact, the documents
7     and the resolution adopted was drafted by Jessica Lutrin, who
8     is a lawyer at Pillsbury.  I think it's an appropriate and
9     proper question.
10         MR. DUVA:  I agree with the resolution, but that's
11    not what the question was.
12         So if the question was who drafted the resolution,
13    that would be Lynne Rhode and Jessica Lutrin.  We have no
14    objection to that.
15         THE COURT:  Go ahead, Counsel.
16    BY MR. SUAREZ:
17    Q.   And it would be accurate to say that Mr. Vinyard had
18    regular and repeated interactions with the lawyers who drafted
19    the resolution and the PUP documents that were presented to the
20    board.
21    A.   I think, you know, Lynne Rhode was the primary person
22    dealing with them, but I -- I don't dispute what you're saying.
23    I think he did -- he did have contact.  I can't quantify it or
24    compare it in percentage with Ms. Rhode, but that's fair.
25    Q.   And you know there came a point in time where some lawyers

BLYTHE - CROSS                                          Vol. 4-10

1     from Foley had questions about the PUP formula and had some
2     concerns about the numbers that the PUP formula was producing.
3     You're aware of that.
4     A.   Are you referring to Mr. Kirwan?
5     Q.   Yeah.  Among others, yeah.
6     A.   Correct.
7     Q.   Okay.  And you are aware that those lawyers from Foley
8     shared those concerns about the PUP formula and the numbers
9     that it was spitting out, to borrow their term -- they shared
10    those concerns with Lynne Rhode, and they shared those concerns
11    with Jessica Lutrin, and they shared those concerns with
12    Herschel Vinyard.
13    A.   I don't -- I don't remember them sharing them with
14    Herschel Vinyard.  If there's something you can show me to
15    refresh my recollection.  I'm not saying -- not disputing what
16    you're saying, but I just don't independently remember him
17    being a part of that conversation.
18    Q.   We will find a document to refresh your recollection.
19         I'm going to try it this way.  You don't recall there
20    being a phone call that involved Mr. Wannemacher, Mr. Vinyard,
21    Ms. Lutrin, and --
22    A.   I remember that there was a phone call with Foley &
23    Lardner, and Ryan Wannemacher participated in that.  And it was
24    determined that Mr. Kirwan was -- you know, had a different
25    interpretation of the formula than JEA.

BLYTHE - CROSS                                    Vol. 4-11

1    Q.    But my question is just simply, you don't recall
2    Mr. Vinyard being a participant in that?
3    A.    I don't remember if he was or not.
4    Q.    Okay.  And do you know that later the council auditor had
5    specific questions about the operation of the PUP.  In fact,
6    there was a meeting, I think, on October the 31st of 2019
7    between folks from JEA and folks from the Council Auditor's
8    Office?
9    A.    Correct.
10   Q.    And Herschel Vinyard was a participant in that meeting.
11   A.    I -- I don't dispute what you're saying.  I don't
12   particularly recall whether he was there or not, but it would
13   make sense if he was there.
14   Q.    And yesterday there was a lot of conversation about Nixon
15   Peabody's memo dated May 20th of 2019.
16          Do you remember that?
17   A.    Yes, sir.
18   Q.    And I don't want to say yesterday.  I mean throughout your
19   direct testimony.
20   A.    Yes.
21   Q.    And can we just refer to it as the Nixon Peabody memo
22   and --
23   A.    Sounds good.
24   Q.    -- we'll know what we mean?
25          Okay.  And you know that when Elizabeth Columbo, the

BLYTHE - CROSS                                    Vol. 4-12

1    lawyer for Nixon Peabody who wrote that memo, when she sent
2    that memo to JEA, that memo was given and emailed to Herschel
3    Vinyard.
4    A.    I think it was.  Yeah, I agree with you.
5          I just want to make one thing clear, if I may.  I
6    waited to review Herschel Vinyard's transcript, his
7    *Garrity*-protected statement, until probably the end of 2021, if
8    not early 2022 because we weren't sure which category he fell
9    in.
10   Q.    Okay.
11   A.    But the decision was made that he wasn't --
12   Q.    I got you.
13   A.    We weren't moving forward, so I reviewed his.
14   Q.    I promise you I'm going to give you ample opportunity to
15   tell the Court all about that decision.
16   A.    Okay.
17   Q.    Okay.  Now, in addition to being the recipient of the
18   Nixon Peabody memo, Herschel Vinyard also sent the memo that
19   was written by OGC to Elizabeth Columbo when she requested
20   that.
21          Do you remember that?
22   A.    The May 20th, 2019, memo?
23   Q.    Okay.  So let me restate a little bit --
24   A.    Okay.
25   Q.    -- because I was confusing.

BLYTHE - CROSS                                             Vol. 4-13

```
1              Elizabeth Columbo writes a memo on May the 20th,
2    shares it with JEA, correct?
3    A.   Correct.
4    Q.   And then JEA shares it with OGC.
5    A.   So I -- I do understand that that memo made it to Kort
6    Parde.  Beyond that, I don't know if anybody -- my
7    investigation hasn't concluded whether anybody else saw that
8    memo at the time other than Kort Parde.
9    Q.   You're not aware of --
10   A.   And Lynne Rhode.
11   Q.   And Lynne Rhode.
12   A.   Right.
13   Q.   So we got Lynne Rhode, OGC lawyer; Parde, OGC lawyer.
14             And are you not aware that Sean Granat also saw that
15   memo?
16   A.   So I -- you know, I know he saw it later when they said
17   they found it in Kort Parde's desk.  I think there's a dispute
18   between Ms. Rhode and Kort Parde and other people at OGC about
19   who saw it and when.
20   Q.   Okay.
21   A.   So that's something that you'll probably have to ask them
22   about.
23   Q.   Okay.  But OGC then wrote a memo around June 7th of 2019
24   sort of giving their own view of the PUP as sort of a
25   counter-memo to what Nixon Peabody had written.
```

BLYTHE - CROSS                                             Vol. 4-14

```
1    A.   The June 17th?
2    Q.   Maybe it's -- June 17th?  Is that what you recollect?
3    A.   So I'm not a lawyer, just a humble accountant who carries
4    a gun now, but that memo --
5    Q.   You're a scary accountant, is what you're saying.
6    A.   That memo was -- to my understanding, was very limited and
7    basically said that, "Yes, they can do it.  However, it has to
8    be vetted through these Florida statutes," I think the same
9    ones that Nixon Peabody said it didn't pass.
10             So it sort of wasn't opining that it did meet
11   those -- the criteria of those statutes, but -- yes, but we've
12   got to look at these statutes and decide whether it's okay.
13   Q.   All right.  Well -- and Lynne -- excuse me, Elizabeth
14   Columbo requested to be provided a copy of that memo.
15   A.   Yes.
16   Q.   And it was Herschel Vinyard who sent her that memo, the
17   OGC memo.
18   A.   I don't disagree with you.
19   Q.   All right.  Now --
20             MR. DUVA:  Your Honor, I know -- I get that some of
21   this is a memory test.  But when we're talking about documents
22   which are admitted into evidence, I think it would be best if
23   the witness gets the opportunity to see the document.
24             I don't know that we can have a cross on a memory
25   test of what a legal memorandum says and how similar or
```

BLYTHE - CROSS                                          Vol. 4-15

```
 1  different it is from the Nixon Peabody memo.
 2          Obviously when we're talking about things that are
 3  not reduced to an exhibit that's admitted -- admitted in the
 4  Government's presentation, I think that's different.  But this
 5  is kind of turning into a memory test on documents that are
 6  admitted in the record.  I think it's fair for the witness to
 7  see the document.
 8          THE COURT:  Counsel?
 9          MR. SUAREZ:  As much as I enjoy listening to
10  Mr. Duva, I haven't heard an objection (unintelligible).
11          MR. DUVA:  That was an objection as to the form,
12  essentially.
13          THE COURT:  Let's proceed.
14          MR. SUAREZ:  Thank you, Your Honor.
15          THE WITNESS:  Could I see the email, please?
16  BY MR. SUAREZ:
17  Q.  Which -- the email from Mr. Vinyard to Elizabeth Columbo?
18  A.  Sure.
19  Q.  We'll get to it.
20  A.  I don't --
21  Q.  You do --
22  A.  I don't remember whether he sent it or not.
23  Q.  Oh, okay.
24  A.  I'd like to see the document.
25  Q.  Okay.  You don't remember that.
```

BLYTHE - CROSS                                          Vol. 4-16

```
 1          Well, we'll get to it and see if it refreshes your
 2  recollection.
 3          THE COURT:  And hold on.
 4          And, Agent, if there is an occasion during
 5  questioning that you need to refer to a document, yes, please
 6  let counsel know.
 7          THE WITNESS:  Thank you, Your Honor.
 8          THE COURT:  Yes.
 9  BY MR. SUAREZ:
10  Q.  And just so that I'm clear, as you sit here right now, you
11  don't recall if Mr. Vinyard sent that memo to Elizabeth Columbo
12  at her request.
13  A.  I'd like to see the document to confirm my memory.
14  It's -- there's thousands of documents in this case.
15  Q.  It's a simple question.  You don't remember.  Right now,
16  you don't -- as you sit there right now, you don't remember
17  that Herschel Vinyard emailed that to Elizabeth Columbo.
18  A.  I know someone at JEA emailed it to Elizabeth Columbo.
19  Q.  You don't know if it's Herschel Vinyard.
20  A.  No, and if you'd offer me the chance to look at the
21  exhibit, yeah, I'd be happy to tell you whether he sent it.
22  Q.  We are going to do our best to pull it up for you.
23          MR. DUVA:  I guess I'm wondering, Your Honor -- I'm
24  going to object to relevance.
25          The testimony on direct was that Elizabeth Columbo,
```

BLYTHE - CROSS                                      Vol. 4-17

1   during the interview, asked for a copy of the document, and
2   Agent Blythe testified that, based on her interview and the
3   302, that she received it.  That's Exhibit 71.
4           So who sent it to her, I don't think it's relevant.
5   It doesn't matter.  I mean, presumably what Mr. Suarez is
6   getting at is that in Herschel Vinyard's *Garrity* statement,
7   who's not a defendant, that he talked about doing this.
8           And the whole point about independent sourcing is an
9   interview with Elizabeth Columbo saying, "I asked for it.  I
10  got it," and then, "I thought it was insufficient and I gave
11  Ryan Wannemacher the same advice on July 1st that I gave him on
12  May 20th."  So who sent what is not relevant.
13          I think at some point in the cross we have to get to
14  Mr. Zahn and Mr. Wannemacher said A, B, and C.  A witness read
15  their statement and took away the A, B, and C, which they could
16  only get from the statement, told the Government about A, B,
17  and C.  The Government took A, B, and C and developed the lead
18  X, Y, and Z, which we then presented to the grand jury and
19  ultimately made its way into the indictment.
20          That's the only relevance that this cross should be
21  covering.  Who emailed who what is -- we're going to be here
22  for three days at this pace.
23          I know we had us here for two, but we had the burden.
24  So I'm just asking for the cross to kind of move in that
25  direction of what -- not Herschel Vinyard said but what these

BLYTHE - CROSS                                      Vol. 4-18

1   other -- Mr. Wannemacher and Mr. Zahn said and how it was used
2   derivatively to further -- to obtain the indictment or further
3   the investigation.
4           THE COURT:  Mr. Suarez, do you understand Mr. Duva's
5   concerns?
6           MR. SUAREZ:  Well, I understand the -- what I think
7   an objection that he's making, Your Honor.
8           COURT REPORTER:  Can you go to the Microphone,
9   please.
10          MR. SUAREZ:  I'm sorry.
11          I think I understand the objection that he's making,
12  Your Honor.  I would point out to the Court the issues
13  here are the treatment that was given to the *Garrity*-protected
14  statements, all of them.
15          And there was lots of testimony in the last two and a
16  half days about going back to 2017 when he watched videos from
17  before Mr. Zahn ever even came on the board of JEA, all of this
18  in the -- from the perspective of giving the Court a full
19  picture of their investigation.
20          I am zeroing in on a very specific area which deals
21  specifically with the process that was used in gathering the
22  *Garrity*-protected statements, the process of their evaluation
23  of those *Garrity*-protected statements.
24          I think it's completely relevant.  It's certainly far
25  more relevant than the 2017 JEA board meetings when Mr. Zahn

BLYTHE - CROSS                                    Vol. 4-19

1   wasn't even on the board, so ...
2               THE COURT:  I'll give you that latitude, Counsel.
3               MR. SUAREZ:  Thank you, Your Honor.
4   BY MR. SUAREZ:
5   Q.   So I want to ask you, then, about the -- when you made the
6   decision to read Herschel Vinyard's statement.
7               When was that done?
8   A.   As I said, I think it was in late 2021.  I probably
9   highlighted my working copy of the transcript and would have a
10  date modified if I could look at my notes.
11              But in any event, I had a conversation with Mr. Duva,
12  and he expressed that he didn't have the intent to prosecute
13  Mr. Vinyard.  And so we, you know, discussed that it would be
14  appropriate to review that statement at that time.
15  Q.   Okay.  And who else was involved in that decision other
16  than Mr. Duva?
17  A.   I don't remember anybody else being a part of that.
18  Q.   Were you asked for your opinion as to whether or not that
19  was an appropriate decision?
20  A.   No.
21  Q.   Did you provide an opinion as to whether or not that was
22  an appropriate decision?
23  A.   I was looking to Mr. Duva for guidance.  It's not -- I
24  don't think Mr. Duva looks to me for legal advice.
25  Q.   Okay.  I'm not asking for legal advice.  I'm just asking

BLYTHE - CROSS                                    Vol. 4-20

1   if you gave your opinion as to the appropriateness of that
2   decision.
3   A.   My understanding is that if somebody is deemed a witness,
4   that it's okay to review those statements.
5   Q.   Did you give Mr. Duva your opinion as to whether or not
6   Mr. Vinyard should be treated as a witness?
7   A.   I don't remember if I gave him my opinion.  Ultimately I
8   don't get to decide who gets prosecuted.  I conduct an
9   investigation, assist them with the investigation, and, you
10  know, he makes the -- all prosecutive decisions.  That's his
11  decision, not mine.
12  Q.   And as far as you know, that he and only -- let me restate
13  that.
14              Mr. Duva and only Mr. Duva made the decision to treat
15  Mr. Vinyard as a witness.
16              MR. DUVA:  I'm going to object as to foundation.  I
17  don't know that Agent Blythe could know the internal processes
18  within our office that led to that decision.  He doesn't know
19  that.
20              MR. SUAREZ:  That's fair, Judge.  I'll restate it.
21              THE COURT:  That's fair.
22  BY MR. SUAREZ:
23  Q.   As far as you know, was Mr. Duva the only person
24  involved in that decision?
25              MR. DUVA:  It's the same question, Your Honor.  I'm

BLYTHE - CROSS                                    Vol. 4-21

1  going to make the same objection.
2         THE COURT:  Yeah.  I don't know if the agent -- I
3  think that with regard to that statement, Mr. Suarez, Agent
4  Blythe wouldn't have a foundation of making that -- a response
5  to that question.
6         MR. SUAREZ:  All right.  I'm going to restate it a
7  little bit and see if it clears that up --
8         THE COURT:  Okay.
9         MR. SUAREZ:  -- if I may, Your Honor.
10 BY MR. SUAREZ:
11 Q.   Who -- to the best of your knowledge, give me a complete
12 list of all the individuals that you're aware of who were
13 involved in the decision to treat Mr. Vinyard as a witness.
14        MR. DUVA:  I'd make the same objection, Your Honor.
15 Foundation and relevance.
16        THE COURT:  Do you know, Agent?
17        THE WITNESS:  AUSA Duva told me, "He's a witness.
18 We're not prosecuting him."  That was the end of the story for
19 me.
20        THE COURT:  Okay.
21        MR. SUAREZ:  Okay.  Thank you, Your Honor.
22        THE COURT:  Yes.
23 BY MR. SUAREZ:
24 Q.   Okay.  So once he became a witness, when did you interview
25 Mr. Vinyard?

BLYTHE - CROSS                                    Vol. 4-22

1  A.   We haven't -- I don't recall interviewing him, or I didn't
2  participate in that one.  I don't think we've interviewed him.
3  Q.   You don't think you interviewed him.
4  A.   No.
5  Q.   Would it surprise you if I say to you that we have
6  searched through all the discovery, and there's no 302, no
7  memorandum of interview, no report reporting a single interview
8  with Herschel Vinyard?
9  A.   No, it does not.
10 Q.   It does not surprise you.
11        Why did you not interview Mr. Vinyard?
12 A.   I talked with AUSA Duva about it.  We discussed it as a
13 team, and after reviewing the OGC interview, we decided it
14 wasn't necessary at that -- at that time.
15 Q.   Okay.  And "we" is you, AUSA Duva.
16        Was there anybody else involved in that discussion?
17 A.   I don't specifically remember, but Agent Hill could have
18 been on the conversation.  She often is.  But I don't
19 specifically remember.
20 Q.   Okay.  And did you agree with that decision not to
21 interview Mr. Vinyard and find out what information he had that
22 would be relevant and productive to the investigation?
23 A.   I didn't feel strongly one way or the other.  You know, I
24 have been jibbed or jabbed by assistant U.S. attorneys for
25 being Agent 302 and interviewing everybody under the sun.  But,

BLYTHE - CROSS                                         Vol. 4-23

1   you know, I didn't feel strongly about interviewing him or not
2   after reviewing his *Garrity* statement.
3   Q.   Well, it's funny you say about interviewing everyone under
4   the sun.
5           I mean, you interviewed more than 90 witnesses,
6   right?
7   A.   We did.
8   Q.   Yeah.  And --
9   A.   80 or so at least.
10  Q.   You interviewed folks at JEA -- right? -- lots of folks at
11  JEA.
12  A.   Sure.  Yes.
13  Q.   Resources people, right?
14  A.   Yes.
15  Q.   Employee benefits people?
16  A.   Yes.
17  Q.   But the chief administrative officer -- right? -- probably
18  the No. 3 person at JEA got --
19  A.   Well, he -- after -- in our investigation, we didn't think
20  he was that key of a person.  We didn't think he was on the
21  inside, as far as the inside baseball of how the PUP worked,
22  who would get paid what.
23          And, you know, we couldn't see that he was making
24  misrepresentations to the board and others like the two
25  defendants in this case.

BLYTHE - CROSS                                         Vol. 4-24

1           So he wasn't somebody that -- although he was in a
2   high-level position, he was there for a very short period of
3   time, and it wasn't somebody that -- you know, we decided that
4   he was a witness.  We read his *Garrity* statement, and we didn't
5   think he had a lot of value to add, so we didn't interview him.
6   Q.   And you agreed with that decision, not to interview the
7   chief administrative officer, right, who was in conversations
8   with the lawyers, who was in conversation with the Council
9   Auditor's Office, right?  You didn't --
10  A.   We didn't think his contribution during that time period
11  was very significant.
12  Q.   Okay.  Not very significant.
13          All right.  Let's move on, then, to Aaron Zahn's
14  statement.  You did obtain that -- Volume 2 of that transcript.
15          When did you get that?
16  A.   That -- we obtained that inadvertently from JEA, I
17  believe.  I don't remember which production that was that we
18  received that.  I'd have to look back at the sets of
19  productions in our reports.
20  Q.   Okay.  And do you know why JEA only produced Volume 2 and
21  not Volume 1 as well?
22  A.   I have no idea.
23  Q.   And when did you make the decision not to read
24  Mr. Zahn's -- Volume 2 of Mr. Zahn's statement?
25  A.   Well, as I testified I think it was yesterday, I didn't

1   know I had it until the defense made AUSA Duva aware that it
2   was in there.  And he and I went through the process we
3   discussed yesterday to segregate that.
4   Q.   Okay.  All right.  Let's talk a little bit about Jody
5   Brooks.
6          Jody Brooks was not a grand jury witness, correct?
7   A.   No, I don't think so.
8   Q.   And you initially testified that Jody Brooks was the
9   person that brought the Nixon Peabody memo to your attention.
10  That was your initial testimony.  I know you corrected it
11  later, but your initial testimony was that she was the one who
12  brought it to your attention.
13  A.   Yes.  I mixed up the timeline there.  We did -- I did
14  interview her about it subsequent -- shortly after finding out
15  about it.
16  Q.   And the -- in fact, you interviewed her on April 13 of
17  2020, right?
18  A.   Correct.
19  Q.   Okay.  And you said that the Nixon Peabody was important
20  because it questioned whether or not JEA could lawfully
21  implement an LTI.
22  A.   Well, that and the fact that, you know, a lot of folks
23  were surprised by its existence and that, you know, the
24  subsequent lawyers, as best I recall, weren't aware of it.
25  Q.   This -- you said the subsequent lawyers weren't aware of

1   it?
2   A.   Foley & Lardner.
3   Q.   All right.  So Lynne Rhode was a lawyer from OGC detailed
4   to JEA, and she was aware of it, correct?
5   A.   Correct.
6   Q.   And you at least don't dispute that Herschel Vinyard,
7   who's also a lawyer at JEA and oversees the legal team, was
8   aware of it, correct?
9   A.   I don't dispute that.
10  Q.   And Ms. Parde, who was a lawyer at OGC, was also aware of
11  it, correct?
12  A.   Yes.
13  Q.   And, in fact, she wrote a memo at least attempting to
14  address some of the issues raised by Nixon Peabody in their
15  memo, correct?
16  A.   Correct.
17  Q.   So that's at least three lawyers, two from OGC, that were
18  aware of it, and maybe Sean Granat -- that's in dispute,
19  right? -- that were aware of it.
20  A.   Yes.
21  Q.   But your testimony to Judge Richardson is that that memo
22  was not seen by any other subsequent lawyers.
23  A.   My understanding is that Foley & Lardner didn't see it.
24  Q.   On Tuesday you corrected your testimony and you
25  explained -- right? -- that you were mistaken and that in fact

BLYTHE - CROSS                                    Vol. 4-27

1  you had not first learned of the Nixon Peabody from Jody
2  Brooks.  You explained that you had received it from OGC.
3  A.    Correct.
4  Q.    Okay.  And I think you said that they found it in a desk
5  drawer belonging to former OGC lawyer Kort Parde; is that
6  right?
7  A.    That's what I was told.
8  Q.    Okay.  Who told you that?
9  A.    Jon Phillips or -- and/or Adina Teodorescu with OGC.
10 Q.    Okay.  They were the lawyers that, in fact, mailed it to
11 you -- emailed it to you, right?
12 A.    Yes.
13 Q.    And, in fact, on March 9th of 2020, OGC Lawyer Adina
14 Teodorescu did an email search and found it.
15 A.    Is that a question?
16 Q.    Yeah, it is a question.
17 A.    Are you asking me if she found it?
18 Q.    Yes.
19 A.    That's my understanding.
20 Q.    Okay.  So she did an email search and she found it, right?
21 A.    That's what I said.
22 Q.    Okay.
23 A.    That's what you said.  I agree with you.
24 Q.    So that's not a desk drawer.  I'm just trying to get my
25 head around the idea that she said found it in a desk drawer

BLYTHE - CROSS                                    Vol. 4-28

1  but she did an email search.
2  A.    So I think you're, you know, splitting hairs here.  One
3  could find a copy of a document in paper form in a desk.  One
4  could go search the email servers to see where that document
5  was electronically --
6  Q.    Right.
7  A.    -- and how it got moved around electronically.  That's
8  what she did subsequent to finding it in a drawer --
9  Q.    And one --
10 A.    -- in hard copy.
11 Q.    And one could give a court the full answer to where a
12 document was found.  It wasn't just in a desk drawer.  It was
13 done through an electronic search of the emails conducted by an
14 OGC lawyer --
15 A.    I was answering where it was found initially.  It was
16 initially found in a desk drawer.  Subsequent to that, my
17 understanding is they went and looked -- searched for it
18 electronically.
19 Q.    Okay.  And she found it at the request of Lanny Russell,
20 who's a lawyer from Smith Hulsey, who reviewed -- who had
21 reviewed Mr. Zahn and Mr. Wannemacher's statements.  He
22 requested they look for this memo.
23 A.    I don't know whether he reviewed their statements or not,
24 but, yeah, my understanding is that he was involved in those
25 email chains with them.

BLYTHE - CROSS                                    Vol. 4-29

1   Q.   Okay.  And then after finding it on March 9th of 2020, on
2   March 23rd of 2020, OGC Attorney Jon Phillips emailed it to
3   you, right?
4   A.   Yes.
5   Q.   And OGC Attorney Jon Phillips and Adina Teodorescu were
6   both present for Mr. Zahn's *Garrity*-protected statement and for
7   Mr. Wannemacher's *Garrity*-protected statement.
8   A.   Were they?
9   Q.   You don't know that?
10  A.   I don't know if they were or not.
11  Q.   Okay.  And while we're talking about Smith Hulsey, earlier
12  in your testimony you mentioned that there was a meeting that
13  you attended with Mr. Duva and the lawyers from Smith Hulsey.
14  A.   Yes, sir.
15  Q.   And you testified something to the effect that you had a
16  sense of validation because many of the things you had found,
17  they had found, correct?
18  A.   Sure.
19  Q.   And --
20  A.   They had a -- they had a group of talented lawyers who
21  spent a lot of time looking at it.  You're going to hear from
22  Mr. Blodgett after my testimony.  So, you know, they did a deep
23  dive on a lot of the same documents, at least from JEA, that we
24  did, so ...
25  Q.   They had found -- you had found some things they hadn't

BLYTHE - CROSS                                    Vol. 4-30

1   found.
2   A.   I think so.  Probably because, you know, they didn't have
3   federal grand jury subpoena authority.  So I think there were
4   places we could go that they hadn't been able to go, but -- or
5   things we found in JEA's records that they hadn't noticed
6   maybe.
7   Q.   They had found some things that you hadn't found.
8   A.   I don't -- I can't specifically remember whether there are
9   things that I hadn't found, but I'm sure there were some emails
10  or communications that they highlighted that had escaped my
11  notice.  I don't remember any specifics though.
12  Q.   Okay.  And other than you and AUSA Duva, who else attended
13  the meeting?
14  A.   I think Tim Adams was there, I can't remember if John
15  Zipperer was there or not, and I believe Agent Hill was there
16  too.
17  Q.   And after that meeting -- was there a PowerPoint presented
18  to you in that meeting?
19  A.   I think so.
20  Q.   Did you retain a copy of that PowerPoint?
21  A.   I don't think we did.
22  Q.   Did you ask for one?
23  A.   No.  I don't -- I didn't ask for one.  I think their --
24  you know, we got a copy of their report when it was issued.
25  Q.   And so -- and the presentation that they made to you, it

BLYTHE - CROSS                                              Vol. 4-31

1    was described by AUSA Duva as excellent work, as very detailed,
2    thorough, and really impressive.
3    A.   Yes.
4             MR. DUVA:  Your Honor, may we approach?
5             THE COURT:  Yes.
6                          *  *  *  *  *
7         (Sidebar No. 2 sealed and under separate cover.)
8                          *  *  *  *  *
9             MR. SUAREZ:  May I inquire?
10            THE COURT:  Yes, sir.
11            MR. SUAREZ:  Thank you, Your Honor.
12   BY MR. SUAREZ:
13   Q.   And so given the fact that this presentation was given to
14   you that was thorough and impressive and it included a
15   PowerPoint, you never requested -- nobody from the prosecution
16   team, as far as you know, requested a copy of that PowerPoint
17   presentation.
18   A.   I don't know.  I don't know if we requested it or not.
19   Q.   As far as you know, you don't have it.
20   A.   I didn't ask for it --
21   Q.   Okay.
22   A.   -- and I don't think I have a copy of it.
23   Q.   Okay.  And I think I was asking you, in addition to you
24   and AUSA Duva, who else attended the meeting from the
25   prosecution team.

BLYTHE - CROSS                                              Vol. 4-32

1    A.   Yes, sir.  You want me to answer that question again?
2    Q.   Yes, please.  Yeah, I'm sorry.  I did ...
3    A.   I did answer the question, but it was Tim Adams --
4    Q.   Okay.  That's right.
5    A.   -- with the State Attorney's Office, myself, AUSA Duva.
6    John Zipperer was probably there.  I don't remember if he was
7    there or not, and Agent Hill was probably also there.
8    Q.   And after that meeting you and the rest of the prosecution
9    team continued to look at -- to comb through and explore what
10   was in the SIC report.
11   A.   Sure.
12   Q.   And, in fact, Mr. Duva indicated to Mr. Blodgett that he
13   was mining the SIC report.
14   A.   It was a good timeline.  They did -- I agree with AUSA
15   Duva.  They did a good job putting it together, and it was kind
16   of a good quick reference.
17            It was -- we had also put together a timeline, and
18   frankly it was better than -- more comprehensive, if you will,
19   than our timeline.  Was it 100 percent inclusive?  No, there
20   were things that weren't in there, but it's a good quick
21   reference.
22   Q.   And in addition to watching the SIC report, did you or any
23   member of the prosecution team watch any of the SIC meetings?
24   A.   SIC meetings, no.  I don't know if anybody else on the
25   team did.  I didn't.  So, yeah, I just watched the -- you know,

BLYTHE - CROSS                                    Vol. 4-33

1   the December 16th, 2019 --
2   Q.   Diamond-Salem?
3   A.   -- kick-off, if you will.
4        Yes.
5   Q.   Other than Diamond-Salem, that's the only SIC-related
6   meeting that you actually watched.
7   A.   Correct.
8   Q.   In addition to the documents that you received from Smith
9   Hulsey, you also --
10  A.   I apologize.  I want to correct that.
11       I think I did watch -- if it was after December 16th,
12  I think I did watch when, like, Daniel Nunn testified and Mike
13  Brost.  So I don't know which meeting or meetings those were,
14  but I think I watched those and/or reviewed the transcripts.
15  Q.   Okay.  So you had -- did you have transcripts of all of
16  the meetings, all of the SIC meetings?
17  A.   They're -- they're all on the City of Jacksonville's
18  website on a special investigatory committee site, along with
19  every document that was produced by a committee.
20  Q.   And you remember either watching one of those meetings or
21  reviewing a transcript of those meetings.
22       And roughly when -- do you have any sense of which
23  meeting that was that you watched?
24  A.   I think those were pretty soon after -- so it would have
25  been sometime in early 2020.  I think those were after the

BLYTHE - CROSS                                    Vol. 4-34

1   December 16th meeting, but I can't specifically recall.  And I
2   think they were early on in the process.
3   Q.   So that we can help identify it, you remember Michael
4   Brost being a witness and Daniel Nunn being a witness, or at
5   least testifying there.
6   A.   Correct.
7   Q.   Anybody else?
8   A.   No.
9   Q.   And so you -- you also received documents from the Council
10  Auditor's Office, correct?
11  A.   Yes.
12  Q.   And specifically regarding Government's Exhibit 20A1, the
13  Performance Unit Scratch Sheet, you first obtained that
14  document on June 20 -- June of 2021 when Jeff Rodda emailed
15  that to you, right?
16  A.   Yeah.  So to be clear, we had that document in a larger
17  subpoena production and had taken notice and seen a different
18  version of that document.
19       But the specific version that Jeff Rodda shared with
20  us on June 28th, 2021, I hadn't taken notice of and seen that
21  it was -- realized that there were these different versions of
22  it and that, you know, there's a significant difference between
23  the one I had seen before and that one.  So that was brought to
24  my attention as of that time.
25  Q.   Okay.

BLYTHE - CROSS                                          Vol. 4-35

1  A.   Does that make sense?

2  Q.   Yeah, yeah, absolutely.

3         And let me -- and the difference between the two that

4  made it significant was that the one Jeff Rodda emailed to you

5  in June of 2021 had $4 billion added to the net book value of

6  JEA and $4 billion added to the net contribution to the City.

7  A.   Yes.

8  Q.   And so a total of $8 billion had been added to that

9  spreadsheet.

10 A.   No.  I think it's -- I think it's just 4, and it carries

11 through to the -- you know, so it's -- the way it works is it's

12 showing the net book value is 4 billion -- it's 4 billion

13 higher.  So the only way for that to -- in my view, to happen

14 is that's contemplating a sale, and that was Mr. Rodda's

15 insight too.

16 Q.   Okay.  I know this much.  I am not going to argue with an

17 accountant who carries a gun.

18         But I want to make sure that your -- your view is

19 that the -- it's the same 4 billion that is being registered in

20 two different cells as opposed to 8 billion, 4 net to JEA, 4 in

21 contribution to the City.

22 A.   So -- yeah.  So that's -- if JEA was sold and after

23 retiring debt there's $4 billion left over, that would be the

24 nets proceeds to the City if -- just in a vacuum, if there's

25 nothing else taken out.

BLYTHE - CROSS                                          Vol. 4-36

1  Q.   Help me with this, and this is a legitimate question.  I

2  don't know the answer to this.

3         If an accountant were to look at this document, is

4  that the only interpretation they would see, or could they

5  interpret that document as reflecting a total of 8 billion, 4

6  to the City and 4 to JEA?

7  A.   I didn't see it that way.

8  Q.   Okay.

9  A.   I don't see it that way.

10 Q.   All right.  And then after Mr. Rodda brought -- can we

11 just refer to the -- for purposes of this examination, when we

12 talk about the Performance Unit Scratch Sheet, can we -- can

13 you and I agree that we're talking about the one that Jeff

14 Rodda brought to your attention with that added -- we're just

15 going to say $4 billion?

16 A.   Sure.  That's the most relevant one.

17 Q.   Okay.  So it would -- after Mr. Rodda brought that

18 spreadsheet, the Performance Unit Scratch Sheet, Government's

19 Exhibit 20A1, to your attention, you then went and looked for

20 that in the JEA subpoena response?

21 A.   Correct.

22 Q.   Okay.  And after you found it in the JEA subpoena

23 response, you then had the FBI's digital forensic examiners try

24 and find you a copy that wasn't stomped on by the lawyers?

25 A.   You know, I was being a little facetious there.  But as

BLYTHE - CROSS                                            Vol. 4-37

1   you saw in one of them, a copy produced to us from the subpoena
2   had an attorney's name in the metadata.  That stuff happens.
3   You know, when things are collected and copied, it can happen.
4   I'm not an expert in that.
5          But, correct, I just wanted him to look at the most
6   original copy we had and see what the metadata was so at least,
7   you know, he was collecting that in the best way possible, as
8   opposed to, you know, me looking at a working copy, right
9   clicking on properties.  He has better tools to make sure that
10  he's not changing anything.
11  Q.   Okay.  And similarly, the notes spreadsheet that's
12  Government's Exhibit 2OL3, that was also provided to you by
13  Kevin Blodgett, but he originally got it from Jeff Rodda,
14  correct?
15  A.   I don't know where he got it from.  He -- you know, if you
16  have a document that shows me that --
17  Q.   That Jeff Rodda was the one that provided it to Kevin
18  Blodgett?
19  A.   Yes.  You -- you may be correct.  I just don't remember if
20  that's who gave it to him.  I know that we got it from Jeff
21  Rodda.
22  Q.   You got it from Jeff Rodda.
23  A.   Right.
24  Q.   Okay.  Okay.  And -- and similar to the Performance Unit
25  Scratch Sheet, once you got it from Jeff Rodda, you then went

BLYTHE - CROSS                                            Vol. 4-38

1   looking for it in the JEA production.
2   A.   The scratch sheet?
3   Q.   Yes, similar to that one.  When you received the note from
4   Jeff Rodda, you then went to see if you had it in the JEA
5   subpoena production.
6   A.   Yes.
7   Q.   But it was Jeff Rodda who first brought it to your
8   attention.
9   A.   I know that that's the case with the $4 billion PUP
10  scratch sheet.  I don't remember if -- I think it was also the
11  case, but I'm not sure, as confident.  I don't remember if
12  we -- if I knew about notes.xls before or not.
13  Q.   Okay.
14          MR. SUAREZ:  Your Honor, may I approach the witness?
15          THE COURT:  Yes, sir.
16  BY MR. SUAREZ:
17  Q.   I'm going to show you what's been entered into evidence as
18  2OL3.  (Unintelligible.)
19          COURT REPORTER:  Can you use the microphone?
20          MR. SUAREZ:  I'm sorry.
21  BY MR. SUAREZ:
22  Q.   Mr. Blodgett was -- I think was the one that actually sent
23  it to the Government after he received it from Mr. Rodda?
24  A.   Correct, in this email, yes.
25  Q.   Okay.

BLYTHE - CROSS                                          Vol. 4-39

1   A.   I think Mr. Rodda sent a direct email to Mr. Duva that
2   day, or on June 28th.
3   Q.   Okay.  So Mr. Rodda, at least on that instance, was
4   sending documents directly to AUSA Duva, correct?
5   A.   On that date he did.
6   Q.   And you don't know if Mr. Rodda read Mr. Zahn's or
7   Mr. Wannemacher's *Garrity* statement.
8   A.   I do.
9   Q.   You do?
10  A.   He's told us he did.
11  Q.   He did?  Okay.
12           Do you know when he read that?
13  A.   I don't.
14  Q.   You don't remember --
15  A.   As I sit here right now, I don't -- I don't remember.
16           THE WITNESS:  Just so you know, you're broadcasting
17  your screen up here.
18  BY MR. SUAREZ:
19  Q.   You indicated earlier in your testimony that you watched
20  all of the relevant JEA board meetings, correct?
21  A.   Yes.
22  Q.   And specifically you watched the December 17th of 2019
23  board meeting?
24  A.   Yes, I think so.
25  Q.   It was the day after the Diamond-Salem hearing, if that

BLYTHE - CROSS                                          Vol. 4-40

1   helps contextualize it for you.
2   A.   Yes.  That's where they announced Mr. Zahn was terminated,
3   in that meeting, I believe.
4   Q.   That's in January 28th, just to orient you.  On December
5   17th, he was placed on administrative leave.
6   A.   Okay.
7   Q.   Does that refresh your recollection?
8   A.   Yeah.
9   Q.   I didn't want to sit there --
10  A.   I know he was placed on leave, yeah.
11  Q.   Okay.  And during that meeting you recall that Sean Granat
12  told -- there was a motion -- April Green, the chair of the
13  board, asked for a motion to terminate Mr. Zahn for cause, and
14  no one made that motion.
15           Do you recall that?
16  A.   I do, and there is some discussion.  Mr. Granat sort of
17  explained what the board's options were and what process they'd
18  have to go through, what for cause and not for cause meant,
19  what the implications were financially, those sorts of things.
20  I remember that.
21  Q.   And he specifically advised the board that they needed to
22  determine what Mr. Zahn knew.
23  A.   I don't remember that part, but I don't disagree with you.
24  Maybe -- maybe they did.
25  Q.   And that video's in evidence --

BLYTHE - CROSS                                      Vol. 4-41

1    A.   It is.
2    Q.   -- also.
3          Okay.  You also watched the January 28th, 2020, board
4    meeting.
5    A.   Yes.  I think I did.
6    Q.   That's the one in which he was terminated, right?
7    A.   Yes.
8    Q.   Okay.  And during that meeting you recall that Sean Granat
9    presented to the board a letter dated January 28th, 2020,
10   outlining OGC's findings of reasons why the board could
11   terminate Mr. Zahn for cause.
12   A.   Yes.
13   Q.   And you recall that he gave approximately a half hour
14   presentation to the board?
15   A.   I don't -- I don't remember how long it was, but he gave a
16   presentation about, you know, what the reasons were.  And
17   they -- you know, they took action after that.
18   Q.   Okay.  And in the board meeting you recall Mr. Granat read
19   every single word of that termination letter to the board.
20   A.   He may have.  I don't remember.
21   Q.   Okay.  And you -- the Government produced the termination
22   letter to us, to the defendants, in discovery.  You know that.
23   A.   I don't disagree with you.
24   Q.   Okay.  And you've read that letter.
25   A.   I think so.

BLYTHE - CROSS                                      Vol. 4-42

1    Q.   Let's take a look at the termination letter.
2          MR. SUAREZ:  Mr. Miller, if we could display
3    Exhibit -- Defendants' Exhibit 143.
4          THE WITNESS:  Is there any chance I could get you to
5    hand me a physical copy of that?  The screen's very blurry --
6          MR. SUAREZ:  There is --
7          THE WITNESS:  -- and it's a long way.
8          MR. SUAREZ:  There is a chance.
9          MR. FELMAN:  What exhibit is it?
10         MR. SUAREZ:  143.
11         THE WITNESS:  Unless you want to zoom in on specific
12   sections, then I might have a chance to --
13         MR. SUAREZ:  Well, let's find the exhibit.
14         Your Honor, may we have a moment just to --
15         THE COURT:  Sure.
16         MR. SUAREZ:  Your Honor, before I show the witness
17   the exhibit, may we come to sidebar?
18         THE COURT:  Yes, sir.
19              *  *  *  *  *
20    (Sidebar No. 3 sealed and under separate cover.)
21              *  *  *  *  *
22         MR. SUAREZ:  May I inquire, Your Honor?
23         THE COURT:  Yes, sir.
24   BY MR. SUAREZ:
25   Q.   And, Agent Blythe, in -- do you know who else, other than

BLYTHE - CROSS                                              Vol. 4-43

1   you and AUSA Duva, read the termination letter from the
2   prosecution team?
3   A.   I don't know.  I -- you know, you're going to hear from
4   Mr. Adams.  You can ask him.  You're going to hear from
5   Mr. Zipperer.  You can ask him.  I would imagine Mr. Adams
6   probably read it, but I don't know.  I don't -- I don't know.
7   Q.   You don't know one way or the other who else read it; is
8   that fair?
9   A.   Fair.
10  Q.   Did you have any discussions with anyone in the
11  prosecution team about the termination letter?
12  A.   I don't specifically remember, no.
13  Q.   Did you have any discussions with any of the lawyers from
14  OGC about the termination letter?
15  A.   No.
16  Q.   Do you know if any of the witnesses that will be
17  testifying at this hearing read the termination letter?
18  A.   I don't know.
19  Q.   Well, let me help you out a little bit, right?
20          There are board members on the witness list, and they
21  would have been --
22  A.   Sure, yes.  The board members were -- received the letter.
23  I would hope they read the letter, and the content behind the
24  letter was presented to them by Mr. Granat, right.
25  Q.   Yeah.  Okay.

BLYTHE - CROSS                                              Vol. 4-44

1   A.   Good point.
2   Q.   And -- and so you recall from watching the January 28th,
3   2020, board meeting that -- and I'm going to just limit that to
4   individuals that are on the Government's witness list.
5          April Green was there, Kelly Flanagan was there, and
6   Fred Newbill was there.
7   A.   Yes.
8   Q.   When you watched the -- the video of the January 28th,
9   2020, board meeting, when did you do that, roughly?
10  A.   It would have been in early 2020, within days or a week or
11  two after.  I don't -- it would have been shortly thereafter.
12  Q.   Okay.  Before the indictment was returned; is that --
13  A.   Absolutely.
14  Q.   Okay.  In addition to the three board members that we
15  noted, April Green, Kelly Flanagan, and Fred Newbill, do you
16  recall, in watching the January 28th, 2020, board meeting,
17  Mr. Kendrick being present?
18  A.   At that board meeting?
19  Q.   Yes, sir.
20  A.   It wouldn't surprise me if he was present.  My
21  understanding is he still worked there at that time.  And I
22  think he was, but I don't -- I don't specifically recall if he
23  was there or not.
24  Q.   What about Mr. Orfano?  Do you recall?
25  A.   I don't know.

BLYTHE - CROSS                                    Vol. 4-45

1   Q.   McCarthy, Mr. McCarthy?
2   A.   I don't know.
3   Q.   Shawn Eads?
4   A.   I don't know.  They're senior leadership team members.
5   They -- I know they were usually at the board meetings, but
6   they didn't always attend the board meetings.
7        I know, in interviewing many of them, they would --
8   you know, would tell you that they attended most of the board
9   meetings or watched from their desks, but they -- you know,
10  they didn't attend every single one.
11       So I don't remember if they were present for that
12  specific one or not.
13  Q.   I'm going to ask you a couple more just in case you may
14  remember.
15  A.   Okay.
16  Q.   Kerri Stewart?
17  A.   I would be much more confident that she was there because
18  she was involved in the interface between the City Council and
19  the board, but I don't know.
20  Q.   What about Deryle Calhoun?  Do you remember?
21  A.   I don't know.
22  Q.   Did you memorialize your impressions of the January 28th,
23  2020, JEA board meeting concerning Mr. Zahn's termination
24  anywhere?  Did you create notes or a document or anything
25  documenting your -- what you learned from that?

BLYTHE - CROSS                                    Vol. 4-46

1   A.   No, other than I -- at some point we put board meetings
2   and minutes and things like that in a -- on a disc in our file
3   to memorialize the recordings or transcripts of the meetings
4   and the board packages that went along with them.
5        I don't remember if January 28th was included in
6   that, but it may be.
7   Q.   But no notes or documentation of your impressions.
8   A.   No.
9   Q.   Okay.  Are you aware that Sean Granat and Lawsikia Hodges,
10  two lawyers from OGC, had individualized conferences with the
11  members of the board to outline their factual findings that are
12  contained in the termination letter?
13  A.   No.
14  Q.   You're not aware of that.
15  A.   No.
16  Q.   And no -- okay.
17       Has any grand jury witness that read the termination
18  letter or participated in the January 28th, 2020, board meeting
19  or watched that board meeting reported to you that they were
20  influenced by the information contained -- that their testimony
21  was influenced by the information contained in the termination
22  letter, specifically any references to Mr. Zahn's statement?
23  A.   I don't know that I can be that specific.  I know one
24  witness has expressed concern related to whether he or she was
25  influenced by OGC information.

BLYTHE - CROSS                                    Vol. 4-47

1   Q.   And who was that?
2   A.   Kelly Flanagan.
3   Q.   Anybody else express any such concerns?
4   A.   Not to my knowledge.
5   Q.   Okay.  And when did you learn that Kelly Flanagan had a
6   concern regarding her exposure to the termination letter?
7   A.   I don't know if it was specifically the termination
8   letter.
9   Q.   Okay.
10  A.   It is more general.
11  Q.   Okay.  Okay.
12  A.   So I don't know what was the foundation for that concern.
13  I didn't receive those specifics.  I understand she spoke with
14  the cross-counsel or filter team, I think.  I don't know if
15  that meeting took place or not.
16         But -- yeah, I don't know what the basis for it was,
17  if that makes sense.
18  Q.   Okay.  When -- when you -- so frame this for me a little
19  bit.  When was it that these concerns were articulated to you?
20  A.   I think it was Friday afternoon --
21  Q.   Okay.
22  A.   -- last week.
23  Q.   And who was present when those concerns were articulated
24  to you?
25  A.   AUSA Duva and her attorneys.  It was a Teams call,

BLYTHE - CROSS                                    Vol. 4-48

1   meeting.
2   Q.   So it was a video?
3   A.   Uh-huh.
4   Q.   Okay.  And when you say her attorneys, who are -- who
5   are -- that are representing her?
6   A.   Give me one second.
7   Q.   You don't remember their names?
8         MR. DUVA:  Jason Mehta and Natalie Adams, which I
9   know counsel knows that.
10        MR. SUAREZ:  Okay.  From Foley?
11        MR. DUVA:  No -- oh, yes, yes.  Currently from Foley.
12  Formerly with the Bradley firm, but yes, moved over to Foley.
13  BY MR. SUAREZ:
14  Q.   Other than you and Mr. Duva, was anybody else present?
15  A.   I don't think Agent Hill was on that call.  I think
16  Mr. Corsmeier was on that.  That's the only other person from
17  the Government that I can remember.
18  Q.   No other investigators were there?
19  A.   No.  I don't think so.
20  Q.   As best you can recall, what did Kelly Flanagan say were
21  her concerns?
22        MR. DUVA:  Your Honor, can we approach?
23        THE COURT:  Yes.
24               * * * * *
25        (Sidebar No. 4 sealed and under separate cover.)

BLYTHE - CROSS                                        Vol. 4-49

```
 1                    *   *   *   *   *
 2         MR. SUAREZ:  May I inquire, Your Honor?
 3         THE COURT:  Yes, sir.
 4  BY MR. SUAREZ:
 5  Q.   Agent Blythe, so when -- when Kelly Flanagan brought these
 6  concerns or articulated some concerns, what specifically did
 7  she bring to your attention were her concerns?
 8  A.   So it was mostly her attorneys speaking on her behalf, but
 9  they told us -- gave two references to her grand jury
10  testimony.
11         And Ms. Flanagan herself said she was unsure, like I
12  said before -- or I testified before, she was unsure whether --
13  or had concerns that information she received from OGC, you
14  know, post-December 16th would somehow influence a response to
15  one of Mr. Duva's questions in grand jury and, you know -- and
16  whether or not she would have an independent basis for that --
17  Q.   And --
18  A.   -- answer.
19  Q.   I'm sorry?
20  A.   And whether she would have an independent basis for her
21  answer outside of the cumulative context, including that
22  information.
23  Q.   So you mentioned that she had two -- she made two
24  references to her grand jury testimony, correct?
25  A.   Her attorneys did, yes.
```

BLYTHE - CROSS                                        Vol. 4-50

```
 1  Q.   Her attorneys did.
 2         And she was there when her attorney made those
 3  references, correct?
 4  A.   Yeah.  She didn't dispute it.
 5  Q.   Okay.  And what -- what were the references that she
 6  brought to your attention were -- she felt could have been
 7  influenced by Mr. Zahn's protected statement?
 8  A.   I don't remember specifically what the question and answer
 9  was.  You know, they gave a couple page references to her
10  transcript.  I'd have to look at my notes to see if I wrote
11  that down.
12  Q.   Do you have your notes here?
13  A.   I might.  I don't know.  You want me to go look in my
14  backpack?
15  Q.   Please.  That's really important.  We need to know --
16  A.   Okay.
17  Q.   -- what those references were.
18         THE WITNESS:  May I step down, Your Honor?
19         THE COURT:  Yeah, of course.
20         Mr. Felman is seeking court relief, so I think what
21  we'll do is take a 10-minute break while the agent is able to
22  look through his notes.
23         COURT SECURITY OFFICER:  All rise.
24         (Recess from 10:24 a.m. until 10:42 a.m.; all parties
25  present.)
```

BLYTHE - CROSS                                        Vol. 4-51

1              COURT SECURITY OFFICER:  All rise.  This Honorable
2   Court is now in session.
3              Please be seated.
4              THE COURT:  Mr. Suarez.
5              MR. SUAREZ:  Thank you, Your Honor.
6              Your Honor, before I continue my inquiry, I see some
7   new faces in the courtroom, and I don't know who everybody is.
8   I just wondered if the Court could remind everyone that the
9   rule has been invoked.  I just want to make sure that that's
10  clear.
11             THE COURT:  Yes.
12             If you are a witness in this proceeding, you're not
13  to be in the courtroom until called.
14             MR. SUAREZ:  Thank you, Your Honor.
15             THE COURT:  All right.
16  BY MR. SUAREZ:
17  Q.   Agent Blythe, when we took the break you were looking for
18  your notes, and you were able to find them.
19             MR. SUAREZ:  Your Honor, if I may approach the
20  witness?
21  BY MR. SUAREZ:
22  Q.   And you were nice enough to provide them to me.
23  A.   I sure was.
24             Thank you.
25  Q.   Now, I have always heard that doctors have terrible

BLYTHE - CROSS                                        Vol. 4-52

1   handwriting.  It apparently looks like accountants with guns do
2   too.
3   A.   This one does.
4   Q.   Could you help me decipher what's in your notes, please.
5   A.   Sure.  So I wrote Kelly Flanagan at the top and underlined
6   it.  I wrote, page 51, line 22, regarding a juror question.
7   And it was a question that had to do with -- where
8   Ms. Flanagan's response was something to the effect of she
9   learned in hindsight.  I'd have to look at the transcript to
10  remember what the question and answer exactly was.  That's just
11  my quick note from that.
12             The next line I have is -- I started to write the
13  page number down but got -- something distracted me and I
14  didn't finish the page number.  And something regarding her
15  response -- something was in her response to the effect that
16  there was additional information now available to her that she
17  had concerns about.
18             And -- and she said something to the effect of --
19  this is what's in my notes -- "concern re info communicated
20  by," and I think if I were to complete that, it would be OGC.
21  Q.   Okay.
22  A.   That's my memory.
23             And she said it colors or informs her overall
24  perspectives.
25  Q.   And you were nice enough to let me take a picture of your

BLYTHE - CROSS                                              Vol. 4-53

1   notes.
2            That completes all of the notes that you took?
3   A.   Yes.
4   Q.   Okay.  Did anyone else take notes during that meeting?
5   A.   I don't know.
6   Q.   Okay.  And were your notes ever expanded or memorialized
7   in a 302 or some other memo?
8   A.   No.  This is considered kind of a witness -- I don't even
9   know that it was a witness prep.  It was essentially her
10  attorneys just sharing this concern.  It wasn't really an
11  interview, so, you know, no, I didn't memorialize it in a
12  report.
13  Q.   You said this is not a witness prep?
14  A.   It was a very short meeting, and essentially, other than
15  talking about this, that -- that was just the only thing that
16  was discussed.
17  Q.   Okay.  Who requested the meeting?
18  A.   I don't remember if -- I think Mr. Duva requested the
19  meeting of her attorneys.  But, you know, Ms. Flanagan was only
20  available that day for a very short period of time, and so
21  there was no question and answer in a typical prep session.
22  Q.   And what was the purpose of the meeting?
23  A.   Well, I thought it was to be a prep session, but
24  apparently it was simply to inform us that Ms. Flanagan had
25  this concern.

BLYTHE - CROSS                                              Vol. 4-54

1   Q.   All right.  So let's then -- I want to unpack a little
2   more what happened at the meeting.
3            So was there a discussion between you and -- by "you"
4   I mean the prosecution team -- and Ms. Flanagan about what her
5   testimony was going to -- what her expected testimony would be
6   at this hearing?
7   A.   No, not really, other than just she had these concerns,
8   you know, as I mentioned in my notes and before we took the
9   break.
10  Q.   Okay.  And when she said, "I have some concerns," was
11  that -- was that how the meeting opened, with her lawyers
12  bringing that to your attention?
13  A.   Yes.
14  Q.   Okay.  And what was the response that was given to her
15  lawyer when that was articulated to you?
16  A.   So just something to the effect of, "Well, you know, okay.
17  Just for discussion's sake, would you think about your
18  understanding as a totality of circumstances," and I used the
19  analogy of a table.
20           I said, "Well, could you think of your understanding,
21  as of the date you testified in grand jury, as a table held up
22  by multiple things, your individual experience and other
23  things.  And if you, you know, kicked the leg out from that
24  table, as it were, would that table fall or would it not?"
25  meaning, you know, do you still have another independent basis

BLYTHE - CROSS                                    Vol. 4-55

1  for that knowledge.
2  Q.   Okay.
3  A.   And we didn't really get an answer to that question.  She
4  didn't answer the question.
5  Q.   Okay.  So when -- when her lawyers brought this to your
6  attention, you provided that analogy of the table.
7  A.   Yes.
8  Q.   And did you ask her specifically if she had an independent
9  basis for the information she provided to the grand jury?
10  A.   I asked the question.  I didn't receive her answer.  The
11  attorneys interjected.  That was it.
12  Q.   Whose attorneys interjected, yours or the -- I mean, the
13  Government's or hers?
14  A.   Ms. Flanagan's.
15  Q.   Ms. Flanagan's.  Okay.
16       And when they interjected, you mean they stopped her
17  from answering the question, or they asked a different
18  question?  How did that interjection occur?
19  A.   I think it was just a statement that, you know, they
20  understand the analogy, but they -- they don't think -- well,
21  they don't know that she feels that way or whether it applies
22  to her.
23       So I don't know.  I didn't hear from Ms. Flanagan --
24  Q.   Okay.
25  A.   -- as best I recall.

BLYTHE - CROSS                                    Vol. 4-56

1  Q.   Did Mr. Duva ask any questions?
2  A.   Yeah.  I think he asked a similar question.  I think I was
3  just trying to frame it up with a nice analogy.  He had already
4  sort of asked a similar question.
5  Q.   And by similar you mean asking her if she had an
6  independent basis for her information, or what do you recall
7  about the questions that he asked?
8  A.   It was something along those lines.
9  Q.   That's the best you can do as you sit here today?
10  A.   Yes.
11  Q.   That's your best recollection.
12       What about Mr. Corsmeier?  Did he ask any questions?
13  A.   I think he did.  I don't remember.
14  Q.   You don't remember.
15       Do you remember any answers that were given in
16  response to his questions?
17  A.   No.
18  Q.   And same thing with Mr. Duva.  I neglected to ask you
19  that.
20       Did you -- did you get any response to the questions
21  that Mr. Duva asked that were similar in nature to yours?
22  A.   It was pretty much the same -- same answer, that she had
23  these concerns about, you know, the information she got from
24  OGC coloring her overall perspective, as she put it.
25  Q.   Okay.  How did we get to the point where she specifically

BLYTHE - CROSS                                              Vol. 4-57

1   points you to her transcript?  Walk me through how that
2   happened.
3   A.   So my understanding is Mr. Duva provided a copy of that to
4   her attorneys for her to review in advance of this hearing --
5   Q.   Okay.  And --
6   A.   -- in that session.  And so her attorneys messaged or
7   communicated somehow to Mr. Duva that they wanted to discuss
8   concerns she had over these two particular answers, questions
9   and answers.
10  Q.   So prior to the meeting, you already knew the pages and
11  line numbers of her transcripts that were concerning?
12  A.   I don't know that -- I don't -- I don't know -- I didn't
13  know them.
14  Q.   Okay.
15  A.   Maybe Mr. Duva did.  I don't remember.
16  Q.   Okay.  So --
17  A.   They gave the specific -- I don't think they gave the
18  specific, like, cites until the meeting.
19  Q.   Okay.  All right.  So that -- and that's what I'm trying
20  to understand.  During the --
21          THE COURT:  Mr. Suarez, this was a couple of weeks
22  ago?
23          MR. SUAREZ:  Last --
24          THE WITNESS:  Friday.
25          MR. DUVA:  It was last Friday, Your Honor.

BLYTHE - CROSS                                              Vol. 4-58

1          THE COURT:  Okay.  All right.  I just wanted to kind
2   of get it in context.
3          MR. SUAREZ:  Yes.
4          THE COURT:  Sorry.  Go ahead, Counsel.
5   BY MR. SUAREZ:
6   Q.   So I'm trying to understand how the dialogue goes from, "I
7   have these concerns," and then the questions that you asked and
8   the question Mr. Duva had, to specifically exploring the
9   transcript.
10          Explain that to me.  Did Mr. Duva ask Ms. Flanagan or
11  her lawyers to point to specific things or --
12  A.   He did.
13  Q.   -- did they volunteer?  I mean, how did that happen?  Walk
14  me through that.
15  A.   I think he asked for them, and then they provided the
16  cites.
17  Q.   So he asked Ms. Flanagan to specifically tell him the
18  cites in the transcript that she was concerned about?
19  A.   So, again, mainly -- it was mainly a conversation with the
20  attorneys.  But, you know, the attorneys provided that -- those
21  cites at some point during the meeting, after, you know, some
22  point in the discussion.  I don't remember if we specifically
23  asked for them.  I think we did.
24  Q.   Okay.  And "we" meaning Mr. Duva asked for them.
25  A.   Yes.

BLYTHE - CROSS                                      Vol. 4-59

1   Q.   And then the lawyers for Ms. Flanagan took you to those
2   specific pages, one you've notated and the other one you didn't
3   get a chance to notate in your notes.
4   A.   Correct.
5   Q.   You mentioned something about the filter team being
6   discussed in -- with Ms. Flanagan.
7           Tell me, when did that happen?  When was it brought
8   to her attention that this perhaps should be discussed with the
9   filter team?
10  A.   I think we offered that to them, that if she had these
11  concerns and she wanted to talk with them about it -- because,
12  you know, we didn't want to be exposed to what the specific
13  information was from OGC that she had concerns about.
14          So we offered her and her attorneys to reach out to
15  the filter team, and, you know, I don't know whether they did
16  that or not.
17  Q.   But when in the conversation?  So one possibility, right,
18  is she says, "I have these concerns."
19          You say, "Whoa, whoa, time out.  We have a filter
20  team.  Go talk to them."
21          We know that didn't happen.  Now I'm trying to figure
22  out at which point somebody says, "Okay.  Time out.  Maybe you
23  should go talk to the filter team."
24          Was it at the beginning?  Walk me through the
25  discussion about the involvement of the filter team.

BLYTHE - CROSS                                      Vol. 4-60

1   A.   I don't remember.  It was sometime during that
2   20-minute-or-so call.
3   Q.   That took place last Friday.
4   A.   Correct.
5   Q.   Was there anything else discussed during that meeting?
6   A.   Not that I recall, no.
7   Q.   Was the identity of the filter team and their contact
8   information provided to Ms. Flanagan?
9   A.   I think so.  I mean, that would have made sense.  I think
10  it was.
11  Q.   Okay.  But you don't specifically remember that
12  information being given to them?
13  A.   You know, so Mr. Duva was communicating with their
14  attorneys to set that meeting up, so I assume that he provided
15  it to them.
16          So, you know, there's some witnesses I've
17  communicated directly with them to coordinate, you know, any
18  kind of meetings or them -- when they need to be here for this
19  hearing, for example, and other folks that Mr. Duva's
20  communicating with their attorney.
21          So they -- Ms. Flanagan and her attorney fell into
22  that category of Mr. Duva's communicating with her attorneys.
23  Q.   So during the meeting you don't recall the contact
24  information and identity of the filter team being provided; is
25  that accurate?

BLYTHE - CROSS                                              Vol. 4-61

1    A.   I think it was.  I don't -- I don't specifically remember
2    it.  You know, I'm not a tape recorder, but it -- I'm pretty
3    sure it was.
4    Q.   Okay.  Subsequent to the meeting -- I would assume that
5    this was pretty significant information that you had just
6    learned, correct?
7    A.   I don't know.  I mean, I think it's -- you know, it's
8    certainly something that, you know, she's expressed a concern.
9    We offered the opportunity for her to speak with the filter
10   team.  I don't know if that took place or not.  I don't know
11   how that's going to be handled going forward.
12   Q.   Okay.  So let's break that down a little bit.
13        Did you or any member of the prosecution team that
14   was present for the interview with Ms. Flanagan call Mr. Pardo
15   on the filter team and alert them that this situation had just
16   developed?
17   A.   I didn't.
18   Q.   Are you aware of anybody doing that?
19   A.   I don't know if Mr. Duva did or not.
20   Q.   So I'm assuming the answer is no, you're not aware --
21        MR. DUVA:  Your Honor, may I approach about the
22   Court's order in that regard?
23        THE COURT:  Yes.
24               *  *  *  *  *
25        (Sidebar No. 5 sealed and under separate cover.)

BLYTHE - CROSS                                              Vol. 4-62

1                *  *  *  *  *
2         THE COURT:  Counsel?
3         MR. SUAREZ:  May I inquire, Your Honor?
4    Thank you.
5    BY MR. SUAREZ:
6    Q.   So the -- so do you know if anyone from the prosecution
7    team contacted the filter team to alert them that they may be
8    getting a call from Ms. Flanagan or that some issue had
9    developed?
10   A.   I did not.
11   Q.   Okay.
12   A.   I don't know if anybody else did or not.
13   Q.   After this meeting where you learned this, did you have --
14   did you and Mr. Duva and Mr. Corsmeier meet to discuss the
15   significance of what had just happened?
16   A.   No.  There was no meeting.  You know, I'm sure me and
17   Mr. Duva spoke about it afterwards.
18   Q.   Well, what did you talk about?
19   A.   Just reiterated what -- what was said.
20   Q.   Did you think it was significant?
21   A.   Did I think it was significant?  Honestly, I think she's
22   getting wrapped around the axle.  And she -- you know, when you
23   live something -- she testified in front of the December 16th,
24   2019, you know, meeting, Diamond-Salem meeting, and
25   specifically said at that meeting that the PUP was shoehorned

BLYTHE - CROSS                                    Vol. 4-63

1    into the -- into that -- I'm not quoting her -- was, you know,
2    put at the back end of that 352-page, 3-plus-hour board meeting
3    and presented in a very short manner.
4              And when she and Mr. Howard asked questions about how
5    it would relate to a recapitalization, they weren't given an
6    explanation that it could result in hundreds of millions of
7    dollars.  So in my view, she still had plenty of other context
8    and information to draw the conclusion that led to her answer
9    to the grand jury.
10              You know, I don't know how she feels exactly, but as
11   of that meeting, she had concerns about how the OGC information
12   colored her understanding.  That's her understanding.  So, no,
13   I don't think it's that significant, but maybe she does.  You
14   can talk to her.
15   Q.   Were there discussions between you and Mr. Duva and
16   Mr. Corsmeier about the significance of what you had just
17   learned?
18              MR. DUVA:  That's asked and answered, Your Honor.  I
19   think that was the immediate prior question.
20              MR. SUAREZ:  I didn't get the answer.
21              THE WITNESS:  That's what we talked about, Your
22   Honor --
23              THE COURT:  Okay.
24              THE WITNESS:  -- and that's it.
25   BY MR. SUAREZ:

BLYTHE - CROSS                                    Vol. 4-64

1    Q.   Were there any discussions about whether or not there was
2    an obligation to make a disclosure to the defense about what
3    you had just learned?
4    A.   No.
5    Q.   Okay.  Let's talk about some of the other expected
6    witnesses at this hearing.
7              Did -- were there other prep meetings that were held
8    with other witnesses?
9    A.   Sure.
10   Q.   Okay.  So let's take them -- I think I have them hopefully
11   in alphabetical order, but let's start with April Green.
12              Did April Green make -- articulate to you any
13   concerns about her testimony in front of the grand jury or her
14   testimony, period, in light of what was disclosed to her by
15   counsel from OGC?
16   A.   I wasn't present for her prep meeting.  I was out of the
17   state testifying in another trial.
18   Q.   So you don't --
19              MR. DUVA:  We had no prep meeting with April Green,
20   Your Honor.
21              THE COURT:  I'm sorry, Mr. Duva.  What did you say?
22              MR. DUVA:  We had no prep meeting with April Green.
23              THE COURT:  Thank you, Counsel.
24              MR. FELMAN:  Your Honor, may we approach sidebar,
25   briefly?  I have a question, I guess, about what we're doing.

BLYTHE - CROSS                                    Vol. 4-65

```
1                    * * * * *
2       (Sidebar No. 6 sealed and under separate cover.)
3                    * * * * *
4           MR. SUAREZ:  May I --
5           THE COURT:  Counsel?
6           MR. SUAREZ:  -- inquire, Your Honor?
7           THE COURT:  Yes, sir.
8  BY MR. SUAREZ:
9  Q.   Did you participate in a prep session with Alan Howard?
10 A.   No, I don't think so.
11 Q.   Do you know if one was held?
12 A.   I think so.
13 Q.   Okay.  But you were not there for it.
14 A.   No.  There were some days last week I was out of pocket.
15 As I said, I was out of state.
16 Q.   Did you have a prep session with Paul McElroy?
17 A.   I wasn't present for it if there was.
18 Q.   Okay.  Do you know if there was one?
19 A.   I think there was.  I wasn't present for it if there was.
20 I can't -- I don't have a -- it's been a busy past couple
21 weeks.  I don't remember all the prep sessions we've had.  I
22 know I was out of town for two or three days, and there was
23 several held during that time.
24 Q.   Okay.  So you think there was one.  You weren't there.
25 That's the best you can --
```

BLYTHE - CROSS                                    Vol. 4-66

```
1  A.   Correct.
2  Q.   Your best answer.  Okay.
3           And I think you gave me the same answer to Alan
4  Howard, that you think there was one but you weren't there, or
5  you're not sure about that one?
6  A.   I'm pretty sure there was one with him, yeah.
7  Q.   Okay.  What about Reverend Newbill, Fred Newbill?  Was
8  there a prep session with him?
9  A.   No.
10 Q.   Was there a prep session with Joe Orfano?
11 A.   Yes.
12 Q.   Okay.  And did you participate in that?
13 A.   No.
14 Q.   Okay.  And was there a prep session with Jeff Rodda?
15 A.   Yes.
16 Q.   And did you participate in that?
17 A.   Yes.
18 Q.   Okay.  Did -- so was Jeff Rodda represented by counsel?
19 A.   No.
20 Q.   Okay.  And did Jeff Rodda articulate to you during this
21 prep session any concerns about his testimony being influenced
22 or colored in any way by either Mr. Wannemacher's protected
23 statement or Mr. Zahn's protected statement or the media
24 coverage that reported on those?
25 A.   No.
```

BLYTHE - CROSS                                           Vol. 4-67

1  Q.   Did you take any notes of Mr. Rodda's statement?
2  A.   Of his statement?
3  Q.   I'm sorry.  Of his prep session.
4  A.   I -- I may have.  I think so.
5  Q.   Okay.  Did you translate those or turn them into a
6  document, a 302 or some form --
7  A.   No, because -- I apologize.  I didn't mean to interrupt
8  your question.
9        No.  My understanding is Mr. Duva made a disclosure
10 and wrote a letter to counsel about what was new information or
11 additional information he provided.
12 Q.   Regarding Mr. Rodda?
13 A.   I think so.
14 Q.   Okay.  Are you aware of any such letter being written with
15 regards to Kelly Flanagan?
16 A.   I don't know whether Mr. Duva has written you
17 correspondence regarding that or not.
18 Q.   Regarding Mr. Rodda, who was present for his prep session?
19 A.   Myself and AUSA Duva and Mr. Corsmeier, AUSA Corsmeier,
20 and I don't remember if Agent Hill was there or not.  She may
21 have been.
22 Q.   Did you ask Mr. Rodda if -- I think you had previously
23 told us that he had told you previously that he read Mr. Zahn's
24 statement, correct?
25 A.   Correct.

BLYTHE - CROSS                                           Vol. 4-68

1  Q.   Had he read Mr. Wannemacher's statement?
2  A.   I think so.
3  Q.   Okay.  Did you have -- did you participate in any other
4  prep session with any other witness?
5  A.   I'd have to look at my calendar as a reference point.
6  Q.   Do you have it here?
7  A.   Sure.
8        THE WITNESS:  Your Honor, do you mind if I pull out
9  my cell phone and look at my calendar?
10       THE COURT:  Go ahead.
11       MR. SUAREZ:  I get a little nervous when an agent
12 with a gun reaches into his pocket when I'm cross-examining,
13 Judge.
14       THE WITNESS:  Wrong side.  I do the shoulder carry.
15       Let's see.  We met with Kyle Billy Monday, May 8th.
16 Want to let me get a list out before we talk about them?
17 BY MR. SUAREZ:
18 Q.   Yeah, yeah.
19 A.   Okay.
20 Q.   That makes sense.
21 A.   There is an Andy Allen prep I was not present for.  There
22 is a Kerri Stewart prep I was not present for.  Alan Howard.
23       Melissa Dykes, I called into.  Lynne Rhode, I was
24 present for.  Kelly Flanagan and Rory Diamond, I was present
25 for.  Oh, Ron Salem.  That's all I've got.

BLYTHE - CROSS                                    Vol. 4-69

1   Q.   Okay.
2   A.   Oh, Tim Adams and John Zipperer, if they count.
3   Q.   So --
4   A.   And I was present for my prep session.
5   Q.   And I didn't hear Jason Gabriel.  Were you present for
6   Jason -- was there a prep session for Jason Gabriel?
7   A.   There was.  I wasn't present for it.
8   Q.   Okay.  And so I'm going to take this one at a time.  You
9   clearly have told me you didn't participate in some of these,
10  but I didn't -- I was just writing them down.
11       So Kyle Billy, were you present for that one?
12  A.   Yes, sir.
13  Q.   Okay.  And when -- when was that?
14       MR. DUVA:  Your Honor, I'm going to make a relevance
15  objection at this point.  I mean, these people are going to
16  testify.  April Green's not, but I think Mr. Suarez can ask
17  them what they said at the prep session, what their testimony
18  was in the grand jury, what they said during their 302s.
19       Whether this agent was present or not present for
20  these meetings and asking him what they said in those meetings,
21  it's not -- it's not relevant.
22       Mr. Suarez is going to get an opportunity to
23  cross-examine everybody that Mr. Blythe, or Agent Blythe, just
24  mentioned except for April Green and probably Rory Diamond
25  because we're not calling them.

BLYTHE - CROSS                                    Vol. 4-70

1        THE COURT:  Well, they will be here, Mr. Suarez.
2   What's your response to Mr. Duva?
3        MR. SUAREZ:  Your Honor, my response is that I just
4   learned that Kelly Flanagan told the Government that her
5   testimony was colored by some of the meetings she had with OGC.
6   I literally just learned that.  That was never disclosed to us.
7        I learned it because I asked questions about the prep
8   session.
9        THE COURT:  And you want to know -- and you want to
10  know whether the others may have fallen into that category.
11       MR. SUAREZ:  Yeah.
12       THE COURT:  Proceed.
13       MR. DUVA:  Agent Blythe's already said no.  He said
14  there's just one person.  And the offer from the Government,
15  which I said at sidebar, was, "If you have concerns about that,
16  call the cross-counsel team."  Apparently she never did.
17       So Mr. Suarez has been told there's one witness, and
18  now we're going down the list of every witness that's on the
19  witness list.  It's not relevant.
20       THE COURT:  I'll allow it.
21       Go ahead, Mr. Suarez.
22       MR. SUAREZ:  Thank you, Your Honor.
23  BY MR. SUAREZ:
24  Q.   So when was the meeting with Kyle Billy?
25  A.   Last Monday.

BLYTHE - CROSS                                    Vol. 4-71

1   Q.   Last Monday, okay.
2            And who was present for that meeting?
3   A.   Me, Mr. Duva, Mr. Corsmeier, and possibly Agent Hill.  I
4   don't remember.
5   Q.   Okay.  And did you take notes at that meeting?
6   A.   I don't think so.
7   Q.   Did anyone from the prosecution team take notes of that
8   meeting?
9   A.   I don't know.  I'm sure Mr. Duva took some notes, but -- I
10  don't remember if he did or not.
11  Q.   Was anyone -- any, specifically, agents charged with
12  taking notes, being the historians of the meeting?
13  A.   So there's nothing -- I don't recall anything new or
14  materially different from any of his prior statements being
15  said.  So, you know, there is no -- I didn't feel any reason to
16  write -- memorialize anything he said.
17  Q.   Okay.  But none of -- neither you or any of the agents
18  were specifically tasked with taking notes.
19  A.   You know, I -- that's something -- a decision I make.  I
20  don't -- I don't wait there and wait for Mr. Duva to instruct
21  me to take notes or not take notes.
22  Q.   Okay.  Were instructions given to either you or Ms. Hill
23  to take notes?
24  A.   So there's nobody to give those instructions.  I don't --
25  Mr. -- Mr. Duva's my partner and friend and we worked on this

BLYTHE - CROSS                                    Vol. 4-72

1   case together, but he's not my boss.  But he doesn't -- he
2   didn't give me any instructions that I took under advisement or
3   not.
4   Q.   Was Mr. Billy represented by counsel?
5   A.   No.
6   Q.   Did Mr. Billy articulate any concern that any of the
7   information he was providing or had previously provided, either
8   to you or to the grand jury, was in any way colored by his
9   review of any reporting of Mr. Zahn or Mr. Wannemacher's
10  statement?
11  A.   No.
12  Q.   Did he tell you whether or not he had read Mr. Zahn or
13  Mr. Wannemacher's statement?
14  A.   I don't remember.
15  Q.   Okay.  I think you said you were not there for Andy
16  Allen's statement?
17  A.   Correct.
18  Q.   Did you say you were there for Kerri Stewart or not there
19  for Kerri Stewart?
20  A.   Not there.
21  Q.   Okay.  And just revisiting Andy Allen, you have not
22  subsequently -- I know you weren't there, but has anybody
23  reported to you that Mr. Allen made any statement that their
24  testimony was influenced or colored or in some way -- I'm just
25  going to say influenced by either reading Mr. Zahn's statement

BLYTHE - CROSS                                        Vol. 4-73

1  or being exposed to any news stories that reported on that?

2  A.  No, sir.

3  Q.  And the same question with Kerri Stewart.  Has anybody

4  reported to you that Kerri Stewart raised any concerns that her

5  testimony may have been influenced by -- either her testimony

6  to the grand jury or her current recollection of events have

7  been colored or altered or influenced in some way by being

8  exposed either directly to Mr. Wannemacher and Mr. Zahn's

9  statement or any news reporting of that?

10  A.  No, sir.

11  Q.  Okay.  And I think you said you phoned in to Ms. Dykes'?

12  A.  Yes.

13  Q.  And who was present for that?

14  A.  Agent Hill, AUSA Duva.  I think AUSA Corsmeier was there,

15  but I'm not sure.

16  Q.  Anybody else?

17  A.  Not to my knowledge.

18  Q.  Okay.

19  A.  Just Ms. Dykes and her attorneys.

20  Q.  And who was there on behalf of Ms. Dykes?

21  A.  Hank Coxe.

22  Q.  Okay.

23  A.  Jeff [verbatim] Lockamy, I think.

24  Q.  Okay.

25  A.  There was probably another couple of other attorneys in

BLYTHE - CROSS                                        Vol. 4-74

1  there.  I don't remember.

2  Q.  So there were more than Mr. Lockamy and Mr. Coxe present

3  for that interview?

4       MR. DUVA:  I make a relevance objection.  She's

5  represented by counsel.  How many lawyers are there, two,

6  three, or four, what's the relevance of that?

7       THE COURT:  Go ahead.  Answer the questions.

8       THE WITNESS:  I think there were more lawyers.  I

9  don't remember who they are.

10  BY MR. SUAREZ:

11  Q.  Okay.  And did you take any notes of your interview with

12  Ms. Dykes?

13  A.  No, sir.

14  Q.  And did -- do you know if anyone took notes of the

15  interview with Ms. Dykes, the prep session?

16  A.  No, sir.

17  Q.  How long did the prep session last?

18  A.  Approximately an hour to an hour and a half.

19  Q.  Did Ms. Dykes or her lawyers raise any concern that

20  Ms. Dykes' testimony may have been influenced or colored in

21  some way by being exposed either directly to Mr. Wannemacher

22  and Mr. Zahn's statements or any news reporting of those

23  statements?

24  A.  No.

25  Q.  Did Ms. Dykes raise any concerns that her current memory

BLYTHE - CROSS                                          Vol. 4-75

1  of the events that she testified about may now be colored by
2  news accounts or news reports or her potential reading of those
3  statements?
4          MR. DUVA:  Object as to relevance and asked and
5  answered and that this is ground that Mr. Suarez can cover with
6  Ms. Dykes on cross-examination.
7          THE COURT:  Overruled.
8          MR. SUAREZ:  Thank you, Your Honor.
9          THE WITNESS:  The answer's no.
10 BY MR. SUAREZ:
11 Q.   Okay.  Were you there for Ms. Rhode?
12 A.   Yes.
13 Q.   And who was present for that?
14 A.   Her attorney, Rut Liles, and herself, me, AUSA Duva, AUSA
15 Corsmeier.
16 Q.   And I think -- did you take any notes?
17 A.   I don't remember if I did or not.
18 Q.   When was that meeting?
19 A.   It was last week sometime.
20 Q.   Okay.  And did it -- do you -- are you aware whether
21 anyone else took any notes of that meeting?
22 A.   I don't know.
23 Q.   Okay.  Did -- how long did the meeting last?
24 A.   45 minutes to an hour.
25 Q.   Okay.  And did Ms. Rhode raise any concerns with you about

BLYTHE - CROSS                                          Vol. 4-76

1  whether or not her testimony had been colored or influenced in
2  some way by her either directly reading Mr. Wannemacher and
3  Mr. Zahn's statements or her exposure to news reporting of
4  those statements?
5  A.   No.
6  Q.   And I think -- forgive me because you -- I didn't notate
7  this.
8          Did you participate in Jason Gabriel's?  Was there a
9  meeting with Jason Gabriel?  Did you participate in it?
10 A.   I think there was.  I wasn't present for it if it did take
11 place.
12 Q.   And the same question I asked you for the other ones.  Has
13 anyone reported to you that Mr. Gabriel raised any concerns
14 that his testimony may have been influenced or colored by his
15 reading of the *Garrity*-protected statements?
16 A.   No, sir.
17 Q.   Did Ms. Dykes tell you during the meeting that she had
18 read the statements?
19 A.   Yes.
20 Q.   Okay.  And did Ms. Rhode tell you that she had read the
21 statements?
22 A.   Yes.
23 Q.   And going back to Ms. Dykes, did she articulate when she
24 read those statements?
25 A.   Well, so, you know, I think she was charged with the

BLYTHE - CROSS                                          Vol. 4-77

1   decision on the termination of Mr. Wannemacher, so she would
2   have read those for sure back then.
3           She expressed it had been a very long time.  I don't
4   recall if she quantified it in years or months, but it had been
5   a long time since both her and Ms. Rhode had read the
6   statements.
7   Q.   Okay.  And I think you just peppered the answer to
8   Ms. Rhode, but just so that we have a specific record, when did
9   Ms. Rhode indicate she had read the *Garrity* --
10  Mr. Wannemacher's and Mr. Zahn's protected statement?
11  A.   I don't remember.  You'll have to ask her.
12  Q.   Well, do you remember -- did you notate it?  Do you have
13  any memory of when she says she read it?
14  A.   I just told you I don't remember, sir.
15  Q.   Has Mr. Gabriel ever told you that he read a
16  *Garrity*-protected statement?
17  A.   Not to my recollection, no.
18  Q.   You indicated that a subpoena was issued to JEA in April
19  of 2020, correct?
20  A.   April 21st.
21  Q.   That's right.
22          And that was -- if I heard you correctly, that was a
23  rolling production?
24  A.   Yes.  They were able to produce some of it fairly quickly,
25  and other productions, you know, took longer to get.

BLYTHE - CROSS                                          Vol. 4-78

1   Q.   Okay.  And before -- I think we've established that before
2   April 21 of 2020, you were interviewing witnesses and gathering
3   evidence.
4   A.   Correct.
5   Q.   And a number of the witnesses that you interviewed were --
6   were interviewed after February 3rd of 2020 and before the
7   conclusion of JEA's rolling production.
8   A.   Can you repeat that?
9   Q.   Sure, yeah.  I'd be happy to.
10          I'm framing the time frame here.  You interviewed
11  witnesses after February 3rd of 2020 and before the conclusion
12  of JEA's rolling production, which necessarily would have been
13  sometime after April 21st of 2020.
14  A.   I interviewed witnesses before that time and after that
15  time.
16  Q.   Okay.  And throughout that window of February 3rd and
17  whenever JEA ended their production.
18  A.   Yes.
19  Q.   And yesterday I think you indicated that -- regarding the
20  JEA production, that search terms were applied to the
21  production in order to identify responsive documents or
22  relevant documents.
23  A.   Yes.
24  Q.   And tell me, who were the individuals that were involved
25  in coming up with the selection of the search terms?

BLYTHE - CROSS                                                    Vol. 4-79

1   A.   The investigative team as a whole:  myself, Agent Hill,
2   Investigator Adams, and AUSA Duva.  We discussed and, you know,
3   I put together an Excel spreadsheet with some potential search
4   terms.  And we, you know, had kind of an iterative process.  I
5   think it went through a couple -- you know, at least a couple
6   drafts.
7   Q.   Okay.  And did you -- did any individual outside the
8   prosecution team participate in the selection of the search
9   terms?
10          For example, did you collaborate with JEA folks, or
11  did you collaborate with OGC folks or Smith Hulsey?  Was there
12  a collaboration with any outside entities or individuals?
13  A.   No.  Not on my specific search terms, no.
14  Q.   I'm sorry.  When you say your specific search terms, you
15  mean the prosecution team's, the Government, the ones that were
16  applied to --
17  A.   Correct.
18  Q.   That was just done exclusively by the prosecution team
19  folks that you identified.
20  A.   Yes.  I and the other members of the prosecution team had
21  input into the draft I put together, and we collaborated on
22  that.
23          MR. SUAREZ:  Your Honor, mercifully, I may be done.
24  May I have just a moment to confer?
25          THE COURT:  Yes, sir.

BLYTHE - CROSS                                                    Vol. 4-80

1          (Pause in proceedings.)
2          MR. SUAREZ:  Thank you, Your Honor.  May I inquire?
3          THE COURT:  Yes, sir.
4          MR. SUAREZ:  I just have a handful of questions.
5   BY MR. SUAREZ:
6   Q.   I think Mr. Duva indicated that April Green would not be
7   testifying, and I think you've said that you didn't know if
8   there was a prep session with her, correct?
9   A.   You know, I recall that he decided to cut her from the.
10  Witness list, so I don't think the prep session was done.  I
11  think I was just mistaken.
12  Q.   And are you aware of April Green raising any concerns
13  about either her testimony previously -- well, let's start with
14  that.
15          Are you aware of Ms. -- of April Green raising any
16  concerns about her testimony being influenced or colored in any
17  way by her -- any exposure she might have had either directly
18  to the statements made by Mr. Wannemacher or Mr. Zahn or
19  exposure to media accounts of those statements?
20  A.   No.
21  Q.   Are you aware of any recollection -- excuse me.
22          Are you aware of any concerns raised by April Green
23  regarding her current recollection of the events that -- that
24  she testified about that may have been influenced or colored in
25  some way by any direct exposure to the -- Mr. Zahn and

BLYTHE - CROSS                                      Vol. 4-81

1   Mr. Wannemacher's statement or news accounts of those
2   statements?
3   A.   No, sir.
4   Q.   Has she ever told you whether she read the statements?
5   A.   I don't -- I don't remember if she did or not.
6   Q.   Okay.
7   A.   I'd have to look at my, you know, 302s or grand jury
8   transcript.
9   Q.   Do you know when the first news accounts were published
10  that reported on Mr. Wannemacher or Mr. Zahn's
11  *Garrity*-protected interviews?
12  A.   No, I don't.
13  Q.   You indicated that you had created a document with the
14  search terms.
15        Was that document shared with any outside parties?
16  In other words, did you send it to OGC for input?  Did you send
17  it to Smith Hulsey?  Did you send it to anybody for input
18  outside of the prosecution team?
19  A.   I didn't send it to anyone for input.  Of course, I sent
20  it to JEA because we -- we gave them the subpoena.  They said
21  okay.
22        Based on the language in the subpoena attachment
23  itself, there's, I think it was 800,000 emails that would be
24  responsive.  They expressed that in all likelihood a very large
25  percentage of those would be nonresponsive or irrelevant.

BLYTHE - CROSS                                      Vol. 4-82

1         So I discussed it with AUSA Duva, thought it made
2   sense to put together some basic search terms to make sure that
3   what was -- we weren't just carte blanche excluding stuff that
4   would be relevant, but we were making sure that the search
5   terms covered everything we could possibly need related to this
6   time period and what we're investigating.
7         And so that narrowed it down to about 300,000 emails
8   and documents.  And so -- and, you know, there's also the
9   attachments to those, so the number of files is much larger.
10        But I didn't ask for JEA or Smith Hulsey & Busey's or
11  OGC's or anybody else's input into that.
12  Q.   Okay.  And other than that dialogue with JEA to sort of
13  narrow the scope so that it wouldn't be so voluminous, did you
14  have any discussions with anyone else about the search terms
15  that were to be employed?
16  A.   Not outside the prosecution team.
17  Q.   Okay.
18        MR. SUAREZ:  I don't have any further questions at
19  this time, Your Honor.
20        THE COURT:  Thank you, Counselor.
21        Mr. Felman.
22        MR. SUAREZ:  Thanks, Agent.
23        THE WITNESS:  Yes, sir.
24        MR. FELMAN:  May it please the Court?
25        THE COURT:  Yes, sir.

BLYTHE - CROSS                                    Vol. 4-83

```
 1              CROSS-EXAMINATION
 2  BY MR. FELMAN:
 3  Q.   Agent Blythe, for the record, I'm Jim Felman, and I
 4  represent Ryan Wannemacher.
 5  A.   Yes, sir.
 6  Q.   Agent Blythe, what was the first thing that you did in
 7  this case?
 8  A.   The very first thing that I did?
 9  Q.   If you can remember.
10  A.   It was probably talk to AUSA Duva on the phone.
11  Q.   Okay.  And was that -- so that would have been before you
12  read the Billy memo?
13  A.   Before I read the Kyle Billy memo?
14  Q.   Yeah.
15  A.   It was very close in time.  That was -- you know, that's
16  sort of the -- you know, the public outcry and investigation
17  spawned out of that sort of a document that kicked it off.
18  Q.   Well, yeah, and that's why I'm tying it to that.  I got
19  the impression that it was the Kyle Billy memo that sort of
20  first sparked your -- is that your testimony? -- I don't want
21  to put words in your mouth -- that that was the document that
22  kind of piqued your interest and was sort of the first
23  chronological document that you were shown about the case.
24  A.   I think so.
25  Q.   And that was November the 18th?  Is that the right date?
```

BLYTHE - CROSS                                    Vol. 4-84

```
 1  A.   That's the date it was issued publicly.
 2  Q.   Okay.
 3  A.   I don't remember exactly when I read it, but it wasn't too
 4  long after.
 5  Q.   Yeah.  And I think -- I think your testimony was roughly
 6  within a month.
 7  A.   Yes.
 8  Q.   So my curiosity just got the better of me because, you
 9  know, when -- what's the date of the Diamond-Salem hearing?
10  A.   December 16th.
11  Q.   Okay.  So was it before or after the Diamond-Salem hearing
12  that you read the Billy memo?
13  A.   Probably before, but I don't -- I don't remember,
14  honestly.  I can't exactly remember.
15  Q.   Probably right around the same time.
16  A.   Maybe.
17  Q.   Okay.  Well, I -- okay.
18          So you -- your first thing was probably a call from
19  Mr. Duva?
20  A.   So I think, you know -- okay.  They're about a month
21  apart, so it's -- it was right around that time.  I can't
22  specifically remember the exact date I read that memo.
23  Q.   Did you watch Diamond-Salem live or after?
24  A.   Afterward.
25  Q.   Other than earlier this week, can you estimate for us how
```

BLYTHE - CROSS                                    Vol. 4-85

1  many times you've watched some or all of the Diamond-Salem
2  hearing?
3  A.   Two or three times.
4  Q.   And -- okay.  So the Diamond-Salem hearing was, again,
5  which date?
6  A.   December 16th, 2019.
7  Q.   And did you have a conversation with Mr. Duva around the
8  time about your impressions of that hearing?
9       MR. DUVA:  Your Honor, he just testified he watched
10 it later, so I assume he's asking him as if -- as of the time
11 that he watched it.
12      MR. FELMAN:  I'll reframe the question.
13 BY MR. FELMAN:
14 Q.   How long after the hearing is it that you think you
15 watched it?
16 A.   Within -- within a week, I can say confidently.
17 Q.   And when do you think, in reference to you watching it for
18 the first time, was the first time you discussed it with
19 Mr. Duva?
20 A.   It would have been contemporaneous with that.  You know,
21 very close in time.
22 Q.   And had Mr. Duva already watched the Diamond-Salem hearing
23 when you first discussed it with him?
24      MR. DUVA:  Your Honor, I don't know how Mr. Blythe
25 could know when I watched the Diamond-Salem hearing unless he

BLYTHE - CROSS                                    Vol. 4-86

1  could say I told him when.
2       THE COURT:  Do you know?
3       THE WITNESS:  I don't know when he watched it.  I am
4  confident at some point we discussed it prior to the end of
5  2019.  You know, he -- I know he opened a file at his office
6  around December 20th, so it would have been by then.
7  BY MR. FELMAN:
8  Q.   Yeah.  So three business days after Diamond-Salem is when
9  this case file got opened.
10 A.   Right.
11 Q.   And so what I'm trying to understand --
12      MR. DUVA:  It was four, Your Honor.  I think it was
13 December 20th.
14      MR. FELMAN:  Right.
15 BY MR. FELMAN:
16 Q.   Well, the hearing was the 16th, so --
17      MR. DUVA:  Right.
18 BY MR. FELMAN:
19 Q.   -- you know, four business days later, this file got
20 opened.
21 A.   Yes.
22 Q.   Okay.  And do you think you -- and when you first
23 discussed it with Mr. Duva, did it seem to you he had already
24 watched it or not?  That's my question.
25 A.   So I can't -- you know, this was a while ago, right?  But

BLYTHE - CROSS/REDIRECT                                    Vol. 4-87

1   I'm sure he did.  When we talked about it by December 20th, I'm
2   pretty sure he had watched it, and we talked about it.
3            You know, my understanding is, you know, it was a
4   publicly noticed meeting.  It was out there, and, you know,
5   it's something that we reviewed in the course of our
6   investigation.  That's undisputable.
7            MR. FELMAN:  Nothing further, Your Honor.
8            THE COURT:  Thank you, Counsel.
9            Any redirect, Mr. Duva?
10           MR. DUVA:  Yes, Your Honor.
11                    REDIRECT EXAMINATION
12  BY MR. DUVA:
13  Q.   Agent Blythe, do you really know when I watched the
14  Diamond-Salem hearing?
15  A.   No.
16  Q.   Okay.  All right.  We'll go back to the beginning of -- I
17  wanted to cover that, but we'll ...
18           Agent Blythe, do you recall some references in
19  pleadings or motions filed by the defendants about the
20  disclosure of Mr. Zahn's -- the face page and portions of day
21  two of his *Garrity* statement that was provided in response to a
22  grand jury subpoena?
23  A.   So I understand --
24  Q.   I'm just asking for a yes or no.
25  A.   Can you ask the question again?  I'm sorry.

BLYTHE - REDIRECT                                          Vol. 4-88

1   Q.   Do you recall reviewing pleadings of the defendants that
2   referenced a production, pursuant to a grand jury subpoena, of
3   day two of Mr. Zahn's *Garrity* statement?
4   A.   Yes.
5   Q.   All right.  I'm going to approach you with the grand jury
6   subpoena to BCSP LLC.
7   A.   Okay.
8   Q.   Is that an entity that is owned by Tim Baker?
9   A.   It is.
10  Q.   And looking at that, does that refresh your recollection,
11  connecting that to the pleadings that mentioned the production?
12           Earlier you testified that JEA produced the
13  statement.  Do you think you were mistaken about that?
14  A.   It's possible.  We had a lot of subpoena productions, so
15  I -- I know that Mr. Baker produced photocopied records, and I
16  think -- I think that's where they did come from.  I apologize.
17  Q.   You're not sure one way or the other?
18  A.   I think I was mistaken.  I -- but I'm not -- you know, I'd
19  have to go back and, you know, look at those.
20  Q.   Did you ever interview Tim Baker?
21  A.   We did, I believe, or ...
22  Q.   When was that?
23  A.   I don't remember.
24  Q.   Is that because it didn't happen?
25  A.   I know we discussed interviewing him.  I -- I guess we

BLYTHE - REDIRECT                                    Vol. 4-89

1    didn't.

2    Q.   All right.  You were asked about collecting a *Garrity*

3    statement of Lynne Rhode.

4         Do you recall that Lynne Rhode resigned on or about

5    December 18th of 2019?

6    A.   Yes.

7    Q.   So do you know -- do you even know whether or not there's

8    a *Garrity* statement of Lynne Rhode?

9    A.   I don't.

10   Q.   You don't know one way or the other?

11   A.   I don't -- I don't know.  I don't recall if there's a

12   transcript for her with OGC where she was provided *Garrity*

13   rights.

14   Q.   And we never interviewed Herschel Vinyard, correct?

15   A.   No.

16   Q.   You were asked about the June 17, 2019, OGC memo, and that

17   is -- postdates the Nixon Peabody memo, which is May 20th of

18   2019?

19   A.   Yes.

20   Q.   Okay.  You testified on direct that you interviewed

21   Elizabeth Columbo; is that right?

22   A.   Yes.

23   Q.   Did Ms. Columbo tell you that she asked JEA for a copy of

24   the June 17, 2019, memo?

25   A.   Yes, I think she did.

---

BLYTHE - REDIRECT                                    Vol. 4-90

1    Q.   And what was it based on Mr. Wannemacher's representations

2    to her, based on what she said to us, why she was asking for a

3    copy of that memo?

4    A.   Because he said that it cleared the concerns raised in the

5    Nixon Peabody memo.

6    Q.   And Mr. Vinyard started at JEA around April 1st of 2019?

7    A.   Yes.

8    Q.   And did you -- other than the constraints presentation,

9    did you come away with the view that Mr. Vinyard was not really

10   even involved that much in the strategic planning?

11   A.   Correct.

12   Q.   When we went to the Smith Hulsey & Busey law firm on

13   December 7th of 2020 -- you were asked some questions about

14   that meeting -- did we share anything about our investigative

15   plan with the Smith Hulsey & Busey lawyers Steve Busey and

16   Kevin Blodgett?

17   A.   No.

18   Q.   And did we tell them what we were looking for in that

19   meeting?

20   A.   No.

21   Q.   Was that a one-way meeting from Smith Hulsey & Busey, the

22   lawyers representing the City Council and the Special

23   Investigative Committee, to us?

24   A.   Yes.  They gave us a presentation about their

25   investigation and their findings, and we took that in.

BLYTHE - REDIRECT                                    Vol. 4-91

1   Q.   I'm showing you, which Mr. Suarez, I don't believe, did,
2   Defense Exhibit 143.  That's the Sean Granat letter to City
3   Council itemizing the reasons that OGC was advocating for a
4   for-cause termination of Mr. Zahn; is that right?
5   A.   Yes.
6   Q.   Did we present that to the grand jury?
7   A.   No.
8   Q.   I mean through your testimony, is what I mean.  I know you
9   don't -- you have the transcripts of the other witnesses, but
10  I'm specifically asking through your testimony.
11  A.   No, not through mine.
12  Q.   Did we present the video of Mr. Granat's presentation
13  about the letter to the grand jury that happened on January
14  28th, 2020?
15  A.   No.
16  Q.   When the board members were -- and take out the Kelly
17  Flanagan part, which we'll get to in a moment with the actual
18  transcript.
19          When the board members were interviewed and testified
20  about -- and testified before the grand jury, was a focus of
21  their questioning the actual video itself of Mr. Wannemacher's
22  presentation of the PUP?
23          MR. SUAREZ:  Your Honor, before we move forward, may
24  we come to sidebar?
25          THE COURT:  Sure.

BLYTHE - REDIRECT                                    Vol. 4-92

1                    *  *  *  *  *
2       (Sidebar No. 7 sealed and under separate cover.)
3                    *  *  *  *  *
4   BY MR. DUVA:
5   Q.   So, Agent Blythe, you have access to the grand jury
6   transcripts of the board members who testified?
7   A.   Yes.
8   Q.   And you were present for interviews of those board members
9   leading up to their grand jury testimony.
10  A.   Yes.
11  Q.   And either you or Investigator Adams or Agent Hill wrote a
12  302 or memorandum of interview?
13  A.   Yes.
14  Q.   And you understand, for purposes of the record, that all
15  of those transcripts have been provided in camera and under
16  seal to the Court.
17  A.   Yes.
18  Q.   Now, in the interviews, in terms of whether something is a
19  material misrepresentation or omission, the interview focused
20  on what Mr. Wannemacher or Mr. Zahn said at the time of the
21  July 23rd, 2019, board meeting, correct?
22  A.   Yes.  That's primarily what we were concerned about, his
23  representations to the board.
24  Q.   Made on livestream video that are posted on the JEA
25  website?

BLYTHE - REDIRECT                                    Vol. 4-93

1   A.   Yes, as far -- in the context of the board meeting, yes.
2   Q.   And kind of the main question is had you known about the
3   recapitalization figures with respect to the PUP if JEA was
4   sold and 4, 5, or $6 billion was added to the net position,
5   that these numbers, in the 600-million-up-to-a-billion-dollars
6   range, would have been spit out of the PUP formula; is that
7   right?
8   A.   Yes.
9   Q.   And was the focus of, "Had you'd known that then, how
10  would you have voted on Resolution 2019-10?"
11  A.   Yes.
12           MR. SUAREZ:  Your Honor, I predicted that we would
13  get a bunch of leading questions, and we're heading down
14  that -- that's the third, I think, leading question he's asked
15  in a row.  So I'm going to object and ask that he not lead the
16  witness.
17           THE COURT:  Mr. Duva?
18           MR. DUVA:  You know, I can ask him what the focus
19  was.
20           THE COURT:  Go ahead and do that.
21  BY MR. DUVA:
22  Q.   What was the focus with respect to the July 23rd, 2019,
23  board meeting and questioning board members about had they
24  known certain things about the PUP and the calculation at that
25  time, how they would have voted on Resolution 2019-10?

BLYTHE - REDIRECT                                    Vol. 4-94

1   A.   The focus of our interviews was to understand what they
2   knew and when they knew it.  Did they understand the PUP, what
3   they understood of the PUP at the time they were asked to vote
4   on it, and asking them if they knew that these payouts were
5   not -- the potential payouts were not consistent with what was
6   in the board material, if they would have voted differently or
7   felt differently, and they clearly did.
8   Q.   Going to the interview of Kelly Flanagan last Friday, was
9   that -- were we given a 30-minute time limit by her lawyers?
10  A.   Yes, we were.
11  Q.   And when she specifically mentioned the testimony -- I
12  don't believe Mr. Suarez showed this to you.  I'm just going to
13  refresh your recollection.
14           In looking at page 51, lines 12 through 22, is that
15  what we discussed specifically?
16  A.   Yes.
17  Q.   Okay.  And for record purposes, it was a juror who asked
18  the question, correct?
19  A.   Yes.
20  Q.   And the question was -- and that was after I was done with
21  the examination?
22  A.   Yes.  That's usually when the jurors are able to ask
23  questions.
24  Q.   So the question was, "The PUP" -- it's really more of a
25  statement and a question.  "The PUP is a pretty big deal and

BLYTHE - REDIRECT                                          Vol. 4-95

1   there was a lot involved around it.  Was it common practice
2   that the board would just vote on something that quickly?  I
3   mean, you said you had never seen it until that day."
4            And then there was a -- the witness said, "I
5   think ..."
6            And then I said, "Go ahead."
7            And the witness said, "It was a marathon meeting, I
8   think, of about three hours in duration.  This was the last
9   agenda item that was covered with the board.  My perspective,
10  in hindsight, is that it felt like it was buried," the "it"
11  presumably being the PUP; is that right?
12  A.   Yes.  That's what I would understand it to mean.
13  Q.   Now, we'll ask Ms. Flanagan these questions, but it's just
14  kind of a Captain Obvious one.
15           But she was present during the July 23rd, 2019, board
16  meeting.
17  A.   Clearly.
18  Q.   And you testified that she was present at Diamond-Salem,
19  correct?
20  A.   Yes, she -- she spoke.
21  Q.   And did -- she spoke about -- at the Diamond-Salem
22  hearing, specifically about two minutes about the PUP and the
23  differences between the Willis Towers Watson presentation and
24  what was presented by Mr. Wannemacher on July 23rd, 2019?
25  A.   Yes, she did.

BLYTHE - REDIRECT                                          Vol. 4-96

1   Q.   And when I pointed that out to her, did we then offer the
2   opportunity for Ms. Flanagan to speak to the cross-counsel
3   team?
4   A.   We did.
5   Q.   And did you contact the cross-counsel team?
6   A.   No.
7   Q.   Do you know whether or not Ms. Flanagan did?
8   A.   No.
9            MR. DUVA:  Nothing further, Your Honor.
10           THE COURT:  All right.  Mr. Suarez, anything else?
11           MR. SUAREZ:  No, Your Honor.
12           THE COURT:  Mr. Felman?
13           MR. FELMAN:  Nothing, Your Honor.  Thank you.
14           THE COURT:  Okay.
15           Mr. Duva, who's next?
16           MR. DUVA:  The Government calls Kevin Blodgett.  I'm
17  going to go ahead and get him.
18           THE COURT:  And about how much time do you need?
19           MR. DUVA:  Probably about an hour.
20           THE COURT:  Okay.  So should we -- we're approaching
21  the noon hour, so maybe we should break and then reconvene so
22  we can start with him.
23           MR. DUVA:  If we do that, depending on afternoon
24  schedules, it will either be Blodgett or Tim Adams, one of the
25  two --

Vol. 4-97

```
 1              THE COURT:  Okay.
 2              MR. DUVA:  -- if we start after lunch.
 3              THE COURT:  All right.  So let's start back up at
 4   1 o'clock.
 5              MR. DUVA:  Sounds good.  Thank you, Your Honor.
 6              MR. SUAREZ:  Your Honor, before we break --
 7              THE COURT:  Yes.
 8              MR. SUAREZ:  -- I would just ask that Agent Blythe
 9   remain available to both sides if we were to need him for any
10   reason to be recalled.
11              THE COURT:  Yes.  Very well.
12              MR. SUAREZ:  Thank you, Your Honor.
13              THE WITNESS:  May I stay in the courtroom, Your
14   Honor?
15              THE COURT:  You can.
16              MR. SUAREZ:  Your Honor, I would request that no
17   witnesses that could testify remain in the courtroom.
18              MR. DUVA:  Your Honor, Agent Blythe is the case
19   agent, and we commonly get the case-agent exception.  He's not
20   under subpoena by the defense.  The Government doesn't intend
21   to recall him.
22              If the defense is going to subpoena Agent Blythe -- I
23   know the Court is trying to be accommodating -- they need to go
24   through the two-week procedures, and they haven't done that.
25              THE COURT:  He is the case agent.
```

Vol. 4-98

```
 1              MR. DUVA:  And he's an FBI agent, so they have to
 2   follow Touhy if they're going to subpoena him to testify
 3   further.
 4              They've had a full cross-examination.  I have no
 5   intent of calling Agent Blythe back at this point, so I'm just
 6   informing the defense they need to go through the Touhy process
 7   if they intend to call Agent Blythe.
 8              MR. SUAREZ:  Your Honor, I think that he's under the
 9   jurisdiction of the Court.  You're a federal magistrate.
10   (Unintelligible.)
11              COURT REPORTER:  I can't hear you.
12              MR. SUAREZ:  I'm sorry.
13              This is -- the issues in this Kastigar hearing are
14   precisely what these agents knew and when they knew it.  This
15   is not a regular case where a case agent is commonly allowed to
16   stay in.
17              There may be issues that come up in the course of
18   this hearing that require his continued testimony, and I would
19   strongly --
20              THE COURT:  Are you suggesting that he be removed
21   from the courtroom for the continuation of this hearing?
22              MR. SUAREZ:  I am suggesting that, Your Honor, yes.
23              MR. DUVA:  And we're objecting to that based on the
24   case agent exception.  Agent Hill has not been inside the
25   courtroom at all during the proceedings.
```

Vol. 4-99

```
 1            And I'm also bringing up the Touhy process, which I
 2   know Mr. Albritton knows since he was a former U.S. attorney.
 3   I presume Mr. Suarez does as well, that they don't just get to
 4   call an FBI agent back.  They have to follow that -- if they
 5   want to issue a subpoena, they have to follow that process.  I
 6   don't -- they have not done that.
 7            MR. ALBRITTON:  Well, I just commonly waived that
 8   when I was a U.S. attorney, Judge, just to let you know.
 9            MR. DUVA:  I don't think that's true, Your Honor.
10            THE COURT:  All right.  Let me -- let me take that
11   under advisement while during the lunch break, and I'll let you
12   know.
13            MR. SUAREZ:  Thank you, Your Honor.
14            COURT SECURITY OFFICER:  All rise.
15         (Recess from 11:52 a.m. until 1:03 p.m.; all parties
16   present.)
17            COURT SECURITY OFFICER:  All rise.  This Honorable
18   Court is now in session.
19            Please be seated.
20            THE COURT:  Before we begin, with regard to the issue
21   of the case agent, per my May 9th order, and the parties agreed
22   that during this hearing that the prosecution team would excuse
23   itself from the courtroom during the defendants'
24   cross-examination of Government witnesses or the examination of
25   defense witnesses when such examinations relate to defendants'
```

ADAMS - DIRECT                                              Vol. 4-100

```
 1   Garrity-related testimony.
 2            Clearly, the agent, the case agent, is part of the
 3   prosecution team.  So in light of that, I will allow Mr. --
 4   well, the agent to remain in the courtroom as case agent.
 5   However, he will be subject to the rules.  When issues come up
 6   concerning Garrity-protected information, then he will have to
 7   leave the courtroom.
 8            Anything else?
 9            MR. DUVA:  No, Your Honor.
10            THE COURT:  Ready, Counsel?
11            MR. DUVA:  Yes, sir.  The Government calls Tim Adams.
12            THE COURT:  All right.
13         (The witness entered the courtroom.)
14            COURTROOM DEPUTY:  Please raise your right hand and
15   remain standing to be sworn in.
16            Do you solemnly swear or affirm that the testimony
17   you're about to give before this Court will be the truth, the
18   whole truth, and nothing but the truth, so help you God?
19            THE WITNESS:  I do.
20            COURTROOM DEPUTY:  Please be seated, and state your
21   full name for the record and spell your last.
22            THE WITNESS:  Timothy Adams, A-d-a-m-s.
23         TIMOTHY ADAMS, GOVERNMENT'S WITNESS, SWORN
24                    DIRECT EXAMINATION
25   BY MR. DUVA:
```

ADAMS - DIRECT                                          Vol. 4-101

1   Q.   Good afternoon, Mr. Adams.
2   A.   Good afternoon.
3   Q.   And you are a former FBI agent?
4   A.   Yes.
5   Q.   How long were you with the bureau?
6   A.   A little over 21 years.
7   Q.   And prior to that, were you actually a prosecutor in
8   Pennsylvania?
9   A.   Yes.
10  Q.   And where and what types of cases did you handle and
11  how -- for how long?
12  A.   I was in Allentown, Pennsylvania, the Lehigh County
13  District Attorney's Office, for under two years.  And it was a
14  broad range of cases, something that was primarily -- my
15  primary assignment was something called central court, which is
16  -- had a broad -- broad variety of cases.
17  Q.   Just make sure that microphone's as close to you -- I know
18  it doesn't move that great, but just try to keep your voice up
19  as best you can.
20       When did you start with the bureau?
21  A.   August of 1996.
22  Q.   And go through the various assignments that you had during
23  your career with the FBI.
24  A.   My first assignment was the Gainesville Resident Agency,
25  which is a satellite office out of the Jacksonville Field

ADAMS - DIRECT                                          Vol. 4-102

1   Office.  There I worked a broad range of cases across several
2   classifications.
3        In two thousand -- late 2005 I was selected as the
4   associate division counsel for the Jacksonville Field Office so
5   moved to -- moved to Jacksonville in early 2006.  I was the
6   associate division counsel for approximately four years.
7        In 2009 I became the chief division counsel and then
8   held that position till 2011.
9   Q.   Let's stop there for a second.
10       Associate division counsel and chief division
11  counsel, what do those roles entail?
12  A.   You're the primary legal counsel for that field office,
13  and you provide guidance to the office on ethical matters,
14  investigative matters, policy and procedure guidelines.  You're
15  essentially in-house counsel for the office.
16  Q.   And you're a barred lawyer at that time?
17  A.   Yes.
18  Q.   You started to talk about 2011 and beyond.
19       How did you finish your career at FBI?
20  A.   After 2011 I worked on the Joint Terrorism Task Force, and
21  then I finished my career on the white-collar crime squad.
22  Q.   When did you leave the FBI?
23  A.   In October of 2017.
24  Q.   What did you do next professionally?
25  A.   I went to work at Deutsche Bank in the anti-money

ADAMS - DIRECT                                          Vol. 4-103

1    laundering area.
2    Q.    How long did you work there?
3    A.    I started in November of 2017, and in approximately May of
4    2018, I moved over to the State Attorney's Office in
5    Jacksonville.
6    Q.    In May of 2018, what was your role at the State Attorney's
7    Office here in Jacksonville?
8    A.    I was an investigator in the special prosecutions
9    division.
10   Q.    How long did you do that?
11   A.    For approximately three years.  I left there in July of
12   2021, and I started as the dean of criminal justice and public
13   safety at St. Johns River State College, and I currently hold
14   that position.
15   Q.    You were a part of the prosecution team of this
16   investigation from early 2020 up until you left your position
17   with the State Attorney's Office in July of 2021?
18   A.    Yes.
19   Q.    Did you testify before the grand jury yourself in this
20   investigation?
21   A.    No.
22   Q.    Talk about, with respect to *Garrity* statements that were
23   provided by Aaron Zahn and Ryan Wannemacher -- first, before I
24   get to the plan, did you ever read those statements?
25   A.    I have no recollection of reading the statements.

ADAMS - DIRECT                                          Vol. 4-104

1    Q.    And beginning the investigation in early 2020, what was
2    the investigative plan, as you understood it, in terms of
3    reading those statements or reading news media about those
4    statements?
5    A.    The guidance that we received was that there were -- there
6    had been proceedings, and -- there were several different types
7    of proceedings and investigations that had happened and were
8    ongoing throughout the course of the investigation.
9          And we received instruction to avoid and not review
10   certain materials, including *Garrity*, and that if we had any
11   issues with that type of material, to contact Mr. Duva.
12   Q.    Did you and I ever have any subsequent conversations about
13   exposure to *Garrity* statements, as you recall?
14   A.    Not that I recall.
15   Q.    Now, at your time -- from your time as associate division
16   counsel and division counsel with the FBI, did you become
17   familiar with what a *Garrity* statement is?
18   A.    Yes.
19   Q.    What is a *Garrity* statement, generally?  I'm not asking
20   about the defendants in this case.  I'm just talking about your
21   general knowledge about *Garrity*.
22   A.    It's a compelled statement, usually in -- in my
23   experience, it's in the employment setting, civil rights
24   investigations primarily.
25          It's a statement that an individual's compelled to

ADAMS - DIRECT                                              Vol. 4-105

1  give related to their employment, and because of that it's
2  protected by the Fifth Amendment, so it can't be used against
3  them subsequently.
4  Q.  And is it true that derivative use can't be made of that
5  statement?  In other words, you can't read the statement and
6  develop investigative leads that lead to other information as
7  long as that's the sole source of the information; is that
8  correct?
9  A.  That's my understanding.
10  Q.  And then ultimately you can't use that to seek a charging
11  document or present that information to the grand jury to
12  procure an indictment.
13  A.  Yes.
14  Q.  Now, before this was a, quote/unquote, federal case, which
15  is a term people like to use, talk about in the end of 2019
16  what the circumstances were at the State Attorney's Office, and
17  sort of take us through how that ended up being that you were
18  part of the prosecution team with this federal investigation
19  once the state attorney, Melissa Nelson, recused herself.
20  A.  Myself and John Zipperer were asked to look into the
21  potential sale or attempt to sell JEA.  The State Attorney's
22  Office had received some information related to that, and so
23  we -- we were asked to look into the matter.
24      Sometime after that the State Attorney's Office
25  recused the office.  And I don't recall if it was at that time

ADAMS - DIRECT                                              Vol. 4-106

1  or shortly thereafter, we were told that we would assist the
2  FBI and the U.S. Attorney's Office in the investigation, as the
3  State Attorney's Office was recused.
4  Q.  The state attorney, Ms. Nelson, recused herself on January
5  13th of 2020?
6  A.  It was January 2020, yes.
7  Q.  You don't remember the day?
8  A.  I don't remember the day.
9  Q.  You mentioned John Zipperer.  Was he another investigator
10  with the State Attorney's Office?
11  A.  Yes.
12  Q.  Retired from the Jacksonville Sheriff's Office?
13  A.  Yes.
14  Q.  And so after Ms. Nelson recused herself, were you assigned
15  to work with the FBI and me as part of the prosecution team to
16  investigate this case?
17  A.  Yes.
18  Q.  Talk about what you did to become -- in addition to what
19  you learned in November/December of 2019, talk about sort of
20  the public nature of what occurred during the invitation to
21  negotiate and the different avenues you had to research what
22  happened in 2019 that led to the investigation that ensued.
23  A.  The primary information -- my recollection is the primary
24  information we received was from individuals that had provided
25  information to the State Attorney's Office.  And when we -- and

ADAMS - DIRECT                                      Vol. 4-107

```
 1   that was at the initiation of the investigation.
 2           At -- after we started working with your office and
 3   the FBI, there was a lot of publicly accessible information,
 4   and we -- we followed the directions that you provided in
 5   relation to that because there was protected materials that
 6   were publicly available.
 7   Q.   And did the publicly available information include JEA
 8   board meetings on the JEA website?
 9   A.   Yes.
10   Q.   And you're aware, as a State Attorney's Office
11   investigator, that any document that resides in JEA is a public
12   record; is that right?
13   A.   Correct.
14   Q.   Now, did you have any --
15           THE COURT:  Keep your voice up, sir.
16           THE WITNESS:  Sorry.
17           MR. DUVA:  Sorry?
18           THE COURT:  I told him to keep his voice up.
19           MR. DUVA:  Thank you, Your Honor.
20   BY MR. DUVA:
21   Q.   Did you have any role in preparing grand jury subpoenas to
22   be issued to JEA or any other entities?
23   A.   I don't recall having any direct responsibility other than
24   being in a support role for that.
25   Q.   Now, you worked with the FBI, Agent Blythe and Agent Hill,
```

ADAMS - DIRECT                                      Vol. 4-108

```
 1   but since you were at the State Attorney's Office, did you have
 2   access to the FBI file and otherwise -- you know, did you go
 3   over and look in it?
 4   A.   No.
 5   Q.   And talk about the work that you did.
 6           Was your work primarily interviewing witnesses?
 7   A.   Yes.
 8   Q.   When you did that, did you prepare a memorandum of
 9   interview?
10   A.   Yes.
11   Q.   And during the early days of COVID, was most of those
12   interviews over the phone?
13   A.   Yes.
14   Q.   Kind of explain the general setup and generally who
15   participated.  I'm not talking about a specific interview but
16   just sort of generally how that transpired in terms of who
17   would be on a particular call to interview a particular
18   witness.
19   A.   Sure.  An individual was identified, generally by
20   Mr. Duva, to be interviewed.  One of the investigators would be
21   provided with responsibility for that interview and the
22   drafting of the report.
23           And then all parties called in to a conference call,
24   and the interview was conducted during that conference call and
25   then documented after that.
```

ADAMS - DIRECT                                              Vol. 4-109

1  Q.   And once you -- if you were leading the interview as the
2  agent, was it your responsibility to write, in your case, a
3  memorandum of interview, and Agent Blythe and Agent Hill, a
4  302?
5  A.   Generally.  There were times that other participants
6  offered to do the report, but generally speaking, yes.
7  Q.   Okay.  And you're aware, from your tenure as an FBI agent,
8  writing 302s, that those are disclosed in discovery.
9  A.   Yes.
10 Q.   Now, talk about having been off the prosecution team, so
11 to speak, since July of 2021.  That's when you stopped working
12 on this.  In other words, you didn't hold over and continue to
13 work on this investigation from that point forward.
14 A.   I did not.
15 Q.   So it's been some time for you since July of 2021 where
16 you've been asked questions or -- you know, really this is the
17 first time, and last week, that you've been asked questions
18 about your involvement in the investigation.
19 A.   Yes.  I haven't dealt with this for quite some time.
20       MR. DUVA:  I want to approach with one exhibit.  It's
21 Government's Exhibit 49.
22       And if we can display this -- oh, we've got to, I
23 think, go -- thank you, Ms. Spaulding.
24 BY MR. DUVA:
25 Q.   Now, this is an email from a David Chapman to State

ADAMS - DIRECT                                              Vol. 4-110

1  Attorney Melissa Nelson; the chief assistant state attorney,
2  Lee Hutton; yourself; and John Zipperer on February 4th of
3  2020.  Is that right?
4  A.   Yes.
5  Q.   Before I showed this to you when we prepped last week, did
6  you have any independent recollection of receiving this email?
7  A.   I did not.
8  Q.   And having shown it to you and showing it to you now, do
9  you have any recollection about receiving it?
10 A.   I do not.
11 Q.   Now, you're not disputing that you received it.  You're
12 just saying you don't have a recollection of receiving it.
13 A.   Correct.
14 Q.   And do you have any recollection whether you clicked on
15 any of these articles and read articles that are set forth in
16 hyperlinks in this Exhibit 49?
17 A.   I do not.
18       MR. DUVA:  May I have a moment, Your Honor?
19       THE COURT:  Yes, sir.
20       (Pause in proceedings.)
21 BY MR. DUVA:
22 Q.   Mr. Adams, since you were off the prosecution team in July
23 of 2021, did you since go and read any media about *Garrity*
24 statements of Mr. Zahn or Mr. Wannemacher?
25 A.   I did not.

ADAMS - CROSS                                          Vol. 4-111

```
 1            MR. DUVA:  Nothing further, Your Honor.
 2            THE COURT:  Very well.
 3            Cross-examination, Mr. Suarez?
 4            MR. SUAREZ:  Yes, Your Honor.
 5            May it please the Court?
 6                      CROSS-EXAMINATION
 7  BY MR. SUAREZ:
 8  Q.   Good afternoon --
 9  A.   Good afternoon.
10  Q.   -- Mr. Adams.
11            Mr. Adams, my name is Eddie Suarez.  I have the
12  pleasure of representing Aaron Zahn.
13            In -- you were both an FBI agent and an AUSA,
14  correct?
15  A.   No, I was not an AUSA.
16  Q.   I'm sorry.  I misunderstood that.
17            You just worked as a lawyer for the bureau?
18  A.   Correct.  I was essentially an in-house counsel --
19  Q.   Understood.
20  A.   -- for the -- an FBI lawyer, yes.
21  Q.   Focusing on this investigation, when you were working as
22  an investigator at the State Attorney's Office, you began -- or
23  the State Attorney's Office began its investigation into the
24  JEA matter around December 9th of 2019?  Does that sound right
25  to you?
```

ADAMS - CROSS                                          Vol. 4-112

```
 1  A.   I don't recall the specific date.  I don't have documents
 2  for that, but it was -- it was somewhere in the latter part of
 3  2019, is my recollection.
 4  Q.   Okay.  Do you recall Ms. Nelson's executive assistant
 5  forwarding you an email received from the website with the
 6  subject, "Formal Request for Grand Jury Investigation by State
 7  Attorney Melissa Nelson of the Mayor, City Council, Ethics
 8  Office, Current and Former Staff"?
 9  A.   I don't recall that.
10  Q.   Show you --
11            MR. SUAREZ:  Mr. Miller, please?
12  BY MR. SUAREZ:
13  Q.   See if this refreshes your recollection.  We're going to
14  show you Defense Exhibit 193, pages 109 and 110, if technology
15  helps us.
16            I'm going to ask you some questions.  We'll wait for
17  that.
18  A.   Okay.
19  Q.   It's not that critical.
20  A.   Okay.
21  Q.   It's December of 2019.  I think we all agree to that.
22            MR. SUAREZ:  Mr. Miller, if you get it, just give me
23  a high sign, and we can -- oh, okay.  See if this helps.
24            Mr. Miller, can we enlarge?
25            Thank you.
```

ADAMS - CROSS                                          Vol. 4-113

```
 1   BY MR. SUAREZ:
 2   Q.   Is that something you've seen before?  Your name is on
 3   there as a recipient.
 4            MR. SUAREZ:  If you could go back.
 5            Mr. Miller, if you can go up and enlarge the top of
 6   that, please.
 7   BY MR. SUAREZ:
 8   Q.   Do you see you being a recipient of that, Mr. Adams --
 9   A.   Yes.
10   Q.   -- around December 9th?
11        Does that refresh your recollection, getting some
12   sort of a formal request?  It looks like someone named Cindy
13   Cribbs is sending that to Mr. Hutton and you and Mr. Zipperer.
14   A.   I don't recall that email, no.
15   Q.   Okay.  The -- if I understood you correctly, you said
16   initially a private citizen provided some information to the
17   State Attorney's Office that led to the opening of the
18   investigation?
19   A.   Individuals provided some information.  I recall at least
20   some of them requesting to be confidential.
21   Q.   Okay.  Was there some agreement by the state attorney that
22   those individuals would remain confidential?
23   A.   That was my understanding at the time, yes.
24   Q.   Are there individuals who did not request to remain
25   confidential that made -- made a request that the state
```

ADAMS - CROSS                                          Vol. 4-114

```
 1   attorney open an investigation?
 2   A.   During that time?  I don't have a specific recollection of
 3   other -- of the individuals at the time.
 4   Q.   As part of your investigation, did you watch any JEA board
 5   meetings?
 6   A.   Yes.
 7   Q.   Do you -- do you recall which ones you watched?
 8   A.   I do not.
 9   Q.   Did you watch the July 23rd of 2019 board meeting when the
10   ITN and PUP were approved?
11   A.   Again, I don't recall which ones I watched.
12   Q.   Do you recall if -- I'm just going to give you some
13   general subject matters and see if it refreshes your
14   recollection.  By subject matter, I mean that were addressed
15   during those board meetings.
16        The July 23rd, that's when the ITN and the PUP were
17   approved.  You don't recall watching that.
18   A.   I do not.
19   Q.   And there was one on December 17th of 2020, the day after
20   the Diamond-Salem meeting, when Mr. Zahn was placed on
21   administrative leave.
22        Do you remember watching that?
23   A.   I do not.
24   Q.   There was one on January 28th of 2020 where -- and I may
25   have said December -- my previous question I think I said
```

ADAMS - CROSS                                           Vol. 4-115

1   December 17th of 2020.  I meant December 17th of 2019.
2              You don't remember watching that either way.
3   A.   No.
4   Q.   Okay.  And January 28 of 2020, do you remember watching
5   that one?  That was the board meeting in which Mr. Zahn was
6   terminated for cause.
7   A.   I do not.  Again, I have a general recollection of
8   watching some of those meetings, but not specifics, no.
9   Q.   Okay.  In the early part of -- I'm sorry.
10             In December of 2019, around December the 17th to be
11  specific, a fellow named David Chapman, who I think is the
12  communications director at the State Attorney's Office,
13  provided you a link to the JEA website with some links to board
14  meetings.
15             Do you remember receiving that?
16  A.   I do not.
17  Q.   And throughout -- starting with December 17th and
18  throughout the investigation, did Mr. Chapman provide you with
19  links to news accounts, news articles, regarding JEA?
20  A.   The -- Exhibit 49 is the only -- that was shown earlier is
21  the only one that I -- I mean, I don't recall anything outside
22  of that.  I didn't recall that one, but I don't recall anything
23  outside of that.
24  Q.   Let me show you Defendants' Exhibit 193, page 99, and just
25  see if this refreshes your recollection.

ADAMS - CROSS                                           Vol. 4-116

1              And while we're putting that up, Mr. Adams, this is
2   an email from Mr. Chapman asking you about -- if you're --
3   about watching the December 17th, 2019, board meeting, the
4   meeting where Mr. Zahn was placed on administrative leave.
5              MR. SUAREZ:  This would be a December 17th meeting,
6   Mr. Miller.
7              It looks like we're still having technical
8   difficulties.
9   BY MR. SUAREZ:
10  Q.   If we can get it, I'll show it to you and see if I can
11  refresh your recollection with that.
12             So did -- do you remember Mr. Chapman providing you
13  with newspaper articles to read throughout that period in
14  December and well into January and February of 2020?
15  A.   I do not have a specific recollection of that, no.
16  Q.   Do you have a recollection of reading newspaper articles
17  during that time?
18  A.   I do not.
19  Q.   You would agree with me just generally that there were
20  lots of newspaper articles covering JEA and the JEA
21  investigation?
22  A.   During -- throughout, yes, I would agree with you.
23  Q.   And did you read any of them?
24  A.   I don't recall reading anything specifically.  If I did, I
25  would have abided by the directions from Mr. Duva.

ADAMS - CROSS                                              Vol. 4-117

1    Q.   But you have no recollection of reading any of them.
2    A.   I do not.
3    Q.   Did you make any effort to catalog anything that you might
4    have read, in other words, document it in some manner?
5    A.   I did not.
6    Q.   Were you aware that on January the -- I believe it's
7    January the 6th of 2020, Mr. Wannemacher was compelled to
8    answer questions posed to him by a team of OGC lawyers pursuant
9    to *Garrity* protections?
10   A.   I don't know if I had specific recollection.  I'm aware
11   that there was such a statement, though.
12   Q.   Have you ever read it?
13   A.   I have not.
14   Q.   And you know that on January 20th and 21 of 2020, two
15   consecutive days, Mr. Zahn was compelled to answer questions
16   posed by a team of OGC lawyers, again under *Garrity*
17   protections.
18   A.   Again, I'm aware that both Mr. Wannemacher and Mr. Zahn
19   had given *Garrity*-protected statements, and I don't recall
20   reviewing either one of them.
21   Q.   You didn't read them.
22   A.   I don't recall reading them.
23   Q.   If you had read them -- because -- since you don't recall
24   if you had read either one of the two protected statements,
25   would you have generated a report or something to note that you

ADAMS - CROSS                                              Vol. 4-118

1    had done that?
2    A.   I would have contacted Mr. Duva and discussed that issue
3    with him.
4    Q.   Are you aware of anyone in the prosecution team who has
5    informed you or you otherwise became aware that they had read
6    any of the -- either transcript, either Mr. Zahn's transcript
7    of his statement or Mr. Wannemacher's?
8    A.   I am not.
9    Q.   Did you or, to your knowledge, any member of the
10   prosecution team -- and just so we're clear, by the prosecution
11   team, I mean -- it's been defined in the pleadings that the
12   parties have filed, but we mean the investigators, as well as
13   the prosecutors on the case.
14   A.   Okay.
15   Q.   So to your knowledge, did anybody in the prosecution team
16   have any conversation or discussion with any lawyer at OGC
17   regarding the contents of Mr. Zahn or Mr. Wannemacher's *Garrity*
18   statements?
19   A.   I have no knowledge of any such discussions.
20   Q.   And you didn't participate in any.
21   A.   I did not.
22   Q.   During the time -- I'm sorry.
23        Did you -- did your office -- or, excuse me, let me
24   rephrase that.
25        Did you have any communications or receive any

ADAMS - CROSS                                          Vol. 4-119

```
 1  information, during the time period in which you were involved
 2  in the investigation, from the Nelson Mullins firm, law firm?
 3  A.   I recall something -- a report from Nelson Mullins that
 4  was -- but I don't recall the specifics, but -- and I don't
 5  know exactly how that was provided to me or how I'm aware of
 6  that.  But I am familiar that there was a -- there was a report
 7  from Nelson -- by Nelson Mullins.
 8  Q.   Was that -- do you recall being provided with something
 9  called a due diligence memorandum?  Does that refresh your
10  recollection?
11  A.   It does not.
12  Q.   Do you recall that due diligence memorandum being sent by
13  the state attorney, Melissa Nelson, to Tysen Duva on December
14  31st of 2019?
15  A.   I do not.
16       MR. SUAREZ:  Mr. Miller, do we have -- can we display
17  Exhibit 194, page 102?
18       See if this refreshes your recollection, if
19  technology doesn't fail us.
20       THE COURT:  There it is.
21       MR. SUAREZ:  Oh, perfect.  Thank you, Your Honor.
22  BY MR. SUAREZ:
23  Q.   So could you take a look at that?  I'd be happy to enlarge
24  any portion of it and see if it refreshes your recollection.
25  A.   It does not, other than the general -- I generally recall
```

ADAMS - CROSS                                          Vol. 4-120

```
 1  the -- a Nelson Mullins memo.
 2  Q.   Okay.  And similarly, do you have any recollection of a
 3  follow-up, a due diligence questions and answers memo that was
 4  forwarded to you and Mr. Zipperer and Mr. Duva on January 21st
 5  of 2020?
 6       Do you have any recollection of that?
 7  A.   I do not.
 8  Q.   Would it be accurate to say throughout the time in which
 9  you participated in the investigation, you coordinated your
10  efforts with Mr. Duva?
11  A.   Correct.
12  Q.   And you participated in some interviews jointly with
13  Mr. Duva?
14  A.   Yes.
15  Q.   And the other investigative agents?
16  A.   Yes.
17  Q.   And some you did, you and Mr. Zipperer did, without the
18  FBI agents or Mr. Duva, but you forwarded your memorandum of
19  interview to them?
20  A.   I'd have to see a report.  I don't recall when -- when we
21  did it collectively as opposed to what interviews Mr. Zipperer
22  and I did before -- before assisting the FBI and the U.S.
23  Attorney's Office.
24  Q.   Whatever you guys did, ultimately you coordinated your
25  investigations.  They sort of merged into one; is that fair?
```

ADAMS - CROSS                                          Vol. 4-121

```
1    A.    They were certainly coordinated, correct.
2    Q.    In the course of the investigation, did you become aware
3    that Ryan Wannemacher's Garrity-protected statement -- that the
4    transcript from that statement had been produced or gathered in
5    some manner by the prosecution team?
6    A.    I recall at some point, and I believe it was recently,
7    being advised that the FBI had received something that was
8    Garrity protected, and I believe it was related to
9    Mr. Wannemacher.
10   Q.    Okay.  And how did you -- how did that come to your
11   attention?
12   A.    I believe I was asked if I had received it or it was
13   forwarded to me.  And this is -- this was within the -- within
14   the past year, I believe.  But I was asked if I had knowledge
15   of it or it had been forwarded to me.
16   Q.    What was your answer?
17   A.    That I had -- I said I had no recollection, but if there's
18   an email trail, I'd like to see that.  But otherwise I had no
19   recollection of that, no.
20   Q.    And who asked you that question?
21   A.    It was either Mr. Duva or Special Agent Blythe, one or the
22   other or both.
23   Q.    You had already retired at that time when you had this
24   inquiry?
25   A.    Yeah.  I was not at the State Attorney's Office at the
```

ADAMS - CROSS                                          Vol. 4-122

```
1    time.  I don't --
2    Q.    I guess I should say retired from the state attorney.
3          What about Mr. Zahn's statement, specifically Volume
4    2 of his statement?  Has it come to your attention that a
5    transcript of his Garrity-protected statement was gathered or
6    collected in some manner by the prosecution team?
7    A.    I don't recall that.
8    Q.    What about any other Garrity statements?  Do you recall
9    seeing any of them, Mr. Vinyard or anyone else?
10   A.    Not a specific recollection.  Again, there was a plan that
11   was in place, and we would have followed that and just talked
12   about Mr. Duva about it throughout.
13   Q.    Okay.  Did you read the SIC report, and by that I mean the
14   special investigation committee?
15   A.    I was aware of it.  I don't recall specifically what --
16   what I read from the report -- from their investigation.  I
17   recall the report.  I don't recall what I did with it.
18   Q.    Okay.  Do you have any recollection of -- and I know you
19   don't remember specifics, and I understand that.
20         But do you recall reading any portion of it?
21   A.    I don't recall.
22   Q.    Do you recall ever determining or noting that there
23   were -- there were -- may have been elements of that report
24   that included information derived from either Mr. Zahn or
25   Mr. Wannemacher's Garrity-protected statement?
```

ADAMS - CROSS                                                  Vol. 4-123

1   A.   I do not.  And, again, something like that would have been
2   coordinated with Mr. Duva also.
3   Q.   Well, if you're reading the report and you read something
4   that's in there that's unexpected, you wouldn't have an
5   opportunity to coordinate that in advance, correct?
6   A.   No.  I would -- I would have stopped and contacted
7   Mr. Duva immediately.
8   Q.   All right.  So if you had -- if that had occurred, you
9   would have stopped and then immediately notified Mr. Duva that
10  you had had contact or had encountered this information.
11  A.   Correct.
12  Q.   And you have no recollection of that happening.
13  A.   I do not.
14  Q.   Did you watch any meetings of the SIC?
15  A.   I don't recall viewing any of those meetings.
16  Q.   I think you told us already you have no recollection of
17  watching the board meeting of January 28th when Mr. Zahn was
18  terminated for cause, correct?
19  A.   Not a specific recollection.  As I mentioned, I have a
20  general recollection of watching the board meetings but not
21  that one specifically.
22  Q.   Do you have any recollection of reading the actual
23  termination letter -- this is a letter that was written on
24  January 28th of 2020 by an OGC lawyer named Sean Granat -- that
25  lays out the grounds and factual basis for seeking termination

ADAMS - CROSS                                                  Vol. 4-124

1   for cause?
2        Do you remember reading that?
3   A.   I do not.
4   Q.   Do you recall reading any news accounts that referenced
5   the contents of that letter?
6   A.   I do not.
7   Q.   And you may have answered -- you may have already answered
8   this question for me.  Forgive me if I posed it already.
9        Do you -- did you read any news accounts that
10  referenced either Mr. Zahn or Mr. Wannemacher's
11  *Garrity*-protected statements?
12  A.   Again, I have no recollection of that.
13  Q.   And I believe you have -- if you haven't indicated this, I
14  think just from the timing of your retirement from the State
15  Attorney's Office, would it be fair that other than your own
16  witness preparation meeting with the prosecution team, you did
17  not participate in the witness preparation meeting with any
18  other witness?
19       MR. DUVA:  Object as sort of vague.  I'm not sure if
20  he's talking about in advance of this hearing or in advance of
21  the grand jury.
22       THE COURT:  Rephrase the question, Counsel.
23       MR. SUAREZ:  I'd be happy to.
24  BY MR. SUAREZ:
25  Q.   In advance of this meeting, you participated in a meeting

ADAMS - CROSS                                          Vol. 4-125

1  with the prosecution team, correct?
2  A.    Correct.
3  Q.    In advance of this hearing and in preparation for this
4  hearing, did you participate in preparation meetings with other
5  witnesses?  In other words, where the other witnesses were
6  going to be testifying, you were part of the investigative or
7  prosecution team for that prep session.
8  A.    Yeah.  Well, I had an individual call with the prosecution
9  team, or with Mr. Duva, and then just prior to this hearing
10 today, was in a conference room with Mr. Zipperer and Mr. Duva
11 and FBI counsel.
12 Q.    Okay.  And what was the nature of that meeting?  What was
13 discussed?
14 A.    Mr. Duva discussed what he was going to ask me during this
15 hearing.
16 Q.    He walked you through the questions he was going to ask
17 you --
18 A.    Right.
19 Q.    -- and the answers -- you walked him through the answers
20 that you would give to those questions?
21 A.    Correct.
22 Q.    When did that meeting take place?
23 A.    Just over the lunch break.
24 Q.    Okay.  Was there any discussion about any of the testimony
25 or cross-examination or events that happened in this hearing,

ADAMS - CROSS                                          Vol. 4-126

1  throughout the pendency of this hearing?
2  A.    No specifics.  We just talked generally about what he was
3  going to ask me and what to expect at the hearing.  There
4  was -- there was no discussion of the testimony from the
5  hearing.
6  Q.    What -- what did he say to you about what you can expect
7  from the hearing?
8          MR. DUVA:  Object to relevance, Your Honor.  What
9  does it matter what I told him about what I expected Mr. Suarez
10 would cross-examination on?  It's not relevant.
11         THE COURT:  Mr. Suarez?
12         MR. SUAREZ:  Your Honor, let me rephrase the
13 question.
14         THE COURT:  Yeah.
15 BY MR. SUAREZ:
16 Q.    Did any conversation that you had with Mr. Duva or any
17 member of the prosecution team touch -- during this meeting
18 that you had today touch on any of the testimony or argument
19 presented to the Court during the last -- during the pendency
20 of this hearing?
21         MR. DUVA:  Object to asked and answered.  He already
22 said no.
23         THE COURT:  You can respond.
24         THE WITNESS:  No.
25         MR. SUAREZ:  Your Honor, may I have a moment to

ADAMS - CROSS                                             Vol. 4-127

```
 1  confer?
 2            THE COURT:  Sure.
 3        (Pause in proceedings.)
 4            MR. SUAREZ:  Thank you, Mr. Adams.
 5        Thank you, Your Honor.  I have no further questions.
 6            THE COURT:  Thank you, Counselor.
 7        Mr. Felman.
 8            MR. FELMAN:  Thank you, Your Honor.  May it please
 9  the Court.
10                    CROSS-EXAMINATION
11  BY MR. FELMAN:
12  Q.   Agent Adams, my name is Jim Felman, and I'm an attorney,
13  and I represent Ryan Wannemacher.
14        You and I have never spoken, correct?
15  A.   Correct.
16  Q.   And I gather -- how long has it been since you stopped
17  working on this case?
18  A.   July would be two years since I left the State Attorney's
19  Office.
20  Q.   So it's fair to say if I were to start asking you about
21  specific dates and documents, the likelihood is you're not
22  going to have a detailed memory of it at this point.
23  A.   I would agree.
24  Q.   Have you ever heard of something called the Diamond-Salem
25  hearing?  Would that mean anything to you?
```

ADAMS - CROSS                                             Vol. 4-128

```
 1  A.   I heard of the Diamond-Salem hearing, yes.
 2  Q.   Do you feel pretty confident you watched that at some
 3  point?
 4  A.   No.  I'm not -- I don't have a recollection of watching
 5  it, no.
 6  Q.   Okay.  Do you -- if I were to tell you that it was the
 7  December the 16th hearing that went on for six hours in front
 8  of City Hall at which Mr. Zahn and Mr. Wannemacher and other
 9  City leaders were grilled about the PUP, would that refresh
10  your recollection of what I'm referring to?
11  A.   It would not.  The hearing generally, that's familiar, but
12  the specifics, no.
13  Q.   You were emailing with Agent Adams [verbatim] that day
14  about this case.  I'll represent that to you.  If you want to
15  see the email, I'll show it to you.
16        Would that suggest to you that you-all were working
17  on this on December the 16th?
18  A.   I'd like to see the email.
19  Q.   So it's within Defense Exhibit 193.
20            MR. FELMAN:  I'm going to show Mr. Duva the precise
21  page because I'm not sure which page it is.
22        I just have the one copy, so I'll just bring it in
23  front of him.
24  BY MR. FELMAN:
25  Q.   Sir, is that an email between you and Agent Zipperer on
```

ADAMS - CROSS                                                    Vol. 4-129

```
 1   December the 16th, 2019?
 2   A.   It appears to be, yes.
 3   Q.   Does it relate to your work on this investigation?
 4   A.   Well, it's a link to a Jacksonville.com article, "Special
 5   Post-Employment Benefits for JEA Execs Top 15 [verbatim]
 6   Million."  So the relevance of it, I wouldn't -- wouldn't be
 7   able to know right now.
 8   Q.   Okay.  But it appears to be an email between you and Agent
 9   Zipperer regarding a news report about the JEA matter.
10   A.   Yes.
11   Q.   On December the 16th of 2019.
12   A.   Yes.
13   Q.   Thank you.
14        Certainly, you're not denying that you were actively
15   involved in investigating this matter on December the 16th of
16   2019.
17   A.   No.
18   Q.   And you're not denying that you watched the Diamond-Salem
19   hearing at some point.
20   A.   I don't have a recollection of watching the hearing, no.
21   Q.   But you're not denying that you did.
22        MR. DUVA:  Your Honor, that mischaracterizes the
23   testimony.  I think he's saying he doesn't recall.
24        MR. FELMAN:  Well, then, I'll try and rephrase it.
25   BY MR. FELMAN:
```

ADAMS - CROSS                                                    Vol. 4-130

```
 1   Q.   I mean, when you say you don't recall, does that mean
 2   you're pretty confident it didn't happen, or you just don't
 3   remember and it might have happened?  It could be either one,
 4   right?
 5   A.   It means that it's been some time ago, so I have no -- no
 6   independent recollection of viewing that hearing.
 7   Q.   Okay.  But by the same token, it's possible that you did
 8   see the hearing and you just don't remember today, or not?
 9   A.   Again, I don't recall.  I don't recall seeing the hearing.
10   Q.   I understand that.
11        How confident are you that you would know one way or
12   the other today whether you did or did not see the hearing?
13   A.   Not very confident.  That's why I don't recall.
14   Q.   Okay.  Then in response to the questions about whether or
15   not you did -- well, we saw an email where the Garrity
16   statements were emailed directly to you, correct?
17        MR. DUVA:  Objection, Your Honor.  I think we were
18   talking about news media.  That's Government's Exhibit 140 --
19   sorry Government's Exhibit 49.  There were some articles,
20   but I --
21        MR. FELMAN:  Yeah.  I'll get the correct exhibit,
22   Mr. Duva.
23        Do you have it handy, Mr. Miller?
24        Well, it's all within this same Exhibit 193, but it
25   would be one dated February the 4th.
```

ADAMS - CROSS                                          Vol. 4-131

1           THE COURT:  Do you have it Mr. Duva?

2           MR. DUVA:  Is that the same one?

3           It's 49, Government 49.

4           MR. FELMAN:  I think so.  Let me make sure.

5           If I may have a moment, Your Honor.

6           THE COURT:  Yeah.

7           MR. FELMAN:  I apologize.  Make sure I've got the

8    right document.

9           THE COURT:  Sure.

10          (Pause in proceedings.)

11          MR. FELMAN:  I withdraw the question, Your Honor.  It

12   seems I'm mistaken.

13   BY MR. FELMAN:

14   Q.   You were -- you were sent a link to newspaper stories on

15   that, apparently, but you would not have any recollection of

16   that at this point if I would ask.

17   A.   Is it Exhibit 40 -- Government's Exhibit 49 you're

18   referring to?

19   Q.   I think so.

20   A.   I have it here.

21   Q.   Okay.  Yeah.  So it's a February 4th email from

22   Mr. Chapman to Melissa Nelson, Agent [Verbatim] Hutton, Agent

23   Adams, yourself -- or you're Adams, I'm sorry -- and Agent

24   Zipperer, and it's links to *Times-Union* stories, including one

25   that says, ███████████████████████████

ADAMS - CROSS                                          Vol. 4-132

1    ████████████  (Garrity No. 1 sealed and under separate cover.)

2    A.   Well, the version I have has part of that blacked out of

3    the -- what you just read.

4    Q.   Okay.  All right.

5           MR. FELMAN:  Is yours blacked out?

6           MR. CORSMEIER:  Yes.

7           MR. DUVA:  We got it from you.

8    BY MR. FELMAN:

9    Q.   You have no recollection one way or the other whether you

10   read this or didn't.

11          MR. SUAREZ:  It's up on the screen if you want it.

12          THE WITNESS:  I do not have a recollection --

13   BY MR. FELMAN:

14   Q.   Okay.

15   A.   -- of seeing that email.

16   Q.   All right.  The same question with respect to the *Garrity*

17   statements themselves.  You don't have a recollection of having

18   read them.

19   A.   I do not.

20   Q.   But that means you could have read them, and you just

21   don't recall.

22   A.   It --

23          MR. DUVA:  Objection.  Mischaracterizes the

24   testimony, Your Honor.

25          THE COURT:  He said he didn't recall reading them,

ADAMS - CROSS                                      Vol. 4-133

1  Mr. Felman.
2  BY MR. FELMAN:
3  Q.   Same question.  Is it possible you -- from that, I don't
4  know.  It could be that you are confident you didn't read them,
5  or it could be you just can't remember one way or the other.
6        Which is it?
7  A.   It is I don't recall reviewing them.  If I did review any
8  *Garrity* material, I would have discussed it with Mr. Duva, and
9  I have no recollection of reviewing the *Garrity* statements.
10 Q.   But you're not here testifying for a certainty that you
11 didn't.
12 A.   I don't recall because it's been some time since I've been
13 involved in the investigation, and I do not have specific -- I
14 do not have an independent specific recollection of reviewing
15 them, no.
16 Q.   But you're not testifying for certain that you didn't.
17 A.   My testimony is I don't recall.
18 Q.   Now, you knew that other people were investigating this at
19 the same time that you were.
20 A.   Other proceedings and investigations -- I don't know the
21 timing of them, but there were other things going on during
22 that time.
23 Q.   Folks from OGC were looking at this.
24 A.   Yes.
25 Q.   Members of the City Council were looking at this.

ADAMS - CROSS                                      Vol. 4-134

1  A.   Yes.
2  Q.   Members of the council auditor were looking at this.
3  A.   Yes.
4  Q.   Lawyers from the Smith Hulsey & Busey firm were
5  investigating this.
6  A.   Is that the SIC --
7  Q.   Yes.
8  A.   -- the Special Investigative Committee?  Yes.
9  Q.   Lawyers from Nelson Mullins were hired by JEA to litigate
10 with Mr. Zahn over his termination.  They were investigating
11 this.
12 A.   I don't know the specifics of the arrangement.  I'm
13 familiar with their memo, though -- or generally a memo from
14 Nelson Mullins, but I don't know the specifics of what they
15 were hired to do.
16 Q.   And from what you could see, all of these people were
17 talking freely with one another about the work they were doing.
18 A.   I don't know how they were communicating with each other.
19        MR. FELMAN:  Nothing further.
20        THE COURT:  Any redirect, Mr. Duva?
21        MR. DUVA:  None, Your Honor.
22        THE COURT:  All right.  You can step down, sir.
23 Thank you.
24        MR. DUVA:  The Government calls John Zipperer.
25        (The witness entered the courtroom.)

ZIPPERER - DIRECT                                          Vol. 4-135

```
 1            THE COURT:  Come forward, sir.
 2            COURTROOM DEPUTY:  Sir, if you'll step into the
 3   witness box and remain standing to be sworn in, please.
 4            Raise your right hand.
 5            Do you solemnly swear or affirm that the testimony
 6   you're about to give before this Court will be the truth, the
 7   whole truth, and nothing but the truth, so help you God?
 8            THE WITNESS:  Yes, ma'am.
 9            COURTROOM DEPUTY:  Please be seated, and state your
10   full name for the record and spell your last.
11            THE WITNESS:  John A. Zipperer, Z-i-p-p-e-r-e-r.
12        JOHN ZIPPERER, GOVERNMENT'S WITNESS, SWORN
13                  DIRECT EXAMINATION
14   BY MR. DUVA:
15   Q.   Mr. Zipperer, good afternoon.
16        You were formerly with JSO, correct?
17   A.   Yes, for 30 years.
18   Q.   Give a brief overview -- I know it was a long, legendary
19   career.  Can you tell the Court what you did at JSO.
20   A.   Well, of course, I started in October '74.  I was in the
21   patrol division for a few years.  I worked the detective
22   division.  I worked everywhere in the detective division except
23   for homicide:  sex crimes, robbery, burglary, narcotics.
24        I worked several cases with the feds.  I was assigned
25   to several task forces over that period of time.  My last
```

ZIPPERER - DIRECT                                          Vol. 4-136

```
 1   assignment, I was assigned to the integrity unit where we
 2   investigated dirty cops for -- I did that for a couple of years
 3   before I retired.
 4   Q.   Had some action in that section, didn't you?
 5   A.   I'm sorry, sir?
 6   Q.   You had some action in that section, didn't you?
 7   A.   Oh, yes, sir.  Had a lot of action.
 8   Q.   Had a pretty big trial here in this courthouse.
 9   A.   Yes, sir, right here in this courthouse.
10   Q.   When did you retire from JSO?
11   A.   My last day was December 13th, 2003.
12   Q.   And what have you done since then?
13   A.   I took a couple years off, then I went to work for the
14   State Attorney's Office.
15   Q.   When did you leave the State Attorney's Office?
16   A.   The last time I left there was May of 2000.
17   Q.   2020?
18   A.   Yes, sir, 2020.
19   Q.   And were you an investigator with the State Attorney's
20   Office?
21   A.   Yes, sir, I was.
22   Q.   Did you work with Tim Adams?
23   A.   I did.
24   Q.   And you worked under a supervisor, but ultimately you-all
25   reported to the state attorney, Melissa Nelson?
```

ZIPPERER - DIRECT                                        Vol. 4-137

1   A.   Yes, sir, that's correct.

2   Q.   And talk about in November/December 2019.  Was there a lot

3   of news media coverage about a JEA scandal and the ITN and, you

4   know, potentially large payouts and a bonus plan?

5   A.   Yes, sir.  There was quite a bit of it.

6   Q.   When that started to happen, did the State Attorney's

7   Office begin to get contacted by concerned individuals?

8   A.   Yes, sir, they did.

9   Q.   And what was your role in all that?  And we'll get to the

10  federal part first, but I'm talking about November/December of

11  2019 when this was a matter that the state attorney was being

12  asked to consider to investigate.

13  A.   Yes, sir.  Late 2019, myself and Tim Adams were called to

14  the boss's office; that's Ms. Melissa Nelson.  She asked us to

15  look into this matter with JEA that had been covered by the

16  news media for the last month or so.

17       And there were several individuals that she had --

18  had reached out to her and that she wanted us to talk to.

19  Q.   And did some of these individuals reach out

20  confidentially?

21  A.   Yes, sir.

22  Q.   And does that happen from time to time at the State

23  Attorney's Office?

24  A.   All the time.

25  Q.   And, sir, ultimately did Ms. Nelson, the state attorney,

ZIPPERER - DIRECT                                        Vol. 4-138

1   recuse herself from any further participation, or her office's

2   participation, in any investigation related to JEA concerning

3   the ITN or the bonus plan?

4   A.   Yes, sir.  I think it was in January she decided we

5   couldn't be involved in it anymore.

6   Q.   That was January 2020?

7   A.   Yes, sir.

8   Q.   And then once that decision was made -- and I believe

9   there's publicity about it -- were you and Investigator Adams

10  detailed in part to the United States Attorney's Office to

11  participate in the investigation with the FBI?

12  A.   Yes, sir.  That's correct.

13  Q.   And tell the Court your role in this.  Obviously there's

14  four investigators:  Agent Blythe, Agent Hill, you, and

15  Investigator Adams.

16       Talk about what your role was.

17  A.   Well, of course, I was just one of the investigators.

18  Myself and Tim Adams had initially started the case, and once

19  Melissa decided that we couldn't be involved, we had to pass it

20  off to the feds because of some perceived conflict that she

21  had.

22       And we were trying to put the pieces together,

23  interviewing a number of people.

24  Q.   And were you sort of the individual, based on your career

25  with JSO and the length of time you were at the State

ZIPPERER - DIRECT                                    Vol. 4-139

1   Attorney's Office, that had relationships with different
2   individuals in government and other places within the city that
3   were more comfortable coming to you?
4   A.   Yes, sir.  I -- you know, I was the old guy who'd been
5   around a long time from Jacksonville, with the sheriff's office
6   for 30 years, like I said before.  And I knew some of these
7   individuals and was able to talk to them.
8   Q.   And that was based on cases that you did both in state
9   court and federal court?
10  A.   Yes, sir.
11  Q.   So as this transition from the State Attorney's Office
12  looking into things and then Ms. Nelson recused herself in
13  January of 2020 and this ultimately became a federal
14  investigation in January of 2020, did you participate in
15  interviews of various individuals?
16  A.   Yes, sir, I did.
17  Q.   Did you write any memoranda of interview?
18  A.   No, sir, I did not.
19  Q.   And were you an active participant in the questioning, or
20  were you more of a listener in those interviews?
21  A.   No, sir.  I just was there for -- just to listen.
22  Q.   And was your role kind of to make people feel more
23  comfortable talking to the FBI and that type of thing?  And if
24  so, explain that.
25  A.   Yes, sir.  I was -- like I said, I was the old guy, and

ZIPPERER - DIRECT                                    Vol. 4-140

1   people feel comfortable talking to me rather than the FBI, so
2   to speak.  And I would just be there to put them at ease.
3   Q.   Do you know what a *Garrity* statement is?
4   A.   Oh, yes, sir.  I'm very familiar with *Garrity*.
5   Q.   How were you familiar?
6   A.   Like I mentioned before, I was in the integrity unit of
7   the sheriff's office, which investigated dirty cops.  We were
8   very cognizant of *Garrity* issues.  That's the reason that the
9   integrity unit was created initially.
10  Q.   And what is a *Garrity* statement?
11  A.   A *Garrity* statement is basically when an individual is
12  forced, or feels forced, to give a statement in order to keep
13  their job, and then that statement cannot be used against them
14  in any way.
15  Q.   Other than to determine how to -- to fire them?
16  A.   Yes, sir, other than to fire them.
17  Q.   Otherwise there's a Fifth Amendment privilege that
18  attaches?
19  A.   That's correct, sir.
20  Q.   Did you read Aaron Zahn or Ryan Wannemacher's *Garrity*
21  statement?
22  A.   No, sir.
23  Q.   Did you read news media about the statements?
24  A.   No, sir.
25       MR. DUVA:  I'm going to approach.

ZIPPERER - DIRECT/CROSS                                    Vol. 4-141

1   BY MR. DUVA:
2   Q.   I believe it's actually there, Government's Exhibit 49.
3   A.   It is here, yes, sir.
4   Q.   This is an email -- and we'll display it.
5            Government's 49 is an email from David Chapman to
6   Ms. Nelson, Mr. Hutton, Investigator Adams, and you, and it
7   appears to be links to various articles; is that right?
8   A.   Yes, sir.
9   Q.   Do you remember receiving this email?
10  A.   I do not remember receiving it, but obviously I did
11  receive it.
12  Q.   So you're not disputing that you received it.
13  A.   I am not disputing that I received it.
14           MR. DUVA:  May I have a moment, Your Honor?
15           THE COURT:  Yes, sir.
16           MR. DUVA:  No further questions, Your Honor.
17           THE COURT:  Cross-examination.
18           MR. SUAREZ:  Yes, Your Honor.  Thank you.
19           May it please the Court?
20           THE COURT:  Yes, sir.
21                    CROSS-EXAMINATION
22  BY MR. SUAREZ:
23  Q.   Good afternoon, Mr. Zipperer.  My name is Eddie Suarez.  I
24  have the pleasure of representing Aaron Zahn.
25           I'm going to ask you a few questions.  I want to

---

ZIPPERER - CROSS                                           Vol. 4-142

1   start with your background, in particular in the sheriff's
2   office.
3            You indicated that you were very familiar with
4   *Garrity* cases from your experience, I think, in -- you termed
5   it dirty cops, which I assume is investigating police officers
6   that have been accused of some wrongdoing?
7   A.   That's right.
8   Q.   And in those instances the officers are compelled to
9   answer questions?
10  A.   On occasion, yes, sir.
11  Q.   And in -- because they're being compelled under a threat
12  that if they don't answer questions, it could have an adverse
13  effect on their employment, correct?
14  A.   That's correct.
15  Q.   And so they are afforded Fifth Amendment protection for
16  those statements.
17  A.   That's correct, sir.
18  Q.   And tell me, when you worked at the sheriff's office, what
19  steps did your office take in order to protect both the Fifth
20  Amendment -- the subject's Fifth Amendment rights, as well as
21  the integrity of your investigation from taint from exposure of
22  the *Garrity* statements?
23  A.   Yes, sir.  What we would do in the integrity unit -- like
24  I said, the integrity unit was created because of a situation
25  where we had a bunch of dirty cops that were involved in

ZIPPERER - CROSS                                        Vol. 4-143

```
 1   robbery and a homicide.
 2          Prior to that, there was an internal unit, and what
 3   would happen would be the officer would be accused of some
 4   violation.  He would come to the internal investigation unit.
 5   They would tell him, you know, "You need to tell us what you
 6   did or we're going to fire you."
 7          He'd tell them and -- he or she, and then that
 8   statement could not be used against him for any prosecution.
 9          So as a result of the criminal -- of the federal
10   investigation I was involved in with the dirty cops, they
11   created the integrity unit so that if there was an officer
12   accused of a crime, we would call that officer in and let them
13   know that, you know -- advise them of their constitutional
14   rights and then tell them they've been accused of a crime, and
15   they had the option to talk to us or not to talk to us.
16          It was a lengthy form that we used at the time.
17   Q.   Okay.  And did -- when you were part of that integrity
18   unit that questioned the accused officer under Garrity
19   protection, did you ever actually have that role where you were
20   questioning the accused officer?
21   A.   Oh, yeah.  I questioned many of them, many of them.
22   Q.   Okay.  And then under -- if I understand what you're
23   describing to me, then as a -- as a sheriff's deputy with the
24   integrity unit, you would not participate in the prosecution
25   or -- further investigation or prosecution of the criminal
```

ZIPPERER - CROSS                                        Vol. 4-144

```
 1   case; is that right?
 2   A.   No, sir.  You misunderstood me.
 3   Q.   Okay.
 4   A.   We would advise that officer of his constitutional
 5   rights --
 6   Q.   Okay.
 7   A.   -- okay?  We then informed them that they had been accused
 8   of the crime, okay, and that any statement that they were going
 9   to give could be used against them in prosecuting him for a
10   crime in the future.
11   Q.   Okay.
12   A.   There were many of them that were, in fact, prosecuted for
13   a crime in the future.  So we did not threaten to fire them.
14   We were not using that against them for any disciplinary
15   reason.  We'd be using that to investigate a criminal --
16   Q.   I see.
17   A.   -- allegation.
18   Q.   In those instances, then, what your office did was just
19   choose not to give them Garrity warnings and not to have them
20   have adverse employment consequences if they refused to answer
21   the question.
22   A.   Right.
23   Q.   Okay.  Now I understand.  Thank you for clarifying it.
24          You never participated in an investigation in which a
25   Garrity warning was given to a police officer?
```

ZIPPERER - CROSS                                    Vol. 4-145

1    A.    There were *Garrity* warnings given by the internal unit --
2    Q.    And that's a separate unit.
3    A.    -- not by the integrity unit.
4    Q.    Okay.  Okay.  And the internal unit did not participate in
5    the investigation or the prosecution of the case.
6    A.    Correct.
7    Q.    And the internal unit did not share with you any
8    information they could -- they might have derived.  Even if
9    it's not directly from the statement, they would not share that
10   with you, correct?
11   A.    I'm not real clear on what you said.  Could you say that
12   again?
13   Q.    Yes, sir.
14         Let's assume for purposes of this question that the
15   internal unit, using the information that they have as a road
16   map, finds other incriminating information in the context of
17   their *Garrity* investigation, the employment investigation.
18         They would not be able to share that with you.
19   A.    Correct.
20   Q.    In these -- in these cop cases you investigated, was there
21   a great deal of newspaper publicity?
22   A.    Yes, sir, all the time.
23   Q.    Okay.  And were -- do you recall any instances where the
24   statements from the officers that had been given pursuant to
25   *Garrity* protections were publicized?

ZIPPERER - CROSS                                    Vol. 4-146

1    A.    No, sir.
2    Q.    Okay.  You never encountered that.
3    A.    I did not.
4    Q.    Okay.  As part of your role in investigating this case,
5    did you watch any JEA board meetings?
6    A.    I did not.
7    Q.    Did you attend or watch the Diamond-Salem hearing?
8    A.    I did not.
9    Q.    There's a fellow at the State Attorney's Office, a
10   Mr. Chapman, who forwarded to you and to Mr. Adams a number of
11   newspaper articles that were coming out throughout January and
12   all the way into March of 2020.
13         Do you remember receiving those newspaper articles?
14   A.    I do not remember that specifically, no, sir.
15   Q.    Okay.  And it would be fair to say, since you don't
16   remember receiving them, you don't remember reading them.
17   A.    I did not read them.  I mean, it's three and a half years
18   ago.  I do not recall this specific email, but I can tell you
19   that I would not have read them because I was very concerned
20   with *Garrity* issues throughout this entire case.  And that had
21   been discussed with myself and Tim Adams a couple times, about
22   *Garrity* issues.
23   Q.    And what was discussed with you?
24   A.    About we needed to be clear of these *Garrity* issues, make
25   sure that there was nothing looked at or paid attention to that

ZIPPERER - CROSS                                      Vol. 4-147

```
 1  we absolutely didn't have to.
 2  Q.   Okay.  And that's with regard to -- with newspaper
 3  accounts in particular?
 4  A.   Newspaper accounts, interviews, the City Council meetings,
 5  the hearings they had, all of that stuff.
 6  Q.   Okay.  So whenever you interviewed a witness, you didn't
 7  ask them if they had read any Garrity-protected statements --
 8  A.   No --
 9  Q.   -- because of that?
10  A.   -- we did not.
11  Q.   Okay.  Throughout the period of time in which you were
12  involved in the investigation, did your -- it would be accurate
13  to say that you and Mr. Adams coordinated your efforts with
14  AUSA Duva and the -- what we've termed the prosecution team.
15  A.   Say that again?
16  Q.   Yes, sir.
17          During the pendency of your involvement in the
18  investigation, it would be accurate to say that you coordinated
19  your investigative efforts with the FBI and the federal
20  prosecution team.
21  A.   Oh, yes, sir.  It was all familiar to them when Melissa
22  said we were out of it.
23  Q.   Okay.  And I think you have told us this, but just to be
24  clear, you never read Mr. Zahn's -- the transcript of
25  Mr. Zahn's Garrity-protected statement.
```

ZIPPERER - CROSS                                      Vol. 4-148

```
 1  A.   I did not.
 2  Q.   Or Mr. Wannemacher's?
 3  A.   I did not.
 4  Q.   Did you read any of the other JEA employees who provided
 5  statements under Garrity protections?
 6  A.   No, sir.
 7  Q.   Did you read the special investigation committee's report
 8  on JEA?
 9  A.   No, sir.
10  Q.   Did you participate in -- well, did you watch any of the
11  SIC meetings?
12  A.   No, sir.
13  Q.   Did you participate in any meetings with lawyers from the
14  Smith Hulsey firm regarding the SIC investigation?
15  A.   I did not.
16  Q.   Did you participate in any meetings with lawyers from the
17  Office of the General Counsel regarding --
18  A.   No, sir.
19  Q.   Okay.  In -- on January 28th of 2020, the Office of
20  General Counsel issued a letter signed by a lawyer named Sean
21  Granat outlining the reasons and factual findings for the board
22  to terminate Mr. Zahn for cause.
23          Have you ever read that letter?
24  A.   No, sir.
25  Q.   We know that there have been prep meetings with the
```

ZIPPERER - CROSS                                    Vol. 4-149

1   expected witnesses at this hearing.

2           Did you participate in prep meetings with witnesses

3   other than yourself?

4   A.   No, sir.

5           MR. SUAREZ:  Your Honor, may I have a moment to

6   confer?

7           THE COURT:  Yes, sir.

8       (Pause in proceedings.)

9           MR. SUAREZ:  One more question, Mr. Zipperer.

10  BY MR. SUAREZ:

11  Q.   Refresh my recollection.  Did you say you left the

12  investigation in May of 2020?  Is that when you --

13  A.   I left the State Attorney's Office in May of 2020, yes,

14  sir.

15  Q.   And that concluded your involvement in this investigation,

16  other than when you're needed as a witness?

17  A.   There were a few more interviews after May of 2020, but I

18  was retired.  I was only called in on certain interviews after

19  that time.

20  Q.   Do you recall which interviews they were?

21  A.   I do not.

22  Q.   Your presence in those interviews would be recorded in the

23  302s and memorandum of interviews that were --

24  A.   That's correct, sir.

25          MR. SUAREZ:  I have nothing further.

BLODGETT - DIRECT                                   Vol. 4-150

1           MR. FELMAN:  No cross, Your Honor.

2           MR. DUVA:  No redirect.

3           THE COURT:  All right, sir.  You can be excused,

4   Mr. Zipperer.

5           THE WITNESS:  Thank you.

6           THE COURT:  Thank you, sir.

7           MR. DUVA:  Government calls Kevin Blodgett.

8           THE COURT:  Very well.

9       (The witness entered the courtroom.)

10          COURTROOM DEPUTY:  Sir, if you'll step into the

11  witness box and remain standing to be sworn in, please.

12          Raise your right hand.

13          Do you solemnly swear or affirm that the testimony

14  you're about to give before this Court will be the truth, the

15  whole truth, and nothing but the truth, so help you God?

16          THE WITNESS:  Yes, ma'am.

17          COURTROOM DEPUTY:  Please be seated.

18          And state your name for the record and spell your

19  last name.

20          THE WITNESS:  My full name is Kevin Paul Blodgett,

21  last name, B as in boy l-o-d-g-e-t-t.

22          MR. DUVA:  Thank you, Your Honor.

23          KEVIN BLODGETT, GOVERNMENT'S WITNESS, SWORN

24              DIRECT EXAMINATION

25  BY MR. DUVA:

BLODGETT - DIRECT                                          Vol. 4-151

1  Q.    Good afternoon, Mr. Blodgett.

2              Can you tell the Court your professional background

3  and where you work and the type of work that you do.

4  A.    Sure.  I'm an attorney.  I work at Smith Hulsey & Busey

5  here in Jacksonville.

6              I passed the bar in 2014 and have worked in

7  Jacksonville for about five years.  And I primarily focus on

8  commercial litigation.  I also have experience doing

9  investigations, internal investigations primarily.

10 Q.    When did you join Smith Hulsey & Busey?

11 A.    The end of 2017.

12 Q.    And what is your current position there?

13 A.    I'm a non-equity partner.

14 Q.    And what is your focus?

15 A.    Commercial litigation.

16 Q.    Let's talk about the -- your representation of the City

17 Council with the Special Investigative Committee.

18             Tell the Court -- take the Court through when that

19 started and how that started and what your role was.

20 A.    Right.  So Smith Hulsey & Busey was retained on December

21 18th, 2019, to represent the special investigatory committee

22 and City Council in connection with the investigation of the

23 JEA matter.

24             And the official charge was twofold.  First, it was

25 investigatory.  Smith Hulsey & Busey was supposed to

---

BLODGETT - DIRECT                                          Vol. 4-152

1  investigate all matters relating to JEA's strategic planning,

2  which included the PUP.

3              And then secondly, JEA [verbatim] was also retained

4  to provide policy and legislative recommendations that may help

5  or improve Jacksonville in the future, based on the

6  investigation that was performed.

7  Q.    Ultimately through this investigation, did you-all,

8  meaning Smith Hulsey & Busey, provide a final report?

9  A.    Yes, sir.

10 Q.    And I'm going to approach.  I don't have the final report

11 marked, but we have the chronology.

12             I'm showing you what's been admitted as Government's

13 Exhibit 48.  Does that appear to be the chronology, sir?

14 A.    Yes, sir.

15 Q.    When was the SIC -- and I'll call it SIC for short.  We've

16 been calling it that for Special Investigative Committee.

17             When was the SIC report released to the public?

18 A.    January 4th of 2021.

19 Q.    Now, that draft on page 1 has December of 2020.

20             What's the reason for that?

21 A.    Smith Hulsey & Busey internally finished drafting the

22 report and the chronology in December of 2020.

23             But as a design to simultaneously release both the

24 report and chronology at once, as well as the documents

25 supporting the chronology, there was a couple of weeks where we

BLODGETT - DIRECT                                    Vol. 4-153

1    had to get a website set up that would allow people to see all
2    of that information at once.
3            So there was a delay between when the work product
4    was done, the report and chronology, and then when it -- when
5    that work product became made available to the public.
6    Q.   Tell the Court how you went about compiling -- I know this
7    is a very general question.
8            But how did you go about compiling the information to
9    put in the chronology?
10   A.   So the chronology only includes documents, and we had a
11   number of sources for documents.  The principal ones were,
12   firstly, the SIC sent a request for documents and set of
13   interrogatories to JEA on or about February 10th of 2020.
14           We also requested documents from witnesses we
15   interviewed.  And we issued, through the SIC, subpoenas to
16   interested third parties, including the invitation-to-negotiate
17   bidders, as well as some of the consultants who assisted with
18   strategic planning and PUP development for the JEA senior
19   leadership team.
20           And we also did some supplemental document requests
21   to JEA during the course of the investigation as well.
22   Q.   I'm going to come back to the timing of document
23   production in a moment, but I want to ask you about reading
24   *Garrity* statements taken by the Office of General Counsel of
25   Mr. Zahn and Mr. Wannemacher.

BLODGETT - DIRECT                                    Vol. 4-154

1            Did you read those?
2    A.   Yes, sir.
3    Q.   And did you have an opportunity to go back and look at
4    billing entries -- and before I get into that, would you keep
5    track of the time that you worked on this investigation via
6    billing entries that were ultimately billed to JEA or the City
7    of Jacksonville?
8    A.   Yes, sir.
9    Q.   And in doing that, did you have an opportunity to go back
10   and look when you first notated in a billing entry that you
11   either reviewed or read a *Garrity* statement?
12   A.   Yes.  For Aaron Zahn, it was May 28th and 29th of 2020,
13   and for Ryan Wannemacher's *Garrity* statement, it was May 30th
14   of 2020 -- no, I'm sorry, it was May 31st of 2020.
15   Q.   And so one way or the other, do you -- do you know when
16   the prosecution team issued a grand jury subpoena to JEA?
17   A.   I believe it was April 21st of 2020.
18   Q.   And in terms of that date and the SIC receiving documents
19   from JEA, how does that stand out in your mind, and what was
20   the process for the SIC committee to receive documents pursuant
21   to its separate request to JEA?
22   A.   JEA, through OGC, informed Smith Hulsey & Busey that the
23   document production that JEA was going to make in response to
24   the SIC's document request was going to be put on hold until
25   JEA fully complied with the Department of Justice's subpoena.

BLODGETT - DIRECT                                      Vol. 4-155

1   Q.   And what is your knowledge as to whether that actually

2   happened?

3   A.   We certainly stopped receiving document productions after

4   that instruction was given to us.

5   Q.   And ultimately, what is your understanding in terms of how

6   the order of operation played out in terms of JEA productions

7   to the Government and then what JEA told you about what it was

8   providing you at any particular time?

9   A.   So because the DOJ subpoena was a unique legal creature,

10  DOJ got documents that were initially withheld from the SIC

11  committee.

12       The SIC committee's request for documents was treated

13  as a public records request.  And so documents that were exempt

14  under public records law, including confidential or proprietary

15  information that was maybe not trade secret but then also

16  trade-secret information, particularly from the consultants who

17  participated in the strategic planning, those documents were,

18  at least preliminarily, withheld from the SIC committee in

19  response to its document request.

20       But my understanding was the DOJ got all of those

21  documents without an exemption process or the delay associated

22  with it.

23  Q.   Who were you communicating with at JEA about the order of

24  operation that you've just talked about?

25  A.   Sean Granat and Chris Garrett, and I believe Kyle Gavin

BLODGETT - DIRECT                                      Vol. 4-156

1   was also involved in some of those communications.

2   Q.   And are those individuals at OGC?

3   A.   Yes, sir.

4   Q.   In the chronology, which is Government's Exhibit 48, are

5   there links to *Garrity* statements of Mr. Zahn or

6   Mr. Wannemacher?

7   A.   Not to my knowledge.

8   Q.   And ultimately did the SIC committee post Mr. Zahn and

9   Mr. Wannemacher's *Garrity* statements on the SIC website?

10  A.   Yes.

11  Q.   Talk about the process that the SIC went to in terms of

12  monthly meetings and public reportings about the process of its

13  investigation since inception up until the Special

14  Investigative Committee report was published on January 4th of

15  2021.

16  A.   The goal was for the special investigatory committee to

17  meet at least once a month.  But this investigation was

18  occurring during COVID, and so I think there were at least two

19  months where there was no meeting.

20       But after every meeting, typically Smith Hulsey &

21  Busey would get new directives, investigative leads, requests,

22  and that would be the subject of the next meeting, is an update

23  on what was performed consistent with the instructions of the

24  SIC committee to Smith Hulsey & Busey.

25  Q.   I want to talk about communications between me and you and

BLODGETT - DIRECT                                          Vol. 4-157

1   me and Mr. Busey that you know about.

2          And generally, at the outset, what was the discussion

3   with respect to information flow and how that worked during the

4   process of 2020?

5   A.   To my recollection, the first conversation about that

6   topic set the tone for the remainder of our investigation.

7          And what happened was, is there was a telephone call

8   with Mr. Busey, yourself, and, for a portion of that meeting,

9   me.  And we talked about the witnesses that you would not -- or

10  that you would prefer the SIC did not interview because it

11  could potentially interfere with the DOJ's prosecution.

12         And our takeaway from that was a statement you made

13  which was, "You do your thing.  We do our thing."  But it was

14  clear that the information flow was going to be unidirectional,

15  from us to you and only if you requested it.

16         And that set the tone for the remainder of our

17  investigation in terms of the parallel investigations that were

18  happening between the SIC and the DOJ.

19  Q.   Did you and I ever have any discussions about Mr. Zahn or

20  Mr. Wannemacher's *Garrity* statements?

21  A.   No.

22  Q.   And did you have an opportunity to look at time entries to

23  refresh your recollection of when these conversations happened

24  between me and you and me and Mr. Busey?

25  A.   Yes.

BLODGETT - DIRECT                                          Vol. 4-158

1   Q.   And I'm going to provide those to you.

2          I'm handing you exhibits just to refresh your

3   recollection, for refreshing purposes.  I'm not going to quiz

4   you on exact dates without showing you something.

5          Now, does there appear to have been a conversation

6   between Mr. Busey and myself on May 22nd of 2020?

7   A.   Yes.

8   Q.   And there are references to the status of the federal

9   investigation; is that right?

10  A.   Yes.

11  Q.   And what did Mr. Busey tell you about that conversation?

12  A.   That's the conversation I mentioned earlier.

13  Q.   What you already testified about?

14  A.   Yes, sir.

15  Q.   There's also an entry on May 28th, 2020, that there was a

16  telephone call between Jason Gabriel, the Office of the General

17  Counsel, the actual general counsel; Council Member Wilson;

18  myself; and Tim Adams regarding, quote, "Coordination of DOJ

19  criminal investigation and City Council's legislative

20  investigation, interviews of witnesses, and related issues."

21         Do you see that, sir?

22  A.   Yes.

23  Q.   What is your understanding of what that conversation

24  entailed?

25  A.   My understanding is it was the same subject matter that

1   was discussed in the initial telephone call I talked about.
2   Q.   Did I ever provide you information that the Government was
3   providing to the grand jury?
4   A.   No.
5   Q.   Did I ever provide you the investigative plan of the
6   prosecution team?
7   A.   No.
8   Q.   Was there a meeting on December 7th of 2020 at Smith
9   Hulsey & Busey that myself, Agent Blythe, and Investigator
10  Adams participated in that you were present at?
11  A.   Yes.
12  Q.   What happened during that meeting?
13  A.   I provided a presentation to the representatives of the
14  DOJ that consisted of explaining my interpretation of documents
15  relating to the strategic planning of JEA and the Performance
16  Unit Plan.
17  Q.   Did you provide information to us about statements that
18  Mr. Zahn and Mr. Wannemacher made during their *Garrity*
19  statements?
20  A.   Not that I recall.
21  Q.   And in essence, during this meeting, was it -- was this
22  sort of a presentation of hot documents that were ultimately
23  going to be in the SIC presentation that was later disclosed on
24  January 4th of 2021?
25  A.   It was a presentation of hot documents, but I'm not sure

1   about the latter part of that question.
2   Q.   What's your recollection, generally, about what was
3   presented?
4   A.   They were documents that I had identified as being
5   material to the investigation.
6   Q.   Did you and I, through -- throughout 2020, have email
7   communications?
8   A.   Yes.
9   Q.   I want to focus on --
10       MR. DUVA:  If we can bring up Government Exhibit
11  20L3, please.
12       And we're going to go -- this is an email.  This is
13  in native form, Your Honor.  We've seen this before.
14       And I want to go to page 2, which is an email from
15  Jeff Rodda to Kevin Blodgett on June 14th of 2021.
16  BY MR. DUVA:
17  Q.   And if you want the -- this one is electronic so it's in
18  native format so it should be on the screen in front of you and
19  then on the big screen here.
20       This email from Mr. Rodda to you June 14th, 2021 --
21       MR. DUVA:  If we could scroll up so he can see the
22  text.
23  BY MR. DUVA:
24  Q.   Before we get into the substance of the email, can you
25  state how this came about?

BLODGETT - DIRECT                                           Vol. 4-161

```
 1   A.    Well, I was not involved in the gathering of these
 2   documents.  I only know secondhand how Mr. Rodda obtained these
 3   documents, and it's explained in the email.
 4   Q.    I want to go back to a phone call, and if it would refresh
 5   your recollection, I'm going to present you with some of your
 6   phone records that you've actually presented to me, a phone
 7   call that you and I had on June 7th of 2021.
 8         Looking back at that, do you have a recollection of
 9   what that conversation was about?
10   A.    Yes, generally.
11   Q.    What was it?
12   A.    You had told me that there were one or more members of the
13   DOJ that you were looking and hoping to get additional support
14   from, with respect to the prosecution in the JEA investigation,
15   and you asked me if I had any additional documents regarding
16   the Performance Unit Plan that would bolster the prosecution's
17   case.
18   Q.    And you understood that to mean, when I told you about
19   additional people, that supervisors in my office were asking
20   questions?
21   A.    Potentially.
22   Q.    Okay.  So based on this phone call about PUP-related
23   documents, did that cause you to reach out to Jeff Rodda?
24   A.    Yes.
25   Q.    Explain what happened.
```

BLODGETT - DIRECT                                           Vol. 4-162

```
 1   A.    I called Mr. Rodda, conveyed the conversation you and I
 2   had.  And Mr. Rodda asked why I was not looking for the
 3   documents myself, and I explained that I no longer had access
 4   to Relativity, which was the document database that Smith
 5   Hulsey & Busey used in connection with --
 6   Q.    And that's because the Special Investigative Committee
 7   report had been published on January 4th of 2021, which was
 8   about five months before?
 9   A.    Correct.
10   Q.    Okay.  Go ahead, sir.
11   A.    And Mr. Rodda asked me what specific documents you were
12   looking for, and I told him that you did not specify.  And
13   after that Mr. Rodda proceeded to look for the documents by
14   himself without my input.
15   Q.    Going to page 1 of 20L3, is there a subsequent email on
16   June 16th of 2021 at 1:30 p.m. from Mr. Rodda to you, copying
17   Kim Taylor, Phillip Peterson, and myself with a number of
18   attachments?
19   A.    Correct.
20   Q.    I'm going to go back to the original email that we talked
21   about.  It's in that same exhibit from Mr. Rodda to you further
22   down on June 14th of 2021, and I meant to get into the
23   substance of that.
24         And it begins with, "Hi Kevin.  Attached is a version
25   of the Performance Unit Scratch Sheet that was created on
```

BLODGETT - DIRECT                                    Vol. 4-163

1   3/18/2019 by Ryan Wannemacher and was last modified on
2   5/20/2020 by Tori Simmons.  What makes this file interesting is
3   that it contemplates a sale."
4          And the language under that email, which is already
5   admitted, continues and it talks about cells H9 and H11 by
6   adding 4 billion to the book value of the net position.
7          Do you recall that, sir?
8   A.   Yes.
9   Q.   And you can see that there in the email?
10         MR. DUVA:  I want to bring up Exhibit 20A1.
11         If you can enlarge that just a bit.
12  BY MR. DUVA:
13  Q.   Is this the version of the Performance Unit Scratch Sheet
14  that Mr. Rodda attached and was talking about?
15  A.   It appears to be.
16  Q.   Now, in the book value for 2018, there appears to be a
17  little over $4 billion added to the book value.
18         Do you see that?
19  A.   Correct.
20  Q.   And when you received this, did you and I have a
21  conversation about this before the June 16, 2021, email?
22  A.   Not that I recall.
23  Q.   Did you ask Mr. Rodda how he found this?
24  A.   I don't think I asked him.  I can't recall asking him.
25         MR. DUVA:  Let's go to the June 16, 2021, email.

BLODGETT - DIRECT                                    Vol. 4-164

1   This is in 20L3 again.
2   BY MR. DUVA:
3   Q.   This is the email, and it shows a bullet point below the
4   third paragraph that says, "The file named 'notes.xlsx' appears
5   to be a PUPs value calculation created on July 11, 2019, by
6   'Ryan' and last modified on July 18th, 2019, also by 'Ryan,'
7   and shows the value of 30,000 PUPs starting at zero dollars and
8   increasing to 11,500 each, for a total of $345 million."
9          Is that accurate?
10  A.   Yes.
11  Q.   And it appears that from the display of the native email,
12  the notes.xlsx file was provided --
13  A.   Right.
14  Q.   -- is that right?
15  A.   Yes.
16  Q.   Okay.
17         MR. DUVA:  I want to show 20L1.
18  BY MR. DUVA:
19  Q.   Does this appear, 20L1, to be the notes.xls file with that
20  arithmetic that's set forth?
21  A.   Yes.
22         MR. DUVA:  And let's go ahead and grab the column to
23  the right of the 11,500.
24  BY MR. DUVA:
25  Q.   So there's arithmetic where the 11,500 per unit equates to

BLODGETT - DIRECT                                    Vol. 4-165

1   a total of 345 million; is that right?

2   A.   Yes.

3   Q.   When you received this email, is this the first that you

4   had received -- I'm going to be more precise about the

5   question.

6        The June 14, 2021, email that's in 20L3 and the June

7   16, 2021, email, is that the first time you'd seen either of

8   these spreadsheets?

9   A.   It's the first time I can recall seeing either of those

10  spreadsheets.

11  Q.   Now, having read everything that you read, had you seen

12  those spreadsheets in any other place besides the email that

13  Mr. Rodda sent you?

14  A.   Not that I recall, and I'm basing that in part on the

15  metadata in the spreadsheets.

16  Q.   Why is that?

17  A.   I just don't recall seeing a spreadsheet with that unique

18  metadata and the information therein.

19  Q.   Do you have any recollection of reading any statement

20  about it, both of those spreadsheets, 20A1 and 20L1?

21  A.   I remember thinking that those spreadsheets were unlike

22  anything I had seen or heard about.

23  Q.   Did you watch the Diamond-Salem hearing on -- that took

24  place on December 16th of 2019?

25  A.   Yes.

BLODGETT - DIRECT                                    Vol. 4-166

1   Q.   When did you watch that?

2   A.   I believe I watched it the day it occurred.

3   Q.   Either of those spreadsheets, were those discussed, 20A1,

4   the 4 billion being added to the net position of 2018 or the

5   notes.xls spreadsheet with the arithmetic of $11,500 per unit,

6   equating to a total of $345 million for 30,000 units?

7   A.   No, neither was discussed.

8   Q.   Were those spreadsheets, 20A1 and 20L1, provided anywhere

9   in Government's Exhibit 48 as a link in the SIC chronology?

10  A.   I'm sorry.  Could you repeat the question?

11  Q.   Yes.  Those spreadsheets, 20A1 and 20L1, the -- 20A1 being

12  the $4 billion added to the net position of 2018 that's now

13  displayed, and 20L1, the notes.xls file that we've been talking

14  about, are those included in the SIC chronology by hyperlink?

15  A.   No.

16       MR. DUVA:  If we can bring up 20L4.

17  BY MR. DUVA:

18  Q.   And, again, this is in native format.

19       Now, 20L4 is an email from Jeff Rodda to me, copying

20  Kim Taylor and Phillip Peterson, correct?

21  A.   Correct.

22  Q.   So you're not on this email; is that right?

23  A.   Correct.

24  Q.   As you investigated this matter for the Special

25  Investigative Committee, talk about the process that you went

1  through to learn the matter and what you relied on to present
2  the report or prepare the report that goes with the chronology
3  that is Exhibit 48.
4        I recognize the report itself is not marked, but talk
5  about what you relied on to prepare that report.
6  A.   All right.  So the report was principally based on our
7  documentary review, the documents we would gather through the
8  various sources I mentioned earlier in my testimony.  And that
9  was principally because Rory Diamond stressed, at the beginning
10 of the investigation, he was a, I believe, quote/unquote,
11 documents guy.  And so we tried to focus on the documents.
12       But we also interviewed a number of witnesses.
13 Sometimes Smith Hulsey & Busey conducted the interviews.  Other
14 times we participated in or sat in interviews that were
15 conducted by Nelson Mullins in connection with their
16 investigation of the potential termination of senior leadership
17 team members.
18       And those were really the two predominant sources of
19 the information that we got.
20 Q.   And did I sit in on any of those interviews with you with
21 Nelson Mullins in that process that you just talked about?
22 A.   No.
23 Q.   Did anybody -- did Agent Blythe here to my right?
24 A.   No.
25 Q.   And any member of the prosecution team?

1  A.   No.
2  Q.   Did we provide any questions for you to ask?
3  A.   No.
4  Q.   Talk about the public records request.
5        I know this is a general and kind of basic question,
6  but as an investigator working with Smith Hulsey & Busey and
7  the SIC committee, you were aware that any document that JEA
8  had could be obtained by a public records request.
9  A.   With the exception of statutorily exempt records, yes.
10 Q.   And ultimately, after productions pursuant to the grand
11 jury subpoena, did JEA begin fulfilling your requests as you
12 made them?
13 A.   Yes.
14 Q.   Did you have access to JEA's financial statements?
15 A.   Yes.
16 Q.   Did you have access to other planning projection
17 mechanisms, like the integrated resource plan, the ten-year
18 site plan, and ratings agency presentations?
19 A.   Yes.
20 Q.   Were you looking into, based on the documents that you
21 received, the veracity of the strategic planning and references
22 or representations that senior leadership team members made as
23 to the financial strength and status of JEA in 2019?
24 A.   Yes.
25 Q.   And were those made to JEA board members in publicly

BLODGETT - DIRECT                                    Vol. 4-169

1   available meetings?
2   A.   Yes.
3   Q.   Are those posted on the JEA website?
4   A.   Yes.
5   Q.   You mentioned witnesses that the Government requested that
6   the SIC committee not interview.
7        Who was that?
8   A.   My understanding is you didn't direct us to not interview
9   them.  I heard you, with respect to Melissa Dykes, say that you
10  would appreciate it or -- I think the phrase you used was
11  prefer that we did not interview Melissa Dykes, but you did not
12  direct us to not interview anyone.
13  Q.   Anyone else?
14  A.   Not that I recall.
15  Q.   Did you get documents informally from bidders that
16  responded with revised replies to the ITN?
17  A.   Yes.
18  Q.   Who were some of those?
19  A.   NextEra, I believe Duke Energy, and there were a few
20  others, but their names escape me.
21  Q.   Through the publicly available information that you
22  obtained in your investigation, did you have certain takeaways
23  with respect to the ITN and how the JEA board was guided to
24  settle on that option?
25  A.   Yes.  The ITN was initially one of several strategic

BLODGETT - DIRECT                                    Vol. 4-170

1   planning options that were presented to the board.  I believe
2   the IPO and the co-op were the other two most talked-about
3   options.
4   Q.   Did your investigation focus on the PUP and whether it was
5   somehow tethered to potential recapitalization?
6   A.   Yes.
7   Q.   Did you read Kyle Billy's memo, the council auditor's
8   memo, that was released on November 18th of 2019?
9   A.   Yes.
10  Q.   Do you recall when you read that?
11  A.   I do not.
12  Q.   When you read it, what were your investigative thoughts as
13  to the relationship between the PUP and a potential
14  recapitalization event in the ITN?
15  A.   I believed that the PUP and the ITN, and really JEA's
16  strategic planning more broadly, were all a part of a same
17  theory that JEA was going to become noncompetitive and not
18  profitable because its electricity sales were going to decline
19  in the future due to increasing energy efficiency and
20  distributed generation technologies.
21        And the idea was that both the strategic planning
22  that was being done by JEA, including the ITN, and the
23  Performance Unit Plan were both needed and appropriate for JEA
24  to pursue and implement in order to make JEA competitive and to
25  combat some of the things that were going to be eroding away

BLODGETT - DIRECT                                    Vol. 4-171

1    its profitability in the future.
2           And so they were linked in my mind, and I think Kyle
3    Billy's memo at least indirectly supported that.
4    Q.   In terms of the JEA board meeting on July 23rd, 2019, did
5    you watch that during your investigation?
6    A.   Yes.
7    Q.   Did you watch Ryan Wannemacher's presentation at about the
8    2 hour, 44 minute mark in that meeting about the Performance
9    Unit Plan?
10   A.   Yes.
11   Q.   And did you review and obtain the entire board package
12   from the JEA website?
13   A.   Yes.
14   Q.   Did you review it?
15   A.   Yes.
16   Q.   What was your assessment of the presentation as to the PUP
17   in connection with recapitalization?  What were your
18   investigative findings?
19   A.   Yeah.  In my opinion, the presentation had several
20   material omissions of fact.
21   Q.   Did Mr. Wannemacher go through any sample calculations of
22   the PUP in connection with recapitalization during that
23   presentation?
24   A.   Yes.  He gave an example where the payout would have been
25   about $30 million for the 30,000 units that would have been

BLODGETT - DIRECT                                    Vol. 4-172

1    issued in the first three-year performance period.
2    Q.   How about calculations if JEA was sold for profits that
3    netted the City of Jacksonville 4, 5, or $6 billion?
4    A.   No calculations or examples like that.
5    Q.   Did Mr. Wannemacher give examples like that of net
6    proceeds to the City of 4, 5, or $6 billion during the
7    Diamond-Salem hearing?
8    A.   No.
9    Q.   Did Mr. Wannemacher divulge the Performance Unit Scratch
10   Sheet that is Exhibit 20A1 that we looked at earlier with
11   $4 billion added to the net position of JEA at the
12   Diamond-Salem hearing?
13   A.   No.
14   Q.   Was that notes.xlsx file, with the growth from zero to
15   $11,500 per unit for a total of $345 million for the PUP at
16   30,000 units, divulged during the Diamond-Salem hearing?
17   A.   I don't know if you're citing to the right exhibit number,
18   but the spreadsheet you're referring to, the answer to your
19   question is yes.
20   Q.   That would be 20L1.
21   A.   Okay.
22   Q.   Did *Garrity* statements in any way lead you to find those
23   spreadsheets?
24   A.   Well, I did not find those spreadsheets, but ...
25          MR. DUVA:  May I have a moment, Your Honor?

BLODGETT - DIRECT                                    Vol. 4-173

1           THE COURT:  Yes.

2      (Pause in proceedings.)

3           MR. DUVA:  I have no further questions for

4    Mr. Blodgett on direct.

5           MR. SUAREZ:  Your Honor, before Mr. Felman interrupts

6    with the bathroom sign, maybe we ought to take an afternoon

7    break now.

8           THE COURT:  I think so.  I know Mr. Felman wants some

9    court relief, and we will do that.

10          Take a --

11          MR. FELMAN:  I second the motion.

12          THE COURT:  -- 15-minute recess.

13          MR. SUAREZ:  In fairness, Judge, it was Mr. Duva's

14   idea to take the break.

15          MR. DUVA:  I knew it was past their time, Your Honor.

16          COURT SECURITY OFFICER:  All rise.

17     (Recess from 2:41 p.m. until 3:03 p.m.; all parties

18   present.)

19          COURT SECURITY OFFICER:  All rise.  This Honorable

20   Court is now in session.

21          Please be seated.

22          THE COURT:  Mr. Suarez, how is the temperature?  Is

23   it warm in here to you slightly?

24          MR. SUAREZ:  It's not too bad, Judge.

25          THE COURT:  You okay?

BLODGETT - CROSS                                     Vol. 4-174

1           MR. SUAREZ:  It's all right.

2           MR. FELMAN:  I found myself sweating profusely after

3    I made the mistake of reviewing that document I shouldn't have,

4    so I think it is a little warm in here.

5           THE COURT:  I'm going to try to lower it a little

6    bit.  Okay.  We'll work on that.

7           MR. SUAREZ:  Thank you, Your Honor.

8           THE COURT:  Go ahead, Counsel.

9           MR. SUAREZ:  Thank you.  May it please the Court?

10              CROSS-EXAMINATION

11   BY MR. SUAREZ:

12   Q.   Good afternoon, Mr. Blodgett.  My name is Eddie Suarez.  I

13   have the pleasure of representing Aaron Zahn.

14        I'm going to ask you a few questions, but I'm going

15   to start with just a preliminary one because it may impact

16   later what we do with the procedures that are in place for

17   this -- for this hearing.

18        Did you attend the February 24th, 2020, SIC meeting?

19   It would have been the month or so or within a month after

20   Mr. Zahn's statement was taken.

21   A.   I did not physically attend that meeting.

22   Q.   Did you watch that meeting?

23   A.   I think I did at some point in time, but I don't know if

24   it was on that day.  But I believe I did see the video stream.

25   Q.   Thank you.  That's all I need to know on that.  Thank you.

BLODGETT - CROSS                                   Vol. 4-175

1          Okay.  So you have some experience in internal
2    investigations, I think you said, and you participated with
3    your law firm in the special investigation committee, correct?
4    A.   Yes, sir.
5    Q.   What -- what was your understanding of what your law firm
6    was charged with doing in terms of this special investigation
7    committee?
8    A.   It was fulfilling the official charge of the SIC
9    committee, which was, I think, a published document on or about
10   February 10th, 2020.
11   Q.   And what's your best understanding of that document?
12   A.   It was twofold.  The first part was investigatory, and we
13   were tasked with looking at all matters relating to JEA's
14   strategic planning, which included the PUP, under the charge.
15          And then also there was a legislative component to
16   the investigation, which included making proposals to improve
17   the City based on our investigative findings.
18   Q.   Okay.  And who was in charge of overseeing the
19   investigation?
20   A.   There was a SIC committee and there was a chairperson of
21   the committee, and it changed during the course of the
22   investigation.
23   Q.   At the beginning who was chairing?
24   A.   Scott Wilson.
25   Q.   Okay.  And then ultimately who chaired it?

BLODGETT - CROSS                                   Vol. 4-176

1    A.   Tommy Hazouri.
2    Q.   Okay.  And within your law firm, who was overseeing the
3    investigation?
4    A.   Steve Busey.
5    Q.   And who else from your law firm participated in the
6    investigation?
7    A.   Myself, Lanny Russell, Chris Dix.  We also had some
8    associates and law clerks working on the investigation as well.
9    Q.   Okay.  And did each of you have a specific role or an area
10   that you focused on in the investigation?  And by each of you,
11   I mean the folks at your law firm that were working on this.
12   A.   For Chris Dix -- the answer to your question is yes.
13   Q.   Okay.  Could you walk me through that?
14   A.   Sure.  Chris Dix focused mainly on electronic information
15   issues, so mostly discovery issues involving ESI.  The law
16   clerks did very specific legal research and document review
17   projects.
18          And then for Steve, Lanny, and I, we had pretty fluid
19   roles.  But I mostly did document review and fact gathering and
20   helped prepare Mr. Busey and Mr. Russell for witness interviews
21   and the meetings with the SIC committee.
22   Q.   Okay.  And in your capacity did you interact with
23   investigators and prosecutors?
24          And let me do this to make it a little easier.  In
25   the various filings that the parties have made, we have come

BLODGETT - CROSS                                            Vol. 4-177

1   up -- we're using the term "the prosecution team" to be the
2   investigators that were assigned to investigating this on
3   behalf of the Government, which included the two state attorney
4   investigators and the FBI agents and the AUSAs assigned to it.
5   So it might be easier for me to refer to the prosecution team,
6   all right?
7           So did you personally interact with anyone from the
8   prosecution team?
9   A.   Yes.
10  Q.   And did you have a primary contact, a person that was --
11  predominantly you communicated with within the prosecution
12  team?
13  A.   Tysen Duva.
14  Q.   So Mr. Duva, the AUSA.
15  A.   Correct.
16  Q.   And if you could approximate for me, let's start with
17  face-to-face meetings, how many times you think you met with
18  Mr. Duva in the course of the investigation.
19  A.   Only once that I can recall.
20  Q.   Okay.  I'm not trying to trick you, but I know there was a
21  presentation that your firm made.
22          Were you there for that?
23  A.   Yes.
24  Q.   And did you meet with him in preparation for today's
25  hearing?

BLODGETT - CROSS                                            Vol. 4-178

1   A.   Yes.
2   Q.   Was that face-to-face or was that done electronically?
3   A.   Face-to-face.
4   Q.   Okay.  So that's -- there's those two meetings.
5           I'm not trying to trick you.  I just want to make
6   sure you were including that prep meeting in the number of
7   meetings you had.
8   A.   I misunderstood your question as being limited to the time
9   that we were doing our investigation.
10          But you're correct.  I think that I've met with Duva,
11  Mr. Duva, to date twice.
12  Q.   And in fairness, it may have been a bad question.  I may
13  have led you to think it was then, so I apologize if I did
14  that.
15          So you've met with him face-to-face twice.
16  A.   Not including today, yes.
17  Q.   Not including today in the courtroom.  That's right.
18  A.   Three, to my knowledge.
19  Q.   Three times.
20          And what about telephonic contact?  Can you give me
21  your best estimate of how many times you spoke with Mr. Duva on
22  the telephone?
23  A.   I'm estimating here, but five.  I mean, I provided the
24  phone records I have.  Those are probably a better indicator of
25  how many times I spoke with Mr. Duva.

BLODGETT - CROSS                                          Vol. 4-179

1   Q.   But your best -- your best recollection is about five
2   times, with the records being the better guide --
3   A.   Right.
4   Q.   -- fair?
5        And I suspect you communicated mostly electronically,
6   through emails with him?
7   A.   That's accurate.
8   Q.   Okay.  And those have been produced as well?
9   A.   Yes.
10  Q.   Okay.  I suspect you would agree that when you are
11  conducting an investigation, documenting your witness
12  interviews are very important.
13  A.   I agree with that.
14  Q.   And you took great care in making sure that you were
15  documenting all of the relevant information that you obtained
16  from witnesses.
17  A.   Correct.
18  Q.   And your entire team, everybody in your law firm, did
19  that, correct?
20  A.   To my knowledge, yes.
21  Q.   Okay.  And I think you told us -- let me just make sure I
22  have the dates correct -- that you read Mr. Zahn's statement on
23  May 28th and May 29th of 2020, correct?
24  A.   That sounds right.
25  Q.   And you indicated in your direct that you read

BLODGETT - CROSS                                          Vol. 4-180

1   Mr. Wannemacher's on, I think it was June 3rd of 2020?
2   A.   No.  It would have been May 30th.  I basically read the
3   statements over three days.
4   Q.   I left out the zero when I took my notes.  My apologies.
5        May 30th?
6   A.   Right.  I think it was May 28th, 29th, and 30th.
7   Q.   And 30th.  Okay.
8        And you would agree with me that it was important for
9   you, in your investigation, in order to gather all the relevant
10  facts, to read those statements.
11  A.   I agree with that.
12  Q.   Because they contained information that was relevant to
13  you and your team members being -- gathering facts relevant to
14  the investigation and ultimately to the charge that you had
15  been given.
16  A.   Yes.
17  Q.   And in addition to reading Mr. Zahn and Mr. Wannemacher's
18  statement, did you read the various news media accounts that
19  were being reported around that time?
20  A.   I did read news articles and other news sources regarding
21  the investigation.
22  Q.   Okay.  Now, I recognize you're not a criminal law
23  practitioner -- wise choice, I might add -- but you would
24  agree -- you're familiar, at least generally, with the
25  protections that are afforded to a citizen that is compelled to

Case 3:22-cr-00023-BJD-MCR   Document 271   Filed 06/02/23   Page 181 of 238 PageID 18799

BLODGETT - CROSS                                    Vol. 4-181

1   give a statement with the protection given under *Garrity*.
2   A.    Yes.
3   Q.    Okay.  And, now, those protections and the constraints
4   that *Garrity* imposes do not apply to your law firm.
5   A.    In this scenario, this case, I think that's accurate with
6   respect to Mr. Zahn and Mr. Wannemacher.
7   Q.    Okay.  And based on your understanding of *Garrity*, the
8   other lawyers outside of the Government, right, the OGC
9   lawyers, they're not bound by *Garrity*.  They can -- they could
10  publish their information freely?
11  A.    That's my understanding.
12  Q.    And Nelson Mullins is free to publish that information
13  freely?
14  A.    That's my understanding.
15  Q.    And you would agree that the Council Auditor's Office is
16  free to publish that information freely.
17  A.    Yes.
18  Q.    And, in fact, your law firm published the *Garrity* -- the
19  transcripts of the *Garrity* statements.
20  A.    Correct.
21  Q.    And when did you say that was done?
22  A.    So our website went live, I think it was January 4th of
23  2021.
24  Q.    Okay.  And you think that's when it was done?
25  A.    Yes.

Case 3:22-cr-00023-BJD-MCR   Document 271   Filed 06/02/23   Page 182 of 238 PageID 18800

BLODGETT - CROSS                                    Vol. 4-182

1   Q.    Okay.  And did you receive any requests from the
2   Government not to publish those *Garrity*-protected statements?
3   A.    I did not, no.
4   Q.    Okay.  You did receive a request from the Government not
5   to interview at least one witness.
6   A.    It wasn't a request to not interview her.  It was -- I
7   think it -- what was the phrase?  Mr. Duva would have preferred
8   that we not interview Melissa Dykes, but he didn't direct us to
9   not interview her.
10  Q.    I understand that.  I don't mean to quibble with you, but
11  I'm confused as to why an expression of preference doesn't
12  equate to a request.
13  A.    I just want to make sure I'm not misrepresenting
14  Mr. Duva's statement, but I take your point.
15  Q.    Okay.  Did Mr. Duva express such a preference about any
16  other witness?
17  A.    Not that I recall.
18  Q.    And he -- not only did he not express such a preference
19  about the transcripts of the *Garrity*-protected statement of
20  Mr. Wannemacher and Mr. Zahn, but he didn't express that
21  preference about any other document.
22  A.    I think that's accurate, yes.
23  Q.    Okay.  When you read news accounts, you would agree with
24  me that there were a number of news accounts that widely
25  reported on the contents of Mr. Zahn's *Garrity*-protected

BLODGETT - CROSS                                      Vol. 4-183

1   statement.

2   A.   I can recall multiple news articles that I have read that

3   did contain statements from Mr. Zahn's *Garrity* statement.

4   Q.   And when you posted the -- Mr. Zahn and Mr. Wannemacher's

5   statements on the website, on the SIC website, did -- did

6   Mr. Duva or anybody from the prosecution team express to you

7   any preference for putting any disclaimers or warnings about

8   the -- about the contents or the fact that these were

9   *Garrity*-protected statements?

10  A.   No.

11  Q.   Okay.  And, in fact, no such warnings were placed.

12  A.   On our website, that's correct.

13  Q.   Okay.  On December the 7th, I think you indicated in your

14  direct that you made a presentation to the investigators, to

15  the prosecution team.

16  A.   Yes.

17  Q.   Do you recall who was present from the prosecution team?

18  A.   Yes.

19  Q.   Okay.  Tell us who that was, please.

20  A.   It was Tysen Duva, Robert Blythe, Tim Adams, and I believe

21  there was at least one other person there, but I do not recall

22  his name.

23  Q.   And how long did that meeting last?

24  A.   It was more than an hour, but I can't recall

25  specifically -- more specifically than that.

---

BLODGETT - CROSS                                      Vol. 4-184

1   Q.   And did you prepare any sort of PowerPoint for that

2   presentation?

3   A.   It was not a PowerPoint.  I just had the documents

4   arranged, and I pulled up the documents on the big screen and

5   talked about the documents.

6   Q.   You -- had you scripted a presentation that you were going

7   to give the members of the prosecution team?

8   A.   I did not have a written script for the presentation.

9   Q.   You just did it as you went.  You were familiar with the

10  documents and comfortable enough to just be able to speak

11  freely off the top of your head?

12  A.   Correct.

13  Q.   Okay.  And prior to that meeting, did anybody from the

14  prosecution team express a preference for any limitation on the

15  types of material that you were going to present to them?

16  A.   No.

17  Q.   Were you given full discretion to use your best judgment

18  on what you would present to them?

19  A.   Yes.

20  Q.   And you relied on your experience as a lawyer and in doing

21  internal investigations in presenting everything that you had

22  obtained and derived from the various sources in giving that

23  presentation.

24  A.   I would say no, but just with how you phrased that

25  question.  I didn't include information in the presentation

BLODGETT - CROSS                                    Vol. 4-185

1   from a number of sources --

2   Q.   Okay.

3   A.   -- including witness statements.  I don't recall including

4   a witness statement.  What I -- I did include were documents

5   that I'd pulled from various sources.  I think that's fair to

6   say.

7   Q.   I'm sorry.  I -- repeat again.  What was it that you did

8   not include?

9   A.   I don't think that I included any witness statements --

10  Q.   From anyone.

11  A.   -- in the presentation from anyone.  That's my

12  recollection.

13  Q.   But, of course, you had read them, and that information

14  was in your head, and it was information that you processed in

15  order to present your view of the case to the prosecution team.

16  A.   Correct.

17  Q.   Okay.  And after the meeting you sent a -- a download link

18  to the Government, to the prosecutor, Mr. Duva, that contained

19  the documents that you had gathered from the SIC?

20  A.   Yes.

21  Q.   And were -- did you take any steps to -- were you given

22  any instruction by Mr. Duva or anybody from the prosecution

23  team expressing a preference that the documents turned over to

24  them be limited in some way?

25  A.   No.

BLODGETT - CROSS                                    Vol. 4-186

1   Q.   And when was the SIC report published?  I think you went

2   over that on direct, but please refresh my recollection on

3   that.

4   A.   It was published on the website on January 4th, 2021.

5   Q.   Were any early drafts of that made available to any third

6   parties?

7   A.   I believe before the report was published online, yes, we

8   did circulate a draft -- or the report to several individuals

9   within the community.

10  Q.   Who did you circulate that to?

11  A.   I believe they were the council members --

12  Q.   Okay.

13  A.   -- and then Mr. Duva.  And I can't remember the other

14  individuals, but there were some other prominent members of the

15  community, including one or more JEA board members.

16  Q.   And do you recall approximately when Mr. Duva was provided

17  with a copy of the early drafts of the SIC?

18  A.   No, because I was not involved with the service process of

19  those reports.

20  Q.   And do you know if that was provided to him

21  electronically?

22  A.   No.  It was a physical copy.

23  Q.   A hard copy was delivered to him?

24  A.   Yes.

25  Q.   Okay.  And who would be the person most knowledgeable of

BLODGETT - CROSS                                          Vol. 4-187

1  when that was done?

2  A.   I'm not sure.

3  Q.   And did -- do you know if that hard copy that was

4  delivered to Mr. Duva, if it's identical to what ultimately

5  became the final report published formally on January the 4th

6  of 2021?

7  A.   I can't remember there being any differences.

8  Q.   Okay.  Are there copies still in existence of that earlier

9  draft that was provided to Mr. Duva?

10  A.   I believe so.

11  Q.   And where would those be?

12  A.   I believe we have a couple of copies at Smith Hulsey &

13  Busey.

14  Q.   And I know you don't remember the date, but do you have an

15  approximation of when that would have been delivered to

16  Mr. Duva?

17  A.   I would be speculating, but late December 2020.

18  Q.   Late December of 2020 is your best guess --

19  A.   Right.

20  Q.   -- and we recognize that that's all it is.

21       After -- so the draft of the report that was

22  physically given to Mr. Duva would have been after the meeting

23  that was had in your office -- I think it was in your office.

24  I guess I added that without really knowing if it was in your

25  office or not, but after the meeting that took place on

BLODGETT - CROSS                                          Vol. 4-188

1  December 7th of 2020.

2  A.   Right.  And just to clarify, I don't think that was a

3  draft report.  My recollection is that it is the same version

4  that was published, but if there was a difference, it would be

5  very nominal.

6  Q.   Okay.  Okay.  I understand.

7  A.   Yeah.

8  Q.   So what -- maybe rather than calling it a draft, it just

9  hadn't been formally released yet.  Would that be fair?

10  A.   Correct.

11  Q.   Okay.  Now, after -- in the December 7th of 2020 email to

12  Mr. Duva with the download link, you draw Mr. Duva's attention

13  to certain versions of a July 10th, 2019, PUP scratch sheet,

14  where you described them as the, quote, "most reliable."

15       Do you remember that?

16  A.   I do.

17  Q.   What did you mean by most reliable?

18  A.   I don't recall at this time.

19  Q.   And after providing Mr. Duva with the early version, let's

20  call it, of the -- I guess by January -- on January 13th you

21  emailed -- there was an email exchange between you and

22  Mr. Duva, but by then the formal -- the final version had been

23  published.

24  A.   Correct.

25  Q.   And Mr. Duva indicated to you that he had been mining the

BLODGETT - CROSS                                    Vol. 4-189

```
 1   SIC report.
 2           Do you recall that email?
 3   A.   Correct.  Yes.
 4   Q.   On June the 14th -- excuse me.
 5           On June the 4th of 2021, you asked Mr. Duva in an
 6   email if he could make himself available -- I'm sorry.
 7   Mr. Duva asked you if you could make yourself available for a
 8   ten-minute phone call, and you agreed that you could do that?
 9           Do you recall that exchange?
10   A.   Yes.
11   Q.   Did you, in fact, talk to him?
12   A.   I believe we talked on June 7th.
13   Q.   Okay.  It was a few days after?
14           What was that call about?
15   A.   I testified about that earlier.  It was the call where
16   Mr. Duva informed me that he was looking for additional PUP
17   documents.
18   Q.   Did he explain to you why he was turning to you for help
19   in finding additional PUP documents?
20   A.   Not that I recall.
21   Q.   Did it strike you as odd that a federal prosecutor, with a
22   team of talented FBI agents and forensic computer specialists,
23   would turn to you, as a private lawyer in a private firm, for
24   help in finding additional PUP documents?
25   A.   Not odd because we had just finished -- my firm had just
```

BLODGETT - CROSS                                    Vol. 4-190

```
 1   finished an investigation into the same subject matter, so I
 2   did not think much of it.
 3           MR. SUAREZ:  Your Honor, I think under the procedures
 4   that we have established, I think at this time it would be
 5   appropriate for us to request that the prosecution team members
 6   and the public be excused from the courtroom.
 7           THE COURT:  Very well.
 8           In light of the Court's previous order, I'd ask that
 9   the people in the audience exit the courtroom, and the CSO
10   could escort the members out.
11                        *  *  *  *  *
12   (Garrity No. 2 sealed and under separate cover.)
13                        *  *  *  *  *
14           THE COURT:  Welcome back, everyone.
15           Mr. Suarez, if you could proceed.
16           MR. SUAREZ:  Thank you, Your Honor.
17   BY MR. SUAREZ:
18   Q.   Just to clarify something, Mr. Blodgett, you're the -- I
19   know you read Mr. Zahn and Mr. Wannemacher's statement in May,
20   I think, of 2021, correct?
21   A.   Correct.
22   Q.   Those -- Mr. Zahn and Mr. Wannemacher's statements were
23   published much earlier, right?  In February of -- February 3rd
24   of 2020, they were made public and they were reported in the
25   news media.
```

BLODGETT - CROSS                                    Vol. 4-191

1           MR. DUVA:  I think Mr. Blodgett said he read those,
2    and I think this was inadvertent because Mr. Suarez said 2021,
3    but it was May of 2020.
4           MR. SUAREZ:  Sorry.  Thank you.
5           MR. DUVA:  Yep.
6           MR. SUAREZ:  My apologies.  Thank you, Mr. Duva.
7    BY MR. SUAREZ:
8    Q.   But the -- in fact, the news accounts, the public
9    dissemination via the news media of those statements, occurred
10   much earlier, on February 3rd of 2020, correct?
11   A.   I don't know if they started on that date specifically,
12   but there were news accounts, when those transcripts became
13   public, summarizing people's impressions of the *Garrity*
14   statement.
15   Q.   Okay.  All right.  And you would agree with me it was
16   somewhere in early February?  Was that -- is that consistent
17   with your recollection?
18   A.   Early to mid February.
19   Q.   Okay.  Going back to your conversations with Mr. Rodda --
20   your email exchange, I should say, with Mr. Rodda regarding the
21   request that Mr. Duva had made, Mr. Rodda emailed you back and
22   sent you some spreadsheets that -- that he indicated or claimed
23   had been created by Ryan Wannemacher, correct?
24   A.   I think that's correct, but it may help to refresh my
25   recollection --

BLODGETT - CROSS                                    Vol. 4-192

1    Q.   Sure.
2    A.   -- to see that document again.
3           MR. SUAREZ:  Mr. Miller, would we be able to publish
4    Exhibit 224?  And there's two of them.  224, Mr. Miller, and
5    then we're going to publish 225.
6           All right.  Could we enlarge that, Mr. Miller?
7    BY MR. SUAREZ:
8    Q.   Okay.  Mr. Blodgett, does that refresh your recollection?
9    A.   Yes.  This was at the bottom of the email chain we looked
10   at earlier.
11   Q.   Okay.  And -- and he told you that he believed these were
12   created by Ryan Wannemacher, correct?
13   A.   Correct.
14   Q.   And did he provide you -- if this question results in you
15   having to talk about something that you know from having read
16   Mr. Wannemacher's and Mr. Zahn's statements, to include --
17   please tell us that.
18   A.   Okay.
19   Q.   Okay.  Or just tell us that it -- that so that we can
20   address that with the Court in advance of your answer.
21          But did you have a discussion with Mr. Rodda about
22   why he thought that this contemplated a sale?
23   A.   Not that I recall.
24   Q.   Did Mr. Rodda explain to you how he found this
25   spreadsheet?

BLODGETT - CROSS                                    Vol. 4-193

1   A.   I think he explained to me how he found one or more of the
2   documents in this email chain, the one we looked at earlier,
3   but I can't remember if he explained to me how he found this
4   specific spreadsheet.
5   Q.   Okay.  Tell me what you remember him telling you about how
6   he found the -- the various spreadsheets that he provided to
7   you.
8   A.   All I can recall is that Mr. Rodda told me that he
9   obtained one of the spreadsheets -- it may not be this one, but
10  he obtained one of the spreadsheets through a request for
11  Pillsbury documents, I believe it was, to JEA.  And the
12  production he got included a spreadsheet --
13  Q.   Okay.
14  A.   -- and potentially other documents.
15          MR. SUAREZ:  Mr. Miller, can we publish Defendants'
16  Exhibit 225, please.
17          And if we could enlarge the "to" and "from."
18  BY MR. SUAREZ:
19  Q.   Okay.  Now, this is -- this email is from you to Jeff
20  Rodda, and you're forwarding -- I believe you're forwarding the
21  spreadsheet to Mr. Duva, correct?
22  A.   That's what -- I'm forwarding -- I'm responding or sending
23  an email to Rodda, and yes, Mr. Duva is cc'd on it.
24  Q.   Okay.  And you cc'd Mr. Duva because he had made the
25  original request --

BLODGETT - CROSS                                    Vol. 4-194

1   A.   Correct.
2   Q.   -- for assistance in finding additional documents relevant
3   to the Performance Unit Plan?
4   A.   Correct.
5   Q.   Let me show you Defendants' Exhibit 185.
6          MR. SUAREZ:  And if we could enlarge the top portion
7   of that, Mr. ...
8   BY MR. SUAREZ:
9   Q.   Okay.  And in here you --
10         MR. SUAREZ:  I'm sorry.  We -- is this 185,
11  Mr. Miller?
12  BY MR. SUAREZ:
13  Q.   Let me ask you this question.
14         Do you recall sending an email to Mr. Duva on June
15  30th of 2021 detailing additional areas of inquiry as a
16  follow-up to some of Mr. Rodda's recent emails, and you
17  included a zip file with some exhibits?
18         Do you recall sending that email?
19  A.   I may have, but I would like to see the email just to
20  refresh my recollection about the dates and --
21  Q.   Okay.  Yeah.  It's up on the screen now.  We can move it
22  up and down as you -- as you like, Mr. Blodgett.  Just let us
23  know.
24  A.   Yes, this email looks familiar.
25  Q.   Okay.  All right.  Now --

BLODGETT - CROSS                                            Vol. 4-195

1           MR. SUAREZ:  And, Mr. Miller, can we scroll down so
2    that Mr. Blodgett can see the discussion with ...
3    BY MR. SUAREZ:
4    Q.   Okay.  Can you -- can you read that, Mr. Blodgett?
5    A.   Yes.
6    Q.   Okay.  Now, you are adding -- you are identifying in this
7    email some additional areas of inquiry for Mr. Duva; is that
8    correct?
9    A.   Yes.
10   Q.   And what prompted you to suggest to Mr. Duva areas of
11   inquiry for him?
12   A.   Just a follow-up on the initial request that we discussed
13   earlier.
14   Q.   Did he ask you to provide him with additional areas of
15   inquiry?
16   A.   No.
17   Q.   This is something you took upon yourself?
18   A.   Correct.
19   Q.   And did you -- these additional areas of inquiry, did you
20   document that in a -- in some sort of a memorandum or a letter
21   or something, or is that what you discussed with him during the
22   ten-minute phone call?
23   A.   This email suggests the areas of inquiry are in the email.
24   Q.   In the email.
25           MR. SUAREZ:  Mr. Miller, can we scroll down to that?

BLODGETT - CROSS                                            Vol. 4-196

1    Are they ...
2           Your Honor, may I approach the witness?
3           THE COURT:  Yes.
4    BY MR. SUAREZ:
5    Q.   I'm going to hand you the physical exhibit.  I think it's
6    easier than having me try to scroll through.
7    A.   Okay.
8    Q.   That -- the areas of inquiry, Mr. Blodgett, are -- there's
9    a -- roughly two and a little -- two and a quarter document of
10   areas of inquiry that you prepared for Mr. Duva?
11   A.   Correct.  And this email actually disproves part of my
12   testimony earlier, but it looks like the first section
13   regarding the PUP actually, I think, does relate to the initial
14   request Mr. Duva sent me.
15          But then the second part, which is what I recall, the
16   Holland & Knight section was not something that Mr. Duva had
17   requested from me before.
18   Q.   You decided to volunteer these additional areas of inquiry
19   for Mr. Duva?
20   A.   Correct.
21   Q.   And you -- in order to craft these areas of inquiry for
22   Mr. Duva, you relied on everything that you had learned in the
23   course of your investigation of JEA, correct?
24   A.   I think I'm only relying on the documents that are
25   referenced in the email.

BLODGETT - CROSS                                          Vol. 4-197

1   Q.   Really.  Okay.
2        So you're -- well, you selected these documents based
3   on the knowledge that you had about the case, right?  That's
4   how you selected these specific documents to reference; fair?
5   A.   I think it's fair to say that I selected these documents
6   based on the knowledge I had about the specific subject matter
7   of these documents.
8   Q.   Okay.  So you -- you based the selection of these
9   documents and the areas of inquiry regarding the PUP based on
10  the universe of information that you had regarding the PUP;
11  fair?
12  A.   At this time I actually had a very limited amount of
13  information available to me, so it wasn't the universe that I
14  had available at the time of the investigation because I did
15  not have Relativity any longer.
16       But based on the information I had available to me at
17  the time of this email, I did identify these areas of inquiry
18  as being material.
19  Q.   Okay.  So in June of 2021, you no longer had access to
20  Relativity, fair?
21  A.   Right.
22  Q.   And then -- so you had to rely on your own -- what's in
23  your head -- right? -- your own recollection of what you had
24  gathered as being part of this investigation --
25  A.   Correct.

BLODGETT - CROSS                                          Vol. 4-198

1   Q.   -- correct?
2        And you had to rely, then, on whatever internal
3   documents your office still had?
4   A.   Correct, or what was available on the SIC committee
5   website and coj.net.
6   Q.   And that led you to write the -- that combination of
7   factors -- right? -- are all the things you consider when you
8   wrote this section regarding the PUP.
9   A.   Correct.
10  Q.   And then you voluntarily decided to write this additional,
11  looks like, page and a half, roughly, regarding Holland &
12  Knight, is what you -- you called it.
13  A.   Correct.
14  Q.   And that involved -- the section of Holland & Knight
15  involved the -- some of the litigation with Vogtle, I presume?
16  A.   Correct.
17  Q.   And there's an additional section on the PUP in there on
18  page -- on the second -- third page of the document?  Begins
19  with JEA's compensation committee meeting on June 18 of 2019?
20  A.   I'm sorry.  Which page is that on?
21  Q.   It would be -- if we -- your email would be page 1, so we
22  go to page 3, and the one, two, three, four, fifth bullet point
23  down, JEA compensation committee --
24  A.   Right.
25  Q.   -- June 18, 2019?

BLODGETT - CROSS                                         Vol. 4-199

1   A.    Correct.  I see that.
2   Q.    And in there you -- using the universe of your knowledge
3   of the case, you give Mr. Duva areas of inquiry relating to the
4   PUP and related to Willis Towers Watson materials that were
5   presented to the board, correct?
6   A.    Using the information in these referenced documents, I
7   provided areas of inquiry.
8   Q.    Well, you no longer had access to Relativity, right?
9   A.    Right.
10  Q.    So you had to rely on whatever was publicly available and
11  what you knew as a result of the time you had spent in the
12  investigation.
13  A.    I agree with that.
14  Q.    Okay.  And that would be true for all of the entries in
15  this document, right?
16  A.    Yes, it appears so.
17         MR. SUAREZ:  Your Honor, may I have a moment to
18  confer?  I may be done.
19         THE COURT:  All right.
20         MR. SUAREZ:  Thank you, Your Honor.
21  (Pause in proceedings.)
22         MR. SUAREZ:  Thank you, Mr. Blodgett.
23         Thank you, Your Honor.  I don't have any further
24  questions of the witness.
25         MR. FELMAN:  No questions, Your Honor.

BLODGETT - REDIRECT                                     Vol. 4-200

1         THE COURT:  Mr. Duva, anything else?
2         MR. DUVA:  Briefly, Your Honor.
3         MR. SUAREZ:  That's lawyer speak for a half an hour,
4   Your Honor.
5                    REDIRECT EXAMINATION
6   BY MR. DUVA:
7   Q.    Mr. Blodgett, do you have Defense 185 still in front of
8   you?  That's the email that we were just looking at.
9   A.    Yes.  Yes, I do.
10  Q.    Going through -- and it references the JEA chronology
11  after -- it says, "If you have ten minutes to discuss this
12  week, will you give me a call?"
13         Do you see that?  And there's about two and a third
14  pages of text?
15  A.    Yes.
16  Q.    Can you point to anything in there where you disclosed
17  anything that Mr. Zahn or Mr. Wannemacher said in their *Garrity*
18  statement?
19  A.    Just give me one moment to review this.
20         MR. FELMAN:  Your Honor, if the answer's yes, I would
21  suggest it probably shouldn't be made on the record with these
22  folks present.  If the answer is yes, I think we have to take
23  some precautions.
24         THE WITNESS:  The answer's no.
25         MR. FELMAN:  Solves it.

BLODGETT - REDIRECT                                    Vol. 4-201

BY MR. DUVA:

Q.   Mr. Suarez was asking you about a bullet point about Plant
Vogtle litigation in the Holland & Knight section, correct?

A.   Correct.

Q.   Now, that litigation is a public document, and anyone can
go to Pacer, if you have access to Pacer, and access materials
that are pertinent to that litigation.

A.   That's correct.

Q.   You were also asked about -- it was on this page here
(indicating).  It's the second lengthy page in the email about
the JEA compensation committee, June 18 of 2019.

A.   Yes.

Q.   Now, if somebody wanted to look at the information
presented at the compensation committee, could you go on the
JEA website and access the minutes and the materials presented
during that meeting?

A.   Yes.

Q.   And are you privy to what the Government asked Willis
Towers Watson for pursuant to a grand jury subpoena?

A.   No.

Q.   Going down in that email four bullets from the bottom,
there are references to Morgan Stanley and JPMorgan.

         Do you see that?

A.   Yes.

Q.   Are you privy to what the Government asked Morgan Stanley

McELROY - DIRECT                                       Vol. 4-202

or JPMorgan for pursuant to a grand jury subpoena?

A.   No.

         MR. DUVA:  May I have a moment, Your Honor?

         THE COURT:  Sure.

         MR. DUVA:  No further questions.

         THE COURT:  All right.  Thank you, sir.  You can step
down.

         THE WITNESS:  Thank you, Your Honor.

         MR. DUVA:  The Government calls Paul McElroy.

         THE COURT:  Very well.

    (The witness entered the courtroom.)

         COURTROOM DEPUTY:  Sir, if you'll step into the
witness box.  Remain standing to be sworn in, please.

         Raise your right hand.

         Do you solemnly swear or affirm that the testimony
you're about to give before this Court will be the truth, the
whole truth, and nothing but the truth, so help you God?

         THE WITNESS:  I do.

         COURTROOM DEPUTY:  Please be seated, and state your
full name for the record and spell your last.

         THE WITNESS:  My name is Paul McElroy, last name
McElroy, M-c-E-l-r-o-y.

         PAUL McELROY, GOVERNMENT'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. DUVA:

McELROY - DIRECT                                      Vol. 4-203

1   Q.    Good afternoon, Mr. McElroy.
2              Can you take the Court through your educational and
3   professional background that led you to your various positions
4   at JEA, and before that, leading up to the time you got to JEA.
5   A.    Sure.  My educational background first.  I'm a graduate of
6   St. Joseph's College in Rensselaer, Indiana, accounting and
7   finance.
8              I did graduate work at the University of Bridgeport,
9   as well as the University of New Haven and have an advanced
10  management program degree from the University of Wharton -- or
11  with the Wharton School, University of Pennsylvania.
12             My work background, I'll start backwards.  My last
13  paid-for assignment was interim CEO at JEA for a six-month
14  stint.  And prior to that had been CEO --
15  Q.    Let me interrupt you, sir.  Sorry.
16  A.    Uh-huh.
17  Q.    When was that six-month stint, just for purposes of the
18  record?
19  A.    The six-month stint was in 20 -- 2020.
20  Q.    Was it around -- did it begin around April of 2020 --
21  A.    Yes.
22  Q.    -- when Ms. Dykes was removed from that position?
23  A.    Yes, it was, from April 2020.
24  Q.    Till about October of 2020?
25  A.    That's correct.

McELROY - DIRECT                                      Vol. 4-204

1   Q.    Okay.  You can go back in time before then.
2   A.    And then before that, ending in April of '18 and then --
3   actually, no, the end of September of 2018 [verbatim], was CEO
4   of the JEA.  CEO-ship ended in the period of April of 2018.
5   Had that position starting out in 2012, so held it for five and
6   a half or so years.
7              Prior to that, was chief financial officer for the
8   JEA, and that position was titled CEO [verbatim], from about
9   2006 to 2012.  And then --
10  Q.    Before that, you had other jobs before you came to JEA?
11  A.    Yes.  Yes.
12  Q.    And just generally -- you don't have to say the job, but
13  what industry and what was your --
14  A.    It was in the financial services industry.  I was
15  responsible for a couple major divisions.  The national --
16  actually, North American footprints, so managed the entire
17  North America for two -- two global companies, financial
18  services subsidiaries in commercial leasing and lending.
19  Q.    I know this is probably a couple semesters' worth of a
20  class, but I'm talking from a very high view.
21             Explain JEA's business and what it does.
22  A.    Well, JEA is a municipal utility that's located, of
23  course -- headquartered in Jacksonville, Florida.  Serves Duval
24  County and parts of the outlying counties.
25             Its two primary businesses are the electric business

McELROY - DIRECT                                          Vol. 4-205

 1  and the water/sewer business.  It also has a smaller chilled
 2  water business.
 3          The primary business or the largest business is the
 4  electric business serving all of Duval County.  Its origin was
 5  in, I believe, 1980 -- 1885 when the first streetlight was --
 6  was lit up here in Downtown Jacksonville.
 7          And it was a component of the city up until
 8  consolidation back in the late '60s, when it was spun off to
 9  its own entity, being the Jacksonville Electric Authority at
10  the time, and operated independently, with an independent
11  board, its own financing and bond resolutions, etc., raised its
12  own money, priced its own programs, managed its own costs and
13  budgets.
14          It then moved -- was combined with the water/sewer
15  business, which had been a component of the city, in the
16  late '90s, '98/'99, which came over from the city and at that
17  time was named The JEA.  Couldn't have the water/sewer business
18  being the Jacksonville Electric Authority any longer.
19          And so it remained a combined entity, district
20  energy, a smaller utility serving chilled water to facilities,
21  such as this one, in the downtown core for air conditioning.
22  Was developed with the Better Jacksonville Plan.  So that's the
23  framework for the lines of business.
24          The footprint for the water/sewer business is a
25  little larger than the electric.  We serve Nassau County, as

McELROY - DIRECT                                          Vol. 4-206

 1  well as parts of St. Johns County.
 2          The municipal structure is unique in that it is a
 3  component of the City of Jacksonville, a component of
 4  government, as opposed to a utility that is an investor-owned
 5  utility, a utility that is a stock-owned company, by investors;
 6  or a cooperative utility, which are mostly rural utilities, and
 7  that's a component driven by the federal government, and those
 8  are owned by the individuals.
 9          So you have co-ops that are owned by the individuals
10  that are served, municipals and state entities that are owned
11  by their municipality or state entity, and investor-owned that
12  are owned by the shareholders.
13          And so each -- each have a different set of drivers
14  in terms of the JEA for its -- its drive is to serve its
15  customers and serve its community and build community and be
16  part of the community going forward.
17          The primary mission, if you will, of an
18  investor-owned is to serve the investors and to run a business,
19  to provide returns for the investor.  And co-ops serve their
20  family of individuals that are the individual owners.
21          The governance of JEA historically has been a board
22  of directors, a board of directors that, up until recently, was
23  appointed by -- seven directors appointed by the mayor of
24  Jacksonville and confirmed by the City Council.
25  Q.  Let me interrupt.

McELROY - DIRECT                                                    Vol. 4-207

```
1          Was that the case when you were the CEO, that that's
2  how the board members were confirmed -- or appointed and
3  confirmed, what you just described?
4  A.   Yes, it was.
5  Q.   And how has that changed, and when did that happen?
6  A.   It -- it happened in 2021.  I believe in 2021.  There was
7  a discussion while I was interim, and the council had complete
8  oversight of that process in terms of looking at the charter of
9  JEA and felt that there was a need to change the appointment
10 process.
11         And historically -- or I guess prospectively now, the
12 charter reads that the mayor, I believe, will have three
13 appointees, and the council will have four.  I may have those
14 numbers mixed, but there's a split there.  And then they'll be
15 confirmed by the City Council.
16         So it went from the mayor appointing directly all of
17 the members to now a split between the council and the mayor
18 appointing members of the board of directors.
19 Q.   Are the JEA board members paid?
20 A.   They are not.
21 Q.   And are these individuals in the community that, through
22 both processes that you explained during your tenure, the mayor
23 appointing these individuals and now what you just described
24 with the split with the mayor and the council -- these are
25 individuals in various capacities in the community?
```

McELROY - DIRECT                                                    Vol. 4-208

```
1  A.   That is correct, and they must be in -- reside in the
2  community.
3  Q.   Talk about the JEA -- JEA board member generally, and I'm
4  getting at at a high level.
5          Talk about the history of your presentations to them
6  and your takeaways in terms of their reliance on the senior
7  leadership team for information to be provided that is
8  accurate.
9  A.   Well, it's critical.  The board members have
10 responsibility, fiduciary responsibility, for the utility, as
11 well as strategy, policy.  And it was our -- and hire/fire of
12 the CEOs are the main charges or responsibilities of the
13 directors.
14         And so it was incumbent upon us to ensure that the
15 directors were completely informed, completely and totally
16 informed, so they could discharge their duties, whether that
17 was a financial or operating matter or whether it was a
18 community affairs matter.
19         And so we had an open dialogue, both with the -- with
20 the members.  And by open I mean this is a public institution.
21 JEA is a public institution, and so meetings were always
22 public.
23         We shared information openly with, certainly,
24 counsel, the community, and others to make sure that they were
25 fully informed of the decisions that the board would make in --
```

McELROY - DIRECT                                    Vol. 4-209

1   in their discharging their duties.

2   Q.   And is it your experience that the board members rely on

3   what the senior leadership team tells them?

4   A.   Absolutely.

5   Q.   I want to move over, and I'm jumping around a little bit.

6           There's been some discussion about Plant Vogtle.  Can

7   you just -- and, again, this is another couple semesters' worth

8   of class.

9   A.   Yeah.

10  Q.   What is Plant Vogtle, and what is the challenge that JEA

11  now faces with respect to that purchase power agreement?

12  A.   Sure.  Plant Vogtle is a nuclear generating facility in

13  Georgia.  When we refer to Plant Vogtle here today, it's

14  usually referred to as Plant Vogtle Units 3 and 4.

15          Plant Vogtle has two functioning nuclear generating

16  units that have been -- have been operating since the 1980s.

17          Back in the late '00s and into 2010ish or so, there

18  was an enormous discussion with respect to climate change and

19  $CO_2$.  And at the time the electric generating industry was the

20  primary producer of $CO_2$ within the United States.

21          And -- and at the top of that list was JEA.  We were

22  cited by S&P during that period of time as being one of the

23  most carbon-intensive electric generating units or companies in

24  the country, so we knew we had a carbon challenge.

25          And in the Southeast -- the Southeast historically

McELROY - DIRECT                                    Vol. 4-210

1   had been reliant on nuclear, and that's all of the major

2   investor-owned utilities, and some of our brother and sister

3   municipal utilities also had partnered with investor-owned

4   utilities for slices of various nuclear plants that were built

5   in the '80s and prior.

6           So there was an emergence with the industry in the

7   late '00s and the early teens, two thousand teens, of new

8   technology coming to market, Westinghouse, who had 50-plus

9   years of building the most -- half of the plants that were in

10  operation and maintaining those over the prior 50 years.

11          And then you had Southern Company, Dominion, Duke,

12  Progress Energy, and Florida Power & Light all looking at this

13  technology, all looking to expand their nuclear facility and

14  production to address climate and $CO_2$ emissions, because

15  nuclear does not provide, in the generation of power, any --

16  any $CO_2$ emissions.

17          So it was a primary cornerstone of our planning.  And

18  we -- we looked at that.  We had a number of workshops with the

19  board.  We talked about -- at length with Progress Energy, as

20  well as Southern, and we had some time with Duke as well.

21          And we ended up with an opportunity to invest in

22  nuclear through MEAG, municipal electric of Georgia, another

23  utility who was a part owner of Plant Vogtle.

24          So we went through the analysis and said, "Well,

25  Southern is a good operator.  They have an operating facility.

McELROY - DIRECT                                          Vol. 4-211

1   This isn't a new facility.  It's an expansion.  They've proven
2   that they can build something and operate it.  They're
3   substantial in size.
4         And we went through a number of other steps in the
5   exercise to identify -- including some outside help and counsel
6   to identify MEAG and Southern as a partner to take a slice up
7   to 10 percent of what we thought would be our -- our electric
8   generation when these units were planned to come online.
9   And --
10  Q.   What was the ultimate agreement there in terms of that
11  slice?
12  A.   The ultimate agreement was we would pay -- we would pay
13  cost plus a small adder, like 50 cents a megawatt hour.  So it
14  was cost based, cost based as opposed to market and as opposed
15  to being marked up for profit.
16        And so we thought it was wise to take a slice to
17  learn.  Much smaller would have been too small to manage,
18  because it is a -- it is a big component of the production of
19  electricity for JEA.  The second -- much larger was too risky
20  for us, so we stayed in that area.
21        Now, the issue that has been commonly debated, you
22  know, the last number of years is that the project went much
23  longer in construction.  It was originally planned to come on
24  in 2016 and '17.  Unit 3 just came online this past month, and
25  I believe Unit 4 is 6 to 12 months behind coming on, and it

McELROY - DIRECT                                          Vol. 4-212

1   cost a lot more.
2   Q.   So there were unexpected construction delays and costs,
3   and also the cost of nuclear power itself --
4   A.   Yes.
5   Q.   -- changed.
6   A.   Yeah, it's changed.  Probably doubled from what we
7   originally anticipated.
8   Q.   So we won't get into much more detail, but safe to say
9   that became a challenge for JEA to deal with moving forward.
10  A.   Yes.
11  Q.   Okay.  Let's go to your time as the CFO in 2006.
12        When you became the CFO, talk about the condition of
13  JEA and the challenges that it faced.
14  A.   C -- the CFO role at that point in time was to really
15  assess and to integrate the corporate planning -- and corporate
16  planning, really the capacity, the generation, unit planning,
17  and the water/sewer capacity and unit planning, with the
18  financial plan.
19        We were in -- in 2006 we were in the middle of an
20  almost $4 billion capital investment plan for both -- both
21  systems.  And to put that in context, those of us that have
22  been members of the community for over 20 years remember the
23  Better Jacksonville Plan.
24        The Better Jacksonville Plan was a $2 billion
25  program, and it was -- it was huge.  Simultaneously, the JEA

1  was investing another 4 billion, so we essentially had three
2  Better Jacksonville Plans going on at that time.
3          And in 2006 we had put on most of that debt.  We
4  still had some through the rest of the decade to come on, but
5  we had not touched pricing in 15 years.  And so the challenge
6  at that point in time was the bill was coming due for this
7  massive construction of increase in capacity and capability to
8  produce electricity, deliver water, and collect sewer.
9          The bill to pay for that was coming due, so we had to
10 reassess our rate structure and look at a way that we could
11 price in some additional revenue requirements and some income
12 and higher costs to our customers and worked with them to
13 facilitate that and smooth that into the process.
14         That was a big challenge.  Once we got that
15 stabilized, the plan -- you know, the long-term plan was to
16 then -- how do we deal with this debt, because the debt had run
17 up substantially beyond benchmarks.
18 Q.   And even at that point, in 2006, was that the highest year
19 of sales in JEA history?
20 A.   And it peaked around that time, yes, sir.
21 Q.   Okay.  And so moving forward from 2006, the debt issue --
22 talk about sales trends that occurred from 2006 to 2012 when
23 you took over as the CEO.
24 A.   Well, 2006 to '12, the -- we had the introduction at the
25 federal level of the Energy Efficiency Act, which forced

1  manufacturers of certain components to make their products more
2  efficient.  So when they came online in our service territory,
3  people were using less electricity.  That was the first step.
4          The second one was the financial crisis of '8 and '9.
5  And the economy -- when you have the economy essentially
6  collapse, as it did then, demand in the electric business goes
7  down.  Plants run less.  People conserve more.  Houses were
8  vacant, etc.
9          So our sales were under pressure there in terms of
10 any type of -- now, historically, prior to that, you could look
11 at a chart -- we may be off a couple of years of 2000, but you
12 can look at a chart going back almost 30 years, and every year,
13 on average, the electric rates -- or electric demand would grow
14 3 percent per year.  It was almost like clockwork.  It might be
15 4 one year, 2 the next, but it was basically a straight line.
16         And in 2006 that line curved and essentially
17 flattened out to -- to us.  So we were seeing -- we were seeing
18 down to nominal growth during '6 to '12.  And so we adjusted
19 our plans and tightened them down significantly to live in sort
20 of a zero-growth environment.
21         No longer could we get to January 1st and think about
22 how we were going to spend that fresh 3 percent of new revenue
23 coming in.  January 1st, the first of the year, we would have
24 the same amount of money that we had the prior year.
25         We had to be very disciplined about our costs, about

McELROY - DIRECT                                             Vol. 4-215

1  our investment, and about the utilization of technology.
2  Q.    And the sales trends flattened in 2006 towards 2012 as you
3  came to the time where you took over as the CEO.
4         Even though that had occurred, what was the condition
5  financially of JEA in 2012 when you took over as CEO?
6  A.    In 2012 we had -- we had a significant debt load.  Again,
7  well out of any benchmarks.
8         From the electric system standpoint, I believe the
9  debt-to-equity ratio or the percentage of equity was 92 percent
10 debt for every dollar invested.  The standard in the industry
11 was closer to 50/50.
12        So we were getting pressure in terms of both our
13 costs going forward that we would charge our customers as well
14 as from the credit -- credit markets.
15        Water was the same, not quite as high, but we had --
16 we had a significant debt challenge going forward.
17 Q.    How did you approach that during your term as the CEO?
18 A.    We -- we put together a plan, and we -- we worked with the
19 board on this in a number of workshops and put together a plan
20 that essentially categorized our capital investment the way you
21 might almost at your homes, a personal budget, that if we had a
22 long-term asset, a generating facility, then we made it go to
23 market to issue debt.
24        But if we were going to maintain a generating
25 facility or a distribution line of electricity, and the same

McELROY - DIRECT                                             Vol. 4-216

1  held for water, then we would look to pay that out of
2  current-period revenue.  And so we had structured the revenue
3  streams in a way to be able to operate the business for capital
4  expenditures on what we called a pay-go -- pay-go strategy.
5         So we would pay as we went for normal repair and
6  maintenance of all of our capital systems as opposed to
7  continuing to go to the debt markets and continually
8  increase -- and I'd say at some point in time, we were going to
9  hit the wall.  And in the water business, we were almost there
10 in the inability to borrow debt further.  And then gradually
11 look to pay down debt.
12        And so we put that in place, with full blessing of
13 the board, compartmentalized, changed our capital planning,
14 changed our discipline in capital and approach to it, and
15 all -- all the while making sure that our efficiency, our
16 production standards, maintained best-in-class status.
17 Q.    And I know I'm jumping ahead a little bit, but the Curry
18 administration came in around May of 2015?
19 A.    Yes.
20 Q.    And when Mayor Curry took over, what did he do with
21 respect to the JEA board that existed once he became the mayor
22 of Jacksonville?
23 A.    He -- he asked for the board to resign, I believe six of
24 the seven members.
25 Q.    Had that ever been done, to your knowledge?

McELROY - DIRECT                                            Vol. 4-217

1   A.   No.

2   Q.   Now, as -- talk about bringing on Melissa Dykes and Ryan

3   Wannemacher and how they came to JEA.

4   A.   When I was promoted to CEO, I vacated the CFO position,

5   and Melissa was operating as treasurer of JEA at the time.  And

6   in essence, about two years prior to that, I -- I hired her for

7   the treasurer position for JEA.  So she was treasurer; I was

8   CFO.

9        I moved to CEO, vacating the CFO position.  I thought

10  that position was -- was so important that we needed to -- to

11  look outside.

12       So we ran a national search, and -- and we had some

13  very qualified candidates.  At the end of it, though, I felt

14  that her qualifications, as well as her knowledge of the system

15  and her focus now on municipal utility finance and operations,

16  she was the best fit for the job.

17  Q.   So Ms. Dykes became the CFO?

18  A.   Yes.

19  Q.   About when was that?

20  A.   Pardon me?

21  Q.   About when was that?

22  A.   So 2012?  2012.

23  Q.   How did Mr. Wannemacher come to JEA?

24  A.   So about a year or so after that, Melissa had an opening

25  in the planning and budgets directorship, and she recruited

McELROY - DIRECT                                            Vol. 4-218

1   Mr. Wannemacher for that position.  They had worked previously

2   together, and she was very high on him.

3   Q.   I want to transition to some financial planning tools that

4   JEA undertakes.  There's been some talk about presentations to

5   rating agencies, ten-year site plans, and integrated resource

6   plans and the financial modeling for the JEA board.

7        Can you unpack that a little bit in terms of the

8   differences in -- in those reporting and the similarities?

9        And let's start with presentations to rating

10  agencies.  What does that entail, and what is the goal?

11  A.   Well, it entails a comprehensive financial and operating

12  view at a point in time for the utility.

13       It's -- it's a basis -- the basis is the actual

14  audited financial statements and then a series of five years of

15  financial projections that cover both the capital investment,

16  as well as expected operating revenue and operating expenses

17  and looking at your strategic plans, strategic objectives and

18  goals, as well as your risk assessment of the -- of the next

19  five years.

20       There was a constant push there.  They would like to

21  see ten.  We focused really on the five years in the

22  development of those plans.

23       They took that information and the -- and the

24  interaction and the exchange that they had with -- with

25  management as the basis, and the audited financial statements

McELROY - DIRECT                              Vol. 4-219

 1  as the basis of their report and their evaluation of the
 2  utility and their ultimate credit rating, which bond investors
 3  used in determining whether or not they would invest in the
 4  JEA.
 5  Q.   How about ten-year site plans?  How are those used?  And
 6  you can just be very general about that.
 7  A.   The ten-year site plans are really a capacity -- utility
 8  capacity plan.  So how much generating capacity do you need for
 9  electric?  How much capacity do you need and capability do you
10  need to treat the sewage you anticipate, as well as where are
11  you going to get your next million gallons of water from?
12         They're generally done in an engineering way and done
13  in a compliant way with both the state and the electric side,
14  FRCC, Florida Reliability Coordinating Council, which is --
15  reports up to NERC in the federal government for both capacity
16  and electrical liability.
17  Q.   And as part of --
18  A.   Long and short of it, making sure you have capacity to
19  serve your needs.
20  Q.   As part of that report, are there financial projections
21  ten years out of what expected sales should look like?
22  A.   Yes.
23  Q.   What is an integrated resource plan?  And, again, you can
24  be general about that.
25  A.   An integrated resource plan essentially takes your --

McELROY - DIRECT                              Vol. 4-220

 1  could be your ten-year site plan as a base and then -- and then
 2  looks at what technologies you can fit into your existing
 3  generation stacks to produce a certain cost outcome and
 4  regulatory outcome for your future generation.
 5         So you may have a thousand megawatts of capability
 6  today.  It may call for 1500 tomorrow.  How are you going to
 7  get that 500?
 8         Or 1500 might be retired.  How are you going to build
 9  and what are you going to rebuild, solar, wind, nuclear, gas?
10  So it's a --
11  Q.   And as part of that integrated resource plan, are there
12  likewise, similar to the ten-year site plan, sales projections
13  or an expectation of how sales will ebb and flow over the next
14  period of years?
15  A.   Yes.
16  Q.   Now, in terms of -- while I understand from your testimony
17  there's different reasons for this reporting, and there might
18  be some slight differences, talk about the importance of being
19  consistent when presenting to the JEA board, presenting to the
20  rating agencies, preparing the ten-year site plans, and also
21  the integrated resource plans.
22  A.   It certainly is my view, and had been practiced, that
23  consistency between those numbers, those various numbers,
24  ten-year site plan and the rating agencies and financial
25  reporting to the board and ultimately the accountants, should

McELROY - DIRECT                                    Vol. 4-221

1  be consistently prepared, and directionally they should be
2  consistent.
3          There were modern -- moderate modifications with
4  respect to the ten-year site plan, which was done essentially
5  by engineers with logarithmic calculations, which in the outer
6  years of the plan, year over year, tended to produce a higher
7  sales expectation than actually occurred.
8          And so we backtested that over a number and number of
9  years, and we started to sort of just make sure that we were
10 directionally moving in the same way, the same line.  But then
11 we would -- we would move those down a little bit from a
12 financial standpoint to ensure that we weren't building plant
13 that wasn't going to run.
14         We would always disclose that and say that there was
15 a difference between.  The board would always have and have
16 full understanding of the ten-year site plan, as well as the
17 financial plan.  We'd go over the whole -- whole concept with
18 them and make sure that they were consistently going in the
19 same direction.
20         We never had a mismatch or a significant variation.
21 Q.  How about the practice of what you tell the board as to
22 what you tell rating agencies?  I mean, should those
23 messages -- should that messaging be the same, or is there a
24 reason --
25 A.  In my opinion, it should be identical, and it really needs

McELROY - DIRECT                                    Vol. 4-222

1  to be, because what you tell a board is public.  You know,
2  people are basing decisions on that.  The board is basing
3  its -- discharging its fiduciary and other responsibilities.
4  And the rating agencies are representing what you've told them
5  to investors who are making decisions.
6          And so both of those are public and need to be stated
7  consistently.
8          MR. DUVA:  I'm going to approach with Exhibit 4.
9          THE COURT:  Yes, sir.
10 BY MR. DUVA:
11 Q.  Mr. McElroy, this is already in evidence.  It's been
12 talked about quite a bit.
13         Is this the PFM report from February 14th of 2018?
14 A.  Yes.  Yes, it is.
15 Q.  And we're going to build up to that.
16         But I want to go back to November of 2017 when
17 Mr. Petway, the outgoing board chair, made certain comments.
18 And, again, we don't need you to recount word for word what
19 those were.
20         But do you recall, at the end of that board meeting,
21 Mr. Petway making certain comments about how JEA customers
22 could be served potentially in the future in the private
23 marketplace?
24 A.  Yes.
25 Q.  And, again, the Court has seen that.

McELROY - DIRECT                                    Vol. 4-223

1        I want you take us through, at a high level, kind of
2   what that spawned in late 2017 and early 2018 which led to the
3   PFM report.
4   A.   Well, after that meeting when Mr. Petway made the public
5   statement at the JEA board meeting, I was called, along with
6   Mr. Howard, to a meeting in the mayor's office with
7   Mr. Weinstein and Mr. Mousa.
8   Q.   When you say Mr. Howard, are you talking about Alan
9   Howard?
10  A.   Alan Howard --
11  Q.   Okay.
12  A.   -- the chair --
13  Q.   And he was a board member at the time?
14  A.   Yes, and chair of the board at the time.
15  Q.   And then going forward he was a board member in 2018 as
16  the chair and into -- months into 2019.
17  A.   Yes.  That is correct.
18  Q.   All right.  Go to that meeting, sir.
19  A.   In that meeting the subject was what do we do with Tom
20  Petway's recommendation and how do we move it forward?
21        And it was discussed at that time and agreed to that
22  Mr. Weinstein and Ms. Dykes, as the chief financial officers of
23  both entities, the City and the JEA, would take lead on an
24  evaluation, and then a third party would be hired to look at
25  the value of JEA.

McELROY - DIRECT                                    Vol. 4-224

1   Q.   And kind of coinciding with that, was there a general
2   December 20, 2017, request for proposal that went out?
3   A.   Yes.
4   Q.   And talk about the circumstances of that and what you
5   understood that to be at the time.
6   A.   That proposal was -- the 20th, that is the proposal that
7   was issued by the City of Jacksonville, yes.
8        My understanding, it was for financial services to
9   evaluate the prospective ongoing asset evaluation, etc.  And
10  from the evening or two before, from the investment banking
11  community, we were communicated directly, in no uncertain
12  terms, by several investment banking firms that they were being
13  sourced to represent a sale of the JEA.
14        And we found that pretty confusing.  They -- they had
15  referenced at that time that there was an RFP out on the street
16  soliciting for their services to represent the JEA/the City in
17  the sale of JEA.
18        We were taken aback.  We were in a meeting with them
19  celebrating some work that they had all done for us earlier in
20  the month, and this sort of took our whole management team.
21        I called the City the next day.  We had surfaced a
22  copy of the proposal, the RFP, in fact.  And the first
23  conversation with Mr. Weinstein was that it -- he didn't know
24  what I was talking about when I said I was looking at the
25  document.

McELROY - DIRECT                                              Vol. 4-225

1     And he was, I believe he indicated, with Mr. Mousa

2  and possibly the mayor at time, that, oh, yes, he remembered

3  it, but it had nothing to do with the sale of JEA.

4  Q.   Ultimately -- we'll kind of skip forward in time to the

5  PFM report, which is February 14, 2018.  And I'm displaying on

6  the screen there -- or Ms. Stockholm is; I'm looking at it --

7  page 18 of the document.  And there's a table there that says,

8  "Potential JEA value ranges."

9         Talk about that in terms of the PFM report and

10 whether this was sort of widely circulated once the report came

11 out and the kind of process that ensued after the report was

12 issued.

13 A.   Well, this was widely circulated, certainly, within City

14 government and the JEA.  It was presented at a public meeting

15 of the workshop of the council and the JEA board.  So

16 management was there.  Citizens were there.

17 Q.   And that workshop, was that ultimately on March 20th of

18 2018?

19 A.   No.  Actually it was -- this was --

20 Q.   Was it February 14th?

21 A.   -- February the 14th.  That is correct.

22 Q.   Okay.

23 A.   So this was the 14th.

24 Q.   Sorry, sir.

25 A.   And then -- and then from that, you know, there certainly

McELROY - DIRECT                                              Vol. 4-226

1  were further discussions.  It became a big component because

2  JEA underwent internal evaluations in the past.  It used to be

3  on a five- to seven-year cycle.  And in partnership with the

4  council auditor, JEA staff and the council auditor would look

5  at the same methodologies and try to strike a value of -- of

6  the utility.

7         And the numbers were substantially lower than this in

8  each of the five- and ten-year prior evaluations that were done

9  by staff and the council auditor.  So this was -- this was eye

10 opening in terms of the amount of potential value that was

11 locked in JEA.

12 Q.   So these different accounting methods that are shown --

13 and we won't spend much more time on this --

14 A.   Yeah.

15 Q.   -- but there's a range from the lowest in the cash, to a

16 multiple -- to the highest in the rate-base multiple of gross

17 proceeds to the City of Jacksonville of 7.5 to $11 billion in

18 terms of a sale price.

19 A.   That is correct.

20 Q.   Okay.  Let's go to page 20 of the exhibit.

21 A.   (Complies.)

22 Q.   And on the bottom, the remaining cash and investment

23 section, there on the second line from the bottom, is there a

24 reference to "... net proceeds to the City could range from 2.9

25 billion to $6.4 billion"?

McELROY - DIRECT                                          Vol. 4-227

1   A.   Yes.

2   Q.   And, again, this is a public document.  It's presented at

3   the City Council and ultimately discussed later in a

4   privatization workshop with the JEA board in March of 2018.

5   A.   Yes.

6   Q.   Okay.  Let's --

7             MR. ALBRITTON:  I can appreciate you want to move

8   things along, but that was a very long question that sounded

9   like a narrative.

10            THE COURT:  I understand, but 1101 -- it's

11   1101(d)(3).  It's an evidentiary hearing, so I'll allow some

12   latitude so we can move along.

13            MR. DUVA:  I'll watch that.  I'm just trying to

14   transition to new topics and kind of bring it to --

15            THE COURT:  Right.

16            MR. DUVA:  -- current.

17   BY MR. DUVA:

18   Q.   What I was getting to, Mr. McElroy, is the March 20th of

19   2018 board meeting, the privatization workshop.

20   A.   Yes.

21   Q.   Now, Mr. Zahn had been a newly appointed and confirmed

22   board member a short time before that meeting; is that right?

23   A.   Yes.

24   Q.   Okay.  And what was the purpose of that meeting?

25            And just for your edification, the Court has watched

McELROY - DIRECT                                          Vol. 4-228

1   a good portion of that and your comments, so we don't need a

2   big wind-up, but generally want to -- generally, at a high

3   level, what was the purpose of that privatization workshop?

4   A.   Was to present to the workshop forum the PFM report, as

5   well as the -- the reports from management on the status of the

6   utility, both financial, operating, and marketwise.  So --

7   Q.   Prior to that meeting had you met Aaron Zahn?

8   A.   Yes, I had.

9   Q.   And how did that occur?

10   A.   We met on, I believe, roughly three occasions.  One was at

11   the urban land use.  He led a panel group, facilitated a panel

12   group, and I sat as a panelist.

13            I met him once for dinner when he was representing

14   his previous employer, and they had a solution -- there were

15   others there too.  He had a solution for -- that might be

16   appropriate for -- for JEA to consider.

17            And I -- I think a third time when he was a nominee

18   before he was confirmed by the City Council.

19   Q.   Once Mr. Zahn was nominated by Mayor Curry, confirmed by

20   the City Council, did you have any reaction to his appointment

21   as a board member?

22   A.   No, no, not as a board member.

23   Q.   And leading up to that privatization workshop -- and the

24   Court having watched it, just for your edification -- and your

25   experiencing the privatization workshop, what was your

McELROY - DIRECT                                    Vol. 4-229

1   assessment of Mr. Zahn sort of digging into the financial
2   background of JEA?
3   A.   Well, I thought it was aggressive, but it was certainly
4   based upon his aggressive behavior, seeking information prior
5   to his confirmation.
6   Q.   And this meeting, this March 20th, 2018, meeting, this was
7   Mr. Zahn's first --
8   A.   Yes.
9   Q.   -- board meeting?
10        I want to talk about the time period -- and the
11   Court's seen part of that, so we're not going to discuss, you
12   know, the back-and-forth there.  It's already been presented.
13        But I want to talk about the time between the March
14   20th, 2018, privatization workshop and ultimately when you
15   resigned as the CEO on April 6th, 2018.  That's about 16 or so
16   days.
17        Can you take us through what happened during that
18   period of time?
19   A.   Yes.  After the meeting on the 20th, I was asked by
20   Mr. Howard, who was then chairman of the JEA board, to meet
21   with him.
22        We had a very brief meeting.  He indicated in the
23   meeting that he had -- they had drawn straws.  He pulled the
24   short one, and it was his responsibility to tell me that he
25   would like me to resign immediately.

McELROY - DIRECT                                    Vol. 4-230

1   Q.   What was your reaction?
2   A.   I was surprised and a little bit shocked, after what we
3   had just gone through in terms of the state of the utility,
4   which by all measures, both internal and external, was in
5   extraordinary conditions, favorable conditions.
6        But I understood that they -- and I understood where
7   I was as CEO.  Every day in the position I'd wake up, "I need
8   four votes to stay in my job."  And so it was never a certain
9   thing.
10        And I served at the pleasure of the board as a public
11   servant on a daily basis, so it certainly was up to them.  But
12   I did indicate that we did have a contract, and I was not
13   really interested in resigning.
14        He then issued -- said something to the effect that,
15   "If you intend to serve out the remaining six months of your
16   contract," which ended September 30th, that, "things could be
17   very difficult for you."
18   Q.   Is that -- "he," are you talking about Mr. Alan Howard?
19   A.   Mr. Alan Howard.
20   Q.   Okay.  And you referenced in your answer there JEA being
21   in extraordinary condition.
22        Are you talking about financially?
23   A.   Financially, operationally, customer service, and
24   community.
25   Q.   In terms of financial extraordinary condition, what did

McELROY - DIRECT                                          Vol. 4-231

 1  you attribute that to?
 2  A.   Absolutely financial discipline; planning; the big issue,
 3  debt paydown; good operating margins; strong financial metrics,
 4  as evaluated by third-party rating agencies and others.
 5  Q.   And did you go to the board meeting on April 6, 2018, and
 6  resign?
 7  A.   Yes, I did.
 8  Q.   And ultimately the Court has seen the clip of that
 9  presentation that you made.
10          MR. DUVA:  Your Honor, it's 5:02.  I'm happy to keep
11  going.  Mr. McElroy's probably got about 30 more minutes of
12  direct.
13          But if the Court wants to stop, now is a good time.
14  I'm going to transition to a new topic.
15          THE COURT:  Mr. Suarez?
16          MR. SUAREZ:  We have some housekeeping matters to
17  bring up with the Court, and I'm mindful of the court
18  personnel.  So it may be -- I would concur that it might be a
19  good time to stop.
20          THE COURT:  Okay.  Very well.
21          MR. DUVA:  Mr. McElroy, you'll need to be back
22  tomorrow at 9 clock.
23          THE WITNESS:  9 o'clock, yes, sir.
24          MR. DUVA:  You can go, sir.
25          THE WITNESS:  Thank you.

Vol. 4-232

 1          MR. ALBRITTON:  Before Mr. McElroy leaves --
 2          THE COURT:  Yes.
 3          MR. ALBRITTON:  -- just because it's going to have
 4  some impact on his ...
 5          One of the housekeeping matters that we wanted to ask
 6  the Court was about the starting time tomorrow, as well as the
 7  ending time.  But the reason why is we've got to get out of our
 8  hotel in the morning, and -- I mean, we all do wake up early,
 9  so, you know, we're not going to wait till the last minute.
10          But it's a lot to do.  Lots of boxes, lots of things
11  we've got to kind of move into one place and then hurry over
12  here.  So that's a long-winded way of saying, Your Honor, we
13  were hoping we could start at 9:30 tomorrow.
14          And I don't want to push my luck, but I did speak
15  with Mr. Duva about this.  And because we're driving back to
16  Tampa, we want to ask --
17          THE COURT:  Of course.
18          MR. ALBRITTON:  -- if we --
19          THE COURT:  I can accommodate --
20          MR. ALBRITTON:  -- could end at 4:00.
21          THE COURT:  -- you on that.  Absolutely.
22          MR. ALBRITTON:  Yeah, so --
23          THE COURT:  9:30.
24          MR. DUVA:  So 9:30.
25          And I think what he's asking at the end of the day is

Vol. 4-233

```
1   to 4:00 tomorrow.  And I -- I live here, so whatever the Court
2   wants to do with that, I have no objection to it.  But I'm
3   happy to keep going after 4:00 as well.
4           THE COURT:  To end at 4:00?  That's what you're
5   asking?
6           MR. ALBRITTON:  Yeah.  Just, again, the only reason
7   why is because we're driving back.  And, you know, as lovely as
8   this city is, we don't want to stay in hotel rooms all weekend.
9           THE COURT:  Of course.  I'll certainly keep that in
10  mind.
11          MR. DUVA:  And I think we're plowing some ground
12  now --
13          THE COURT:  Yes.
14          MR. DUVA:  -- and we'll do that tomorrow.  So --
15          THE COURT:  You made some --
16          MR. DUVA:  -- I think we're kind of where we thought
17  we would be, so I don't have any issue with that.
18          THE COURT:  Absolutely.  Okay.
19          9:30 tomorrow.
20          THE WITNESS:  Can I --
21          THE COURT:  Yes.
22      (The witness left the courtroom.)
23          THE COURT:  Any other housekeeping matters?
24          MR. SUAREZ:  Yes, Your Honor.
25          MS. JEFFERSON:  Can I address the exhibits briefly?
```

Vol. 4-234

```
1           MR. SUAREZ:  Yes.
2           MS. JEFFERSON:  All right.  Raquel Jefferson.
3           So we have a number -- a few new exhibits that we've
4   added, and that -- we'll be amending the exhibit list.
5           We also received this, I don't know, two-,
6   two-and-a-half-inch stack of documents that was produced to us
7   today by the cross-counsel team for the Government that we're
8   going to need to get in a form that we can mark as exhibits, so
9   we're also going to need to do that.
10          But two of the --
11          THE COURT:  Is that *Garrity*-related information?
12          MS. JEFFERSON:  I believe that some of it will need
13  to be redacted and put under seal.
14          So I'm hopeful that we'll have it back to you, back
15  to the Court, tomorrow to be marked as an exhibit.
16          THE COURT:  Okay.
17          MS. JEFFERSON:  But yes, some of it is.  And some of
18  it --
19          THE COURT:  You're going to keep that separate,
20  right?
21          MS. JEFFERSON:  Yes, we will.
22          THE COURT:  Okay.
23          MS. JEFFERSON:  We've -- as we've been doing with the
24  other exhibits, we've been providing redacted versions and
25  unredacted versions.  And so the -- we will make sure that the
```

Vol. 4-235

```
 1   correct prosecution respective team gets the correct version,
 2   and the Court gets the correct version.
 3              THE COURT:  Excellent.  All right.
 4              Okay.  Court will be in -- oh, you've got something,
 5   Mr. Suarez?
 6              MR. SUAREZ:  Yes.  I think using the lectern might be
 7   easier, Your Honor.
 8              Judge, as you may recall, during one of --
 9   Mr. Felman's cross-examination of one of the witnesses, I think
10   he inadvertently quoted a headline from a newspaper article
11   that contained Garrity information that would be directly
12   relevant to Mr. Zahn.
13              It was an unfortunate error.  We didn't do it.  It
14   was nobody's fault, but we just want to make sure that the
15   Court -- that we continue to assert -- our fear would be that
16   our failure to assert on the record would be deemed as a waiver
17   somehow.
18              And we did not obviously engage in a free and
19   deliberate choice.  We didn't do it knowingly and intelligently
20   with full awareness of the rights being abandoned, so we want
21   to make it clear to the Court.
22              We're going to explore this issue a little bit more
23   this evening.  We may come back with a motion to have that
24   portion of the transcript be sealed, if that is necessary to
25   protect it.
```

Vol. 4-236

```
 1              But at this point all I want to do is just make sure
 2   the Court is aware of that.
 3              THE COURT:  Noted, Counsel.
 4              MR. FELMAN:  So, Your Honor, I have to disagree with
 5   Mr. Suarez.  It wasn't no one's fault.  It was my fault, and I
 6   made a mistake, and I apologize and --
 7              MR. DUVA:  I was just about to point that out.
 8              MR. FELMAN:  I knew you were, Mr. Duva.  That's why I
 9   started saying it for you.
10              But I don't have the right to waive his client's
11   rights.  But I can only represent to the Court it was a
12   mistake.  I did not mean to do that, and I apologize to the
13   Court and to the Zahn team and to the Government.
14              But I did it.  It was my fault, and I made a mistake,
15   and so --
16              THE COURT:  Mr. Suarez was just being diplomatic
17   and --
18              MR. DUVA:  I'm joking, Your Honor.  We have no -- we
19   have no intention to claim waiver, and we have no opposition to
20   that reference being sealed.
21              THE COURT:  Okay.  Excellent.
22              MR. FELMAN:  Thank you.
23              THE COURT:  All right.  See you in the morning.
24              COURT SECURITY OFFICER:  All rise.
25              (The proceedings were adjourned at 5:08 p.m., to be
```

Vol. 4-237

```
 1   continued on May 19, 2023.)

 2                              -  -  -

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Vol. 4-238

```
 1            CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   MIDDLE DISTRICT OF FLORIDA   )

 6

 7        I hereby certify that the foregoing transcript is a

 8   true and correct computer-aided transcription of my stenotype

 9   notes taken at the time and place indicated therein.

10

11        DATED this 21st day of May, 2023.

12

13                            s/Shelli Kozachenko_____
                              Shelli Kozachenko, RPR, CRR, CRC
14                            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```