## No. 24-12617-AA

In the

# United States Court of Appeals
# for the Eleventh Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

AARON ZAHN,
*Defendant-Appellant*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:22-CR-23-BJD-MCR-1

---

## REDACTED BRIEF OF THE UNITED STATES

---

GREGORY W. KEHOE
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

EMILY C. L. CHANG
Assistant United States Attorney
Appellate Division
USA No. 166
400 W. Washington St., Ste. 3100
Orlando, FL 32801
(407) 648-7500

August 14, 2025

*United States v. Aaron Zahn*
No. 24-12617AA

## Certificate of Interested Persons and Corporate Disclosure Statement

In addition to the persons identified in the Certificate of Interested

Persons and Corporate Disclosure Statement in Aaron Zahn's principal brief,

the following persons and entities have an interest in the outcome of this case:

1. Altman, Jennifer G., Esq.;

2. Barksdale, Hon. Patricia D., United States Magistrate Judge (recused);

3. Birk, Edward L., Esq.;

4. Citro, Vincent, Esq.;

5. Cox Media Group Jacksonville, owner of WJAX-TV;

6. First Coast News, owned by Tegna, Inc. (ticker symbol: TGNA);

7. Florida Times-Union, owned by Gannett Co., Inc. (ticker symbol: GCI);

8. Fugate, Rachel E., Esq.;

9. Galeno, Maria T., Esq.;

10. Graham Media Group, Florida, Inc. (ticker symbol: GHC);

11. Handberg, Roger B., former United States Attorney;

12. Howard, Hon. Marcia Morales, United States District Judge (recused);

13. Kehoe, Gregory W., United States Attorney;

*United States v. Aaron Zahn*
No. 24-12617AA

14.    Lambert, Hon. Laura Lothman, United States Magistrate Judge (recused);

15.    Mansfield, Jennifer A., Esq.;

16.    Minchin, Minch, Esq.;

17.    Pope, Marcia L., Esq.;

18.    Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division;

19.    Sweeney, Sara C., former Acting United States Attorney;

20.    Toomey, Hon. Joel B., United States Magistrate Judge; and

21.    Van Son, John R., Esq.

## Statement Regarding Oral Argument

Although the United States believes that the issues are adequately addressed in the briefs, it agrees that oral argument might be of assistance to the Court.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement ........ C-1

Statement Regarding Oral Argument .............................................................. i

Table of Contents .......................................................................................... ii

Table of Citations ...................................................................................... vii

Statement of Jurisdiction ........................................................................... xiii

Statement of the Issues ................................................................................. 1

Statement of the Case .................................................................................... 1

    *Course of Proceedings* ............................................................................ 2

    A.   Motion to dismiss for failure to state an offense ........................... 2

    B.   Motion to dismiss based on *Kastigar* violation ............................. 3

    C.   Motions for judgment of acquittal ................................................ 4

    D.   Sentence ....................................................................................... 5

    *Statement of the Facts* ............................................................................ 5

    I.   Background on privatization efforts at JEA ................................. 5

    II.   May 2018–May 2019: Zahn leads the charge on strategic planning and creation of the PUP ............................................... 6

      A.   Strategic planning and presentation of Scenario One ............... 6

      B.   The PUP ................................................................................. 7

    III.   June to July 22, 2019 ................................................................ 10

A.   Zahn uses co-opted WTW materials for PUP presentation to the Compensation Committee ............................................ 10

B.   June 2019 Board meeting ...................................................... 13

   (1)   *The PUP* ....................................................................... 13

   (2)   *Scenario Two: Zahn convinces the Board that disaster is imminent* .................................................................. 13

C.   Preparations for July 2019 Board meeting ............................ 15

   (1)   *Minimum ITN requirements* ...................................... 15

   (2)   *Concerns among executives about exorbitant PUP payouts if JEA were sold* .................................................. 15

   (3)   *Zahn misinterprets the PUP's cost* ............................ 16

   (4)   *Pressing for legal backing* ......................................... 17

IV.   July Board meeting .................................................................. 18

A.   Presentation of Scenario Two ............................................... 18

B.   Presentation of Scenario Three ............................................. 19

C.   Presentation of the PUP ........................................................ 20

D.   Livestreaming ....................................................................... 24

V.   Fall 2019 ................................................................................. 24

A.   Legal Review of the PUP ....................................................... 24

B.   Allocation of PUP units ......................................................... 25

C.   Question about the PUP's value ............................................ 26

D.   JEA moves forward with the ITN .......................................... 27

VI.    End of the PUP and ITN................................................27

VII.   JEA's financial position ...........................................28

    A.    April 2018–mid-2019.........................................29

    B.    Fall 2019 ..................................................30

VIII.  Other relevant background ..........................................32

    A.    City's ownership of JEA .....................................32

    B.    Federal funding from FEMA ..................................33

IX.    *Kastigar* inquiry .................................................34

X.     Jury instructions ..................................................40

*Standards of Review*....................................................42

Summary of the Argument .................................................43

Argument and Citations of Authority......................................48

I.     Sufficient fraud and property evidence supported Zahn's
      convictions under 18 U.S.C. §§ 666 and 1343 ...........................48

    A.    The object of Zahn's scheme was to obtain money—
        which is property. (Zahn's Issue I.A)...................................49

      (1)    *Sections 666 and 1343 reach schemes to cheat the City of its
           right to receive the full proceeds from a sale of its assets* ...............49

      (2)    *Zahn conspired and schemed to fraudulently obtain hundreds
           of millions of dollars in proceeds from the City's sale of JEA* .........52

        (a)    *Zahn schemed to obtain money—a traditional property
              interest*..................................................................52

        (b)    *The money Zahn schemed to obtain was "*property *in the
              City's hands."*............................................................56

B.   Zahn sought to obtain that money "by means of" material misrepresentations and omissions (Zahn's Issue I.B.) ............ 59

C.   Zahn acted with intent to defraud. (Zahn's Issue I.C) ............ 63

II.   The evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Zahn "caused" wires to be transmitted "for the purpose of" executing his fraudulent scheme. (Zahn's Issue II) ......................................................... 67

A.   Zahn caused the wire transmission of his fraudulent misrepresentations ................................................................. 67

B.   Those wires were transmitted "for the purpose of executing" Zahn's scheme .................................................... 69

III.   Sufficient evidence established that the City received federal funds that were "benefits" under section 666 and that Zahn was the City's "agent." (Zahn's Issue III.A–C) ......................... 72

A.   In 2019, the City (through JEA) received millions in FEMA assistance ................................................................. 73

B.   The City and JEA received "benefits" under section 666 ........ 77

C.   Zahn was the City's agent ..................................................... 81

IV.   The district court did not constructively amend the indictment, which, fairly read as a whole, alleges that Zahn was the City's agent. (Zahn's Issue III.D) ................................. 83

V.   Zahn hasn't established that the district court abused its discretion in refusing to give his requested jury instructions. (Zahn's Issue I.D) ...................................................................... 85

A.   The court's instructions adequately covered the law concerning "property" and did not substantially impair his ability to present his defense .................................................. 85

B.   Zahn's proposed causation instruction was incorrect. ............. 88

VI.    The district court did not err in denying Zahn's motion to dismiss the indictment on Kastigar grounds. (Zahn's Issue IV) .......................................................................... 88

A.    *Kastigar* requires the United States to prove that all its grand-jury evidence is untainted by compelled testimony, but constitutional-harmlessness analysis applies ..................... 89

B.    The district court correctly determined that constitutional-harmlessness analysis applies because the United States failed to show that all the grand-jury evidence was untainted .............................................................. 91

C.    The district court correctly sustained the indictment because any *Kastigar* violation was harmless beyond a reasonable doubt. ................................................ 93

(1)    *United States proved legitimate, independent sources for much of the grand-jury evidence.* ...................................... 93

(2)    *The court did not shift the burden of proof to Zahn* ...................... 96

(3)    *In evaluating constitutional harmlessness, the court properly assumed that any grand-jury evidence not presented at the* Kastigar *hearing was tainted.* ................................. 98

(4)    *Any* Kastigar *error was harmless beyond a reasonable doubt* ..... 100

Conclusion ............................................................. 103

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

# Table of Citations

## Cases

*Molinos Valle Del Cibao, C. por A. v. Lama*,
  633 F.3d 1330 (11th Cir. 2011)...............................................................74

*Barineau v. Barineau,*
  662 So. 2d 1008 (Fla. 1st DCA 1995)........................................................75

*Bonner v. Holt*,
  26 F.3d 1081 (11th Cir. 1994)................................................................43

*Bridge v. Phoenix Bond. & Indem. Co.*,
  553 U.S. 639 (2008).........................................................................62

*Chapman v. California*,
  386 U.S. 18 (1967)..............................................................91, 100, 102

*Ciminelli v. United States*,
  598 U.S. 306 (2023)....................................................................49, 56

*Cleveland v. United States*,
  531 U.S. 12 (2000)....................................................... 50–51, 56–57, 86

*Davis v. Ayala*,
  576 U.S. 257 (2015)....................................................................98–99

*District of Columbia v. Wesby*,
  583 U.S. 48 (2018)........................................................................101

*Fernandez v. United States*,
  114 F.4th 1170 (11th Cir. 2024)...............................................................92

*Fischer v. United States*,
  529 U.S. 667 (2000).....................................................................78–80

*Garrity v. New Jersey*,
  385 U.S. 493 (1967).......................................................................3, 89

*Kastigar v. United States*,
  406 U.S. 441 (1972)...................................................................3, 89–90

*Kelly v. United States,*
590 U.S. 391 (2020) ............................................................. 49, 56

*\*Kousisis v. United States,*
145 S. Ct. 1382 (2025) .................................................. 63–64, 66

*\*Loughrin v. United States,*
573 U.S. 351 (2014) ..................................................46, 59–62, 88

*Neder v. United States,*
527 U.S. 1 (1999) ..................................................................... 59

*Paez v. Mulvey,*
915 F.3d 1276 (11th Cir. 2019) ....................................... 101–102

*Parr v. United States,*
363 U.S. 370 (1960) .......................................................... 71–72

*\*Pasquantino v. United States,*
544 U.S. 349 (2005) ...............................................49–50, 52, 86

*Pereira v. United States,*
347 U.S. 1 (1954) ..................................................................... 68

*Schmuck v. United States,*
489 U.S. 705 (1989) ........................................................... 69, 72

*Sekhar v. United States,*
570 U.S. 729 (2013) .................................................................. 50

*Smith v. Singletary,*
61 F.3d 815 (11th Cir. 1995) .................................................... 43

*United States v. Bell,*
112 F.4th 1318 (11th Cir. 2024) ................................... 42–43, 64

*United States v. Berroa,*
856 F.3d 141 (1st Cir. 2017) .................................................... 62

*United States v. Booker,*
136 F.4th 1005 (11th Cir. 2025) ............................................... 99

*United States v. Bradley*,
    644 F.3d 1213 (11th Cir. 2011) .................................................... 61, 65, 88

*United States v. Briston,*
    192 F. App'x 84 (3d Cir. 2006) ................................................................ 80

*United States v. Broughton*,
    689 F.3d 1260 (11th Cir. 2012) ................................................................ 42

*United States v. Byrd*,
    765 F.2d 1524 (11th Cir. 1985) .................................................. 90, 92, 102

*United States v. Caporale*,
    806 F.2d 1487 (11th Cir. 1986) ................................................................ 35

*United States v. Carrasco*,
    381 F.3d 1237 (11th Cir. 2004) ................................................................ 43

*United States v. Dooley*,
    578 F.3d 582 (7th Cir. 2009) ............................................................. 68–69

*United States v. Doran*,
    854 F.3d 1312 (11th Cir. 2017) ..................................................... 74–75, 83

*United States v. Esformes*,
    60 F.4th 621(11th Cir.), *cert. denied*, 144 S. Ct. 485 (2023) ........................ 97

*United States v. Evans*,
    473 F.3d 1115 (11th Cir. 2006) ................................................................ 72

*United States v. Fischer*,
    168 F.3d 1273 (11th Cir. 1999) ................................................................ 78

*United States v. Gillis*,
    938 F.3d 1181 (11th Cir. 2019) ................................................................ 92

*United States v. Gregory*,
    730 F.2d 692 (11th Cir. 1984) ............................................................ 90–92

*United States v. Griffin*,
    76 F.4th 724 (7th Cir. 2023) .................................................................... 49

*United States v. Griffin,*
    324 F.3d 330 (5th Cir. 2003) ...............................................................51–52

*United States v. Hampton,*
    775 F.2d 1479 (11th Cir. 1985) ........................................................90, 92

*United States v. Harding,*
    104 F.4th 1291 (11th Cir. 2024) ............................................................ 85

*United States v. Hasson,*
    333 F.3d 1264 (11th Cir. 2003) ............................................................. 69

*United States v. Helmsley,*
    941 F.2d 71 (2d Cir. 1991) .................................................................... 58

*United States v. Hird,*
    913 F.3d 332 (3d Cir. 2019) .................................................................. 58

*United States v. Hoffman,*
    901 F.3d 523 (5th Cir. 2018) ................................................................ 50

*United States v. Horner,*
    853 F.3d 1201 (11th Cir. 2017) ............................................................. 87

*United States v. Iriele,*
    977 F.3d 1155 (11th Cir. 2020) ............................................................. 57

*United States v. Johnson,*
    713 F.2d 633 (11th Cir. 1983) .........................................................84–85

*United States v. Kwiat,*
    817 F.2d 440 (7th Cir. 1987) ................................................................ 72

*United States v. Langston,*
    590 F.3d 1226 (11th Cir. 2009) ................................................ 81–82, 84

*United States v. Macrina,*
    109 F.4th 1341 (11th Cir. 2024) ......................................................85, 87

*United States v. Maxwell,*
    579 F.3d 1282 (11th Cir. 2009) ............................................................. 58

*United States v. McLean*,
    802 F.3d 1228 (11th Cir. 2015) ..................................................... 76–77, 80

*United States v. Phillips*,
    4 F.4th 1171 (11th Cir. 2021) .......................................................... 43, 83–84

*United States v. Sanders*,
    668 F.3d 1298 (11th Cir. 2012) ................................................................. 84

*United States v. Schmidgall*,
    25 F.3d 1523 (11th Cir. 1994) ....................................................... 89–91, 95

*United States v. Schmidgall*,
    25 F.3d 1533 (11th Cir. 1994) ...................................................... 90, 92, 98

*United States v. Schmitz*,
    634 F.3d 1247 (11th Cir. 2011) ................................................................. 67

*United States v. Seiffert*,
    501 F.2d 974 (5th Cir. 1974) .................................................................... 90

*United States v. Singer*,
    963 F.3d 1144 (11th Cir. 2020) ................................................................. 87

*United States v. Sullivan*,
    118 F.4th 170 (2d Cir. 2024) .................................................................... 79

*United States v. Takhalov*,
    827 F.3d 1307 (11th Cir. 2016) ................................................................. 63

*United States v. Ward*,
    486 F.3d 1212 (11th Cir. 2007) ................................................................. 68

*United States v. Wheeler*,
    16 F.4th 805 (11th Cir. 2021) .................................................................... 64

*United States v. Williams*,
    507 F.3d 905 (5th Cir. 2007) .................................................................... 67

**Statutes**

18 U.S.C. § 371 ......................................................................................... 2

18 U.S.C. § 666........................................ 1–2, 48–49, 51–52, 59, 72–77, 80–81

18 U.S.C. § 666(a)(1) ................................................................. 81

18 U.S.C. § 666(b)................................................................78–79

18 U.S.C. § 666(c) ..................................................................... 67

18 U.S.C. § 1341 ........................................................................ 50

18 U.S.C. § 1343 ....................................................2, 48–52, 59, 64, 87

18 U.S.C. § 1344(2) ................................................................... 59

18 U.S.C. § 3231 ......................................................................xiii

28 U.S.C. § 1291 ......................................................................xiii

42 U.S.C. § 5121–5207 ............................................................. 80

**Rules**

Fed. R. App. P. 4(b) ..................................................................xiii

**Regulations**

44 CFR § 206.202 ..................................................................... 80

44 CFR § 206.223 ..................................................................... 80

44 CFR § 206.3 .......................................................................... 80

**Other Authorities**

*Fiduciary*, Black's Law Dictionary (12th ed. 2024) ....................................... 84

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Middle District of Florida in a criminal case. That court had jurisdiction. *See* 18 U.S.C. § 3231. The court entered judgment against Aaron Zahn on August 1, 2024, Doc. 542, and he timely filed a notice of appeal 12 days later, Doc. 548. *See* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

## Statement of the Issues

I.    Did the United States present sufficient evidence that Zahn

(1) schemed to obtain "property" (2) "by means of" misrepresentations (3) as

part of a scheme to "defraud"? (Zahn's Issues I.A–C)

II.    Did the United States present sufficient evidence that Zahn

"caused" wires to be transmitted "for the purpose of" executing his fraudulent

scheme? (Zahn's Issue II)

III.    Did the United States present sufficient evidence that the City met

the jurisdictional requirements of section 666? (Zahn's Issue III.A–C)

IV.    Did the district court's jury instructions constructively amend the

indictment? (Zahn's Issue III.D)

V.    Did the district court abuse its discretion in declining to give

Zahn's proposed jury instructions where the court's instructions adequately

covered the law on property and causation and did not substantially impair

Zahn's ability to present his defense? (Zahn's Issue I.D)

VI.    Did the district court correctly sustain the indictment because any

*Kastigar* violation was constitutionally harmless? (Zahn's Issue IV)

## Statement of the Case

JEA, a public water and electric utility, is an agency of the City of

Jacksonville. Aaron Zahn was JEA's CEO. He and Ryan Wannemacher,

1

JEA's CFO, told the Board that JEA was running headlong into a financial crisis. They also proposed to the Board a long-term incentive plan (the "performance unit plan" or "PUP"), which they billed as a compensation tool with a modest annual cost of about $3.4 million. Those were lies. Zahn and Wannemacher used those lies to convince the Board to explore a sale of JEA and approve the PUP. Upon a sale of JEA, the PUP would trigger the payment of hundreds of millions of dollars—money that belonged to the City, JEA's owner—to Zahn, Wannemacher, and other JEA employees.

A jury convicted Zahn of wire fraud and conspiracy to steal municipal funds. This is his appeal.

## Course of Proceedings

### A. Motion to dismiss for failure to state an offense

A grand jury indicted Zahn and Wannemacher for conspiracy to steal municipal property and commit wire fraud, in violation of 18 U.S.C. §§ 371, 666, 1343 (Count One); and wire fraud, in violation of 18 U.S.C. § 1343 (Count Two). Doc. 1. According to the indictment, Zahn and Wannemacher fraudulently presented a bleak picture of JEA's future performance to convince the JEA Board to explore a sale and save JEA from a certain demise that would adversely affect the City, millions of customers, and hundreds of employees. *Id.* ¶¶ 19(h)–(k), 20(f). Zahn and Wannemacher also fraudulently

convinced the Board to approve a long-term incentive program, hiding its true intent (to enrich senior executives) and cost when implemented in conjunction with a sale of JEA (hundreds of millions of dollars that would otherwise go to the City). *Id*. ¶ 19(b), (c), (e)–(g), (n)–(p).

Before trial, Zahn and Wannemacher moved to dismiss the indictment, arguing that it didn't allege that they had conspired to defraud JEA of any money or property "in the hands" of a victim, or that their scheme would "*naturally cause* probable property loss." Doc. 93 at 3–4. The court denied the motion. Doc. 373.

## B.    Motion to dismiss based on *Kastigar* violation

Zahn and Wannemacher also moved for a hearing under *Kastigar v. United States*, 406 U.S. 441 (1972), to determine whether the United States had used in grand jury any compelled testimony that they had given under protection of *Garrity v. New Jersey*, 385 U.S. 493 (1967). Docs. 111–12. The court granted that motion. Doc. 164. After an eight-day *Kastigar* hearing, the district court concluded that, "even assuming that some of the evidence presented to the Grand Jury was tainted," the United States had "shown an independent basis for the factual allegations in the Indictment" and the untainted evidence was "sufficient to sustain the Indictment." Doc. 310 at 102; Doc. 361. Accordingly, any use of tainted evidence was constitutionally

harmless. *Id.*; Doc. 310 at 102. The facts of the *Kastigar* inquiry are addressed

in more detail below.

## C.    Motions for judgment of acquittal

Zahn and Wannemacher were tried by separate juries during a 17-day

trial. Doc. 504 at 8; Doc. 487. After the United States rested, Zahn moved for a

Rule 29 judgment of acquittal, arguing that the United States had failed to

prove:

- the jurisdictional requirements of section 666 (i.e., that Zahn was the City's agent, the City received FEMA funds, and the FEMA funds were federal benefits) (Doc. 523 at 149–51, 155);

- that Zahn "caused" wires, or that the wires "helped carry out" the scheme (*id.* at 152–55, 162–65); and

- that Zahn had schemed to obtain something that was "property" in the City's hands (*id.* at 155–62).

The court reserved decision on the motion. *Id.* at 175. Zahn renewed his

motion after the close of his own case and the United States' rebuttal. Doc. 524

at 193–95. The court denied the motion. *Id.* at 197. Zahn's jury convicted him

of conspiracy to steal municipal property and wire fraud. Doc. 488.

(Wannemacher's jury acquitted. Doc. 489.)

After trial, Zahn moved for a judgment of acquittal or a new trial,

reiterating his Rule 29 arguments. Doc. 497. The court denied that motion.

Doc. 540.

**D.    Sentence**

Given his offense level (29) and criminal-history category (I), Zahn's guidelines range was 87 to 108 months' imprisonment. Doc. 558 at 121. The court sentenced him to 48 months' imprisonment. *Id.* at 129.

This appeal followed. Doc. 548.

*Statement of the Facts*

**I.    Background on privatization efforts at JEA**

In November 2017, JEA's outgoing Board Chair sparked a political firestorm by suggesting that the City should consider selling JEA. GX 1 at 2:00–3:40; Doc. 504 at 174, 181, 186.[1] JEA's financial advisor, PFM, appraised JEA's value and reported to City Council in February 2018 that JEA's value—that is, the price a buyer might pay for JEA's assets—ranged from $7.5 billion to $11 billion. Doc. 476-4 at 4, 18; Doc. 504 at 179–85. The PFM report also estimated that net proceeds to the City could range from $2.9 billion to $6.4 billion. Doc. 476-4 at 20; Doc. 504 at 185.

Two weeks after the PFM report was issued, Zahn was appointed to serve on the JEA Board. Doc. 504 at 187; Doc. 476-5. No one claimed that

---

[1] "GX" denotes Government trial exhibits, and "ZX" denotes Zahn's trial exhibits.

JEA was in financial trouble at that time. Doc. 513 at 207. To the contrary, JEA's then-CEO said JEA was "extraordinarily healthy," and JEA's treasurer agreed that JEA was financially sound. Doc. 505 at 8; Doc. 515 at 186–87.

In April 2018, Zahn was appointed JEA's interim CEO and resigned from the Board. Doc. 505 at 10. He became the permanent CEO in November 2018. Doc. 513 at 78.

## II. May 2018–May 2019: Zahn leads the charge on strategic planning and creation of the PUP

### A. Strategic planning and presentation of Scenario One

In May 2018, the Board instructed JEA to stop privatization-related strategic planning. Doc. 505 at 176–77; Doc. 512 at 170. Yet in late 2018, under Zahn's leadership, JEA engaged McKinsey, a consulting firm, to help with strategic planning by educating JEA on the "status-quo scenario" (i.e., what would happen if JEA failed to address industry trends). Doc. 512 at 167–70, 176. A few months later, JEA asked McKinsey to define another scenario (the "traditional utility response," or Scenario Two) to show how far JEA could cut costs to maximize profitability and address gaps in the status-quo scenario (Scenario One). *Id.* at 186; Doc. 514 at 152–53, 276.

Through Spring 2019, McKinsey worked with JEA's executive team to create Scenario One, which Zahn, CFO Wannemacher, and Chief Operating

Officer Melissa Dykes presented at the May 2019 Board meeting. Doc. 505 at 199, 205. Zahn explained that Scenario One was "a viable scenario for JEA looking forward to 2030." GX 19.2. Zahn's presentation painted a scary picture: it showed that by 2030, rising energy costs and lower sales would lead to a $2.3-billion cash gap that JEA could resolve with a 52% base-rate increase, or a 40% rate increase and "no city contribution past 2023." Doc. 476-76 at 25. The presentation urged the Board to "imagine the impacts," and an accompanying graphic showed that JEA's value—measured by its effect on customers, the community, and environment, and its financial health—would go down. *Id*. at 31. Zahn assured the Board that the executive team was "committed to making sure that the status quo doesn't become a reality." GX 29, clip 9 at 2:15–2:23.

## B.    The PUP

Meanwhile, in January 2019, JEA engaged David Wathen of Willis Towers Watson (WTW), an expert on long-term incentive plans in the utility industry, to conduct a compensation analysis and design a long-term incentive plan. Doc. 511 at 60–62, 114. That month, during a presentation to the Board's Compensation Committee, Zahn said that JEA aspired to compensate its employees at a level commensurate with the market median. Doc. 505 at 194–95; Doc. 476-71 at 13. He discussed establishing a compensation policy that

7

would add a long-term incentive based on financial value and profitability. *Id.* at 17. Zahn's vision for a long-term incentive ultimately became the "performance unit plan" or "PUP," which gave employees the opportunity to buy for $10 "performance units," the value of which would increase as JEA increased in value. Doc. 511 at 119–20; Doc. 520 at 22.

On March 18, 2019—just one day before Zahn and Wannemacher were to meet with WTW—"Ryan" (Wannemacher) authored two spreadsheets, each titled "Performance Unit Scratch Sheet." Doc. 511 at 27–31; Docs. 476-20, 476-23. They both showed the supposed effect of JEA's book value on the value of PUP units, but one spreadsheet (Doc. 476-23) showed JEA's book value increasing by only $400 million across three years, while the other spreadsheet (Doc. 476-20) showed a $4 billion increase from 2017 to 2018. Only recapitalization of JEA could cause such an increase. Doc. 511 at 202; Doc. 515 at 109.

The next day, Zahn and Wannemacher met with Wathen and others to discuss a long-term incentive plan for JEA. Doc. 511 at 62–63. Wathen advised that long-term incentive plans are uncommon among public power utilities because city leaders and ratepayers often scrutinize such plans, and market-based measures (such as a stock price) are unavailable. Doc. 476-57 at 5; Doc. 511 at 64–65, 116–17.

8

Still, WTW designed a draft framework for a possible long-term incentive plan. Doc. 476-57 at 24; Doc. 511 at 65. Zahn asked Wathen to tailor the plan to tie PUP units to JEA's value. Doc. 476-68 at 1; Doc. 511 at 119. Wathen had never seen such a plan at a public utility. *Id.* at 120. Wannemacher sent Wathen only the version of the "Performance Unit Scratch Sheet" that reflected $400-million increases (Doc. 476-23) to illustrate a potential book-value calculation over three years. Doc. 476-59; Doc. 505 at 201–02; Doc. 511 at 124. And in discussing that model with Wathen, Wannemacher didn't mention how a sale of JEA could affect those calculations (as reflected in the other spreadsheet "Ryan" had created the week before). *Id.* at 127.

In fact, at trial, five of JEA's Board members, JEA's treasurer, a JEA compensation specialist, and representatives from the City's Office of General Counsel (OGC), the Council Auditor's Office, and WTW, testified that, during the relevant period, they never saw the "Performance Unit Scratch Sheet" that showed the $4 billion increase (i.e., GX 20A-1 at Doc. 476-20); Doc. 511 at 83, 141, 203; Doc. 512 at 87, 231, 269; Doc. 513 at 88, 222; Doc. 515 at 234; Doc. 517 at 197.

In May 2019, Zahn told outside counsel that Zahn had the mayor's support to receive up to $40 million in connection with a successful

9

recapitalization of JEA. Doc. 518 at 201–02. Zahn also said the mayor supported payments of up to $10 million for other members of the executive team. *Id.* at 202.

### III.   June to July 22, 2019

### A.   Zahn uses co-opted WTW materials for PUP presentation to the Compensation Committee

On June 18, 2019, Zahn and Herschel Vinyard, JEA's Chief Administrative Officer, presented their long-term incentive proposal to the Board's Compensation Committee. Doc. 476-25 at 13; Doc. 523 at 22. Weeks earlier, Wathen had submitted to JEA draft presentation materials, anticipating his future participation in this Compensation Committee meeting. Doc. 511 at 72, 77–78, 129–32. But, in reply, Zahn merely asked for the presentation in its original file format (which is editable), rather than in PDF (which is not). *Id.* at 76; Doc. 476-62.

Come June, Zahn and Vinyard's presentation to the Compensation Committee included a duplicate of a WTW slide that Wathen had sent to JEA. *Compare* Doc. 476-63 at 29 *with* Doc. 476-25 at 11. That slide introduced the long-term incentive vehicle as a "performance unit" whose value was tied to JEA's net book value, with three-year performance cycles. *Id.*; Doc. 505 at 220–21. And it said that PUP payments across all employees would total *about*

10

*$3.4 million*. Doc. 476-25 at 11.

Zahn and Vinyard also presented the appendix (Doc. 476-26). Doc. 505 at 220. Every page bore WTW's logo, and it said that WTW had "prepared for JEA" that appendix for the June 18, 2019, Compensation Committee meeting. Doc. 476-26. But the cover slides were different; it was no longer a "discussion draft" or "discussion document," as shown below:



Doc. 476-63 at 1–2 (discussion draft WTW sent to JEA on May 9, 2019).



Doc. 476-26 at 1 (which Zahn presented to Compensation Committee as appendix on June 18, 2019). Like the main presentation, the appendix said that the PUP payments would cost about $3.4 million. *Id.* at 21.

Nothing in the Compensation Committee's materials tied the PUP to a sale of JEA or indicated how much the PUP units would be worth if JEA were sold. *See* Doc. 513 at 190–91; Docs. 476-25, 476-26. The Compensation Committee approved development of a long-term incentive plan. Doc. 523 at 25.

Wathen testified that a possible sale had never been discussed with him, and that he wouldn't have recommended a three-year plan had he known that JEA was considering a sale soon. Doc. 511 at 140, 171. He also confirmed that

JEA's use of WTW materials had not been authorized and that the presentation did not reflect WTW's final plan design. *Id*. at 133–38. Wathen learned about this unauthorized use of WTW's materials only in late 2019, after the media ran stories inaccurately stating that WTW had designed the PUP. *Id*. at 133, 135–39.

**B.    June 2019 Board meeting**

*(1)    The PUP*

At the June 2019 Board meeting, the Board authorized JEA management to provide a framework for an incentive program (including the PUP) for Board approval. Doc. 506 at 10.

*(2)    Scenario Two: Zahn convinces the Board that disaster is imminent*

Before Scenario Two was presented to the Board, an OGC attorney read aloud a disclaimer that the financial projections therein were "not a projection of future financial performance" and "[did] not reflect numerous likely future events and future JEA actions that will likely cause actual results to differ materially from this business case." GX 20F-3 at 49:45–50:25. But Zahn promptly explained that JEA included that disclaimer simply to comply with the SEC's regulations and it was "nothing more than us complying with the law." *Id*. at 50:25–50:50.

At Zahn's behest, Dykes then presented Scenario Two, which showed

13

the drastic measures deemed necessary for JEA to manage a $3.2 billion cash gap and $1.2 billion in debt due by 2030 while operating within the Florida Constitution's and City Charter's constraints. Doc. 476-28 at 22; Doc. 514 at 155–56. According to Scenario Two, JEA would have to lay off 29% of its workforce, raise rates by 26%, cancel capital expenditures, and implement other cost-saving efforts that would reduce service quality and reliability. Doc. 476-28 at 22. Dykes told the Board that this was "our best guess" and "best projection" of where JEA was "headed over the next 10 years," ZX 30.03 at 2:20–2:30, and that Scenario Two would "prepare[] JEA for organized decline," Doc. 476-28 at 30.

Zahn then previewed the concept of a "nontraditional utility response," or Scenario Three, where JEA would invest in employees, "innovate[e] to win," and "focus[] on growth" of JEA. GX 20F-3, clip 3.

Most Board members were shocked by the notion of Scenario Two's imminent and dire consequences for the City, community, and JEA employees, and they pressed for an urgent response because Scenario Two was "not acceptable." Doc. 514 at 9; GX 20F-3, clip 4. The Board directed JEA to return with (a) a plan to implement Scenario Two; (b) strategies to consider alternative ownership of JEA; and (c) strategies to remove some of JEA's constraints. GX 20F-3, clip 5; Doc. 506 at 9, 117–18; Doc. 514 at 158.

14

**C.    Preparations for July 2019 Board meeting**

*(1)    Minimum ITN requirements*

After the June Board meeting, JEA engaged banks, law firms, and other entities to assist with the Invitation to Negotiate (ITN) that Florida law required for a sale of JEA. Doc. 506 at 76; Doc. 518 at 74. JEA's management team also established the following minimum requirements for any change to JEA's structure under Scenario Three:

- at least $3 billion to the City of Jacksonville;
- at least $400 million in payments to JEA customers;
- three years of guaranteed employee compensation for all employees; and
- retention payments (100% of current base salary) for all full-time employees.

Doc. 476-39 at 10. Because of those requirements, a sale of JEA to an investor-owned utility (as opposed to other proposed restructuring alternatives) was most likely to maximize proceeds to the City and meet minimum requirements. Doc. 514 at 174–75; Doc. 516 at 105. A week before the July Board meeting, Zahn met with Florida Power & Light (FP&L) about a possible sale of JEA. Doc. 515 at 174, 177.

*(2)    Concerns among executives about exorbitant PUP payouts if JEA were sold*

About two weeks before the July 23, 2019, Board meeting, "Ryan" created a "Notes.xlsx" spreadsheet. Doc. 476-34; Doc. 511 at 17, 31–32. It

showed that if JEA's net value increased by $3.6 billion, the PUP units would be worth *$345 million*—even if only 30,000 units were issued to JEA's employees. Doc. 476-34; Doc. 513 at 53–54; Doc. 524 at 94–96.

Zahn told Dykes that he wanted to present Scenario Three and the PUP to the Board at the same time so that the sale of JEA would trigger PUP payments. Doc. 514 at 161, 221; Doc. 515 at 63. But some senior executives were concerned about public employees getting a percentage of any sale proceeds. Doc. 514 at 221–22; Doc. 523 at 131. Joe Orfano, JEA's treasurer, told Zahn he thought it would be "untoward" or "unseemly" to roll out a PUP in conjunction with a possible sale of JEA. Doc. 515 at 202–03. Zahn did not respond. *Id.* And after that, Orfano was removed from an email group devoted to discussions about the PUP. *Id.*

Orfano knew that JEA's sale price could be substantial, and he had never seen a big sale tied to an incentive compensation plan. Doc. 515 at 205. When he asked Wannemacher whether he should discuss the PUP's potential value, Wannemacher said Zahn had directed them not to discuss that with anyone. *Id.* at 203, 205, 241–42.

### (3)    *Zahn misrepresents the PUP's cost*

Usually, Board members received copies of the Board presentation a week in advance, but Zahn didn't release the July Board materials—which

16

were dense, voluminous, and "very tough to understand"—until just a few days before the Board meeting. Doc. 506 at 19–20; Doc. 513 at 24, 51, 98–99. The materials included information about the PUP, and Dykes was under the impression that Zahn had individually met with Board members about it beforehand. Doc. 514 at 184. When she asked him whether the Board members understood what they would be approving concerning the PUP, Zahn replied, "Everyone who needs to understand it, understands it." *Id.*

During a meeting with Board member Andy Allen, Zahn "brushed over" the PUP. Doc. 513 at 59. Allen asked how much the PUP would cost, and Zahn replied, "Three to four million." Doc. 512 at 265. Zahn didn't discuss how a sale would affect the PUP or what the potential payouts would be. Doc. 513 at 63–64. Allen testified that he would have wanted to know such information before voting on the PUP, as that would have "drastically changed votes." *Id.*

### (4)    *Pressing for legal backing*

The night before the July Board meeting, Zahn sent Vinyard to the OGC with an urgent, "pretty uncommon" request. Doc. 517 at 165–66, 262. Zahn wanted a memo—signed by Jason Gabriel, the City's General Counsel—stating that the Board had the authority to approve the resolutions that would be presented at that meeting. *Id.* at 165–66, 262.

17

Gabriel wasn't that familiar with the resolutions, but he issued a memo stating that the executive team intended to present at the meeting various options (Scenarios Two and Three) and resolutions (including one concerning the PUP), and that the Board was authorized, "subject to applicable laws," to proceed with the options as presented. Doc. 476-87; Doc. 517 at 166. The memo didn't discuss PUP payouts in connection with a sale of JEA, because that possibility hadn't been brought to Gabriel's attention. *Id.* at 171. The PUP was a "very minuscule focus" at the time, and he understood that it was a plan that WTW had developed that would cost only several million dollars. *Id.* at 169–70; Doc. 518 at 12–13. He testified that, had he known that City employees had developed a plan granting them a "100-, 200-, 300-, $400 million bonus pool" from the sale of a City asset, he would have rejected it outright because it would be "so preposterous" "as a matter of law, fact, [and] policy." Doc. 517 at 190–91; Doc. 518 at 64.

## IV. July Board meeting

### A. Presentation of Scenario Two

At the July Board meeting, Dykes presented an implementation plan for Scenario Two. GX 20Q, clip 2. It was stark, involving significant headcount reductions, lower operational goals and service levels, and bare-minimum maintenance. *Id.* Moreover, Vinyard explained that attempting to alter the

18

Florida Constitution and City Charter—which significantly limited JEA's business opportunities—would be lengthy, costly, and unlikely to succeed. GX 20Q, clip 4; Doc. 506 at 127; Doc. 512 at 118; Doc. 523 at 73–75.

**B.    Presentation of Scenario Three**

Wannemacher then presented Scenario Three, the "non-traditional" response. GX 20Q, clip 6. Thus, the Board was given these main options:

| Scenario Two (Traditional Response) | Scenario Three (Non-traditional response) |
|---|---|
| <$2 billion to the City over next 20 years | At least $3 billion of value to the City |
| $0 to customers | > $400 million to customers |
| Significant rate increases | > 3 years of base-rate stability |
| 0% funding for renewable-energy requirements | 100% renewable electricity for the City by 2030 |
| Status quo retirement obligations | Retirement-benefit protections |
| No employment guarantees and termination of 600 employees | Employee benefits guaranteed for three years |
| No employee retention payments | Retention payments to all full-time employees |

Doc. 476-39 at 10. Zahn said that the Board's decision would reflect whether it wanted JEA to shrink or grow. GX 20Q, clip 7.

The Board unanimously passed a resolution authorizing Zahn to explore Scenario Three by soliciting competitive bids. GX 20Q, clip 8. When a Board member explained that he supported Scenario Three because JEA "need[ed] to make some dramatic changes" to avoid a "slow but certain death spiral," GX

19

20Q, clip 9 at 11:40–11:50, 14:30–14:52, and another member expressed similar sentiments, Zahn and Wannemacher didn't clarify that Scenario Two was not a financial forecast or even the most likely scenario for JEA, Doc. 515 at 68.

## C.    Presentation of the PUP

At the outset of the PUP presentation, JEA's human-resources director reiterated that JEA's goal was to align its compensation with the market median. GX 20Q at 2:42:50–2:43:15; Doc. 476-36 at 64. Wannemacher explained that each PUP unit's value would fluctuate based on JEA's financial performance over three years, and he gave an example of "how this would work." GX 20Q at 2:44:00–2:45:20.

Wannemacher explained that JEA's forecasted value in 2019 was $3 billion. Doc. 476-36 at 66. If JEA's value increased by at least 10% (or $300 million) after the three-year performance period, the PUP payout pool (to be divided pro rata among unit-holders) would be 10% of any value increase above that $300 million. *Id*. As an example, Wannemacher supposed a 20% increase ($600 million) in JEA's value over three years, which he acknowledged would be "substantial." GX 20Q at 2:45:50–2:46:15. In that case, the PUP pool would be $30 million (10% of $300 million). He said in that case, the PUP would cost $10 million per year—or slightly more than 6% of

20

JEA's total annual payroll. *Id.* at 2:46:15–2:46:38.

Neither Zahn nor Wannemacher revealed that the PUP units would likely be worth a lot more if JEA were sold. Doc. 512 at 230; GX 20Q. Instead, Wannemacher just referred the Board to their materials. *Id.* at 2:45:00. Those materials included the June Compensation Committee meeting slides and appendix, which bore WTW's logo and estimated the PUP's total cost as $3.4 million. Doc. 476-36 at 90–130. Those slides immediately preceded the PUP resolution. Doc. 513 at 108.

When a Board member asked how Scenario Three would affect the PUP, Wannemacher said a recapitalization of JEA would end the performance period, so the PUP's value would be calculated at that time. GX 20T, clip 2 at 4:20–5:00. He did not provide any financial calculations, though, so five Board members believed that the PUP would cost about $3.4 million annually. Doc. 512 at 141, 230, 268; Doc. 513 at 109, 220.

JEA management presented the PUP resolution for the Board's consideration. GX 20T, clip 2. The resolution's preamble said that the Compensation Committee had approved in June 2019 the framework for a long-term incentive plan. Doc. 476-41 at 1. (That framework, as mentioned above, stated that the PUP would cost only $3.4 million. Doc. 476-26 at 21.)

The PUP resolution gave Zahn (as CEO) authority to implement the

PUP and the Compensation Committee chair (Camille Lee-Johnson, a Board member who invoked her Fifth Amendment privilege and did not testify) authority to administer the PUP. Doc. 476-36 at 1, 7; Doc. 520 at 157. The resolution defined "Current Year Value" as the sum of JEA's net position and payments or credits to the City or JEA customers during the preceding year. Doc. 476-36 at 5. It defined a "Recapitalization Event" as the closing and funding of a transaction that provided at least $3 billion in cash to the City, and it clarified that "[a]ny consideration and change in Net Position … in connection with the Recapitalization Event [would] be taken into account" in calculating the PUP units' value. *Id*. at 5–6. Therefore, if JEA were sold, PUP participants would get a portion of the sale proceeds. Doc. 516 at 111–12. This resolution was the first Board material to relate the PUP to a sale of JEA. *See* Docs. 476-25, 476-26; Doc. 476-36 at 60–130; Doc. 523 at 34. But no one discussed the effect of that sale.

Under the resolution, each PUP unit's value would increase by $100 for every percentage-point increase above the Challenge Value Target (110%).[2] Doc. 476-36 at 9. Under this formula, if JEA's value increased by 120% (i.e., 10 percentage points above the 110% target), each PUP unit would be worth

---

[2]This is mathematically different from the example Wannemacher provided. GX 20Q at 2:45:50–2:46:15–2:46:38.

$1,000 ($100 x 10). *Id.* But if JEA were sold and its value increased by more than $3 billion (as shown in Wannemacher's spreadsheet from March, *see* Doc. 476-20), JEA's value would increase by 100% (i.e., 90 percentage points above the 100% target), and each PUP unit would be worth nine times as much: $9,000 ($100 x 90). No one discussed that.

Wannemacher recommended issuance of 30,000 units for the initial, three-year performance period. Doc. 476-36 at 65. But the resolution presented to the Board authorized 100,000 units, with no mention of a 30,000-unit limit. Doc. 476-41 at 4; Doc. 524 at 160.

The Board unanimously passed the PUP resolution, thus giving the Board's final approval for the PUP, effective immediately. GX 20T, clip 2 at 5:15–5:25; Doc. 476-41 at 1–2; Doc. 514 at 11, 188.

Gabriel, Vinyard, JEA's human-resources director, and the OGC attorney assigned to JEA didn't realize then that if JEA were sold and the City received $4 billion to $6 billion in net proceeds, the PUP could be worth hundreds of millions of dollars. Doc. 517 at 33, 171; Doc. 523 at 48, 55. The five Board members who testified at trial didn't know, either. Doc. 512 at 88, 161, 230; Doc. 513 at 64–65, 85–86, 112, 191–92, 221. Had they known, they wouldn't have supported such a "ridiculous" plan that would have resulted in excessive compensation, particularly for a city-owned utility. Doc. 512 at 88,

23

231, 270; Doc. 513 at 54, 67, 112–13, 223–24.

## D.    Livestreaming

Since 2018, JEA had automatically broadcast every Board meeting online. Doc. 505 at 35; Doc. 513 at 39. IBM Ustream livestreamed the JEA Board meetings (including the July 2019 Board meeting) using interstate wire communications. Doc. 512 at 217.

## V.    Fall 2019

## A.    Legal review of the PUP

After the July Board meeting, Vinyard pushed to finalize the PUP so employees could purchase their units in January 2020. Doc. 517 at 173–74, 177, 193. In the meantime, Gabriel continued to press Vinyard for answers about what the PUP was: A bonus plan? Deferred compensation? Something else? *Id.* at 182–83. But Gabriel didn't receive satisfactory answers, and no one alerted him that the PUP could yield a huge payout to the unit-holders if JEA were sold. *Id.* at 185; Doc. 518 at 18–22, 27.

In fact, Zahn had hidden the PUP's true value from Vinyard, his own right-hand man. It had been Vinyard's idea to send the PUP to the Florida Attorney General, the Florida Ethics Commission, and the IRS for review because he wanted to ensure that the PUP was legal and ethical under Florida

law.[3] Doc. 523 at 59–61, 113–15, 120, 127. But Vinyard didn't know that the plan involved paying employees tens (or hundreds) of millions of dollars in bonuses from the sale of a City asset. *Id.* at 64–65.

## B. Allocation of PUP units

The PUP resolution didn't specify how the 100,000 PUP units would be allocated, but the Board materials indicated that executives were meant to benefit the most from long-term incentives. *See* Doc. 476-26 at 24–25; Doc. 476-41.

In August 2019, the OGC attorney assigned to JEA sent JEA's outside counsel a draft document to be sent from the PUP Plan Administrator (Johnson). Doc. 476-81. The draft said that Johnson was delegating her authority to Zahn and that all 100,000 PUP units would be allocated. *Id.* The allocation was supposed to be based on position level and performance review, and the document said that Johnson had "determined that the CEO has exceeded his performance metrics … ." *Id.* at 2. The OGC attorney recalled that either Zahn or Vinyard had asked OGC to prepare the document in case Johnson requested OGC assistance. Doc. 517 at 139. Vinyard denied

---

[3]OGC withdrew its request for a legal opinion from the Florida Attorney General in December, after the PUP was rescinded. Doc. 517 at 219. And although a similar request to the Florida Ethics Commission was drafted, it was never sent. *Id.* at 113.

authorizing the document, though. Doc. 523 at 123.

## C.    Questions about the PUP's value

After watching the July Board meeting online, Assistant Council Auditor Jeff Rodda raised concerns about the PUP Resolution. Doc. 511 at 262–63. He emailed Wannemacher many questions, including ones about the PUP's purpose and the maximum cost to JEA. *Id.* at 176–78; Doc. 476-130 at 5. Several days passed with no response. *Id.* at 4. Eventually, Wannemacher responded with recent drafts of PUP documents and a Board-approved award agreement, and he asked Rodda if they could revisit the issue in a few weeks. *Id.*

That didn't happen until 11 weeks later, on October 31. Doc. 512 at 29. At a follow-up meeting with Rodda, when Wannemacher was asked about any prior calculations of how much the PUP would pay in the event of a recapitalization, Wannemacher just steered the conversation toward the example he had given at the Board meeting. Doc. 511 at 178, 186. And while he acknowledged that recapitalization would affect the PUP's value, he didn't discuss the magnitude of that effect. *Id.*

Separately, in August, outside counsel emailed Wannemacher and others, alerting them that, based on another attorney's calculations, "the PUP formula is spitting out much larger numbers than we anticipated." Doc. 518 at

138–39. She asked Wannemacher if he had any PUP formula calculations to share. *Id.* But Wannemacher did not send her either of the spreadsheets that showed his prior calculations of the PUP units' value. Doc. 511 at 16; Doc. 518 at 184.

### D.    JEA moves forward with the ITN

After the July Board meeting, JEA engaged a team of bankers, lawyers, and accountants to advise on the ITN process. Doc. 518 at 73–74. JEA solicited bids on August 2, 2019. Doc. 476-77 at 2.

NextEra—the world's largest utility company—expressed interest in paying $11 billion to purchase JEA's assets and liabilities. Doc. 476-96 at 3; Doc. 506 at 61. The offer would have satisfied the ITN's minimum requirements and resulted in $6.4 billion in net proceeds to the City. Doc. 476-96 at 3, 9–12. (The two next highest bids for JEA offered $9 billion and $8.6 billion. Doc. 506 at 57.)

### VI.    End of the PUP and ITN

In November, Zahn met with Vinyard, Gabriel, and others to discuss the PUP. Doc. 517 at 44–45. Gabriel expressed continuing concerns over the PUP. *Id.* at 194. When he asked whether anyone had performed financial projections on the plan, the room became quiet, then Zahn responded, "It's nominal." Doc. 517 at 195. (In Gabriel's mind, nominal meant several million dollars.

27

*Id*.) Zahn didn't discuss how a sale of JEA would affect PUP payouts. Doc. 517 at 46.

A week later, Gabriel prepared a letter to memorialize that discussion, including issues and deficiencies that OGC had raised about the PUP. Doc. 517 at 197–98. When Zahn reviewed a draft of the OGC letter, he wanted to delete numerous statements that could call the plan into question, including that the PUP was like a stock-option plan, that it would be unique in the public sector, and that OGC had concluded that the City Charter and state and federal law prohibited the PUP as currently structured. *Id*. at 200; Doc. 476-47.

Zahn then sent Gabriel his own letter, announcing that JEA leadership had decided to "postpone indefinitely" the PUP's implementation based on "the incongruity of the Plan's long-term nature and the very real potential short-term implications of the JEA's strategic planning process." Doc. 476-46 at 2. The Board voted to rescind the PUP at the December Board meeting. Doc. 506 at 94. The ITN was canceled on December 24, 2019. *Id*. at 63.

## VII.  JEA's financial position

Despite the grim outlook that Zahn led the executive team to present to the Board in Scenarios One and Two, JEA remained financially healthy before, after, and throughout 2019.

A.    **April 2018–mid-2019**[4]

At the June 2019 Board meeting, Wannemacher reported that JEA was performing very well. Doc. 506 at 114–15. One Board member recalled that the presentations of Scenarios One and Two were the first time he had heard anyone say that JEA was in financial distress. Doc. 512 at 226. Indeed, Board members recalled that throughout the monthly Board meetings, JEA executives had acknowledged longer-term challenges and disruptive trends, but they otherwise consistently said that JEA was financially healthy and achieving its operational goals. *Id.* at 108, 235; Doc. 506 at 106; Doc. 513 at 128, 208, 228–29, 240; Doc. 514 at 266–69; Doc. 517 at 53.

That was consistent with other indicators: a JEA presentation dated December 2018 projected stable revenue and meaningful debt reduction without any need for base-rate increases. Doc. 516 at 97–98; Doc. 476-17 at 2–3. And in Zahn's February 2019 meetings with three major credit-ratings agencies—which included summaries of JEA's past twelve months of financial performance and its three- to five-year financial projections—he didn't raise issues about long-term financial problems. Doc. 515 at 187–89, 192–93. Quite the opposite: he represented that JEA's "financial metrics reflect a thriving

---

[4]JEA was also financially healthy for years before 2018. *See* Doc. 504 at 159, 162–164; Doc. 514 at 207; Doc. 476-108 at 5.

utility today and long into the future." *Id*. at 194.

**B.    Fall 2019**

Moreover, in preparing for the ITN after the July Board meeting, the bankers used JEA's financial statements to build a model to project JEA's business performance over the next several years—and that model showed that JEA wasn't facing any unusual financial distress in 2019. Doc. 516 at 106–07.

JEA was doing well according to Wannemacher and Zahn, too, at least when they met with others. S&P, a credit-ratings agency, became concerned that the ITN had been predicated on a study suggesting significant declines in electric demand, significant rate increases, and a significant cut in staffing. Doc. 514 at 57– 59. So Zahn and Wannemacher met with S&P, and before that meeting, JEA submitted an update that reflected a positive view of its financial condition. *Id*. at 63–66; Doc. 476-108. It said that "JEA remains a superior electric utility" with "excellent financial and operational metrics." *Id*. at 5, 14. S&P agreed and subsequently issued a ratings bulletin leaving JEA's ratings unchanged notwithstanding the ITN process. Doc. 476-107. S&P also noted that JEA's Scenario-One assessment was a "departure" from JEA's "historical and projected financial profiles and other public … utilities' responses to similar challenges." *Id*.

Tim Hunt, a JEA analytics employee, also noticed a disconnect between

30

Scenario One and his understanding of JEA's financial future. Doc. 518 at 256–58. He particularly disagreed with Scenario One's prediction that solar adoption would contribute to an 8% decline in sales because that didn't square with his prior studies of consumer solar adoption. *Id.* at 257–59, 263. After he escalated the issue, he and Zahn met in mid-September to discuss. *Id.* at 260–62.

Hunt shared his view that the solar-adoption projections that drove Scenario One seemed to be "a little out of the realm of reality." Doc. 518 at 263. And he expressed concern that JEA was alarming its employees, 30% of which could face layoffs based on erroneous assumptions. *Id.* Zahn replied that sometimes one must "use extreme conditions in order to get leverage for appropriate decisions to be made." Doc. 518 at 263–64. Zahn also told Hunt that he was using the threat of layoffs as leverage to "get the City in line." *Id.* at 283–84.

In mid-October, JEA sent Fitch (another ratings agency) an updated five-year forecast for JEA's electric system. Doc. 476-110 at 1; Doc. 515 at 220. Wannemacher supervises the group that prepared the forecast. *Id.* at 221. Because those historical results and JEA's five-year forecast reflected the soundness of JEA's financial condition in the past and future, Fitch continued

to give JEA an AA credit rating.[5] Doc. 515 at 223, 229–31.

## VIII. Other relevant background

### A.   City's ownership of JEA

A Florida law and the Jacksonville City Charter created JEA (previously known as the Jacksonville Electric Authority) to own, manage, and operate the water and electric utilities for the City. Doc. 470-33 at 9–10; Doc. 470-99 at 91. It is the City's "biggest and most important asset." Doc. 476-7 at 3. Because the City owns JEA, the City can choose to sell or retain JEA. Doc. 476-4 at 3–4; Doc. 504 at 139, 144; Doc. 514 at 129; Doc. 476-13 at 17.

JEA is an independent agency and "major component unit" of the City. Doc. 470-99 at 80; Doc. 511 at 263. As such, it is mostly free from state and municipal intervention, except for certain structural, governance, and financial rules that the City Charter, Florida Constitution, or Florida law impose. Doc. 470-33 at 9; Doc. 514 at 278–79. For example, JEA cannot sell more than 10% of its assets (defined as "property or functions") without approval from both City Council and voters. Doc. 470-33 at 16. And, under Florida's statutes an Invitation to Negotiate (ITN, or solicitation for bids) must precede any sale of

---

[5]In April 2020, even after the PUP and ITN were canceled and JEA went through leadership changes, JEA remained in an exceptional position—both financially and operationally. Doc. 505 at 13–14.

a public asset such as JEA. Doc. 506 at 52, 76; Doc. 516 at 200. JEA is also subject to auditing by the City Council Auditor's Office. Doc. 511 at 263.

Although JEA is "legally separate" from the City, the City is financially accountable for it. Doc. 470-99 at 80. The City's financial statements include JEA's financial results, and JEA is a wholly-owned subsidiary of the City from an accounting perspective. Doc. 523 at 199–200.

JEA reports to a Board appointed by the mayor and confirmed by the City Council, and the City can "impose its will on JEA," mainly by approving its budget. Doc. 476-7 at 2; Doc. 470-99 at 91. Board members rely heavily on JEA's executive team to educate them about complex utilities, Doc. 513 at 75, and before each Board meeting, the CEO generally individually briefs each Board member on all key action items to be covered during the meeting. Doc. 514 at 192.

JEA's goals are to cover its own costs and financially support the City by paying an annual "contribution" in a negotiated amount. Doc. 470-33 at 16; Doc. 504 at 142–47; Doc. 514 at 249. JEA contributes about $120 million to the City's general fund every year. Doc. 504 at 146–47.

## B.    Federal funding from FEMA

As a municipal utility, JEA is eligible to receive federal FEMA funds following a natural disaster. Doc. 515 at 94–95. During the 2019 fiscal year,

JEA received and spent $4.8 million from FEMA's "Disaster Grants – Public Assistance" program. Doc. 476-115 at 4–6.

## IX.    *Kastigar* inquiry

███████████████████████████████████

████████████████████████████████████

██████    Wannemacher gave his *Garrity* statement to OGC on January 3, 2020. Doc. 132 at 7. █████████████████████████████

████████

At the eight-day *Kastigar* hearing, the United States presented 20 witnesses, including 12 of the 25 grand-jury witnesses.[6] Docs. 268–86. The prosecution team never read Zahn's and Wannemacher's *Garrity* statements, Doc. 310 at 71, so the United States used a separate team of attorneys to handle proceedings and briefing that required knowledge of those statements, *id.* at 21 n.9.

The United States argued that it had established at the hearing independent sources for its grand-jury evidence. Doc. 291. Zahn and Wannemacher responded by moving to dismiss the indictment, contending that the United States had failed to meet its *Kastigar* burden. Docs. 297, 299.

---

[6]The *Kastigar* testimony of two witnesses (Lynne Rhode and Daniel Nunn) concerned only Wannemacher. Doc. 310 at 15 nn.4–5.

In a Report and Recommendation (R&R), the magistrate judge acknowledged that 14 grand-jury witnesses did not testify at the *Kastigar* hearing. Doc. 310 at 69. The judge therefore analyzed whether, "even assuming that the evidence not presented at the *Kastigar* hearing was tainted," "the evidence that was actually presented … was sufficient to sustain the Indictment." *Id*. at 70. And the judge concluded that the United States' use of any tainted evidence had been harmless beyond a reasonable doubt. *Id.* at 102.

The judge found that the prosecution team had avoided reading, requesting, or consuming media about, the *Garrity* statements, and that their procedures to prevent taint had been "reliable and did not result in a violation of Defendants' constitutional rights." Doc. 310 at 71. The judge also recognized that the crux of a *Kastigar* violation is whether a prosecutor "used [immunized] testimony in any way to build a case against the defendant." *Id*. at 74 (quoting *United States v. Caporale*, 806 F.2d 1487, 1518 (11th Cir. 1986)). And, at least with respect to the witnesses and evidence presented at the *Kastigar* hearing, the judge found that the United States had "shown an independent basis for the factual allegations in the Indictment." Doc. 310 at 102.

The judge found that a Council Auditor's Office memorandum detailed the PUP and the massive payouts that would result from a sale of JEA. Doc.

35

310 at 75. That memorandum was issued on November 18, 2019, and a prosecution-team member reviewed it within a month—i.e., before Zahn and Wannemacher gave their *Garrity* statements. *Id*. That review prompted the prosecution team to interview Council Auditor employees, obtain PUP-related communications, and review publicly available JEA Board meetings.[7] *Id*. The Council Auditor memorandum also led, in part, to the prosecution team's issuance of a grand-jury subpoena to JEA on April 21, 2020. Doc. 310 at 76.

The judge further found that by reviewing the Board meetings, the prosecution team identified and subpoenaed, and interviewed key individuals from, WTW, McKinsey, Morgan Stanley, JP Morgan Chase, NextEra Energy, and S&P Global. Doc. 310 at 76. And based on JEA's and WTW's subpoena responses and subsequent interviews, the prosecution team learned that WTW hadn't developed the PUP. *Id*. at 78. Yet WTW's work had been used— without authorization—to "lend false credibility" to the PUP and to misrepresent its cost when Zahn and Wannemacher presented it to the Board in July 2019. *Id*.

The judge found that, through documents and an interview with S&P, the prosecution team learned that S&P disagreed with the gloomy financial

---

[7]The Board meetings included Zahn's and Wannemacher's presentations about misleading strategic-planning scenarios, false financial projections, and the purpose and cost of the PUP. *See Statement of Facts* sections II–IV.

projections that JEA's executive team had presented to the Board. Doc. 310 at 77. Rather, S&P viewed JEA's financial condition in 2019 as "very, very, quite strong." *Id.* ████████████████████████████████████████

████████████████

The judge also found that the prosecution team obtained and deciphered two key documents that Wannemacher had authored—a "Performance Unit Scratch Sheet" (Doc. 476-20) and "Notes.xlsx" (Doc. 476-34), which showed how drastically PUP payouts would increase upon a sale of JEA—without using the *Garrity* statements. Doc. 310 at 81–91. The judge found that Assistant Council Auditor Rodda, who had discovered the spreadsheets, "unequivocally and persuasively testified that nothing in Defendants' *Garrity* statements led him to the two spreadsheets." *Id.* at 81, 88–90. ████████████████████████

████████████████████ *Id.* at 83, 85. And besides, ████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████" *Id.* at 86. The judge found that such testimony "provided an independent basis for the Government to build its case." *Id.* at 87. The judge thus concluded that "the Government has shown it had a legitimate, independent source for these spreadsheets." *Id.* at 88.

The judge found that the prosecution team's obtainment of the Nixon

37

Peabody memo was also untainted.[8] Doc. 310 at 93–96. The City Council's

Special Investigative Committee (SIC) had run a parallel PUP-related

investigation, ███████████████████████████████████

████████████████████████. *Id.* at 80, 94. Another SIC attorney sought a

copy of the memo from OGC, and when one was found, OGC sent a copy to

the prosecution team. *Id.* at 93. The judge noted that ████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████ *Id.* at 95.

The judge found that the United States had presented at the *Kastigar*

hearing exhibits that corresponded to 23 of the overt acts alleged in the

indictment. Doc. 310 at 97. Many exhibits were public records or produced in

response to the grand-jury subpoenas. *Id.* Moreover, the City's General

Counsel, JEA executives, and Board members who testified before the grand

jury and at the *Kastigar* hearing based their testimony on their personal

involvement in the events. Doc. 310 at 97–100.

Zahn argued that ten *Kastigar* fact witnesses were tainted by reading or

---

[8]The memo (referenced in the indictment (Doc. 1)  ¶¶ 19(d), 20(h))
opined that a long-term incentive program involving bonds based on JEA's
value ran afoul of Florida law. Doc. 310 at 92.

hearing OGC's letter terminating Zahn's employment, which contained fruits of his *Garrity* statement. Doc. 310 at 100–01. The judge pointed out that Zahn had not identified "any particular statement in the Termination Letter that could have been gleaned solely from his *Garrity* statement and that would have been useful to the prosecution," and that any potentially useful statements were also available from untainted sources. *Id.* at 101.

The judge concluded that, "even assuming that some of the evidence presented to the Grand Jury was tainted," the United States had "shown an independent basis for the factual allegations in the Indictment," and the untainted evidence was "sufficient to sustain the Indictment." Doc. 310 at 102. Accordingly, any use of tainted evidence was constitutionally harmless. *Id.*

Zahn objected that the judge had improperly shifted the burden and made inferences in the United States' favor; failed to require the United States to demonstrate that its investigation had been taint-free; and erred in its harmlessness analysis. Doc. 315 at 46–84. The district court overruled Zahn's objections and adopted the R&R as the court's opinion. Doc. 361.[9]

---

[9]Because Zahn's appeal on *Kastigar* grounds relates only to his motion to dismiss, we do not discuss additional *Kastigar* proceedings at trial (*see* Zahn's brief at 27).

### X.    Jury instructions

Before trial, Zahn requested the following jury instruction regarding

sections 666 and 1343:

> It does not suffice that the object [of a fraud] may have become
> money or property in JEA's [or the City's] hands; rather, the
> object sought must have been money or property in the hands of
> the JEA [or the City].[10]

Doc. 398 at 36, 38, 42–43. Zahn also requested the following jury instruction

concerning section 1343:

> To prove … a scheme to defraud JEA or the City … of money or
> property "by means of" false or fraudulent pretenses,
> representations, or promises means that the Government must
> prove … that the scheme … would have resulted, in the ordinary
> course, as the direct means to unlawfully obtain money or
> property from JEA and the City … .
>
> [T]he Government must prove that the object of the alleged
> conspiracy was a scheme that would have directly resulted in
> unlawfully obtaining money or property [or that the alleged loss of
> money or property would have directly resulted from the alleged
> scheme to unlawfully obtain money or property].

*Id.* at 38–39, 43.

At the charge conference, Zahn argued that his proposed additions were

correct statements of law that were "key to [his] defense" and not covered by

other instructions. Doc. 524 at 217, 222. The court overruled these requests. *Id.*

---

[10]Bracketed portions reflect variations in the three instructions Zahn
proposed.

at 217, 223.

Zahn urged the court to exclude from the section 666 instructions references to the City because "[t]he Indictment does not allege that Mr. Zahn is an agent of the City." Doc. 398 at 34–35; Doc. 524 at 213. The court overruled that objection. *Id*.

> The court instructed the jury that the elements of section 666 were:
>
> [First], Mr. Zahn was an agent of the City … or [JEA];
>
> [Second], the City … or [JEA] was a local government or an agency thereof that received in a one-year period benefits in excess of $10,000 under a federal program involving … federal assistance;
>
> [Third], Mr. Zahn conspired to … obtain by fraud … property that was owned by or under the care, custody, or control of the City … or [JEA]; and
>
> [Fourth], the property had a value of $5,000 or more.

Doc. 527 at 15–16. The court's instructions about the third element emphasized that the object of misappropriation must have been the victim's "property":

> To embezzle means to wrongfully …  take someone else's money or property after lawfully taking possession or control of it.
>
> To steal …  means to wrongfully … take the … money or property belonging to someone else with … intent to deprive the owner of its use … .
>
> To obtain by fraud means to act knowingly and with the intent to deceive or cheat, usually for the purpose of causing financial loss to someone else or bringing about a financial gain to oneself or

41

another.

To intentionally misapply money or property means to intentionally convert such money or property for one's own use and benefit or for the use and benefit of another… .

*Id*. at 17.

The court instructed that the first element of section 1343 required a finding that Zahn "knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises." Doc. 527 at 18. The court added, "A scheme to defraud means any plan or course of action intended to deceive or cheat someone out of money or property by using false or fraudulent pretenses, representations, or promises." *Id*. at 19.

### Standards of Review

I–III. This Court reviews de novo whether sufficient evidence supported Zahn's convictions, viewing the evidence in the light most favorable to the United States and making all reasonable inferences and credibility choices in the United States' favor. *United States v. Broughton*, 689 F.3d 1260, 1276 (11th Cir. 2012). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," and this Court "will not disturb the verdict unless no trier of fact could have found guilt beyond a reasonable doubt." *United States v. Bell*, 112 F.4th

42

1318, 1331 (11th Cir. 2024) (internal quotation marks and citations omitted).

IV.    This Court reviews de novo whether a district court's jury instructions constructively amended the indictment. *United States v. Phillips*, 4 F.4th 1171, 1175 (11th Cir. 2021).

V.    This Court "review[s] a district court's refusal to give a requested jury instruction for abuse of discretion." *United States v. Carrasco*, 381 F.3d 1237, 1242 (11th Cir. 2004).

VI.    "Harmless error is a mixed question of law and fact subject to de novo review." *Bonner v. Holt*, 26 F.3d 1081, 1083 (11th Cir. 1994). Although this Court "has plenary review of the ultimate determination of whether an error is harmless," it will "only review the findings of fact which underlie that determination for clear error." *Smith v. Singletary*, 61 F.3d 815, 817 (11th Cir. 1995).

## Summary of the Argument

I.    The evidence was sufficient for a reasonable jury to find that Zahn (1) schemed to obtain "property" (2) "by means of" misrepresentations (3) as part of a scheme to "defraud." The evidence showed that he conspired to fraudulently obtain millions of dollars (i.e., money, a traditional property interest) from the sale of JEA, a City asset. And he conspired and schemed to get that money by making material misrepresentations and omissions, so he

satisfied the "by means of" requirement. Plus, the United States proved his intent to economically injure—and thus defraud—the City by presenting evidence of his material misrepresentations about the PUP's price and the need to explore a sale of JEA.

II.    The evidence was sufficient for a reasonable jury to find that Zahn "caused" wires to be transmitted "for the purpose of" executing his fraudulent scheme. One "causes" wires to be used when he acts, knowing that use of the wires will follow in the ordinary course of business. For years, JEA has livestreamed every Board meeting, which requires use of interstate wire communications. And, because of Zahn's conduct, the livestreaming wires contained fraudulent misrepresentations and false pretenses as the July Board meeting was broadcast to the public. Therefore, a reasonable jury could conclude that when Zahn fraudulently presented Scenario Three and the PUP during the July Board meeting, he "caused" interstate wires to be transmitted.

Plus, the livestream facilitated his scheme. To profit, Zahn had to convince all stakeholders—not just Board members—that it was prudent to both sell JEA and implement the PUP. A jury could reasonably infer based on the trial evidence that livestreaming fraudulent misrepresentations about the PUP and the necessity of privatizing JEA enabled Zahn to communicate

44

critical (mis)information, which in turn furthered his goal of getting the community "alignment" he needed.

III.    The United States presented sufficient evidence for a reasonable jury to find that (1) in any relevant one-year period, the City received more than $10,000 from the federal government (2) in "benefits" under a federal assistance program, and (3) Zahn was an agent of the City.

First, in 2019, JEA received millions in FEMA funds. Because JEA's finances are but a subset of the City's finances, a reasonable jury could conclude that the City received the FEMA funds (through JEA).

Second, the district court correctly determined, as a matter of law, that the payments from FEMA were "benefits" under section 666, and the United States' evidence sufficed to prove that JEA received more than $10,000 in such "benefits."

Third, the United States proved that JEA's job was to steward the City's utility services on the City's behalf. As such, Zahn—as JEA's foremost executive—was an agent of both JEA and the City.

IV.    Fairly read as a whole, the indictment alleged that Zahn was an agent of both JEA and the City. It alleged that Zahn was the CEO of JEA and that the City owned JEA. So, as the district court pointed out, "Because JEA belonged to [the City], Zahn was an agent of [the City], consistent with how

the Indictment reads." Doc. 540 at 5. Moreover, the indictment alleged that Zahn owed a fiduciary duty to the City—so he was an agent inherently authorized to act on behalf of the City. Thus, the indictment alleged that Zahn was an agent of the City, and the court correctly instructed the jury that it could convict based on that finding.

V.    Zahn hasn't established that the district court abused its discretion in refusing to give his requested jury instructions.

First, the court's instructions that the elements of section 666 include misappropriation of "property that was *owned by or under the care, custody, or control*" of the City or JEA, Doc. 527 at 15–16, sufficed to inform the jury that the conspiracy's object was "property" of the City or JEA. But there was more. Regarding section 1343, the court defined a "scheme to defraud" as a plan "intended to deceive or cheat *someone out of money or property*" through fraudulent misrepresentations. Doc. 517 at 19 (emphasis added). Accordingly, the court's instructions bolstered Zahn's point that the jury had to find that the object of his scheme was "property" when it was in the victim's hands.

Second, Zahn's proposed causation "instruction under *Loughrin*" imposed a requirement beyond what section 1343 demands. *See Loughrin v. United States*, 573 U.S. 351 (2014). Because Zahn's proposed causation

46

instruction was legally inaccurate, the district court did not abuse its discretion in declining to give it.

VI.    The district court did not err in denying Zahn's motion to dismiss the indictment on *Kastigar* grounds.

Following an eight-day *Kastigar* hearing, the court made extensive findings of fact (none of which Zahn disputes as clearly erroneous). According to those findings, prosecution-team members adopted reliable procedures to shield themselves from the *Garrity* statements. And the team's untainted review and analysis of the Council Auditor memorandum and publicly available Board meetings (all of which predated the *Garrity* statements) led the team to identify, subpoena, and interview witnesses—and therefore gather critical evidence—from a slew of key entities. Plus, the prosecution team obtained two key spreadsheets and the Nixon Peabody memo through untainted means. The court logically concluded that when witnesses testified about what they personally experienced and understood during events that predated the *Garrity* statements, such testimony was untainted. Thus, the court correctly concluded that the United States had met its burden of proving how it actually built its case against Zahn using evidence and leads independent from the *Garrity* statements.

The court also correctly concluded, in Zahn's favor, that the United States failed to show that *all* the grand-jury evidence was untainted because the United States hadn't proven that the 13 grand-jury witnesses who didn't testify at the *Kastigar* hearing weren't tainted by widespread publicization of the *Garrity* statements. The court assumed that they were tainted—giving Zahn the best possible position—and applied constitutional-harmlessness analysis based on circuit precedent.

That was proper. The court had the full grand-jury record, so it could assess whether evidence not vetted at the *Kastigar* hearing—even if tainted— would have affected any reasonable grand juror's decision to indict Zahn. The district court correctly concluded that any *Kastigar* violation was harmless beyond a reasonable doubt because every reasonable grand juror would have found probable cause based on the wealth of untainted evidence that Zahn's grand jury heard.

## Argument and Citations of Authority[11]

### I.    Sufficient fraud and property evidence supported Zahn's convictions under 18 U.S.C. §§ 666 and 1343.

Zahn contends that his convictions rested on insufficient evidence that:

---

[11] Zahn repeatedly characterizes this prosecution—and, by extension, the jury's guilty verdict—as a "political" one. *See* Zahn's brief at i, 40, 43, 60. We will respond to his legal arguments.

(1) he schemed to obtain "property" (2) "by means of" misrepresentations (3) as part of a scheme to "defraud." Zahn's brief at 43–58. He is wrong.

**A.    The object of Zahn's scheme was to obtain money—which is property. (Zahn's Issue I.A)**

The City owns JEA. By devising a scheme to fraudulently obtain money from the sale of JEA—a City asset—Zahn schemed to obtain money (i.e., property) that belonged to the City.

**(1)    Sections 666 and 1343 reach schemes to cheat the City of its right to receive the full proceeds from a sale of its assets.**

Sections 666 and 1343 criminalize only schemes whose object is deprivation of a traditional property interest. *See Kelly v. United States*, 590 U.S. 391, 398–99 (2020) (section 666); *Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (section 1343). Money is a traditional property interest. *Kelly*, 590 U.S. at 398. And not just money in one's pocket: "an entitlement to collect money from [a party]" is property, too. *Pasquantino v. United States*, 544 U.S. 349, 355 (2005). So a scheme to deprive someone of money otherwise due is as much a scheme to deprive him of property as a scheme to fraudulently remove money from his pocket. *Id*. at 356–57; *cf. United States v. Griffin*, 76 F.4th 724, 739 (7th Cir. 2023) (fraudulently obtained guarantees "that committed the [Small Business Administration] to stand behind a significant portion of the loan amount in case of default, are most certainly 'property'" under section 1343);

*United States v. Hoffman*, 901 F.3d 523, 538 (5th Cir. 2018) (noting that fraudulently claiming a state tax credit, obtaining a public grant, or failing to report income all involve depriving the government of "property" under *Pasquantino* because they all reduce dollars otherwise owed to the state).

In some circumstances, though, the object of a fraud becomes "property" only once it's transferred from the victim to the fraudster. In that situation, the Supreme Court has explained, "[i]t does not suffice … that the object of the fraud may become property in the recipient's hands"; the object "must be property in the hands of the victim."[12] *Cleveland v. United States*, 531 U.S. 12, 15 (2000).

In *Cleveland*, for instance, the Supreme Court held that "a 'license' is not 'property' while in the State's hands and so [it] cannot be 'obtained' from the State." *Sekhar v. United States*, 570 U.S. 729, 737 (2013). The Court reasoned that a state's interest in an unissued video-poker license wasn't "property," because the state's "interest in choosing particular licensees was 'purely regulatory' and '[could not] be economic.'" *Pasquantino*, 544 U.S. at 357

---

[12] *Cleveland* interpreted the term "property" in the mail-fraud statute, 18 U.S.C. § 1341, but the Supreme Court has "construed identical language in the wire and mail fraud statutes *in pari materia.*" *Pasquantino*, 544 U.S. at 355 n.2. We therefore cite to section 1341 and 1343 cases.

(quoting *Cleveland*, 531 U.S. at 22–23). After all, "[l]icenses pre-issuance do not

generate an ongoing stream of revenue," and the state cannot sell its licensing

authority. *Cleveland*, 531 U.S. at 22–23. Nor does the state conduct its own

gaming operations or "'sell' video poker licenses in the ordinary commercial

sense." *Id*. Because the license wasn't a traditional property interest while in

the state's hands, the Court held that a scheme to fraudulently obtain a license

from the state couldn't be prosecuted under section 1341. *Id*. at 15. And the

Supreme Court noted that "the Government nowhere allege[d]

that Cleveland defrauded the State of any money to which the State was

entitled by law." *Id.* at 22.

　　*United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003), is also instructive.

There, developers faced section 666 and 1341 charges for fraudulently

obtaining tax credits that the federal government (through the state housing

authority) had issued to incentivize construction of affordable housing. *Id*. at

337–40. But the Fifth Circuit held that the housing authority's interest in those

unissued credits wasn't "property." *Id*. at 354–55. After all, "[u]nissued tax

credits have zero intrinsic value"; unused credits revert to the federal

government, not the housing authority; and the housing authority doesn't

"derive any benefit, gain, or income from tax credits while it possesses them."

*Id*. at 354–55. Accordingly, the credits "do not amount to economic property

51

as contemplated by [section 1341] while they are in the [housing authority's] possession." *Id.* at 355.

Finally, "[t]he fact that the victim of the fraud happens to be the government, rather than a private party, does not lessen the injury." *Pasquantino*, 544 U.S. at 356. Thus, sections 666 and 1343 reach schemes to cheat a city government of its right to receive the full proceeds from a sale of its assets. *See id.*

**(2)    Zahn conspired and schemed to fraudulently obtain hundreds of millions of dollars in proceeds from the City's sale of JEA.**

Contrary to Zahn's assertions, *see* Zahn's brief at 43–53, the evidence sufficed to prove that he conspired and schemed to obtain money that was "a traditional property interest in the City's hands."

*(a)    Zahn schemed to obtain money—a traditional property interest.*

Taking the evidence in the light most favorable to the verdict, a reasonable jury could readily conclude that because the City owns JEA, any proceeds from a sale of JEA belong to the City. The United States proved in its case-in-chief that JEA is a City-owned utility and the City's "biggest and most important asset." Doc. 476-7 at 3; Doc. 476-13 at 17. The City approves JEA's budget. Doc. 470-99 at 91. The City audits JEA. Doc. 511 at 263. The City decides whether to keep or sell it. Doc. 476-4 at 4–5, 18–19. The mayor and

City Council appoint its Board, which in turn, establishes JEA's strategy and gives its CEO direction. Doc. 504 at 142–46. And, because the City owns JEA, the City is entitled to receive the cash value of JEA if JEA is ever sold. Doc. 504 at 179–85; Doc. 476-4 at 18–20.

The trial also included evidence that, although JEA is a "legally separate" entity that owns and manages the water and electric utilities that serve the City, the City can impose its will on JEA. Doc. 470-99 at 80, 91. Plus, the City's financial statements include JEA's financial results, and the City is financially accountable for JEA. *Id.* at 80; Doc. 523 at 199–200. Zahn's repeated insistence that JEA isn't a City asset, "as JEA own[s] its own assets," Zahn's brief at 8, 28, is meritless; nothing about JEA's ownership of its own assets precludes the City from owning JEA. Thus, the City has a property interest in JEA, both as an operating utility (pre-sale) and as cash proceeds (post-sale).

Next, a reasonable jury could infer that Zahn's scheme involved two parts: (1) inducing the City to sell JEA and (2) cashing in on that sale through the PUP. First, Zahn misled the JEA Board into believing that, absent a drastic change, JEA would be in dire financial straits. *See Statement of Facts*, sections II–III. That wasn't true. *See id.* at section VII. But, by presenting a false picture of JEA's imminent demise, Zahn persuaded the Board to approve exploration

53

of other options and the ITN launch. *See id.* at section IV.B. Of course, the most viable option, according to Zahn's story, was to sell JEA, and several large utility companies submitted sizeable bids. *See id.* at section V.D. Thus, by misrepresenting to the Board JEA's true economic status, Zahn led the Board (and therefore, JEA and the City) to pursue conversion of JEA from an operating utility to cash proceeds.

Second, in the meantime, Zahn fraudulently presented the PUP as the brainchild of compensation experts, framing it as a solution for bringing JEA employees' compensation in line with the market's median. Doc. 476-71 at 13; Doc. 476-36 at 64; *Statement of Facts*, section III.A. And he grossly misrepresented the PUP's cost, assuring the Board that—at only several million dollars—the cost would be modest. Doc. 512 at 265. That was half-true: if JEA continued with business as usual, the PUP wouldn't cost much. But that wouldn't hold true if Zahn's parallel efforts to push for a sale of JEA succeeded. Doc. 476-34.

Beyond half-truths, Zahn and Wannemacher made material omissions about the PUP. At the July 2019 Board meeting, Wannemacher explained how the PUP would cost only $10 million per year, even in extraordinary boom times. GX 20Q at 2:45:50–2:46:38. But he and Zahn knew that if JEA were sold, the PUP units would likely be worth hundreds of millions of dollars.

Doc. 515 at 203, 205, 241–42; Docs. 476-20, 476-34. And the senior

executives—and Zahn in particular—stood to gain the most, Doc. 476-26 at

24–25; Doc. 476-36 at 126–27. But, at Zahn's direction, Wannemacher hid the

PUP units' potential value. Doc. 515 at 203, 205, 241–42.

Zahn and Wannemacher didn't reveal that crucial information to the

Board members; the OGC; JEA's human-resources director; or even Vinyard,

Zahn's right-hand man. *See Statement of Facts*, section IV.C. Those who were

asked said that, had they known, they would not have supported or advanced

the PUP. *See id.*; Doc. 517 at 190–91; Doc. 523 at 64–65.

But the Board members didn't know. They relied on Zahn's

misrepresentations and unanimously gave final approval for the PUP. Doc.

476-41 at 1; Doc. 514 at 11; GX 20T, clip 2 at 5:15–5:25. Consequently, if JEA

were sold, every $10 PUP unit would increase in value by $100 for each

percentage value change above 110%, when compared to JEA's base year

value of about $3 billion. Doc. 476-41 at 9; Docs. 476-20, 476-34. NextEra's

$11 billion offer would have resulted in $6.4 billion in net proceeds to City—a

213% increase over $3 billion, or 103 percentage points above 110%. *See* Doc.

476-96 at 3; Doc. 506 at 61–62. So, each $10 PUP unit would have increased

in value from $10 to $10,300, and 100,000 PUP units would have cost the City

$1.03 billion—a far cry from the "nominal" $3.4-million payment Zahn had

presented, *see* Doc. 476-36 at 123. So, the trial evidence was sufficient to prove that Zahn sought to fraudulently prompt a sale of JEA and obtain exorbitant proceeds from that sale that otherwise would have gone to the City. *See* Doc. 1.

Zahn frames his scheme as one to deprive the City and JEA Board of their "right to information" or "right to control." *See* Zahn's brief at 46–48, 52. While we don't disagree that Zahn committed those additional frauds (actionable or not) and that they were part of his scheme, the United States charged and proved a scheme to defraud, the object of which was money, a traditional property interest. *See Kelly*, 590 U.S. at 398.

(b)    *The money Zahn schemed to obtain was "*property *in the City's hands."*

Although Zahn argues that the City lacks a property interest in proceeds from a potential sale of JEA, *see* Zahn's brief at 43, 47–48, 50, 52, he is wrong. The inquiry under *Cleveland* is whether the victim's interest in the object of a fraud is one that "has long been recognized as property." 531 U.S. at 23. If that answer is yes, then the object is "property in the victim's hands." *Id*. at 15. And, as we've just explained, the City's interest in money it is owed from the sale of one of its assets is a traditional property interest—so the money Zahn schemed to obtain was "*property* in the City's hands." *See id*.

The cases Zahn cites don't advance his argument to the contrary. *Ciminelli* and *Yates* are distinguishable because the United States didn't rely on

56

an invalid theory of property here; the objects in those cases could become "property" only in the hands of someone other than the victim. That's not the case here, as explained above. And the United States alleged (and proved) a scheme to defraud, not a scheme to merely deceive (*Ratcliff*) or to engage in anti-competitive conduct (*Lancaster Cmty. Hosp.*). *See* Zahn's brief at 49, 52. And, unlike unissued video-poker licenses (*Cleveland*), the opportunity—but not the right—to receive bank deposits (*Henry*), and unissued affordable-housing tax credits (*Griffin*), JEA has inherent monetary value to the City because it generates revenue as the City's utility. *See* Zahn's brief at 51–52.

Moreover, Zahn's argument ignores the City's ownership of JEA, *see Statement of Facts*, section VIII.A, and evidence that if JEA were sold, the City was entitled to the proceeds from that sale, Doc. 476-4 at 20; Doc. 476-96 at 3, 9–12. Instead, he relies on JEA's status as a "distinct legal entit[y]" to argue that the City didn't own JEA. Zahn's brief at 7–8. The substantial evidence discussed above, though, establishes the contrary, and the jury was "free to choose among the reasonable constructions of the evidence"; it was not obliged to accept Zahn's view. *See United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020).

And yes, Zahn's scheme was thwarted before it reached fruition. *See* Zahn's brief at 49–50. But that doesn't matter, because a scheme to defraud the

government of money is cognizable under sections 666 and 1343 even if it's unclear whether that money is currently—or will ever become—due. *See United States v. Maxwell*, 579 F.3d 1282, 1302 (11th Cir. 2009) ("financial loss is not at the core of … mail and wire frauds," as those statutes "punish the intent to obtain money or property from a victim by means of fraud and deceit"); *United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991) (schemes to avoid paying state taxes are prosecutable under section 1341 "even if in the end [defendant] owed no taxes" because "absence of proof of taxes actually due is immaterial," as "success of a scheme to defraud is not required"); *United States v. Hird*, 913 F.3d 332, 342–46 (3d Cir. 2019) (defrauding government of money was object of scheme to avoid fines by rigging traffic court, even though "they were only fines … that … people *might* have owed *if* they had been found guilty").

In sum, the evidence was sufficient for the jury to find that the City had a *present* property interest in JEA, regardless of JEA's form—either as an operating utility (pre-sale) or as billions in cash (post-sale). And through his scheme, Zahn sought to fraudulently cheat the government of money—a traditional property interest in the City's hands.[13]

---

[13]Because the United States proved that Zahn conspired and schemed to defraud the City of a traditional property interest, the federalism concerns Zahn cites in his brief at 45 do not apply. In addition, for the reasons discussed, the district court properly denied Zahn's motion to dismiss.

**B.    Zahn sought to obtain that money "by means of" material misrepresentations and omissions. (Zahn's Issue I.B)**

Section 666 criminalizes efforts to obtain money "by" fraud, and section 1343 proscribes schemes to obtain money "by means of" material misrepresentations or omissions. *See* 18 U.S.C. §§ 666, 1343; *Neder v. United States*, 527 U.S. 1, 22 (1999). Section 1344(2)—the bank-fraud statute, which is not charged here, but uses similar language—criminalizes schemes to obtain a bank's money "by means of" false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1344(2).

In analyzing the bank-fraud statute in *Loughrin v. United States*, the Supreme Court explained that "by means of" "typically indicates that the given result (the 'end') is achieved, at least in part, *through* the [misrepresentation] (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental." 573 U.S. 351, 363 (2014). "In other words, not every but-for cause will do." *Id*. The *Loughrin* Court then interpreted "by means of," for purposes of section 1344(2), as requiring proof that the defendant's false statement was "the mechanism" that would, "in the ordinary course," "naturally induc[e] a bank (or custodian) to part with its money." 573 U.S. at 365–66. But the Court also clarified that "by means of" does not require proof of actual loss—or even a risk of such loss—

because "the gravamen of § 1344 is the scheme, rather than the completed fraud." *Id.* at 366 n.9 (internal quotation marks and citation omitted).

The United States was required to (and did) present sufficient evidence that Zahn conspired and schemed to achieve his goal of obtaining the City's money (his "end") at least in part through his material misrepresentations and omissions (his "means"). *See Loughrin*, 573 U.S. at 363 (explaining the broader meaning that the phrase "by means of" "typically indicates"). Zahn fabricated an emergency (one "means") to instigate Board action that hurtled JEA headlong toward a sale. And simultaneously, Zahn fraudulently convinced the Board to implement the (misrepresented) PUP (another "means") so that when the sale of JEA occurred, he would get a windfall from the City (the "end"). Thus, the United States proved that Zahn's fraudulent conduct was foundational—not merely "oblique, indirect, and incidental"—to his scheme to obtain the City's money.[14] *See Loughrin*, 573 U.S. at 363.

Zahn further argues that his fraudulent conduct couldn't have caused loss to the City, because JEA's buyer—not the City—would have made the

---

[14]Although Zahn argues that the Board's decisions "could not directly result in the City losing money," Zahn's brief at 55, that assertion measures the evidence against a heightened standard that even *Loughrin* doesn't impose. *See Loughrin*, 573 U.S. at 363 ("by means of" "typically indicates that the given result (the 'end') is achieved, *at least in part*, *through* the [misrepresentation] (the 'means')") (first emphasis supplied).

PUP payments. Zahn's brief at 34–35. But the concept of having the buyer pay for the PUP first arose in October, months after Zahn's fraud to the Board about the PUP. *See* Doc. 476-84 at 2 n.2; Doc. 476-88 at 3 n.4. Moreover, the evidence, viewed in the light most favorable to the verdict, shows that no one (including Zahn) envisioned that the buyer would pay for the PUP. Zahn urgently sought legal cover from the OGC before presenting the PUP to the Board in July. Before and long after that Board meeting, JEA sought or planned to seek legal approval from more lawyers, the Florida Attorney General, and the Florida Ethics Commission. *See Statement of Facts*, sections III.C.4, V.A. No such review would have been necessary unless the PUP required the City—a public entity—to pay these bonuses.

And, even if the buyer ultimately agreed to make the PUP payments (and, counterintuitively, would not pay the City any less as a result), Zahn still committed fraud because the evidence shows that Zahn *believed* that JEA and the City would have to pay for the PUP. *See Statement of Facts*, sections III.C.4, V.A; *United States v. Bradley*, 644 F.3d 1213, 1247 (11th Cir. 2011) (defendants' belief that Medicaid would not pay for certain drugs—even if mistaken—was sufficient to establish defendants' fraud under sections 1341 and 1341 because they *intended* to defraud Medicaid).

In arguing otherwise, Zahn urges this Court to apply a *Loughrin*-plus

standard. According to him, the United States had to prove that his scheme would "naturally induce" the City to lose money "in a manner akin to 'proximate causation.'" Zahn's brief at 54 (quoting *United States v. Berroa*, 856 F.3d 141, 149–50 & n.4 (1st Cir. 2017)). But *Loughrin* doesn't even mention proximate cause.

*Berroa* doesn't help Zahn, either. *See* Zahn's brief at 54–55, 59. In a divided opinion, the majority extended *Loughrin* to section 1341 and held that defendants' submission of fake exam scores to fraudulently obtain medical licenses "cannot be said to have 'naturally induc[ed]' healthcare consumers [who didn't know that their doctors weren't properly qualified] to part with their money years later." *Berroa*, 856 F.3d at 149–50. But the majority limited its holding to the case's facts while conceding that "*Loughrin*'s 'naturally inducing' test … is 'flexible' and 'does not lend itself to a black-letter rule that will dictate the result in every case.'" *Berroa*, 856 F.3d at 150 n.4 (quoting *Bridge v. Phoenix Bond. & Indem. Co.*, 553 U.S. 639, 654 (2008)). To date, no other Circuits have followed *Berroa*, which isn't persuasive—or binding.

Finally, Zahn's passing references to federalism concerns are a red herring. *See* Zahn's brief at 55. Applying the *Loughrin* standard to sections 1343 and 666 wouldn't exclude from prosecution frauds that are only tangentially related to the federal interests in preventing the misuse of wires, *cf. Berroa*, 856

F.3d at 171 (Lipez, J., dissenting), and "protect[ing] the integrity of the vast sums of money distributed through Federal programs from … fraud," *see* S. Rep. No. 98-225, p.370 (1983).

**C.    Zahn acted with intent to defraud. (Zahn's Issue I.C.)**

Zahn next argues that the United States failed to prove a scheme to defraud in light of *United States v. Takhalov*, in which this Court held that one can't be defrauded of property if he is "merely induced … to enter into a transaction that he otherwise would have avoided." Zahn's brief at 57 (quoting *Takhalov*, 827 F.3d 1307, 1310 (11th Cir. 2016)). There, this Court rejected the validity of a federal fraud conviction when the defendant did not seek to cause the victim net pecuniary loss. *See Kousisis v. United States*, 145 S. Ct. 1382, 1390 (2025) (citing *Takhalov*, 827 F.3d at 1307).

But the Supreme Court recently expressly overruled *Takhalov*, affirming fraudulent-inducement theories of wire-fraud prosecution and holding that section 1343 criminalizes fraud where a defendant "intentionally l[ies] to induce a victim into a transaction that will cost [the victim] money or property." *Kousisis*, 145 S. Ct. at 1398. That's exactly what happened here: Zahn (1) devised a scheme (2) to induce JEA to pass resolutions that would facilitate Zahn's obtainment of JEA's and the City's money (3) by means of false or fraudulent pretenses. *See id.* at 1391.

63

Based on the United States' evidence, a reasonable jury could (and did) find that the Board voted for Scenario Three because of Zahn's material misrepresentations and omissions about JEA's financial future. Board members felt an urgency to prevent disaster for JEA's employees and the Jacksonville community. A reasonable jury could also find that the Board approved the PUP based on Zahn's material misrepresentations and omissions about how much the PUP would really cost—especially given the range of JEA's likely sale prices.

At bottom, Zahn lied about "essential characteristics" about both Scenario Three and the PUP "that … alter[ed] the nature of the bargain." *United States v. Wheeler*, 16 F.4th 805, 820 (11th Cir. 2021). And he geared his material lies and omissions toward inducing the Board to make decisions that would cost JEA and the City significant sums. Such fraudulent inducement falls squarely within the "broad, generic language of § 1343." *Kousisis*, 145 S. Ct. at 1391; *see United States v. Bell*, 112 F.4th 1318, 1334 (11th Cir. 2024) (finding requisite intent to defraud where sellers deceived investors as to a "core attribute" about what they were selling).

Zahn nevertheless argues that the United States' evidence was insufficient because his scheme ultimately would have resulted in disclosure and approval. Zahn's brief at 57–58. That's legally inaccurate. The possibility

64

that a defendant's deception might be exposed doesn't absolve him of liability under section 1343: "All that is necessary is that the scheme be reasonably calculated to deceive." *Bradley*, 644 F.3d at 1239. And Zahn obtained by deceit the Board's approval for the PUP and Scenario Three—both crucial, indispensable steps in his quest for a publicly funded windfall.

Moreover, contrary to Zahn's assertions, *see* Zahn's brief at 57–58, evidence of his fraudulent intent extended far beyond the July Board meeting, demonstrating that his scheme did not contemplate full disclosure. The ITN's minimum requirements didn't reveal JEA's true financial prospects or whether privatization was necessary. And Zahn continued to conceal the truth about Scenario One even after Hunt confronted him about how unrealistically pessimistic that Scenario's forecasts were. *See* Doc. 518 at 256–64.

And, until the end, Zahn and Wannemacher continued to hide material information about how much the PUP would likely pay upon a sale of JEA. They never asked outside counsel to opine on the propriety of large payouts based on a sale of a public asset. Doc. 518 at 79, 84, 185. And when counsel asked for PUP formula calculations because the "formula [was] spitting out large numbers," Wannemacher didn't send his calculations that reflected those massive payouts. Doc. 518 at 138–39, 184. Zahn even hid the PUP's true value from Vinyard, his Chief Administrative Officer. So Vinyard worked to get legal

and ethical guidance from state and federal authorities, not knowing that the PUP involved paying employees—and two in particular—tens of millions of dollars in bonuses (a fact that would have driven Vinyard to resign had he known). Doc. 523 at 60–65, 114–15, 120, 127. Unsurprisingly, then, the letter request to the Florida Attorney General didn't discuss potential payouts to executives, and the OGC attorney who signed that request didn't know how much the PUP would be worth, if the City netted multiple billions in a sale. Doc. 517 at 40, 42.

Plus, from July until the end of October, Wannemacher evaded the Council Auditor Office's questions, and even represented that JEA's net position after recapitalization would be zero dollars. Doc. 511 at 176–78; Doc. 524 at 89–90. And in November, when Gabriel asked whether anyone had done financial projections on the PUP, Zahn brushed him aside with a simple, "It's nominal." Doc. 517 at 195. So the United States presented ample evidence that Zahn and Wannemacher fraudulently induced the Board to vote for Scenario Three and the PUP in a scheme to obtain proceeds that belonged to the City. *See Kousis*, 145 S. Ct. at 1398.

Finally, Zahn's argument that he is saved because section 666 "does not apply to bona fide salary … or other compensation paid … in the usual course of business" is without merit. *See* Zahn's brief at 57. The jury's finding that he

attempted to obtain this "other compensation" via his scheme to defraud

precludes any reliance on this exception. *See United States v. Schmitz*, 634 F.3d

1247, 1264 n.13 (11th Cir. 2011) ("[A] salary is not bona fide or earned in the

usual course of business under § 666(c) if the employee is not entitled to the

money.") (quoting *United States v. Williams,* 507 F.3d 905, 908 (5th Cir. 2007));

*see also* Doc. 527 at 18 (instructing jury that, "[i]n determining whether Mr.

Zahn is guilty of this offense, do not consider bona fide salary … and other

compensation paid … in the usual course of business").

## II.    The evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Zahn "caused" wires to be transmitted "for the purpose of" executing his fraudulent scheme. (Zahn's Issue II)

Section 1343's jurisdictional element requires proof that Zahn

(1) "cause[d]" the transmission of wires (2) "for the purpose of executing" his

scheme to defraud. Although Zahn argues otherwise, *see* Zahn's brief at 60–64,

the United States proved as much.

## A.    Zahn caused the wire transmission of his fraudulent misrepresentations.

"[A] person 'causes' … [wires] to be used … when he acts 'with

knowledge that the use of the [wires] will follow in the ordinary course of

business, or where such use can reasonably be foreseen, even though not

actually intended.'" *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007)

(quoting *Pereira v. United States,* 347 U.S. 1, 8–9 (1954)).

The United States presented evidence during its case-in-chief that since 2018, as a matter of standard practice, JEA has automatically broadcast every Board meeting, making it available to the public through a livestream that uses interstate wire communications. *See Statement of Facts*, section IV.D. Consequently, a reasonable jury could conclude that when Zahn and Wannemacher fraudulently presented Scenario Three and the PUP and put them up for a vote at that July Board meeting, they knew that the use of wires to transmit their misrepresentations would follow. Indeed, because JEA "repeatedly used [livestreaming wires] in the course of business," their use was "undeniably … foreseeable." *See Ward*, 486 F.3d at 1226.

The Seventh Circuit *Dooley* decision on which Zahn relies, *see* Zahn's brief at 61–62, supports this conclusion. Officer Dooley was an evidence custodian who stole cash that was stored as evidence at the police department. *United States v. Dooley*, 578 F.3d 582, 584 (7th Cir. 2009). The United States charged Dooley with wire fraud based on an email he received from his supervisor, requesting his transfer of that evidence to the FBI. *Id*. at 584, 588. The Seventh Circuit reversed Dooley's conviction because he hadn't "caused" the email to be sent. *Id*. at 589. The court reasoned that, even absent Dooley's theft, his supervisor would have sent him "exactly the same e-mail message."

68

*Id.* So, because "Dooley's conduct had no effect on either the existence of that wire transmission *or its content*," "[h]e did not 'cause' it to be sent in any sense of the word." *Id.* (emphasis added).

Here, the opposite is true. Because of Zahn's (and Wannemacher's) conduct, the livestreaming wires' *content* contained their fraudulent misrepresentations and false pretenses as the July Board meeting was broadcast to the public. Thus, "in the absence of [Zahn's] fraudulent conduct," the wire transmission "would have occurred in substantially different form," *see Dooley*, 578 F.3d at 589. Accordingly, he "caused" the wires' transmission for purposes of section 1343.

**B.    Those wires were transmitted "for the purpose of executing" Zahn's scheme.**

"To violate the wire fraud statute, it is not necessary that the transmitted information include any misrepresentation." *United States v. Hasson*, 333 F.3d 1264, 1272–73 (11th Cir. 2003). A wire transmission is "for the purpose of executing" the scheme if it is "incident to an essential part of the scheme" or "a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710–711 & n.6 (1989) (citation omitted). Of course, the proof here exceeded that lower standard because, as we've just explained, the wires that broadcast the July Board meeting contained a host of Zahn's material misrepresentations.

69

And, contrary to Zahn's assertions, *see* Zahn's brief at 63, the livestream facilitated and advanced—and thus helped carry out—his scheme. The United States' case-in-chief included evidence that any sale of JEA required approval from not only the Board, but also City Council and Jacksonville's voters, and that the PUP was designed to funnel substantial sale proceeds from JEA and the City, to Zahn, *see Statement of Facts*, sections IV.C, V.B, VIII.A. So to profit from the scheme, Zahn had to convince all such stakeholders—not just Board members—that it was prudent to both sell JEA and implement the PUP. And Zahn knew it: as he announced at the June Board meeting, "I am not here to just implement the traditional utility response. I believe … there's a lot of exciting opportunities if we just gain some alignment with our entire community." GX 20F-3, clip 6 at 2:13–2:28. That alignment was critical because before, even short-term incentive programs had been poorly received by the public, and privatization discussions had resulted in "ugly politics." Doc. 514 at 140–42.

So, although Zahn asserts that the wire transmission was "independent of the scheme," Zahn's brief at 61, that's incorrect, especially because this Court must view the evidence in the light most favorable to the verdict. A jury could reasonably infer based on the evidence that livestreaming fraudulent misrepresentations about the PUP and the need to privatize JEA enabled Zahn

to communicate critical (mis)information, which in turn helped him get the community "alignment" he needed.

After all, the livestreamed Board meetings were intended for the public. Doc. 505 at 170. As Dykes testified, Wannemacher chose his words carefully during the July Board meeting to avoid "publicly discuss[ing]" JEA's value, Doc. 515 at 26, and the Board meetings involved "a bit of theater" because any substantive conversations had already occurred during Board members' individual meetings with Zahn. *Id.* at 74–75.

And people tuned in to the livestreamed Board meetings. *See, e.g.*, Doc. 505 at 136 (bond counsel); Doc. 511 at 80 (JEA's compensation specialist); Doc. 520 at 21 (union leader); Doc. 524 at 73 (City Council auditor) (United States' rebuttal case). Thus, there was abundant evidence that Zahn caused the transmission of wires "for the purpose of executing" his scheme.

*Parr* is distinguishable. *See* Zahn's brief at 62–63. There, the Supreme Court reversed mail-fraud convictions because state law required the underlying mailings to be mailed. *Parr v. United States*, 363 U.S. 370, 375, 391 (1960). Therefore, the mailings weren't criminal under section 1341, "even though some … who [were] … required to do the mailing for the District plan[ned] to steal … some indefinite part of its moneys." *Parr*, 363 U.S. at 391.

Livestreaming the JEA Board meetings was automatic as a matter of

practice, Doc. 505 at 35, but it wasn't "legally compelled," as in *Parr*, 363 U.S. at 391. Plus, the livestreamed July meeting contained false pretenses and misrepresentations that advanced Zahn's scheme.[15] So, wires airing those fraudulent representations to the public weren't just "incident to" the scheme, though that would satisfy *Schmuck*. Rather, those wires were essential because, as the district court astutely observed, "the listening public was also an object of [Zahn's] scheme." Doc. 540 at 11. Accordingly, the district court did not err in denying Zahn's motion for judgment of acquittal based on section 1343's jurisdictional element. *See id*. at 13.

### III. Sufficient evidence established that the City received federal funds that were "benefits" under section 666 and that Zahn was the City's "agent." (Zahn's Issue III.A–C)

Section 666's jurisdictional element requires proof that (1) in a relevant one-year period, the City received more than $10,000 from the federal government (2) in "benefits" under a federal assistance program, and (3) Zahn

---

[15]Zahn's reliance on *United States v. Kwiat* is misplaced. *See* Zahn's brief at 63. There, the Seventh Circuit reversed mail-fraud convictions because the defendants' mailings "did not make the fraud possible or facilitate it." 817 F.2d 440, 443 (7th Cir. 1987). But the wires here contained misrepresentations and thus facilitated Zahn's fraud. Moreover, Zahn's complaints that the district court misread *Evans* are baseless. *See* Zahn's brief at 63. Here, as in *United States v. Evans*, 473 F.3d 1115 (11th Cir. 2006), Zahn caused transmission of a wire that was (at least) "incident to an essential part of the scheme." *Id*. at 1118.

was an agent of the City. *See* 18 U.S.C. § 666. The United States presented sufficient evidence to prove each fact beyond a reasonable doubt.

**A.    In 2019, the City (through JEA) received millions in FEMA assistance.**

The evidence established that during the 2019 fiscal year, JEA spent $4.8 million in "disaster grants" from FEMA. Doc. 476-115 at 5–6; Doc. 515 at 236. Zahn argues that "JEA—not the City—received federal money" and that, in denying his motion for a judgment of acquittal, the district court wrongly assumed that "the City and JEA are one and the same." Zahn's brief at 65; *see* Doc. 540 at 5–6. He is mistaken: based on evidence of the City's ownership of and financial accountability for JEA, a jury could reasonably find that both JEA and the City received the FEMA funds.

The United States' case-in-chief was replete with testimony and evidence that JEA was a City-owned asset. Doc. 476-7 at 3; Doc. 504 at 139–44; Doc. 514 at 129; Doc. 518 at 248. The City could choose to sell or retain JEA. Doc. 476-4 at 4–5. And although JEA is "legally separate," it is a City agency for which the City is financially accountable, so the City's financial statements include JEA's financial results. Doc. 470-99 at 80; Doc. 511 at 263; Doc. 523 at 199–200. Accordingly, FEMA's $4.8 million grant to JEA concomitantly boosted the City's finances by $4.8 million, because JEA's finances are but a subset of the City's finances:



Accordingly, a reasonable jury could conclude that the City received the FEMA funds (through JEA).

Zahn resists this conclusion, relying on the veil-piercing doctrine. *See* Zahn's brief at 65–67. But that applies to corporations. Under Florida law, a corporation is a "fictional person," and the "purpose of this fiction is to limit the liability of the corporation's owners." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011). But JEA is inherently different from a corporation; it's a City agency. And far from having limited liability concerning JEA, the City remains financially accountable for it.

Moreover, the cases Zahn cites in his brief at 55–56 are inapposite. *Molinos* is not a section 666 case; it's a civil contract case. *Doran* is inapt because it involves a corporation, and regardless, it's readily distinguishable. Florida State University (FSU) had established a fund that was a nonprofit

corporation, and Doran embezzled the fund's money.[16] *United States v. Doran*, 854 F.3d 1312, 1314 (11th Cir. 2017). The prosecution argued that section 666 reached Doran's embezzlement because the fund was "closely affiliated" with FSU—which had received federal benefits—and Doran was an FSU professor. *Id.* But none of the fund's assets came from FSU, it never funneled money to FSU, and FSU didn't assume any financial liability for it. *Id.* And although FSU received millions of dollars in federal benefits, the fund received none. *Doran*, 854 F.3d at 1314. To illustrate:



Accordingly, this Court held that although the entities were affiliated, they weren't "alter ego[s]" such that the Court could "pierce the [fund's] corporate veil" and treat them as one. *Id.* at 1315.

Unlike the fund in *Doran*, JEA is an agency of the City. Its founding

---

[16]Under Florida law, the veil-piercing doctrine also applies to non-profit corporations. *Barineau v. Barineau,* 662 So. 2d 1008, 1009 (Fla. 1st DCA 1995).

assets came from the City. It annually contributes more than $100 million to the City. And, as we've emphasized, the City is financially accountable for it. The fund's relationship with FSU is thus fundamentally different from JEA's relationship with the City.

*McLean* doesn't apply, either. *See* Zahn's brief at 66–68. McLean was an agent of the MCRA, a city agency.[17] *United States v. McLean*, 802 F.3d 1228, 1232 (11th Cir. 2015). Like JEA, the MCRA was a component unit of the city for which the city was financially accountable. *See id.* at 1241. When the city received federal funding, it passed at least $10,000 of those funds to the MCRA. *Id.* at 1243.

McLean was charged under section 666 for bribery in connection with an MCRA grant, but this Court held that the prosecution had failed to prove that the MCRA had received a "federal benefit." *McLean*, 802 F.3d at 1231, 1243–44. Evidence that the city (i.e., the parent) received federal-program benefits was—without more—insufficient to establish that the city agency (i.e., the subsidiary) that later received some of those funds had the requisite relationship with that federal program. *Id.* at 1243–44. That makes sense, because assistance to a city doesn't automatically flow down to all of its

---

[17]*McLean* does not discuss veil-piercing, presumably because it doesn't involve a corporation.

agencies:[18]



But the converse, which is what happened here, is true. An agency's receipt of

federal benefits intrinsically inures to the benefit of the city:



Consequently, the evidence here was sufficient to prove that in 2019, the City

(through JEA) received millions in federal FEMA assistance.

**B.    The City and JEA received "benefits" under section 666.**

The United States' case-in-chief included evidence that in 2019, JEA

---

[18]*McLean* and *DeQuattro*, which Zahn cites in his brief at 56, reflect these
principles.

77

received from FEMA $4.8 million under a federal program titled "Disaster Grants – Public Assistance." Doc. 476-115 at 5–6; Doc. 515 at 235–36. Dykes also testified that JEA was eligible to receive FEMA funds following a natural disaster. *Id*. at 95. That more than sufficed to establish that JEA received more than $10,000 in federal "benefits." *See United States v. Fischer*, 168 F.3d 1273, 1277 (11th Cir. 1999) (holding evidence sufficient to establish agency's receipt of "benefits" under section 666(b) where agency "received payments under a federal assistance program").

In arguing otherwise, Zahn conflates sufficiency of the evidence with the legal question of whether specific federal funds are "benefits" as a matter of law. *See* Zahn's brief at 67–69. The *Fischer* cases are instructive: this Court considered the sufficiency issue in *Fischer*, 168 F.3d at 1273 ("*Fischer I*"), and the Supreme Court considered the legal "benefits" question in *Fischer v. United States*, 529 U.S. 667 (2000) ("*Fischer II*").

The evidence in *Fischer I* showed that a county agency received millions of dollars from Medicare to provide healthcare services. *Id*., 168 F.3d at 1276–77. Without mentioning any evidence of Medicare's underlying purpose, structure, or operations, this Court determined that there was sufficient evidence that the agency had received "benefits" under section 666(b) because the agency had "received payments under a federal assistance program." *Id*.

The Supreme Court later affirmed. *Fischer II*, 529 U.S. at 671.

In *Fischer II*, the Supreme Court addressed the underlying legal question of whether Medicare's payments were "benefits" under section 666. Because "the nature of the program bears on the question of statutory coverage," the Court examined the nature, purposes, operations, and funding structure of the Medicare program. 529 U.S. at 671–75, 680. To that end, the Court reviewed the statutes and regulations that established and govern Medicare. *Id*. The Court also considered the "conditions under which the [agency] … receiv[ed] the federal payments." *Fischer II*, 529 U.S. at 681. Based on that review, the Court concluded that Medicare's payments to the agency were "benefits" under section 666. *Id*. at 682.

Zahn doesn't dispute that FEMA's payments to JEA were "benefits" under the law (nor could he credibly do so). He merely contends that the United States failed to present *to the jury* evidence of the program's structure, operation, or purpose. *See* Zahn's brief at 67–69. But, as *Fischer II* shows, whether FEMA's payments to JEA were "benefits" is a legal question for the court to determine, not a fact question for the jury to resolve. *See United States v. Sullivan*, 118 F.4th 170, 199 (2d Cir. 2024) (what constitutes a benefit under section 666(b) is a matter of statutory interpretation for the court, not a

question for the jury to resolve).[19]

And the district court correctly held that the FEMA grants were federal "benefits" under section 666. *See* Doc. 540 at 6. Under the Stafford Act, 42 U.S.C. §§ 5121–5207, FEMA provides federal-assistance programs to state and local governments for disaster-related losses. 44 CFR § 206.3. Extensive federal regulations govern the structure and operation of FEMA's "Public Assistance" program. *Id.* § 206.202. And the requisite "nexus between the federal funds and their ultimate use" is satisfied, *see McLean*, 802 F.3d at 1240, because Public Assistance grants are available only for work that is "required as the result of the emergency or major disaster event," *see* 44 CFR § 206.223.[20] Thus,

---

[19]In *McLean*, this Court stated that, "if we were to address this issue, we would determine that the decision to classify assistance as a federal benefit was properly submitted to the jury." 802 F.3d at 1247. That conclusion is dicta, both on its own terms and because the Court had already decided the issue on invited-error grounds, *see id.* at 1245. And, respectfully, that conclusion is incorrect for the reasons stated in the text above. Instead of addressing *Fischer II*'s treatment of this very issue as a legal one, this Court relied on its precedent addressing a different, broader concept—"when a jurisdictional issue is inextricably entwined with a substantive element of a crime." *See* 802 F.3d at 1245–47 (quotation at 1246). *McLean*'s dicta, therefore, is not persuasive. As the Third Circuit has explained, "It is clear from … the Court's analysis in *Fischer* [*II*] that this is a statutory inquiry that requires a court to decipher congressional intent by analyzing the 'program's structure, operation, and purpose.'" *United States v. Briston,* 192 F. App'x 84, 88 (3d Cir. 2006) (quoting *Fischer II*, 529 U.S. at 681).

[20]Accordingly, any grant recipient "receiv[ed] a benefit in the conventional sense of the term," *Fischer II*, 529 U.S. at 680, unlike in *Pinson*, which Zahn cites in his brief at 58.

the district court correctly determined, as a matter of law, that FEMA's

payments were "benefits" under section 666, and the United States' evidence

sufficed to prove that JEA received more than $10,000 in such "benefits."

## C.    Zahn was the City's agent.

Section 666 applies to "agent[s] of an organization" who obtain property

by fraud. 18 U.S.C. § 666(a)(1). Because Zahn argues that the United States

failed to produce sufficient evidence that he was an agent of the City, Zahn's

brief at 69, this Court must first review the "legal construct" and "applicable

law" that created Zahn's employment with JEA to determine whether he was

a "dual agent" of JEA and the City. *See United States v. Langston*, 590 F.3d

1226, 1233–34 (11th Cir. 2009). When an agency employee—or the agency

itself—is "authorized to act on behalf of" the principal entity, the employee is

an agent of both the agency and the principal entity. *Id*.

That's the case here. The Jacksonville City Charter created JEA and

authorized JEA to employ a "managing director," or CEO, to manage JEA's

affairs. Jacksonville, Fla., City Charter § 21.07(j) (2019). The Charter outlined

JEA's affairs, giving JEA "all powers with respect to electric, water, … and …

other utilities" that the City had, *id*. § 21.01, and authority to sell up to 10% of

the utility system without City-Council approval (and more, with such

---

81

approval), *id*. § 21.04(n). *See* Doc. 517 at 155; Doc. 470-33 at 16. The Charter also granted JEA authority to "exercise all powers granted to the city with regard to sewage collection and disposal and water supply" under Florida statute. City Charter § 2104(w); *see* Doc. 470-99 at 91. Thus, JEA (the agency) and Zahn (the head of JEA) were agents of the City.

This Court must next "determine whether the Government produced sufficient relevant evidence … to allow a jury to conclude that [Zahn] was an agent of the [City]." *Langston*, 590 F.3d at 1234. The United States' case-in-chief included evidence that JEA could not sell more than 10% of its assets without City approval, Doc. 470-33 at 16, which underscores the City's dominance over JEA and JEA's role as the steward of the City's utilities. Zahn publicly broadcast updates about JEA's finances and operations, and he was responsible for promulgating policies that supported JEA's business strategy while protecting 485,000 Jacksonville-area customers (i.e., the City's constituents). Doc. 476-113 at 1, 13. And, as JEA's CEO, *id*. at 1, Zahn's mandate was not to turn a profit, but to cover JEA's costs and support the City government, Doc. 504 at 144–45.

The United States' case-in-chief also included evidence that Zahn's charge to ensure JEA's "financial success and sustainability," Doc. 476-113 at 12–13, inherently authorized him to act on behalf of the City, which was

financially accountable for JEA, Doc. 470-99 at 80. In sum, the United States proved that JEA's job was to steward the City's utility services on the City's behalf. As such, the jury reasonably could find that Zahn—JEA's foremost executive—was an agent of both JEA and the City.[21]

## IV.    The district court did not constructively amend the indictment, which, fairly read as a whole, alleges that Zahn was the City's agent. (Zahn's Issue III.D)

Based on the Fifth Amendment's grand-jury guarantee, "[a] defendant can only be convicted of a crime charged in an indictment." *United States v. Phillips*, 4 F.4th 1171, 1175 (11th Cir. 2021). And a district court cannot "constructively amend an indictment by changing the essential elements of a charged offense to broaden the possible bases for conviction beyond what is contained in the indictment" because it would be "fundamentally unfair to convict a defendant on charges of which he had no notice." *Id.* (internal quotation marks and citations omitted).

Zahn contends that the district court impermissibly broadened the indictment by instructing the jury that it could convict upon finding that he

---

[21]The cases Zahn cites in his brief at 58 are distinguishable. In *Doran*, the defendant was an agent of two entities, but he embezzled funds of the entity that didn't receive federal funds. And in *Abu-Shawish*, the prosecution didn't even allege—let alone prove—that Abu-Shawish was an agent of the entity he defrauded.

was an agent of the JEA *or the City* when the indictment charged that "Zahn was an agent of *JEA*." Zahn's brief at 70–71. But "the indictment itself [is] the surest indication of the grand jury's intent." *United States v. Johnson*, 713 F.2d 633, 643–44 (11th Cir. 1983). And this Court must consider what the indictment is "fairly read" as charging, *see United States v. Sanders*, 668 F.3d 1298, 1312 (11th Cir. 2012), reading it "as a whole" and "giv[ing] [it] a 'common sense construction.'" *Phillips*, 4 F.4th at 1176 (citation omitted).

Fairly read as a whole, the indictment alleged that Zahn was an agent of both JEA and the City. It alleged that Zahn was the CEO of "[JEA], the public utility owned by the City of Jacksonville." Doc. 1 at 1. So, as the district court pointed out, "[b]ecause JEA belonged to [the City], Zahn was an agent of [the City], consistent with how the Indictment reads." Doc. 540 at 5; *see* Doc. 1 at 3 (specifying that JEA was an "agency" and "entit[y]" of the City). What's more, the indictment alleged that Zahn owed a fiduciary duty to the City. *Id.* at 1. A "fiduciary" is "[s]omeone who must exercise a high standard of care in managing another's money or property" or "[s]omeone who is required to act for the benefit of another person." *Fiduciary*, Black's Law Dictionary (12th ed. 2024). A fiduciary is therefore an agent inherently "authorized to act on behalf of" his principal. *See Langston*, 590 F.3d at 1234.

Thus, the indictment alleged that Zahn was an agent of the City, and the

court correctly instructed the jury that it could convict based on that finding. Accordingly, unlike *Keller*, *Narog*, and *Cancelliere* (*see* Zahn's brief at 70–71), the court's jury instructions did not "modif[y] the elements of the offense charged [such] that [Zahn] may have been convicted on a ground not alleged by the grand jury's indictment." *Johnson*, 713 F.2d at 643 (citation omitted).

### V.    Zahn hasn't established that the district court abused its discretion in refusing to give his requested jury instructions. (Zahn's Issue I.D.)

"A district court abuses its discretion by denying a requested jury instruction when the instruction is substantively correct, it was not substantially covered in the charge given to the jury, and the failure to give it seriously impaired the defendant's ability to present an effective defense," *United States v. Harding*, 104 F.4th 1291, 1296 (11th Cir. 2024). "A defendant must establish each condition to warrant a reversal for abuse of discretion." *United States v. Macrina*, 109 F.4th 1341, 1351 (11th Cir. 2024). Zahn has failed to do so.

### A.    The court's instructions adequately covered the law concerning "property" and did not substantially impair his ability to present his defense.

Zahn first contends that the district court failed to instruct the jury that "[i]t does not suffice that the object [of a fraud] may have become money or property in JEA's [or the City's] hands; rather, the object sought must have

85

been money or property in the hands of the JEA [or the City]." Doc. 398 at 36, 38, 42–43; *see* Zahn's brief at 58–60. But his instruction was only semi-accurate.

As we previously discussed, *Cleveland* holds that "[i]t does not suffice … that the object of the fraud may become property in the recipient's hands"; the object "must be property in the hands of the victim." 531 U.S. at 15. But Zahn's proposed instruction transposes *Cleveland*'s focus on whether the object is property in the victim's hands (as opposed to in the recipient's) into *when* the object becomes *money* in the victim's hands. By leaving "the recipient's hands" out of the proposed instruction and adding "money" in, Zahn's instruction gave the impression that he could not be convicted unless his scheme sought to obtain money that the City already had in hand. That's legally incorrect, as we explain above at Section I.A: one has a property interest in money that he is legally entitled to—even if that money is not yet in his physical possession. *See Pasquantino*, 544 U.S. at 355.

The court instructed the jury that the elements of section 666 include misappropriation of "property that was *owned by, or under the care, custody, or control*" of the City or JEA. Doc. 527 at 15–16 (emphasis added). That alone sufficed to clarify that the conspiracy's object had to be "property" of the City or JEA. But the court gave additional instructions to emphasize the point. *Id*.

86

at 17 (defining "embezzle" as taking "*someone else's money*"; "steal" as taking "money or property *belonging to someone else*"; and "obtain by fraud" as acting with intent to deceive "for the purpose of *causing financial loss to someone else*") (emphases added).

As for section 1343, the court similarly defined the requisite "scheme to defraud" as a plan "intended to deceive or cheat *someone out of money or property*" through fraudulent misrepresentations. Doc. 527 at 19 (emphasis added). Therefore, because the district court "covered the substance of [Zahn's] proposed instruction[s] in the charge it gave" (insofar as Zahn's proposed instruction contained legally accurate statements), it was "not required to adopt the precise wording of [Zahn's] proposed charge[s]." *United States v. Singer*, 963 F.3d 1144, 1163 (11th Cir. 2020).

Moreover, Zahn hasn't established that failing to give his requested property instructions "seriously impaired [his] ability to present an effective defense." *See Macrina*, 109 F.4th at 1351. "This Court examines the jury charges as a whole, determining whether the entire charge sufficiently instructed the jury about the issues," *United States v. Horner*, 853 F.3d 1201, 1208 (11th Cir. 2017), and the court's instructions here bolstered—rather than hindered—Zahn's point that the jury had to find that he had schemed to obtain the City's "property."

**B.     Zahn's proposed causation instruction was incorrect.**

Zahn's next argument—that the court abused its discretion by failing to give his so-called "instruction under *Loughrin*"—lacks merit, too. *See* Zahn's brief at 59. Zahn's proposed instruction imposes a causation requirement that exceeds section 1343's requirements. According to his instruction, the United States had to prove that, in the ordinary course, his scheme would have directly resulted in unlawful obtainment of money or property, Doc. 398 at 38–39, 43. But that's incorrect. Indeed, this Court has held that even if a scheme would not have resulted in unlawful obtainment of Medicaid money due to the defendants' mistake of certain facts, they would still be guilty of wire and mail fraud because they intended to trick Medicaid into paying money. *See Bradley*, 644 F.3d at 1247. Because Zahn's proposed causation instruction was legally inaccurate, the district court did not abuse its discretion in declining to give it.

**VI.    The district court did not err in denying Zahn's motion to dismiss the indictment on *Kastigar* grounds. (Zahn's Issue IV)**

Zahn argues that the district court legally erred in denying his motion to dismiss the indictment on *Kastigar* grounds. Zahn's brief at 71–84. But, as we explain below, he's wrong.

A.   *Kastigar* **requires the United States to prove that all its grand-jury evidence is untainted by compelled testimony, but constitutional-harmlessness analysis applies.**

Under the Fifth Amendment, a person can't be compelled to testify if his testimony would incriminate him. In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that this protection "against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office." *Id.* at 500.

Under *Kastigar v. United States*, 406 U.S. 441 (1972), both "use" and "derivative use" immunity apply to compelled testimony, so prosecutors can't "us[e] the compelled testimony in any respect." *Id.* at 452–53, 462. This "insures that the testimony cannot lead to the infliction of criminal penalties on the witness" and "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Id.* at 453, 462. "Prohibited indirect derivation includes using immunized testimony to help shape the questioning of another witness." *United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994) ("*Schmidgall I*").

So, when a defendant shows that he has given immunized testimony, the prosecution must show that its evidence is untainted "by establishing the existence of an independent, legitimate source for the disputed evidence."

89

*Schmidgall I*, 25 F.3d at 1528. "[C]onclusory denials … regarding the use of immunized testimony alone are not enough." *United States v. Schmidgall*, 25 F.3d 1533, 1536 n.4 (11th Cir. 1994) ("*Schmidgall II*"). Therefore, "the government must demonstrate that each step of the investigative chain through which the evidence was obtained is untainted" and "affirmative[ly] show[] that none of the evidence presented to the grand jury was derived directly or indirectly from the immunized testimony." *Schmidgall I*, 25 F.3d at 1528.

Although this is a "heavy burden," *Kastigar*, 406 U.S. at 461, it's surmountable. Indeed, "[t]he government is not required to negate all abstract 'possibility' of taint." *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir. 1985). It need only "demonstrate by a preponderance of the evidence an independent source" for all the evidence presented to the grand jury. *United States v. Hampton*, 775 F.2d 1479, 1485 (11th Cir. 1985) (quoting *United States v. Seiffert*, 501 F.2d 974, 982 (5th Cir. 1974)).

The United States' failure to carry its burden doesn't warrant automatic dismissal. The court must sustain the indictment if any use of the prohibited evidence was "harmless beyond a reasonable doubt." *United States v. Gregory*, 730 F.2d 692, 698 (11th Cir. 1984).[22] So the question is whether, absent any

---

[22]In *Gregory*, this Court remanded for an evidentiary hearing on harmlessness. Here, the district court has already held a multi-day evidentiary

constitutionally forbidden evidence, "honest, fair-minded [grand] jurors might very well have" found no probable cause and returned a "no bill" rather than indicting. *See Chapman v. California*, 386 U.S. 18, 25–26 (1967) (addressing constitutional harmless-error standard). Or, put another way, whether every reasonable grand juror would have found probable cause based on the presented evidence that the government proved was untainted.

**B.    The district court correctly determined that constitutional-harmlessness analysis applies because the United States failed to show that all the grand-jury evidence was untainted.**

As the district court correctly found, *see* Doc. 310 at 69–70, the United States didn't carry its burden of establishing that *all* of its grand-jury evidence was untainted. *See Schmidgall I*, 25 F.3d at 1528. Only 12 of the 25 grand-jury witnesses testified at the *Kastigar* hearing. Given the widespread publicization of Zahn's *Garrity* statement, the other 13 witnesses ostensibly had exposure to the statement, and the United States did not prove that such exposure didn't taint their testimony.

But the district court's analysis didn't end there—and rightly so, because the principle of constitutional harmlessness applies. *See, e.g., Gregory*, 730 F.2d at 698. Zahn disagrees, contending that "[t]his Court's precedents assuming

_____

hearing and made appropriate findings.

harmless error applies to *Kastigar* errors are mistaken" and that this Court "should disavow review for harmless error in this context." Zahn's brief at 80–81. He is wrong.

This Court held in *Schmidgall II*—without assumption or qualification—that "[d]ismissal of the indictment is not required when use of the immunized testimony was harmless beyond a reasonable doubt." 25 F.3d at 1538. There, because the facts established by the immunized testimony were also established by other, untainted testimony or were insignificant, this Court held that the error was harmless beyond a reasonable doubt and concluded that "the indictment may stand." *Id.* at 1538–39. That is a holding—not a mere assumption. Numerous pre-*Schmidgall II* decisions say the same. *See, e.g.*, *Byrd*, 765 F.2d at 1529 n.8; *Gregory*, 730 F.2d at 698; *Hampton*, 775 F.2d at 1489 n.51. (It also doesn't matter whether, as Zahn suggests, Zahn's brief at 80, those defendants challenged the court's application of constitutional harmlessness. *See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) ("[T]here is no exception to the [prior panel precedent] rule where the prior panel failed to consider arguments raised before a later panel.") This Court is "bound by [its] prior panel precedent unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *Fernandez v. United States*, 114 F.4th 1170, 1180 (11th Cir.

2024) (internal quotation marks and citation omitted).

Thus, the district court correctly determined that harmless-error analysis applies to *Kastigar* errors.

**C.    The district court correctly sustained the indictment because any *Kastigar* violation was harmless beyond a reasonable doubt.**

*(1)    The United States proved legitimate, independent sources for much of the grand-jury evidence.*

Following the lengthy *Kastigar* hearing, the district court concluded that the United States had established a legitimate, independent source for all the grand-jury evidence and testimony outlined in the detailed R&R.[23] Doc. 310 at 101–02; *see* Docs. 310, 361. That conclusion was well-founded given the court's findings of fact.

The court found that the prosecution team had adopted reliable procedures to shield themselves from the *Garrity* statements. Doc. 310 at 71. The prosecution team's untainted review and analysis of the Council Auditor memorandum and publicly available Board meetings (all of which predated the *Garrity* statements) led the team to identify, subpoena, and interview key witnesses from JEA, S&P, WTW, McKinsey, Morgan Stanley, JP Morgan

---

[23]Because the district court adopted the R&R as its opinion, we characterize Doc. 310 as the district court's findings and conclusions, even though the magistrate judge authored it.

Chase, and NextEra. *Id.* at 75–76.

Based on that, the prosecution team knew that in 2019, JEA was in a strong financial position—not in dire straits. Doc. 310 at 77. And although Zahn portrayed WTW as the chief architect of the PUP, WTW hadn't played a role in developing it. *Id.* at 78–79. The court also found that the Council Auditors' grand-jury testimony and evidence had been untainted. *Id.* at 82. Their testimony—and that of JEA Board members, JEA executives, and Gabriel—was based on their own personal involvement in the relevant events and information gleaned from legitimate, independent sources. *Id.* at 82, 97–100.

The court also found that certain sources that could have been tainted—including the SIC attorneys—were not. Doc. 310 at 80–81. And the prosecution team's obtainment of key documents such as the "Notes.xlsx" spreadsheet and the "Performance Unit Scratch Sheet" (which showed that Wannemacher had performed calculations showing astronomical PUP payouts upon a sale of JEA) and the Nixon Peabody memo (which is discussed in the indictment) had been untainted. *Id.* at 82–95. Thus, the court required the United States to affirmatively show that "each step of the investigative chain through which the evidence was obtained [was] untainted" and "that none of the evidence presented to the grand jury was derived directly

or indirectly from the immunized testimony." *Schmidgall I*, 25 F.3d at 1528.

Zahn doesn't contend that any of the court's findings were clearly erroneous. And although he asserts that the court "fail[ed] to require the Government to prove how it built its case against Mr. Zahn," Zahn's brief at 74–76, the R&R—which retraces and evaluates for taint the grand-jury evidence and testimony with granularity—belies that claim. The R&R recounts how the United States proved that it actually built its case using taint-free evidence and leads, not merely how it could have done so. *See* Doc. 310.

This is particularly true of Rodda's discovery of the two key spreadsheets. The court recognized that, although the documents were part of JEA's subpoena production, ███████████████████████████████████████
███████████████████. Doc. 310 at 83. Were Zahn correct that the court merely "posit[ed] a hypothetical means by which the Government *might have* sourced" the spreadsheets, Zahn's brief at 75, the court's analysis would have ended there. But it didn't.

Instead, aware of the correct legal standard (*see* Doc. 310 at 17–18), the court painstakingly detailed the untainted chain of events by which the United States obtained the documents. *See id.* at 81–91. And, far from relying on conclusory denials, the court based its findings on comprehensive testimony about the circumstances in which Rodda discovered the spreadsheets. *Id.* at

95

87–91. The court also observed ████████████████████████

████████████████████████████████████████████

*See id*. at 83–84. ████████████████████████████████

████████████████████████████████████████████

████████████. The court correctly concluded that the United States met its

burden of proving how it built its case against Zahn using legitimate,

independent evidence and leads. *Id*. at 101.

**(2)**    ***The court did not shift the burden of proof to Zahn.***

The record also shows that the district court did not shift the burden to

Zahn, as he argues. Zahn's brief at 76–78. To the contrary, by (correctly)

laying the full burden on the United States, the court found that the United

States had failed to carry its burden. Then, the court appropriately resorted to

constitutional-harmlessness analysis, which we discuss below. The court's

passing statement that "Zahn has not identified" something, *see* Doc. 310 at

101, merely highlighted that—despite getting a chance to counter the United

States' evidence at the hearing—Zahn couldn't do so. The statement didn't

shift the burden of proof; it emphasized the weakness in Zahn's position.

Nor did the court "relieve[] the Government of its burden to show" that

certain interviews didn't "provide investigatory leads." *See* Zahn's brief at 77

(citing Doc. 310 at 67–70 & n.17). The court found that the United States had

met its burden of showing that the *Kastigar* witnesses' grand-jury testimony was untainted. And the court assumed that the remaining grand-jury witnesses—including the 14 people cited in footnote 17 of the R&R—had offered tainted grand-jury testimony. *See* Doc. 310 at 69 n.17. So, far from relieving the United States of its burden, the court weighed the absence of the evidence against the United States by evaluating constitutional harmlessness using the worst-case assumption (for the United States).

Finally, contrary to Zahn's claim, the court did not make "39 impermissible inferences in the Government's favor that shifted the burden from the Government to Mr. Zahn."[24] *See* Zahn's brief at 77. Or any.

The Council Auditor's memorandum blew the lid off Zahn's scheme more than a month before Zahn gave his *Garrity* statements. The United States proved by a preponderance of the evidence that its investigation stemmed solely from the prosecution team's review of that memorandum and publicly available JEA Board meetings, and other investigative steps independent of the immunized testimony. So, far from improperly inferring anything about how

---

[24]Zahn discusses only seven of the inferences. *See* Doc. 315-1 at 1, 2, 4 (inferences 6, 10, 27–29, 31, 33). He has therefore abandoned any claim concerning the rest. *See United States v. Esformes*, 60 F.4th 621, 635 (11th Cir.) (deeming abandoned claims where defendant merely offered a "bare citation" with no support for his assertions), *cert. denied*, 144 S. Ct. 485 (2023).

the United States' investigation would have unfolded absent the *Garrity* statements, the court determined that the United States' investigation—as it *actually* unfolded—was untainted, at least with respect to the witnesses and evidence presented at the *Kastigar* hearing.

Moreover, the court logically concluded that when witnesses testified about what they experienced firsthand during events that predated the *Garrity* statements, such testimony was untainted. *See* Doc. 315-1 at 2, 4. That conclusion was proper because "[p]roof of reliance on information gathered prior to the taking of immunized testimony generally is sufficient for the government to carry its burden under *Kastigar.*" *Schmidgall II*, 25 F.3d at 1537. Thus, the district court did not erroneously shift the burden to Zahn, by impermissible inference or otherwise.

**(3)** ***In evaluating constitutional harmlessness, the court properly assumed that any grand-jury evidence not presented at the*** Kastigar ***hearing was tainted.***

As we've discussed, in analyzing constitutional harmlessness, the court assumed that any grand-jury testimony not vetted at the *Kastigar* hearing was tainted. Doc. 310 at 70, 102. In other words, the court made a presumption in Zahn's favor as to that body of evidence. That approach was correct.

Assuming error is a method of judicial efficiency. The Supreme Court does it. *See, e.g.*, *Davis v. Ayala*, 576 U.S. 257, 260 (2015) ("Assuming without

deciding that a federal constitutional error occurred, the error was harmless … ."). This Court does, too. *See, e.g.*, *United States v. Booker*, 136 F.4th 1005, 1016 (11th Cir. 2025) ("[E]ven assuming *arguendo* that the district court abused its discretion by admitting Booker's guilty pleas …, that error was harmless … ."). The practice makes sense, because it allows the court to determine whether—even assuming the appellant's best possible position— relief is warranted.

Moreover, the court correctly proceeded without requiring the United States to "prove[] the source of *all* its evidence," *see* Zahn's brief at 79. The court had the full grand-jury record, *see* Doc. 163, so it had a complete picture of the evidence that was not vetted at the *Kastigar* hearing, and it could properly assess whether such evidence—even if tainted—would have affected any reasonable grand juror's decision to indict Zahn.[25] As such, Zahn had the benefit of a full evidentiary hearing that was missing in *Hill* (*see* Zahn's brief at 80), which involved no hearing at all.

---

[25]Zahn notes in his brief at 65 that after a later *Kastigar* hearing, the district court excluded part of Anton Derkach's testimony because it was tainted. That doesn't change the correctness of the harmlessness analysis in the R&R because the court had accounted for such taint by assuming that Derkach (who did not testify at the first *Kastigar* hearing) had given tainted grand-jury testimony. *See* Doc. 310 at 70, 102.

*(4)*    *Any* **Kastigar** *error was harmless beyond a reasonable doubt.*

The district court correctly concluded that, even assuming that any other grand-jury evidence was tainted, any *Kastigar* violation was harmless beyond a reasonable doubt. Doc. 310 at 102. That is, based on the "clean" evidence alone, every "honest, fair-minded" grand juror would have found probable cause to indict Zahn. *See Chapman*, 386 U.S. at 25–26.

Untainted testimony from firsthand witnesses and publicly available information—including Board meetings and materials and the Council Auditor's memorandum—readily confirms many of the indictment's allegations, including the introductions to key individuals and entities, JEA's engagement of law firms, presentation of the three Scenarios and the PUP, the PUP formula and share allocation, the minimum bidding requirements under Scenario Three, and the Board's decisions. Doc. 310 at 75–76. Grand-jury subpoena productions and testimony vetted through the *Kastigar* hearing revealed that Zahn had used WTW's work without its consent and that Zahn started planning to bring about a sale of JEA in 2018. *See* Doc. 1 ¶¶ 19(a), 19(l), 20(c); Doc. 268 at 227–28; Doc. 269 at 82–83; Doc. 310 at 78. The United States also established the untainted provenance of the two key spreadsheets and testimony that Zahn and Wannemacher didn't divulge those documents to any key stakeholders. *See* Doc. 1 ¶ 19(e)–(f); Doc. 310 at 81, 88–91.

Agent Blythe testified about Nixon Peabody's work on the PUP and the circumstances under which JEA hired McKinsey without revealing the PUP's true intent. *See* Doc. 1 ¶¶ 10, 19(d), 19(g); Doc. 269 at 18, 92–99, 122; Doc. 271 at 25; Doc. 275 at 95–98. Agent Blythe and Orfano also testified about JEA's true financial condition. *See* Doc. 1 ¶ 19(i); Doc. 268 at 199–200; Doc. 270 at 55; Doc. 274 at 140. And Rauch (from Florida Power & Light) testified that Zahn met with her to discuss a potential purchase of JEA before the July 2019 Board meeting. *See* Doc. 1 ¶ 19(j); Doc. 272 at 45–48.

Untainted testimony of Gabriel and Allen supported the indictment's allegations that Zahn and Wannemacher falsely represented that the PUP payouts would be modest (despite their knowledge to the contrary). *See* Doc. 1 ¶¶ 19(r), 20(o), 20(z); Doc. 273 at 168; Doc. 275 at 118. And Council Auditor employees testified that Wannemacher failed to disclose to them how astronomical the PUP payouts could be if JEA were sold. *See* Doc. 1 ¶¶ 19(w), 20(y); Doc. 272 at 96; Doc. 274 at 111–14; Doc. 310 at 75, 82. Plus, "each Exhibit in the 20 series that the Government presented at the *Kastigar* hearing pertains to a similarly numbered overt act in Count One of the Indictment." *Id*. at 96–97.

"Probable cause is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018). And it "does not require anything close to conclusive proof or

proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). Yet probable cause is all Zahn's grand jury needed to return a true bill. The district court correctly concluded that any *Kastigar* violation was harmless beyond a reasonable doubt because every reasonable grand juror would have found probable cause based on the wealth of untainted evidence that Zahn's grand jury heard. *See Chapman*, 386 U.S. 18, 25–26.

The district court supported its conclusion by citing *Byrd*, in which this Court said that the focus of a *Kastigar* harmlessness inquiry is "whether the evidence would have been sufficient to sustain an indictment even if [defendant's] immunized testimony had not been improperly used or presented." *See* Doc. 310 at 70, 102 (citing *Byrd*, 765 F.2d at 1529 n.8). Zahn disputes the soundness of that approach in light of *Satterwhite* (*see* Zahn's brief at 78–79), but the district court didn't err: the ultimate question before this Court is whether any *Kastigar* error was harmless beyond a reasonable doubt— and the answer's yes.

## Conclusion

The United States requests that this Court affirm the district court's judgment.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division


By:    *s/ Emily C. L. Chang*
EMILY C. L. CHANG
Assistant United States Attorney
Appellate Division
USA No. 166
400 W. Washington St., Ste. 3100
Orlando, FL 32801
(407) 648-7500
emily.chang@usdoj.gov

**Certificate of Compliance with Type-Volume Limitation**

This brief contains 22,980 countable words under 11th Cir. R. 32-4, which exceeds the ordinary word-count limitation. *See* Doc. 43 (Eleventh Circuit Court of Appeals' order granting the United States' Motion for Leave to Exceed Type-Volume Limitation).

## Certificate of Service

I certify that on August 14, 2025, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

SAMUEL J. SALARIO, JR., ESQ.
*Counsel for Aaron Zahn*

*and*

I certify that on August 14, 2025, I electronically filed the sealed copy of the brief and sent the document by United States mail to:

SAMUEL J. SALARIO, JR., ESQ.
1700 South MacDill Avenue, Suite 240
Tampa, FL 33629

*Counsel for Aaron Zahn*

_s/ Emily C. L. Chang_
EMILY C. L. CHANG
Assistant United States Attorney

gkpr/no/06.28.25

*REDACTED VERSION.docx*