No. 24-12617

_____

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

AARON ZAHN,

Defendant-Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Case No. 3:22-CR-00023-BJD-MCF

_____

**REPLY BRIEF OF APPELLANT (REDACTED)**

_____

PAUL C. HUCK, JR.
SAMUEL J. SALARIO, JR.
JESSICA SLATTEN
ROBERT E. MINCHIN III
**LAWSON HUCK GONZALEZ, PLLC**
1700 South MacDill Ave., Ste. 240
Tampa, FL 33629
850-825-4334

*Counsel for Aaron Zahn*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for Appellant Aaron Zahn certifies that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Albritton, A. Brian

2. Allen, Andy

3. Bray, Angela

4. Breslow, Brandon Kyle

5. Campion, John

6. Chang, Emily

7. City of Jacksonville, Florida

8. City of Jacksonville, Council Auditor's Office

9. City of Jacksonville, Office of General Counsel

10. Cline, John D.

11. Corsmeier, Arnold B.

12. Creed & Gowdy

13. Davis, Brian J., Hon.

14. Dykes, Melissa

15. Duva, Tysen

16. Green, April

17. Felman, James E.

18. Flanagan, Kelly

19. Foley & Lardner LLP

20. Gowdy, Bryan

21. Granat, Sean Bryan

22. Howard, Alan

23. Huck, Paul C., Jr.

24. Jacksonville Electric Authority

25. Jefferson, Raquel Ramirez

26. Johnson, Camille-Lee

27. Kynes, Markman & Felman, P.A.

28. Law Office of John D. Cline

29. Lawson Huck Gonzalez, PLLC

30. Licandro, Catherine M.

31. McBride, Mitchell

32. Minchin III, Robert E.

33. Murphy, Niels P.

34. Nelson, Mullins, Riley & Scarborough, LLP

35. Newbill, Fredrick, Rev.

36. Nixon Peabody LLP

37. Pardo, David

38. Pestana, Diego M.

39. Pillsbury Winthrop Shaw Pittman, LLP

40. Phelps Dunbar LLP

41. Richardson, Monte E., Hon.

42. Salario, Jr., Samuel J.

43. Shannon, Ann

44. Slatten, Jessica

45. Suarez, Eduardo A.

46. The Suarez Law Firm, P.A.

47. United States Attorney's Office, Middle District of Florida

48. Vinyard, Herschel T.

49. Wannemacher, Ryan

50. Wedekind, III, Lee Dilly

51. Yanes, Katherine Earle

52. Zahn, Aaron

No publicly traded company or corporation has an interest in the outcome of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT.......................................................... CIP - 1

TABLE OF CONTENTS ........................................................................i

TABLE OF CITATIONS ..................................................................... iii

INTRODUCTION................................................................................1

ARGUMENT ......................................................................................3

I.    No property-fraud: The City had no traditional property interest,
      the scheme could not have caused its deprivation, and the district
      court refused to instruct the jury properly...................................3

      A.    The City lacked a traditional property interest in the proceeds
            of a hypothetical asset sale. ...............................................3

            1.    The City does not "own" JEA. .....................................4

            2.    Even if the government proved "ownership," it did not
                  prove a legal right to payment. ..................................10

      B.    The scheme would not naturally result in the City parting with
            property. ..........................................................................12

      C.    Mr. Zahn did not intend to defraud the City. ...................16

      D.    The jury instructions on "property" and causation were
            wrong...............................................................................17

II.   No wire-fraud jurisdiction: Mr. Zahn didn't "cause" the livestream,
      and it wasn't "for the purpose of executing" a scheme. ..........18

      A.    Mr. Zahn did not cause a wire transmission......................19

      B.    The livestream was not "for the purpose of executing" a
            scheme..............................................................................21

i

III.  No Section 666 jurisdiction: The City didn't receive federal funds, the funds weren't "benefits," and Mr. Zahn wasn't the City's agent. ...................................................................................25

    A.  The City didn't receive federal funds.............................25

    B.  The federal funds were not "benefits."..........................27

    C.  Mr. Zahn was not the City's "agent."............................ 30

    D.  The indictment's "agency" charge was constructively amended. ...................................................................32

IV.  *Kastigar*: The government's conceded violations of *Kastigar* cannot be excused as harmless error.....................................35

    A.  The government's *Kastigar* violations are not harmless error. ......35

    B.  *Kastigar* error in obtaining an indictment is structural error. .........40

CONCLUSION .................................................................41

CERTIFICATE OF COMPLIANCE ....................................43

CERTIFICATE OF SERVICE............................................44

# TABLE OF CITATIONS

**Cases**                                                                  **Page(s)**

*Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*,
   555 F.3d 1331 (11th Cir. 2009)............................................................27, 28

*\*Arizona v. Fulminante*,
   499 U.S. 279 (1991) ............................................................................36, 40

*Bravo v. United States*,
   532 F.3d 1154 (11th Cir. 2008)..................................................................29

*\*Chapman v. California*,
   386 U.S. 18 (1967).......................................................................................36

*\*Ciminelli v. United States*,
   598 U.S. 306 (2023) ......................................................................4, 6, 11, 22

*\*City of Jacksonville v. Bowman*,
   320 So. 3d 931 (Fla. 1st DCA 2021).....................................................26, 31

*Cobo v. O'Bryant*,
   116 So. 2d 233 (Fla. 1959).............................................................................7

*Cola v. Reardon*,
   787 F.2d 681 (1st Cir. 1986) .......................................................................22

*Comegys v. Vasse*,
   26 U.S. 193 (1828) .........................................................................................9

*Connecticut v. Johnson*,
   460 U.S. 73 (1983) .......................................................................................22

*CSX Transp., Inc. v. McBride*,
   564 U.S. 685 (2011) .....................................................................................13

*Ferry v. Spokane, P. &. S. Ry. Co.*,
   258 U.S. 314 (1922) ........................................................................................9

*Fischer v. United States*,
    529 U.S. 667 (2000) ................................................................27, 29

*Fischer v. United States*,
    No. 99-116, 1999 WL 1210828 (Dec. 15, 1999) ...........................29

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    11 F.4th 1266 (11th Cir. 2021) ....................................................26

*Fried v. State*,
    355 So. 3d 899 (Fla. 2023) ...............................................................7

*Gaia Tech's, Inc. v. Reconversion Tech's, Inc.*,
    93 F.3d 774 (Fed. Cir. 1996) ...........................................................8

*Hayes v. Wilh Wilhelmsen Enters., Inc.*,
    818 F.2d 1557 (11th Cir. 1987) ....................................................10

*\*Kastigar v. United States*,
    406 U.S. 441 (1972) ................................................................ 35-41

*Kousisis v. United States*,
    605 U.S. 114 (2025) ........................................................................16

*Loretto v. Teleprompter Manhattan CATC Corp.*,
    458 U.S. 419 (1982) ..........................................................................4

*\*Loughrin v. United States*,
    573 U.S. 351 (2014) ................................................................ 12-18

*McCormick v. United States*,
    500 U.S. 257 (1991) ........................................................................22

*Miami-Dade Water & Sewer Auth. v. Metro. Dade Cnty.*,
    503 So. 2d 1314 (Fla. 1987) ........................................................7, 8

*\*Pereira v. United States*,
    374 U.S. 1 (1954) ................................................................... 19, 20

iv

*Randall v. Kreiger*,
90 U.S. 137 (1874) ........................................................................ 9

*\*Satterwhite v. Texas*,
486 U.S. 249 (1988) ..................................................................... 36

*\*Schmuck v. United States*,
489 U.S. 705 (1989) ................................................................ 22-24

*Thomas v. State*,
583 So. 2d 336 (Fla. 5th DCA 1991) ............................................ 7

*United States v. Alvarado*,
808 F.3d 474 (11th Cir. 2015) .................................................... 10

*\*United States v. Berroa*,
856 F.3d 141 (1st Cir. 2017) ....................................................... 13

*United States v. Bradley*,
644 F.3d 1213 (11th Cir. 2011) .............................................. 15, 18

*United States v. Campbell*,
26 F.4th 860 (11th Cir. 2022) ..................................................... 28

*\*United States v. DeQuattro*,
118 F.4th 424 (1st Cir. 2024) ..................................................... 26

*\*United States v. Dooley*,
578 F.3d 582 (7th Cir. 2009) .................................................. 19, 20

*\*United States v. Doran*,
854 F.3d 1312 (11th Cir. 2017) ............................................. 25, 26

*United States v. Elkins*,
885 F.3d 775 (11th Cir. 1989) .................................................... 22

*United States v. Evans*,
143 F.4th 1 (1st Cir. 2025) ......................................................... 29

v

*United States v. Gillis*,
  938 F.3d 1181 (11th Cir. 2019)......................................................41

*United States v. Hasson*,
  333 F.3d 1264 (11th Cir. 2003).......................................19, 20, 22

*United States v. Henry*,
  29 F.3d 112 (3d Cir. 1994)............................................................11

*United States v. Hill*,
  779 F.3d 1318 (11th Cir. 2015).......................................................7

*United States v. Keller*,
  916 F.2d 628 (11th Cir. 1990).................................................32, 33

*United States v. Koen*,
  982 F.2d 1101 (7th Cir. 1992).......................................................24

*United States v. Langston*,
  590 F.3d 1226 (11th Cir. 2009).................................................30, 31

*United States v. Madden*,
  733 F.3d 1314 (11th Cir. 2013)......................................................33

*United States v. Mangano*,
  128 F.4th 442 (2d Cir. 2025)...........................................................6

*United States v. Maze*,
  414 U.S. 395 (1974).......................................................................23

*United States v. McLean*,
  802 F.3d 1228 (11th Cir. 2015)................................................. 26-30

*United States v. Monea Fam. Tr. I*,
  626 F.3d 271 (6th Cir. 2010)...........................................................8

*United States v. Narog*,
  372 F.3d 1243 (11th Cir. 2004)......................................................33

*United States v. Nguyen*,
   829 F.3d 907 (8th Cir. 2016).............. .........................................................24

*United States v. Phillips*,
   4 F.4th 1171 (11th Cir. 2021) ............ .........................................................33

*United States v. Schmidgall*,
   25 F.3d 1533 (11th Cir. 1994)...............................................................37, 39

*United States v. Sanders,*
   668 F.3d 1298 (11th Cir. 2012)..............................................................33, 34

*United States v. Ward*,
   486 F.3d 1212 (11th Cir. 2007)....................................................................20

*United States v. Williams*,
   527 F.3d 1235 (11th Cir. 2008).............................................................19, 20

*Watts v. Joggers Run Prop. Owners Ass'n, Inc.*,
   133 F.4th 1032 (11th Cir. 2025) ...................................................................4

**Constitutional Provisions**

Art. VIII, § 1(a) Fla. Const.........................................................................7

Art. VIII, § 1(e), Fla. Const.......................................................................7

Art. VIII, § 2(a) Fla. Const.........................................................................7

Art. VIII, § 6(e) Fla. Const.........................................................................7

Art. VIII, §11(a)(1), Fla. Const. (1968).....................................................7

**Code**

18 U.S.C. § 666 .................................................12, 25, 26, 29, 32

18 U.S.C. § 666(b)...........................................................27, 28

18 U.S.C. § 666(d)(1) ........................................................................32, 34

18 U.S.C. § 1343 .......................................................................................19

**Statutes**

Ch. 67-1509, § 1, Laws of Fla. (1967) ................................................7, 8

Ch. 80-515, Laws of Fla. (1980) ...............................................................7

Ch. 92-341, Laws of Fla. (1992) ...............................................................7

**Other Authorities**

AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE ........................5

William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 2 (1765) ............4

BLACK'S LAW DICTIONARY (12th ed. 2024)...............................................5

City of Jacksonville, Fl., Charter § 21.03(a) (2019).................................31

City of Jacksonville, Fl., Charter §21.07(j) (2019) .................................31

Dan B. Dobbs, et al., DOBBS' LAW OF TORTS, § 201 (2d ed. 2015).......................13

FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS, § 31 (2025 ed) ..............5, 6

RESTATEMENT (FIRST) OF AGENCY §§ 14(b), cmts. a, c (trustees), 14(c), cmt. a (1958) (directors)....................................................................34

RESTATEMENT (FIRST) OF PROPERTY § 10, cmt. b (1936) .........................4

**INTRODUCTION**

This case does not involve a federal crime. It involves the government criminalizing local politics after watching deliberations over private-sector ideas about asset sales and benefit plans at a public utility explode "in the newspaper."

JEA's Board voted to explore selling its assets and approve a benefit plan, conditioned on development and review, that could be funded with sale proceeds. But a sale was so unlikely it was "like landing a 747 on an aircraft carrier during a hurricane," and an actual decision was to be based on different information a year later. Still, two City of Jacksonville officials plotted to blow it up. They succeeded.

Later, soaked in his *Garrity* statements, the government tarred Mr. Zahn before a jury primed for it by the media. He was convicted of scheming to defraud the City of money it never had, from assets it never owned, in a hypothetical sale the City never considered, using a benefit plan Mr. Zahn himself terminated—all federalized because the early board meeting was livestreamed (even though the Board was in person) and JEA (not the City) received federal funds.

That theory knows no limits. Consider a schoolteacher who proposes district-wide bake sales—parents bake sweets—to fund music programs. At an in-person school-board meeting broadcast on YouTube, the teacher hypes cuts to music programs and omits the nitty-gritty of a plan to give music teachers 10% of cookie profits to boost morale. The board charges a PTA committee to evaluate the

1

idea, but before it starts work, an art teacher hears about the morale plan, complains, and the proposal fizzles.

That's not a federal case: It targets an intangible right to informed bake-sale policy decisions, leveraging a wire the teacher didn't cause and that had nothing to do with convincing the in-person board. But on the government's theory, the teacher schemed to defraud the district of cookie money it never had, from cookies it never owned, through a policy vote broadcast by wire.

The government's brief recognizes the overreach. So it largely abandons the case it tried for after-the-fact "constructions" of the evidence. On property, the case isn't about "money" after all; it's about the City "owning" JEA in a way the law doesn't recognize. On wire fraud, the livestream serves the new purpose of persuading "stakeholders." On federal funds, the government rehashes its "ownership" theory to prove the City's receipt of funds and Mr. Zahn's agency. There is more, but the arguments share a common failure: They weren't the case the government tried, so it doesn't have the evidence on appeal.

The government closes with a blueprint for violating the Fifth Amendment. It can violate DOJ procedure, build a case on *Garrity* information, not document how it built it, deny the district court a full accounting of the tainted information, then concede a tainted indictment on appeal and excuse it as harmless because the evidence was sufficient for probable cause. That's not how harmless-error works—

the question is whether there's a reasonable possibility the tainted information influenced the decision to indict—and indictments tainted by *Kastigar* error aren't reviewable for harmlessness, anyway. The Court should reverse.

**ARGUMENT**[1]

I.      **No property-fraud: The City had no traditional property interest, the scheme could not have caused its deprivation, and the district court refused to instruct the jury properly.**

Rather than proving "property," causation, and intent with evidence, the government inflamed a jury over an exploratory vote and persuaded the district court the case was "overflowing with dollar signs." (ECF-524 at 197). Its effort to reverse-engineer the missing proof on appeal fails.

   A.      **The City lacked a traditional property interest in the proceeds of a hypothetical asset sale.**

The government doesn't dispute it had to prove a "*present* property interest" both (1) "in the City's hands" when the scheme unfolded and (2) extending to future proceeds if JEA's assets were sold. (*See* RB-53-54, 56-58). It stakes Mr. Zahn's convictions entirely on the proposition that the jury could have found the City "owns" JEA. (*See id.* at. 52-53, 57-58). Yet it admits JEA owns its own assets, conceded below there's no equity the City could own, and can't explain on appeal

---

[1]      Mr. Zahn's principal brief is cited as PB-X; the government's is cited as RB-X, with "X" being the page number. Record references follow the format explained in Zahn's principal brief. *See* PB-1 n.1

3

how or why the City "owns" JEA. Its theory of property is a chimera, not a "traditionally recognized property interest." *Ciminelli v. United States*, 598 U.S. at 306, 314 (2023).

### 1. The City does not "own" JEA.

The City's claimed "ownership" interest must be one "long … recognized as property." *Id.* at 315. Traditionally, "ownership" is "the totality of rights, powers, privileges[,] and immunities which constitute complete property" in a thing. *Watts v. Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th 1032, 1041 (11th Cir. 2025) (quoting RESTATEMENT (FIRST) OF PROPERTY § 10, cmt. b (1936)). "Property" is "that sole and despotic dominion which one man claims and exercises over [a thing], in total exclusion of the right of any other individual," 2 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 2 (1765), including the dominion to possess, use, and dispose of the thing, *Loretto v. Teleprompter Manhattan CATC Corp.*, 458 U.S. 419, 435 (1982).

The record belies any claim the City had that in JEA. The government admits that JEA owned its own assets. (RB-53). JEA was free to run its business—employees, contracts, debts, lawsuits, selling less than 10% of its assets—without the City's say-so (and without paying for the assets). (ECF-470-33 at 10-18). Because JEA was created mainly to provide utilities to City residents, the City can appoint Board members, approve budgets, approve a sale of more than 10% of

assets, and take a contribution in lieu of taxes. But that is hardly the "dominion" over the "totality" of JEA that characterizes the traditional concept of ownership.

Still, the government argues the City "owns" JEA like the parent of a wholly-owned subsidiary. (RB-33, 78). But a parent can control every aspect of a subsidiary because it owns all the subsidiary's stock. *See* 1 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS, § 31 (2025 ed). It can also prove ownership with a share certificate. The government cannot; it relies solely on assumptions the City "owned" JEA and colloquial comments about "ownership," that cannot be reasonably construed as proving it. (RB-32-33, 57).

**The government's right of "ownership" is not traditional property.**
Recognizing the City did not "own" JEA's assets, (RB-53), the government argues the City's "ownership" was a "property interest" in JEA "as an operating utility" that entitled the City to proceeds "post-sale." (RB-58). That kind of interest is called "equity": a residual interest in the assets of the enterprise—but not ownership of the assets themselves—after creditors are paid.[2] Using the government's analogy, a parent "does not own the subsidiary's property," s*ee* 1 FLETCHER CYCLOPEDIA, *supra*, § 31, but does own its equity—all its stock.

---

[2]     *See Equity*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("7. The amount by which … an interest in property exceeds secured claims or liens …."); *Equity*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://bit.ly/3LJRPII ("1. Representing an ownership interest; *an equity stake*").

The government cannot claim the City owned the equity in JEA because it conceded below it doesn't exist: "There's no equity in JEA." (ECF-526 at 62; *see also* ECF-502 at 3). That concession is binding. *See United States v. Mangano*, 128 F.4th 442, 466 (2d Cir. 2025). Besides, the government's uncontroverted evidence established the same thing, so "no equity in JEA" is what it proved. (ECF-516 at 35, 114). There was no "equity" in JEA the City could have owned.

Because neither assets nor equity is available to the government, reversal is required. There's no need to speculate whether the City owned some other interest "long … recognized as property," *Ciminelli*, 598 U.S. at 306, 315, because the government (1) didn't prove it below and (2) hasn't said what it is here.

**Legally, the City does not own JEA.** The government hasn't identified a traditional property interest because it cannot. Neither the State laws establishing JEA nor Article 21 of the City's Charter provide that the City owns JEA. On the contrary, the State and JEA itself each wield substantial powers that preclude the City from asserting ownership over the "totality" of the enterprise.

As to the State, it created the City and JEA and can bend both to its will. The Legislature exercised its constitutional authority to "create" the City in 1967. *See* Art. VIII, § 6(e), Fla. Const. (1968); Ch. 67-1320, Laws of Fla. (1967). The Florida Constitution grants it extensive powers over the City, including the powers to amend the City's Charter, to "alter" the City, and to abolish it altogether. *See* Art.

6

VIII, §§ 1(a), 2(a), 6(e) & note, Fla. Const. The City is a "creature[] of the State without any independent sovereignty," *Fried v. State*, 355 So. 3d 899, 910 (Fla. 2023),[3] and the Legislature has "plenary authority" over its affairs. *Id.* If the City "displeases" the Legislature, it can "withdraw" the City's powers over JEA, or even "melt [it] down and repour it into a smaller mold, … without the offending power." *Thomas v. State*, 583 So. 2d 336, 341 (Fla. 5th DCA 1991); *see also Cobo v. O'Bryant*, 116 So. 2d 233, 235 (Fla. 1959).

Likewise, JEA is a "creature" of the Legislature. The Legislature created JEA as a "body politic and corporate … authorized to own, manage, and operate an electric utilities system." *See* Ch. 67-1509, § 1, Laws of Fla. (1967). Later, it added water and sewer and provided for Article 21 of the Charter, concerning JEA. *See* Ch. 92-341, Laws of Fla. (1992); Ch. 80-515, Laws of Fla. (1980). The Legislature can amend Article 21 and, independently, regulate JEA's officers. *See* Art. VIII, §§ 2(a), 11(a)(1), Fla. Const. (1968); *see also* Art. VIII, § 1(e), Fla. Const. And the legislative power to create JEA implies the power to destroy it. *See Miami-Dade Water & Sewer Auth. v. Metro. Dade Cnty.*, 503 So. 2d 1314, 1316 (Fla. 1987).

---

[3]     Because the JEA-City relationship is created by state law, precedents of the state's highest court control, as do precedents of the intermediate appellate courts absent a "persuasive indication" the highest court would decide differently. *United States v. Hill*, 779 F.3d 1318, 1322 (11th Cir. 2015).

As to JEA, it is independent of the City—a distinct "body politic and corporate." *See* Ch. 67-1509, § 1, Laws of Fla. (1967). The City "has no control" over how JEA exercises its powers. *City of Jacksonville v. Bowman*, 320 So. 3d 931, 935-36 (Fla. 1st DCA 2021).

Thus, the City does not "own" JEA because it does not exclusively hold the "totality of rights, powers, privileges, and immunities which constitute complete property" in JEA. At most, it shares those rights with the State and JEA itself.

**The government didn't prove "ownership."** Astonishingly, there is no document in this case formally establishing that the City owns JEA. Someone claiming to "own" a home, a car, or jewelry needs a deed, certificate of title, or bill of sale to prove it. *E.g.*, *United States v. Monea Fam. Tr. I*, 626 F.3d 271, 276 (6th Cir. 2010) (testimony insufficient to prove ownership of diamond; "document that established … ownership" required); *Gaia Tech's, Inc. v. Reconversion Tech's, Inc.*, 93 F.3d 774, 779 (Fed. Cir. 1996) (minutes insufficient to prove written assignment; written assignment required). Yet the government produced nothing.

A document establishing ownership was essential for the jury to find the City "owned" JEA. Otherwise, the facts showed the City did not own JEA in any way property traditionally understands it. (*Supra* at 4-5). That leads the government to mischaracterize evidence and cut and paste out of context.

8

It states that "the City *is entitled* to receive the cash value of JEA if JEA is ever sold." (RB-53) (emphasis added). But its record evidence does not say "the City is entitled" to anything—each cite involves potential values for JEA and assumes, without explanation, proceeds go to the City. (ECF-504 at 179-85; ECF-476-4 at 18-20). Might the City have expected or assumed it would receive proceeds from a sale? Sure, it might have expected to bargain, misunderstood its rights, or cut a deal with the Legislature. But is an expectation or assumption of receiving money, unaccompanied by ownership, evidence of ownership? No; expectations and assumptions aren't property rights. *See Ferry v. Spokane, P. &. S. Ry. Co.*, 258 U.S. 314, 319-20 (1922) (holding that "a mere expectancy or possibility" is not a property right) (quoting *Randall v. Kreiger*, 90 U.S. 137, 148 (1874)); *Comegys v. Vasse*, 26 U.S. 193, 200 (1828) (distinguishing a property right from an "expectation" or a "mere possibility"). Likewise, the government implies the City had some right to "keep or sell" JEA; but its evidence doesn't say the City had that right, either. (RB-52 (citing ECF-476-4 at 4-5)).

Finally, the government spotlights comments in testimony and documents using "own" and "asset" to describe the City-JEA relationship. (RB-52-53). None state that the City had dominion over JEA, controlled JEA, or anything of the sort. Nor do any explain how the City owned JEA, how it was "entitled" to proceeds, or anything else. Each cite is just a conclusory mention of "own" or "asset" used

9

colloquially to describe how a public utility relates to its community, or the importance of JEA to the City, or mere assumptions. (*E.g.*, ECF-476-4 at 4-5, 18-19; ECF-504 at 139; ECF-514 at 139). The same evidence confirms the colloquial use. (*E.g.* ECF-476-4 (describing "ratepayer 'owners'"); ECF-504 at 142 ("owned essentially by the citizens"); ECF-514 at 129 ("owned by our customers")).

But when a layperson uses a term with both colloquial and legal meanings, and context shows a colloquial usage, it does not prove the legal meaning. *See United States v. Mercer*, 165 F.3d 1331, 1336 (11th Cir. 1999) (holding "partner was probably used in a colloquial sense" and was not evidence of a true partnership); *see also Hayes v. Wilh Wilhelmsen Enters., Inc.*, 818 F.2d 1557, 1559-60 (11th Cir. 1987) (holding testimony amounting to "legal conclusions" insufficient to raise a "question of material fact"). At most, the cited evidence assumed a conclusion the government *never* proved with facts demonstrating true "ownership" and is thus insufficient to sustain the conclusion. *See United States v. Alvarado*, 808 F.3d 474, 491-92 (11th Cir. 2015) (holding defendant's evidence he was "authorized" involved "assumptions, not proof of authorization").

### 2.    Even if the government proved "ownership," it did not prove a legal right to payment.

Even if the government proved an "ownership" interest, it's merely an ephemeral interest in the "operating business" that springs into a payment-right

"post-sale." (RB-58). Under that theory, the City had no "entitlement to collect money," until there was a sale agreement producing that money. (*See* PB-49-53).

The parent-subsidiary analogy makes the point. The parent of a wholly-owned subsidiary has a residual right to the subsidiary's assets—net of payment to creditors—always. By virtue of ownership, it has complete control over the subsidiary—always. The City didn't have that. It had influence (*e.g.*, board-appointments) and contribution (taxes by another name), but it lacked the continuing entitlement and control characterizing traditional ownership.

As a result, the City lacked present property, and a right to payment didn't exist unless a sale occurred. That makes this just like *United States v. Henry*, 29 F.3d 112, 114-15 (3d Cir. 1994), because "something" that may become property "if and when it [is] received" is not a present property interest. (PB-49-53). The government's cases about unsuccessful schemes to dodge state taxes or fines, (RB-58), are inapposite: The state always has a legal right to taxes and fines—under statutes. Here, the existence of the right depended on a sale.

*    *    *

The government never thought about proving a "traditionally protected property interest" at trial. *Ciminelli*, 598 U.S. at 315. Rather, it prosecuted an invalid right-to-control theory—JEA's Board was denied information about policy

11

votes—and persuaded a local jury with "dollar signs." The "ownership" argument fails because the government neglected to prove it.

### B. The scheme would not naturally result in the City parting with property.

Because the Board's votes to explore Scenario 3 and conditionally approve a PUP were votes to investigate policy—not formalize decisions—the government failed to prove the scheme would cause the City to lose money. *See Loughrin v. United States*, 573 U.S. 351 (2014). The City could not lose money without an implemented asset sale and PUP, which hinged on a chain of contingencies the government never proved would happen because of the claimed scheme. (RB-59).

The government effectively concedes it. It admits Section 666 and the wire-fraud statute are "similar" to the bank-fraud statute in *Loughrin*, (RB-59), requiring it to prove a "false statement" that would serve as a "mechanism naturally inducing [the City] to part with its money." *Loughrin*, 573 U.S. at 365.

But the only statements it cites as that "mechanism" were those "instigat[ing]" the Scenario-3 and PUP votes. (RB-60). Yet it does not dispute that (1) a vote to explore Scenario 3 could not directly result in an asset sale (the "means" to produce money), (2) a vote to conditionally approve a PUP could not directly result in an implemented PUP (the "means" to take it), or (3) each depended on a series of distinct negotiations, approvals, and decisions by different decisionmakers acting independent of the scheme.

12

On those facts, the most the government proved was that the votes might have been a but-for cause of the City parting with money—if every contingency broke the right way. But "not every but for cause will do"; "indirect" or "incidental" connections will not. 573 U.S. at 363. The government must prove a "sufficiently direct causal nexus" like that required by "proximate causation."[4] *United States v. Berroa*, 856 F.3d 141, 149 n.4, 152 (1st Cir. 2017).

The government's silence about whether an asset sale would naturally follow from the Board's exploratory vote is stunning. Its most probative witness—JEA's investment banker—said a sale would be like "landing a 747 on an aircraft carrier during a hurricane." (ECF-516 at 171-72). It hinged on, among other things, successful diligence, resolving Vogtle, consent from contract counterparties, approvals from regulators, and approval by the JEA Board, City Council, and voters, all sensitive to politics. (PB-26-28). The government presented no evidence

---

[4]    The government complains that *Loughrin* doesn't "mention proximate cause" and *Berroa* "isn't persuasive," (RB-62), but never develops an argument. *Loughrin* is cast in classic probable-cause language, asking about a "natural[]" result flowing "in the ordinary course" from the defendant's action, and rejecting "indirect" or "incidental" connections. 573 U.S. at 363-64; *see also CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (describing proximate cause as "shorthand" for concept that "[i]njuries have countless causes, and not all should give rise to legal liability"); Dan B. Dobbs, et al., DOBBS' LAW OF TORTS, § 201 (2d ed. 2015) (discussing proximate-cause tests).

all these things would (or could) happen in the "ordinary course" as the "natural" result of exploring Scenario 3. *Loughrin*, 573 U.S. at 363.

Moreover, any JEA Board, City Council, and voter approvals of a sale would be remote in time and based on vastly different information. Back in July 2019, the earliest JEA thought those decisions could come was (1) for the Board and Council, eight months later (March 2020), and (2) for the voters, a year later (mid-2020). (ECF-476-37 at 190). By then, the terms of a sale (if any), the amount of PUP payments (if any), and whether the buyer would pay would be known and disclosed. (PB-32-36). Misstatements to the Board in July 2019, before this information was known—before Mr. Zahn could have known it—could not result in the approvals directly causing the City to part with money. The theory assumes future fraud based on future information to make the claimed scheme work.

Although that's enough to reverse, the government fares no better on an implemented PUP. It doesn't dispute that the formal PUP documents required a buyer of JEA's assets—not the City—to make payments, such that the City could not have lost money.[5] (PB-28-29). Complaining that wasn't until "months after"

---

[5]    The assertion that JEA wouldn't seek approval from lawyers, the Attorney General, and Commission on Ethics unless "the PUP required the City to pay" is false. (RB-61). The request to the Attorney General and draft request to the Commission on Ethics both stated that the buyer was responsible for PUP payments, and lawyer review was required on unrelated issues. (ECF-470-27 at 3 n.4; ECF-476-88 at 3 n.4; ECF-476-84). The implication—without record support—a buyer would have paid less, (RB-61), is make-weight.

14

the vote, (RB-61), misses the point: The fact that JEA later required it proves that statements before the Board's policy vote could not naturally have caused the City to part with money because too many contingent events had to unfold.

Next, the government says *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011), means payment by the buyer is irrelevant if Mr. Zahn "believed" the City would pay. (RB-61). Not so. Predating *Loughrin*, *Bradley* has nothing to do with causation. It involved a scheme to obtain Medicaid reimbursements state administrators—unlike the City—actually paid. *Id.* at 1227, 1233. There was no causation problem; real victims parted with real money. The defendants' assertion that they believed reimbursement wasn't prohibited went to fraud and intent, not causation. *See id.* at 1247-48.

The government says nothing about the remaining contingencies to the PUP. That it died in legal review and became so mired in practical difficulties it was unlikely to be implemented before a (hypothetical) sale proves that any connection between the vote and the City parting with money was indirect. (PB-13-14, 30). It is no different from *Berroa*, where doctors' false statements to obtain medical licenses could not have resulted in patients paying for treatment. 856 F.3d at 149-50. The statements might be a but-for cause, but not *Loughrin*'s "natural" one.

The government frames this as an illegal scheme that failed. Really, it is federal prosecutors policing local politics—reaching for perceived misconduct

nowhere near property, usurping local authorities. These are the federalism concerns undergirding *Lougrin*. *See* 573 U.S. at 362-33.

### C.   Mr. Zahn did not intend to defraud the City.

Because the claimed scheme, as intended by Mr. Zahn, would result in the details of any asset sale and a PUP (if implemented pre-sale) being fully disclosed before any sale, the government failed to prove intent to defraud. Mr. Zahn acknowledges the decision in *Kousisis v. United States*, 605 U.S. 114 (2025), but here, there "was not even proof of intent to deceive." (PB-57).

Contrary to the government's response, (RB-65), this isn't an argument about a mistakenly conceived plan. It's a plan that the defendant intended would cause disclosure before any transaction. (*See* PB-34-36, 56-58). *See Kousisis*, 605 U.S. at 123-24 (holding defendant can commit wire fraud by inducing a victim to enter a transaction).

So the government overreaches on the record. (RB-65-66). Mainly, it asserts that Mr. Zahn "hid the PUP's true value from" JEA's Chief Administrative Officer, who ran point on legal and ethics vetting. But that's not what its record cites say. (RB-66 (citing ECF-523 at 60-65, 114-15, 120, 127)). Rather, they disclose that the CAO knew what the PUP formula was and did not testify that Mr. Zahn hid anything from him. The government stacks inferences to say that Mr. Zahn's (not) hiding the PUP's "value" from the CAO caused the Attorney General

16

letter not to contain numbers, but its record cites don't support that either. (RB-66 (citing ECF-517 at 40, 42)). And because most of what's left didn't involve Mr. Zahn at all, it says nothing about what he intended.

**D.      The jury instructions on "property" and causation were wrong.**

In defending the jury instructions, the government fails twice over.

First, it misstates Mr. Zahn's proposed "property" instruction. (*See* ECF-398 at 38). The instruction did *not* ask the jury to find *when* the object of the scheme became money or property. (RB-86). It asked—as required by *Cleveland*—*whether* there was property in the City's hands at all, explaining that (1) whether the object of the scheme "may have become money in the hands of" the City was not the question and (2) whether the object was money or property in the City's hands was. (ECF-398 at 38).

Under *Cleveland*, Mr. Zahn's jury had to find, at minimum, that the City had a legal right to hypothetical sale proceeds. Denying this instruction prevented the jury from considering it, after he made a commitment to the jury about it. (ECF-504 at 52-53). The instructions did not otherwise require the jury to decide whether the City had legal right to proceeds from a JEA sale. Because the law precludes letting that go unanswered, (*supra* at 3-4), Mr. Zahn is entitled to a new trial.

Separately, he is entitled to a new trial on the wire-fraud count because, in rejecting his proposed "causation" instruction under *Loughrin*, (*see* ECF-398 at 28-

17

39), the district court gave the government a second pass. Without that instruction, the jury could let the government *assume* Mr. Zahn's conduct would have naturally resulted in the City losing money without ever *proving* it—convicting Mr. Zahn of a future scheme based on future facts. The government's reliance on *Bradley,* (RB-88), avails it of nothing because *Bradley* is not a causation case. (*Supra* at 15).

This case is. Because the district court rejected Mr. Zahn's causation instruction, the jury never learned that the government had to show the alleged scheme would naturally result in the City parting with money. This wrongly permitted the jury to convict on assumptions stacked on assumptions about hypothetical, future events.

## II. No wire-fraud jurisdiction: Mr. Zahn didn't "cause" the livestream, and it wasn't "for the purpose of executing" a scheme.

A single livestream of one regularly-scheduled meeting, automatically broadcast under an open-government policy, doesn't greenlight a federal prosecution. Proving that, the government refuses to defend the wire-fraud theory it prosecuted—Mr. Zahn misled the JEA Board at the meeting—because he cannot have "caused" the livestream "for the purpose of executing" the scheme when the Board was present in the flesh. So it unveils a theory it never prosecuted: Mr. Zahn "caused" the livestream "for the purpose" of influencing the "City Council" and "voters." (RB-69-70). That theory risks every local-government Zoom call involving government property becoming a federal crime.

18

### A.    Mr. Zahn did not cause a wire transmission.

The government's new theory can't save its failed proof of causation. The undisputed facts are the same: Scheme or no scheme, (1) the JEA Board would've met and (2) it would've been livestreamed. (PB-37). Mr. Zahn didn't "cause" that transmission because it didn't "follow" from any "act" he committed. *Pereira v. United States*, 374 U.S. 1, 8-9 (1954); *United States v. Dooley*, 578 F.3d 582, 588 (7th Cir. 2009) ("[T]he communication must occur not only *after* the defendant's act, but *as a result of* that act.").

The government's rejoinder that the meeting's "content" differed because Mr. Zahn made "misrepresentations and false pretenses" is meritless. (RB-68-69). The statutory hook is causing a wire transmission, not causing misrepresentations. *See* 18 U.S.C. § 1343 ("transmits or causes to be transmitted by means of wire"); *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008) (holding the statute punishes those who "cause [a] wire transmission to be made"). That's why the double-jeopardy unit of prosecution is a "wire transmission," *Williams*, 527 F.3d at 1241, and why "it is not necessary that the transmitted information include any misrepresentation," *United States v. Hasson*, 333 F.3d 1264, 1272 (11th Cir. 2003). The "wire transmission"—not a statement during one—is what Mr. Zahn had to "cause." *See also Pereira*, 347 U.S. at 9 (mail-fraud; whether the defendant "'causes' the mails to be used").

19

Granted, it's enough if Mr. Zahn did something from which a transmission foreseeably "follow[ed]" in the "ordinary course." (RB-67). But he still had to *do something from which the transmission* (livestream) *followed*—"[t]he statute requires a *causal* connection between the defendant's actions and the communication, not simply a temporal one."[6] *Dooley*, 578 F.3d at 588. The government cannot show the required connection exists.

Instead, it misreads *Dooley* to backstop its "content" argument. (RB-68-69). The wire transmission there was an email from the thief's superior providing instructions, which the superior would have sent anyway—theft or no theft. 578 F.3d at 589. Because causation failed either way, *Dooley* left open what happens if a wire transmission assumes a "substantially different form" because of the defendant's acts. *Id.* at 589. It described transmissions—not the truth of statements—transformed by a defendant's acts, like victims who wire-transfer funds to fraudsters when "[i]f not for the defendant's misconduct, no wire transfers in those amounts ever would have occurred." *Id.* & n.3. There, one might say the defendant's act *resulted in* a wire transmission (transfer of specific funds).

_____

[6]    The government's citation of *United States v. Ward*, 486 F.3d 1212 (11th Cir. 2007), (RB-67-68), doesn't help it. In *Ward*, a defendant participated in a scheme and a co-schemer foreseeably used the wires. *Id.* at 1222. Here, there was no evidence Mr. Wannemacher caused the livestream, either; the meeting and the livestream would have happened regardless of the scheme.

But it is impossible to say speaking at an event that would happen regardless *results in* a wire transmission of the same event that would also happen regardless. If that is the law, a scalper selling phony tickets knowing he's in view of ESPN's booth "causes" its broadcast of pregame coverage. This "read[s] the word 'causes' completely out of the statute." *Id.* at 588.

### B. The livestream was not "for the purpose of executing" a scheme.

The government claims Mr. Zahn's purpose at the Board meeting was to "instigate Board action" on Scenario 3 and a PUP. (RB-60). To save its defective proof, it now pivots to a purpose to influence the City Council and voters to approve a sale in a hypothetical Council meeting and election way down the road. (*See* RB-70-71). The theory fails for procedural and substantive reasons.

Procedurally, the theory is improper because it wasn't presented to the jury. The case at trial was that Mr. Zahn used the July 2019 meeting to mislead the Board to make the decisions it did. (ECF-526 at 27, 28, 30-31, 39, 41, 43, 49-50, 52, 67, 69-73, 86, 89, 169, 172-73, 175). The government argued the livestream to the jury consistent with that theory, (1) acknowledging "yes, it was a predetermined meeting" but that "didn't matter" because it "was already part of the

plan" and (2) Mr. Zahn uttered statements—"sounds"—misleading the Board.[7] (*Id.* at 43, 48). The new theory, in contrast, is cobbled from snippets of evidence, (*see* RB-70-71), to construct a rationale the jury would never have understood.

But "[a]ppellate courts are not permitted to affirm convictions on any theory they please simply because the facts … were presented to the jury." *McCormick v. United States*, 500 U.S. 257, 270-71, n.8 (1991). So the government cannot "cherry pick facts presented to the jury," *Ciminelli*, 598 U.S. at 316-17, to manufacture grounds to affirm not "presented in a focused or otherwise cognizable sense" at trial, *Cola v. Reardon*, 787 F.2d 681, 693 (1st Cir. 1986). An appellate court cannot "perform the jury's function of evaluating the evidence …, when the jury may never have performed that function." *Connecticut v. Johnson*, 460 U.S. 73, 85-86 (1983) (plurality opinion). The new theory is off the table. *See United States v. Elkins*, 885 F.3d 775, 782 (11th Cir. 1989) (stating that court cannot affirm on a theory "not presented to the jury").

Substantively, the theory fails. Sure, a wire transmission is "for the purpose of executing" a scheme where it is "incident to an essential part of the scheme." But that just means "[t]he transmission itself need not be essential to the success of the scheme." *Hasson*, 333 F.3d at 1264. Still, "[t]he relevant question at all times is

---

[7]    The government did point out that one witness watched the livestream from New Mexico, but that was to show that "an interstate wire communication occurred during that board meeting." (ECF-526 at 43, 48).

whether the [transmission] is part of the execution of the scheme *as conceived by the perpetrator at the time*." *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (emphasis added). It must be "sufficiently closely related to the scheme," *United States v. Maze*, 414 U.S. 395, 399 (1974), to have aided it. (*See* PB-61).

Here, the livestream exposed the scheme to sunlight—what open-government policies do—unavoidably working against it. But a wire transmission that "increase[s] the probability that the [scheme] would be detected" cannot be for the purpose of executing it. *Maze*, 414 U.S. at 403. The livestream vastly increased the probability someone would dispute Scenario 3 or scrutinize the PUP, particularly given the political sensitivity. A schemer who wanted to bring this plan to fruition would far prefer keeping it quiet. Broadly sharing it early cannot have been part of its execution "as conceived." *Schmuck*, 489 U.S. at 715.

The government's evidence about "people who tuned in" proves it.[8] (RB-71). The "compensation specialist" thought it raised "conflicts of interest" and asked OGC "has this been looked at"? (ECF-511 at 80-82, 103-04). At the next public meeting, the "union leader" declared "[s]o much for transparency." (ECF-520 at 21, 51-53). The "City Council auditor" watched to facilitate the investigation culminating in the memo that caused the PUP's demise. (ECF-524 at

---

[8]    The point here is not that the livestream was "counterproductive" in "hindsight," *Schmuck*, 489 U.S. at 715, but that its probable effect "at the time," *id.*, was to expose the scheme, not facilitate it.

72-74). The livestream was destined for this at the beginning, so a reasonable jury (if asked) could not find the "for the purpose of executing" element met. *See United States v. Nguyen*, 829 F.3d 907, 921 (8th Cir. 2016) (mailing that "conflicts with … the scheme" is insufficient); *United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir. 1992) (mailing that "works against [a scheme]" is insufficient).

Even if that weren't true, the theory fails because the livestream was "too remote from the defendant's scheme" to be "for the purpose of executing it." *Koen*, 982 F.2d at 1107. When the Board met, the possibility JEA would present a sale to the Council and voters was entirely hypothetical. That was a year away and would involve vastly different information—including the disclosed terms of a sale, the PUP payments, and who would pay them. (*Supra* at 14).

The government points to no evidence permitting a jury to find (if asked) that a livestream of a meeting to persuade an in-person board was "conceived by the perpetrator," *Schmuck*, 489 U.S. at 715, to execute a scheme by influencing the Council and voters—months to years in the future.[9] On its theory, a mayor pitching

---

[9]    The government mischaracterizes the testimony it cites. It claims a witness testified the meeting "involved a bit of theater," (RB-71), but neglects to say that the "theater" came from Board members, not Mr. Zahn. (ECF-515 at 74-75). It claims Mr. Wannemacher wanted to avoid "discussing JEA's value," (RB-71 (cleaned up)), but neglects to mention that publicly naming your value is a bad idea when "launching a procurement process." (*See* ECF-515 at 26, 41).

a council to sell a city park (property) by lowballing its value during a Zoom meeting (wire) reaching supporters (might help) commits wire fraud. Not so.

### III. No Section 666 jurisdiction: The City didn't receive federal funds, the funds weren't "benefits," and Mr. Zahn wasn't the City's agent.

The government's proof of Section 666's jurisdictional elements suffers the same defect. The government didn't bring the evidence to trial, and it can't rewrite history on appeal.

### A. The City didn't receive federal funds.

*United States v. Doran*, 854 F.3d 1312 (11th Cir. 2017) controls. That the government needs four Venn diagrams to dodge *Doran* proves it.

*Doran* is simple. When a victimized entity has not received federal "benefits," Section 666 prohibits conviction on proof that a "separate legal entity" "closely affiliated" with it has. *Id.* at 1314-15. The only exception is when the entities "are alter egos." *Id.* at 1315. Here, Mr. Zahn was convicted on proof (1) the City did not receive benefits, (2) JEA was a legally separate entity, and (3) JEA received federal funds. (*Supra* at 8; PB-37). The government did not prove they were alter egos. (PB-67). It disputes none of this. *Doran* requires reversal.

The government vastly overcomplicates things. Its claim that *Doran*'s alter-ego rule doesn't apply because it's just for "corporations" is make-weight. (RB-

25

74). Nothing in *Doran* implies that.[10] Rather, in *Doran,* the Court reasoned that its prior decision in *McLean*—which *did* involve government agencies—was controlling. *See Doran*, 342 F.3d at 1315 (discussing *McLean*). And the issue is the same: How does Section 666 treat funds received by an entity that is legally separate from the victim? Thus, the government has no answer to *United States v. DeQuattro*, 118 F.4th 424, 439-42 (1st Cir. 2024), (PB-67), where the court applied *Doran* and held that benefits received by one governmental body (a tribal gaming authority) were not received by a closely-affiliated one (the tribe).

Moreover, the City and JEA are each a "body politic and *corporate*." (PB at 7; ECF-470-33 at 6-7). They are treated as artificial persons too, *e.g.*, *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1277 (11th Cir. 2021), and rely on their legal separateness to limit liability—as do the City and JEA. *See Bowman*, 320 So. 3d 936 (holding that "JEA is a legal entity independent of the City" and "the City is not vicariously liable for JEA's alleged negligence"). The government posits a distinction without a difference.

The rest of the government's argument is about "close affiliation," which *Doran* rejected. Still, the government mischaracterizes the record by claiming that because the City attaches JEA's financials with its own, JEA's federal funds

---

[10]    Not the facts, either. The recipient in *Doran* was a nonprofit, but the difference is form, not substance. It was "established" by the governmental victim as a "university direct support organization." *Doran*, 854 F.3d at 1314 & n.6.

"boosted the City's revenue." (RB-73). The City's annual report, which the government cites, states that JEA's financials (and three other entities') are separate, audited by separate auditors, and included simply to "allow the user to address the relationship" between the entity and the City. (ECF-470-99 at 41; *id.* at 35). That's not proof the City's revenue was "boosted."

### B.    The federal funds were not "benefits."

Proving Section 666(b) "benefits" requires that federal funds were (1) disbursed under a comprehensive program, (2) used locally in a way related to that program, and (3) not merely compensation or cost-reimbursement. *See Fischer v. United States*, 529 U.S. 667, 679-80 (2000); *United States v. McLean*, 802 F.3d 1228, 1244 (11th Cir. 2015).

Rather than showing record proof on each element, the government flails. It highlights that the funds originated at FEMA as "Disaster Grants – Public Assistance." (RB-78). Although it adds that "JEA received funds from FEMA," (*id.* at 77-78), its exhibits prove otherwise: JEA received them from the Governor. (ECF-476-115 at 5; ECF-476-116 at 5). Plus, it cites nothing proving the structure and operation of the program, its relationship to the Governor, JEA's use of the funds, or no cost-reimbursement.

*McLean* requires reversal. There, the government appealed a judgment of acquittal holding its "benefits" evidence insufficient. 802 F.3d at 1240. The

27

evidence was that a local agency received (1) funds its home-city first obtained through federal programs and (2) "stimulus" funds its home-county used to build bus shelters for the agency. *Id.* at 1242-43. This Court affirmed the JOA because no evidence proved the "structure, operation, and purpose" of the programs or "the ultimate use of th[e] funds at a local level." *Id.* at 1244. Thus, "a reasonable jury" could not find Section 666(b) "benefits." *Id.* Same here.

The government says *Mclean's* sufficiency analysis was "dicta"—because the case was decided on "invited-error grounds"—and erroneously treats "benefits" as a factual question instead of a legal one. (RB-79-80 & n.19). But it fails to mention why *McLean* invoked invited error. As here, it argued in *McLean* that "benefits" is "a question of law." *Id.* at 1245. The Court said the government waived that point by inviting the district court to treat "benefits" as a jury issue— proposing an instruction, which the district court gave, and arguing at JOA that the jury's finding should not be disturbed. *Id.*

The government did the same thing here. It asked for the same kind of jury instruction, made the same kind of JOA argument, and the District Court agreed on both. (*See* ECF-345 at 17; ECF-524 at 14; ECF-527 at 16; ECF-540 at 3-4; *see also* ECF-523 at 166; ECF-526 at 47). On appeal, the government cannot sandbag its insufficient proof of "benefits" with arguments it never raised that assign error to rulings it requested. An appellee cannot cross-appeal an error in a judgment it

won, *Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*, 555 F.3d 1331, 1343 (11th Cir. 2009), or press an alternative ground to affirm it forfeited and waived. *See United States v. Campbell*, 26 F.4th 860, 873-74 (11th Cir. 2022).

Separately, *McLean*'s analysis is holding, not dicta. The Court spent two pages on why "benefits" is a fact question and another nine on sufficiency. 802 F.3d at 1234-45, 1245-47. Four paragraphs on invited error, *id.* at 1245, did not erase its work. *McLean*'s analysis is a controlling alternative holding. *See Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008). The Court has treated it as such. *See Doran*, 854 F.3d at 1315 ("*[M]cLean* is dispositive.").

Also, *McLean*'s analysis is sound, *see* 802 F.3d at 1245-47, and *Fischer II* does not imply otherwise. (RB-79). *Fischer II* resolved a legal question because that was what the petitioner presented: whether healthcare providers receive Medicare "benefits" when, under the Medicare Act, only patients are recipients. *See* Brief for Pet'r., *Fischer v. United States*, No. 99-116, 1999 WL 1210828, at *14-21 (Dec. 15, 1999). The Supreme Court resolved that question, nothing more. *See Fischer II*, 529 U.S. at 666.

The government's closing grab-bag of statutory and CFR cites (RB-80-81) cannot save it. Merely identifying a grant program does not prove its "structure, operation, and purpose." *E.g.*, *United States v. Evans*, 143 F.4th 1, 12 (1st Cir. 2025) (evidence of "Violence Against Women" grant supporting counselors

29

insufficient). Even if it did, the government's failure to flag evidence of the relationship between the Governor and JEA or JEA's use of the funds, plainly fact questions, dooms it. *See McLean*, 802 F.3d at 1244-45.

### C.    Mr. Zahn was not the City's "agent."

The government defends its evidence of agency only one way: JEA was an "agent" of the City, therefore Mr. Zahn also was. (RB-82). Putting aside that this makes every JEA employee the City's agent—it provides no principle distinguishing among employees—the government misreads *United States v. Langston*, 590 F.3d 1226 (11th Cir. 2009), which requires reversal.

On the "legal construct," (RB-81), the government contorts *Langston*. The dual-agency question is not whether the law makes *JEA* an agent of the City; it is whether it makes *Mr. Zahn* an agent of the City. The Court reasoned that whether an executive of a state commission was also "an agent of the state" is determined by "the relevant state law." *Id.* at 1234. It held that the statute creating the commission failed to "expressly create[] a dual agency relationship" between the *executive* and the state—*not* the commission and the state—because it "establishes the [executive's] agency with just one entity," the commission. *Id.*

Shed the government's misreading, and this case is foursquare. Article 21 of the Charter provided that (1) JEA's Board "shall employ" Mr. Zahn to work "*under the supervision of* [the Board]" as CEO and (2) the Board had "full and

30

independent authority to hire, transfer, promote, discipline, terminate, and evaluate employees."[11] Charter of the City of Jacksonville, Fl. ("Charter") §§ 21.07(j), 21.08 (2019) (emphasis added). As in *Langston*, Mr. Zahn served "at the pleasure" of the Board alone and was not a "dual agent." 590 F.3d at 1234.

Moreover, the government's argument fails on its terms because JEA isn't an agent of the City. *See Bowman*, 320 So. 3d at 935-36. In *Bowman*, a Florida court interpreted the Article 21 of the Charter and held that JEA is "a legal entity independent of the City" that enjoys "plenary authority" over its operations and "is independently responsible for all … employees." *Id.*

Indeed, the Charter contains no provision that JEA works on behalf of the City. On the contrary, it provides JEA "own[s], manage[s], and operate[s] a utilities system within and without" the City and provides that it has "plenary authority" to do that how it wants, on its own. *See* Charter §§ 21.01, 21.04. JEA exercises water and sewer powers the City might otherwise because the Legislature created an integrated utility, not because the City functions as agent.

On the evidence, the government neglects to mention Mr. Zahn's employment contract. It was between him and JEA and provided no authority to

---

[11]    The Charter refers to the Board as "JEA" and the CEO role as "managing director." City of Jacksonville, Fl., Charter §§ 21.03(a), 21.07(j) (2019). Mr. Zahn's employment agreement provides that "managing director" was his role. (ECF-476-113 at 1). Because amendments occurred after the events leading to this prosecution, it is important to refer to the version in effect in 2019.

act on the City's behalf. (ECF-476-113). That should end it. *See Langston*, 590
F.3d at 1234. The government's assertion about Mr. Zahn's supposed "mandate" is
mischaracterization: The witness was discussing his views about "municipal"
utilities, not facts about JEA and Mr. Zahn. (RB-82 (citing ECF-504 at 144-45)).
The rest of the government's argument says only that JEA provided utilities in the
City and nothing about whether Mr. Zahn acted on its behalf.

**D.     The indictment's "agency" charge was constructively amended.**

The indictment charged only that Mr. Zahn "was an agent of JEA, within the
meaning of 18 U.S.C. § 666(d)(1)." (ECF-1 at 1-2 ¶1). The jury was instructed to
convict if Mr. Zahn was the City's agent. (ECF-345 at 15). That is a constructive
amendment. *See United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990).

Again, the government essentially admits it. It does not dispute that a
specific agent-organization relationship is an essential element of a Section 666
offense. Nor does it dispute that the indictment (1) charged that Mr. Zahn was an
"agent" of JEA under the statutory definition, (2) did *not* allege he was the City's
"agent," and (3) did *not* allege he did anything making him the City's agent under
the statute—*e.g.*, he was "authorized to act on [its] behalf" or was its "employee."
18 U.S.C. § 666(d)(1). Because that is undisputed, *Keller* and *United States v.
Cancelliere*, 69 F.3d 1116, 1221 (11th Cir. 1995), control: The indictment

32

unambiguously charged an "essential element" in a single, specific way (agent of JEA); the instructions allowed conviction another way (agent of the City).

So the government cherry-picks allegations the City "owned" JEA and Mr. Zahn had a "fiduciary duty" to the City and argues they imply he was the City's "agent," so the indictment must have charged it. (*See* RB-84). That's not "fairly reading" the indictment; it's unlawfully rewriting it.

An indictment is not a Rorschach test. When it unambiguously charges an essential element in a single, specific way, that charge controls. *See Keller*, 916 F.2d at 634 ("[T]he indictment specifically alleges that only two individuals conspired and contains no language indicating there were unnamed or unknown conspirators …."). Here, the indictment unambiguously charged Mr. Zahn as an agent only of JEA. The government cannot gaze at the indictment, imagine something else, and red-pen the new charge. *See, e.g.*, *United States v. Narog*, 372 F.3d 1243, 1248-49 (11th Cir. 2004) (constructive amendment where indictment charged offense one specific way, even though it contained the "broad statutory language"); *United States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013) (same; where instructions varied from charge, though not by much).

Unsurprisingly, the government's cases don't advance its argument. *United States v. Phillips*, 4 F.4th 1171, 1176-77 (11th Cir. 2021), addressed "surplusage" in an indictment, not an essential element. And in *United States v. Sanders*, 668

F.3d 1298, 1311 (11th Cir. 2012), the jury instruction used "the precise language of the indictment," not inferences from snippets. The government fails on the law.

But even if it did not, its inferences from "ownership" and "fiduciary duty" are wrong. It does not follow from A "owning" B that B is A's "agent." (*Supra* Point III.C). Nor does it follow from X owing "fiduciary duties" to Y that that X is Y's "agent"—directors owe fiduciary duties to shareholders and trustees owe fiduciary duties to beneficiaries, but neither are agents. *See, e.g.*, RESTATEMENT (FIRST) OF AGENCY §§ 14(b), cmts. a, c (trustees), 14(c), cmt. a (1958) (directors). On its own terms, the government's effort to read tea-leaves in the indictment fails: What it needs—but never alleged—are facts creating an agency relationship.

Finally, even if that "ownership" and "fiduciary duty" imply agency, the indictment "fairly read" doesn't charge Mr. Zahn as the City's agent. It charged only that he was JEA's agent, indicating that was the only agency. The "whole" indictment confirms that because it describes Mr. Zahn solely as JEA's agent, identifying his role as JEA's CEO, his work on behalf of JEA, and his interactions with JEA's Board and employees. (*E.g.*, ECF-1 at 1, 3-4, 6, 11-13). In contrast, it alleges *nothing* marking Mr. Zahn as an "agent" of the City under Section 666(d)(1). The indictment "as a whole" charges him as only an agent of JEA.

**IV.** *Kastigar*: **The government's conceded violations of** *Kastigar* **cannot be excused as harmless error.**

The government closes with a concession of error under *Kastigar v. United States*, 406 U.S. 441 (1972), that dooms Mr. Zahn's convictions. Admitting it violated *Kastigar*'s prohibition against directly or indirectly using Mr. Zahn's immunized testimony to indict him, (RB-91, 96), the government posits, (RB-102), that "the ultimate question … is whether any *Kastigar* error was harmless beyond a reasonable doubt." But in urging this Court to affirm because "probable cause" supports the indictment, (RB-100-02), the government reduces the constitutional harmlessness standard to a strawman. It never tries to—and on this record cannot—meet its burden to prove there is no reasonable possibility that hearing testimony from mostly tainted witnesses affected the grand jury's decision to indict. That warrants reversal, but there's a more fundamental problem: Because *Kastigar* error in securing an indictment is structural, not trial error, harmless-error review should not apply. Either way, Mr. Zahn's convictions should be reversed.

**A.** **The government's** *Kastigar* **violations are not harmless error.**

The government's failure to prove harmlessness after putting all its eggs in that basket requires reversal. It defends the district court's harmless-error ruling under a "probable cause" showing that reduces harmless error to a sufficiency-of-the-evidence test. The constitution sets a higher standard.

35

Because the government concedes it violated *Kastigar* by inundating the grand jury with tainted testimony—more than half of its witnesses—it must prove there is no reasonable possibility the tainted testimony (its error) contributed to the grand jury's decision to indict (the benefit of its error). *See Chapman v. California*, 386 U.S. 18, 23-24 (1967); *Satterwhite v. Texas*, 486 U.S. 249, 258-59 (1988).

*Chapman*'s harmless-error analysis is not, as the government claims, basically a probable-cause test. (*See* RB-102) (citing *United States v. Byrd*, 765 F.2d 1524 (11th Cir. 1985)). *Chapman* does not put the Government in that "virtually risk-free" position. *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991). Indeed, the Supreme Court explicitly "rejected" "the much more lenient rule" that "would allow affirmance . . . if the evidence other than the [erroneously admitted evidence] was *sufficient* to sustain the verdict." *Id.* (emphasis added).

Rather than addressing the effect of presenting more tainted than untainted witnesses on the grand jury's decision, the government centers on the "clean" case it says proves "probable cause" to indict. That presents two problems.

First, as shown (PB-14-19, 62-66), the government's case is nowhere near as "clean" as it claims. Rather than complying with DOJ *Kastigar* procedures designed to insulate its investigation from taint, the government weaponized Mr. Zahn's statement—using the termination letter that flowed from the statement, mining reports of investigators who relied on it, interviewing witnesses steeped in

36

it (including through widespread media coverage), and cribbing the indictment off it. Consequently, the *Kastigar* proceedings devolved into how the government *could have built a clean case*, not proving *the case it built was clean*—and wrongly shifting the burden to Mr. Zahn to prove otherwise. That, even now, the government attributes its discovery of key spreadsheets to "accident" (RB-96)— only after enlisting individuals exposed to Mr. Zahn's *Garrity* statement for the express purpose of finding evidence to make its case, (*see* PB-64)—belies a mostly-clean case.

Second, *Kastigar* tolerates zero taint. So considering that the government has conceded taint, the point that matters is that its "cleansed" version of the case is not what the grand jury heard. The entire case that the grand jury "actually" heard is the lens through which this Court conducts a *de novo* harmless-error review. *United States v. Schmidgall*, 25 F.3d 1533, 1536-37 (11th Cir. 1994). But the government never puts the tainted testimony from any—let alone all—the tainted witnesses in the context of the entire grand-jury presentation to explain the effect the tainted testimony had on the grand jury's decision.

Nor could it. The government presented each of its witnesses for a material reason. But faced with building a case after Mr. Zahn's *Garrity* statement was weaponized, it failed to ensure they could separate their memories of what they saw and heard in real-time from their hindsight impressions of the same events

after learning—from the statement and its fruits—███████████████

███. That showing—████████████████████████—was the lynchpin of

the government's case.

Indeed, the record defies concluding that there is no reasonable possibility

the tainted witnesses' testimony affected the decision to indict. Rather, it shows

that the taint was not merely theoretical or "ostensibl[e]." (RB-91). For example,

the district court ruled that one of the tainted grand-jury witnesses (Mr. Derkach)

could not repeat portions of his grand-jury testimony at trial precisely because it

was tainted by Mr. Zahn's *Garrity* statement. And the taint did not go to an

ancillary issue. It went to the central issue ███████████, including ███████

██████████████. (*Compare* ECF-407 at 9-10, 16 (limiting tainted

proffered trial testimony of Anton Derkach), *with* ECF-315 at 65 (quoting

Derkach's tainted grand jury testimony)). That Mr. Zahn's grand jury heard this

pivotal tainted testimony, alone, forecloses the government from establishing its

*Kastigar* violation was harmless beyond a reasonable doubt.

But there is more. This very issue—whether and how significantly exposure

to Mr. Zahn's *Garrity* statements tainted the grand-jury witnesses' hindsight views

of central events—plagued the case. For example, Ms. Flanagan, testified at the

*Kastigar* hearing to fearing she could not separate the wheat from the chaff. (*See*

ECF-272 at 162-70). Perhaps spotting the same problem with all its grand-jury

38

witnesses, (*see* ECF-299-3) (documenting taint of the *Kastigar* witnesses)), the government failed to make most of them available for *Kastigar* vetting.

So there is no record against which to measure the depth of the unvetted witnesses' taint. For each witness, does exposure to Mr. Zahn's *Garrity* statement reach one line of grand-jury testimony or color the entire exchange? How important is the tainted testimony, both individually and collectively, to the case the government asked the grand jury to accept? Having failed to make the necessary record, the government couldn't say and thus didn't meet its burden to prove there is no reasonable possibility that building a case on the testimony of mostly tainted witnesses affected the decision to indict.

Here, the government doesn't attempt the necessary showing. The closest it comes—through its parry that the Court can read the transcripts of the tainted grand-jury witnesses' testimony and conclude they testified about events they witnessed before Mr. Zahn gave his *Garrity* statement—cannot save the indictment. (*See* RB-98-99). It is not as if the government's witnesses went on record *before* Mr. Zahn gave his *Garrity* statement. Rather, the government secured their testimony *after* they were tainted by Mr. Zahn's *Garrity* statement— which was why Mr. Derkach could not repeat his tainted grand-jury testimony at trial. *Compare Schmidgall*, 25 F.3d at 1537 (emphasizing that the government had "reli[ed] on information gathered prior to the taking of immunized testimony"),

*with United States v. Hampton*, 775 F.2d 1479, 1490 (11th Cir. 1985) (explaining that where exposure … is widespread and predates most of the government's investigation, and the government fails to follow reliable procedures for walling off immunized material, its *Kastigar* burden is "virtually insurmountable").

Unable to prove harmlessness, the government urges the Court to do what the Supreme Court prohibits: reward its failures and let it keep an indictment it concedes is tainted simply because it is supported by "probable cause." Because that shortchanges the controlling constitutional standard, and because the error was not harmless under that standard, Mr. Zahn's convictions should be reversed.

B.    ***Kastigar* error in obtaining an indictment is structural error.**

The government's failure to prove its *Kastigar* error was harmless can decide this case. Even so, *Kastigar* error in securing an indictment cannot be harmless. *Kastigar* held that the Fifth Amendment forecloses the government from using compelled testimony "in any respect." Where, as here, the *Kastigar* violation taints the indictment, the constitutional error is not "trial error" susceptible to harmless-error review. *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991).

The government has no answer on the merits. It argues only that prior panel decisions preclude reaching those merits.

True enough, prior panels have affirmed tainted indictments after finding harmless error. (*See* RB-92 (collecting cases)). But those decisions largely predate

40

*Fulminante*. And none appears to have considered, much less reasoned, why—under *Kastigar*'s blanket proscription against using immunized testimony *in any respect* and *Fulminante*'s limitation of harmless-error analysis to *trial* error—a tainted indictment can ever be harmless beyond a reasonable doubt.

Rather, as shown (PB-69-70), prior decisions holding that *Kastigar* errors were harmless pronounced results; they did not reason why the harmless-error rule categorically applies. Declaring a result without reasoning to the conclusion is an assumption; a holding, in contrast, requires both result and reason. *See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019). Where reason is concerned, the government offers none to defend subjecting tainted indictments to harmlessness review post-*Fulminante*.

## CONCLUSION

The government brought a shopping list rather than a recipe: hypothetical money it couldn't bake into a "property interest," a wire transmission it couldn't blend into its scheme, and an indictment suffused in taint it can't extract. Those failures are on the government for rushing into a local furore, with no federal reason for being out front and cutting every corner to get there. This Court should reverse and remand for a judgment of acquittal, dismissal, or new trial, depending on the rationale.

Dated: November 17, 2025        Respectfully submitted,

By:    */s/ Samuel J. Salario, Jr.*
       PAUL C. HUCK, JR.
       SAMUEL J. SALARIO, JR.
       JESSICA SLATTEN
       ROBERT E. MINCHIN III
       LAWSON HUCK GONZALEZ, PLLC
       1700 South MacDill Avenue
       Suite 240
       Tampa, FL 33629
       (850) 825-4334
       paul@lawsonhuckgonzalez.com
       samuel@lawsonhuckgonzalez.com
       jessica@lawsonhuckgonzalez.com
       bob@lawsonhuckgonzalez.com
       michelle@lawsonhuckgonzalez.com

       *Counsel for Aaron Zahn*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation set forth in the Court's Order Granting Appellant's Motion to File his Reply Brief with Excess Words (Doc. 52) because it contains 9,979. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: November 17, 2025                    By:    <u>*/s/ Samuel J. Salario, Jr.*</u>

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2025 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I further certify an electronic copy of the unredacted version of this brief has been filed under seal with the Court and has been served by email on counsel for the government.

By:    */s/ Samuel J. Salario, Jr.*